IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br><br>                    Plaintiff,<br><br>     vs.<br><br>CITY OF NEWTON, IOWA; and ROB BURDESS, NATHAN WINTERS, and CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br><br>                    Defendants.<br>_____<br><br>NATHAN WINTERS and CHRISTOPHER WING,<br><br>                    Counterclaim Plaintiffs,<br><br>     vs.<br><br>TAYVIN GALANAKIS,<br><br>                    Counterclaim Defendant. | 4:23-cv-00044-SHL-SBJ<br><br><br><br><br><br><br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COUNTERCLAIMS** |

## I.    INTRODUCTION.

Defendants Nathan Winters and Christopher Wing, both police officers with the City of Newton, Iowa, assert counterclaims against Plaintiff Tayvin Galanakis for defamation and under related theories based on Galanakis's social media posts about an encounter with Winters and Wing in August 2022. Galanakis moves to dismiss, arguing that his social media statements are substantially true and/or otherwise not actionable. The Court agrees that most of his statements are not actionable in defamation or under other theories, but also concludes that a few statements are sufficiently grounded in fact to state plausible claims for defamation and false-light invasion of privacy. The Court therefore GRANTS IN PART WITHOUT PREJUDICE and DENIES IN PART Galanakis's Motion to Dismiss Counterclaims.

## II.     FACTUAL AND PROCEDURAL BACKGROUND.

Winters and Wing are police officers with the Newton Police Department. (ECF 1-1, ¶¶ 4–5.) Galanakis alleges that they unlawfully arrested him without reasonable suspicion or probable cause in the early morning hours of August 28, 2022. (Id., ¶¶ 9–54.) Galanakis brings claims against Winters and Wing under 42 U.S.C. § 1983; article I, section 8 of the Iowa Constitution; and Iowa common law. (Id., ¶¶ 55–76, 93–102.) He also brings claims against the City of Newton and Chief of Police. (Id., ¶¶ 77–92, 103–116.)

Winters and Wing filed counterclaims against Galanakis. (ECF 3.) They allege that Galanakis published "written and oral defamatory statements, making false complaints, and intentionally inflicting emotional distress" upon them. (Id., ¶ 9.) They allege that the defamatory statements were made online on YouTube, Facebook, GoFundMe, and TikTok. (Id., ¶ 12.) Each of Winters and Wing brings claims for defamation (Counts I and II); violations of Iowa Code § 80F.13 (Counts III and IV); intentional infliction of emotional distress (Counts V and VI); and invasion of privacy (Counts VII and VIII).

Winters's counterclaims arise out of four categories of statements allegedly made by Galanakis, including, <u>first</u>, statements that Winters committed acts of domestic abuse. These statements included the following comments or captions on YouTube videos:

- "NATHAN WINTER OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX GIRLFRIEND." (Id., ¶ 12.a);

- "EVEN AFTER NATHAN BEAT THE SHIT OUT HIS EX GIRLFRIEND." (Id., ¶ 12.b); and

- "NATHAN WINTERS OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING OF HIS EX GIRLFRIEND THE CHIEF OF POLICE ALLOWED NATHAN WINTERS TO STAY ON THE FORCE EVEN AFTER NATHAN BEAT THE SHIT OUT HIS GIRLFRIEND." (Id., ¶ 12.r.)

In addition, Galanakis allegedly placed a caption on a TikTok video stating: "Newton PD arrests citizen talking about Nathan Winters domestic abuse history." (Id., ¶ 12.m.)

<u>Second</u>, Galanakis made statements accusing Winters of "sexual harassment" during their encounter on August 28, 2022. These statements arose out of an alleged portion of the encounter where Galanakis told Winters he was not under the influence of alcohol and asked, in reference to a breathalyzer, "you want to blow me?" (ECF 4-1, p. 8.) According to Galanakis, Winters responded with a crude sexual comment. (Id.) Galanakis posted about the comment several times

on Facebook in reference to video from the encounter, including: "they didn't show the clip of Nathan sexually harassing me" (ECF 3, ¶ 12.c); "keep my mouth shut and let the police officer harass me while I sit there in despair" (id., ¶ 12.e); "Then he [Officer Winters] continued to harass me about how sure he was that I was drunk. Then I go you can blow me right now and it will say 0, then he made a sexual joke about what I was knowing I was talking about the breathalyzer" (id., ¶ 12.i); and "PD definitely played apart in making KCCI censor. Literally gave them the clip of winters sexually harassing me" (id., ¶ 12.j). Galanakis also posted a comment on YouTube stating: "Winters ma[de] a sexual joke knowing I mean the breathalyzer." (Id., ¶ 12.p.)

Third, Galanakis made statements that Winters interprets as being directed toward Winters's competence, including the following Facebook statements:

- "I got falsely ARRESTED. Nathan Winters of the Newton Police Department, IA decided to assume and guess I was drinking based off of me having a hard time finding my insurance. I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum." (Id., ¶ 12.d.);

- "He [Officer Winters] sounded like a little kid who was roll playing a cop during recess. I'm thinking in my head no way this guy pass training." (Id., ¶ 12.f.);

- "Officer Winters is not fit mentally for the job and physically." (Id., ¶ 12.g); and

- "Wing and Winters performed horribly that night and that's just something the chief should not let slide. I'm not asking for winters to get fired, as he seems to be slightly mental and that would be just unfair to fire him based on something he can't help." (Id., ¶ 12.h.)

Winters alleges that Galanakis posted similar statements about Winters's competence on other social media, including: "For everyone wondering, Winters did not get punished and has been working till this day. Let's make sure this guy never walks around any community with a gun again!" (id., ¶ 12.k (GoFundMe)); "Hear these mfs mocking me, lmao little did they know" (id., ¶ 12.o (TikTok)); "Wing and Winters look at each other and laugh in mockery" (id., ¶ 12.q (YouTube)).

Fourth, and finally, Galanakis made two other statements on TikTok that Winters characterizes as defamatory but do not fall neatly into the other three categories, including: "Cop says 'never wanted to throat punch someone so hard in my life' during my stop;" and "basically I got kidnapped then raped by the NPD all night." (Id., ¶¶ 12.l, 12.n.) As with Galanakis's other

statements, these two statements appear to have been made in reference to video from his encounter with police on August 28, 2022.

Wing's counterclaims arise out of several of the same statements, as well as four others: a statement on Facebook that Winters's "boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a woman" (id., ¶ 35.b); a caption to a TikTok video showing the August 28 encounter with the caption "Here comes LT Wing input, dude sounds like he's faded as!" (id., ¶ 35.d); and two comments attached to a YouTube video of the encounter: "Nathan Winters and LT Wing of The Newton Police department falsely arrested teen in Newton Iowa" and "So basically I got kidnapped then raped by the NPD all night" (id., ¶¶ 35.f, 35.h).

## III. LEGAL STANDARDS AND PRINCIPLES ON MOTIONS TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6).

When ruling on a motion to dismiss, the Court must "accept the well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Meardon v. Register*, 994 F.3d 927, 934 (8th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court may draw on its "judicial experience and common sense" in evaluating plausibility. *Id*. at 679. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

At the outset, Winters and Wing ask the Court to deny Galanakis's Motion to Dismiss in its entirety without considering the merits because their counterclaims simply provide "examples" of defamatory statements but did not purport to include every such statement. They argue that this is enough to satisfy the requirement of Fed. R. Civ. P. 8(a)(2) to provide a "short and plain statement of the claim," and that they are entitled to discovery to flesh out their claims further.[1]

---

[1] Winters and Wing support their position, in part, by citing to *Conley v. Gibson*, 355 U.S. 41, 47 (1957). (ECF 9-1, p. 8.) *Conley* was abrogated sixteen years ago by *Twombly*, 550 U.S. at 562–63. Winters and Wing also cite the Iowa Rules of Civil Procedure and Iowa state court cases for the governing pleading standards. This, too, is misguided. The Iowa Rules of Civil Procedure do not apply in federal court, and federal pleading standards are more onerous than those applicable in state court. *See Hawkeye Foodservice Dist., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 607–08 (Iowa 2012) (discussing the difference between state and federal pleading standards and refusing to adopt the federal "plausibility" standard).

These arguments misunderstand federal pleading standards. In a defamation claim, the plaintiff generally must identify the allegedly defamatory statements to state a plausible claim for relief. *See, e.g.*, *Jang v. Trs. of St. Johnsbury Academy*, 771 F. App'x 86, 87–88 (2d Cir. 2019) (affirming grant of motion to dismiss where the plaintiff "failed . . . to identify specific false and defamatory statements"); *Porter v. Hennepin Cnty.*, Civil No. 06-3142 (JRT/FLN), 2006 WL 3841540, at *3 (D. Minn. Dec. 29, 2006) (dismissing pleading for "fail[ure] to identify the specific statements that give rise to the defamation claim"). The failure to identify allegedly defamatory statements, or to whom they were made, or when, "is a clear example of what the Supreme Court was addressing when it issued its opinion in [*Twombly*]" requiring plaintiffs to provide sufficient facts to state a "plausible" claim for relief. *Mills v. Crowe*, 4:08-CV-1850, 2010 WL 624011, at *6 (E.D. Mo. Feb. 18, 2010); *see also Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) (affirming dismissal for failure to state claim where plaintiff did not identify who made the allegedly false statements, where they were made, or to whom), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). These cases establish that Winters and Wing cannot survive a motion to dismiss by relying on unidentified statements that were not included in their pleading. Instead, the viability of their counterclaims revolves around the statements they <u>did</u> identify.

This leads to a related question about what the Court should consider when ruling on Galanakis's Motion to Dismiss. It is well established that the Court may consider materials outside the pleadings that are "necessarily embraced by the complaint." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). This includes videos. *See Herron v. E.W. Scripps Co.*, 776 F. App'x 929, 930 n.2 (8th Cir. 2019) (per curiam) (considering video as part of ruling on motion to dismiss false-light claim); *see also Anderson v. St. Luke's Hospital*, No. 19-cv-106 (MJD/LIB), 2019 WL 7882118, at *3 n.5 (D. Minn. Nov. 19, 2019) (collecting cases where district courts considered videos as part of ruling on motions to dismiss). "In a defamation case, where the published material is central to a plaintiff's allegations, courts routinely look outside the four corners of the complaint to view the entire publication." *Financial Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 664 (7th Cir. 2022).

The application of these well-established principles is complicated here. Winters's and Wing's counterclaims allege that Galanakis made defamatory statements as part of videos posted on YouTube and TikTok, among other places. Accordingly, in his Motion to Dismiss, Galanakis

provided links to those videos to help provide the context the Court must consider when ruling on the legal sufficiency of Winters's and Wing's claims under Fed. R. Civ. P. 12(b)(6). The Court has reviewed the videos at the links provided by Galanakis and found them to contain every statement, verbatim, identified in Winters's and Wing's counterclaims as having been made by Galanakis on the YouTube and TikTok platforms. Furthermore—and, again, consistent with the allegations in the counterclaims—most of the statements appear as overlays or captions to body camera footage from Galanakis's encounter with Winters and Wing on August 28, 2022. In other words, the videos (and corresponding statements) appear to be exactly what Winters and Wing are complaining about in their counterclaims. Nonetheless, Winters and Wing refuse to concede the authenticity of the videos, although their counsel admitted at oral argument that he had no reason to believe the videos had been modified from the form that gave rise to their claims in the first place.

By refusing to concede authenticity, Winters and Wing are trying to take advantage of Eighth Circuit caselaw limiting the Court's ability to consider matters outside the pleadings to materials "whose authenticity no party questions." *Ashanti*, 666 F.3d at 1151 (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)). This effort is misguided. The limitation on considering matters outside the pleadings is meant for good faith disputes as to authenticity, not as an opportunity for gamesmanship to keep courts from reaching the merits of a dispute on a motion to dismiss. *See Hannan v. Rose*, 2020 WL 3965341, at *13 (S.D.N.Y. Feb. 28, 2020) ("If there is a *legitimate* dispute regarding the authenticity of a document, then it may not serve as the basis for dismissal.") (emphasis added).

There is no good faith dispute here. Winters and Wing allege that Galanakis defamed them, in part, through statements on YouTube and TikTok videos. Galanakis provided links to those videos, which contain exactly the statements Winters and Wing accuse him of having made in exactly the context implied in their counterclaims. Winters and Wing do not identify anything about the videos that they claim has been edited or doctored since they filed their counterclaims; instead, it seems clear that their refusal to concede authenticity is simply meant as a roadblock to prevent the Court from reaching the merits. This is improper. *See Six v. Generations Fed. Credit Union*, 891 F.3d 508, 519 (4th Cir. 2018) ("When a litigant contests the authenticity of a document, the litigant must have a good faith basis for the objection; a litigant cannot challenge or deny the authenticity of a written agreement that he knows to be authentic." (citing *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003))).  Given counsel's concession at oral argument that he was

unaware of any changes to the videos in the links provided by Galanakis, the Court will consider those videos when ruling on the motion to dismiss.

Granted, Winters and Wing are also making a separate argument: that Galanakis edited the body camera footage before posting his videos on YouTube and TikTok in the first place. On this point, Winters and Wing are correct. The videos clearly were edited to include commentary in the form of text overlays or captions. In addition, certain segments of the videos were sped up (presumably to help hold the viewer's attention), and there are places where the videos are interspliced with "flashbacks" to footage from earlier in the encounter. These edits are not, however, a reason for the Court not to consider the videos when ruling on the motion to dismiss. To the contrary, the fact that the footage was edited before being placed on YouTube and TikTok is exactly why the Court *should* consider the videos as part of the evaluating the motion to dismiss. The videos, as edited, are what third parties see, and thus those videos contain the context the Court must consider when evaluating whether Winters and Wing have stated plausible claims for relief. *See Gannett Co.*, 46 F.4th at 664.

## IV.    LEGAL AND FACTUAL ANALYSIS – DEFAMATION.

### A.  *Legal Background.*

"Generally speaking, defamation is the publication of false statements of fact which tend to harm an individual's reputation." *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021). To prove a defamation claim, "a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996). "Publication is an essential element of defamation and simply means a communication of statements to one or more third persons." *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). "Statements that cannot be reasonably interpreted as stating actual facts about a person are not actionable as defamation." *Bauer*, 958 N.W.2d at 198. "Thus, speech that is considered 'rhetorical hyperbole' and 'vigorous epithet' are nonactionable as defamation." *Id.* "Whether a statement is capable of a defamatory meaning is a question for the court." *Id.*

Courts applying Iowa law must consider four factors in deciding whether a statement is an actionable statement of fact or protected opinion. <u>One</u>: "whether the alleged defamatory statement 'has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous.'" *Yates v. W. Iowa Racing Ass'n*, 721 N.W.2d 762, 770 (Iowa 2006) (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)). <u>Two</u>: "the

degree to which the alleged defamatory statements are objectively capable of proof or disproof." *Id.* (cleaned up) (quoting *Ollman*, 750 F.2d at 981). Three: "the context in which the alleged defamatory statement occurs." *Id.* Four: "the broader social context into which the alleged defamatory statement fits." *Id.* (cleaned up) (quoting *Ollman*, 750 F.2d at 983). "Whether a listener understands a statement to be defamatory requires viewing the statements 'in the context of the surrounding circumstances and within the entire communication.'" *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018) (quoting *Huegerich*, 547 N.W.2d at 221).

> **B.  *Winters Has Stated a Plausible Claim for Defamation on Five of the Eighteen Statements Identified in His Counterclaims.***

Winters's counterclaims identify eighteen allegedly defamatory statements made by Galanakis, falling roughly into the following categories: (i) four statements relating to alleged domestic abuse; (ii) five statements regarding alleged harassment or sexual harassment; (iii) seven statements regarding Winters's fitness for his job; and (iv) two miscellaneous statements about Galanakis being "kidnapped and raped" and Winters wanting to "throat punch" Galanakis. For present purposes, Galanakis does not dispute that Winters has alleged "publication" of these statements or that they were "of and concerning Winters." The viability of the statements therefore revolves around whether they are capable of defamatory meaning. *See Taggart*, 549 N.W.2d at 802 (reciting elements of defamation). It bears repeating that this is a question of law for the Court to decide. *Bauer*, 958 N.W.2d at 198.

**Statements regarding alleged domestic abuse.** Three of the four statements regarding alleged domestic abuse are actionable in defamation, including those stating that Winters was "convicted" of domestic abuse and "beat the shit out" of his ex-girlfriend. (ECF 3, ¶¶ 12.a, 12.b, 12.r.). Assuming (as the Court must for present purposes), that these statements are false, they are capable of defamatory meaning after applying the four factors set forth in *Yates v. Iowa West Racing Ass'n*.

A statement that someone has been "convicted" of an offense has a "precise core of meaning for which a consensus of understanding exists." Which is to say, a reasonable listener would understand the statement to mean that Winters was adjudicated guilty of domestic abuse in a criminal proceeding. *See Bauer*, 958 N.W.2d at 199 ("An example of a defamatory statement that is capable of precise meaning and easily verifiable is an accusation that a person committed a crime."). Similarly, statements that Winters "beat the shit out" of his ex-girlfriend would be understood by a reasonable listener to mean that Winters used force against her and caused injuries.

*See, e.g.*, *Hooser v. Anderson*, No. A14-1055, 2015 WL 1959898, at \*4–6 (Minn. Ct. App. May 4, 2015) (affirming jury verdict based, in part, on defendant's allegedly defamatory statement about whether someone "beat him up"). Statements like these are "objectively capable of proof or disproof" because, *inter alia*, whether someone was convicted of a crime or caused injury through force are matters of fact, not opinion. *See Yates*, 721 N.W.2d at 773 ("Clearly, an accusation of a crime is laden with factual content and the facts are easily verifiable.").

The "context in which the alleged defamatory statement occurs" and "broader social context" reinforce why statements about Winters being "convicted of domestic abuse" or "beating" his ex-girlfriend are actionable in defamation. The allegations of the counterclaims make clear, particularly when viewed in conjunction with the YouTube and TikTok videos themselves, that Galanakis's goal was to portray Winters negatively to a broad audience on social media. This is the kind of context in which defamation may occur. *See Bauer*, 958 N.W.2d at 200 (recognizing that social media sites are an important source of factual information and may give rise to defamation claims); *see also Yates*, 721 N.W.2d at 770 (requiring courts to consider, *inter alia*, the "category of publication, its style of writing and intended audience") (quoting *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891–82 (Iowa 1989), *disapproved of on other grounds by Schlegel v. Ottumwa Courier, a Div. of Lee Enters., Inc.*, 585 N.W.2d 217 (Iowa 1998)).

In arguing for dismissal of the counterclaims, Galanakis relies on a protective order entered against Winters in the Iowa District Court for Jasper County in August 2021 and extended on at least three subsequent occasions between October 1, 2021, and February 22, 2023. (ECF 5-2.) Galanakis argues that a protective order is close enough under Iowa law to a "conviction" to make his allegations about domestic abuse "substantially true," particularly given that Iowa Code § 236.4(2) requires, at minimum, a "[p]resent danger of domestic abuse" before such an order may be entered. Similarly, Galanakis argues that the "gist" of his statements about Winters were accurate even if he used imprecise legal terminology.

The Court disagrees. "As a general proposition, society views a criminal conviction much differently than a civil judgment." *Cate St. Cap. Inc. v. Indus. Intel. Inc.*, No. 1:14-CV-00200-JCN, 2015 WL 12564165, at \*4 (D. Me. Oct. 28, 2015). This is because, *inter alia*, criminal convictions involve a heightened burden of proof, can give rise to serious forms of punishment up to and including incarceration, and cannot be obtained without the defendant first being afforded a panoply of constitutional rights that are not present to anywhere near the same degree in a civil

case. "The law thus recognizes that the 'sting' of a false report regarding a person's mere involvement in criminal proceedings is significant and differs in kind from the 'sting' of an assertion that a person was involved in some other legal proceedings." *Id.* at *5. Or, to state it differently: labeling Winters as a "convicted" domestic abuser who "beat" his ex-girlfriend is more likely to bring public scorn than saying he was an "alleged" domestic abuser who "presented a danger" to his ex-girlfriend. Both are troubling, to be sure, but the former is more definitive than the latter. In analogous circumstances, New York's highest court explained, in logic that applies here, that a statement that someone was "under indictment" could be defamatory when the person was merely under investigation:

> It is one thing to say that a person has been accused by his colleagues and, without waiving immunity, has testified before a grand jury to criminal activities, and quite another thing to say that an indictment has been brought against him by a grand jury. (See *Jones, Varnum & Co. v. Townsend's Administratrix, supra,* 21 Fla. 431, 440.) The former charge may be a serious blot upon reputation, but the latter says, in a practical and amoral sense, much more, for it announces that an actual criminal prosecution has been brought against him, that he must stand trial and may be found guilty and sentenced to a prison term.

*Crane v. New York World Telegram Corp.*, 126 N.E.2d 753, 757 (N.Y. 1955). Taking the next step and claiming the person was "convicted" is even worse.

　　To support his argument that the term "conviction" has an equivocal meaning, Galanakis relies on *State v. Hanna*, which analyzed the meaning of that term in the context of liquor license laws. 179 N.W.2d 503, 507 (Iowa 1970). The holding of *Hanna* is too narrow to support Galanakis's position. The Iowa Supreme Court held that the word "convicted" as used in a statute dealing with revocation of liquor licenses was broad enough to cover situations in which someone had been found guilty by a jury but was awaiting judgment. *Id.* at 508. *Hanna* explained that the word "conviction" is commonly understood "to signify merely an ascertainment of guilt by the trial court and not as requiring an entry of judgment thereon." *Id.* As applied here, *Hanna* would help Galanakis if Winters had been found guilty of criminal domestic abuse following jury trial or via guilty plea but was still awaiting final judgment. As it is, however, neither of these things happened. Indeed, Winters apparently has not been charged criminally at all. *Hanna* therefore does not mean Galanakis's statements are "substantially true."

　　Cases from other jurisdictions recognize that statements about a person having been "convicted" or otherwise involved in a "criminal" case can have defamatory meaning when there

have only been civil, administrative, or investigative proceedings. In *St. Surin v. Virgin Islands Daily News, Inc.*, for example, the Third Circuit held that a newspaper article reporting that a "prosecutor" was expected to bring "charges" against someone was capable of defamatory meaning when the subject was only under investigation for possible civil regulatory sanctions. 21 F.3d 1309, 1317–18. "Public knowledge that one is the subject of an administrative investigation does not harm one's reputation as much as public knowledge that one is about to be charged with a crime." *Id.* at 1317; *see also Crane,* 126 N.E.2d at 757, (holding that statement about plaintiff being "under indictment" was actionable in defamation even if he had in fact been accused of the crimes by private parties and was guilty of them).

Similarly, but even more directly on point, the District of Maine held in *Cate Street Capital Inc. v. Industry Intelligence Inc.* that a statement that a person had been "convicted of cheating a former partner out of $1.0 million" was capable of defamatory meaning where the person merely had been held liable in a civil case for breach of contract and fraud. 2015 WL 12564165, at *4–6. *Cate St. Cap. Inc.* concluded that the "average reader would understand and appreciate that use of the term 'convicted' suggests criminal, as opposed to civil, responsibility." *Id.* at *5. The court therefore denied the defendants' motion for summary judgment. *Id.* at *6; *see also McGarry v. CBS, Inc.*, No. CIV. A. 91-4638, 1991 WL 280247, at *1–2 (E.D. Pa. Dec. 23, 1991) (holding that statement about plaintiff having been "convicted" of theft was not "substantially true" where plaintiff merely agreed to enter a pretrial diversion program, "which does not involve an adjudication of guilt or innocence"). For the same reasons, the Court denies Galanakis's Motion to Dismiss as it relates to the statements about Winters having been "convicted" of domestic abuse.

The outcome is the same for Galanakis's statements about Winters having "beat the shit out" of his ex-girlfriend. A reasonable person would interpret those statements to mean Winters caused pain or injury to his ex-girlfriend through physical contact. Under Iowa law, however, a protective order may be entered when a person commits "[a]ny act which is intended to place another *in fear of* immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act." Iowa Code § 708.1 (defining assault) (emphasis added); *see also* Iowa Code § 236.2 ("'*Domestic abuse*' means committing assault as defined in section 708.1 . . . ."). It follows that the entry of the protective order against Winters does not *per se* mean a judge found him to have caused pain or injury to the protected party through physical contact. Galanakis's statements (which the Court must assume for present

11

purposes were false) are therefore capable of defamatory meaning. *See, e.g.*, *McFarland v. McFarland*, 684 F. Supp. 2d 1073, 1087 (N.D. Iowa 2010) (denying motion to dismiss where defendants allegedly published statements accusing plaintiff of, *inter alia*, domestic abuse assault).

Only one of Galanakis's statements about domestic abuse is not actionable as a matter of law: the caption on a TikTok video stating, "Newton PD arrests citizen talking about Nathan Winters domestic abuse history." (ECF 3, ¶ 12.m.) Given the public records showing that a protective order was entered (and later extended three times) against Winters pursuant to Iowa Code § 236.4(2), it is not inaccurate to say he has a "domestic abuse history." In fact, courts sometimes use similar terminology when discussing people subject to protective orders. *See, e.g.*, *United States v. Meade*, 175 F.3d 215, 226 (1st Cir. 1999) (describing the "dangerous propensities of persons with a history of domestic abuse" when discussing federal statute prohibiting firearm possession by people subject to protective orders). The TikTok caption therefore is not capable of defamatory meaning in and of itself, nor has Winters alleged sufficient surrounding context to state a plausible claim for relief under defamation law.

**Statements about "harassment" and "sexual harassment."** In contrast to the statements about domestic abuse, most of which are capable of defamatory meaning, the Court concludes as a matter of law that Galanakis's statements accusing Winters of "harassment" or "sexual harassment" are not actionable as defamation. The statements emanate from dialogue between Winters and Galanakis in Winters's police car relatively early in their encounter on August 28, 2022. The relevant portion of their discussion is reflected in one of the YouTube videos posted by Galanakis and transcribed here:

| | |
|---|---|
| WINTERS: | How much have you had to drink tonight? |
| GALANAKIS: | None. |
| WINTERS: | What do you mean, none? |
| GALANAKIS: | I've had nothing to drink. |
| WINTERS: | Ok. Why would you, uh--why would your eyes be watery and bloodshot? |
| | ***[2] |
| GALANAKIS: | Do you want to blow me real quick? |

---

[2] At this point, the video is edited to include a brief "flashback" to footage of Galanakis's eyes as seen from Winters's body camera when Winters first walked up to Galanakis's vehicle.

| WINTERS: | No, I don't want to blow you (inaudible). We'll probably get there. Um-- |
| GALANAKIS: | That's funny-- |
| WINTERS: | --how old are you? |
| GALANAKIS: | Nineteen. |

(https://www.youtube.com/watch?v=so_bFYoIsow (last accessed May 3, 2003).)

As shown by his immediate reaction in the video, Galanakis interpreted Winters's statement, "No, I don't want to blow you," as a crude sexual joke. In later statements on Facebook and YouTube, as alleged by Winters, Galanakis characterized the comment as "harassment" or "sexual harassment," as follows: "they didn't show the clip of Nathan [Winters] sexually harassing me" (ECF 3, ¶ 12.c); "keep my mouth shut and let the police officer harass me while I sit there in despair" (id., ¶ 12.e); "Then he [Winters] continued to harass me about how sure he was that I was drunk. Then I go you can blow me right now and it will say 0, then he made a sexual joke about what I was knowing I was talking about the breathalyzer" (id., ¶ 12.i); and "PD definitely played apart in making KCCI censor. Literally gave them the clip of winters sexually harassing me" (id., ¶ 12.j); and "Winters ma[de] a sexual joke knowing I mean the breathalyzer" (Id., ¶ 12.p). Winters alleges that these statements are capable of defamatory meaning.

The Court disagrees, for at least two reasons. <u>First</u>, the question of what constitutes "sexual harassment" is not capable of precise meaning and verification in the circumstances presented here. The Iowa Supreme Court has held, for example, that "sexual harassment" has a different meaning in the Iowa Rules of Professional Conduct than it does under state and federal employment laws. *See State v. Watkins*, 914 N.W.2d 827, 842–44 (Iowa 2018). In any of those settings, crude sexual comments can contribute toward the conclusion that sexual harassment occurred. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 612–13 (Iowa 2015) (concluding that attorney violated professional rule prohibiting sexual harassment by, *inter alia*, making crude sexual comments to a client). Thus, although it is unlikely that Winters's isolated statement would be enough, standing alone, to constitute "sexual harassment" in any formal legal sense, Galanakis's references to "sexual harassment" are nonetheless not the type of fact-laden statements that can be actionable in defamation. *See Bandstra*, 913 N.W.2d at 48–49 (statement that "[unless] he was holding a knife to her throat, it wasn't rape" was not capable of defamatory meaning due to lack of consensus of understanding as to definition of "rape"). Instead, they are non-actionable statements of opinion arising out of the undisputed fact that Winters made

a comment perceived by Galanakis as a crude sexual joke. *See Yates*, 721 N.W.2d at 773 (holding that statement of opinion based on an undisputed fact is not capable of defamatory meaning).

The words "harass" and "harassment" are even less capable of defamatory meaning than the phrase "*sexual* harassment." One of the definitions of "harass" is: "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct." *Harass*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/harass (last accessed May 8, 2023). In context, the allegations in Winters's counterclaims show that Galanakis was expressing his opinion that he was "harassed" by Winters during the extended stop on August 28, 2022, including (but not limited to) when Winters made what Galanakis interpreted as a crude sexual joke. Absent further context beyond what is alleged in Winters's counterclaims, there is no way a reasonable listener could interpret Galanakis's statements about "harassment" as the type of factual statement that would be actionable in defamation. *See, e.g., Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 492 (Iowa 2021) (granting judgment as matter of law for defendant in defamation case because statement that doctor was prescribing "excessive" medication was not one "for which a consensus of understanding exists").

<u>Second</u>, and relatedly, the counterclaims acknowledge—and the videos confirm—that Galanakis made extensive video footage from his encounter with Winters available on YouTube and TikTok. Viewers therefore had the opportunity to see for themselves what Winters said and did. With this context in mind, it would be even harder for a listener to interpret Galanakis's statements as anything other than his opinion or "rhetorical hyperbole" about what happened during the encounter. The Iowa Supreme Court addressed an analogous issue in *Bauer v. Brinkman*, concluding that a social media post calling an apartment owner a "slumlord" was not capable of defamatory meaning when viewed in the surrounding social media context even though there may be some uses of "slumlord" that are capable of precise meaning and verification. 958 N.W.2d at 199–202. The same logic governs here and compels the Court to conclude as a matter of law that Galanakis's statements about "harassment" and "sexual harassment" are not actionable in defamation absent further factual context beyond what is currently pled. *See, e.g., Liu v. Northwestern Univ.* 78 F. Supp. 3d 839, 850–51 (N.D. Ill. 2015) (dismissing defamation claim where plaintiff failed to allege sufficient context to give comments plausible defamatory meaning).

**Statements about Winters's fitness for his job.** For similar reasons, the Court concludes that Winters has not stated a plausible claim for defamation as to several of Galanakis's statements

about Winters's fitness for his job, including: "He [Winters] sounded like a little kid who was roll playing a cop during recess. I'm thinking in my head no way this guy pass training." (ECF 3, ¶ 12.f (Facebook)); "I'm not asking for winters to get fired, as he seems to be slightly mental and that would be just unfair to fire him based on something he can't help" (id., ¶ 12.h (Facebook)); "For everyone wondering, Winters did not get punished and has been working till this day. Let's make sure this guy never walks around any community with a gun again!" (id., ¶ 12.k (GoFundMe)); "Hear these mfs mocking me, lmao little did they know" (id., ¶ 12.o (TikTok)); and "Wing and Winters look at each other and laugh in mockery" (id., ¶ 12.q (YouTube)).

It is clear from the face of these alleged statements that they were not made in isolation. Instead, two of them were literally overlaid onto videos of Galankis's encounter with Winters (id., ¶¶ 12.o, 12.q) while two more—the statements about how Winters "sounded" (id., ¶ 12.f) and what he "seems to be," (id., ¶ 12.h)—were made in obvious reference to those videos. With this context in mind, and with Winters not having alleged any *other* context that plausibly points in a different direction, the Court concludes as a matter of law that Galanakis was either offering his own summary of what the videos showed or otherwise stating opinions and "rhetorical hyperbole." *See Bauer*, 958 N.W.2d at 201 (word choice and surrounding context can help "alert" reader that statement is mere opinion). The statements are therefore akin to what Iowa courts have found in analogous circumstances not to be capable of defamatory meaning. In *Yates,* for example, the Iowa Supreme Court held that a statement describing a dog kennel as producing "substandard and poor performers" was not capable of defamatory meaning. *Yates*, 721 N.W.2d at 773. Likewise for a statement describing a doctor's standard of care as "incompetent," *Andrew*, 960 N.W.2d at 492, and a businessperson's statement that a competitor had "no ethics," *Cap. Ideas, LLC v. Springboard Advert. LLC*, No. 20-0296, 2021 WL 4592831, at *6 (Iowa Ct. App. Oct. 6, 2021). *See also Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding that a statement that a developer was "blackmailing" a city was not capable of defamatory meaning). The same conclusion is appropriate here as to the statements in counterclaim paragraphs 12.f, h, k, o, and q. They are not actionable in defamation as currently pled.

By contrast, the Court concludes that Winters has done just enough to state a plausible claim for relief as to the following Facebook statements: "I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum" (ECF 3, ¶ 12.d.); and "Officer Winters is not fit mentally for the job and physically" (id., ¶ 12.g). The Iowa Supreme Court has held that

statements about someone's capacity or fitness to perform a job are capable of defamatory meaning. *See, e.g.*, *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (imputation of substance abuse); *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115–16 (Iowa 1984) (accusations of falsifying information). As the Facebook statements in paragraphs 12.d and g address Winters's capacity to perform his job, and as it is not clear on the face of the statements or from surrounding context that the statements are mere matters of opinion, the Court cannot conclude as a matter of law that the statements are not actionable.

The parties should not read too much into this conclusion. The statements in paragraphs 12.d and g are both alleged to have been made on Facebook. Unlike the TikTok and YouTube videos, both of which the Court reviewed via links provided by Galanakis, the Court has not been given a link to the Facebook posts and therefore cannot evaluate them in context. Moreover, while posts about what Galanakis was "thinking," how Winters "sounded," or what Winters "seems to be" (ECF 3, ¶¶ 12.f, 12.h) contain telltale verbal indicators of being statements of opinion, the statements in paragraphs 12.d and g do not, on their face, contain such obvious indicators. Instead, it is at least plausible that a viewer would understand them as statements of fact about Winters's intelligence. Following discovery, the Court presumably will have additional context that may very well show this is not the case, and Galanakis instead was simply offering his opinion about Winters's job performance. If so, the statements would not be capable of defamatory meaning. *See Bauer*, 958 N.W.2d at 201 (concluding that Facebook posts that could be interpreted as factual assertions when considered in isolation can become non-actionable statements of opinion once considered in the context of surrounding messages); *see also Andrews*, 960 N.W.2d at 492; *Cap. Ideas*, 2021 WL 4592831, at *6. As it currently stands, however, the Court does not have enough context to reach this conclusion as a matter of law. The Court therefore concludes that the statements in paragraphs 12.d and g are plausibly capable of defamatory meaning.

**Miscellaneous statements.** The last two statements identified in Winters's counterclaims are not actionable as a matter of law. As alleged in Winters's counterclaims, the first statement— "Cop says 'never wanted to throat punch someone so hard in my life' during my stop" (ECF 3, ¶ 12.l)—is so devoid of context that the Court cannot understand what would make it defamatory. In fact, Winters's counterclaims allege no facts indicating that the reference to "Cop" is even to *him*; by contrast, the TikTok link provided by Galanakis (ECF 5-1, p. 10, n. 6) seems to show that the "Cop" in question is someone else. Winters does not provide sufficient facts to plausibly claim

that he was defamed by Galanakis quoting someone else. Nor, for that matter, has Winters stated sufficient facts to state a plausible claim for defamation even if the reference to "Cop" *was* to him. *See, e.g.*, *Liu*, 78 F. Supp. 3d at 851 (dismissing for failure to state a claim where plaintiff failed to provide sufficient context to show that statement was capable of defamatory meaning).

Galanakis's statement that "basically I got kidnapped then raped by the NPD all night" (ECF 3, ¶ 12.n) is also not actionable in defamation, albeit for a different reason. The statement was made as a text overlay to a TikTok video showing excerpts from Galanakis's interactions with Winters on August 28, 2022. In context, the statement was obviously rhetorical hyperbole designed to reflect Galanakis's frustration at what he believes was mistreatment by Winters. *See Bauer*, 958 N.W.2d at 201 (holding that statements like "slumlord" and "PIECE OF SHIT" are not actionable in defamation because the "tone 'is pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage' thus alerting readers that the statements are expressions of personal judgment'" (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 32 (1990) (Brennan, J., dissenting))). As the video corresponding to the "kidnapped then raped" comment does not show any conduct that could be characterized as "rape" in any legal sense, no reasonable viewer could have interpreted the statement literally. It was instead a non-actionable—if distasteful—example of rhetorical hyperbole. *See id.*

**Summary**. As to most of the statements identified in his counterclaims, Winters has not alleged sufficient facts to allow a reasonable viewer to conclude that they are capable of defamatory meaning. The Court therefore GRANTS WITHOUT PREJUDICE Galanakis's Motion to Dismiss Count I as to all statements identified in paragraph 12 of the counterclaims except the statements in paragraphs 12.a, 12.b, 12.d, 12.g, and 12.r. As to those five statements, the Motion to Dismiss is DENIED.

*C.  Wing Has Not Stated a Plausible Claim for Defamation Except as to One Statement.*

Wing's counterclaims identify eight allegedly defamatory statements made by Galanakis, five of which overlap with the statements identified in Winters's counterclaims: "Wing and Winters performed horribly that night and that's just something the chief should not let slide . . . ." (ECF 3, ¶ 35.a); "basically I got kidnapped then raped by the NPD all night" (id., ¶ 35.c); "Hear these mfs mocking me, lmao little did they know" (id., ¶ 35.e); "Wing and Winters look at each other and laugh in mockery" (id., ¶ 35.g); and "So basically I got kidnapped then raped by the NPD all night" (id., ¶ 35.h). The Court concludes that these five statements are not actionable as

defamation in Wing's counterclaims for the same reasons most of them were not actionable as to Winters. For example, in context, the statements that Wing "performed horribly" and Galanakis was "kidnapped then raped" were clear expressions of opinion and rhetorical hyperbole. *See Bauer*, 958 N.W.2d at 201. As to the statements "Hear these mfs mocking me, lmao little did they know" and "Wing and Winters look at each other and laugh in mockery," they simply summarize what was happening in corresponding video footage. Wing does not explain how a reasonable listener could have construed these statements as "false," much less why they might have defamatory meaning. Wing therefore has failed to state a viable claim under Fed. R. Civ. P. 12(b)(6) with respect to these statements.

Wing also has not stated a viable claim with respect to the YouTube video caption stating, "Nathan Winters and LT Wing of The Newton Police department falsely arrested teen in Newton Iowa." (ECF 3, ¶ 35.f.) Whether Galanakis can satisfy each element of "false arrest" is something the Court (or a jury) will have to decide later. For now, however, it is clear from the video caption considered in context that Galanakis was expressing his *subjective belief* that it was a false arrest based on the fact that he was detained but never charged with anything. For this reason, and because the statement is a caption on a video of the very encounter at issue, no reasonable listener could interpret it to have a defamatory meaning even if the Court (or jury) later concludes Galanakis has not satisfied the formal legal elements for "false arrest." It is instead a non-actionable statement of opinion. *See Bandstra*, 913 N.W.2d at 48–49 (holding as a matter of law that "you are not victims" and "[unless] he was holding a knife to her throat, it wasn't rape" were non-actionable statements of opinion); *Yates*, 721 N.W.2d at 773 (statements of opinion based on undisputed facts are not capable of defamatory meaning).

Galanakis's statement "[h]ere comes LT Wing input, dude sounds like he's faded as!" (ECF 3, ¶ 35.d) is also a non-actionable statement of opinion. Galanakis's use of the words "sounds like" is a clear signal that he was offering his interpretation of the video, rather than declaring as a fact that Wing was "faded" (whatever that means). *See Bauer*, 958 N.W.2d at 201 (word choice and surrounding context can help "alert" reader that statement is mere opinion). Moreover, as with other statements, the comment that Wing "sounds like he's faded" was made as a text overlay to the video itself, thus inviting viewers to decide for themselves what Wing sounded like. The statement is therefore not capable, in context, of having a defamatory meaning. *See id.*

Only one of Galanakis's statements is plausibly capable of having defamatory meaning as to Wing: the statement that Winters's "boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a woman." (ECF 3, ¶ 35.b.) Galanakis claims he was referring to the Newton Police Chief, not Wing, but Wing's counterclaims allege otherwise. (Id., ¶ 35 (alleging that the statement was "concerning Counterclaim Plaintiff Lt. Wing").) The Court must assume, at this stage, that Wing's allegation is true. With that assumption in mind, the statement is plausibly capable of defamatory meaning because it states or implies two facts, neither of which (according to Wing) is true: (1) that Wing has the authority to discipline or terminate Winters; and (2) that Winters "beat[] up a woman." In other words, the statement could be interpreted as a factual assertion that Wing is "allowing" Winters to continue working despite being aware that Winters "beat[] up a woman." This is enough to satisfy Fed. R. Civ. P. 12(b)(6).

For these reasons, the Court GRANTS WITHOUT PREJUDICE Galanakis's Motion to Dismiss Count II as to all statements identified in paragraph 35 except 35.b. As to that one statement, the Motion to Dismiss Count II is DENIED.

## V.    LEGAL AND FACTUAL ANALYSIS – IOWA CODE § 80F.1(13).

In 2007, the Iowa Legislature enacted the "Peace Officer, Public Safety, and Emergency Personnel Bill of Rights." *See* Iowa Code § 80F.1.[3] "This law provides 'officers'—as defined in the statute—with certain rights and procedural protections, particularly during the course of investigations into complaints of alleged misconduct." *Dautovic v. Bradshaw*, No. 09-1763, 2011 WL 1005432, *1 (Iowa Ct. App. Mar. 21, 2011). In Counts III and IV, Winters and Wing, respectively, bring claims against Galanakis pursuant to Iowa Code § 80F.1(13), which states: "An officer shall have the right to bring a cause of action against any person, group of persons, organization, or corporation for damages arising from the filing of a false complaint against the officer or any other violation of this chapter including but not limited to actual damages, court costs, and reasonable attorney fees." Winters and Wing do not allege that Galanakis filed a formal complaint against them with the Newton Police Department or any other agency. Rather, as alleged, their claims under section 80F.1(13) revolve around the same social media statements at issue in their defamation claims. (ECF 3, ¶¶ 56–57, 64–65.)

---

[3] The statute was later amended twice, once in 2021 and again in 2022. *See* IA LEGIS 1142 (2022), 2022 Ia. Legis. Serv. Ch. 1142 (H.F. 2496) (West); IA LEGIS 183 (2021), 2021 Ia. Legis. Serv. Ch. 183 (S.F. 342) (West). Neither amendment affects the outcome here.

The viability of Counts III and IV hinges on whether the word "complaint" as used in section 80F.1(13) is intended to give a cause of action to officers whenever someone makes an inaccurate statement about them in any forum, or whether it instead is limited to *formal* complaints filed with the officers' employing agencies. The answer is found in the definitions section of the statute: "'Complaint' means a formal written allegation signed by the complainant or a signed written statement by an officer receiving an oral complaint stating the complainant's allegation." Iowa Code § 80F.1(1)(b). This definition, on its face, makes clear that a "formal written allegation" is required, not a social media post or other informal statement.

Winters and Wing try to overcome this result by arguing the word "formal" is broad enough to include published social media statements. This argument is inconsistent not just with the statute's definition of "complaint," but also many of its other provisions showing that "complaint" refers to a submission *to the employing agency* that *triggers an internal investigation* into the officer's conduct. For example, section 80F.1(1)(c) states: "'Formal administrative investigation' means an investigative process ordered by a commanding officer of an agency or commander's designee during which the questioning of an officer is intended to gather evidence *to determine the merit of a complaint* which may be the basis for seeking removal, discharge, or suspension, or other disciplinary action against the officer" (emphasis added). Every subsequent use of the word "complaint," when considered in context, clearly refers to the same formal investigative process. Sections 80F.1(5) and (7), respectively, state that an "officer who is the subject of a complaint, shall at a minimum, be provided a written summary of the complaint prior to an interview . . ." and an "interview of an officer who is the subject of the complaint shall, at a minimum, be audio recorded." Furthermore, "[t]he officer shall have the right to have the assistance of legal counsel, at the officer's expense, during the interview of the officer and during hearings or other disciplinary or administrative proceedings relating to the complaint." *Id.*, § 80F.1(8)(a). The statute also affords other rights to the officer in connection with the "complaint," including, *inter alia*, requiring paperwork to be filed with the county attorney's office if the "complaint is determined by the investigating officer to be a violation of [Iowa Code] section 718.6," which criminalizes the making of false reports to law enforcement authorities or other public safety entities. *Id.*, § 80F.1(12). Given this context, there is no canon of construction that would allow the word "complaint" to be interpreted as referring to anything other than a formal complaint made directly to the employing agency regarding the officer's performance. As Winters's and Wing's

counterclaims do not allege any such formal complaint, they must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

One other argument warrants attention. Winters and Wing assert that they "did not list the medium in which Plaintiff [made] his complaint" and thus they have stated a "prima facie case pursuant to Iowa Code § 80F.1." (ECF 9-1, p. 15.) In other words, they argue that Galanakis is *inferring* that they never filed a formal complaint with the Newton Police Department even though their pleading does not specifically say this. The Court rejects this argument, which is another example of Winters and Wing misunderstanding the governing pleading standard. Under federal law, a party cannot leave out important details in a pleading and then try to use those omissions to sneak past Fed. R. Civ. P. 12(b)(6). Instead, the party must include all facts necessary to state a plausible claim for relief. By failing to allege that Galanakis filed a formal complaint with the Newton Police Department, Winters and Wing have not satisfied their pleading burden as to their claim under Iowa Code § 80F.1(13). The Court GRANTS WITHOUT PREJUDICE Galanakis's Motion to Dismiss Counts III and IV.

## VI.   LEGAL AND FACTUAL ANALYSIS – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In counterclaim Counts V and VI, Winters and Wing (respectively) bring claims under Iowa law for intentional infliction of emotional distress. To state such a claim, each of them must state sufficient facts to plausibly establish four elements: "(1) outrageous conduct by [Galanakis]; (2) [Galanakis] intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) [Winters and/or Wing] suffered severe or extreme emotional distress; and (4) [Galanakis's] outrageous conduct was the actual and proximate cause of the emotional distress." *Fuller v. Loc. Union No. 106 of United Broth. of Carpenters & Joiners of Am.*, 567 N.W.2d 419, 423 (Iowa 1997). "Before [Galanakis's] conduct can be considered outrageous, it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Harsha v. State Savs. Bank*, 346 N.W.2d 791, 801 (Iowa 1984)). "For emotional distress cases, 'it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous.'" *Hedlund v. State*, 930 N.W.2d 707, 724 (Iowa 2019) (quoting *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991)).

The Court concludes that Winters and Wing have not alleged sufficient facts to state a plausible claim of "outrageous conduct" by Galanakis. As alleged in their counterclaims—and as

confirmed by the videos themselves—the conduct at issue primarily involves Galanakis posting videos on social media of his encounter with Winters and Wing overlaid with editorial commentary, as well as related social media posts discussing the same encounter. For the most part, the posts simply involve Galanakis's "take" on videos that viewers also can watch for themselves. Galanakis's statements are sometimes distasteful (e.g., describing the situation, colloquially, as "rape") and plausibly might have crossed the line into defamation in a few instances (e.g., stating that Winters had been "convicted" of domestic abuse after "beating the shit out" of his ex-girlfriend). As alleged, however, the Court concludes as a matter of law that Galanakis's conduct is not "so extreme in degree, as to go beyond all possible bounds of decency" or "atrocious[] and utterly intolerable in a civilized community." *See, e.g.*, *Taggart*, 549 N.W.2d at 802 (holding that sexist, condescending, threatening, and berating comments did not amount to "outrageous" conduct); *Vinson*, 360 N.W.2d at 119 (holding that evidence of "deliberate campaign to badger and harass plaintiff" did not amount to "outrageous" conduct).

The Court acknowledges that the counterclaims allege conduct beyond just the allegedly false statements themselves. Winters and Wing allege, for example, that Galanakis "took advantage of the publicity generated from these false and defamatory statements by using them to sell merchandise" and "earn income." (ECF 3, ¶¶ 22–23, 42.) This allegation is so light on detail, however, that it does not nudge the intentional infliction of emotional distress claims past the Fed. R. Civ. P. 12(b)(6) threshold, particularly given the Court's conclusion above that most of Galanakis's statements do not rise to the level of actionable defamation in the first place. There is nothing inherent about Galanakis attempting to monetize his interactions with Winters and Wing that moves his conduct into the range of "outrageous" in a situation where it would not otherwise reach that level. *See Vinson*, 360 N.W.2d at 119 (conduct not outrageous despite being "petty and wrong, even malicious").

Similarly, the Court recognizes that Winters and Wing allege that Galanakis set in motion a chain of events that has led to Winters and Wing facing "death threats, gross insults, words that encouraged him to commit suicide, and shocking statements and communications which would shock the conscience of society." (ECF 3, ¶¶ 29, 48.) This allegation, which the Court views as plausible, demonstrates the extent to which legal doctrines like intentional infliction of emotional distress have taken on a new gloss in the modern social media era. Many social media participants are motivated by a desire to create "viral" content that spreads at a rate that would have been

inconceivable when the doctrine of intentional infliction of emotional distress was being developed more than fifty years ago. *See Amsden v. Grinnell Mut. Reins. Co.*, 203 N.W.2d 252 (Iowa 1972) (adopting elements of intentional infliction of severe emotional distress). Such content often involves over-the-top rhetoric or carefully cultivated video and audio footage designed to tell a compelling—but sometimes misleading—story, often with a specific "villain" at the center. In some instances, the online community responds with even-more-over-the-top rhetoric (if not worse) directed at the "villain." *See, e.g.*, Clay Calvert, *Troll Storms and Tort Liability for Speech Urging Action by Others: A First Amendment Analysis and an Initial Step Toward a Federal Rule*, 97 WASH. U.L. REV. 1303, 1305–09 (2020) (discussing examples of hateful and offensive speech and conduct arising from social media posts).

The problem for Winters and Wing is that the Iowa Supreme Court continues to impose a high bar for what constitutes "outrageous" conduct by the original actor in the first instance. *See Hedlund*, 930 N.W.2d at 725 (refusing to find "outrageous" conduct despite defendant's alleged efforts to humiliate plaintiff in the eyes of his coworkers, peers, and the community). As currently pled, Galanakis's conduct in making social media posts about his interactions with Winters and Wing, often accompanied by videos of those same interactions, does not plausibly rise to the level of "outrageous" even if some members of the online community responded to his posts in improper or disturbing ways. *See id.* (explaining that something akin to "unremitting psychological warfare" is necessary before conduct can be considered "outrageous"). If there are additional facts that Winters and Wing believe illustrate outrageousness, they should move for leave to amend and add them to their pleading. For now, however, the counterclaims do not state sufficient facts to plausibly state a claim for intentional infliction of emotional distress. The Court therefore GRANTS WITHOUT PREJUDICE Galanakis's Motion to Dismiss Counts V and VI.

## VII. LEGAL AND FACTUAL ANALYSIS – INVASION OF PRIVACY.

Winters's and Wing's final counterclaims (Counts VII and VIII) assert invasion of privacy. Under Iowa law, there are four types of "invasion of privacy" claims: (1) "unreasonable intrusion upon the seclusion of another;" (2) "appropriation of the other's name or likeness;" (3) "unreasonable publicity given to the other's private life;" and (4) "publicity that unreasonably places the other in a false light before the public." *Koeppel v. Speirs*, 808 N.W.2d 177, 181 (Iowa 2011) (quoting Restatement (Second) of Torts, § 652A(2), at 376). Winters and Wing focus on the fourth type here.

To state a claim for false-light invasion of privacy, each of Winters and Wing must plead sufficient facts to establish the following elements: "(1) [Galanakis] gave publicity to a matter concerning [Winters/Wing] that placed [him] before the public in a false light; (2) the false light [he] was placed in would be highly offensive to a reasonable person; and (3) [Galanakis] had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Winters/Wing] was placed." *Mills v. Iowa*, 924 F. Supp. 2d 1016, 1035 (S.D. Iowa 2013). "The essential element of untruthfulness differentiates 'false light' from the other forms of invasion of privacy and many times affords an alternate remedy for defamation even though it is not necessary for a plaintiff to prove that he or she was defamed." *Anderson v. Low Rent Hous. Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa 1981).

Winters has stated a plausible claim for false-light invasion of privacy. Galanakis allegedly made false statements of fact on various social media sites about Winters having been "convicted" of domestic abuse and "beat[ing] the shit out" of his ex-girlfriend. Galanakis is further alleged to have kept these statements on social media even after being notified that Winters was not "convicted" of anything and instead simply consented to the entry and extension of a protective order. (ECF 3, ¶¶ 18–20.) These allegations are sufficient to satisfy Fed. R. Civ. P. 12(b)(6) on a false-light invasion of privacy claim. *See McFarland*, 684 F. Supp. 2d at 1093 (denying motion to dismiss false-light invasion of privacy claim where plaintiff alleged that defendants sent an email communication to over 300 households accusing plaintiff of physical abuse). The Court therefore DENIES Galanakis's Motion to Dismiss Winters's Count VII.

Wing, too, has stated a plausible claim for false-light invasion of privacy. He alleges, *inter alia*, that Galanakis has portrayed him in a false light by claiming that Wing chose not to discipline or fire Winters despite Winters "beating up a woman." As noted above, Galanakis argues that this statement was made in reference to the Newton Police Chief, not Wing, but the Court must assume for now that it was "concerning Counterclaim Plaintiff Lt. Wing," as alleged in the counterclaims. (ECF 3, ¶ 35.) With that assumption in mind, Wing has done just enough to plausibly allege an invasion of privacy claim because Galanakis's statement arguably places him in a false light by suggesting he has the authority to fire Winters (which Wing says is untrue) and is declining to do so even though Winters "beat[] up a woman" (which Wing also says is untrue). Galanakis's statements, as alleged, therefore layer two falsehoods on top of one another in a way that plausibly could be construed as placing Wing in a false light. *See, e.g., Anderson*, 304 N.W.2d at 248–51

(affirming jury verdict on false-light invasion of privacy claim arising out of misleading statements). The Court DENIES Galanakis's Motion to Dismiss Wing's Count VIII.

## VIII.   CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART Galanakis's Motion to Dismiss Counterclaims. Counts III, IV, V, and VI are dismissed without prejudice in their entirety. Count I is dismissed without prejudice as to the statements identified in paragraphs 12.c, e, f, h, i, j, k, l, m, n, o, p, and q. Count II is dismissed without prejudice as to the statements identified in paragraphs 35.a, c, d, e, f, g, and h. The remainder of Counts I and II are not dismissed. Counts VII and VIII are also not dismissed.

IT IS SO ORDERED.

Dated: May 8, 2023

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE