UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　　　Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>　　　　　Defendants.<br>────────────────────────<br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>　　　　Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>　　　　Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**BRIEF IN SUPPORT OF DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT**<br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.a.2., Defendants

City of Newton, Iowa (the "City"), Chief Rob Burdess, Officer Nathan Winters, and Lieutenant

Christopher Wing (collectively, "Defendants") submit this Brief in support of their Motion for

Summary Judgment.

## <u>TABLE OF CONTENTS</u>

I.     Introduction …………………..…………………………………………………...3

II.    Summary of Background Facts …………………………………..…………………3

III.   Argument ……………………………………………………………………...10

       A.     Officer Winters and Lieutenant Wing are Entitled to Qualified Immunity ………10

              1.     Federal Qualified Immunity …………………………………………..11

              2.     State Qualified Immunity …………………………………………..15

       B.     Chief Burdess is Entitled to Federal and State Qualified Immunity ……………18

       C.     The City is Entitled to Summary Judgment on Galanakis's *Monell* Claim and on His State Claims Under Iowa Law ……………………………………………20

IV.    Conclusion …………………………………………………………………21

## I.  INTRODUCTION

Because the consequences can be deadly, the Iowa Supreme Court considers the crime of operating while intoxicated ("OWI") in violation of Iowa Code section 321J.2 to be "a relatively serious crime within the spectrum of prohibited acts in Iowa."  *State v. Lovig*, 675 N.W.2d 557, 565 (Iowa 2004).

Here, after Officer Winters stopped Plaintiff Tayvin Galanakis ("Galanakis") for illegally driving with his bright lights on, Galanakis showed several signs that he was impaired and under the influence of drugs or alcohol.  He was unable to produce his license, registration, and proof of insurance without Officer Winters's help, he failed several properly administered field sobriety tests, he told Officer Winters he could not remember the last time he smoked marijuana, he inaccurately told Officer Winters that he was drug tested every Friday, and he made several antagonizing comments toward Officer Winters throughout the stop.  Altogether, this provided at least arguable probable cause to believe Galanakis committed OWI in violation of Iowa Code section 321J.2.

Accordingly, based on the material undisputed facts, the Court should grant Officer Winters, Lieutenant Wing, and Chief Burdess summary judgment on the basis of federal and state qualified immunity.  The Court should also grant the City summary judgment because there is no evidence to support Galanakis's claims against the City under 42 U.S.C. § 1983 or Iowa law, and the City is otherwise immune from liability under Iowa Code section 670.4A.2.

## II.  SUMMARY OF BACKGROUND FACTS

The Defendants incorporate the facts included in their Statement of Material Facts and provide the following summary of the background facts.

On August 28, 2022, at approximately 12:13 a.m., Officer Winters was on active duty

patrol in a Newton Police Department vehicle with Lieutenant Wing when Winters stopped Plaintiff Tayvin Galanakis ("Galanakis") for operating his vehicle with the bright lights on in violation of Iowa Code section 321.415.  Statement of Material Fact ("SOF") No. 5.

**Officer Winters's Request for License, Registration, and Proof of Insurance**

When Officer Winters approached Galanakis's driver's side window, he asked Galanakis to provide his driver's license, vehicle registration, and proof of automobile insurance.  SOF No. 6.  Galanakis was unable to do this on his own.  *See* SOF Nos. 6–11.  He first produced two documents and asked Officer Winters, "is it one of these?" SOF No. 7.  Officer Winters responded, "that's the registration," but Galanakis could not determine which of the registration documents was current and expired.  *Id*.  So eventually, Galanakis tells Officer Winters, "I'll just give you both of them."  *Id*.  Officer Winters accepted the current registration and did not take Galanakis's expired registration.  *Id*.  Only after this did Galanakis realize which of the two registrations was expired.  *Id*.

After Galanakis finally provided his registration, Officer Winters had to remind Galanakis to provide proof of insurance by asking him a second time.  SOF No. 9.  Similar to Galanakis's inability to provide his registration on his own, he asked Officer Winters, "would it be that white card?" SOF No. 10.  Then, Galanakis produced proof of insurance that expired in 2021.  *Id*.  When Officer Winters told Galanakis that the proof of insurance "expired in '21," Galanakis showed Officer Winters an email on Galanakis's phone that provided proof of insurance.  *Id*.  It took about 3 minutes from Officer Winters's first request for Galanakis's license, registration, and proof of insurance for Galanakis to produce these things.  SOF Nos. 6–11.

Once Officer Winters collected Galanakis's license, registration, and proof of insurance, he asked Galanakis to remove his chewing gum, exit his vehicle, and accompany Officer Winters

to his Newton Police Department vehicle, and Galanakis complied.  SOF No. 12.  At least three air fresheners were hanging from Galanakis's rear-view mirror.  SOF No. 13.

### Galanakis's Eyes

Galanakis's eyes were watery and bloodshot.  SOF No. 14.  So in Officer Winters's police vehicle, Officer Winters asked Galanakis why his eyes were watery and bloodshot, and Galanakis said, "I got contacts."  SOF No. 14.  However, later, Galanakis informs Officer Winters that he is not wearing his contacts.  SOF No. 15.

### Galanakis's Walk-and-Turn Field Sobriety Test

Officer Winters and Galanakis eventually exited Officer Winters's police vehicle, and Officer Winters had Galanakis perform several field sobriety tests.  SOF No. 17.  One of the tests was a walk-and-turn test.  SOF No. 18.  For this test, Officer Winters and Galanakis selected a straight line, and Officer Winters instructed Galanakis to stand on the line with his left foot on the line and his right foot in front of his left foot, with the heel of his right foot touching the toe of his left foot.  SOF No. 19–21.  Officer Winters then instructed Galanakis to take "9 heel-to-toe steps, touching heel to toe each time" and "keeping [his] arms down to [his] side."  SOF No. 22.  Officer Winters also demonstrated how to do this.  *Id*.  Continuing with the instructions, Officer Winters told Galanakis that "when you get to your ninth step, leave your front foot on the line, turn by taking a series of small steps, turn and take 9 heel-to-to steps back.  SOF No. 23.  Officer Winters also instructed Galanakis to "count [his] steps out loud."  SOF No. 24.

Before Galanakis began the walk-and-turn test, Officer Winters asked him if he had any problems with his ankles, knees, hips, or back, and Galanakis confirmed that he could perform the walk-and-turn test without any physical trouble.  SOF Nos. 25–27, 36.

Galanakis failed the walk-and-turn test in several ways.  SOF Nos. 19–38.  Contrary to

Officer Winters's instructions, Galanakis did not count his steps out loud, and instead of keeping track of his own steps, Galanakis told Officer Winters to "tell me when I get to 9." SOF. Nos. 29–30. Further, for both the first and second sets of 9 steps, Galanakis took well over 9 steps. SOF Nos. 31–35. He took 14 steps and 15 steps, respectively, by Officer Winters's count. *Id*. And before he performed the turn part of the test, had had to ask Officer Winters, "how do I turn?" SOF No. 33.

When Officer Winters asked Galanakis, "how many steps did I say to take," Galanakis incorrectly said "like 8 or 9." SOF No. 37. And when Officer Winters asked, "why'd you take 14 and then 15" steps, Galanakis incorrectly said, "I thought you were going to tell me when to turn." SOF No. 38.

### Galanakis's One-Leg Stand Field Sobriety Test

Galanakis also performed a one-leg stand test. SOF No. 39. As Officer Winters was instructing Galanakis on how to perform the one-leg stand test, Galanakis interjected, "you a rookie bro." SOF No. 40. He then asked, "this your first year," and "how many false accusations you got?" SOF Nos. 41, 42.

To perform the one-leg stand test, Officer Winters instructed Galanakis to "raise either your left or your right foot, whichever one you want, and raise it approximately 6 inches off the ground and keep it parallel to the ground." SOF No. 43. Officer Winters also demonstrated how to perform this part of the test. *Id*. Then, Officer Winters instructed Galanakis to "watch the tip of your toe, keep your arms down to your side, and count out loud in the following manner." SOF No. 44. Before Officer Winters could demonstrate the manner, Galanakis suddenly interrupted and said, "repeat the instructions." *Id*.

Officer Winters asked Galanakis which instruction he wanted repeated. SOF No. 45.

Galanakis responded, "so you said 6 seconds, hold it up," and Officer Winters interjected, "no, you're gonna hold your foot approximately 6 inches off the ground, and keep it parallel to the ground." *Id*. Galanakis told Officer Winters to demonstrate the test again, and Officer Winters demonstrated. SOF No. 46.

After demonstrating the one-leg stand test a second time, Officer Winters instructed Galanakis to "keep your arms down to your side, watch the tip of your raised foot, count out loud in the following manner: 1 thousand 1, 1 thousand 2, 1 thousand 3, 1 thousand 4, so on and so forth until I tell you to stop." SOF No. 47. When performing the one-leg stand test, Galanakis did not count out loud at all. SOF No. 49. So Officer Winters asked, "how did I tell you to count?" SOF No. 50. Galanakis responded, "1 Mississippi, 2 Mississippi, 3 Mississippi—I honestly forgot how you told me, but . . . ." *Id*. Shortly after that, Galanakis told Officer Winters that "it's ridiculous." SOF No. 51.

**Galanakis's Finger-to-Nose Field Sobriety Test**

Officer Winters also had Galanakis perform a finger-to-nose field sobriety test, where Galanakis closes his eyes, tilts his head back, and touches the tip of his nose with the tip of his finger following Officer Winters's commands. SOF No. 52. During this test, Galanakis had eye lid tremors, which indicate impairment and intoxication by drugs or alcohol. SOF Nos. 53, 54. Galanakis also never properly touched the tip of his nose with the tip of his finger when he was performing the finger-to-nose test. SOF No. 55.

**Galanakis's Preliminary Breath Test (PBT)**

After Galanakis performed the other field sobriety tests, Officer Winters gave him a preliminary breath test ("PBT"), which tests for impairment and intoxication by alcohol, exclusively. SOF Nos. 58, 59. The PBT results showed that Galanakis was not impaired by

alcohol.  SOF Nos 60–61.

### Officer Winters's Question About the Last Time Galanakis Smoked Marijuana

Following Galanakis's PBT, Officer Winters asked Galanakis, "when's the last time you smoked weed."  SOF No. 62.  Galanakis paused and stared off for about 8 to 10 seconds before answering, "I do not remember that."  SOF No. 62–63.  However, Galanakis has never smoked weed in his life, making his answer seriously suspect.  SOF Nos. 64–65.

### Galanakis's Representations About William Penn University's Drug Testing Policy

Previously, in Officer Winters's police vehicle, Galanakis informed Officer Winters that Galanakis was a freshman student athlete on the William Penn University ("WPU") football team.  SOF No. 66.  Galanakis also told Officer Winters that because Galanakis is on the WPU football team, he "get[s] tested every Friday" for drugs.  SOF No. 67.

However, Officer Winters believed Galanakis was not being truthful when he represented that he was drug tested every Friday as a member of the WPU Football team because Officer Winters knew WPU participated in the National Association of Intercollegiate Athletics ("NAIA") and that the NAIA's drug testing polices only subjected football players to drug testing before a championship game—not on a weekly basis.  SOF No. 68.  Officer Winters also questioned the truthfulness of Galanakis's assertion because Officer Winters knew the NAIA drug testing policies did not subject *every* player on a particular football team to weekly drug testing, as Galanakis suggested.  SOF No. 69.  Officer Winters knew that the NAIA drug testing polices instead provided for selection of football players for drug testing before a championship game either randomly or on the basis of playing time or position.  *Id*.

In fact, Officer Winters's understanding of the NAIA's drug testing policies and procedures is consistent with its current drug testing policies.  SOF No. 70.  And Galanakis's assertion that he

got drug tested every Friday is inconsistent with WPU's Drug Education and Testing Program Policy, which states that the "athletic department, through Drug Free Sport, will conduct *random* institutional drug testing of all athletic teams." SOF No. 71 (emphasis added).

Also, Galanakis was never drug tested as a member of the WPU Football team. SOF No. 72.

### Galanakis's Demeanor and Emotions

Throughout his interactions with Officer Winters, Galanakis made several antagonizing comments, like "you a rookie bro," "this your first year?", "how many false accusations you got?", and "this is about to be your first" false accusation. SOF Nos. 78–81. He also called Officer Winters a "dumbass." SOF No. 82.

### Officer Winters Arrested Galanakis for OWI

Ultimately, Officer Winters arrested Galanakis for OWI in violation of Iowa Code section 321J.2. SOF No. 84.

### Galanakis's Legal Claims

Now, Galanakis claims Officer Winters and Lieutenant Wing arrested him without probable cause in violation of the Fourth Amendment to the United States Constitution and in violation of article I, section 8 of the Iowa Constitution. Doc. 1-1 at 7, 9. Galanakis also claims Officer Winters and Lieutenant Wing falsely arrested him in violation of Iowa common law. Doc. 1-1 at 14.

In addition to his claims against Officer Winters and Lieutenant Wing, Galanakis claims Chief Burdess is individually liable for Officer Winters's and Lieutenant Wing's alleged Fourth Amendment violation because Chief Burdess did not properly train and supervise them. Doc. 1-1 at 11–12. Galanakis also claims Chief Burdess's training and supervision was negligent in

violation of Iowa common law.  Doc. 1-1 at 16.

Finally, Galanakis claims the City is liable for Officer Winters's and Lieutenant Wing's alleged Fourth Amendment violation under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and he claims the City negligently supervised and trained Officer Winters and Lieutenant Wing in violation of Iowa common law.  He claims the City is otherwise liable for their violations of Iowa state law under a theory of respondeat superior.  Doc. 1-1 at 11, 17.

### III.  ARGUMENT

The Court should grant Officer Winters, Lieutenant Wing, and Chief Burdess summary judgment on all the claims asserted against them in their individual capacities because they are entitled to federal and state qualified immunity.  The Court should also grant the City summary judgment because Galanakis lacks sufficient evidence to prove the City is liable for the claims brought under 42 U.S.C. § 1983 and Iowa state law, and because the City is otherwise immune from liability under Iowa Code section 670.4A.2.

### A.  Officer Winters and Lieutenant Wing are Entitled to Qualified Immunity

Officer Winters and Lieutenant Wing are entitled to federal qualified immunity on Galanakis's Fourth Amendment claim brought under 42 U.S.C. § 1983 because Galanakis cannot show that they lacked probable cause to believe Galanakis committed OWI in violation of Iowa Code section 321J.2.  Nor can Galanakis demonstrate that the alleged lack of probable cause was clearly established.

Similarly, Officer Winters and Lieutenant Wing are entitled to state qualified immunity on Galanakis's claim under article I, section 8 of the Iowa Constitution and his Iowa common law false arrest claim because Galanakis lacks sufficient evidence to support these claims, and because the claimed violations were not clearly established.

## 1.  Federal Qualified Immunity

Law enforcement officers are entitled to federal qualified immunity unless (1) "the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional or statutory deprivation," and (2) "the right was clearly established at the time." *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023).

"Clearly established means that at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up).   So, to be clearly established, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).   That is, existing precedent in the form of "controlling authority" or "a robust consensus of cases of persuasive authority" must show that it is beyond debate that the officer's conduct was unconstitutional.   *See id*.

Importantly, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality" because "doing so avoids the crucial question whether the official acted reasonably in the *particular* circumstances that he or she faced." *Id*. at 63–64 (emphasis added).   Instead, courts must apply the "clearly established standard" in a way that "requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*." *Id*. at 63 (emphasis added).   This "requires a high degree of specificity" that is "especially important in the Fourth Amendment context." *Id*. at 63–64 (cleaned up).

In this case, Officer Winters and Lieutenant Wing are entitled to qualified immunity because Galanakis cannot meet his burden of showing they violated Galanakis's clearly established Fourth Amendment right against arrest without probable cause.

First, Galanakis cannot show that Officer Winters or Lieutenant Wing violated the Fourth Amendment. "A warrantless arrest is unreasonable and violates the Fourth Amendment unless it is supported by probable cause." *Nieters*, 83 F.4th 1099, 1105 (8th Cir. 2023) (internal quotation marks omitted). Probable cause exists "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or committing an offense." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009 (8th Cir. 2017).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Nieters*, 83 F.4th at 1105–1106 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). And officers get "substantial latitude in interpreting and drawing inferences from factual circumstances." *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020).

Here, Officer Winters arrested Galanakis for OWI in violation of Iowa Code section 321J.2, and Galanakis cannot demonstrate with sufficient evidence that Officer Winters lacked probable cause to do so. Section 321J.2 prohibits operating a motor vehicle "[w]hile under the influence of an alcoholic beverage or other drug or combination of such substances." Iowa Code § 321J.2.1. After Officer Winters stopped Galanakis, Galanakis could not produce his registration and proof of insurance without Officer Winters's help. SOF Nos. 6–11. When Galanakis first retrieved two documents, he asked Officer Winters "is it one of these right here?", and Officer Winters had to tell him "that's the registration." SOF Nos. 6–7. Even after examining both documents for 5 or 6 seconds, Galanakis failed to distinguish between the expired and current registrations and said, "here, I'll just give you both of them." SOF No. 7. Then, Officer Winters had to remind Galanakis to provide proof of insurance. SOF No. 9. Again, Galanakis asked for Officer Winters's help to identify his proof of insurances by asking "would it be that white card?" SOF No. 10. And before Galanakis eventually produced a current copy of his proof of insurance,

he showed Officer Winters an expired proof of insurance, and Officer Winters had to tell him "that's one that expired in '21." SOF No. 10. Further, it took Galanakis approximately 3 minutes to provide Officer Winters his license, registration, and proof of insurance. SOF No. 11.

Galanakis also failed three different field sobriety tests and could not remember or follow basic instructions. SOF Nos. 17–57. He failed the walk-and-turn test in several ways, including by taking well over the instructed 9 steps on the first and second sets of 9 steps, by not counting his steps out loud, by asking Officer Winters to tell him when to turn, and by asking Officer Winters how to turn in the middle of the test. SOF Nos. 17–38. In fact, Galanakis could not even recall Officer Winters's instructions on the number of steps to take and when to turn. SOF Nos. 37–38. Galanakis also failed the one-leg stand test by not counting out loud, and he again could not remember Officer Winters's simple instructions on how to count. SOF Nos. 47–50. He misstated Officer Winters's instructions on the one-leg stand test twice. SOF Nos. 45, 47–50. Galanakis also failed the finger-to-nose by exhibiting eye lid tremors and failing to properly touch the tip of his nose with the tip of his finger. SOF Nos. 52–55.

Three failed field sobriety tests coupled with the inability to provide registration and proof of insurance without help were sufficient probable cause to suspect Galanakis of OWI. *See State v. Lowry*, 690 N.W.2d 700, at *3 (Iowa Ct. App. 2004) (Table) ("The officer could reasonably rely on the [field sobriety] test results as an indicator of whether or not defendant was under the influence of an intoxicant."); *see also id.* at 2 (concluding "slow and uncoordinated" movements indicate intoxication). But Officer Winters had even more facts to support his probable cause conclusion. When Officer Winters asked Galanakis when he last smoked marijuana, Galanakis awkwardly stared off for 8 or 10 seconds before saying "I do not remember that," which is even more awkward in light of the fact that he has never smoked marijuana before. SOF Nos. 62–65.

Further, Officer Winters had good reason to believe Galanakis lied when he said WPU drug tested him every Friday, because Officer Winters knew that the applicable NAIA drug testing policies only subjected football players, like Galanakis, to drug testing before a championship game.  SOF Nos. 66–72.  In fact, Galanakis's representation that WPU drug tested football players every Friday is inconsistent with the University's current policies.  *Id*.

On top of all that, Galanakis's mood and demeanor changed from cooperative to emotional and antagonistic.  He said things to Officer Winters like "you a rookie bro," "this your first year?", "how many false accusations you got?", and "this is about to be your first" false accusation.  SOF Nos. 78–81.  He also called Officer Winters a "dumbass."  SOF No. 82.

The totality of all these circumstances were sufficient to lead a reasonable person to believe that Galanakis committed OWI.  And as a result, Officer Winters had probable cause to arrest Galanakis, entitling him and Lieutenant Wing to qualified immunity.  *See Ehlers*, 846 F.3d at 1009.  With respect to Lieutenant Wing, Galanakis cannot even show that he made the arrest decision, meaning he may be separately entitled to qualified immunity on this basis alone because he did not violate the Fourth Amendment.

Second, Galanakis cannot satisfy the clearly established prong of the qualified immunity analysis because he cannot point to any controlling authority or a robust consensus of persuasive authority showing it was beyond debate that Officer Winters's or Lieutenant Wing's conduct under the particular circumstances was unconstitutional.  *Wesby*, 583 U.S. 48, 63 (2018).

"Even without probable cause, an officer will be entitled to qualified immunity if there is at least arguable probable cause."  *Nieters*, 83 F.4th at 1106 (cleaned up).  That is, when "an officer mistakenly arrests a suspect believing the arrest is based in probable cause," they are still entitled to qualified immunity "if the mistake is objectively reasonable."  *Id*. (cleaned up).

As discussed above, the totality of the circumstances provided overwhelming probable cause to believe Galanakis committed OWI.  But even if not, it was at least arguable.  And to show otherwise, Galanakis would need to point to controlling authority or a broad consensus of persuasive authority showing it was beyond debate that arresting Galanakis under all the circumstances violated the Fourth Amendment.  He cannot do that.

Because Galanakis cannot demonstrate, with evidence, that Officer Winters and Lieutenant Wing violated his clearly established Fourth Amendment right against arrest without probable cause, Officer Winters and Lieutenant Wing are entitled to federal qualified immunity.

### B.  State Qualified Immunity

For the same material reasons they are entitled to federal qualified immunity, Officer Winters and Lieutenant Wing are entitled to state qualified immunity on Galanakis's claims for arrest without probable cause under article I, section 8 of the Iowa Constitution and false arrest under Iowa common law.

Iowa Code section 670.4A.1.a. states that officers "subject to a claim brought under this chapter"[1] are not liable for damages if "[t]he right, privilege, or immunity secured by law was not clearly established at the time of the alleged deprivation, or at the time of the alleged deprivation the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law."  Iowa Code § 670.4A.1.a.  This language tracks the language the U.S. Supreme Court has used to articulate federal qualified immunity.  *Dunn v. Doe 1–22*, __ F. Supp. 3d __, 2023 WL 3081611, at *16 (S.D. Iowa 2023).  It is therefore plainly apparent that "the Iowa Legislature [adopted] a state law version of qualified

---

[1] "[C]laim[s] brought under this chapter" includes claims for violations of rights under the Iowa Constitution and false arrest under Iowa common law.  *See* Iowa Code §§ 670.2.1 & 670.1.4; *Strong v. Town of Lansing*, 179 N.W.2d 365 (Iowa 1970).

immunity that tracks the qualified immunity doctrine as it exists under federal law." *Id*.

Further, like the qualified immunity analysis, the analysis of Galanakis's claim for arrest without probable cause under Article I, section 8 of the Iowa Constitution will be materially the same as the analysis of his Fourth Amendment claim. *See Dunn*, 2023 WL 3081611, at *19–20. Article I, section 8 protects against unlawful seizures, including arrests without probable cause. *See Baldwin v. City of Estherville*, 915 N.W.2d 259, 272–273, 279 (Iowa 2018). And because the language of article I, section 8 is almost identical to the language of the Fourth Amendment, the Iowa Supreme Court generally interprets the scope of article I, section 8's seizure provisions to track the Fourth Amendment. *Dunn*, 2023 WL 3081611, at *19 (citing *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019)). So like the Fourth Amendment, article I, section 8 prohibits warrantless arrests without probable cause, and "[p]robable cause exists when the facts and circumstances within the arresting officer's knowledge would warrant a person of reasonable caution to believe that a crime is being committed." *Id*. (citing *State v. Christopher*, 757 N.W.2d 247, 250 (Iowa 2008) and quoting *State v. Harris*, 490 N.W.2d 561, 563 (Iowa 1992)). This analysis is materially similar to the analysis of Galanakis's Fourth Amendment claim.

Similarly, the analysis of Galanakis's false arrest claim under Iowa common law will also be materially the same as the analysis of his Fourth Amendment and article I, section 8 claims. False arrest is the detention or restraint of a person against their will and in violation of the law. *See Dunn*, 2023 WL 3081611, at *20 (citing *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002)). Under Iowa Code section 804.7.1.c., it is lawful for an officer to arrest someone if the "officer has *reasonable grounds* for believing that an indictable public offense has been committed and has reasonable grounds for believing that the person to be arrested has committed it." Iowa Code § 804.7.1.c. (emphasis added). "'Reasonable ground' as used in section 804.7 is

'equivalent to traditional probable cause.'" *Dunn*, 2023 WL 3081611, at *20 (quoting *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984)). And although an arrest that complies with the Fourth Amendment does not "automatically" satisfy section 804.7, Iowa law imposes a "less demanding probable cause standard to civil false arrest claims than to those raised in connection with a criminal prosecution." *Dunn*, 2023 WL 3081611, at *20 (internal quotation marks omitted). As long as "the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Id*. (quoting *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983)). This analysis is materially similar to the analysis of Galanakis's Fourth Amendment claim.

So, because Iowa's state qualified immunity analysis tracks federal qualified immunity, and because the analysis of Galanakis's state law claims for arrest without probable cause and false arrest is materially the same as the analysis of Galanakis's Fourth Amendment claim, Officer Winters and Lieutenant Wing are entitled to qualified immunity under Iowa Code section 670.4A.1.a. for the same material reasons they are entitled to federal qualified immunity.

Galanakis was unable to provide his registration and proof of insurance without Officer Winters's help, he failed to properly perform three different properly administered field sobriety tests, he could not tell Officer Winters the last time he smoked marijuana—despite having never smoked marijuana—he inaccurately told Officer Winters that he was drug tested every Friday, and he made several antagonizing comments toward Officer Winters. SOF Nos. 6–83. Taken together, all this was more than enough to support probable cause and a good faith reasonable belief that Galanakis committed OWI in violation of Iowa Code section 321J.2. His arrest was therefore lawful under the Iowa Constitution and Iowa common law.

But even if Galanakis's arrest was somehow not technically lawful, Officer Winters and

Lieutenant Wing would still be entitled to qualified immunity because Galanakis cannot demonstrate that it was clearly established that his arrest was unlawful. *See Nieters*, 83 F.4th at 1105.  To do so, Galanakis must to point to controlling authority or a broad consensus of persuasive authority showing it was beyond debate and not even arguable that arresting Galanakis was unlawful given the particular circumstances. *See Wesby*, 583 U.S. at 63–64.  Galanakis cannot meet this burden.

Therefore, in addition to federal qualified immunity on Galanakis's Fourth Amendment claim, Officer Winters and Lieutenant Wing are entitled to state qualified immunity on Galanakis's claims under Iowa state law.

### B. Chief Burdess is Entitled to Federal and State Qualified Immunity

Galanakis asserts two claims against Chief Burdess, one for supervisory liability under 42 U.S.C. § 1983 and one for negligent supervision and training under Iowa common law.  Chief Burdess is entitled to federal and state qualified immunity on these claims because Galanakis cannot demonstrate, with sufficient evidence, a violation of law that was clearly established under then-existing precedent.

A supervisor is liable under § 1983 for the constitutional violations of his subordinates if his failure to properly supervise and train the subordinate caused the constitutional violation.  *See Jackson v. Nixon*, 747 F.3d 537, 543, (8th Cir. 2014).  However, when a supervising officer did not directly participate in the alleged constitutional violation and is sued for failure to train or supervise the offending officer, "the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015); *see also Sturgeon v. Faughn*, 36 F.4th 804, 809 (8th Cir. 2022).

"Deliberate indifference is a subjective standard that entails a level of culpability equal to the criminal law definition of recklessness." *Krigbaum*, 808 F.3d at 340 (cleaned up).  Ultimately, "[t]o be deliberately indifferent, an official must both be aware of facts from which the inference could be drawn that a substantial risk of unconstitutional harm exists, and he must also draw the inference." *Sturgeon*, 36 F.4th at 809 (cleaned up).

Here, Galanakis lacks sufficient evidence to show that Chief Burdess knew about a pattern of unconstitutional behavior by Officers Winters or Lieutenant Wing.  He also necessarily lacks any evidence that Chief Burdess was deliberately indifferent to the nonexistent pattern.  Without sufficient evidence of these two things, Chief Burdess is entitled to federal qualified immunity and summary judgment on Galanakis's § 1983 claim based on supervisory liability.

Chief Burdess is also entitled to state qualified immunity on Galanakis's negligent supervision and training claim under Iowa common law.  First, as a matter of Iowa law, Galanakis cannot maintain this claim against Chief Burdess, individually, and can only assert it against the City.  That is because negligent supervision and training under Iowa law is "premised on agency principles and imposes *on an employer* the duty to exercise reasonable care in . . . supervising . . . individuals, who, because of their employment, may pose a threat of injury to members of the public." *McCoy v. Thomas L. Cardella & Assocs.*, 992 N.W.2d 223, 228 (Iowa 2023).  Chief Burdess is not an employer.  So, Galanakis's negligent hiring and supervision claim against him fails as a matter of Iowa law. *See id.*  Second, even if this claim were existed against Chief Burdess, Galanakis lacks sufficient evidence to prove it, and he cannot demonstrate that controlling authority or a consensus of persuasive authority put it beyond debate that Chief Burdess's conduct, specifically, amounted to negligence.

Chief Burdess is therefore entitled to qualified immunity and summary judgment on

Galanakis's claims for supervisory liability under 42 U.S.C. § 1983 and for negligent supervision and training under Iowa common law.

### C.  The City is Entitled to Summary Judgment on Galanakis's *Monell* Claim and on His State Claims Under Iowa Law

Galanakis claims the City is liable for the violation of his Fourth Amendment right against arrest without probable cause under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  He also claims the City negligently supervised and trained Officer Winters and Lieutenant Wing and that the City is otherwise liable for their conduct on a theory of respondeat superior.  The Court should grant summary judgment to the City on all these claims.

Galanakis lacks sufficient evidence to support *Monell* liability against the City.  Under *Monell*, "[s]ection 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."  *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up).  A policy is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Id*. at 700 (cleaned up).  And an unofficial custom is "a continuing, widespread, persistent pattern of unconstitutional misconduct by the [municipality's] employees."  *See Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

Galanakis's *Monell* claim fails because, as discussed above, he lacks sufficient evidence to support his underlying Fourth Amendment claims against Officer Winters and Lieutenant Wing.  *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) ("[I]n order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.").  Based on the evidence, there was probable cause to believe Galanakis committed OWI.  His *Monell* claim also fails because he cannot identify a single City official policy or unofficial custom that

caused his alleged Fourth Amendment violation.  Nor can he show, with evidence, that the City was deliberately indifferent in failing to train or supervise its officers.  Galanakis therefore lacks sufficient evidence to support his *Monell* claim, and the Court should grant summary judgment on this claim.

Galanakis similarly lacks sufficient evidence to support his negligent supervision and training claim under Iowa law because he cannot demonstrate the requisite underlying tort or wrongful act.  "[T]he torts of negligent hiring, supervision, or training must include as an element an underlying tort or wrongful act committed by the employee."  *Schoff v. Combined Ins. Co. of Am.*, 604 N.W. 2d 43, 53 (Iowa 1999) (internal quotation marks omitted).  For the reasons previously discussed, Galanakis lacks enough evidence to show that Officer Winters, Lieutenant Wing, or Chief Burdess violated the U.S. Constitution, the Iowa Constitution, or any other federal or state law.  And even if he had enough evidence to make that showing, he then lacks evidence to show the City's supervision or training was negligent and cause the underlying violation.  The Court should therefore grant summary judgment on Galanakis's negligent supervision and training claim against the City.

Finally, the City is immune from liability on any claim "where [Officer Winters, Lieutenant Wing, or Chief Burdess] was determined to be protected by qualified immunity."  Iowa Code § 670.4A.2.  So because Officer Winters, Lieutenant Wing, and Chief Burdess are entitled to state qualified immunity on Galanakis's state claims against them in their individual capacities, the City is immune to those claims under Iowa Code section 670.4A.2.

## IV.  CONCLUSION

For these reasons, the Court should grant Officer Winters, Lieutenant Wing, and Chief Burdess summary judgment on all the claims asserted against them in their individual capacities

because they are entitled to federal and state qualified immunity.  The Court should also grant the City summary judgment because Galanakis lacks sufficient evidence to prove the City is liable for the claims brought under 42 U.S.C. § 1983 and Iowa state law, and because the City is otherwise immune from liability under Iowa Code section 670.4A.2.

      Dated: December 6, 2023.

By:   */s/ Nicholas F. Miller*
      Matthew S. Brick, AT0001081
      Erin M. Clanton, AT0002592
      Douglas A. Fulton, AT0002672
      Nicholas F. Miller, AT0015361
      **BRICK GENTRY, P.C.**
      6701 Westown Parkway, Suite 100
      West Des Moines, IA 50266
      T: (515) 274-1450
      F: (515) 274-1488
      matt.brick@brickgentrylaw.com
      erin.clanton@brickgentrylaw.com
      doug.fulton@brickgentrylaw.com
      nick.miller@brickgentrylaw.com

      Counsel for Defendants
      CITY OF NEWTON, ROB BURDESS, NATHAN WINTERS and CHRISTOPHER WING

      Counsel for Counterclaim Plaintiffs
      NATHAN WINTERS and CHRISTOPHER WING

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 6, 2023, a true copy of the foregoing BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was electronically filed using the Court's CM/ECF system, which sent notice to counsel of record, as follows:

      Matthew M. Boles
      Adam C. Witosky
      GRIBBLE, BOLES, STEWART & WITOSKY LAW

2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
mboles@gbswlaw.com
awitosky@gbswlaw.com
Counsel for Plaintiff/Counterclaim Defendant


/s/     *Nicholas F. Miller*
**Nicholas F. Miller, AT0015361**