UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>         Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br>         Defendants.<br><br>NATHAN WINTERS and CHRISTOPHER WING,<br>         Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>         Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br>**STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br><br><br><br><br><br><br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.a.3, Defendants City of Newton, Iowa (the "City"), Chief Rob Burdess, Officer Nathan Winters, and Lieutenant Christopher Wing (collectively, "Defendants") submit this Statement of Material Facts setting forth each material fact to which they contend there is no genuine issue to be tried.

**STATEMENT OF MATERIAL FACTS**

**The Officers**

1. The City maintains and operates the Newton Police Department. Doc. 1-1 ¶ 2; Doc. 2 ¶ 2.

2. Rob Burdess was the Chief of Police for the Newton Police Department on August

1

28, 2022.  Doc. 1-1 ¶ 3; Doc. 2 ¶ 3.

3.	Nathan Winters was a police officer with the Newton Police Department on August 28, 2022.  Doc. 1-1 ¶ 4, Doc. 23 ¶ 4.

4.	Christopher Wing was a police officer with the Newton Police Department on August 28, 2022, with the rank of lieutenant.  Doc. 1-1 ¶ 5, Doc. 23 ¶ 5.

## The Stop

5.	On August 28, 2022, at approximately 12:13 a.m., Officer Winters was on active duty patrol in a Newton Police Department vehicle with Lieutenant Wing when Winters stopped Plaintiff Tayvin Galanakis ("Galanakis") for operating his vehicle with the bright lights on in violation of Iowa Code section 321.415.  Def. Appx. 7, 11–15; Def. Appx.,6 13:17–14:25.[1]

## Officer Winters's Request for License, Registration, and Proof of Insurance

6.	After stopping Galanakis's vehicle, Officer Winters spoke to Galanakis through Galanakis's driver's side window and asked Galanakis to produce his driver's license, vehicle registration, and proof of automobile insurance.  Def. Appx. 6 at 14:23–17:25.

7.	Approximately 55 seconds to 1 minute after Officer Winters first asked Galanakis for his driver's license, vehicle registration, and proof of automobile insurance, Galanakis produced two documents and asked Officer Winters "is it one of these right here?"  Def. Appx. 6 at 14:23–15:28.  Officer Winters replied, "that's the registration."  Def. Appx. 6 at 14:23–15:31.  Then, looking at the two documents, Galanakis said "I just got a new one so I don't know which one's the old one."  Def. Appx. 6 at 14:23–15:35.  After examining the two documents for 5 or 6 seconds, Galanakis eventually said, "here, I'll just give you both of them."  Def. Appx. 6 at 14:23–15:46.  Officer Winters did not take both registration documents and instead took only Galanakis's

---

[1] Pin citations to the video recording from Officer Winters's body camera are to the time stamp in the upper right-hand corner of the video.

2

up-to-date registration.  Def. Appx. 6 at 14:23–16:10.  Galanakis then examined the registration document that Officer Winters did not take and said, "yeah, this is the old one right here."  *Id*.

8. After providing his vehicle registration, Galanakis produced his driver's license to Officer Winters.  Def. Appx. 6 at 16:10–16:35.

9. Officer Winters accepted Galanakis's driver's license and, for the second time, asked Galanakis for proof of automobile insurance.  Def. Appx. 6 at 16:30–16:35.

10. In response to Officer Winters's second request for proof of insurance, Galanakis said "yeah, I got you" and searched his vehicle's passenger-side glove compartment.  Def. Appx. 6 at 16:30–17:00.  After searching the glove compartment for a few seconds, Galanakis asked Officer Winters, "would it be that white card?"  Def. Appx. 6 at 16:30–16:51.  Galanakis then produced a document, and Officer Winters said "that's one that expired in '21."  Def. Appx. 6 at 16:30–16:57.  Galanakis eventually produced proof of his vehicle insurance by showing Officer Winters an email stored on Galanakis's phone.  Def. Appx. 6 at 16:30–17:25.

11. Galanakis produced proof of his automobile insurance approximately 3 minutes after Officer Winters first asked him for proof of insurance.  Def. Appx. 6 at 14:23–17:25.

12. Once Officer Winters collected Galanakis's driver's license, vehicle registration, and proof of automobile insurance, Officer Winters asked Galanakis to remove the chewing gum from his mouth, exit his vehicle, and accompany Officer Winters to his Newton Police Department vehicle, which Galanakis did.  Def. Appx. 6 at 17:24–18:25.

13. While Officer Winters spoke to Galanakis through his driver's side window, several air fresheners could be seen hanging from the rear-view mirror.  Def. Appx. 6 at 17:24–17:42.

**Galanakis's Eyes**

14. Galanakis's eyes were watery and bloodshot.  Def. Appx. 6 at 19:34–19:38.  So, in

Officer Winters's Newton Police Department vehicle, Officer Winter asked Galanakis why his eyes were watery and bloodshot. *Id*. Galanakis responded, "I got contacts." Def. Appx. 6 at 19:34–19:44.

15. Officer Winters and Galanakis exited Officer Winter's Newton Police Department vehicle, and approximately two minutes after Galanakis told Officer Winters "I got contacts," Galanakis told Officer Winters that he was not wearing his contacts and had taken them out at a friend's house earlier that night. Def. Appx. 6 at 19:34–22:21.

16. The reason Galanakis took his contacts out, he said, was because he is allergic to dogs. *Id*.

### Galanakis's Walk-and-Turn Field Sobriety Test

17. After Officer Winters and Galanakis exited Officer Winter's Newton Police Department vehicle, Officer Winters had Galanakis perform some field sobriety tests. Def. Appx. 6 at 21:43 *et seq*.

18. Officer Winters had Galanakis perform a walk-and-turn field sobriety test. Def. Appx. 6 at 25:02–27:30.

19. For the walk-and-turn test, Officer Winters and Galanakis identified and selected a visible straight line for Galanakis to perform the test. Def. Appx. 6 at 25:15–25:21.

20. Officer Winters then gave Galanakis instructions on how to properly perform the walk-and-turn test. Def. Appx. 6 at 25:15–26:13.

21. Officer Winters instructed Galanakis to stand on the line they selected with his left foot on the line and his right foot in front of his left foot, with the heel of his right foot touching the toe of his left foot. Def. Appx. 6 at 25:15–25:30.

22. Officer Winters then instructed Galanakis to take "9 heel-to-toe steps, touching heel

to toe each time" and "keeping [his] arms down to [his] side." Def. Appx. 6 at 25:30–25:43. After giving this instruction, Officer Winters also demonstrated the proper way to take the steps. Def. Appx. 6 at 25:43–25:51.

23. Next, Officer Winters instructed Galanakis that "when you get to your ninth step, leave your front foot on the line, turn by taking a series of small steps, turn and take 9 heel-to-toe steps back." Def. Appx. 6 at 25:50–25:58.

24. Officer Winters also instructed Galanakis to "count [his] steps out loud." Def. Appx. 6 at 26:00–26:10.

25. Before Galanakis began performing the walk-and-turn test, Officer Winters asked Galanakis if he had "any problems with [his] ankles, knees, hips, or back." Def. Appx. 6 at 26:12–26:16. Galanakis responded, "just my right ankle" and that he "messed it up during football." Def. Appx. 6 at 26:12–26:19.

26. Officer Winters asked Galanakis if his right ankle "prevented [him] from walking." Def. Appx. 6 at 26:12–26:20. Galanakis responded, "just a little bit, but I'll be able to do this." Def. Appx. 6 at 26:12–26:22.

27. Officer Winters also asked Galanakis if his right ankle "hurt right now." Def. Appx. 6 at 26:12–26:25. Galanakis responded, "nope." *Id*.

28. Galanakis did not have any questions about how to properly perform the walk-and-turn-test and began performing it. Def. Appx. 6 at 26:12–26:35.

29. When performing the walk-and-turn test, Galanakis did not count his steps out loud. Def. Appx. 6 at 26:26–27:30.

30. Before completing the first 9 steps of the walk-and-turn test, Galanakis told Officer Winters "tell me when I get to 9." Def. Appx. 6 at 26:26–27:30. Officer Winters did not respond.

*Id*. After taking more steps, Galanakis then said, "I guess so." *Id*.

31. When performing the first 9 steps of the walk-and-turn test, Galanakis took more than 9 steps. Def. Appx. 6 at 26:26–27:30.

32. Officer Winters counted 14 steps that Galanakis took when performing the first 9 steps of the walk-and-turn test. Def. Appx. 6 at 26:26–27:30.

33. Before performing the turn part of the walk-and-turn test, Galanakis asked Officer Winters, "how do I turn." Def. Appx. 6 at 26:26–27:30. Officer Winters responded, "take a series of small steps." Def. Appx. 6 at 26:26–27:30.

34. When performing the second 9 steps of the walk-and-turn test, Galanakis took more than 9 steps. Def. Appx. 6 at 26:26–27:30.

35. Officer Winters counted 15 steps that Galanakis took when performing the second 9 steps of the walk-and-turn test. Def. Appx. 6 at 26:26–27:30.

36. While Galanakis was performing the second 9 steps of the walk-and-turn test, he stated, "come on man, this is too easy." Def. Appx. 6 at 26:26–27:30.

37. After Galanakis completed the second 9 steps of the walk-and-turn test, Officer Winters asked, "how many steps did I say to take?" Def. Appx. 6 at 26:26–27:30. Galanakis responded, "like 8 or 9." Def. Appx. 6 at 26:26–27:30.

38. Officer Winters also asked Galanakis, "why'd you take 14 and then 15" steps during the first and second 9 steps of the walk-and-turn test, respectively. Def. Appx. 6 at 26:26–27:30. Galanakis responded, "I thought you were going to tell me when to turn." Def. Appx. 6 at 26:26–27:30.

**Galanakis's One-Leg Stand Field Sobriety Test**

39. Officer Winters also had Galanakis perform a one-leg stand field sobriety test. Def.

6

Appx. 6 at 27:29–29:50.

40. After Officer Winters began instructing Galanakis on the proper way to perform the one-leg stand test, Galanakis told Officer Winters, "you a rookie bro." Def. Appx. 6 at 27:29–29:50.

41. During Officer Winters' instructions to Galanakis on the proper way to perform the one-leg stand test, Galanakis asked Officer Winters, "this your first year?" Def. Appx. 6 at 27:29–29:50.

42. During Officer Winters' instructions to Galanakis on the proper way to perform the one-leg stand test, Galanakis also asked Officer Winters, "how many false accusations you got?" Def. Appx. 6 at 27:29–29:50.

43. To perform the one-leg stand test, Officer Winters instructed Galanakis to "raise either your left or your right foot, whichever one you want, and raise it approximately 6 inches off the ground and keep it parallel to the ground." Def. Appx. 6 at 27:29–29:50. Officer Winters then demonstrated how to perform this part of the one-leg stand test for Galanakis. *Id*.

44. Officer Winters also instructed Galanakis to "watch the tip of your toe, keep your arms down to your side, and count out loud in the following manner." Def. Appx. 6 at 27:29–29:50. At this point, Galanakis asked Officer Winters to "repeat the instructions." *Id*.

45. Officer Winters asked Galanakis which instruction he wanted repeated. Def. Appx. 6 at 27:29–29:50. Galanakis responded, "so you said 6 seconds, hold it up," and Officer Winters interjected, "no, you're gonna hold your foot approximately 6 inches off the ground, and keep it parallel to the ground." *Id*.

46. Galanakis asked Officer Winters to demonstrate the one-leg stand test a second time, which Officer Winters did. Def. Appx. 6 at 27:29–29:50.

47. After demonstrating the one-leg stand test a second time, Officer Winters instructed Galanakis to "keep your arms down to your side, watch the tip of your raised foot, count out loud in the following manner: 1001, 1002, 1003, 1004, so on and so forth until I tell you to stop." Def. Appx. 6 at 27:29–29:50.

48. Galanakis did not have any questions about how to properly perform the one-leg stand test before he began performing it. Def. Appx. 6 at 27:29–29:50.

49. When performing the one-leg stand test, Galanakis did not count out loud at all. Def. Appx. 6 at 27:29–29:50.

50. When Galanakis did not count out loud while performing the one-leg stand test, Officer Winters asked him, "how did I tell you to count?" Def. Appx. 6 at 27:29–29:50. Galanakis responded, "1 Mississippi, 2 Mississippi, 3 Mississippi." *Id*. Galanakis then said, "I honestly forgot how you told me, but . . . ." *Id*.

51. As Galanakis continued to perform the one-leg stand test, he told Officer Winters that "it's ridiculous." Def. Appx. 6 at 27:29–29:50.

**Galanakis's Finger-to-Nose Field Sobriety Test**

52. Officer Winters also had Galanakis perform a finger-to-nose field sobriety test, where Galanakis closes his eyes, tilts his head back, and touches the tip of his nose with the tip of his finger following Officer Winters's commands. Def. Appx. 6 at 30:53–33:45; Def. Appx. 12–13.

53. Galanakis had eye lid tremors when he was performing the finger-to-nose test. Def. Appx. 6 at 30:53–33:45; Def. Appx. 12–13.

54. Eye lid tremors indicate impairment and intoxication by drugs or alcohol. Def. Appx. 12–13.

55. Galanakis never properly touched the tip of his nose with the tip of his finger when he was performing the finger-to-nose test. Def. Appx. 6 at 30:53–33:45; Def. Appx. 12–13.

### Proper Administration of Galanakis's Field Sobriety Tests

56. Officer Winters properly administered Galanakis's field sobriety tests, including the walk-and-turn test, the one-leg stand test, and the finger-to-nose tests. Def. Appx. 35–36.

57. Officer Winters properly instructed Galanakis on the proper way to perform Galanakis's field sobriety tests, including the walk-and-turn test and the one-leg stand test. Def. Appx. 35–36.

### Galanakis's Preliminary Breath Test (PBT)

58. After Officer Winters had Galanakis perform some other field sobriety tests, Officer Winters gave him a preliminary breath test ("PBT"), which tests for impairment by alcohol. Def. Appx. 6 at 34:09–35:11; Def. Appx. 83–84.

59. A PBT cannot test for impairment by substances other than alcohol. Def. Appx. 6 at 34:09–35:11; Def. Appx. 83–84.

60. Galanakis's PBT revealed that he was not impaired by alcohol. Def. Appx. 6 at 34:09–35:11; Def. Appx. 13.

61. Galanakis's PBT results did not eliminate the possibility that he was under the influence of a substance other than alcohol, like marijuana or some other drug. Def. Appx. 83.

### Officer Winters's Question About the Last Time Galanakis Smoked Marijuana

62. After Galanakis's PBT, Officer Winters asked Galanakis, "when's the last time you smoked weed." Def. Appx. 6 at 35:11–35:32. Galanakis responded, "I do not remember that." *Id*.

63. Approximately 8 to 10 seconds passed from the time Officer Winters asked

Galanakis when he last smoked weed and Galanakis's answer. Def. Appx. 6 at 35:22–35:32.

64. Although Galanakis told Officer Winters that Galanakis did not remember the last time he smoked marijuana, Galanakis has never actually smoked marijuana. Def. Appx. 19–23 at 44:12–48:19.

65. Galanakis's answer that he did not remember the last time he smoked marijuana was inconsistent with the fact that he has never smoked marijuana. Def. Appx. 6 at 35:11–35:32; Def. Appx. 19–23 at 44:12–48:19.

**Galanakis's Representations About William Penn University's Drug Testing Policy**

66. When Officer Winters and Galanakis were in Officer Winters's Newton Police Department vehicle, Galanakis informed Officer Winters that Galanakis was a freshman student athlete on the William Penn University football team. Def. Appx. 6 at 18:50–19:15.

67. Galanakis also told Officer Winters that because Galanakis is on the William Penn University football team, he "get[s] tested every Friday" for drugs. Def. Appx. 6 at 36:40–36:44; Def. Appx. 24–25 at 51:9–52:8; Def. Appx. 8 ¶ 8.

68. Officer Winters believed Galanakis was not being truthful when he represented that he was drug tested every Friday as a member of the William Penn University Football team because Officer Winters knew William Penn University participated in the National Association of Intercollegiate Athletics ("NAIA") and that the NAIA's drug testing polices and procedures only subjected football players to drug testing before a championship game, not on a weekly basis. Def. Appx. 8–9 ¶¶ 9–12.

69. Officer Winters also believed Galanakis was not being truthful when he represented that he was drug tested every Friday as a member of the William Penn University Football team because Officer Winters knew the NAIA drug testing policies and procedures did not subject every

player on a particular football team to weekly drug testing, as Galanakis suggested. Def. Appx. 8–9 ¶¶ 9–12. Officer Winters knew that the NAIA drug testing polices and procedures instead provided for selection of football players for drug testing before a championship game either randomly or on the basis of playing time or position. Def. Appx. 8–9 ¶¶ 9–12.

70. Officer Winters's understanding of the NAIA drug testing policies and procedures is consistent with the NAIA's current drug testing polices. Def. Appx. 37–53.

71. Galanakis's representation to Officer Winters' that Galanakis was drug tested every Friday as a member of the William Penn University football team is inconsistent with William Penn University's Drug Education and Testing Program Policy, which states that the "athletic department, through Drug Free Sport, will conduct random institutional drug testing of all athletic teams." Def. Appx. 26–28 at 114:2–116:9; Def. Appx. 54–69.

72. Despite telling Officer Winters that he was drug tested every Friday as a member of the William Penn University Football team, Galanakis was never drug tested while he was a student athlete on William Penn's football team. Def. Appx. 24 at 51:9–51:18.

**Galanakis's Mood Changes**

73. Galanakis's mood changed throughout his interactions with Officer Winters on August 28, 2022. Def. Appx. 6; Def. Appx. 29–31 at 118:14–120:2.

74. Galanakis exhibited different emotions and demeanors throughout his interactions with Officer Winters on August 28, 2022. Def. Appx. 6; Def. Appx. Def. Appx. 29–31 at 118:14–120:2.

75. At some times during Galanakis's interactions with Officer Winters on August 28, 2022, Galanakis was cooperative and conversational with Officer Winters. Def. Appx. 6; Def. Appx. Def. Appx. 29–31 at 118:14–120:2.

76. At some times during Galanakis's interactions with Officer Winters on August 28, 2022, Galanakis was argumentative and antagonistic toward Officer Winters. Def. Appx. 6; Def. Def. Appx. 29–31 at 118:14–120:2.

77. Galanakis repeatedly insisted that Officer Winters administer a preliminary breath test. Def. Appx. 6 *et seq*.

78. Galanakis told Officer Winters, "you a rookie bro." Def. Appx. 6 at 27:31–29:50.

79. Galanakis asked Officer Winters, "this your first year?" Def. Appx. 6 at 27:31–29:50.

80. Galanakis asked Officer Winters, "how many false accusations you got?" Def. Appx. 6 at 27:31–29:50.

81. Galanakis told Officer Winters, "this is about to be your fist" false accusation. Def. Appx. 6 at 27:31–29:50.

82. Galanakis called Officer Winters a "dumbass." Def. Appx. 6 at 36:24–36:36.

83. Mood changes can indicate impairment or intoxication by drugs or alcohol. Def. Appx. 80.

**Officer Winters Arrested Galanakis for OWI**

84. Ultimately, Officer Winters arrested Galanakis for OWI in violation of Iowa Code section 321J.2. Def. Appx. 6 at 40:18–40:55.

Dated: December 6, 2023.

By:   */s/ Nicholas F. Miller*
Matthew S. Brick, AT0001081
Erin M. Clanton, AT0002592
Douglas A. Fulton, AT0002672
Nicholas F. Miller, AT0015361
**BRICK GENTRY, P.C.**
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
T: (515) 274-1450
F: (515) 274-1488
matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com
doug.fulton@brickgentrylaw.com
nick.miller@brickgentrylaw.com

Counsel for Defendants
CITY OF NEWTON, ROB BURDESS,
NATHAN WINTERS and CHRISTOPHER WING

Counsel for Counterclaim Plaintiffs
NATHAN WINTERS and CHRISTOPHER WING

## CERTIFICATE OF SERVICE

    I hereby certify that on December 6, 2023, a true copy of the STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was electronically filed using the Court's CM/ECF system, which sent notice to counsel of record, as follows:

    Matthew M. Boles
    Adam C. Witosky
    GRIBBLE, BOLES, STEWART &
    WITOSKY LAW
    2015 Grand Avenue, Suite 200
    Des Moines, Iowa 50312
    mboles@gbswlaw.com
    awitosky@gbswlaw.com
    Counsel for Plaintiff/Counterclaim Defendant

    */s/    Nicholas F. Miller*
    **Nicholas F. Miller, AT0015361**