UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>          Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>          Defendants.<br><hr>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>          Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>          Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**APPENDIX IN SUPPORT OF<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.a.4., Defendants

City of Newton, Iowa (the "City"), Chief Rob Burdess, Officer Nathan Winters, and Lieutenant

Christopher Wing (collectively, "Defendants") submit this Appendix in support of their Motion

for Summary Judgment.

By:    /s/ Nicholas F. Miller
        Matthew S. Brick, AT0001081
        Erin M. Clanton, AT0002592
        Douglas A. Fulton, AT0002672
        Nicholas F. Miller, AT0015361
        **BRICK GENTRY, P.C.**
        6701 Westown Parkway, Suite 100
        West Des Moines, IA 50266
        T: (515) 274-1450

F: (515) 274-1488
matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com
doug.fulton@brickgentrylaw.com
nick.miller@brickgentrylaw.com

Counsel for Defendants
CITY OF NEWTON, ROB BURDESS,
NATHAN WINTERS and CHRISTOPHER
WING

Counsel for Counterclaim Plaintiffs
NATHAN WINTERS and CHRISTOPHER
WING

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2023, a true copy of the APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was electronically filed using the Court's CM/ECF system, which sent notice to counsel of record, as follows:

Matthew M. Boles
Adam C. Witosky
GRIBBLE, BOLES, STEWART &
WITOSKY LAW
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
mboles@gbswlaw.com
awitosky@gbswlaw.com
Counsel for Plaintiff/Counterclaim Defendant


/s/    *Nicholas F. Miller*
**Nicholas F. Miller, AT0015361**

## TABLE OF CONTENTS

I.      Declaration of Nicholas Miller …………………………………………… Def. Appx. 1

II.     Declaration of Rob Burdess …………………………………..…………Def. Appx. 3

        a.      Video Recording from Officer Winters's Body Camera ……………..Def. Appx. 6

III.    Declaration of Nathan Winters ………………………………………….Def. Appx. 7

IV.     Officer Nathan Winters's Iowa Incident Report …………………………..Def. Appx. 10

V.      Lieutenant Christohper Wing's Iowa Incident Report ………………..……..Def. Appx. 14

VI.     Excerpts from Plaintiff Tayvin Galanakis's Deposition Transcript …………Def. Appx. 16

VII.    Excerpts from Dr. Lance Platt's Deposition Transcript ………..……………Def. Appx. 32

VIII.   NAIA National Administrative Council Drug Testing Policy Manual ……..Def. Appx. 37

IX.     William Penn University Sports Medicine Department Drug Education and Testing Program Policy …………………………..…………………………..Def. Appx. 54

X.      Declaration of Matt Bruner …………………………………………….Def. Appx. 70

        a.      Matt Bruner's Report ……………………………..…………………Def. Appx. 73

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　　Plaintiff, | No. 4:23-cv-00044-SHL-SBJ |
| v. | |
| CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>　　　　Defendants. | **DECLARATION OF NICHOLAS MILLER** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>　　　　Defendants/Counterclaim Plaintiffs, | |
| v. | |
| TAYVIN GALANAKIS,<br>　　　　Plaintiff/Counterclaim Defendant. | Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nicholas F. Miller, under 28 U.S.C. §1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.　　　　I am counsel of record in this action for Defendants City of Newton, Iowa, Rob Burdess, and Nathan Winters.

2.　　　　Attached to my Declaration is a true and accurate copy of the Declaration of Rob Burdess.

3.　　　　Attached to my Declaration is a true and accurate copy of the Declaration of Nathan Winters.

4.　　　　Attached to my Declaration is a true and accurate copy of Officer Nathan Winters's

DEF. APPX. 1

Iowa Incident Report.

5.    Attached to my Declaration is a true and accurate copy of Lieutenant Christopher Wing's Iowa Incident Report.

6.    Attached to my Declaration are true and accurate copies of excerpts from Plaintiff Tayvin Galanakis's deposition.

7.    Attached to my Declaration are true and accurate copies of excerpts from Dr. Lance Platt's deposition.

8.    Attached to my Declaration is a true and accurate copy of the NAIA's National  Administrative Council Drug Testing Policy Manual.

9.    Attached to my Declaration is a true and accurate copy of William Penn University Sports Medicine Department's Drug Education and Testing Program Policy, which was Galanakis Deposition Exhibit 8.

10.    Attached to my Declaration is a true and accurate copy of Matt Bruner's Declaration.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Nicholas F. Miller*                        

DEF. APPX. 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>        Defendants. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**DECLARATION OF ROB BURDESS** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>        Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>        Plaintiff/Counterclaim Defendant. | <br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Rob Burdess, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I am the Chief of Police for the Defendant City of Newton, Iowa's Police Department.

2.      As the Chief of Police for the Newton Police Department, I am the lawful custodian of police records, including video recordings from Newton Police Department officers' body cameras.

3.      As the lawful custodian of video recordings from Newton Police Department officers' body cameras, I have personal knowledge of the Newton Police Department's procedures

DEF. APPX. 3

for taking custody of and maintaining the video recordings from officer body cameras.

4.      Newton Police Officers are required to preserve any recording that contains evidence relevant to potential criminal, civil or administrative matters for a minimum of 90 days. Recorded evidence is automatically sent to a secure and encrypted cloud server through WiFi, LTE/PEU, and while a camera is docked for charging. The recorded evidence is preserved on the cloud server and is only accessible to select members of the Newton Police Department administration. The recorded evidence is a .mp4 format video file. A .mp4 is a standard file type that can play on most devices. The recorded evidence is saved until the cessation of the court proceedings or per the Newton Police Department's video evidence retention schedule.

5.      Consistent with the Newton Police Department's procedures for taking custody of and maintaining video recordings from officer body cameras, the Newton Police Department collected, kept, and maintained a true and accurate copy of the video recording from Defendant Officer Nathan Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis on August 28, 2022.

6.      A true and accurate redacted copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022, is published and publicly available on the City of Newton's website at https://www.newtongov.org/CivicMedia?CID=Public-Safety-6#allVideos.

7.      Also, included with my Declaration is a flash drive containing a true and accurate copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022. This copy was produced in discovery by the attorneys representing the City of Newton, Nathan Winters, Christopher Wing, and myself in this action to Mr. Galanakis under the Bates Number CITY ID 00630.

DEF. APPX. 4

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/
Rob Burdess

DEF. APPX. 5

# PLACEHOLDER

This page of Defendants' Appendix is a placeholder for the flash drive containing a true and accurate copy of the video recording from Officer Winters's body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis

The flash drive will be mailed to the Court, c/o the Honorable Presiding Judge Locher, via First Class United States Mail.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>　　　　Defendants. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**DECLARATION OF NATHAN WINTERS** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>　　　　Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>　　　　Plaintiff/Counterclaim Defendant. | Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nathan Winters, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.　　　I am a police officer with the City of Newton, Iowa's Police Department.

2.　　　On August 28, 2022, while I was on duty in my capacity as a Newton Police Department officer, I stopped Plaintiff Tayvin Galanakis's vehicle because he was illegally operating the vehicle with its bright lights on.

3.　　　After stopping Mr. Galanakis, I field sobriety tested him and arrested him for operating his vehicle while under the influence of a drug.

4.　　　When I stopped, field sobriety tested, and arrested Mr. Galanakis, I was wearing a

DEF. APPX. 7

1

body camera on my person that video recorded my interactions with Mr. Galanakis.

5.    Consistent with the Newton Police Department's procedures for taking custody of and maintaining video recordings from officer body cameras, the Newton Police Department collected, kept, and maintained a true and accurate copy of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022.

6.    A true and accurate copy of substantial portions of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022, is published and publicly available on the City of Newton's website at https://www.newtongov.org/CivicMedia?CID=Public-Safety-6#allVideos.

7.    I have reviewed the Declaration of Rob Burdess and the flash drive included with his Declaration that contains a true and accurate copy of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022.  This copy was produced in discovery by the attorneys representing the City of Newton, Rob Burdess, Christopher Wing, and myself in this action to Mr. Galanakis under the Bates Number CITY ID 00630.

8.    During my interactions with Mr. Galanakis on August 28, 2022, he represented to me that he is a student athlete on the William Penn University football team and that he is therefore subject to drug testing every Friday.

9.    On August 28, 2022, I knew that William Penn University participated in the National Association of Intercollegiate Athletics (NAIA) college athletics association and that the NAIA's drug testing policies and procedures only subjected football players to drug testing before a championship game, not on a weekly basis as Mr. Galanakis represented to me.

10.    On August 28, 2022, I also knew that the NAIA's drug testing policies and

DEF. APPX. 8

procedures did not subject every player on a particular football team to drug testing before a championship game, as Mr. Galanakis suggested. I understood that the NAIA's drug testing policies and procedures provided for the selection of football players for drug testing before a championship game either randomly or on the basis of playing time or position.

11.    I knew about the NAIA's drug testing policies and procedures through previous recruitment encounters with the NCAA division I, II, III, NAIA and the NJCAA. I had to read and fill out consent forms pertaining to drug testing for athletes, and the procedures and timing of when these tests may take place.

12.    Given my understanding of the NAIA's drug testing policies and procedures, I believed Mr. Galanakis was not being truthful when he represented that he was drug tested every Friday. His representation struck me as inconsistent with what I knew about the NAIA's drug testing policies and procedures, and I suspected that he was lying to me to persuade me that he was not intoxicated by drugs or alcohol, including marijuana. This factored into my judgment and led me to believe Mr. Galanakis was intoxicated by marijuana or another drug.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/ Nathan Winters

Nathan Winters

Rev. 07/2019

Grid

Photos  Yes  No

Car #

Video #

# IOWA INCIDENT REPORT
## NEWTON POLICE DEPARTMENT
**101 W 4TH ST S**
**NEWTON, IA 50208**
**6417921547**

Case Number **22-25845**
Date/Time of Report **08/29/2022    02:13    Hrs**
Status **02 - INACTIVE**

# SUMMARY

| County **JASPER - 50** | Report Type **0 - INITIAL INCIDENT** | ORI Number **IA0500100** |
|---|---|---|

| Is Date and Time of Incident Known?  **Yes** | Incident Date or Lower Date Range  **08/28/2022** | Upper Date Range | Incident Time or Lower Time Range  **00:13  Hrs.** | Upper Time Range  **Hrs.** |
|---|---|---|---|---|

| Day of Week Incident Occurred **SUNDAY** | Exceptionally Cleared | Date Cleared Exceptionally |
|---|---|---|

## INCIDENT REPORTED BY

| Was Incident Reported by a Victim?  **NO** | Reporting Victim's Sequence No. | Name - Last **WINTERS** | First **NATHAN** | Middle | Suffix |
|---|---|---|---|---|---|

| Business Name (if Incident was Reported by a Business) |
|---|

| Address **101 W 4TH ST S** |
|---|

| City **NEWTON** | State **IA** | Zip Code **50208** | Home Phone **(641) 791-0850** | Work Phone |
|---|---|---|---|---|

# OFFENSE 001

| Seq. No. **001** | Ordinance **GENERIC** | Code Section **1** | UCR Offense Code **ALL OTHER OFFENSES - 90Z** |
|---|---|---|---|

| Charges/Offense **INFORMATION** | Attempted/Completed **C - COMPLETED** |
|---|---|

Type of Criminal Activity (up to 3)

| Type of Weapon/Force Involved (up to 3) **99 - NONE** | Gang Information (up to 2) **N** |
|---|---|

| No. of Premises Entered | Method of Entry **N - NO FORCE** | Offender Suspected of Using (up to 3) **N - NOT APPLICABLE** |
|---|---|---|

## LOCATION OF OFFENSE

| Location Type **13 - HIGHWAY/ROAD/ALLEY/STREET/SIDEWALK** | X Coordinate **495512.125** | Y Coordinate **4616312** |
|---|---|---|

| Literal Description **SOUTH 2ND AVE WEST** |
|---|

| Address **200 BLK S 2ND AVE W** | Address 2 | City **NEWTON** | State **IA** | Zip **50208** |
|---|---|---|---|---|

# VICTIM 001

| Type of Victim **S - SOCIETY/PUBLIC** | Sequence No. **001** | Business/Organization/State/County/Municipality Name **CITY OF NEWTON** |
|---|---|---|

| Address **101 W 4TH ST S** | City **NEWTON** | State **IA** | Zip Code **50208** | Phone **(641) 791-0850** |
|---|---|---|---|---|

## VICTIM CONNECTED TO UCR OFFENSE CODES

| UCR Offense Code 1 **ALL OTHER OFFENSES - 90Z** | UCR Offense Code 2 |
|---|---|
| UCR Offense Code 3 | UCR Offense Code 4 |
| UCR Offense Code 5 | UCR Offense Code 6 |
| UCR Offense Code 7 | UCR Offense Code 8 |
| UCR Offense Code 9 | UCR Offense Code 10 |

## ADDITIONAL OFFENSE CIRCUMSTANCE INFO

| Aggravated Assault/Homicide Circumstances (up to 2) |
|---|
| Additional Justifiable Homicide Circumstances |

# END OFFENSE 001

DEF. APPX. 10

CITY ID 00001

# OFFENDER 001

| Type of Offender | Sequence No. | NIBRS Offense Sequence Numbers | Lesser Offense Sequence Numbers |
|---|---|---|---|
| 02 - Suspect | 001 | 001 | |

| Name - Last | First | Middle | Suffix |
|---|---|---|---|
| GALANAKIS | TAYVIN | JOHN | |

| Alias(es) |
|---|
| |

| Address | | City | | State | Zip Code | Home Phone |
|---|---|---|---|---|---|---|
| 715 S 3RD AVAE W | | NEWTON | | IA | 50208 | |

| DOB Known? | DOB | Age or Lower Age Range | Upper Age Range | SSN | Resident Status |
|---|---|---|---|---|---|
| YES | 08/16/2003 | 19 | | 482336773 | R - RESIDENT |

| Driver's License - Number | State | Gender | Height | Weight | Eye Color | Hair Color |
|---|---|---|---|---|---|---|
| 216AN9626 | IA | MALE | 6' 00" | 120 LBS | BROWN - BRO | BROWN - BRO |

| Skin Tone | Race | Ethnicity |
|---|---|---|
| FAIR - FAR | W - WHITE | NOT OF HISPANIC ORIGIN - N |

| Scars/Marks/Tattoos | Offender Present When Officer Arrived? |
|---|---|
| NONE | YES |

| Type of Injury (up to 5) |
|---|
| N - NONE |

## EMPLOYMENT OR SCHOOL INFO

| Employer or School | Occupation |
|---|---|
| | |

| Address | City | State | Zip Code | Work Phone |
|---|---|---|---|---|
| | | | | |

## ARREST INFO

| Offender Arrested? | Arrest Trans. Booking No. | Type of Arrest | Arrest Date | Arrest Time |
|---|---|---|---|---|
| NO | | | | Hrs. |

| Associated Offense Sequence No. | Miranda By | Miranda Date | Miranda Time |
|---|---|---|---|
| | | | Hrs. |

| Arrestee Condition | Arrestee Armed With (up to 2) |
|---|---|
| | |

| Place of Birth | Multiple Arrestee Indicator | Additional Incidents Cleared |
|---|---|---|
| | | |

## JUVENILE INFO

| Parent/Guardian Contacted? | Name - Last | First | Middle | Suffix |
|---|---|---|---|---|
| | | | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Juvenile Arrestee Disposition |
|---|---|---|
| | | |

# END OFFENDER 001

# VEHICLE 001

| Vehicle Year | Make | Model | Style |
|---|---|---|---|
| 2015 | CHEVROLET - CHEV | IMPALA | 4D |

| License Plate # | State | Year | Type |
|---|---|---|---|
| BZB943 | IA | 2023 | |

| VIN | Color(s) |
|---|---|
| 2G1WB5E39F1104187 | WHITE - WHI |

| Associated Offense Sequence No. | Vehicle Impounded? | Impound Location | Impound Tag Number |
|---|---|---|---|
| 001 | NO | | |

## NARRATIVE

On 08/28/2022 at approximately 0013 hours, I, Officer Nathan Winters was on active patrol in my fully marked patrol car(843) when I was traveling east bound on S 2nd AVE W in Newton. I was traveling in approximately the 300 BLK when I noticed a white vehicle traveling west bound on S 2nd AVE W in Newton IA. I noticed that this vehicle had its bright lights on and did not dim their headlights while they were driving towards me. The driver of this vehicle turned south on W 2nd ST S in Newton IA.

I also turned south onto W 2nd ST S. I initiated my emergency lights on my patrol car to initiate a traffic stop on the vehicle. The traffic stop was conducted in approximately the 200 BLK of S 3rd AVE W in Newton IA. I radioed my location to Jasper County dispatchers. I exited my patrol car where I approached the driver on the driver side door where I made contact with a male who was identified as Tayvin Galanakis(08/16/2003) of Newton IA.

I advised Tayvin the reason for the stop. When I did so, he stated "yeah, I turn my brights on because I have a head light out". I advised him that he was not allowed to have his bright lights on in town and that he had to dim his head lights to oncoming traffic at approximately 500 feet (see IA code 321.415). While I was speaking with Tayvin, I noticed that he had watery and blood shot eyes. I noticed that there was a small odor of an alcoholic beverage that was coming from his person. I asked Tayvin where he was headed and he stated "I am headed home". I asked him Tayvin for his license, registration and proof of insurance. I asked tayvin where he was coming from and he stated "from a friends house". I asked him if he had anything to drink. I could not hear his answer so I asked him again and he did not answer this question.

Tayvin reached over to the glove box where he retrieved some paper work. While he did so, I noticed that he moved slowly. I also noticed that while I was speaking with him, I noticed that he was speaking with a slowed slurred speech. While Tayvin was trying to find his registration, he was moving slowly, he had the correct registration in his left hand and he continued to move slowly. Tayvin then gave me two registrations for the vehicle. Tayvin then sat in the driver seat without giving me the insurance. I then asked him again for his insurance.

While I was waiting for his insurance, Tayvin grabbed a debit card out of his billfold. He then placed this back and then gave me his license. Tayvin then grabbed the registration again and then looked at it and then placed it back into the glove box. At this point I had still not received the insurance card. Tayvin continued to sit in the drivers seat with no insurance. I had to remind him again for his insurance.

As I was waiting for Tayvin to give me his insurance card, I noticed that he continued to move slowly. Tayvin then provided me an insurance card that was

DEF. APPX. 11

CITY ID.00002

expired 2021. He then stated I have the email version. As Tayvin started to look in his phone for his insurance, he continued to move slowly thumbing through items on his phone where he finally was able to find the insurance. I advised Tayvin that I wanted him to exit his vehicle. I told him to take his gum out of his mouth and place it on his dash. He did so without incident.

I advised Tayvin that I wanted him to have  a seat in my front passenger seat of my patrol car.  Tayvin did so. I sat in the drivers seat. While tayvin and I sat in my patrol car, I asked him where he was coming from and he stated "uh, back there at Creightons". While he and I were speaking in my patrol car, I noticed a small scent of alcohol that was coming from his person.  Tayvin then stated "I am home from college". I continued to speak with Tayvin and while I did so, I continued to notice that he was speaking with a slurred speech.

I asked Tayvin how much he had to drink tonight and he stated "none". I asked him why his eyes were watery and blood shot tayvin then stated "you wanna blow me really quick". I stated no.  Tayvin then stated "I got contacts but we can do the little thing". Tayvin stated "that is funny, I have had nothing to drink".

I advised him that his movements in the car with him fumbling over the registrations, him moving slowly are concerns.  Tayvin then stated "yep". He then stated "so what happens when nothing pops up, do you get in trouble". I advised him that I am doing my duties and that I would probably not get in trouble for doing my job. I advised Tayvin that I wanted to make sure that he was safe to drive.  I advised him that I wanted to exit my patrol car and go onto the sidewalk that was near by.

Tayvin and I then spoke on the sidewalk that near us. I asked him if he had any contacts or glasses in and he stated "i took them out at a friends house".  I asked him if he had any head injuries and he stated "no".  I advised him that I wanted him to stand with his heels and his toes together and his arms down to his side. I demonstrated this position for him. I advised him that I was going to check his eyes. I told Tayvin that I wanted him to follow my finger with his eyes and his eyes only and to not move his head. I asked him if he had any questions and he stated "no". I asked him what color his eyes were and he stated hazel. I asked him if they ever changed colors and he stated "no".  I began the test. I asked him if he could see my finger clearly and he stated "yessir".  Tayvin had equal tracking and equal pupil size in both of his eyes in two(2) passes of his eyes.

During this test, tayvin did not have lack of smooth pursuit, he did not have distinct and sustained nystagmus at maximum deviation, and he did not have onset prior to 45 degrees. Tayvin did not show any clues of impairment in this test.

The next test was the walk and turn test.  I asked Tayvin if he was comfortable in walking in the shoes that he had on and he stated "yes".  I asked tayvin if he could see the crack that was in the parking lot that we were standing in.  Tayvin stated "yes". I told him that I wanted him to take his left foot and place it on the crack, and take his right foot and place it in front of his left foot with the heel of his right foot touching the toe of his left foot.  I demonstrated this position for him. I asked him if he had any questions about this test so far and  he stated "no". I told him to stay in this position until I told him to begin the test.

I advised him that from the position that he was in, I wanted him to take nine(9) heel to toe steps, along the crack in the parking lot. I told him that each step would be heel to toe and to keep his arms down to his side during this test. I again asked him if he had any questions and he stated "no". I demonstrated three(3) steps for him. I advised him that when he gets to his ninth step to leave his front foot on the line and turn by taking a series of small step and then take nine(9) heel to toe steps back down that line. I demonstrated the turn and three(3) more steps for him.

I advised Tayvin that during this test to leave his arms down to his side, watch his steps, count his steps out loud, and once he has started walking do not stop until he has completed the test. I asked tayvin if he had any issues with his ankles, knees, hips of his back and he stated "just my right ankle". I asked him if this was going to prevent him from walking and he stated "sometimes, but I will be able to do this". I asked him if his ankle is hurting now and he again stated "no". I advised him that if he did not have any questions that he could begin the test.

During his first nine(9) steps, Tayvin stepped off line for one(1) clue, he took 13 steps for one(1) clue, and once he got to his 13th step, he stopped walking for one(1) clue. He then made an improper turn by pivoting on both of his feet instead of taking a series of small steps for one(1) clue.  IN his second nine(9) steps, he missed heel to toe for one(1) clue, and he took fifteen(15) steps back down the line. During this test, Tayvin stated "Common man, this is to easy, lets do the breath now". I asked Tayvin how many steps I told him to take and he stated "like 8 or 9".  tayvin then stated "I thought you were going to tell me when to turn". I advised him that I was not going to do that and that he was to count his steps out loud.  During this test, Tayvin showed five(5) clues of impairment in this test.  It should be noted that two(2) out of the eight(8) indicate a failing score.

The next test was the one leg stand test. I advised him that I wanted him to stand with his heels and his toes together and his arms down to his side.Tayvin then stated "God, you a rookie bro and asked me if this was my first year". Tayvin then stated "How many false accusations you got"?  I advised him that I believed "zero".  He then stated "this is about to be your first one".

I advised Tayvin that when I say begin, I wanted him to raise either his left or his right foot and raise is approximately six(6) inches off of the ground and keep it parallel to the ground. I demonstrated this test for him. I advised him that during this test, I wanted him to keep his arms down to his side, watch his raised foot and count out loud in the following manner "1001,10021003,1004" so on and so fourth until I told him to stop. I asked him if he had any questions and he asked repeat the directions.  I did so. I then asked him if he had any questions and he stated "no".  During this test,  he was  swaying from side to side for one(1) clue, and he kept his right arm away from his body for balance for one(1) clue. Tayvin did not count  out loud like  he was told to do so.  During this test, Tayvin showed two(2) clues  of impairment in this test. It should be noted that two(2) out of the four(40 clues indicate a failing score.

I  advised Tayvin that I had three(3) more  tests for him. I advised him thatI was again going to check his eyes. I advised him that I was going to make a circle around the outside of his face and I was going to come in towards the bridge of his nose but I was not going to touch his nose. I advised him that I wanted him to watch my finger with his eyes and his eyes only and to  not move his head. I asked him if he had any questions and he stated "no".  In this test, I am checking for lack of convergence. In two(2) circular passes of his face, Tayvin showed lack of  convergence in both of his eyes.  Lack of convergence is present in a persons eyes when they cannot converge their eyes towards the middle of his nose.  This is an indication of impairment.

The next test was the modified romberg test.  I advised Tayvin that I when I was done explaining the test, I wanted him to close  his eyes, tilt his head back and estimate the passing of 30 seconds. I advised him that when he is done estimating 30 seconds, to open his eyes, tilt his forward and then say done.  I asked him  if he had any questions and he stated no. He began the test. During this test, he was swaying, he had eye lid tremors, and in 34 seconds he estimated 30 seconds. The eye lid tremors and the swaying from side to side are all indicators of impairment.

The next test was the finger to nose test.  I advised him that I wanted him to stand with his heels and his toes together and make a fist and rotate his palms where they were facing me. I told him to extend both of his index fingers on both of his hands.  I advised him that I was going to give him a series of commands.  I told him either the command would be either left or right. I told him that whichever hand I say, I wanted him to bring that hand up and touch the tip of his nose with the tip of his finger and then bring his hand immediately back down. I advised him that I did not want him touching his nose with the pad of his finger. I told him that during this test he was going to have his eyes closed and his head titled back.  I asked him if he had any questions and he stated no.

The following is the order of the test.

1. Left: He used his left hand and touched his right nostril with his knuckle.
2. Right: Tayvin used his  right hand and touched the middle of his cheek.

DEF. APPX. 12

CITY ID 00003

4. Right: Tayvin used his right hand and touched under neath of his nose.
5. Right: Tayvin used his right hand and touched his right nostril.
6. Left: Tayvin used his left hand and touched the pad of his finger to the tip of his nose.

During this test, Tayvin was having a hard time keeping his head tilted back. He had eye lid tremors, and he never touched the tip of his nose with the tip of his finger. All of these are indicators of impairment.

I offered Tayvin a Preliminary Breath Test(PBT). I advised him that I was going to estimate if and how much alcohol was on his breath. He submitted to a PBT which indicated his Brac to be .000%. I then read him his MIRANDA warnings where I asked Tayvin when was the last time he smoked weed, he started to look around, there was a very long pause, then he stated "I do not remember". Through my training and experience, I know persons who look away and around to be "looking" for an answer. I then asked him if he smoked tonight and he stated "no".

I advised Tayvin that I believed that he was under the influence of something. I asked him if he wanted to talk to another officer and he stated "hell yeah, get him over here". I asked him if he wanted to do drug influence evaluation. Tayvin asked what that was and I explained it to him briefly and he then stated "yeah lets do it'.

I called Officer Shinkle who was on duty at this time. I advised him of this and he stated he would be available. See his report.

I returned to speak with Tayvin where I advised him that we would have to go to the PD to do this evaluation. He then stated "right now"? I advised him yes. He then stated "I dont want to do that right now". I asked him why and he stated "because you have me out in this damn rain". I then advised him that we would go to the PD where it was dry and Tayvin stated "well, I do not want to do that right now". He then stated "No, I want to go home, you waisted my time". I advised him to turn around and place his hands behind his back. I advised him that he was being placed under arrest for OWI. Tayvin was placed in a set of hinged handcuffs behind his back where they were double locked. I searched his person for any contraband and none was found. Tayvin was placed in the back seat of my patrol car where he was placed in the prisoner compartment. I placed the seat belt on his person. I locked and secured his car. I had my BWC on during this.

Tayvin was transported to the Newton PD where he spoke with Officer Shinkle. See his report. At 0048 hours, I read him the implied consent advisory where I requested a sample of his urine for chemical testing. I advised him that he did not have to answer this right away. I then read him his 8094.20 advisory where I advised him that he could call anyone for any reason.

Tayvin was not charged, and it was determined that he was not under the influence.

He was released without a charge.

At this time, this ends my involvement in this case and this report is for informational use only.

# OFFICER

Complainant/Reporting Party Signature

| Reporting Officer | | Badge Number | Supervisor | | | | Badge Number |
|---|---|---|---|---|---|---|---|
| **WINTERS, NATHAN** | | **639** | | | | | |
| Video Taken? (Check All That Apply) 01 - IN CAR, 02 - OFFICE, 03 - BOTH IN CAR AND OFFICE, 04 - BODY CAMERA, 05 - BOTH IN CAR AND BODY CAMERA | | | | | Evidence Seized? **NO** | Photos Taken? **NO** | |
| Incident Assigned To **PATROL** | | | | | | | |

DEF. APPX. 13

Grid #_____
Arrest #_____
Car # _843_
Video # _BWC_

rlc030102

# IOWA INCIDENT REPORT SUPPLEMENTAL
## NEWTON POLICE DEPARTMENT
### 101 W 4TH ST S
### NEWTON, IA 50208
### (641) 792-1547

| C A S E I N F O | Case Number | Date of This Report | County in which Incident Occurred |
|---|---|---|---|
| | 22-25845 | 08/29/2022 | JASPER - 50 |

| ORI Number |
|---|
| **NEWTON POLICE DEPARTMENT - IA0500100** |

| Date of Original Occurrence | Type of Offense |
|---|---|
| 08/28/2022 | **OWI INVESTIGATION** |

| Name - Last | First | Middle | Suffix |
|---|---|---|---|
| **GALANAKIS** | **TAYVIN** | **JOHN** | |

| Clearance Classification | | | Investigative Status | | |
|---|---|---|---|---|---|
| ☑ Unfounded | ☐ Exceptionally Cleared | ☐ Cleared by Arrest | ☐ Open | ☑ Closed | ☐ Suspended |

## Narrative

On Saturday, August 28, 2022, at 0013hours, I was riding with Officer Winters after having a meeting with him. We had just left the back lot of the PD traveling eastbound on S 2nd Ave W. As we were approaching W 2nd St, a white Chevy Impala was traveling westbound toward us with its high beams on. The vehicle turned south on W 2nd St and Officer Winters initiated a stop on the vehicle in the 200 blk S 3rd Ave W.

I approached the vehicle on the passenger side, which was occupied by one male later identified as Tayvin Galanakis. Officer Winter was talking with Tayvin and explained the reason for the stop and requested he license registration and insurance. I could not hear any of the responses from Tayvin as the passenger side window was up. Tayvin had some trouble locating the requested documents and made several attempts to locate the documents in the glove box by putting stuff back in the glove box and then going back and looking in the glove box again.

Officer Winters asked Tayvin to step back to the patrol car, and asked him to take his gum out and put it on the dash. This was an indicator to me that he suspected he was under the influence. Tayvin was asked to have a seat in the front passenger seat of Officer Winters. I walked back and opened the door for Tayvin and I took a seat in the back seat cage, and radioed dispatch to rest Officer Winters depravation period due to the fact that Tayvin had gum in his mouth. During their conversation Tayvin explained that he was at a friend's house and that he was on his way home. He also explained that he plays football for William Penn College and that he was home for the weekend because as a freshman they aren't part of the travel team. Officer Winters as Tayvin how much he had to drink tonight and Tayvin said that he nothing to drink. Officer Winters then asked Tayvin why he would have bloodshot and watery eyes. Tayvin said the he would blow right now and Officer Winters advised they would get to that. When asked why he would think that Office Winters explained that his difficulty retrieving paperwork was a clue as well as the odor of alcohol.

Tayvin told Officer Winters that he wanted to blow right know. Officer Winters explained that he would get to that but first offered him sobriety tests, which Tayvin agreed to.

For the sobriety tests Tayvin was asked to step to the parking lot area of the water tower. After asking some questions regarding his eyes he performed the HGN test. During the test Tayvin engaged Officer Winters in conversation about football and was upset that he had just got his hair permed and that the rain was going to mess it up. I should be noted that there was a very light rain during the sobriety tests; however nearer the time of arrest it picked up a little and was more steady.

The second test he offered was the walk and turn. After completing the test Tayvin asked for the breath test stating that he was two for two on the tests. Officer Winter rebuked him and told him that he wasn't and asked why he took more steps than advised.

They proceeded to the One Leg Stand (OLS). During the performance of the walk and turn and one leg stand I was Officer Winters backup officer and it was not my role or position to score these test.

Officer Winters then administered three additional eye tests which are designed to detect drug impairment. After the tests Tayvin asked officer Winters why he assumed he was drunk. Officer Winters told him that he was showing several strong signs of impairment. Officer Winters then read Tayvin his Miranda Warning, which Tayvin acknowledged before blowing into the PBT which showed no presence of alcohol.

Officer Winters then asked Tayvin when the last time he smoked Marijuana. This lead me to believe that there was something with the other tests that lead Officer Winters to believe that Tayvin was impaired. Tayvin couldn't tell Officer Winters when the last time he smoked marijuana was but insisted that it wasn't recent and stated that he is tested weekly for

Officer Winters then made a phone call to Officer Shinkle who was working and was a Drug Recognition Expert. While Officer Winters was on the phone Tayvin asked if he could make a phone call to his mom and I told him that he could. During the course of his conversation with is mom he asked me to talk to her and I told him that I really couldn't because he was an adult. Tayvin asked me why I was allowing this to happen and I pointed out that he was specialized in this area and that if he believed he was under the influence that he could do this. Initially Tayvin indicated that he would do a DRE eval but after Officer Winters was done with his phone call he decided that he wasn't going to do one at which time Officer Winters told Tayvin that he was under arrest for OWI. He was handcuffed, searched and placed in the back of patrol car 843.

Once at the PD Tayvin agreed to do a DRE evaluation, which was performed by Officer Shinkle. During that time I spoke with his mom, Lindsey Maxwell, 2 different times. I explained what was going and told her that I was a little limited on what I could say due to the fact that he was of age, and told her that I would have him call her when he was done. After the DRE evaluation was complete Officer Shinkle and Winters came into the office and Officer Shinkle told me that he found no signs of impairment. Officer Winters asked if they should charge him he had been arrested. I told them absolutely not that if a DRE evaluation showed no evidence that we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way. About this time dispatch advised that his mom was in the front lobby to pick him. He was then released to his mom with no charges.

DEF. APPX. 14

CITY ID 00005

| O F F I C E R | Complainant/Reporting Party (Signature) | | | |
|---|---|---|---|---|
| | Reporting Officer's Name - Last **WING** | First **CHRIS** | Middle | Suffix |
| | Title **LIEUTENANT** | Badge Number **6A** | UserID **606** | |
| | Assisting Officer / Admin Reviewer's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Supervisor's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Incident Assigned to: | | | |

DEF. APPX. 15

CITY ID 00006

```
 1              UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3
     - - - - - - - - - - - - - - - -
 4   TAYVIN GALANAKIS,              :
                                    :          ORIGINAL
 5        Plaintiff,                :
     vs.                            : Case No.
 6                                  : 4:23-cv-000044
                                    :
 7   CITY OF NEWTON, IOWA, ROB      :
     BURDESS, NATHAN WINTERS,       :
 8   CHRISTOPHER WING, individually:
     and in their official         :
 9   capacities with the Newton    :
     Police Department,            :
10                                  :
          Defendants.              :
11   - - - - - - - - - - - - - - - -
     NATHAN WINTERS and            :
12   CHRISTOPHER WING,             :
                                    :
13        Counterclaim Plaintiffs,:
                                    :
14   vs.                            :
                                    :
15   TAYVIN GALANAKIS,             :
                                    :
16        Counterclaim Defendant. :
     - - - - - - - - - - - - - - - -
17

18     VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19   taken by the Defendants/Counterclaim Plaintiffs

20   before Jessi C. Lass, Certified Shorthand Reporter

21   of the State of Iowa, at 6701 Westown Parkway, Suite

22   100, Des Moines, Iowa, commencing at 2:14 p.m.,

23   Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

*SUSAN FRYE COURT REPORTING | 515-284-1972*
*300 Walnut Street, #36, Des Moines, IA 50309-2224*

```
 1                     A P P E A R A N C E S

 2    For the Plaintiff/Counterclaim Defendant:

 3         CHRISTOPHER C. STEWART, ESQ.
           GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
 4         2015 Grand Avenue, Suite 200
           Des Moines, Iowa 50312
 5

 6    For the Defendants/Counterclaim Plaintiffs:

 7         NICHOLAS F. MILLER, ESQ.
           BRICK GENTRY PC
 8         6701 Westown Parkway, Suite 100
           West Des Moines, Iowa 50266
 9

10    Videographer:
           AMY COOPER
11         FIDELITY VIDEO SERVICES, INC.

12    Also present:
           NATHAN WINTERS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

DEF. APPX. 17

 1             T A B L E   O F   C O N T E N T S

 2   WITNESS:  TAYVIN GALANAKIS                              PAGE

 3   Examination By Mr. Miller ........................5

 4   Examination By Mr. Stewart ....................120

 5

 6   EXHIBITS                                    PAGE FIRST
                                                REFERENCED
 7   1   - Body cam video (City ID 00630) .............20

 8   2   - NAIA drug-testing policy manual ...........56

 9   3   - Video (City ID 00627) .....................65

10   4   - 8/29/22 Facebook post by Galanakis ........75

11   5   - Facebook comment string ...................87

12   6   - 11/1/22 Facebook post by Galanakis ........91

13   7   - GoFundMe page for Galanakis ...............96

14   8   - William Penn University "Drug Education ...114
          and Testing Program Policy"
15
     CERTIFICATE OF REPORTER..........................123
16

17   Reporter's Note:  The original exhibits were
     forwarded to Mr. Miller.
18
     (ph) indicates a phonetic spelling.
19   [sic] indicates the text is as stated.
     Quoted text is as stated by the speaker.
20

21

22

23

24

25

DEF. APPX. 18

 1    tell me how many seconds to count to.  So there's a

 2    big period in betwine -- in between the set of rules

 3    when he first told me.

 4          Q.   Did Officer Winters instruct you to count

 5    out loud?

 6          A.   Yes.  I did see that.

 7          Q.   Did you count out loud?

 8          A.   No.

 9          Q.   Did you forget that part of the

10    instructions?

11          A.   Yes.

12          Q.   Let's move on to when Officer Winters

13    asked you a question about the last time you used

14    marijuana.  Have you ever used marijuana?

15          A.   No.

16          Q.   Never?

17          A.   No.

18          Q.   Have you ever used any other drugs?

19          A.   My inhaler.

20          Q.   Anything else?

21          A.   No.

22          Q.   Have you ever drank alcohol?

23          A.   No.

24          Q.   Never?

25          A.   I wouldn't say -- I wouldn't say never,

DEF. APPX. 19

Case 4:23-cv-00044-SHL-SBJ    Document 40-3    Filed 12/06/23    Page 23 of 102

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                              Page 45

1    but it's been a while.

2          Q.    When?

3          A.    I was -- I was at my house two years ago

4    last time I did.

5          Q.    Do you remember Officer Winters asking you

6    about the last time you used marijuana?

7          A.    Do I remember him asking that question?

8          Q.    Yes.

9          A.    Yeah.

10         Q.    He asked you that on August 28th, 2022,

11   when -- during his stop?

12         A.    Yes, he did say that.

13         Q.    Do you remember how you responded?

14         A.    I said, "I don't know."

15         Q.    I'm going to show you a portion of the

16   Officer Winters' body cam video, which is Galanakis

17   Deposition Exhibit 1, beginning at 35 minutes,

18   21 seconds and ending at 35 minutes, 34 seconds,

19   based on the timer in the upper right-hand corner of

20   the video.

21              Okay, Mr. Galanakis.  I'm going to hand

22   you my computer so you can watch that portion of the

23   video.  Press play -- press play when you're ready.

24   And you can stop it at 35 minutes, 34 seconds.

25         A.    35:34.  Thank you.

DEF. APPX. 20

Case 4:23-cv-00044-SHL-SBJ    Document 40-3    Filed 12/06/23    Page 24 of 102

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 46

1       Q.    Press play whenever you're ready.

2       A.    (Witness complies.)

3             35:34?

4       Q.    Yeah.

5       A.    Sorry.  I went 10 seconds over.

6       Q.    That's okay.

7             MR. MILLER:  I'm taking my computer back,

8    because Mr. Galanakis has reviewed that portion of

9    the video.

10      Q.    (Mr. Miller)  Why did it take you some

11   time to respond to Officer Winters' question about

12   the last time you used marijuana?

13      A.    It took me a while because at first he was

14   accusing me of drinking alcohol and he could smell

15   it in my breath, and then I go and blow the zeros,

16   and then he asks me that question, last time I

17   smoked marijuana.  So I'm right there thinking, Why

18   is he asking me this question?  Am I really getting

19   arrested for blowing zeros right now?

20            And so I'm sitting there trying to take in

21   everything that just happened to me, and it's taking

22   me a while to understand, Oh, I blew zeros; that's

23   why he's asking me that question.  It's not because

24   my eyes looked red.  It's because I blew zeros.  So

25   now I finally understanding that, and I say, "I

DEF. APPX. 21

Case 4:23-cv-00044-SHL-SBJ    Document 40-3    Filed 12/06/23    Page 25 of 102

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 47

 1    don't know."

 2        Q.   Well, so you just testified that you've

 3    never smoked marijuana; right?

 4        A.   (Nods head.)

 5        Q.   Why would it take you that amount of time

 6    to tell Officer Winters that you've never smoked

 7    marijuana?

 8             MR. STEWART:  Objection.  Asked and

 9    answered.

10             Go ahead.

11        A.   Yeah.  Well, just how I answered the

12    previous question.

13        Q.   (Mr. Miller)  Explain for me one more

14    time.

15        A.   Okay.  So when I got pulled over, he said

16    he smelled alcohol coming from my breath.  So I was

17    like, "Let's do the test, the Breathalyzer test."

18    And we get to that point after doing all the

19    walk-through tests, blow zeros -- this is my first

20    time getting pulled over and doing any of that, by

21    the way.  I blow zeros, and now I'm thinking, Wow,

22    what just happened?  Because he just stated that --

23    he asked me a question about when the last time I

24    used marijuana, when he said my breath smelled like

25    alcohol, and now I blow zeros, and all of a sudden

DEF. APPX. 22

Case 4:23-cv-00044-SHL-SBJ    Document 40-3    Filed 12/06/23    Page 26 of 102

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 48

1    it's weed.  So I'm sitting there like, What in the

2    world is going on?  That's why it took me so long to

3    answer that question.

4        Q.   If you've never smoked marijuana before,

5    as you testified here today, why did you tell

6    Officer Winters you couldn't remember the last time

7    you smoked marijuana?

8             MR. STEWART:  Object --

9        A.   I said that --

10            MR. STEWART:  I'm going to object to that

11   as asked and answered.

12            Go ahead.

13       A.   I said that because I didn't know how to

14   react in that moment after blowing zeros and

15   actually dealing with something that you would see

16   on a viral YouTube video.  So then I kind of get

17   caught up right there not answering that question

18   right.  I said "I don't know" when I should have

19   said, "No, never smoked weed."

20       Q.   (Mr. Miller)  Well, there was no viral

21   YouTube video at the time you made that response.

22       A.   Yeah, I'm just saying, like, what I went

23   through felt like something I've already seen on the

24   internet.  And me understanding that that's what I'm

25   going through right now, I was in a state of shock.

 1    asked you?

 2              MR. STEWART:  Objection.  Asked and

 3    answered.

 4              Go ahead.

 5       A.   Well, just like I said, in the field I was

 6    going off smoking marijuana, and then in there I was

 7    being honest when he said, "When's the last time you

 8    used marijuana in a form?"

 9       Q.   (Mr. Miller)  Okay.  On August 28th, 2022,

10    did William Penn University, where you were a

11    student athlete, have a drug-testing policy or

12    procedure for testing student athletes?

13       A.   No.

14       Q.   They did not have a drug-testing policy?

15       A.   No.

16       Q.   Were you ever drug-tested while you were a

17    student athlete at William Penn University?

18       A.   No.

19       Q.   Well, why did you tell Officer Winters on

20    August 28th, 2022, that you get drug-tested every

21    Friday?

22       A.   So I told him that because I felt like it

23    was a bunch -- it was a waste of my time being

24    there, being sober, and having nothing -- absolutely

25    nothing in my system.  So I felt like letting him

DEF. APPX. 24

1   know that would cut me off way sooner than taking me

2   to the department for no reason and arresting me for

3   no reason.  So I felt like, if I told him that, he

4   would understand.

5          And also, adding onto that, we were told

6   by our coaches before the season that we would be

7   getting drug-tested, but obviously that was just a

8   scare tactic so we'd all behave.

9      Q.   So when you told Officer Winters that you

10  get drug-tested every Friday because you're on the

11  William Penn University football team, you

12  intentionally lied?

13     A.   At the time I didn't lie.  I was saying

14  what I was told.

15     Q.   You told Officer Winters that you get

16  drug-tested every Friday; right?

17     A.   (Nods head.)

18     Q.   In fact --

19          MR. STEWART:  Is that a yes?  Sorry.  Is

20  that a yes?

21          THE WITNESS:  Yes.

22          MR. MILLER:  I appreciate it.

23          MR. STEWART:  Yeah.

24          THE WITNESS:  Yes.

25     Q.   (Mr. Miller)  That's not true, is it?

DEF. APPX. 25

 1      A.    Yep.

 2            MR. MILLER:  Okay.  I am handing what's

 3      been marked Galanakis Deposition Exhibit 8 to

 4      Mr. Galanakis' counsel.

 5            MR. STEWART:  Is there any particular

 6      portion we're looking at here, Counsel?

 7            MR. MILLER:  Yeah.  Just one second.

 8            First sentence, Section 3.1.

 9            Hopefully I said "First sentence,

10      Section 3.1."

11            MR. STEWART:  That starts with "The

12      athletic department"?

13            MR. MILLER:  Correct.

14            MR. STEWART:  Okay.

15      Q.    (Mr. Miller)  All right.  Mr. Galanakis,

16      your legal counsel's just handed you what's been

17      marked Galanakis Deposition Exhibit 8.  Do you have

18      any idea what that is?

19      A.    "Sports Medicine Department, Drug

20      Education and Testing Policy."

21      Q.    Have you ever seen this before?

22      A.    I probably have, but I don't remember any

23      of it.

24      Q.    Why would you have seen this before?

25      A.    Most likely, before we started practicing,

DEF. APPX. 26

1    they gave us this.  I think -- well, they gave us

2    this form, along with many other forms.

3        Q.   I think before you testified that William

4    Penn didn't have a drug-testing policy; right?

5        A.   That they didn't?

6        Q.   Right.  Or to your knowledge, did they?

7    Does this refresh your memory at all?

8        A.   Well, the coaches -- the coaches said that

9    we would be getting drug-tested every Friday.  So

10   that's the only understanding I got of William Penn

11   drug testing.  I do not remember this form.

12       Q.   Which coach said that?

13       A.   I couldn't remember which coach, but it

14   was in the team meeting room right before the season

15   started.

16       Q.   All right.  If you want to look at the

17   first sentence in Section 3.1.

18       A.   3.1.

19       Q.   You just let me know when you're there.

20       A.   All right.  I see it.

21       Q.   The first sentence in Section 3.1 of

22   Galanakis Deposition Exhibit 8 says, quote, "The

23   athletic department, through Drug Free Sport, will

24   conduct random institutional drug testing of all

25   athletic teams."  Did I read that right?

1      A.    Yes.

2      Q.    Is that consistent with what you've

3   testified here today, that your coach said you would

4   get tested every Friday?

5      A.    Those two are not consistent with each

6   other.

7      Q.    Which one is true?

8      A.    The 3.1 William Penn University page.

9   That would be true, since it's in the handbook.

10     Q.    So when you told Officer Winters on

11  August 28th, 2022, that you get drug-tested every

12  Friday, that wasn't accurate, was it?

13     A.    At the time it was accurate for me.

14     Q.    Well, you'd never been tested before;

15  right?

16     A.    No.

17     Q.    And you said you never got drug-tested?

18     A.    No.

19     Q.    So your statement to Officer Winters that

20  you get drug-tested every Friday was not in fact

21  accurate?

22     A.    I believe it was accurate, from my

23  understanding at the time.

24     Q.    Was it factually accurate?

25     A.    Compared to this and what I said, no.

DEF. APPX. 28

1        Q.    Yeah.  Is it possible?

2        A.    Is it possible that someone -- another

3    officer could think I was high or drunk?

4        Q.    Yeah.  Is it possible, based on your

5    performance on the field sobriety testing on

6    August 28th, 2022, that a reasonable officer could

7    suspect you were impaired by a substance like drugs

8    or alcohol?

9        A.    I don't know.

10       Q.    You don't know if that's possible?

11       A.    I don't know if that's possible.  A lot of

12   things would have to play out.

13       Q.    Bear with me for just one quick second.

14             How would you characterize your attitude

15   toward Officer Winters on August 28th, 2022?

16       A.    I would say it was -- I gave him a fair

17   attitude, and how I would characterize it -- I don't

18   know how I would characterize it.  There was -- I

19   experienced a bunch of emotions and showed different

20   attitudes towards him during the whole stop.

21       Q.    But it's your testimony that you gave him

22   a fair attitude?

23       A.    Yes.

24       Q.    Did I hear that right?

25       A.    Yes.

DEF. APPX. 29

Case 4:23-cv-00044-SHL-SBJ    Document 40-3    Filed 12/06/23    Page 33 of 102

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 119

1      Q.   You don't think saying "You a rookie, bro"
2  is inconsistent with a fair attitude?

3      A.   I mean, I've had experience with Winters
4  before all this happened.  So I already knew what he
5  was -- pretty much he was trying to do the whole
6  time before we ever seen each other in that
7  circumstance.  It was in February when he pulled my
8  mom over.

9           When he pulled my mom over, he didn't let
10  her drive home because she wasn't wearing glasses,
11  and she needed glasses to drive home.  And at that
12  moment -- yeah, I'm almost done -- at that moment I
13  came and picked her up, and that's the first time I
14  met Winters.  And the first thing he says to me is,
15  "Have you been drinking tonight?  What parties you
16  been to?" when I picked my mom up.

17           So coming back to what we're talking
18  about, the reason why I was giving him that attitude
19  is because he was doing the same thing he was doing
20  that other night.

21      Q.   Okay.  It's your testimony that you gave
22  him a fair attitude?

23      A.   I would like to word it differently.

24      Q.   Go ahead.

25      A.   My attitude towards Winters wasn't the

DEF. APPX. 30

1   best throughout the whole situation.  I could have

2   composed myself a lot better.

3             MR. MILLER:  Okay.  Mr. Galanakis, I don't

4   have any other questions for you.  Your counsel may

5   have some questions.  I don't know.  But I

6   appreciate you being here today.

7             THE WITNESS:  Thank you.

8             MR. STEWART:  Let's take about five

9   minutes.

10            THE VIDEOGRAPHER:  Off the record at

11  5:13 p.m.

12            (A brief recess was taken.)

13            THE VIDEOGRAPHER:  On the record at

14  5:15 p.m.

15                      EXAMINATION

16  BY MR. STEWART:

17      Q.   Tayvin, you mentioned earlier you'd been

18  pulled over at least once or -- well, let me ask you

19  this:  How many times have you been pulled over for

20  the headlight issue?

21      A.   Three different times.

22      Q.   Outside of your interaction with Officer

23  Winters and the other defendants from Newton, in

24  those other interactions being pulled over, were you

25  ever pulled out of the vehicle and run through field

**LANCE PLATT - November 03, 2023**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

TAYVIN GALANAKIS,                    §
    Plaintiff,                   §
                                     §
V.                                   §  CASE NO. 4:23-cv-00044
                                     §
CITY OF NEWTON, IOWA, ROB BURDESS,   §
NATHAN WINTERS, CHRISTOPHER WING,    §
INDIVIDUALLY AND IN THEIR            §
OFFICIAL CAPACITIES WITH THE         §
NEWTON POLICE DEPARTMENT,            §
    Defendants.                  §
                                     §
 --------------------------------    §
                                     §
NATHAN WINTERS AND CHRISTOPHER       §
WING,                                §
    Defendants/Counterclaim      §
    Plaintiffs,                  §
                                     §
V.                                   §
                                     §  Removed from the
TAYVIN GALANAKIS,                    §  District Court for
    Plaintiff/Counterclaim       §  Jasper County, Iowa
    Defendant.                   §  No. LACV123038

_____

ORAL AND VIDEOTAPED DEPOSITION OF
LANCE PLATT
NOVEMBER 3, 2023
VOLUME 1 of 1

_____

    ORAL AND VIDEOTAPED DEPOSITION OF LANCE PLATT,
produced as a witness at the instance of the Defendants
City of Newton and Rob Burdess and Defendants/Counterclaim
Plaintiffs Nathan Winters and Christopher Wing and duly
sworn, was taken in the above-styled and numbered cause on
the 3rd day of November, 2023, from 9:07 a.m. to 11:56
a.m., before Laurin Rainer, Certified Shorthand Reporter
in and for the State of Texas, reported by computerized
stenotype machine, at the offices of Associated Court
Reporters, 1716 Briarcrest Drive, Suite 300, Bryan, Texas
77802, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

DEF. APPX. 32

**LANCE PLATT - November 03, 2023**

```
 1                          APPEARANCES

 2  FOR THE DEFENDANTS CITY OF NEWTON AND ROB BURDESS AND
    DEFENDANTS/COUNTERCLAIM PLAINTIFFS NATHAN WINTERS AND
 3  CHRISTOPHER WING:

 4       Mr. Nicholas F. Miller
         Brick Gentry, P.C.
 5       6701 Westown Parkway
         Suite 100
 6       West Des Moines, Iowa 50266
         Telephone: (515)274-1450 - Fax: (515)274-1488
 7       Email: nick.miller@brickgentrylaw.com

 8  FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT TAYVIN GALANAKIS:

 9       Mr. Matthew M. Boles
         Matthew M. Boles
10       Gribble, Boles, Stewart & Witosky Law
         2015 Grand Avenue
11       Suite 200
         Des Moines, Iowa 50312
12       Telephone:  (515)644-6852
         Email: mboles@gbswlaw.com

13

14  ALSO PRESENT:

15       Ms. Myra Thetford, Videographer

16

17

18

19

20

21

22

23

24

25
```

DEF. APPX. 33

**LANCE PLATT - November 03, 2023**

```
1                        INDEX
2                                            PAGE
3  Appearances ........................................    2
4  LANCE PLATT
5        Examination by Mr. Nicholas F. Miller ..........    4
6  Reporter's Certificate ............................  102
7
8                       EXHIBITS
9  NO.  DESCRIPTION                                   PAGE
10 1    Platt and Associates Technical Report ..........   13
11 2    Body cam video ................................   20
12 3    William Penn University Sports Medicine Department
      Drug Education and Testing Program Policy ......   90
13
14 4    National Association of Intercollegiate Athletics
      National Administrative Council Drug Testing
15      Policy Manual ..................................   93
16
17
18
19
20
21
22
23
24
25
```

**LANCE PLATT - November 03, 2023**

```
 1              THE VIDEOGRAPHER:  Off the record --
 2              MR. BOLES:  You've picked a great spot to
 3  go to lunch at, right?
 4              THE VIDEOGRAPHER:  Off the record at
 5  11:39 a.m.
 6              (Recess)
 7              THE VIDEOGRAPHER:  Back on the record at
 8  11:51 a.m.
 9      Q.   (BY MR. MILLER) Okay, Doctor, is -- in your
10  opinion -- I guess I should say did you reach an opinion
11  as to whether Officer Winters administered his field
12  sobriety testing correctly?
13      A.    Based on my observation of the testing, I
14  believe that they were administered correctly, as far as
15  the walk and turn and the one leg stand goes.  He did
16  follow the -- the -- the recommendations on the other ones
17  he did, the lack of convergence, modified Romberg, and the
18  other -- the finger to nose.  So as far as administering
19  the tests, yes.  I mean, there were some things I was
20  concerned with, the environment, you know, because it was
21  wet and things like that.  These tests were not validated
22  in a wet environment.  So that could have -- could have
23  been a factor.  But as far as the instructions, yes, I --
24  I will -- I will agree with him on -- on those.
25      Q.    With respect to the wet environment, I think you
```

**LANCE PLATT - November 03, 2023**

1  testified earlier that you didn't conclude that that

2  impacted Mr. Galanakis' ability to perform the field

3  sobriety tests, right?

4      A.    It wouldn't have been for me as -- as an

5  officer, but it did look -- the more I looked, it did --

6  it did look pretty wet, and it was pretty raining the

7  whole time.  Maybe or maybe not.  I mean, it -- it could

8  be -- could have been considered.  It -- it could be

9  considered.  Weather is a factor.

10     Q.    But it wasn't significant in forming your

11 opinions in this case?

12     A.    I don't think it was, not with Mr. Galanakis,

13 no.

14     Q.    When an officer is trying to make a

15 determination as to whether there's sufficient clues or

16 indicators of impairment or intoxication by drugs or

17 alcohol to justify an arrest or, you know, sending them

18 down to the police station --

19     A.    Right.

20     Q.    -- for a DRE expert's analysis, is that process

21 difficult?

22     A.    As far as -- as the arrest process goes?  It's

23 not difficult; but there is a process, you know, that --

24 that you -- that you have to go through.  Understanding

25 that, just because someone doesn't perform adequately on



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

# NATIONAL ADMINISTRATIVE COUNCIL DRUG TESTING POLICY MANUAL

TABLE OF CONTENTS

I    — MEDICAL CODE ........................................................................................................................1
II   — ORGANIZATION .....................................................................................................................1
III  — IMPLICATIONS ON STUDENT-ATHLETE ELIGIBILITY .......................................................2
IV  — STUDENT-ATHLETE SELECTION .......................................................................................2
V   — CHAMPIONSHIP, INSTITUTION, AND STUDENT-ATHLETE NOTIFICATION ...................2
VI  — SPECIMEN-COLLECTION PROCEDURES ..........................................................................3
VII — CHAIN OF CUSTODY ............................................................................................................5
VIII — NOTIFICATION OF RESULTS AND CHALLENGE PROCES5
IX  — SANCTIONS FOR USE OF BANNED SUBSTANCES ..........................................................6
X   — RESTORATION OF ELIGIBILITY .........................................................................................7
APPENDIX A — MEDICAL EXEMPTION PROCEDURES FOR NAIA DRUG TESTING POLICY .......8
APPENDIX B — NAIA POSTSEASON DRUG TESTING RESULTS PROCESS & REPORTING ..........11
APPENDIX C — NAIA POSTSEASON DRUG TESTING APPEALS PROCESS ...............................13
APPENDIX D — CONSENT FORM ...........................................................................................13
APPENDIX E — NAIA BANNED DRUG CLASSES ....................................................................15
APPENDIX F — NAIA CERTIFICATION OF STUDENT-ATHLETE CONSENT FORM .....................17

## I — MEDICAL CODE

A.   The presence in a student-athletes' urine of a substance belonging to a class of drugs currently banned by the National Association of Intercollegiate Athletics (NAIA) may be cause for loss of eligibility.

B.   Evidence of presence of a banned substance will be determined from analysis of the student-athletes' urine and confirmation by analytical testing methods approved by the NAIA (e.g., immunoassay, gas chromatography/mass spectrometry, liquid chromatography, isotope ratio mass spectrometry or other methods deemed appropriate to confirm the presence of a banned substance) in a laboratory designated by the NAIA.

C.   The current NAIA list of banned drug classes can be found on the NAIA website www.naia.org. In addition, other substances may be screened to gather data for making decisions as to whether other drugs should be added to the list. (See Appendix E for the NAIA BANNED SUBSTANCE LIST.)

## II — ORGANIZATION

A.   These procedures are developed pursuant to NAIA Bylaws Article IV, Section E.

B.   The National Drug Testing and Education Committee will review on an annual basis the procedures of the NAIA drug-testing program.

C.   The NAIA staff will support, coordinate and be responsible for the general administration of the drug-testing program. The NAIA staff may contract with an outside agency to assist in the administration of the program including, but not limited to, specimen collection, laboratory testing services, results management and appeal consultation administration.

D.   National Championship hosts shall be responsible for designating an individual to serve as the drug-testing coordinator. The drug-testing coordinator must be an individual that has a reporting line external to a coaching staff member and he/she may not have any coaching related responsibilities.

      i.   National Championship hosts shall be responsible for designating a location at the venue that is clean, secure and confidential at which testing can occur.

E.   Designated NAIA staff member(s) will approve any contracts between the NAIA and the outside drug-testing agency.

<span style="color:red">DEF. APPX. 37</span>



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

  i.  Any drug-testing laboratory contracted will be required to demonstrate, to the satisfaction of the National Drug Testing and Education Committee, proficiency in detection and confirmation of the banned substance categories on the NAIA Banned Substance List.

## III — IMPLICATIONS ON STUDENT-ATHLETE ELIGIBILITY

A.  Each academic year all eligible NAIA student-athletes must sign a Consent Form in which he or she consents to be tested for the use of drugs prohibited by the NAIA Banned Substance List to participate in any NAIA National Championship competitions (see Appendix D).  This Consent Form shall be administered by the institution.

  To ensure all student-athletes participating in NAIA National Championship competitions have signed a Consent Form and such form is on record with the institution, a representative of each institution participating in any National Championship competition must sign an Official Certification of Student-Athlete Consent Form (see Appendix F) at check-in.  An institution has not completely checked in until this form is signed and submitted along with a copy of the institution's official roster. This signed form, with the submitted roster, will be retained on file at the NAIA national office.

B.  All student-athletes found to test positive for a substance belonging to a banned drug class are subject to loss of eligibility. See NAIA Bylaws Article VIII, Section B.

C.  A student-athlete who refuses to sign the Student-Athlete Notification Form or the Custody and Control Form, fails to arrive at the collection station within a reasonable time frame after notification and without justification, leaves the collection station before providing a specimen according to protocol, attempts to alter the integrity or validity of the urine specimen and/or collection process, or fails to provide a urine specimen according to protocol is cause for the same action(s) as evidence of use of a banned substance.

## IV — STUDENT-ATHLETE SELECTION

A.  The method for selecting championships at which testing will occur and the method for selecting student-athletes to be tested will be approved in advance of the testing occasion by the National Office.

B.  At NAIA individual/team championship events (e.g., wrestling, swimming and diving), the choice of student-athletes may be based on NAIA National Office-approved random selection, record-setting performance, competitive ranking or position of finish.

C.  At NAIA team championships (e.g., football, baseball), student-athletes may be selected on the basis of playing time, position, and/or an NAIA National Office-approved random selection.

D.  Persons who test positive for a banned substance defined on the NAIA Banned Substance List, and subsequently have their eligibility restored will automatically be tested at any subsequent NAIA championship at which they appear and at which drug testing is being conducted. The student-athlete also will be tested during the period of their suspension. Costs associated with follow-up testing shall be paid by the institution of the student to be tested.

  i.  It is the responsibility of the institution to notify the drug-testing certified collector that a student-athlete who is present must be tested to satisfy the retesting requirement.

E.  Student-athletes may be tested before, during and/or after NAIA championships.

## V — CHAMPIONSHIP, INSTITUTION, AND STUDENT-ATHLETE NOTIFICATION

A.  Host tournament directors and drug-testing coordinators for NAIA championships will be notified of the drug-testing plan seven to 10 days before the day of testing.

B.  At NAIA team championship events, a student-athlete selected for drug testing will be handed a Student-Athlete Notification Form by a designated official. The Notification Form will instruct the student-athlete to accompany the designated official to the collection station within one hour, unless otherwise directed by the certified collector or designee.

DEF. APPX. 38



i.   At NAIA team championship events, when competition begins at 10 p.m. or later local time, student-athletes will be notified according to Section V, Item C. An institution may defer testing until the next morning. In all cases, testing must begin by 10 a.m.

ii.   Determination of the time of testing (i.e., post-game or next-morning) will be established by the institution no later than immediately after the game.

iii.   An institutional representative must be in the collection station at any next-morning testing to certify the identity of the student-athletes selected for testing. The institutional representative must remain in the collection station until testing is complete.

iv.   The institutional representative and the certified collector will be responsible for establishing a collection site for any next-morning tests. The site coordinator shall make the host institution's facility available for any next-morning tests, if necessary.

v.   If testing is conducted after final rounds at team championships, both teams will be tested after the game. Deferral of testing is not permitted.

C.   At NAIA individual championship events, a student-athlete will be handed a Student-Athlete Notification Form by an official courier. The Notification Form will instruct the student-athlete to accompany the courier to the collection station within one hour, unless otherwise directed by the courier, certified collector or designee. Prior to checking into the collection station, the student-athlete should inform the institutional representative that he/she has been selected for drug testing.

i.   If the selected student-athlete is scheduled to compete in another event during that day's championship event, the student-athlete shall defer testing until the completion of his or her final event that session or that day as directed by the courier, certified collector or designee.

ii.   The courier and selected student-athlete will obtain an institutional representative's signature on the Student-Athlete Notification Form in order to defer testing until completion of the student-athlete's final event that session or that day. No later than one hour after completion of this event, the institutional representative must present the student-athlete to the collection station and certify identification of the student-athlete. In the event deferred testing occurs, the NAIA may require personal observation until time of collection.

D.   The courier will record the time of notification and the Student-Athlete Notification Form will be read and signed by the student-athlete.

E.   A declared witness may accompany a student-athlete to the collection station and shall remain during the entire collection process.

## VI — SPECIMEN-COLLECTION PROCEDURES

A.   Only those persons authorized by the certified collector will be allowed in the collection station.

i.   The certified collector must release a student-athlete to meet academic obligations, and may release a sick or injured student-athlete from the collection station or may release a student-athlete to return to competition, or for other compelling reason as approved by the third-party testing agency. In all cases appropriate arrangements for having the student-athlete tested will have been made and recorded by the certified collector.

B.   Upon entering the collection station, the student-athlete will be identified by a courier, an institutional representative or through other appropriate identification methods, and then the student-athlete will be officially signed into the station.

i.   A collector will require the student-athlete to rinse and dry his or her hands.

ii.   The student-athlete will select a sealed beaker from a supply of such and attach a unique bar code to the beaker.

iii.   A collector will monitor the furnishing of the specimen by direct observation in order to ensure the integrity of the specimen.

iv.   The student-athlete will be responsible for keeping the collection beaker closed and controlled.

DEF. APPX. 39



    v.    Fluids and food provided by the certified collector to student-athletes must be from individual sealed containers that are opened and consumed in the station. These items must be caffeine-free, alcohol-free, and free of any other banned substances.

    vi.    If the specimen is incomplete, the student-athlete must remain in the collection station unless otherwise directed by the certified collector. During this period, the student-athlete is responsible for keeping the collection beaker closed and controlled, unless otherwise directed by the certified collector.

        a.    If the specimen is incomplete and the student-athlete must leave the collection station for a reason approved by the certified collector, the specimen may be discarded at the discretion of the certified collector.
        b.    Upon return to the collection station, the student-athlete will complete the collection procedure.

    vii.    Once a specimen (at least 90 mL) is provided, the collector who monitored the furnishing of the specimen by observation will sign that the specimen was directly validated, and a collector will check the specific gravity of the urine in the presence of the student-athlete.

        a.    If the urine has a specific gravity at or above 1.005, the specimen will be processed and sent to the laboratory.
        b.    If the urine has a specific gravity below 1.005, the specimen will not be sent to the lab unless otherwise directed by the third-party testing agency. The student-athlete must remain in the collection station until an adequate specimen is provided.
        c.    Final determination of the specimen adequacy will be made by the laboratory.
            1)    If the laboratory determines that a student-athlete's specimen is inadequate for analysis, at the NAIA discretion, another specimen may be collected.
            2)    If a student-athlete provides multiple diluted samples (three or more) in a testing event, or is suspected of breach of protocol (see Section VI, Item H), the NAIA will have the authority to test the student-athlete for all banned substances.

    viii.    Once a specimen has been provided that meets the on-site specific gravity parameters, the student-athlete will select a specimen collection kit and a uniquely numbered set of bar codes from a supply of such.

        a.    A collector will record the specific gravity.
        b.    The collector will pour at least 60 mL of the specimen into the "A" vial and at least 25 mL into the "B" vial in the presence of the student-athlete.
        c.    The collector will place the cap on each vial in the presence of the student-athlete: the collector will then seal each vial in the required manner under the observation of the student-athlete and witness (if present).

C.    Vials sent to the laboratory shall not contain the name of the student-athlete or the institution.

D.    All sealed specimens will be secured in a shipping case.  The collector will prepare the case for forwarding.

E.    The student-athlete, collector, and witness (if present) will sign certifying that the procedures were followed as described in the protocol. Any deviation from the procedures must be described and recorded at that time. If deviations are alleged, the student-athlete will be required to provide another specimen.

F.    After the collection has been completed, the specimens will be forwarded to the laboratory, and all copies of all forms, if any, will be forwarded to the designated persons.

G.    All specimens are the property of the NAIA.

H.    A student-athlete who is found to have not signed an NAIA Consent Form or who refuses to sign the Student-Athlete Notification Form or Custody and Control Form, fails to arrive at the collection station at the designated time without justification, fails to provide a urine specimen according to protocol, leaves the collection station before providing a specimen according to protocol, or attempts to alter the integrity or validity of the urine specimen and/or collection process, will be in breach of protocol and treated as if there was a positive test for a banned substance. The student-athlete will be penalized in accordance to the bylaws. The certified collector will inform the student-athlete of these

DEF. APPX. 40



implications (in the presence of a witness) and record such. If the student-athlete is not available, the certified collector will notify the NAIA staff member and an institutional representative.

## VII — CHAIN OF CUSTODY

A. The collector will deliver the shipping case(s) to the carrier.

B. A laboratory employee will record that the shipping case(s) has been received from the carrier.

C. The laboratory will record whether the numbered bar-code seal on each vial arrived intact.
   i. If a specimen arrives at the laboratory with security seals not intact, at the NAIA discretion, another specimen may be collected.

D. If the chain of custody is broken at any point in the process, the NAIA may collect another specimen.

## VIII — NOTIFICATION OF RESULTS AND CHALLENGE PROCESS

A. The laboratory will use a portion of specimen A for its initial analysis.

   i. Analysis will consist of sample preparation, instrument analysis and data interpretation.

   ii. The laboratory director or designated certifying scientist will review all results showing a banned substance and/or metabolite(s) in specimen A.

   iii. The laboratory will inform the third-party testing agency of results by each respective code number.

B. Upon receipt of the results, the third-party testing agency will identify any specimens with positive findings.

   i. For NAIA individual championships, only positive test results will be reported to the institution. Positive test results should be made available within approximately 30 days of the collection.

   ii. For NAIA team championships, institutions will receive notification of negative test results from the third-party testing agency by secure website.

   iii. For student-athletes who have a positive finding, the third-party testing agency will notify the NAIA National Office and the director of athletics of the finding by phone as soon as possible. The phone contact will be followed by an "overnight" letter (marked "confidential") to the chief executive officer, faculty athletics representative and director of athletics of the institution. Included with the letter will be the supplemental report (positive finding), and the student-athlete's Custody and Control Form.  The institution shall notify the student-athlete of the positive test result. (See Appendix A for the Medical Exemption Challenge Procedures.)

      a. The third-party testing agency will, during the phone conversation, advise the director of athletics that specimen B will be tested. The student-athlete may be present at the opening of specimen B.
      b. The institution and/or the student-athlete will be given the option to be represented at the laboratory for the opening of specimen B. Notification by the institution and/or the student-athlete of intent to be represented must be given to the third-party testing agency.
      c. If the institution and/or the student-athlete desire representation, they must inform the third-party testing agency within 48 hours of the phone notification, who will attend the opening of the specimen B, and present themselves at the lab within two business days of informing the third-party testing agency or as otherwise directed by the laboratory. If they choose not to send a representative to be present for the opening of the specimen B, the institution or the student-athlete will give approval to the third-party testing agency to arrange for a surrogate to attend the opening of the specimen B.
         1) The surrogate will not otherwise be involved with the analysis of the specimen.
      d. The student-athlete, the student-athlete's representative, the institution's representative or the surrogate will attest by signature as to the code number on the bottle of specimen B, that the security seal has not been broken, and that there is no evidence of tampering.

DEF. APPX. 41



      e.    The third-party testing agency will inform the laboratory to proceed with the analysis of the specimen B.

    iv.    Specimen B findings will be final. The laboratory will inform the third-party testing agency of the results.

      a.    For student-athletes who have a specimen B positive finding, Drug Free Sport will contact the Director of Athletics or a designee by phone. The institution shall notify the student-athlete of the finding. At this point, normal NAIA eligibility procedures will apply.

      b.    Upon notification of the specimen B positive finding, the student-athlete is ineligible for further participation and the institution shall withhold the student-athlete from all intercollegiate competition. In the event that the student-athlete tests positive for substance(s) for which the institution desires an exemption (see Appendix A Medical Exemptions), and documentation has been submitted prior to the notification of the specimen B sample, the eligibility of the student-athlete may be maintained while the exemption request is under review.

    v.    A positive finding may be challenged by the institution to the National Drug Testing and Education Committee. The student-athlete will remain ineligible pending the outcome of the challenge.

      a.    The institution has sole discretion on whether to challenge on behalf of a student-athlete.

      b.    The notification of an institution's intent to challenge shall be submitted by the director of athletics and/or faculty athletics representative to the third-party testing agency within two business days of the confirmation of the positive drug test, unless an extension is granted by the third-party testing agency or the Committee. Challenge documentation must be submitted by the institution within 45 days of the notice of intent to challenge.

      c.    No later than five business days before the scheduled challenge, the institution is required to submit to the third-party testing agency all required documentation, including a written summary describing the institution's drug education policy and practices and the grounds for the challenge.

      d.    If the student-athlete's next competition is imminent and if the institution so requests, the Committee shall make a good-faith reasonable effort to hear the challenge before the student-athlete's next contest or within 48 hours of the institution's notice of the intent to challenge, whichever is longer.

      e.    Such a challenge will be conducted by phone conference with the student-athlete and an athletics administrator required to participate therein. It is recommended that the head coach or designee also participate. The student-athlete may have others available to participate on his/her behalf.

      f.    Copies of reports from the laboratory that contain results from the A specimen and B specimen will be forwarded to the Director of Athletics or designee before the challenge call.

      g.    Technical experts, including the third-party testing agency staff, may serve as consultants to the Committee in connection with such challenges.

      h.    The third-party testing agency staff and collectors may serve as consultants to the Committee in challenge phone calls involving matters of collection protocol.

C.    The NAIA National Office will notify the institution's chief executive officer and director of athletics of the findings and the result of any challenge. This notification will be initiated by phone to the director of athletics. This will be followed by another "overnight" letter (marked "confidential") to the chief executive officer and the director of athletics. It is the institution's responsibility to inform the student-athlete of the final outcome.

D.    The NAIA, its agents, and the institution of the involved student-athlete, shall maintain strict confidentiality with regard to information related to a positive test and challenge thereof pending final resolution.

## IX — SANCTIONS FOR USE OF BANNED SUBSTANCES

Sanctions for student-athletes who test positive as well as determinations of how championship results are reported following a positive test are determined by the NAIA membership, and the complete description is contained in NAIA Bylaws Article VIII. These penalties include, but are not limited to, the following areas:

A.    Individual Student-Athlete Penalties

      A student-athlete who tests positive for use of a banned substance, as defined by the NAIA Banned Substance List, shall be sanctioned as outlined below.

    i.    As a first offense, a student-athlete who tests positive for the use of any banned substance:

<span style="color:red">DEF. APPX. 42</span>



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

    a.   Shall be immediately suspended from further competition in all sports;

    b.   Shall be suspended in all sports for a minimum of 365 days from the date of the specimen collection that led to the positive test result;

    c.   Shall be charged one additional season of competition in the applicable sport as a punitive measure (in addition to being charged a season of competition for the student's actual participation);

    d.   Shall be charged one punitive season of competition in all additional sports because of the positive test result (in addition to any seasons of competition the student may have been charged for actual participation).

   ii.  As a second offense, a student-athlete who tests positive for the use of any banned substance:

    a.   Shall immediately lose all remaining eligibility within the NAIA in all sports.

   A positive test on an exit test (see NAIA Bylaws Article VIII, Section D, Item 3) taken during the reinstatement process shall constitute a second offense.

**B.**  Reporting of Individual Competition Results
   i.  Individual placings and honors earned by a student-athlete who tests positive at the national championship will be vacated, and will remain vacant. Subsequent placings will not be reassigned.

**C.**  Reporting of Team Scores in Individual Competition Results
   i.  In the sports of cross country, golf, indoor track and field, outdoor track and field, swimming and diving, and wrestling, if a student-athlete tests positive and the individual student-athlete's score/points affects the team score/points:

    a.   The individual's points will be deducted from the overall team score/points; and

    b.   Team scores will be recalculated accordingly, and all team placings will be reassigned (if applicable).

**D.**  Reporting of Team Competition Results
   i.  In the sports of baseball, basketball, competitive cheer and dance, football, lacrosse, soccer, softball, tennis and volleyball, should a student-athlete who competed as a member of the team at the national championship test positive, a final determination of whether the team championship or placing will be vacated will be made by the National Drug Testing and Education Committee.

**E.**  Institution Violation
   i.  An institution's athletics program(s) or staff member(s) may be brought before the National Conduct and Ethics Committee for additional penalties if the institutional staff member(s) provided or required the student's use of the banned substance that led to a positive test.

## X — RESTORATION OF ELIGIBILITY

**A.**  Reinstatement processes for student-athletes who test positive on a first offense are determined by the NAIA membership, and the complete description is contained in NAIA Bylaws Article VIII, Section B. Reinstatement includes, but is not limited to, following conditions:

   i.  Complete the required suspension and be charged seasons of competition as dictated in NAIA Bylaws Article VIII, Section B, Item 1.

   ii.  Complete an appropriate counseling or treatment program, as determined by the student-athlete's institution. The institution shall dictate the specific treatment plan, as it deems appropriate, for the specific student-athlete. The institution must provide verification that it approved the treatment plan and that the counseling or treatment program has been completed.

   iii.  Pass an additional drug test (i.e. exit test) administered by the NAIA's third-party provider during the 11th month of the suspension.

   iv.  Receive verification from The National Drug Testing and Education Committee that all components of reinstatement have been satisfied.

<span style="color:red">DEF. APPX. 43</span>



## APPENDIX A — MEDICAL EXEMPTION PROCEDURES FOR NAIA DRUG TESTING POLICY

The NAIA recognizes that some banned substances are used for legitimate medical purposes. Accordingly, the NAIA allows exemptions to be made for those student-athletes with a documented medical history demonstrating the need for regular use of such a drug. Exemptions may be granted for substances included in the following classes of banned drugs: stimulants, anabolic agents, beta blockers, diuretics, peptide hormones, anti-estrogens, and beta-2 agonists.

The institution shall inform the third-party testing agency of its intent to request a medical exemption to a positive drug test when it is notified of the positive result of the A sample. If the B Sample is confirmed positive and reported to the institution and documentation to support the medical exemption request has not been submitted, the student-athlete will be declared ineligible until such time documentation is received and reviewed and the exemption is granted. If the medical exemption is not granted, the student-athlete's institution may then request a challenge.

A medical exemption for the use of stimulants should refer to the guidelines for reporting as outlined in the NAIA policy.

Review of the request for medical exemptions will be conducted by the National Drug Testing and Education Committee.

The chairperson of the National Drug Testing and Education Committee will inform the institution's Director of Athletics regarding the outcome of the medical exemption request.

In the event that the medical exemption request is not granted, the institution may challenge the denial to the National Drug Testing and Education Committee using the procedures outlined in Section VIII, Item B5of the NAC Drug Testing Policy Manual.

Should an institution's challenge be denied by the National Drug Testing and Education Committee, the institution may appeal the Committee's finding to the National Coordinating Committee pursuant to NAIA Bylaws Article VI, Section E.

DEF. APPX. 44



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

# NAIA Official Medical Exemption Form

The NAIA recognizes that some banned substances are used for legitimate medical purposes. Accordingly, the NAIA allows exemptions to be made for those student-athletes with documented medical history demonstrating the need for regular use of such a drug. Exemptions may be granted for substances included in the following classes of banned drugs: stimulants, anabolic agents, beta blockers, diuretics, peptide hormones, anti-estrogens, and beta-2 agonists.

**Case #** (for national Office use Only) _____

## 1.
Name of Athlete: _____     Sport(s): _____

Institution: _____     Conference: _____

Address: _____

## 2.
List all doctor proscribed medications currently being taken by student. Include diagnosis and date medication was initially prescribed for the student, as well as the issue date of the student's current prescription.

| Rx | Diagnosis | Date Rx Began | Date of Current Rx |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## 3.
**I hereby certify that the above information is complete and accurate:**

_____     _____     _____

Student-Athlete Signature          Name (please print)          Date

_____

Parent Signature (if student-athlete is a minor)

## 4.
**In the event that the student tests positive for a banned substance, the following information is required to be completed by the treating physician (M.D. or D.O.):**

_____     _____     _____

Current Treating Physician          Specialty          Date Assessment Completed

_____

_____

_____     _____     _____

Physician Office Address and Phone          Physician Signature          Today's Date

**Required Materials:**

_____ Complete Assessment/Notes/Diagnosis
_____ Medications(s) and dosage
_____ Blood pressure and pulse readings and comments
_____ Note that alternative non-banned medications have been considered, and comments
_____ History of treatment (previous/ongoing)
_____ Laboratory/testing results (if applicable)
_____ ADHD rating scale (if applicable)

_____     _____

Athletic Director Signature          Athletic Trainer Signature

<span style="color:red">DEF. APPX. 45</span>

NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

| | |
|---|---|
| | Send this form and transcript to the NAIA National Office.<br>**All 4 areas of this form must be completed before the request can be considered by the National Office.** |

| **FOR OFFICIAL USE ONLY — DO NOT WRITE IN THIS SPACE** | | |
|---|---|---|
| ☐ **Granted** | | |
| ☐ **Denied.** The request does not meet criteria established by membership. | NAIA Official | Date |

DEF. APPX. 46



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

## APPENDIX B — NAIA POSTSEASON DRUG TESTING RESULTS PROCESS & REPORTING



TESTING AGENCY receives test results from WADA-accredited laboratory; if negative, sends negative results to director of athletics and NAIA National office *(NAC Drug Testing Policy Manual Section VIII, Item B.ii)*

If positive, TESTING AGENCY breaks secure code to identify institution and student-athlete; TESTING AGENCY starts positive case log and checklist *(Section VIII, Item B.iii)*

TESTING AGENCY will immediately inform NAIA administrator of positive result. *(Section VIII, Item B.iii)*

TESTING AGENCY calls director of athletics to explain NAIA protocol and next steps to take *(Section VIII, Item B.iii.a)*

TESTING AGENCY sends confidential, overnight letter to director of athletics and institution's CEO *(Section VIII, Item B.iii)*

Institution informs student-athlete of positive result; reviews NAIA protocol with student-athlete regarding opening of "B" specimen *(Section VIII, Item B.iii.c)*

Institution informs TESTING AGENCY of how to proceed with opening of "B" specimen *(Section VIII, Item B.iii.c)*

TESTING AGENCY instructs WADA-accredited laboratory to proceed with testing the "B" specimen; laboratory uses surrogate as witness in most cases *(Section VIII, Items B.iii.c-e)*

WADA-accredited laboratory reports "B" specimen result to TESTING AGENCY *(Section VIII, Item B.iv)*

TESTING AGENCY reports "B" specimen result to director of athletics; if negative, student-athlete remains eligible; if positive, institution declares student-athlete ineligible; director of athletics informs student-athlete of right to challenge *(Section VIII, Items B.iv-v)*

Institution informs TESTING AGENCY if institution will proceed with a challenge or not; if no challenge, TESTING AGENCY instructs NAIA to close the case *(Section VIII, Item B.v.b)*

**DEF. APPX. 47**



NAIA will notify institution in writing of the sanction that is applied and the right to challenge *(Section VIII, Item C)*

DEF. APPX. 48



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

## APPENDIX C — NAIA POSTSEASON DRUG TESTING CHALLENGE PROCESS

The notification of an institutional challenge shall be submitted by the director of athletics or faculty athletics representative to the third-party testing agency within two business days of the confirmation of the positive B specimen result.  *(NAC Drug Testing Policy Manual Section VIII, Item B.v.b)*

If the institution wants to challenge, TESTING AGENCY sends challenge letter with instructions and laboratory documentation to director of athletics *(Section VIII, Item B.v.e)*

TESTING AGENCY works with NAIA National Office staff to coordinate conference call scheduling and document production, including case report; Documentation is forwarded to NAIA National Drug Testing and Education Committee, WADA-accredited laboratory and director of athletics *(Section VIII, Item B.v)*

Challenge is heard. Technical experts and TESTING AGENCY may serve as consultants to the Committee in connection with such challenges. *(Section VIII, Item B.v.g)*

NAIA National Drug Testing and Education Committee renders a decision.

NAIA National Drug Testing and Education Committee informs TESTING AGENCY of decision; NAIA informs CEO and director of athletics of decision *(Section VIII, Item C)*

Director of athletics informs student-athlete of the result of the challenge *(Section VIII, Item C)*

Challenge granted, student-athlete becomes eligible

Challenge denied, student-athlete remains ineligible and exit test is to be scheduled.

TESTING AGENCY updates case report and challenge database

TESTING AGENCY forwards final drug-testing results for all student-athletes to the director of athletics

Role of TESTING AGENCY: TESTING AGENCY may serve as a consultant regarding the basis of the appeal, and if requested, will provide referral to other experts. As a consultant, TESTING AGENCY may answer questions, raise other relevant issues, and provide information as requested by members of the Committee, including – if requested – a written or verbal summary of the case. TESTING AGENCY will not participate as a voting member on the call.

## APPENDIX D — CONSENT FORM

DEF. APPX. 49



A.  Requirement to Sign Drug-Testing Consent Form
   1.  Name of Institution: _____
   
   2.  Name of student-athlete: _____ Sport(s): _____
   
   3.  You must sign this form to participate in any NAIA National Championship competition. This includes but is not limited to Opening Rounds and Final Sites. If you have any questions, you should discuss them with your director of athletics.

B.  Consent to Testing
   1.  You agree to allow the NAIA to test you in relation to any participation by you in any NAIA national championship or invitational competition. Examples of drugs in each class can be found at www.naia.org/wellness. Note: There is no complete list of banned substances. Check the NAIA Drug Free Sport AXIS for questions about supplements, medications and banned drugs.

C.  Consequences for a Positive Drug Test
   1.  By signing this form, you affirm that you are aware of the NAIA drug-testing program, which provides:
   
   2.  A student-athlete who tests positive for use of a banned substance as defined by the NAIA Banned Substance List, shall be sanctioned as outlined below:
      a.  A student-athlete's first offense for testing positive for the use of any banned substance shall be immediately suspended from further competition in any sport; and
      b.  The period of suspension will be for a minimum of 365 days from the date of the specimen collection that lead to the positive test result; and
      c.  The student-athlete shall be charged one season of competition in all sports because of the positive test result.
      d.  A student-athlete testing positive a second time for the use of any banned substance shall lose all remaining NAIA regular season and post-season eligibility in all sports.
      e.  Individual placings and honors earned at the national championship at which the positive test occurred shall be vacated.
      f.  Team championships will be determined by the National Drug Testing and Education Committee.

D.  Signatures
   1.  By signing below, I consent:
      a.  To be tested by the NAIA in accordance with NAIA drug-testing policy, which provides among other things that I will be notified of selection to be tested;
      b.  I must appear for NAIA testing or be sanctioned for a positive drug test; and my urine sample collection will be observed by a person of my same gender;
      c.  To accept the consequences of a positive drug test;
      d.  To allow my drug-test sample to be used by the NAIA drug-testing laboratories for research purposes to improve drug-testing detection; and
      e.  To allow disclosure of my drug-testing results only for purposes related to eligibility for participation in NAIA competition.

I understand that if I sign this statement falsely or erroneously, I violate NAIA legislation on ethical conduct and will jeopardize my eligibility.

| | |
|---|---|
| _____ | _____ |
| Date | Signature of student-athlete |
| _____ | _____ |
| Date | Signature of parent (if student-athlete is a minor) |

_____    _____    _____
Name (please print)                                Date of birth            Age
_____
Home address (street, city, state and zip code)
_____
Sport(s)

<span style="color:red">DEF. APPX. 50</span>



NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS

## APPENDIX E — NAIA BANNED SUBSTANCE LIST

It is your responsibility to check with the appropriate or designated athletics staff before using any substance.

A.  The NAIA bans the following classes of drugs:

    1.  Stimulants

    2.  Anabolic Agents

    3.  Diuretics and Other Masking Agents

    4.  Peptide Hormones and Analogues

    5.  Anti-estrogens

    6.  Beta-2 Agonists

    Note:  Any substance chemically related to these classes is also banned.

    The institution and the student-athlete shall be held accountable for all drugs within the banned drug class regardless of whether they have been specifically identified.

B.  Drugs and Procedures Subject to Restrictions:

    1.  Blood Doping

    2.  Local Anesthetics (under some conditions)

    3.  Manipulation of urine samples

    4.  Beta-2 Agonists permitted only by prescription and inhalation

    5.  Caffeine if concentrations in urine exceed 15 micrograms/ml

C.  NAIA Nutritional/Dietary Supplements Warning:

    Before consuming any nutritional/dietary supplement product, review the product with the appropriate or designated athletics department staff.

    1.  Dietary supplements, including vitamins and minerals, are not well regulated and may cause a positive drug test result.

    2.  Student-athletes have tested positive and lost their eligibility using dietary supplements.

    3.  Many dietary supplements are contaminated with banned drugs not listed on the label.

    4.  Any product containing a dietary supplement ingredient is taken at your own risk.

    Note to Student-Athletes: There is no complete list of banned substances. Do not rely on this list to rule out any supplement ingredient. Check with your athletics department staff prior to using a supplement.

D.  Some Examples of NAIA Banned Substances in Each Drug Class:

    1.  Stimulants:

DEF. APPX. 51

Amphetamine (Adderall); caffeine (guarana); cocaine; ephedrine; fenfluramine (Fen);  methamphetamine; methylphenidate (Ritalin); phentermine (Phen); synephrine (bitter orange); methylhexaneamine, "bath salts" (mephedrone) etc.

Exemptions:  phenylephrine and pseudoephedrine are not banned.

2.  Anabolic Agents (sometimes listed as a chemical formula, such as 3,6,17-androstenetrione):
Androstenedione; boldenone;  clenbuterol; DHEA (7-Keto); epi-trenbolone;  etiocholanolone; methasterone;  methandienone;  nandrolone; norandrostenedione; ostarine, stanozolol; stenbolone; testosterone; trenbolone; etc.

3.  Diuretics (water pills) and Other Masking Agents:
Bumetanide;  chlorothiazide; furosemide; hydrochlorothiazide; probenecid; spironolactone (canrenone); triameterene; trichlormethiazide; etc.

4.  Peptide Hormones and Analogues:
Growth hormone (hGH); human chorionic gonadotropin (hCG); erythropoietin (EPO); etc.

5.  Anti-Estrogens:
Anastrozole; tamoxifen; formestane; ATD, clomiphene etc.

6.  Beta-2 Agonists:
Bambuterol; formoterol; salbutamol; salmeterol; etc.

Additional examples of banned drugs can be found at www.naia.org/wellness.

Any substance that is chemically related to the class, even if it is not listed as an example, is also banned!

Information about ingredients in medications and nutritional/dietary supplements can be obtained by contacting the Drug Free Sport AXIS™ 866.635.7877 or www.drugfreesport.com/axis, password: naialive5.

It is your responsibility to check with the appropriate or designated athletics staff before using any substance.

DEF. APPX. 52



**APPENDIX F — NAIA CERTIFICATION OF STUDENT-ATHLETE CONSENT FORM**

# NAIA DRUG TESTING AT NATIONAL CHAMPIONSHIPS
## 2018-19 Official Certification of Student-Athlete Consent Form

This form must be filled out and signed at check-in for a participating institution for any NAIA championship competition. An institution is deemed to not have checked in until this form is signed and submitted along with a copy of the institution's official roster. This signed document, with the submitted roster, will be retained on file at the NAIA national office.

**1.**
Name of Coach: _____     Sport : _____

Institution: _____     Conference: _____

Address: _____

_____

Year: _____

Round/Location: _____     (ex. Opening Round-xxxxx, Final Site-Kansas City)

**2.** I hereby certify that the postseason roster I am submitting / attaching is complete and accurate and that ALL student-athletes listed have a signed NAIA drug-testing consent form on file with our institution.

_____     _____     _____
Coach Signature     Name (please print)     Date

_____
Championship Manager / Site Coordinator

<span style="color:red">DEF. APPX. 53</span>

# *William Penn University*

## *Sports Medicine Department*



# Drug Education and Testing Program Policy

DEF. APPX. 54

# WILLIAM PENN UNIVERSITY

# DRUG TESTING POLICY

# FOR STUDENT-ATHLETES

**Drug Education and Testing Program Policy** ............................................... 1

1.0 INTRODUCTION .......................................................................... 3

2.0 STUDENT-ATHLETE NOTIFICATION AND EDUCATION.................................. 3

3.0 INSTITUTIONAL DRUG AND SUBSTANCE ABUSE TESTING............................. 3

    3.1 Methods for Selection and Eligibility for Drug Testing ........................... 3

    3.2 Notification for Drug Testing ..................................................... 4

    3.3 Reasonable Suspicion Testing .................................................... 4

    3.4 Safe Harbor ......................................................................... 5

    3.5 Re-Entry Testing ................................................................... 5

    3.6 Follow-Up Testing ................................................................. 5

    3.7 Pre-Season Screening ............................................................. 5

    3.8 Collection Procedures ............................................................. 5

    3.9 Substances Tested ................................................................. 5

    3.10 Reporting Results ................................................................ 6

    3.11 Accumulation of Results ........................................................ 6

    3.12 Institutional Discipline for a Positive Test .................................... 6

    3.13 Exceptions for Prescription Medications ...................................... 7

    3.14 Appeals Process .................................................................. 8

    3.15 Institutional Drug Testing Record Keeping ................................... 8

4.0 USE OF DIETARY SUPPLEMENTS ..................................................... 8

5.0 USE OF TOBACCO ...................................................................... 9

6.0 USE OF ALCOHOL....................................................................... 9

APPENDIX I: ................................................................................ 10

BANNED SUBSTANCES .................................................................... 10

    LIST OF BANNED SUBSTANCES FOR STUDENT ATHLETES........................... 11

APPENDIX II: ............................................................................... 14

Reasonable Suspicion Reporting Form ................................................. 14

    William Penn Athletics Department DRUG TESTING REASONABLE ................ 15

    SUSPICION REPORTING FORM ......................................................... 15

DEF. APPX. 55

# 1.0 INTRODUCTION

William Penn University believes that it is a privilege for a student to represent William Penn on or off the field and the responsibility of such representation is a matter of both character and integrity. William Penn University, along with the Heart of America Athletic Conference (THE HEART), and the National Association for Intercollegiate Athletics (NAIA), seek to uphold this responsibility by providing programs to insure a fair, safe, and honorable field of play.

William Penn University also encourages the promotion of good physical health and well-being of all student-athletes. As a consequence, William Penn University's education program will consist of a twofold process: (1) student-athlete education, and (2) illegal drug and substance abuse testing.

The purpose of the educational program is to assist student-athletes by ensuring that they are well informed about illegal drugs, dietary supplements, and the abuse of legal drugs. The educational program further attempts to promote a healthy student-athlete lifestyle as well as create a fair competitive environment.

The purpose of the drug and substance abuse testing program is to discourage the use of illegal drugs, and the abuse of legal drugs and dietary supplements by student-athletes through a screening program based on periodic testing designed to identify those who use a banned substance including, without limitation, those substances appearing on the Banned Substances for Intercollegiate Athletics established by THE HEART and/or the NAIA ("Banned Substance"), which is published on the William Penn University Athletics webpage, or is available through the William Penn University Athletic Department.

This policy is not a contract between the William Penn University and the student-athletes at William Penn University. However, signed consent and notification forms by the student-athlete shall be considered affirmation of the student-athlete's understanding of the terms and conditions contained in this policy. William Penn University reserves the right to amend and adjust this policy at any time.

# 2.0 STUDENT-ATHLETE NOTIFICATION AND EDUCATION

All student-athletes will be required to sign a drug testing consent form and will be notified of the Drug Education and Testing program by the Director of Sports Medicine, head coach, drug-site testing coordinator, or the designate of the Athletic Director.

Student-athletes who test positive for a "Banned Substance," and if such result is not the result of approved prescription medication (as discussed in 3.14 EXCEPTIONS FOR PRESCRIPTION MEDICATIONS), will be subject to sanctions, as discussed in 3.13 INSTITUTIONAL DISCIPLINE FOR A POSITIVE TEST, and will be referred by the Athletic Department to the office of the William Penn University counselor.

# 3.0 INSTITUTIONAL DRUG AND SUBSTANCE ABUSE TESTING

## 3.1 Methods for Selection and Eligibility for Drug Testing

The Athletic Department, through Drug Free Sport, will conduct random institutional drug testing of all athletic teams. The head coach of each team will provide a roster of all student-athletes to the Drug Testing Site Coordinator. Rosters must be kept up to date in order to ensure that there may be proper selections of current student-athletes.

Student-athletes who are eligible for institutional drug testing shall include any student-athlete listed on the NAIA or institutional squad list, which includes:

- Those who are actively participating,

DEF. APPX. 56

- Those with medical disabilities,
- Red-shirted student-athletes,
- Partial and non-qualifiers, and

That list will then be compared to the list of student-athletes maintained by William Penn University personnel who are responsible for eligibility and financial aid issues. A final list of William Penn University student-athletes will then be submitted to Drug Free Sport. The Drug Testing Site Coordinator shall be responsible for submitting all institutional drug-testing reports to the Athletic Director.

## 3.2 Notification for Drug Testing

Student-athletes selected for drug testing will be notified either in person or by telephone (no voice mail or e-mail or text message) by the Drug Testing Site Coordinator. Upon contact with the Drug Testing Site Coordinator, the selected student-athletes must sign the Student-Athlete Notification form or immediately prior to testing. The amount of time between notification and collection of urine specimen will generally be no more than 24 hours before the drug test. Coaches may also inform the student athletes that a call is coming to the student athlete from 641-673-1293 or to report to the athletic training facility in order to be notified in person.

## 3.3 Reasonable Suspicion Testing

William Penn University reserves the right to require a student-athlete to submit to additional drug testing when there is reasonable suspicion to believe that the student-athlete has been using a Banned Substance.

"Reasonable suspicion" is defined as behavior, conduct, or performance by the student-athlete that leads a faculty or staff member at William Penn University to conclude that likelihood exists that the student-athlete is using or is under the influence of a Banned Substances. Indicators which may be used to determine if reasonable suspicion exists include, but are not limited to, the following:

- Observed possession or use of a Banned Substance
- Arrest or conviction for a criminal offense related to the possession or use of a Banned Substance
- Changes in student-athlete's behavior, conduct, performance, class attendance, GPA, athletic practice attendance, injury rate or illness, physical appearance, academic or athletic motivational level, emotional condition, mood, and legal involvement.
- An offense while living in a dormitory that involves illicit drugs

Reasonable suspicion testing is to protect the health of the student-athlete, the health of others, and/or to protect the integrity of the sport and William Penn University.

If a faculty or staff member of William Penn University has reasonable suspicion that a student-athlete is using or is under the influence of a Banned Substance, that faculty or staff member should notify the Athletic Director and or Drug Testing Coordinator using the Drug Testing Reasonable Suspicion Reporting Form, which is available in the William Penn University Sports Medicine Department.

The Athletic Director shall then consult with Director of Sports Medicine, and the Head Coach of that student-athlete's sport to determine if drug testing is required. If there is any disagreement as to whether the student-athlete should be tested, the Athletic Director will have the final decision.

If additional drug testing is determined to be necessary Drug Testing Site Coordinator, shall require the student-athlete to submit to additional drug testing in the manner stated above. Further, if a student-athlete is observed or otherwise found to be in possession and/use of a Banned Substance, he or she will be subject to the same procedures that would be followed in the case of a positive drug test.

DEF. APPX. 57

**3.4 Safe Harbor**

Student-athletes who, prior to notification of any drug test, voluntarily seek help, or disclose that they have a drug or substance abuse issue shall receive all reasonable support and assistance appropriate to facilitate retention and academic, athletic, and social success.

**Voluntary disclosure must come prior to any notification of drug testing**. After an athlete has been notified of an upcoming drug test, the safe harbor no longer applies. Student-athletes who are willing to accept help will be ineligible for competitions during their treatment but may still continue to practice if deemed safe by the Athletic Director, Director of Sports Medicine, and/or Team Physician.

Student-athletes may seek counseling either on campus or with an outside source of their choice. Once rehabilitative steps have begun, prior to returning to regaining competitive eligibility, the student-athlete must provide a negative drug test. All costs for rehabilitative assistance and reentry drug testing will be the responsibility of the student-athlete.

A student-athlete may only self-disclose and avoid policy sanctions one time during his or her tenure at William Penn University. After the first self-disclosure, William Penn University recommends that the student-athlete still voluntarily report if he or she has a drug or substance abuse issue, but sanctions will be followed as listed below under 3.13 INSTITUTIONAL DISCIPLINE FOR A POSITIVE TEST.

**3.5 Re-Entry Testing**

A student-athlete who has had his or her eligibility to participate in intercollegiate sports suspended as a result of a positive drug test may be required to undergo re-entry drug testing before regaining eligibility. The Drug Site Testing Coordinator will arrange for re-entry testing after the student-athlete is certain that he or she can produce a negative drug test and has shown indications that re-entry into the intercollegiate sports program is appropriate.

**3.6 Follow-Up Testing**

A student-athlete who has returned to participation in intercollegiate sports following a positive drug test under this policy may be subject to follow-up testing. Testing will be unannounced and will be required at a frequency determined by the Athletic Director, Director of Sports Medicine, Team Physician, or head coach.

**3.7 Pre-Season Screening**

Student-athletes are subject to pre-season drug testing and may be notified of such by the Athletic Director or Drug Site Testing Coordinator at any time prior to their first competition.

**3.8 Collection Procedures**

Mahaska Health, in coordination with William Penn Sports Medicine, will be responsible for the collection process. The athlete's initial specimen will be sent to a certified laboratory, which will be responsible for analyzing the urine specimen provided by the athlete. The detailed collection protocol (observed collection), shall be established by Drug Free Sport. Drug Free Sport may modify such collection protocol from time to time.

**3.9 Substances Tested**

Testing of the sample is intended to detect and/or identify any Banned Substance. In addition, such testing can detect substances used as a recreational drug, as well as those that are performance enhancement, and prescription drugs.

DEF. APPX. 58

## 3.10 Reporting Results

The Drug Testing Site Coordinator will notify the Athletic Director and head coach of any and all positive test results. The Athletics Director will have a meeting with the student-athlete and head coach where the results and consequences will be discussed.

## 3.11 Accumulation of Results

All test results accumulate during the entire time that an individual is a student-athlete at William Penn University.

## 3.12 Institutional Discipline for a Positive Test

### First Violation

A student-athlete with an initial positive test result for a Banned Substance while enrolled at William Penn University will be referred to the Athletic Director and/or Drug Testing Coordinator for institutional sanctions as well as to the William Penn University counselor for an initial evaluation and potential rehabilitation regarding substance abuse.

Referral to the William Penn University counselor will determine the educational content and duration for this program. The Athletic Director, or designee, shall notify the student-athlete and the head coach of the student-athlete's sport of the first positive test result for the purpose of securing assistance in the prevention of further drug use by the student-athlete.

The student-athlete will be suspended for 10% of the entire season's competition in his/her intercollegiate sport (coaches have the discretion to increase the duration of suspension based on their team rules). If less than 10% of the schedule is remaining in the current season, or if the positive test comes during an "off" season (i.e. during the Spring for football), then any loss of competition imposed will carry over into the following season.

Exhibition games may be included in the suspension but will not be counted toward the 10%. The student-athlete may be withheld from practice if deemed necessary based on the student athlete's health status as it is affected by the substances taken. This decision will be determined by the Director of Sports Medicine, Team Physician and Athletic Director.

The student-athlete will retain his/her athletic awarded financial aid. The student-athlete will be required to provide a negative drug test prior to being reinstated for competition. All costs of additional testing will be charged to the student-athlete and must be paid for before eligibility is reinstated.

A student-athlete who tests positive may be subject to additional follow-up testing over the student-athlete's athletic career. In addition, the student-athlete shall be required, in the presence of the Head Coach of the sport in which the student-athlete participating, or if unavailable the Director of Athletics—to contact his or her parent or guardian to disclose the positive drug test and the sanctions for such positive drug test.

The head coach of each sport, upon approval of the Athletic Director, has the ability to add on additional sanctions as written in the team rules, excluding expulsion or reduction of athletic aid within the period of the award.

### Second Violation

A student-athlete with a second positive test result for a Banned Substance while enrolled at William Penn University will be referred to the Athletic Director and/or Drug Testing Coordinator for further institutional sanctions as well as to the William Penn University for additional evaluation, with a potential for off-campus counseling to be required at the students-athlete's expense.

DEF. APPX. 59

A second offense has nothing to do with any previous testing and does not include appeals or drug testing to restore eligibility. This can be a second positive test of the same banned substance or the second time the student-athlete has been tested resulting in a positive test showing the presence of a Banned Substance. This evaluation also will determine the educational content and potential rehabilitation regarding substance abuse. Only members of the athletic department will regulate athletic eligibility. The Athletic Director, or designee, will notify the student-athlete and the head coach of the student-athlete's sport of the second positive test result for the purpose of securing additional assistance in the prevention of further drug use by the student-athlete.

The student-athlete will be suspended for 50% of the entire season's competition in his/her intercollegiate sport (coaches have the discretion to increase the duration of suspension based on their team rules). If less than 50% of the schedule is remaining in the current season, or if the positive test comes during an "off" season (i.e. during the Spring for football), then any loss of competition imposed will carry over into the following season.

Exhibition games that fall within this suspension will be included, but will not be counted toward the 50%. The student-athlete may be withheld from practice if deemed necessary based on the student-athlete's health status as it is affected by the substances taken. This decision will be determined by the Director of Sports Medicine, Team Physician and Athletic Director.

The student-athlete also may lose 50% or his/her athletic-awarded financial aid (effective the start of the next semester). The student-athlete will be required to provide a negative drug test prior to being reinstated for competition. All costs of additional testing will be charged to the student athlete and must be paid for before eligibility is reinstated

A student-athlete who tests positive may be subject to additional follow-up testing over the student-athlete's athletic career. In addition, the student-athlete shall be required, in the presence of the Head Coach of the sport in which the student-athlete participating, or if unavailable the Director of Athletics—to contact his or her parent or guardian to disclose the positive drug test and the sanctions for such positive drug test.

The head coach of each sport, upon approval of the Athletic Director, has the ability to add on additional sanctions as written in the team rules, excluding expulsion or reduction of athletic aid within the period of the award. The Athletic Director also may add additional sanctions to the student-athlete outside of those listed in this policy or written in the team rules.

### *Third Violation*

A student-athlete with a third positive test result for a Banned Substance while enrolled at
William Penn University will be permanently banned from ever returning as a participant in any William Penn University Athletic Department-sponsored activity. This does not include appeals to prior testing, but is a third positive test during drug testing.

The Athletic Director and/or Drug Testing Coordinator will cancel current and non-renewal of athletic-awarded scholarships. In addition, the student-athlete shall be required, in the presence of the Head Coach of the sport in which the student-athlete participating, or if unavailable the Director of Athletics—to contact his or her parent or guardian to disclose the positive drug test and the sanctions for such positive drug test.

## 3.13 Exceptions for Prescription Medications

William Penn University recognizes that some Banned Substances are used for legitimate medical purposes. Accordingly, William Penn University allows exception to be made for those student-athletes with a documented medical history demonstrating the need for regular use of such a drug.

If a legitimate, non-performance enhancing reason for a documented medical condition is demonstrated, in writing, by the student-athlete's physician, exceptions may be granted for substances included in the following classes of banned drugs:

DEF. APPX. 60

- Stimulants
- Anabolic agents*
- Beta blockers
- Diuretics
- Peptide hormones*
- Anti-estrogens
- Beta-2 agonists

*A medical exception for the use of anabolic agents and peptide hormones must be submitted and approved before a student-athlete can participate in intercollegiate athletics.

Additional information regarding medical exceptions procedures will be dealt with on an individual basis. Prescriptions for medical marijuana will not be granted as an exception because marijuana, in all forms, is an illegal drug in the State of Iowa.

### 3.14 Appeals Process

A student-athlete may appeal an institutional drug test result within 24 hours of his or her receipt of notification of a positive drug test. Such appeal shall be in writing and shall be submitted to the Drug Testing Coordinator and/or Athletic Director. Once an appeal is received, and if the appeal is based specifically upon the test analysis, the student-athlete will then allow to Drug Free Sport to conduct further analysis and lab testing.

Only one appeal is allowed per institutional drug test. The cost of further analysis and all processes therein will be at the expense of the student-athlete and must be paid for in full prior to any further analysis and before eligibility to participate in the student-athlete's sport can be reinstated.

A committee made up of the Director of Sports Medicine, a member of the Athletic Department Council who does not oversee the student-athlete, and Athletic Director will review the case. The student-athlete will be notified of the date and time of the meeting and have the right to appear before the panel with an advisor (legal or otherwise). The advisor may only advise the student-athlete and may not participate in the conversation with the committee.

### 3.15 Institutional Drug Testing Record Keeping

The Drug Testing Site Coordinator will keep records on the number of student-athletes tested and the results of the tests. These results are kept confidential to the extent allowed by applicable state and federal laws and related rules and regulations. Results will be compared with previous years' results to determine the effectiveness of the substance abuse and education program.

## 4.0 USE OF DIETARY SUPPLEMENTS

Dietary supplements have become commonplace in athletics since the passage of the Dietary Supplements Health and Education Act in 1994. Deceptive marketing by supplement

manufacturers and supplement distributors have led student-athletes to believe that a product with the word "all natural" on the label is safe.

Before consuming any nutritional/dietary supplement product, the athlete should review the product with the athletics department staff. Dietary supplements are not well regulated and may contain a Banned Substance that will cause a positive drug test result.

DEF. APPX. 61

Any product containing a dietary supplement ingredient is taken at the student-athlete's risk. Many serious side effects, including death, have been linked to dietary supplements. Any student-athlete, or coach, requesting more information about dietary supplements and potential Banned Substances that are, or might be, ingredients in these supplements should seek additional education.

Further information can be sought through the National Center for Drug Free Sport Resource Exchange Center (REC) at (877) 202-0767 or visit the website at www.drugfreesport.com/rec.

## 5.0 USE OF TOBACCO

The use of tobacco products by institution personnel or student-athletes on any playing sites during any competition and/or any events with the team where William Penn University is being represented is prohibited. This includes, but is not limited to the use of tobacco products on the field of play, banquets, and autograph sessions surrounding a Conference championship or postseason tournament.

## 6.0 USE OF ALCOHOL

The Athletic Department supports William Penn University's policy on the use of Alcohol as stated in the Student Handbook.

DEF. APPX. 62

# APPENDIX I:

# BANNED SUBSTANCES

DEF. APPX. 63

-Athletes

## LIST OF BANNED SUBSTANCES FOR STUDENT ATHLETES

### 1.0 BANNED CLASSES OF DRUGS

William Penn University bans the following classes of drugs:

- Stimulants
- Anabolic Agents
- Alcohol and Beta Blockers
- Diuretics and Other Masking Agents
- Street Drugs
- Peptide Hormones and Analogues
- Anti-estrogens
- Beta-2 Agonists

Note: Any substance chemically related to these classes is also banned.

The institution and the student-athlete shall be held accountable for all drugs within the banned drug class regardless of whether they have been specifically identified.

### 2.0 DRUGS AND PROCEDURES SUBJECT TO RESTRICTIONS

William Penn University subjects the following drugs and procedures to restrictions:

- Blood Doping
- Local Anesthetics (under some conditions)
- Manipulation of Urine Samples
- Beta-2 Agonists permitted only by prescription and inhalation
- Caffeine if concentrations in urine exceed 15 micrograms/ml

### 3.0 NUTRITIONAL/DIETARY SUPPLEMENTS WARNING

Before consuming any nutritional/dietary supplement product, please fill out the Student-Athlete Dietary Supplement Disclosure & Review Form and review the product with your coach or athletic training staff.

- Dietary supplements are not well regulated and may cause a positive drug test result.
- Student-athletes have tested positive and lost their eligibility using dietary supplements. Many dietary supplements are contaminated with banned drugs not listed on the label.
- Any product containing a dietary supplement ingredient is taken at your own risk even if disclosed and reviewed with a coach or the athletic training staff.

It is your responsibility to check with the appropriate Athletic Department staff member before using any substance.

DEF. APPX. 64

Note to Student-Athletes: There is no complete list of banned substances. Do not rely on this list to rule out any supplement ingredient. Check with your athletics department staff prior to using a supplement.

## 4.0 EXAMPLES OF BANNED SUBSTANCES IN EACH DRUG CLASS

Any substance that is chemically related to the class, even if it is not listed as an example, is also banned. Information about ingredients in medications and nutritional/dietary supplements can be obtained by contacting the Resource Exchange Center, REC, www.drugfreesport.com/rec.

### 4.1 Stimulants

- amphetamine (Adderall) • fenfluramine (Fen)     • phentermine (Phen)
- caffeine (guarana)        • methamphetamine     • synephrine (bitter orange)
- cocaine  • methylphenidate (Ritalin        • methylhexaneamine
- ephedrine

*Exceptions*
- Phenylephrine and pseudoephedrine are not banned.

### 4.2 Anabolic Agents

(Anabolic agents are also sometimes listed as a chemical formula, such as 3,6,17-androstenetrione)

- boldenone        • stanozolol      • norandrostenedione
- clenbuterol      • testosterone  • methandienone
- DHEA (7-Keto)  • methasterone       • etiocholanolone
- nandrolone       • androstenedione    • trenbolone

### 4.3 Alcohol and Beta Blockers

- alcohol  • nadolol       • propranolol
- atenolol • pindolol      • timolol
- metoprolol

DEF. APPX. 65

**4.4 Diuretics (water pills) and Other Masking Agents**

- bumetanide
- chlorothiazide
- furosemide

- hydrochlorothiazide
- probenecid
- spironolactone (canrenone)

- triameterene
- trichlormethiazide

**4.5 Street Drugs**

- heroin    • tetrahydrocannabinol (THC)
- synthetic cannabinoids (eg. spice, K2, JWH-018, JWH-073)
- marijuana

**4.6 Peptide Hormones and Analogues**

- growth hormone(hGH)
- human chorionic (hCG)
- erythropoietin (EPO) gonadotropin

**4.7 Anti-Estrogens**

- anastrozole tamoxifen
- formestane
- 3,17-dioxo-etiochol-1,4,6-triene(ATD)

**4.8 Beta-2 Agonists**

- bambuterol
- formoterol

- salbutamol
- salmeterol

DEF. APPX. 66

# APPENDIX II:
# Reasonable Suspicion Reporting Form

DEF. APPX. 67

## William Penn Athletics Department DRUG TESTING REASONABLE

## SUSPICION REPORTING FORM

I, _____ (*William Penn University Faculty or Staff Member*) under the reasonable suspicion provisions that are outlined in the Drug Education and Drug Testing Policy for Student-Athletes, report the following objective sign(s), symptom(s) or behavior(s) that I reasonably believe warrant _____ *(name of student-athlete)* to be referred to the Director of Athletics or his/her designee for possible drug testing. The following sign(s), symptom(s), or behavior(s) were observed by me over the past _____ hours and/or _____ days.

***Please check below all that apply:***

**The Student-Athlete has demonstrated:**

☐ Dilated pupils                                    ☐ Overstimulated or 'hyper'

☐ Constricted pupils                               ☐ Withdrawn and/or less communicative

☐ Red eyes communicative                         ☐ Periods of Memory Loss

☐ Smell of alcohol on the breath                 ☐ Smell of Marijuana directly identifiable to the individual

☐ Staggering or difficulty walking Slurred speech   ☐ Excessive Talking

☐ Constantly running and/or red nose

☐ Recurrent violations of William Penn University Student Code of Conduct

Recurrent motor vehicle accidents and/or violations
*(list dates: _____ )*

**The Student-Athlete has shown:**

☐ Irritability                                      ☐ Weight gain

☐ Loss of temper                                   ☐ Weight loss

☐ Poor motivation                                  ☐ Sloppy hygiene and/or appearance

☐ Emotional outburst (e.g. crying)               ☐ Failure to follow directions

☐ Physical outburst (e.g. throwing equipment)

☐ Verbal outburst (e.g. to faculty, staff, students, teammates)

DEF. APPX. 68

**The Student-Athlete has been:**

☐ Late for practice                                    ☐ Staying up too late

☐ Late for class Missing appointments

☐ Not attending class Missing or skipping meals

☐ Receiving poor grades

**Other specific objective findings include:**

_____

_____

_____

_____

_____

*Signatures:*

_____          _____

*Person Making Report Name*                          *Position*

_____          _____

*Person Making Report Signature*                     *Date*

_____

*Assistant Athletic Director Name*

_____          _____

*Assistant Athletic Director Name Signature*         *Date*

Check One:
**William Penn University Counselor consulted?**    ☐ Yes        ☐ No
 **Reasonable Suspicion finding upheld?**            ☐ Yes        ☐ No

<span style="color:red">DEF. APPX. 69</span>

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>          Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>          Defendants.<br><hr><br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>          Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>          Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**DECLARATION OF MATT BRUNER**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Matt Bruner, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I was retained by the City of Newton, Iowa, Rob Burdess, Nathan Winters, and Christopher Wing to provide expert testimony in this case.

2.      A true and correct copy of the expert witness report I authored is attached to this Declaration, and the report includes all my opinions and the facts and data I relied on to form my opinions.

3.      A true and correct copy of my curriculum vitae is also attached following my expert witness report.

DEF. APPX. 70

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/

Matt Bruner

**Green Line Consulting, LLC**

Matt Bruner
Huxley, IA 50124
Email:  matt.bruner@gmail.com   Cell: 515-598-6894

September 8, 2023

Mr. Nicholas F. Miller
Brick Gentry Law Firm

Re:  Review of technical report submitted by Dr. Lance A. Platt, Ph.D., of Platt and Associates,
     pertaining to case report, video, field sobriety testing, arrest, and post-arrest processing of Mr.
     Tayvin Galanakis on August 28, 2022, in Newton, IA.

Mr. Miller:

At your request I have reviewed Dr. Platt's technical report submitted on July 1, 2023, along with body
camera videos of the traffic stop, testing, and processing of Mr. Galanakis from the early morning
hours of August 28, 2022.  I conducted a thorough review of the 37 pages of Dr. Platt's technical
analysis of the incident included in his 55 page report.

My attached response is formatted into several logical sections to assist in understanding where my
experience in impaired driving enforcement and instruction agrees with much of Dr. Platt's technical
analysis report.  The second section is an analysis of specific statements and sections of Dr. Platt's
technical report that I disagree with as being substantially incorrect, omitting pertinent information, or
to which I've come to a different conclusion than Dr. Platt.

Thirdly, I provide my expert analysis of the video and reports provided to me from the night of the
stop.  This is followed by my conclusion and opinion on whether there was sufficient impairment
displayed by Mr. Galanakis in the early morning hours of August 28, 2022 to warrant an arrest for OWI
and the performance of a drug influence evaluation by a certified Drug Recognition Expert.  Lastly,
specific and general references that I used to form my conclusion and opinion are cited for your
convenience.

Sincerely,

Matt Bruner

<span style="color:red">DEF. APPX. 72</span>

**1. Agreements with Dr. Platt's Technical Report**

a.  The vast majority of Dr. Platt's report are accurate citations and references directly from the "NHTSA SFST Student Manual," (albeit an outdated "HS 178 02/2018" version from just over five years ago).  To clarify, the manual he is referencing is developed and published by the National Highway Traffic Safety Administration (NHTSA), the International Association of Chiefs of Police (IACP) and the Department of Transportation (DOT)'s Traffic Safety Institute (TSI).  It is titled, "DWI Detection and Standardized Field Sobriety Testing (SFST) Participant Manual."  This manual is the cornerstone for basic impaired driving training and enforcement across the United States (and internationally), having been since at least 1987.

The SFST manual, along with similarly published Advanced Roadside Impaired Driving Enforcement (ARIDE) and Drug Recognition Expert (DRE) manuals are regularly reviewed and revised by IACP's Technical Advisory Panel.  Periodic reviews are performed to stay current with improved scientific techniques and changing drug/alcohol trends with input from the scientific, medical, and law enforcement communities.

Dr.  Platt appropriately references the "SFST Student Manual" heavily in his technical analysis, giving much credit to its accuracy, importance, and legitimacy in alcohol-impaired driving investigations.  Any peace officer, instructor, or expert worth their salt should rely on this manual and others published by the reputable sources of NHTSA, IACP, and TSI, such as the current ARIDE Manual and DRE (Pre-School & 7-Day School) manuals.  These manuals "bridge the gap" and focus on impaired driving investigations of alcohol AND drug-impaired drivers. Since the ARIDE manual builds upon the foundation of the SFST Manual, and the DRE Manual builds upon the foundations of both of those manuals, many references in my report will cite the 2023 ARIDE and Drug Recognition Expert Manuals, which are the most up to date and all-encompassing resource for drug (including alcohol) impaired driving.

b.  The format Dr. Platt uses in his analysis is appropriate and follows the standardized and accepted three-phase process used by officers across the country in impaired driving investigations:
    - Phase 1 - Vehicle in Motion
    - Phase 2 - Personal Contact
    - Phase 3 - Pre-Arrest Screening

This approach chronologically walks the officer and report-reader though the impaired driving investigation process. It is important to note that impairment may be observed in EACH of these phases and the stepped approach is used by officers in the field to logically determine if there is sufficient probable cause to arrest the driver for impaired operation, or to request further chemical or drug-influence testing.  As Dr. Platt correctly references, "*DWI detection is defined as: THE ENTIRE PROCESS OF IDENTIFYING AND GATHERING EVIDENCE TO DETERMINE IF A SUBJECT SHOULD BE ARRESTED FOR A DWI VIOLATION."*

c.  When looking specifically at Dr. Platt's "Observations of Examiner" notes throughout the report, although I disagree with many conclusions, I do agree with the discrepancy discovered under section 3.05 (P. 34) relating to timing on the Modified Romberg Balance Test.  Dr. Platt

DEF. APPX. 73

points out that the officer articulates several different lengths of time that Mr. Galanakis took to complete the test: 34, 38, and 37 seconds. Dr. Platt does not, himself, articulate what he observed as the correct amount of time observed on the video. After careful review of video of the issue, I observed Mr. Galanakis began the test at the 18:35 mark of the video and completed the test by opening his eyes and saying "30" at the 19:05 mark, showing the test took the subject an appropriate 30 second period of time to complete. Other reliable indicators of impairment were ALSO observable during that 30 second portion of the video, but will be addressed later in my analysis of the indicators of impairment observed.

d. Importantly, in Section 3.00 (a) "Simplicity," Dr. Platt cites the SFST manual reading, "*Simplicity is the key to divided attention field sobriety testing. It is not enough to select a test that just divides the subject's attention. The test must also be one that is reasonably simple for the average person to complete as instructed when sober. Tests that are difficult for a sober subject to perform have little or no evidentiary value.*" An emphasis should be placed on this fundamental and key statement. The divided attention field sobriety tests, including the Horizontal Gaze Nystagmus (HGN), Walk & Turn, One-Leg Stand, Lack of Convergence, Modified Romberg Balance, and Finger to Nose tests are all standardized and designed in a manner that a sober/non-impaired subject would perform well. SFST, ARIDE and DRE students perform these tests during their training on many non-impaired subjects (instructors, other officers, etc.) and do not regularly see indicators of impairment.

While I agree with the vast majority of the material cited in Dr. Platt's technical report, I fundamentally disagree with many of his individual analyses under the "Observations of Examiner" sections of the report and conclusions derived from the video, reports, and manuals. Of those, I will focus on his review of the traffic stop, field sobriety testing, and Mr. Galanakis' initial processing at the Newton Police Department as it is of most significance to the case.

## 2. Disagreements and Omissions from Dr. Platt's Technical Report

a. <u>Omission in 2.04</u> "Observations of Examiner" – In reference to the "<u>small</u>" odor of an alcoholic beverage the officer detected, Dr. Platt states, "*While this may have been the officer's opinion, there is no way that the officer can correlate the odor of alcohol to a level of intoxication.*" In my review of the officer's report & video, at no time does he reference a specific level of intoxication correlated with the smell of alcohol. He instead appropriately uses it as a <u>describable cue or evidence of an intoxicant</u> onboard Mr. Galanakis.[1]

b. <u>Disagreement with 2.04</u> "Observations of Examiner" – Dr. Platt states, *"Mr. Galanakis does not admit to consuming alcohol (he is asked twice) or taking any type of drugs on this date."* As recorded in DRE Andrew Shinkle's report, Mr. Galanakis stated he took "Welburtin" (Wellbutrin), a central nervous system depressant drug 11-12 hours earlier.

---

[1] *DWI Detection and Standardized Field Sobriety Testing Participant Manual*. February 2023 Edition. Session 6- P. 7.

DEF. APPX. 74

c. <u>Disagreement with 2.05</u> "Observations of Examiner" – Dr. Platt states, *"In my opinion and NHTSA, bloodshot and glassy or glossy eyes are not always indicative of alcohol consumption or intoxication."* While this specific, narrow statement is true, bloodshot and watery eyes ARE consistent with drug (including alcohol) impairment and a reliable indicator for officers when taken in context and with the totality of the circumstances.[2,3] The fact that there may be an alternative explanation for an indicator or clue observed by the officer does not necessarily negate its importance. "Officers are not required to rule out the possibility of innocent behavior as long as reasonable suspicion of criminal activity exists.[4] "

d. <u>Disagreement with 3.01 (B)</u> "Observations of Examiner" – Dr. Platt states, *"These are the only clues for the HGN test"* in reference to lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and onset of nystagmus prior to 45 degrees. More accurately, these are the only scientifically-validated clues in the standardized HGN test of a subject under the influence of a central nervous system depressant, inhalant, or dissociative anesthetic. Many other clues of impairment are observable during the divided-attention HGN test such as: droopy eyelids, head movements, inattentive eye movements, inability to follow instructions, being "on the nod," etc.[5] An officer cannot ignore displayed indicators of impairment to rely strictly on clues related to just 3 of the 7 drug categories.

e. <u>Omission in 3.01 (N)</u> "Observations of Examiner" – Dr. Platt states, *"The officer does state in his case report that he did not observe any HGN test clues. Based upon NHTSA impaired driving training a lack of observed HGN could eliminate a CNS Depressant an Inhalant or PCP as the alleged impairing substance."* PCP (as a category) is no longer specifically referenced in the IACP/NHTSA/TSI curriculum, rather, the drug category of Dissociative Anesthetics are used (which included PCP). This category also includes many drugs other than PCP that are abused. Another issue with Dr. Platt's statement is that it is also ignoring the fact that a negative HGN test IS CONSISTENT with a subject under the influence of the other 4 (of the 7) drug categories: CNS Stimulants, Hallucinogens, Narcotic Analgesics & Cannabis.[6] The lack of HGN on an impaired individual is helpful evidence in assisting an ARIDE-trained officer or DRE in determining potentially which drug category or categories of which the subject may be under the influence.[7]

f. <u>Omission in 3.02</u> "Walk and Turn Test" – Dr. Platt states, "*The NHTSA W&T test was researched and validated as a test for determining **alcohol** (bolded & underlined) levels above or below .08, based upon the NHTSA SFST validation studies.* What Dr. Platt fails to state is that the divided-attention Walk and Turn Test is a useful test in determining divided attention impairment.

[2] *DWI Detection and Standardized Field Sobriety Testing Participant Manual*. February 2023 Edition. Session 6- P. 5.

[3] *Drug Recognition Expert Course 7-Day School Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P. 17.

[4] State v. Brian Sean Moran, No. 15-2164 (Iowa Court of Appeals, filed October 26, 2016).

[5] DRE Drug Category Matrix, *Drug Evaluation and Classification Training: the Drug Recognition Expert School.* U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

[6] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 4.

[7] DRE Drug Category Matrix, op. cit.

<span style="color:red">DEF. APPX. 75</span>

*"Because Cannabis impairs attention, the Standardized Field Sobriety Tests (SFSTs) like Walk and Turn (WAT) and the One Leg Stand (OLS), as well as the Finger to Nose (FTN) are excellent tools for recognizing people under the influence of Cannabis.[8]"*

g. <u>Disagreement/Omission 3.02(d) & (i)</u> "Observations of Examiner" – Dr. Platt states he observed 3 out of a possible 8 clues on the Walk & Turn test:

> 1) Took wrong number of steps
> 2) Stopped while walking
> 3) Conducted an improper turn

Officer Winters' report states that he observed 5 out of a possible 8 clues on the Walk & Turn test:

> 1) Stepped off line
> 2) Took 13 steps (improper number of steps)
> 3) Stopped walking
> 4) Improper turn
> 5) Missed heel to toe

Taking either of the above interpretations into account, including Dr. Platt's own observation of 3 validated clues of impairment (the evaluation criteria of which is 2 clues out of 8 to indicate a BAC above .08 and thus impairment and intoxication[9]), Dr. Platt infers that Mr. Galanakis is displaying a level of impairment above the evaluation criteria on the test.  Later, on page 30, under "Observation of Examiner" ("I"), Dr. Platt opines that "…*it is my opinion Mr. Galanakis performs well physical however he does not follow the instructions given to him by the officer.*"  What Dr. Platt fails to state is that three scientifically validated clues of impairment are displayed by Mr. Galanakis, who was unable to divide his attention and perform the psychophysical test appropriately, indicating impairment.

h. <u>Disagreement with 3.02(f)</u> "Observations of Examiner" – Dr. Platt states, *"It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his W&T results, he does mention an ankle injury however the officer does not expand upon it."*  This is not true.  On the body camera video at the 13:25 mark, Officer Winters appropriately asks, *"Any problems with your ankles, knees, hips or back?"* prior to conducting the Walk & Turn test. The following exchange then occurs:

> *Mr. Galanakis:*　　"Just my right ankle."
> *Officer Winters:*　　"What's wrong with your right ankle?"
> *Mr. Galanakis:*　　"Messed it up during football."
> *Officer Winters:*　　"Ok, does it prevent you from walking?"
> *Mr. Galanakis:*　　"Just a little bit but I'll be able to do this."
> *Officer Winters:*　　"OK, does it hurt right now?"
> *Mr. Galanakis:*　　"Nope, I have all my weight on my left foot right now."

---

[8] *Drug Recognition Expert Course 7-Day School Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P. 9-10.

[9] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 29.

DEF. APPX. 76

Mr. Galanakis then attempts to perform the test.  In contrast to Dr. Platt's incorrect statement earlier, Officer Winters not only asked about the ankle injury (or any others), but asked three follow-up questions to which Mr. Galanakis negates the issue, and even states that he'll be able to do the test.  To an even greater extent, Dr. Platt recklessly reiterates this false statement **five** additional times in his technical report:

P. 30, 3.02(g) "Observations of Examiner"
P. 30, 3.02(h) "Observations of Examiner"
P. 32, 3.03(e) "Observations of Examiner"
P. 33, 3.03(f) "Observations of Examiner"
P. 33, 3.03(g) "Observations of Examiner"

i) <u>Disagreement with 3.03 (d)</u> "Observations of Examiner" – Dr. Platt states, *"I observed Mr. Galanakis to exhibit 1 out of a possible 4 OLS test clues, the officer also interfered with Mr. Galanakis as he performed the test."*  Although Dr. Platt does not expound upon how the officer interfered with the test, I will assume he is referencing Officer Winters' reminder during the test to Mr. Galanakis to keep his raised leg straight, and count in the correct manner.  These are not considered interference with the test, rather an attempt to remind Mr. Galanakis how to perform the test properly and is essential for evaluating divided attention.[10]

j) <u>Disagreement with 3.03 (h)</u> "Observations of Examiner" - Dr. Platt states, *"Based upon my observation of the submitted video, it is my opinion that Mr. Galanakis performed the OLS test well physically and mentally."*  I disagree with this opinion as Mr. Galanakis displayed at least one validated clue of impairment (raised arms for balance), but also displayed numerous other indicators of impairment during the test (described in greater detail later in my report):

- Interrupting the officer's instructions
- Inability to comprehend simple instructions during instruction phase (the length of test)
- Failure to keep both legs straight during test
- Failure to count out loud or in the instructed manner
- Short term memory impairment

k) <u>Omission in 3.04</u> - Lack of Convergence (LOC) Test - Dr. Platt states, *"The Lack of Convergence test is not part of the NHTSA SFST battery."*  While the fact that the Lack of Convergence test is not included in the original three standardized field sobriety tests developed in the late 1970's, it <u>is</u> now part of NHTSA's, IACP's, and TSI's ARIDE & DRE curriculum and validation studies.  While approximately 8-12% of the general population cannot naturally cross their eyes as a stimulus is moved toward their face, a recent study[11] showed that 77% of subjects under the influence of cannabis displayed a lack of convergence.  When used in conjunction with the HGN, Walk & Turn, and One Leg Stand tests (among others), it provides a reliable indicator and display of impairment by a person under the influence of alcohol and/or drugs.

---

[10]*Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P.27.

[11] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). *Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment*. Accident Analysis and Prevention, 92, 219-229.

DEF. APPX. 77

l) <u>Disagreement with 3.04</u> - "Observations of Examiner" – Dr. Platt states, *"Mr. Galanakis also wears glasses, he may not be able to cross his eyes."*  As observed in the body camera video, Mr. Galanakis states that he normally wears contact lenses, but took them out earlier.  He does not mention the wearing of glasses, nor does DRE Shinkle's DRE "facesheet" indicate he wears corrective lenses.

m) <u>Omission & Disagreement with 3.06</u> - "Finger to Nose (FTN) Test":  Dr. Platt states, *"The Finger to Nose test is not a part of the NHTSA SFST battery.  The scoring or assessment for this test is unknown."*  While the Finger to Nose Test is not included in the original three standardized field sobriety tests developed in the late 1970's, it <u>is</u> now part of NHTSA's, IACP's, and TSI's ARIDE & DRE curriculum and validation studies.  It is also standardized & scientifically validated[12] with standardized clues and has been in use for the last decade.  A recent study also showed that cannabis-impaired subjects displayed 3 or more misses on the Finger to Nose test in 87% of studied DRE evaluations[13].  When used in conjunction with the HGN, Walk & Turn, and One Leg Stand tests (among others), it provides a reliable indicator and display of impairment by a person under the influence of alcohol and/or drugs.

In the "Observations of Examiner" portion of this section, Dr. Platt also states, *"… the trick to causing eye lid tremors and making it very difficult to touch the tip of your nose with the tip of your finger I(s) to make the person close their eyes and tilt their head back."*  Based on my training and experience as a certified Seated-Battery SFST Instructor and certified DRE Instructor, this statement is not true.  I have conducted the standardized and scientifically validated Finger to Nose Test for over ten years in enforcement contacts in the field and in classroom settings.  I have observed that a non-impaired person is able to follow the instructions and perform the divided-attention test with little to no difficulty and touch the tip of their nose with the tip of their finger correctly.  Conversely, I have regularly observed that drug (including alcohol) impaired individuals DO regularly have a difficult time with the simple test.

n) <u>Disagreement with 4.00</u> "Arrest Decision" – Dr. Platt states, *"…it is my opinion that Mr. Galanakis does not exhibit physical and/or mental difficulty while being contacted by the officer that I would associate with any type of drugs or alcohol including Cannabis."*  Due to the clear mental and physical impairment observed of Mr. Galanakis during all three phases of this OWI investigation, it is my opinion that there is sufficient probable cause to justify Officer Winters' arrest of Mr. Galanakis for OWI.  Those indicators of impairment and evidence of probable cause are described in detail in the next section of this report.

---

[12] Fiorentino, Dary D. (2011) *Validation of sobriety tests for the marine environment*. Accident Analysis and Prevention 43, 870–877.

[13] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). *Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment*. Accident Analysis and Prevention, 92, 219-229.

<span style="color:red">DEF. APPX. 78</span>

**3) Expert Analysis & Opinion**

My thorough review of Officer Winters' body camera video reveals numerous cues, clues, and indicators of impairment displayed by Mr. Galanakis during Phase 1 (vehicle in motion), Phase 2 (personal contact), and Phase 3 (pre-arrest screening) of his OWI investigation.  Officer Winters' report also documents indicators of impairment he observed firsthand in the field during the stop.  The totality of the circumstances and evidence collected during all three phases is important to be considered when formulating an arrest/no-arrest decision by peace officers in the field.  It is my opinion and conclusion that there are sufficient indicators of impairment to justify Officer Winters' arrest of Mr. Galanakis for operating a motor vehicle while intoxicated and also to support Officer Winters' request for a certified Drug Recognition Expert to perform a drug influence evaluation of Mr. Galanakis.  My conclusion is supported by the totality of the following cues, clues, and indicators observed in the video and in Officer Winters' report.

Phase 1 - Vehicle in Motion

a)  Mr. Galanakis failed to dim his high beams when meeting the police officer's vehicle.  While Mr. Galanakis states this is due to having a headlight out, the failure to dim his high-beam headlights when approaching oncoming traffic is consistent with divided-attention impairment.[14]  It takes the ability to manage numerous simultaneous tasks to safely operate a motor vehicle, such as controlling the steering wheel, gas & brake pedals, maintaining a heading within the painted lanes, maintaining an appropriate speed, monitoring oncoming and crossing traffic, reacting to traffic signs/signals, etc.  When drugs (including alcohol) are impairing a person, this ability to divide attention is diminished.  The effects of the decreased ability to divide attention are commonly displayed in unsafe driving behaviors such as Mr. Galanakis' failure to dim his high-beams.

Phase 2 - Personal Contact

b)  Numerous air fresheners can be seen hanging from the rearview mirror of Mr. Galanakis' vehicle.  He is also observed chewing gum during the beginning encounter.  Officers are trained to observe possible cover-up odors that may be used to mask the smell of intoxicants.[15]

c) Mr. Galanakis provides inconsistent statements about who the vehicle belongs to.  He initially states that it is his car, then claims that it is actually his grandfather's.  Later Mr. Galanakis claims it is his father's after being questioned about it being registered in his father's name.  Inconsistent responses are a cue officers are trained to detect during phase 2 of their investigation.

d) When Officer Winters requests Mr. Galanakis' driver's license, registration, and insurance, he appears to move slowly and display mental impairment.[17]  Mr. Galanakis is unable to divide his attention as he retrieves his registration, looks at it, then holds onto it without giving it to Officer Winters.  He then pulls out his driver's license and holds it in his hand while looking back into his glove box.  Mr. Galanakis then looks back at the same registration he earlier pulled out, laying in his lap.

---

[14] *DWI Detection and Standardized Field Sobriety Testing Participant Manual*. February 2023 Edition. Session 5- P. 10.
[15] ibid., Session 6- P. 7.
[16] ibid., Session 6- P. 6.
[17] ibid., Session 6- P. 11-12.

DEF. APPX. 79

e)  Mr. Galanakis begins displaying visibly excited emotions once inside the police car, quickly going on the "offensive" during his encounter with the officers.  He begins filming a video from the passenger seat, changing his emotions from cooperative to argumentative with the officer.  These mood changes are consistent with drug impairment.[19]

Phase 3 - Pre-Arrest Screening

f) During the Horizontal Gaze Nystagmus test, Mr. Galanakis appears worried about his hair perm versus the focusing on the field sobriety testing being conducted by Officer Winters.  While the officer is attempting to conduct the test, Mr. Galanakis oddly comments, "You have some big fingers."  Unusual statements are an indicator of impairment officers are trained to detect.[20]

g) During the Walk and Turn Test instruction stage, Mr. Galanakis interrupts Officer Winters' simple instructions of the turn and return 9 steps stating, "What, you want me to turn back around?"  He is then explained the turn and steps again.  This is a display of a lack of concentration, consistent with drug impairment. [21]

h) During the Walk and Turn Test walking stage, Mr. Galanakis appears to miss the line on the ground with the back half of his foot (at an angle).  While this would not be a validated clue of impairment if not completely off the line, it is noteworthy.[22]

i) Does not count out loud as instructed during the Walk and Turn Test.[23]

j) On step seven of the first nine-steps, Mr. Galanakis exclaims, "Say when I get to nine."  This is unusual and not performing the test as he was instructed.  This is also a display of a lack of concentration and short term memory, consistent with drug impairment.[24]

k) Mr. Galanakis performs thirteen steps instead of the nine he was instructed to perform in the first half of the test.  This is a validated clue of impairment.[25]

---

[19] DRE Drug Category Matrix, *Drug Evaluation and Classification Training: the Drug Recognition Expert School.* U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

[20] *DWI Detection and Standardized Field Sobriety Testing Participant Manual.* February 2023 Edition. Session 6- P. 6.

[21] *Drug Recognition Expert Course 7-Day School Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P.11.

[22] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 31.

[23] ibid., Session 2- P. 31.

[24] *DRE 7-Day School Instructor Guide.* Session 21- P.11.

[25] *ARIDE Instructor Guide.* Session 2- P. 28.

DEF. APPX. 80

l) Instead of turning properly and as instructed, Mr. Galanakis states, "Am I good? So, how do I turn?" Here Mr. Galanakis displays short term memory and divided attention impairment. He is reminded by Officer Winters to turn, "Uh, take a series of small steps." Mr. Galanakis again does not follow instructions or the earlier demonstration and turns in place, resetting his feet several times, not taking a series of small steps. This is a validated clue of impairment.[26]

m) On the return 9-steps, Mr. Galanakis actually took 16 steps. This is a validated clue of impairment.[27]

n) On steps 4 and 8 of the return nine-steps, Mr. Galanakis appears to miss a heel-to-toe step by greater than 1/2". This is a validated clue of impairment.[28]

o) During the return 9 steps, Mr. Galanakis exclaims, "Come on man, this is too easy." This is another display of Mr. Galanakis having divided attention impairment, and also impaired perception of what exactly is taking place.

p) After the Walk and Turn test and exclaiming he was "2 for 2," Mr. Galanakis was asked "How many steps did I say to take?" He responded "Like 8 or 9." This display of divided-attention impairment and short-term memory impairment was displayed approximately 1 minute and 20 seconds after being told numerous times to take 9 steps.

q) During the One Leg Stand Test instruction stage, Mr. Galanakis interrupts Officer Winters' instructions stating, "God, you're a rookie bruh," "This your first year?," and "How many false accusations you got?"

r) Also during the One Leg Stand Test instruction stage, Mr. Galanakis interrupts Officer Winters' demonstration and abruptly states, "Repeat the directions." When asked from where to where, Mr. Galanakis states, "So you said 6 seconds hold it up." This is contrary to the simple instructions to hold his foot 6 inches off the ground as the officer demonstrates. Mr. Galanakis again asks the officer to demonstrate it again, indicative of divided attention impairment and short-term memory impairment.

s) During the balance and counting stage of the One Leg Stand Test, Mr. Galanakis has to be reminded to keep his leg straight, a display of divided attention and short-term memory impairment.

t) Mr. Galanakis did not count out loud as instructed and when asked if he remembered how he was told to count, stated, "1-Mississippi, 2-Mississippi, 3-Mississippi…I honestly forgot how you told me…" Mr. Galanakis also states, "Just tell me when to switch." Mr. Galanakis was not instructed to switch anything during the instruction phase of the test. This is a display of divided attention and short-term memory impairment.

_____

[26] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 28.

[27, 28] …

DEF. APPX. 81

u) Mr. Galanakis raises his arms for balance greater than 6 inches from his sides.  This is a validated clue of impairment.[29]  Mr. Galanakis also appears to possibly sway from side to side, but I am unable to verify that clue due to the officer's body camera moving as well.

v) Officer Winters' report states that he observed a lack of convergence in both of Mr. Galanakis' eyes.  While this is difficult to see in the body camera video due to wording in the upper left of the screen covering Mr. Galanakis' eyes, the presence of a Lack of Convergence is indicative of individuals under the influence of central nervous system depressants, inhalants, dissociative anesthetics and/or cannabis.[30]  Taking into account that Mr. Galanakis DID NOT display any Horizontal Gaze Nystagmus (indicative of individuals under the influence of central nervous system depressants, inhalants, and/or dissociative anesthetics), the presence of Lack of Convergence without HGN would be consistent with cannabis impairment.[31]

w)  During the Modified Romberg Balance Test, Mr. Galanakis starts the test too soon, while Officer Winters is still giving the instructions.  This is an indicator and display of divided attention impairment.

x) Officer Winters' report indicates he observes eyelid tremors displayed by Mr. Galanakis.  In the body camera video, Officer Winters moves his body camera and attempts to document the eyelid tremors on video.  Due to moisture on the lens/fogging and movement of the camera it is difficult to definitively identify the eyelid tremors, but movement of Mr. Galanakis' eyelids can be seen.  Eyelid tremors are commonly displayed by individuals under the influence of cannabis and other drugs.[32]  A recent study documented 86% of lab-confirmed cannabis-impaired drivers displayed eyelid tremors.[33]

y) During the Modified Romberg Balance Test, Officer Winters' hand signals appear to identify side-to-side sway, which he documents in his report.  Due to the movement of the camera, it is difficult to confirm this sway via video alone.  Sway during the Modified Romberg Balance Test is an indicator officers are instructed to look for as an indicator of impairment.[34]

---

[29]*Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 35.

[30]ibid. Session 5- P. 9.

[31] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[32]*Drug Recognition Expert Course 7-Day School Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P.21.

[33] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[34] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 15.

DEF. APPX. 82

z) During the Finger to Nose Test, Mr. Galanakis has to be told how to position his hands twice during the instructions.  The video of the test is slightly blurry from moisture on the camera lens and movement of the camera.   Officer Winters reports observing the following clues of impairment during the test:  missing tip of nose (5 times), use of pad instead of fingertips, and eyelid tremors.  I also observed that Mr. Galanakis moved his head forward towards his finger instead of keeping his head tilted back.  All of these are indicators of impairment, especially of those individuals under the influence of cannabis.[35,36,37,38]

aa)  Mr. Galanakis submits a sample of his breath into officers' PBT registering a 0.00 Breath Alcohol Level.  This breath alcohol level is not consistent with the level of impairment observed.  This is indicative of impairment by something other than alcohol.

bb) After being read the Miranda Warning, Mr. Galanakis is asked when the last time he used Marijuana.  Contrary to his talkative behavior for the majority of the field sobriety testing, Mr. Galanakis is quiet for approximately eight seconds and then states, "I do not remember that." When asked if it was that night, Mr. Galanakis states he had not used weed that night.

cc) After arrest and at the police station, in reference to the field sobriety tests, Mr. Galanakis states, "I felt like I was doing good on those."  This is a display of impaired perception and proprioception.


In addition to scientifically validated and other indicators of impairment, officers are trained to take into account what the definition of being "under the influence" is when determining whether to arrest a suspect of OWI or to release them.   This definition can be found in Iowa's Criminal Jury Instructions:

> *2500.5 <u>OWI – Definition</u> – Under The Influence. A person is "under the influence" when, by drinking liquor and/or beer, one or more of the following is true:*
> *1. Her reason or mental ability has been affected.*
> *2. Her judgment is impaired.*
> *3. Her emotions are visibly excited.*
> *4. She has, to any extent, lost control of bodily actions or motions*

---

[35] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 20.

[36] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[37] Fiorentino, Dary D. (2011) Validation of sobriety tests for the marine environment. Accident Analysis and Prevention 43 (2011) 870–877.

[38] Logan, B.; Kacinko, S.L.; and Beirness, D.J. (2016). An Evaluation of Data from Drivers Arrested for Driving Under the Influence in Relation to Per se Limits for Cannabis. *AAA Foundation for Traffic Safety.*

DEF. APPX. 83

Mr. Galanakis' actions and comments meet each of the previous four considerations:

1. "*Reason or mental ability…affected*" - Mr. Galanakis displays a lack of ability to divide attention and short-term memory impairment throughout his encounter with officers.
2. "*Judgement is impaired*" - Mr. Galanakis chose to drive with his bright headlights on and failed to dim them when encountering traffic.  He also chose to be argumentative and verbally aggressive towards officers during the encounter.
3. "*Emotions are visibly excited*" - Mr. Galanakis' emotions range from cooperative to argumentative to verbally aggressive.
4. *"To any extent, lost control of bodily actions or motions"* – Mr. Galanakis displayed a loss of control of bodily actions numerous times during the field sobriety tests (swaying, using arms for balance, eyelid tremoring, inability to touch tip of nose, etc.)

When sufficient indicators of impairment are observed during the three phases of an officer's OWI investigation, officers are trained to then conduct a preliminary breath test to help determine if the impairment is due to alcohol.  Mr. Galanakis' 0.00 breath alcohol reading showed that the impairment he was displaying was not from alcohol in his system.  Officers trained in SFST and A.R.I.D.E. are taught that if impairment other than alcohol is observed, they should attempt to contact a Drug Recognition Expert to conduct a drug influence evaluation to determine whether the impairment is medical or drug-related.  If a DRE isn't available, officers are trained to proceed with the arrest based on probable cause, followed by the implied consent procedure or chemical specimen search warrant process.

Based on my training as a NHTSA SFST practitioner for 17 years, a NHTSA-certified SFST Instructor for 13 years, a NHTSA-certified SFST Train-the-Trainer for 10 years, National Association of State Boating Law Administrators' Certified Seated SFST Instructor for 11 years, Drug Recognition Expert for 9 years and DRE Instructor for 7 years, I am exceedingly familiar with the content within the SFST, ARIDE, and DRE curriculum.  My knowledge and experience includes the practices, procedures, and studies behind the protocols formulated for officers to detect, test, and arrest impaired drivers.

Based on this training and experience, it is my opinion and conclusion that Mr. Galanakis displayed sufficient indicators of impairment (and thus probable cause) to justify an arrest for operating a motor vehicle while intoxicated.  These indicators also rise to the level necessary to request a Drug Recognition Expert investigate the non-alcohol impairment observed in the field further through a drug influence evaluation.  Officer Winters, Lieutenant Wing, and DRE Officer Shinkle followed standard practices and procedures consistent with their NHTSA and IACP training in the traffic stop, field sobriety testing, arrest, and drug influence evaluation of Mr. Galanakis.  The ultimate post-arrest release of Mr. Galanakis to his mother without criminal charges demonstrated that the officers acted in a fair and objective manner in the best interest of justice and of Mr. Galanakis himself.

Statement of Compensation:
I am compensated as follows, not to exceed $10,000:
   i. Travel Time: Consultant will be reimbursed according to the relevant standard mileage rate as published by the United States Internal Revenue Service.
   ii. Testimony (whether in court or virtual): $250.00 an hour.
   iii. Trial Preparation (non-report): $150.00 an hour.
   iv. Report Preparation: $100.00 an hour.
   v. Deposition Attendance: $400.00 per deposition.

DEF. APPX. 84

## Materials Reviewed in Preparation of Report

• Dr. Lance Platt's expert witness report addressed to Mr. Boyles on July 1, 2023.

• Body camera video from Newton Police Officer Nathan Winters from the early morning hours of August 28, 2022.

• Dash camera video from squad car Operated by Newton Police Officer Nathan Winters from the early morning hours of August 28, 2022.

• Police officer reports submitted from Newton Officers Nathan Winters, Lt. Chris Wing, and DRE Officer Andrew Shinkle.


## References Cited Within Report

Adler, Eugene V. and Burns, Marcelline (1994). Drug Recognition Expert (DRE) Validation Study. Final Report to Governor's Office of Highway Safety, State of Arizona. June 4, 1994.

Bigelow, G. E., Bickel, W. E., Roache, J. D., Liebson, I. A., & Nowowieski, P. (1985). Identifying Types of Drug Intoxication: Laboratory Evaluation of a Subject-Examination Procedure. Washington DC: National Highway Traffic Safety Administration. DOT HS 806753.

Couper, F., Huestis, M., Fulford, J., Perkinson, N., Miller, S., Katz, A., Symoun, J., Raymond, P., & Smither, D.D. (2014). Drugs and Human Performance Fact Sheets [Unpublished manuscript]. National Highway Traffic Safety Administration.

DRE Drug Category Matrix, Drug Evaluation and Classification Training: the Drug Recognition Expert School. U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

Fiorentino, Dary D. (2011) Validation of sobriety tests for the marine environment. Accident Analysis and Prevention 43 (2011) 870–877.

Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229. Retrieved from https://doi.org/10.1016/j.aap.2016.04.012.

International Association of Chiefs of Police, 2023. Advanced Roadside Impaired Driving Enforcement Instructor Guide. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–233.

International Association of Chiefs of Police, 2023. Drug Evaluation and Classification (Preliminary School) Instructor Guide. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–245.

DEF. APPX. 85

International Association of Chiefs of Police, 2023. Drug Recognition Expert Course 7-Day School Participant Manual. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–765.

International Association of Chiefs of Police, 2023. DWI Detection and Standardized Field Sobriety Testing Participant Guide. February 2023 Edition.

Logan, B.; Kacinko, S.L.; and Beirness, D.J. (2016). An Evaluation of Data from Drivers Arrested for Driving Under the Influence in Relation to Per se Limits for Cannabis. AAA Foundation for Traffic Safety.

National Traffic Law Center (2020).  Investigation and Prosecution of Cannabis-Impaired Driving Cases Monograph.  National District Attorney's Association.

Shrivastava, A., Johnston, M., & Tsuang, M. (2011). Cannabis use and cognitive dysfunction. Indian Journal of Psychiatry, 53(3), 187–191.

State v. Brian Sean Moran, No. 15-2164 (Iowa Court of Appeals, filed October 26, 2016).

Respectfully Submitted,

_____
 Matt Bruner   9/8/23

DEF. APPX. 86

The Curriculum Vitae of:


CAPTAIN MATT BRUNER
Iowa Department of Natural Resources
Law Enforcement Bureau


Latest update: September 2023

DEF. APPX. 87
1





**Matt Bruner, Captain**
**Iowa Department of Natural Resources**
**Law Enforcement Bureau**
**502 E. 9th Street**
**Des Moines, IA 50319**
**(C) 515-336-5456**
**Matt.Bruner@dnr.iowa.gov**

Captain Matt Bruner has been with the Iowa Department of Natural Resources' Law Enforcement Bureau since 2003, serving seasonally for three years while attending the University of Iowa, before being hired as a State Conservation Officer in 2006. He began his career assigned to Webster and Humboldt counties before transferring in 2010 to Boone and Story counties as a Field Training Officer.  In 2020, Officer Bruner was promoted to Captain of Training & Support Services.  In September 2021, Captain Bruner transferred to become the District 6 Field Captain.

Captain Bruner serves as a Drug Recognition Expert, Drug Recognition Expert Instructor, NHTSA Standardized Field Sobriety Testing Instructor, NASBLA Boating Under the Influence (BUI) Enforcement/ Seated SFST Instructor and has served as a Field Training Officer, Precision Driving Instructor, Marine patrol, ATV, Snowmobile and Law Enforcement Technology Instructor in the DNR Probationary Conservation Officer Academy and Water Patrol officer training program.

Captain Bruner is the lead officer on Iowa's BWI team, updating and preparing the department's boating while intoxicated forms and field note-taking guides annually. He also drafts and presents legislative changes pertaining to boating while intoxicated code regularly. Captain Bruner developed and authored the department's S.O.P on boating while intoxicated investigations and arrests. In 2012 he was named NASBLA Boating Officer of the Year for his efforts in the field of detecting, deterring and arresting impaired operators.  Captain Bruner was named the 2017 Iowa Fish and Game Officer of the Year & 2017 Law Enforcement Case of the year recipient.  In 2020, Captain Bruner was named the Shikar-Safari Iowa Conservation Officer of the Year.  In 2023, Captain Bruner received the prestigious Kip Hayward award from the Governor's Traffic Safety Bureau's DRE Program for reaching the highest level in impaired driving enforcement in the state.

Captain Bruner regularly assists agencies outside the DNR instructing field sobriety testing at the Iowa Law Enforcement Academy to new recruits, out-of-state transfers, jail staff, and served as a SFST Instructor "Train-the-Trainer" through ILEA to certified officers training to become SFST instructors. He teaches annually at the Iowa Drug Recognition Expert classroom and field certification schools, and instructs multiple A.R.I.D.E. classes each year for the Governor's Traffic Safety Bureau.  He has served as Iowa DRE School Lead Instructor, Course Manager, and as a Core Instructor.  Captain Bruner also serves as a board member on Iowa's Drug Recognition Expert Advisory Board.

Captain Bruner is happily married and the father of 2 boys. He enjoys being active outdoors when not working and can be found hunting, fishing, boating & running his bird-dog.  He enjoys anything related to the University of Iowa- especially Hawkeye football, wrestling & basketball.

DEF. APPX. 88




**Captain Matt Bruner #C36**
**Iowa Department of Natural Resources**
**Law Enforcement Bureau**
**502 E. 9th Street**
**Des Moines, IA 50319**
**(C) 515-336-5456**
**matt.bruner@dnr.iowa.gov**

## Education

- 2001-2005- University of Iowa                           Iowa City, IA
    B.S. Environmental Science, Biology minor
    * Included on Dean's List
- Sept. 2006– Iowa Law Enforcement Academy             Johnston, IA
    (1st in Class Academically)
- 2018-2020- Iowa Certified Public Manager Certificate    Des Moines, IA
    Drake University
- 2023- National Conservation Law Enforcement Chief's Leadership Academy
        National Conservation Training Center      Shepherdstown, WV

## Professional Experience

- Iowa Department of Natural Resources             April 2020 – Present
  Captain / Conservation Officer Supervisor
    - Training Coordinator
    - Vehicle Fleet Coordinator
    - ISICS Radio System Coordinator
    - Iowa Drug Recognition Expert Advisory Board Member

- Iowa Department of Natural Resources             August 2006 – March 2020
  State Conservation Officer
    - Drug Recognition Expert (2014- present)
    - Drug Recognition Expert Instructor (2016-present)
    - NHTSA SFST Instructor (2010-present)
    - NHTSA SFST Instructor Train-the-Trainer (2013-present)
    - NASBLA Seated-Battery SFST Instructor (2012-present)
    - Lead Field Training Officer (2010-2020)
    - Precision Driving Instructor (2009-2020)

- Iowa Department of Natural Resources             May 2003- July 2006
  Seasonal Water Patrol & ATV Patrol Officer               (Seasonal Position)

## Awards & Recognition

- 2023 Kipton Hayward Award - Iowa Drug Recognition Expert of the Year (2023)
- Shikar-Safari International Iowa Conservation Officer of the Year (2020)
- Iowa Hunter Education Program Officer of the year (2019)
- Iowa Bowhunters Association Officer of the Year (2018)
- DNR Law Enforcement Case of the Year (2016)
- Jim Meyerdirk Iowa DRE School Award for Academic Excellence (2014)
- NASBLA Iowa Boating Officer of the Year (2012)
- Iowa Law Enforcement Academy Woodard Award (Top Academic Honor) (2006)

DEF. APPX. 89

**Summary of Relevant Training, Instruction, Presentations & Qualifications**

| | Hours | Date(s) |
|---|---|---|
| Instruct DRE Recertification @ Des Moines Police Department, Des Moines, IA | 8 | September 8, 2023 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Urbandale Police Department, Urbandale, IA | 8 | August 24, 2023 |
| Attend IACP Impaired Driving and Traffic Safety (DRE) Conference @ Anaheim, California | 24 | August 9-11, 2023 |
| Instruct DRE Recertification @ Iowa State Patrol Post #1, Des Moines, IA | 8 | August 1, 2023 |
| Instruct NASLBA Seated-Battery Comprehensive BUI course (including wet lab) @ Billings, MT to Montana Game Fish & Parks | 24 | June 26-28, 2023 |
| Presentation at Iowa Governor's Traffic Safety Bureau 2023 Conference- "Blazed & Bewildered: The Impacts of Marijuana on Driving Ability" | 1 | June 14, 2023 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Eagle Grove Police Department, Eagle Grove, IA | 16 | June 6-7, 2023 |
| Lead Instructor for 2023 DRE Out-of-state Field Certs @ Jacksonville, FL | 72 | April 24- May 2, 2023 |
| Lead Instructor 2023 Iowa DRE School (including two wet labs) @ West Des Moines, IA | 80 | April 3-14, 2023 |
| Attend NASBLA BUI / Seated STSF Instructor Recertification Webinar | 1.5 | March 28, 2023 |
| Attend National Conservation Law Enforcement Leadership Academy @ USFWS National Conservation Training Center - Shepherdstown, WV | 130 | March 19-31, 2023 |
| Lead Instructor for 2023 DRE Instructor School @ West Des Moines, IA | 40 | March 6-10, 2023 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab)@ Ames Police Department, Ames, IA | 16 | December 7-8, 2022 |
| Instruct abbreviated A.R.I.D.E. (including wet lab) to Iowa County Attorneys' Association Fall Conference @ Coralville, IA | 8 | November 14, 2022 |
| Instruct DRE Recertification @ Des Moines PD, Des Moines, IA | 8 | October 24, 2022 |
| Instruct NASBLA BUI Comprehensive Course @ MOTCO (US Army Base), Concord, California | 24 | October 18-20,2022 |
| Attend IACP Drugs & Impaired Driving (DRE) Conference- San Antonio, TX | 24 | August 21-23, 2022 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Marion County Sheriff's Office, Knoxville, IA | 16 | July 27-28, 2022 |

DEF. APPX. 90

| | | |
|---|---|---|
| Instruct NASBLA BWI / SFST / Chemical Specimen Search Warrant refresher to Conservation Officers @ ISP Post #1, Des Moines, IA | 5 | May 24, 2022 |
| Instruct Advanced Roadside Impaired Driving Enforcement course @ Hawkeye Community College, Waterloo, IA | 8 | May 20, 2022 |
| Instruct "Intro to Drugged Driving" to Iowa Law Enforcement Academy Certification by Exam Students, Johnston, IA | 2 | May 12, 2022 |
| Core Instructor for 2022 DRE Out-of-state Field Certs @ Jacksonville, FL | 72 | April 25-May 3, 2022 |
| Core Instructor for 2022 Iowa DRE School (including wet lab) @ Altoona, IA | 80 | March 21-April 1, 2022 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Le Mars Police Department, Le Mars, IA | 16 | February 8-9, 2022 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Dallas County Sheriff's Office, Adel, IA | 16 | February 1-2, 2022 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Clive Police Department, Clive, IA | 16 | January 11-12, 2022 |
| Instruct DRE Recertification @ DPS Headquarters, Des Moines, IA | 8 | November 5, 2021 |
| Instruct at ILEA SFST Instructor Course (including wet lab), Johnston, IA | 8 | November 3, 2021 |
| Instruct DRE Recertification @ Des Moines P.D., Des Moines, IA | 8 | October 25, 2021 |
| Lead Instructor 2021 Out-of-state Field Certs @ Jacksonville, FL | 64 | October 5-12, 2021 |
| Lead Instructor 2021 DRE In-State Field Certs @ Des Moines, IA | 30 | September 23-25, 2021 |
| Lead Instructor 2021 DRE 7-Day School (including wet lab) @ Altoona, IA | 60 | September 13-22, 2021 |
| Lead Instructor 2021 DRE Preschool @ Altoona, IA | 16 | September 9-10, 2021 |
| Attend IACP Drugs & Impaired Driving Conference in Orlando, FL | 24 | August 14-16,2021 |
| Instruct NASBLA Seated-Battery Essentials, NHTSA SFST & Iowa BWI Procedures to Probationary Conservation Officer recruits @ ISP Post #1 | 20 | August 9-10, 2021 |
| Instruct NASBLA Seated-Battery Transition Course @ Blackhawk County Sheriff's Office, Waterloo, IA | 8 | May 27, 2021 |
| Instruct online BWI & SFST Refresher Webinar to DNR Officers | 2.5 | May 26, 2021 |
| Instruct DRE Recertification @ Gates Hall, Nevada, IA | 8 | May 24, 2021 |

DEF. APPX. 91

| | | |
|---|---|---|
| Instruct BWI / Implied Consent update to Iowa State Patrol Post 1, Des Moines, IA | 1 | May 13, 2021 |
| Instruct DRE Recertification @ Des Moines P.D., Des Moines, IA | 8 | October 26, 2020 |
| Instruct DRE Recertification @ State Patrol Post #7, Fort Dodge, IA | 8 | September 8, 2020 |
| Instruct ILEA "Intro to Drugged Driving" to ILEA Recruits, Johnston, IA | 3 | August 28, 2020 |
| Instruct ILEA "Intro to Drugged Driving" to ILEA Recruits, Des Moines, IA | 3 | August 19, 2020 |
| Instruct DRE Recertification @ Iowa State Patrol Post #1, Des Moines, IA | 8 | August 18, 2020 |
| Instruct NASBLA Seated-Battery Essentials, NHTSA SFST & Iowa BWI Procedures to Probationary Conservation Officer recruits @ ISP Post #1, Des Moines, IA | 24 | March 22-24, 2020 |
| Instruct BWI / SFST Refresher webinar to DNR Officers | 2 | May 21, 2020 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Altoona Police Department, Altoona, IA | 16 | March 11-12, 2020 |
| Instruct DRE Recertification @ Des Moines P.D., Des Moines, IA | 8 | December 16, 2019 |
| Course Manager 2019 Out-of-state field certs @ Phoenix, AZ | 64 | November 3-10, 2019 |
| Instruct ILEA "Intro to Drugged Driving" to ILEA Recruits, Johnston, IA | 3 | October 9, 2019 |
| Course Manager 2019 In-State field certs @ Des Moines, IA | 30 | September 27-29, 2019 |
| Course Manager 2019 DRE 7-Day School (including wet lab) @ West Des Moines, IA | 60 | September 16-25, 2019 |
| Course Manager 2019 DRE Pre School (including wet lab) @ West Des Moines, IA | 16 | September 12-13, 2019 |
| Instruct ILEA "Intro to Drugged Driving" to ILEA Recruits, Johnston, IA | 3 | August 30, 2019 |
| Attend Texas Impaired Driving Summit @ Austin, TX | 16 | June 24-25, 2019 |
| Instruct DRE Recertification @ State Patrol Post #1, Des Moines, IA | 8 | June 17, 2019 |
| Instruct "Drug Impaired Individuals" presentation to ILEA Jail school, Webster City, IA | 4 | June 6, 2019 |
| Instruct NASBLA BWI & Iowa OWI initial training to probationary conservation officer recruits @ IS Post 1 – Des Moines, IA | 24 | May 20-22, 2019 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Nevada Police Department, Nevada, IA | 16 | May 14-15, 2019 |

DEF. APPX. 92

| | | |
|---|---|---|
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Indianola Police Department, Indianola, IA | 16 | May 1-2, 2019 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Grinnell Police Department, Grinnel, IA | 8 | April 8, 2019 |
| Instruct Seated-Battery SFST Course @ Des Moines P.D., Des Moines, IA | 8 | March 25, 2019 |
| Instruct ILEA "Intro to Drugged Driving" to ILEA Recruits, Johnston, IA | 3 | March 14, 2019 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Humboldt County Sheriff's Office, Humboldt, IA | 16 | January 15-16, 2019 |
| Instruct "Drug Impaired Individuals" to ILEA Jail school, Johnston, IA | 4 | January 10, 2019 |
| Instruct "Drug Impaired Individuals" to ILEA Jail school, Johnston, IA | 4 | December 13, 2018 |
| Instruct DRE Recertification @ Des Moines P.D., Des Moines, IA | 8 | December 10, 2019 |
| Lead Instructor at 2018 DRE Out-of-state field certifications @ Phoenix, AZ | 64 | October 14-21, 2018 |
| Lead Instructor at Iowa 2018 DRE In-State field certifications @ DSM, IA | 30 | September 27-29, 2018 |
| Lead Instructor at Iowa 2018 DRE 7-Day school (including wet lab)@ Altoona, IA | 60 | September 17-26, 2018 |
| Lead Instructor at Iowa 2018 DRE Preschool (including wet lab) @ Altoona, IA | 16 | September 13-14, 2018 |
| Attend IACP Drugs & Impaired Driving Conference- Nashville, TN | 24 | August 13-15, 2018 |
| Instruct "Into to Drug Impaired Driving" to ILEA Basic class, Johnston, IA | 2 | August 10, 2018 |
| Instruct BWI search warrant / SFST update @ Iowa State Patrol Post #1, Des Moines, IA | 8 | May 22, 2018 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Carroll Police Department, Carroll, IA | 16 | May 8-9, 2018 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Centerville Police Department, Centerville, IA | 16 | March 21-22, 2018 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab)@ Ankeny Police Department, Ankeny, IA | 16 | February 13-14, 2018 |
| Instruct 2017 DRE Recertification @ Des Moines P.D., Des Moines, IA | 8 | December 4, 2017 |
| Instruct 2017 DRE Out-of-state field certifications @ Phoenix, AZ | 64 | October 15-22, 2017 |
| Instruct 2017 DRE In-State field certifications @ Des Moines, IA | 30 | September 28-30, 2017 |

DEF. APPX. 93

| | | |
|---|---|---|
| Instruct 2017 DRE 7-Day school (including wet lab) @ Altoona, IA | 60 | September 18-27, 2017 |
| Instruct 2017 DRE Preschool (including wet lab) @ Altoona, IA | 16 | September 14-15, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Waukee Police Department, Waukee, IA | 16 | August 21-22, 2017 |
| Instruct "Into to Drug Impaired Driving" to ILEA Basic class, Johnston, IA | 2 | August 7, 2017 |
| Instruct NASBLA seated-battery SFST transition- Lake Rathbun, Centerville, IA | 8 | July 11, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Coralville, IA | 10 | June 1, 2017 |
| Instruct NASBLA Seated-Battery SFST transition- Coralville, IA | 8 | May 31, 2017 |
| Instruct SFST & Case Law update to District 1 C.O.'s @ ISP Post #7, Fort Dodge, IA | 3 | May 18, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab)@ Ottumwa Convention Center, Ottumwa, IA | 10 | April 11, 2017 |
| Instruct "Intro to Drugged Driving" to ILEA certification class, Johnston, IA | 3 | April 10, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Carroll Fire Department, Carroll, IA | 10 | April 5, 2017 |
| Instruct NASBLA Seated-battery SFST Transition course-  Clinton, IA | 8 | March 29, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Marshalltown P.D., Marshalltown, IA | 10 | March 27, 2017 |
| Instruct Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ (Agri-vision) Winterset, IA | 16 | March 13-14, 2017 |
| Instruct SFST update to Huxley P.D. & reserves, Huxley, IA | 2 | March 8, 2017 |
| Instruct NHTSA SFST Instructor  Train-The-Trainer class @ ILEA, Johnston, IA | 32 | February 6-9,2017 |
| Drug Recognition Expert Instructor Certification, ISP Post #1, Des Moines, IA | 65 | September-October 2016 |
| Instruct NASBLA BUI / Seated-Battery Comprehensive Course to DNR probationary conservation officers (including wet lab) @ ISP Post #1, Des Moines, IA | 24 | August 8-10, 2016 |
| Instruct "Intro to Drugged Driving" to ILEA recruit class, Johnston, IA | 3 | July 25, 2016 |

DEF. APPX. 94

| | | |
|---|---|---|
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab)@ Ames P.D., Ames, IA | 8 | July 20, 2016 |
| Assist instruction for ILEA SFST Instructor Recertification @ ISU, Ames, IA | 8 | July 11, 2016 |
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Indianola Police Department, Indianola, IA | 8 | May 25, 2016 |
| Instruct Seated-battery SFST & BWI update for DNR C.O.'s @ ISP Post #1, Des Moines, IA | 8 | May 11, 2016 |
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab @ Iowa State Patrol Post #1, Des Moines, IA | 8 | April 11, 2016 |
| Assist instruction for ILEA SFST scenarios for new recruits, Johnston, IA | 6 | April 5, 2016 |
| Instruct SFST wet lab for DNR Park Rangers @ Camp Dodge, Johnston, IA | 6 | March 30, 2016 |
| Instruct "Intro to Drugged Driving" to ILEA certification class, Johnston, IA | 2 | March 17, 2016 |
| Seated Battery SFST & BWI Law presentation to UMRCC Conference @ Dubuque, IA | 2 | March 15, 2016 |
| Instruct NHTSA SFST Instructor Train-The-Trainer class @ ILEA, Johnston, IA | 32 | February 8-11, 2016 |
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab @ Des Moines Police Department Academy, Des Moines, IA | 5 | December 15, 2015 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 12 | December 2 & 3, 2015 |
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Iowa State Patrol Post #8, Mason City, IA | 8 | November 18, 2015 |
| Assist w/ DRE Field Certifications, Des Moines, IA | 10 | September 17, 2015 |
| Instruct NHTSA SFST Instructor Train-The-Trainer class @ ILEA, Johnston, IA | 32 | August 17-20, 2015 |
| Assist instruction for ILEA SFST scenarios for new recruits, Johnston, IA | 6 | July 22, 2015 |
| Assist instruction for ILEA SFST wet lab & scenarios for new recruits, Johnston, IA | 18 | March 31, April 8-9, 2015 |
| Instruct NASBLA Seated-Battery SFST transition course @ Dubuque County Sheriff's Office, Dubuque, IA | 8 | March 24, 2015 |

9

DEF. APPX. 95

| | | |
|---|---|---|
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Perry Police Department, Perry, IA | 8 | March 16, 2015 |
| Instruct NHTSA SFST Instructor Train-The-Trainer class @ ILEA, Johnston, IA | 32 | February 16-19,2015 |
| Assist instruction of Advanced Roadside Impaired Driving Enforcement course (including wet lab) @ Adventureland Inn, Altoona, IA | 8 | January 13, 2015 |
| Assist instruction for ILEA SFST wet lab & scenarios for new recruits, Johnston, IA | 6 | November 20, 2016 |
| Assist instruction for ILEA SFST wet lab & scenarios for new recruits, Johnston, IA | 6 | December 3, 2016 |
| Drug Recognition Expert classroom & field certification, Altoona, IA | 160 | September-October 2014 |
| Instruct NHTSA SFST Instructor Train-The-Trainer class, Council Bluffs, IA | 32 | August 18-21, 2014 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 12 | July 29-30, 2014 |
| Instruct NASBLA Seated-Battery transition course - Clear Lake, IA | 8 | April 29, 2014 |
| Assist instruction for ILEA SFST wet lab & scenarios | 12 | April 1-2, 2014 |
| Instruct DPS recruits on BWI & water safety- Waukee, IA | 8 | February 24, 2014 |
| Instruct NHTSA SFST Instructor Train-The-Trainer - Altoona, IA | 32 | February 3-6, 2014 |
| Instruct NASBLA SFST Seated-Battery class - Des Moines, IA | 24 | January 14-16, 2014 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 6 | December 3, 2013 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 6 | December 4, 2013 |
| Assist instruction for ILEA SFST wet lab for new recruits, Johnston, IA | 6 | November 19, 2013 |
| Instruct NASBLA Seated-battery SFST Transition course in Coralville, IA | 8 | November 5, 2013 |
| Instruct NHTSA SFST Instructor Train-The-Trainer- Altoona, IA | 32 | August 13-16, 2013 |
| Instruct NASBLA Seated-Battery Transition Course @ ISP Post #12, Stockton, IA | | April 30, 2013 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 6 | April 2, 2013 |
| Assist instruction for ILEA SFST wet lab & scenarios, Johnston, IA | 6 | April 3, 2013 |
| Attend ILEA SFST Instructor Update and Recertification- Iowa City, IA | 8 | March 6, 2013 |

DEF. APPX. 96

| | | |
|---|---|---|
| Attend Advanced Roadside Impaired Driving Enforcement class in Iowa City, IA | 16 | February 21-22, 2013 |
| Assist instruction for ILEA SFST wet lab for new recruits, Johnston, IA | 6 | November 28, 2012 |
| Instruct NASBLA Seated-Battery Transition Course, Des Moines, IA | 8 | June 5, 2012 |
| Attend NASBLA Seated-Battery BUI Instructor Course, Des Moines, IA | 24 | April 17-19, 2012 |
| Attend NASBLA Seated-Battery BUI Comprehensive Course, Des Moines, IA | 24 | August 23-25, 2011 |
| Attend NHTSA Standardized Field Sobriety Testing Instructor Course-Iowa Law Enforcement Academy, Coralville, IA | 40 | April 13-16, 2010 |
| Attend ILEA Precision Driving Instructor Certification, Johnston, IA | 40 | August 3-7, 2009 |
| Attend NASBLA BUI & SFST Course - Des Moines, IA | 24 | June 1-3, 2009 |
| Attend ASI ATV Operation Instructor Certification- Camp Dodge, Johnstons, IA | 40 | April 9-12, 2008 |
| Attend NASBLA Boat Accident Investigation Level 1 Course- Springfield, IL | 40 | March 10-14, 2008 |
| Attend NASBLA BUI Comprehensive Course – Okoboji, IA | 16 | April 24-25, 2007 |

**Specialized Readings**

- Fiorentino, Dietel & Jimenez.  "Development of Sobriety Tests for the Marine Environment." *Transportation Research Record 2222 (2011): 85-89.*

-  Fiorentino, D.  "Validation of Sobriety Tests for the Marine Environment." *Accident Analysis and Prevention. 43.3 (2012): 870–877.*

- Sussman, E.D., Needalman, A., Mengert, P.H. "An Experimental Evaluation of a Field Sobriety Test Battery in the Marine Environment." *National Technical Information Service- United States Coast Guard. (1990).*

- Burns, Marcelline Ph.D. "The Robustness of the Horizontal Gaze Nystagmus Test." *DOT-HS-810-83. (2007).*

- Citek, K., Ball, B., & Rutledge, D. A.  "Nystagmus testing in intoxicated individuals." *Optometry. 74 (2003): 695-710.*

- Stuster, J., & Burns, M.  "Validation of the Standardized Field Sobriety Test Battery at BACs Below .10 Percent." *DOT HS-808-839. (1998).*

- Abbott, W. Clay.  "Nine steps on a seven-step boat." *Texas District and County Attorney Association. The Texas Prosecutor.   (July-August 2012).*

- George E. Bigelow, Ph.D. et al. Behavioral Pharmacology Research Unit, Department of Psychiatry and Behavioral Sciences.  "Identify Types of Drug Intoxication: Laboratory Evaluation of a Subject

DEF. APPX. 97

Examination Procedure May 1984 Final Report." *(Source: Commonly called the Johns Hopkins Study), NHTSA, Pub. No. DOT HS 806 753 (1985)*

- *Compton, Richard P.* "Field Evaluation of the Los Angeles Police Department Drug Detection Procedure." *DOT HS 807 012. (1986)  (Commonly referred to as the 173 Case Study)*

- Jones, A.W. "Evidence-based survey of the elimination rates of the ethanol from blood with applications in forensic casework." *Forensic Science International. 15 (2010): 1-20.*

- A.W. Jones, L. Anderson.   "Influence of age, gender, and blood-alcohol concentration on the disappearance rate of alcohol from blood in drinking drivers." *J. Forensic Sci. 41 (1996) 922-926.*


**Specialized Online Trainings**

*Identifying Cannabis Impaired Drivers in a Changing Culture (Jennifer Cifaldi, Illinois Traffic Safety Resource Prosecutor- 1.5 hrs) - 7/25/23*

*Cannabinoids in Impaired Driving (Dr. Sabra Jones, PhD, D-ABFT, Regional Toxicology Liaison, NHTSA Region 5 - 1.5 hrs) - 7/12/23*

*.05 Utah's Experiment in Saving Lives (Tyson Skeen, Utah Prosecution Council & Sgt. Jared Cornia, Utah Highway Patrol - 1.5 hrs) - 6/20/23*

*DRE Vital Signs:  A Closer Look at Frequently Asked & Unasked Questions (Dr. Jack E. Richman, O.D, F.A.A.O, Professor, The New England College of Optometry - 1.5 hrs) - 5/31/23*

*What Really is the Horizontal Gaze Nystagmus Test?  (Dr. Jack E. Richman, O.D, Professor, The New England College of Optometry - 1.5 hrs) - 5/24/23*

*DRE & the IACP 2023:  Updates & Enhancements (Joe Abrusci, DEC Program Project Manager, International Association of Chiefs of Police - 1.5 hrs) - 2/21/23*

*Marijuana & Driving in 2023:  It's not just Delta-9-THC Anymore (Erin Karchner, PhD, F-ABFT, US Armed Forces Medical Examiner System -1.75 hrs) - 1/18/23*

*Forensic Toxicology in DUI Cases: Bringing Out the Nerd in You (Amy Miles, Director of Forensic Toxicology, Wisconsin State Laboratory of Hygiene - 1.5 hrs)  -  12/13/22*

*Cannabis and The Eyes (Dr. Karl Citek- 1.5 hrs) - 11/30/22*

*2022 Impaired Driving Curriculum Updates (Kyle Clark, IACP- 2 hrs) - 11/9/22*

*Vision, the Brain, and Driving Abilities (Dr. Jack Richman- 2.5 hrs) - 6/8/22*

*Balance Testing & Impairment: A Closer Look at the WAT, OLS & Modified Romberg Tests (Dr. Jack Richman- 2hr) - 06/01/22*

*Visual Responses to Drug Intoxication (Dr. Karl Citek - 2 hrs) - 3/30/22*

*Evolution of SFSTs (IACP - 1hr) - 3/15/22*

*Delta 8 THC & Salvia (Cpl. Hutton- Missouri State Patrol - 1 hr) - 3/9/22*

*DRE & IACP Program Updates (IACP - 1.5 hr) - 2/15/22*

*The Truth Is In the Eyes (Dr. Karl Citek - 3 hrs) - 8/11/21*

*The Mellanby Effect (IACP - 1.5 hr) - 8/5/21*

*The Implications of Field Sobriety Test Evidence in Drug Impaired Driving Cases* (IACP - 1.5 hrs) - 5/11/21

*Cannabis & DUID Investigations* (IACP- 1hr) - 4/9/21

*BUI & Seated Battery SFST Instructor* Updates (NASBLA - 1 hr) - 2/18/21

*Eyes, Driving & Effects of Intoxication* (Dr. Karl Citek - 2hrs) - 11/18/20

*Crash Investigation Involving DUI Cannabis* (IACP - 1.5 hrs) - 8/29/20

*Medical Conditions That Mimic Alcohol or Drug Impairment* (IACP - 1.5 hrs) - 8/26/20

*The Eyes Have It:  Horizontal Gaze Nystagmus in the Impaired Driving Case* (Dr. Karl Citek- 2 hr) - 8/20/20

*Showing Impairment beyond the SFSTs* (Keith Graves- 1.5 hr) - 8/27/19

*DRE Updates & Emerging Drug Trends* (IACP- 1 hr) - 8/27/19

*Human Performance & Toxicology Results* (IACP - 1 hr) - 6/17/19

*DUI Report Writing* (IACP - 1 hr) - 5/28/19

*Under the Influence of Cannabis- Understanding the Highway High* (IACP DRE Section - 1 hr) - 11/13/18

*What's New in DRE, SFST & A.R.I.D.E?*  (IACP - 1 hr) - 4/18/18

DEF. APPX. 99