UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br>　　　　Defendants.<br><hr>NATHAN WINTERS and CHRISTOPHER WING,<br>　　　　Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>　　　　Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**APPENDIX IN SUPPORT OF COUNTERCLAIM PLAINTIFF NATHAN WINTERS'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**<br><br><br><br><br><br><br><br><br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

　　　　Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.a.4., Officer Nathan Winters ("Officer Winters") submits this Appendix in support of his Motion for Partial Summary Judgment.

By:　　/s/ Nicholas F. Miller
　　　　Matthew S. Brick, AT0001081
　　　　Erin M. Clanton, AT0002592
　　　　Douglas A. Fulton, AT0002672
　　　　Nicholas F. Miller, AT0015361
　　　　**BRICK GENTRY, P.C.**
　　　　6701 Westown Parkway, Suite 100
　　　　West Des Moines, IA 50266
　　　　T: (515) 274-1450
　　　　F: (515) 274-1488

matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com
doug.fulton@brickgentrylaw.com
nick.miller@brickgentrylaw.com

Counsel for Counterclaim Plaintiff
NATHAN WINTERS

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2023, a true copy of the APPENDIX IN SUPPORT OF COUNTERCLAIM PLAINTIFF NATHAN WINTERS'S MOTION FOR PARTIAL SUMMARY JUDGMENT was electronically filed using the Court's CM/ECF system, which sent notice to counsel of record, as follows:

Matthew M. Boles
Adam C. Witosky
GRIBBLE, BOLES, STEWART &
WITOSKY LAW
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
mboles@gbswlaw.com
awitosky@gbswlaw.com
Counsel for Plaintiff/Counterclaim Defendant

/s/     *Nicholas F. Miller*
**Nicholas F. Miller, AT0015361**

## **TABLE OF CONTENTS**

I.      Declaration of Nicholas Miller ……………………………………..…… Winters. Appx. 1

     a.      Copy of YouTube Video …………………………….…………. Winters Appx. 3

     b.      Screenshot of YouTube Video ………………………….………. Winters Appx. 4

II.     Declaration of Rob Burdess …………………………….……..… Winters Appx. 5

     a.      Video Recording from Officer Winters's Body Camera ….……….. Winters Appx. 8

III.    Declaration of Nathan Winters ……………………….……………. Winters Appx. 9

IV.     Officer Nathan Winters's Iowa Incident Report …………………..…….. Winters Appx. 12

V.      Lieutenant Christohper Wing's Iowa Incident Report ……..……..……... Winters Appx. 16

VI.     Excerpts from Plaintiff Tayvin Galanakis's Deposition Transcript ….…… Winters Appx. 18

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>        Defendants.<br>_____<br><br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>        Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>        Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**DECLARATION OF NICHOLAS MILLER**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nicholas F. Miller, under 28 U.S.C. §1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.      I am counsel of record in this action for Counterclaim Plaintiff Nathan Winters.

2.      Attached to my Declaration is a true and accurate copy of the Declaration of Rob Burdess.

3.      Attached to my Declaration is a true and accurate copy of the Declaration of Nathan Winters.

4.      Attached to my Declaration is a true and accurate copy of Officer Nathan Winters's Iowa Incident Report.

5.      Attached to my Declaration is a true and accurate copy of Lieutenant Christopher

Wing's Iowa Incident Report.

6.    Attached to my Declaration are true and accurate copies of excerpts from Plaintiff Tayvin Galanakis's deposition.

7.    Attached to my Declaration is a true and accurate copy of Galanakis Deposition Exhibit 3, which is the publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022.

8.    The publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022, can be viewed at https://www.youtube.com/watch?v=so_bFYoIsow.  I last visited this URL address and viewed the video on December 13, 2023.

9.    Attached to my Declaration is a true and accurate screenshot of the video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022, at https://www.youtube.com/watch?v=so_bFYoIsow, taken on December 13, 2023.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Nicholas F. Miller*

# PLACEHOLDER

This page of Winters's Appendix is a placeholder for the flash drive containing a true and accurate copy of the a true and accurate copy of Galanakis Deposition Exhibit 3, which is the publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022.

The flash drive will be mailed to the Court, c/o the Honorable Presiding Judge Locher, via First Class United States Mail.



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>        Defendants. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**DECLARATION OF ROB BURDESS** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>        Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>        Plaintiff/Counterclaim Defendant. | Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Rob Burdess, under 28 U.S.C. § 1746, declare under penalty of perjury that the following

is true and correct:

1.      I am the Chief of Police for the Defendant City of Newton, Iowa's Police

Department.

2.      As the Chief of Police for the Newton Police Department, I am the lawful custodian

of police records, including video recordings from Newton Police Department officers' body

cameras.

3.      As the lawful custodian of video recordings from Newton Police Department

officers' body cameras, I have personal knowledge of the Newton Police Department's procedures

1

WINTERS APPX 5

for taking custody of and maintaining the video recordings from officer body cameras.

4.      Newton Police Officers are required to preserve any recording that contains evidence relevant to potential criminal, civil or administrative matters for a minimum of 90 days. Recorded evidence is automatically sent to a secure and encrypted cloud server through WiFi, LTE/PEU, and while a camera is docked for charging. The recorded evidence is preserved on the cloud server and is only accessible to select members of the Newton Police Department administration. The recorded evidence is a .mp4 format video file. A .mp4 is a standard file type that can play on most devices. The recorded evidence is saved until the cessation of the court proceedings or per the Newton Police Department's video evidence retention schedule.

5.      Consistent with the Newton Police Department's procedures for taking custody of and maintaining video recordings from officer body cameras, the Newton Police Department collected, kept, and maintained a true and accurate copy of the video recording from Defendant Officer Nathan Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis on August 28, 2022.

6.      A true and accurate redacted copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022, is published and publicly available on the City of Newton's website at https://www.newtongov.org/CivicMedia?CID=Public-Safety-6#allVideos.

7.      Also, included with my Declaration is a flash drive containing a true and accurate copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022. This copy was produced in discovery by the attorneys representing the City of Newton, Nathan Winters, Christopher Wing, and myself in this action to Mr. Galanakis under the Bates Number CITY ID 00630.

2

WINTERS APPX 6

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:    December 1, 2023

/s/ _____
Rob Burdess

3

# PLACEHOLDER

This page of Winters's Appendix is a placeholder for the flash drive containing a true and accurate copy of the video recording from Officer Winters's body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis.

The flash drive has already been mailed to the Court, c/o the Honorable Presiding Judge Locher, via First Class United States Mail.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>　　　　Defendants.<br><br>———————————————<br><br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>　　　　Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>　　　　Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**DECLARATION OF NATHAN WINTERS**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nathan Winters, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.　　　I am a police officer with the City of Newton, Iowa's Police Department.

2.　　　On August 28, 2022, while I was on duty in my capacity as a Newton Police Department officer, I stopped Plaintiff Tayvin Galanakis's vehicle because he was illegally operating the vehicle with its bright lights on.

3.　　　After stopping Mr. Galanakis, I field sobriety tested him and arrested him for operating his vehicle while under the influence of a drug.

4.　　　When I stopped, field sobriety tested, and arrested Mr. Galanakis, I was wearing a

WINTERS APPX 9

body camera on my person that video recorded my interactions with Mr. Galanakis.

5.      Consistent with the Newton Police Department's procedures for taking custody of and maintaining video recordings from officer body cameras, the Newton Police Department collected, kept, and maintained a true and accurate copy of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022.

6.      A true and accurate copy of substantial portions of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022, is published and publicly available on the City of Newton's website at https://www.newtongov.org/CivicMedia?CID=Public-Safety-6#allVideos.

7.      I have reviewed the Declaration of Rob Burdess and the flash drive included with his Declaration that contains a true and accurate copy of the video recording from my body camera of my traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022. This copy was produced in discovery by the attorneys representing the City of Newton, Rob Burdess, Christopher Wing, and myself in this action to Mr. Galanakis under the Bates Number CITY ID 00630.

8.      During my interactions with Mr. Galanakis on August 28, 2022, he represented to me that he is a student athlete on the William Penn University football team and that he is therefore subject to drug testing every Friday.

9.      On August 28, 2022, I knew that William Penn University participated in the National Association of Intercollegiate Athletics (NAIA) college athletics association and that the NAIA's drug testing policies and procedures only subjected football players to drug testing before a championship game, not on a weekly basis as Mr. Galanakis represented to me.

10.      On August 28, 2022, I also knew that the NAIA's drug testing policies and

2

WINTERS APPX 10

procedures did not subject every player on a particular football team to drug testing before a championship game, as Mr. Galanakis suggested. I understood that the NAIA's drug testing policies and procedures provided for the selection of football players for drug testing before a championship game either randomly or on the basis of playing time or position.

11.    I knew about the NAIA's drug testing policies and procedures through previous recruitment encounters with the NCAA division I, II, III, NAIA and the NJCAA. I had to read and fill out consent forms pertaining to drug testing for athletes, and the procedures and timing of when these tests may take place.

12.    Given my understanding of the NAIA's drug testing policies and procedures, I believed Mr. Galanakis was not being truthful when he represented that he was drug tested every Friday. His representation struck me as inconsistent with what I knew about the NAIA's drug testing policies and procedures, and I suspected that he was lying to me to persuade me that he was not intoxicated by drugs or alcohol, including marijuana. This factored into my judgment and led me to believe Mr. Galanakis was intoxicated by marijuana or another drug.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/ Nathan Winters

Nathan Winters

WINTERS APPX 11

Rev. 07/2019

Grid **9**

Photos Yes **No**

Car # **843**

Video # **AXON**

| | |
|---|---|
| Case Number | 22-25845 |
| Date/Time of Report | 08/29/2022    02:13    Hrs |
| Status | 02 - INACTIVE    UN |

# IOWA INCIDENT REPORT
## NEWTON POLICE DEPARTMENT
### 101 W 4TH ST S
### NEWTON, IA 50208
### 6417921547

# SUMMARY

| County | Report Type | ORI Number |
|---|---|---|
| JASPER - 50 | 0 - INITIAL INCIDENT | IA0500100 |

| Is Date and Time of Incident Known?    Yes | Incident Date or Lower Date Range    08/28/2022 | Upper Date Range | Incident Time or Lower Time Range    00:13    Hrs. | Upper Time Range    Hrs. |
|---|---|---|---|---|

| Day of Week Incident Occurred    SUNDAY | Exceptionally Cleared | Date Cleared Exceptionally |
|---|---|---|

## INCIDENT REPORTED BY

| Was Incident Reported by a Victim?    NO | Reporting Victim's Sequence No. | Name - Last    WINTERS | First    NATHAN | Middle | Suffix |
|---|---|---|---|---|---|

| Business Name (if Incident was Reported by a Business) | Address    101 W 4TH ST S |
|---|---|

| City    NEWTON | State    IA | Zip Code    50208 | Home Phone    (641) 791-0850 | Work Phone |
|---|---|---|---|---|

# OFFENSE 001

| Seq. No.    001 | Ordinance    GENERIC | Code Section    1 | UCR Offense Code    ALL OTHER OFFENSES - 90Z    2100 |
|---|---|---|---|

| Charges/Offense    INFORMATION | Attempted/Completed    C - COMPLETED |
|---|---|

| Type of Criminal Activity (up to 3) |
|---|

| Type of Weapon/Force Involved (up to 3)    99 - NONE | Gang Information (up to 2)    N |
|---|---|

| No. of Premises Entered | Method of Entry    N - NO FORCE | Offender Suspected of Using (up to 3)    N - NOT APPLICABLE |
|---|---|---|

## LOCATION OF OFFENSE

| Location Type    13 - HIGHWAY/ROAD/ALLEY/STREET/SIDEWALK | X Coordinate    495512.125 | Y Coordinate    4616312 |
|---|---|---|

| Literal Description    SOUTH 2ND AVE WEST |
|---|

| Address    200 BLK S 2ND AVE W | Address 2 | City    NEWTON | State    IA | Zip    50208 |
|---|---|---|---|---|

# VICTIM 001

| Type of Victim    S - SOCIETY/PUBLIC | Sequence No.    001 | Business/Organization/State/County/Municipality Name    CITY OF NEWTON |
|---|---|---|

| Address    101 W 4TH ST S | City    NEWTON | State    IA | Zip Code    50208 | Phone    (641) 791-0850 |
|---|---|---|---|---|

## VICTIM CONNECTED TO UCR OFFENSE CODES

| UCR Offense Code 1    ALL OTHER OFFENSES - 90Z | UCR Offense Code 2 |
|---|---|
| UCR Offense Code 3 | UCR Offense Code 4 |
| UCR Offense Code 5 | UCR Offense Code 6 |
| UCR Offense Code 7 | UCR Offense Code 8 |
| UCR Offense Code 9 | UCR Offense Code 10 |

## ADDITIONAL OFFENSE CIRCUMSTANCE INFO

| Aggravated Assault/Homicide Circumstances (up to 2) |
|---|

| Additional Justifiable Homicide Circumstances |
|---|

# END OFFENSE 001

CITY ID 00001
WINTERS 22-25845 IX 12

# OFFENDER 001

| Type of Offender | Sequence No. | NIBRS Offense Sequence Numbers | Lesser Offense Sequence Numbers |
|---|---|---|---|
| 02 - Suspect | 001 | 001 | |

| Name - Last | First | Middle | Suffix |
|---|---|---|---|
| GALANAKIS | TAYVIN | JOHN | |

| Alias(es) |
|---|
| |

| Address | City | State | Zip Code | Home Phone |
|---|---|---|---|---|
| 715 S 3RD AVAE W | NEWTON | IA | 50208 | |

| DOB Known? | DOB | Age or Lower Age Range | Upper Age Range | SSN | Resident Status |
|---|---|---|---|---|---|
| YES | 08/16/2003 | 19 | | 482336773 | R - RESIDENT |

| Driver's License - Number | State | Gender | Height | Weight | Eye Color | Hair Color |
|---|---|---|---|---|---|---|
| 216AN9626 | IA | MALE | 6' 00" | 120 LBS | BROWN - BRO | BROWN - BRO |

| Skin Tone | Race | Ethnicity |
|---|---|---|
| FAIR - FAR | W - WHITE | NOT OF HISPANIC ORIGIN - N |

| Scars/Marks/Tattoos | Offender Present When Officer Arrived? |
|---|---|
| NONE | YES |

| Type of Injury (up to 5) |
|---|
| N - NONE |

## EMPLOYMENT OR SCHOOL INFO

| Employer or School | Occupation |
|---|---|
| | |

| Address | City | State | Zip Code | Work Phone |
|---|---|---|---|---|
| | | | | |

## ARREST INFO

| Offender Arrested? | Arrest Trans. Booking No. | Type of Arrest | Arrest Date | Arrest Time |
|---|---|---|---|---|
| NO | | | | Hrs. |

| Associated Offense Sequence No. | Miranda By | Miranda Date | Miranda Time |
|---|---|---|---|
| | | | Hrs. |

| Arrestee Condition | Arrestee Armed With (up to 2) |
|---|---|
| | |

| Place of Birth | Multiple Arrestee Indicator | Additional Incidents Cleared |
|---|---|---|
| | | |

## JUVENILE INFO

| Parent/Guardian Contacted? | Name - Last | First | Middle | Suffix |
|---|---|---|---|---|
| | | | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Juvenile Arrestee Disposition |
|---|---|---|
| | | |

# END OFFENDER 001

# VEHICLE 001

| Vehicle Year | Make | Model | Style |
|---|---|---|---|
| 2015 | CHEVROLET - CHEV | IMPALA | 4D |

| License Plate # | State | Year | Type |
|---|---|---|---|
| BZB943 | IA | 2023 | |

| VIN | Color(s) |
|---|---|
| 2G1WB5E39F1104187 | WHITE - WHI |

| Associated Offense Sequence No. | Vehicle Impounded? | Impound Location | Impound Tag Number |
|---|---|---|---|
| 001 | NO | | |

## NARRATIVE

On 08/28/2022 at approximately 0013 hours, I, Officer Nathan Winters was on active patrol in my fully marked patrol car(843) when I was traveling east bound on S 2nd AVE W in Newton. I was traveling in approximately the 300 BLK when I noticed a white vehicle traveling west bound on S 2nd AVE W in Newton IA. I noticed that this vehicle had its bright lights on and did not dim their headlights while they were driving towards me. The driver of this vehicle turned south on W 2nd ST S in Newton IA.

I also turned south onto W 2nd ST S. I initiated my emergency lights on my patrol car to initiate a traffic stop on the vehicle. The traffic stop was conducted in approximately the 200 BLK of S 3rd AVE W in Newton IA. I radioed my location to Jasper County dispatchers. I exited my patrol car where I approached the driver on the driver side door where I made contact with a male who was identified as Tayvin Galanakis(08/16/2003) of Newton IA.

I advised Tayvin the reason for the stop. When I did so, he stated "yeah, I turn my brights on because I have a head light out". I advised him that he was not allowed to have his bright lights on in town and that he had to dim his head lights to oncoming traffic at approximately 500 feet (see IA code 321.415). While I was speaking with Tayvin, I noticed that he had watery and blood shot eyes. I noticed that there was a small odor of an alcoholic beverage that was coming from his person. I asked Tayvin where he was headed and he stated "I am headed home". I asked Tayvin for his license, registration and proof of insurance. I asked tayvin where he was coming from and he stated "from a friends house". I asked him if he had anything to drink. I could not hear his answer so I asked him again and he did not answer this question.

Tayvin reached over to the glove box where he retrieved some paper work. While he did so, I noticed that he moved slowly. I also noticed that while I was speaking with him, I noticed that he was speaking with a slowed slurred speech. While Tayvin was trying to find his registration, he was moving slowly, he had the correct registration in his left hand and he continued to move slowly. Tayvin then gave me two registrations for the vehicle. Tayvin then sat in the driver seat without giving me the insurance. I then asked him again for his insurance.

While I was waiting for his insurance, Tayvin grabbed a debit card out of his billfold. He then placed this back and then gave me his license. Tayvin then grabbed the registration again and then looked at it and then placed it back into the glove box. At this point I had still not received the insurance card. Tayvin continued to sit in the drivers seat with no insurance. I had to remind him again for his insurance.

As I was waiting for Tayvin to give me his insurance card, I noticed that he continued to move slowly. Tayvin then provided me an insurance card that was

CITY ID 00002
WINTERS APPX 15

expired from 2021. He then stated I have the email version. As Tayvin started to look in his phone for his insurance, he continued to move slowly thumbing through items on his phone where he finally was able to find the insurance. I advised Tayvin that I wanted him to exit his vehicle. I told him to take his gum out of his mouth and place it on his dash. He did so without incident.

I advised Tayvin that I wanted him to have a seat in my front passenger seat of my patrol car. Tayvin did so. I sat in the drivers seat. While tayvin and I sat in my patrol car, I asked him where he was coming from and he stated "uh, back there at Creightons". While he and I were speaking in my patrol car, I noticed a small scent of alcohol that was coming from his person. Tayvin then stated "I am home from college". I continued to speak with Tayvin and while I did so, I continued to notice that he was speaking with a slurred speech.

I asked Tayvin how much he had to drink tonight and he stated "none". I asked him why his eyes were watery and blood shot tayvin then stated "you wanna blow me really quick". I stated no. Tayvin then stated "I got contacts but we can do the little thing". Tayvin stated "that is funny, I have had nothing to drink".

I advised him that his movements in the car with him fumbling over the registrations, him moving slowly are concerns. Tayvin then stated "yep". He then stated "so what happens when nothing pops up, do you get in trouble". I advised him that I am doing my duties and that I would probably not get in trouble for doing my job. I advised Tayvin that I wanted to make sure that he was safe to drive. I advised him that I wanted him to exit my patrol car and go onto the sidewalk that was near by.

Tayvin and I then spoke on the sidewalk that was near us. I asked him if he had any contacts or glasses in and he stated "i took them out at a friends house". I asked him if he had any head injuries and he stated "no". I advised him that I wanted him to stand with his heels and his toes together and his arms down to his side. I demonstrated this position for him. I advised him that I was going to check his eyes. I told Tayvin that I wanted him to follow my finger with his eyes and his eyes only and to not move his head. I asked him if he had any questions and he stated "no". I asked him what color his eyes were and he stated hazel. I asked him if they ever changed colors and he stated "no". I began the test. I asked him if he could see my finger clearly and he stated "yessir". Tayvin had equal tracking and equal pupil size in both of his eyes in two(2) passes of his eyes.

During this test, tayvin did not have lack of smooth pursuit, he did not have distinct and sustained nystagmus at maximum deviation, and he did not have onset prior to 45 degrees. Tayvin did not show any clues of impairment in this test.

The next test was the walk and turn test. I asked Tayvin if he was comfortable in walking in the shoes that he had on and he stated "yes". I asked tayvin if he could see the crack that was in the parking lot that we were standing in. Tayvin stated "yes". I told him that I wanted him to take his left foot and place it on the crack, and take his right foot and place it in front of his left foot with the heel of his right foot touching the toe of his left foot. I demonstrated this position for him. I asked him if he had any questions about this test so far and he stated "no". I told him to stay in this position until I told him to begin the test.

I advised him that from the position that he was in, I wanted him to take nine(9) heel to toe steps, along the crack in the parking lot. I told him that each step would be heel to toe and to keep his arms down to his side during this test. I again asked him if he had any questions and he stated "no". I demonstrated three(3) steps for him. I advised him that when he gets to his ninth step to leave his front foot on the line and turn by taking a series of small step and then take nine(9) heel to toe steps back down that line. I demonstrated the turn and three(3) more steps for him.

I advised Tayvin that during this test to leave his arms down to his side, watch his steps, count his steps out loud, and once he has started walking do not stop until he has completed the test. I asked tayvin if he had any issues with his ankles, knees, hips of his back and he stated "just my right ankle". I asked him if this was going to prevent him from walking and he stated "sometimes, but I will be able to do this". I asked him if his ankle is hurting now and he again stated "no". I advised him that if he did not have any questions that he could begin the test.

During his first nine(9) steps, Tayvin stepped off line for one(1) clue, he took 13 steps for one(1) clue, and once he got to his 13th step, he stopped walking for one(1) clue. He then made an improper turn by pivoting on both of his feet instead of taking a series of small steps for one(1) clue. In his second nine(9) steps, he missed heel to toe for one(1) clue, and he took fifteen(15) steps back down the line. During this test, Tayvin stated "Common man, this is to easy, lets do the breath now". I asked Tayvin how many steps I told him to take and he stated "like 8 or 9". tayvin then stated "I thought you were going to tell me when to turn". I advised him that I was not going to do that and that he was to count his steps out loud. During this test, Tayvin showed five(5) clues of impairment in this test. It should be noted that two(2) out of the eight(8) indicate a failing score.

The next test was the one leg stand test. I advised Tayvin that I wanted him to stand with his heels and his toes together and his arms down to his side. Tayvin then stated "God, you a rookie bro and asked me if this was my first year". Tayvin then stated "How many false accusations you got"? I advised him that I believed "zero". He then stated "this is about to be your first one".

I advised Tayvin that when I say begin, I wanted him to raise either his left or his right foot and raise is approximately six(6) inches off of the ground and keep it parallel to the ground. I demonstrated this test for him. I advised him that during this test, I wanted him to keep his arms down to his side, watch his raised foot and count out loud in the following manner "1001,10021003,1004" so on and so fourth until I told him to stop. I asked him if he had any questions and he stated repeat the directions. I did so. I then asked him if he had any questions and he stated "no". During this test, he was swaying from side to side for one(1) clue, and he kept his right arm away from his body for balance for one(1) clue. Tayvin did not count out loud like he was told to do so. During this test, Tayvin showed two(2) clues of impairment in this test. It should be noted that two(2) out of the four(40 clues indicate a failing score.

I advised Tayvin that I had three(3) more tests for him. I advised him thatI was again going to check his eyes. I advised him that I was going to make a circle around the outside of his face and I was going to come in towards the bridge of his nose but I was not going to touch his nose. I advised him that I wanted him to watch my finger with his eyes and his eyes only and to not move his head. I asked him if he had any questions and he stated "no". In this test, I am checking for lack of convergence. In two(2) clincial passes of his face, Tayvin showed lack of convergence in both of his eyes. Lack of convergence is present in a persons eyes when they cannot converge their eyes towards the middle of his nose. This is an indication of impairment.

The next test was the modified romberg test. I advised Tayvin that I when I was done explaining the test, I wanted him to close his eyes, tilt his head back and estimate the passing of 30 seconds. I advised him that when he is done estimating 30 seconds, to open his eyes, tilt his forward and then say done. I asked him if he had any questions and he stated no. He began the test. During this test, he was swaying, he had eye lid tremors, and in 34 seconds he estimated 30 seconds. The eye lid tremors and the swaying from side to side are all indicators of impairment.

The next test was the finger to nose test. I advised him that I wanted him to stand with his heels and his toes together and make a fist and rotate his palms where they were facing me. I told him to extend both of his index fingers on both of his hands. I advised him that I was going to give him a series of commands. I told him either the command would be either left or right. I told him that whichever hand I say, I wanted him to bring that hand up and touch the tip of his nose with the tip of his finger and then bring his hand immediately back down. I advised him that I did not want him touching his nose with the pad of his finger. I told him that during this test he was going to have his eyes closed and his head titled back. I asked him if he had any questions and he stated no.

The following is the order of the test.

1. Left: He used his left hand and touched his right nostril with his knuckle.
2. Right: Tayvin used his right hand and touched the middle of his cheek.

CITY ID 00003

WINTER'S APPX 14

3. Left: Tayvin used his left hand and touched his left nostril.
4. Right: Tayvin used his right hand and touched under neath of his nose.
5. Right: Tayvin used his right hand and touched his right nostril.
6. Left: Tayvin used his left hand and touched the pad of his finger to the tip of his nose.

During this test, Tayvin was having a hard time keeping his head tilted back. He had eye lid tremors, and he never touched the tip of his nose with the tip of his finger. All of these are indicators of impairment.

I offered Tayvin a Preliminary Breath Test(PBT). I advised him that I was going to estimate if and how much alcohol was on his breath. He submitted to a PBT which indicated his Brac to be .000%. I then read him his MIRANDA warnings where I asked Tayvin when was the last time he smoked weed, he started to look around, there was a very long pause, then he stated "I do not remember". Through my training and experience, I know persons who look away and around to be "looking" for an answer. I then asked him if he smoked tonight and he stated "no".

I advised Tayvin that I believed that he was under the influence of something. I asked him if he wanted to talk to another officer and he stated "hell yeah, get him over here". I asked him if he wanted to do drug influence evaluation. Tayvin asked what that was and I explained it to him briefly and he then stated "yeah lets do it'.

I called Officer Shinkle who was on duty at this time. I advised him of this and he stated he would be available. See his report.

I returned to speak with Tayvin where I advised him that we would have to go to the PD to do this evaluation. He then stated "right now"? I advised him yes. He then stated "I dont want to do that right now". I asked him why and he stated "because you have me out in this damn rain". I then advised him that we would go to the PD where it was dry and Tayvin stated "well, I do not want to do that right now". He then stated "No, I want to go home, you waisted my time". I advised him to turn around and place his hands behind his back. I advised him that he was being placed under arrest for OWI. Tayvin was placed in a set of hinged handcuffs behind his back where they were double locked. I searched his person for any contraband and none was found. Tayvin was placed in the back seat of my patrol car where he was placed in the prisoner compartment. I placed the seat belt on his person. I locked and secured his car. I had my BWC on during this.

Tayvin was transported to the Newton PD where he spoke with Officer Shinkle. See his report. At 0048 hours, I read him the implied consent advisory where I requested a sample of his urine for chemical testing. I advised him that he did not have to answer this right away. I then read him his 8094.20 advisory where I advised him that he could call anyone for any reason.

Tayvin was not charged, and it was determined that he was not under the influence.

He was released without a charge.

At this time, this ends my involvement in this case and this report is for informational use only.

## OFFICER

| Complainant/Reporting Party Signature | | | | | |
|---|---|---|---|---|---|
| Reporting Officer **WINTERS, NATHAN** | Badge Number **639** | Supervisor | | | Badge Number |
| Video Taken? (Check All That Apply) **01 - IN CAR, 02 - OFFICE, 03 - BOTH IN CAR AND OFFICE, 04 - BODY CAMERA, 05 - BOTH IN CAR AND BODY CAMERA** | | | | Evidence Seized? **NO** | Photos Taken? **NO** |
| Incident Assigned To **PATROL** | | | | | |

CITY ID 00004
WINTERS APPX 15

# IOWA INCIDENT REPORT SUPPLEMENTAL
## NEWTON POLICE DEPARTMENT
### 101 W 4TH ST S
### NEWTON, IA 50208
### (641) 792-1547

Grid #: _____
Arrest #: _____
Car #: 843
Video #: BWC

rlc030102

| CASE INFO | | | |
|---|---|---|---|
| Case Number **22-25845** | Date of This Report **08/29/2022** | County in which Incident Occurred **JASPER - 50** | |
| ORI Number **NEWTON POLICE DEPARTMENT - IA0500100** | | | |
| Date of Original Occurrence **08/28/2022** | | Type of Offense **OWI INVESTIGATION** | |
| Name - Last **GALANAKIS** | First **TAYVIN** | Middle **JOHN** | Suffix |
| Clearance Classification ☑ Unfounded ☐ Exceptionally Cleared ☐ Cleared by Arrest | | Investigative Status ☐ Open ☑ Closed ☐ Suspended | |

## Narrative

On Saturday, August 28, 2022, at 0013hours, I was riding with Officer Winters after having a meeting with him. We had just left the back lot of the PD traveling eastbound on S 2nd Ave W. As we were approaching W 2nd St, a white Chevy Impala was traveling westbound toward us with its high beams on. The vehicle turned south on W 2nd St and Officer Winters initiated a stop on the vehicle in the 200 blk S 3rd Ave W.

I approached the vehicle on the passenger side, which was occupied by one male later identified as Tayvin Galanakis. Officer Winter was talking with Tayvin and explained the reason for the stop and requested he license registration and insurance. I could not hear any of the responses from Tayvin as the passenger side window was up. Tayvin had some trouble locating the requested documents and made several attempts to locate the documents in the glove box by putting stuff back in the glove box and then going back and looking in the glove box again.

Officer Winters asked Tayvin to step back to the patrol car, and asked him to take his gum out and put it on the dash. This was an indicator to me that he suspected he was under the influence. Tayvin was asked to have a seat in the front passenger seat of Officer Winters. I walked back and opened the door for Tayvin and I took a seat in the back seat cage, and radioed dispatch to rest Officer Winters depravation period due to the fact that Tayvin had gum in his mouth. During their conversation Tayvin explained that he was at a friend's house and that he was on his way home. He also explained that he plays football for William Penn College and that he was home for the weekend because as a freshman they aren't part of the travel team. Officer Winters as Tayvin how much he had to drink tonight and Tayvin said that he nothing to drink. Officer Winters then asked Tayvin why he would have bloodshot and watery eyes. Tayvin said the he would blow right now and Officer Winters advised they would get to that. When asked why he would think that Office Winters explained that his difficulty retrieving paperwork was a clue as well as the odor of alcohol.

Tayvin told Officer Winters that he wanted to blow right know. Officer Winters explained that he would get to that but first offered him sobriety tests, which Tayvin agreed to.

For the sobriety tests Tayvin was asked to step to the parking lot area of the water tower. After asking some questions regarding his eyes he performed the HGN test. During the test Tayvin engaged Officer Winters in conversation about football and was upset that he had just got his hair permed and that the rain was going to mess it up. I should be noted that there was a very light rain during the sobriety tests; however nearer the time of arrest it picked up a little and was more steady.

The second test he offered was the walk and turn. After completing the test Tayvin asked for the breath test stating that he was two for two on the tests. Officer Winter rebuked him and told him that he wasn't and asked why he took more steps than advised.

They proceeded to the One Leg Stand (OLS). During the performance of the walk and turn and one leg stand I was Officer Winters backup officer and it was not my role or position to score these test.

Officer Winters then administered three additional eye tests which are designed to detect drug impairment. After the tests Tayvin asked officer Winters why he assumed he was drunk. Officer Winters told him that he was showing several strong signs of impairment. Officer Winters then read Tayvin his Miranda Warning, which Tayvin acknowledged before blowing into the PBT which showed no presence of alcohol.

Officer Winters then asked Tayvin when the last time he smoked Marijuana. This lead me to believe that there was something with the other tests that lead Officer Winters to believe that Tayvin was impaired. Tayvin couldn't tell Officer Winters when the last time he smoked marijuana was but insisted that it wasn't recent and stated that he is tested weekly for

Officer Winters then made a phone call to Officer Shinkle who was working and was a Drug Recognition Expert. While Officer Winters was on the phone Tayvin asked if he could make a phone call to his mom and I told him that he could. During the course of his conversation with mom he asked me to talk to her and I told him that I really couldn't because he was an adult. Tayvin asked me why I was allowing this to happen and I pointed out that he was specialized in this area and that if he believed he was under the influence that he could do this. Initially Tayvin indicated that he would do a DRE eval but after Officer Winters was done with his phone call he decided that he wasn't going to do one at which time Officer Winters told Tayvin that he was under arrest for OWI. He was handcuffed, searched and placed in the back of patrol car 843.

Once at the PD Tayvin agreed to do a DRE evaluation, which was performed by Officer Shinkle. During that time I spoke with his mom, Lindsey Maxwell, 2 different times. I explained what was going and told her that I was a little limited on what I could say due to the fact that he was of age, and told her that I would have him call her when he was done. After the DRE evaluation was complete Officer Shinkle and Winters came into the office and Officer Shinkle told me that he found no signs of impairment. Officer Winters asked if they should charge him he had been arrested. I told them absolutely not that if a DRE evaluation showed no evidence that we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way. About this time dispatch advised that his mom was in the front lobby to pick him. He was then released to him mom with no charges.

CITY.ID.00005
WINTERS-4PX.16

| O F F I C E R | Complainant/Reporting Party (Signature) | | | |
|---|---|---|---|---|

| Reporting Officer's Name - Last | First | Middle | | Suffix |
|---|---|---|---|---|
| **WING** | **CHRIS** | | | |
| Title | Badge Number | UserID | | |
| **LIEUTENANT** | **6A** | **606** | | |
| Assisting Officer / Admin Reviewer's Name - Last | First | Middle | | Suffix |
| | | | | |
| Title | Badge Number | UserID | | |
| | | | | |
| Supervisor's Name - Last | First | Middle | | Suffix |
| | | | | |
| Title | Badge Number | UserID | | |
| | | | | |
| Incident Assigned to: | | | | |

CITY_ID_00006
WIN000244PPX 17

```
 1              UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3
     - - - - - - - - - - - - - - - -
 4   TAYVIN GALANAKIS,              :
                                    :      ORIGINAL
 5        Plaintiff,                :
     vs.                            : Case No.
 6                                  : 4:23-cv-000044
                                    :
 7   CITY OF NEWTON, IOWA, ROB      :
     BURDESS, NATHAN WINTERS,       :
 8   CHRISTOPHER WING, individually:
     and in their official          :
 9   capacities with the Newton     :
     Police Department,             :
10                                  :
          Defendants.               :
11   - - - - - - - - - - - - - - - -
     NATHAN WINTERS and             :
12   CHRISTOPHER WING,              :
                                    :
13        Counterclaim Plaintiffs,:
                                    :
14   vs.                            :
                                    :
15   TAYVIN GALANAKIS,              :
                                    :
16        Counterclaim Defendant. :
     - - - - - - - - - - - - - - - -
17

18     VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19   taken by the Defendants/Counterclaim Plaintiffs

20   before Jessi C. Lass, Certified Shorthand Reporter

21   of the State of Iowa, at 6701 Westown Parkway, Suite

22   100, Des Moines, Iowa, commencing at 2:14 p.m.,

23   Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff/Counterclaim Defendant:

 3         CHRISTOPHER C. STEWART, ESQ.
           GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
 4         2015 Grand Avenue, Suite 200
           Des Moines, Iowa 50312
 5

 6    For the Defendants/Counterclaim Plaintiffs:

 7         NICHOLAS F. MILLER, ESQ.
           BRICK GENTRY PC
 8         6701 Westown Parkway, Suite 100
           West Des Moines, Iowa 50266
 9

10    Videographer:
           AMY COOPER
11         FIDELITY VIDEO SERVICES, INC.

12    Also present:
           NATHAN WINTERS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

WINTERS APPX 19

Case 4:23-cv-00044-SHL-SBJ   Document 45-3   Filed 12/13/23   Page 23 of 43

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 3

 1           T A B L E   O F   C O N T E N T S

 2   WITNESS:  TAYVIN GALANAKIS                          PAGE

 3   Examination By Mr. Miller .........................5

 4   Examination By Mr. Stewart ......................120

 5

 6   EXHIBITS                                PAGE FIRST
                                            REFERENCED
 7   1   - Body cam video (City ID 00630) ............20

 8   2   - NAIA drug-testing policy manual ...........56

 9   3   - Video (City ID 00627) .....................65

10   4   - 8/29/22 Facebook post by Galanakis ........75

11   5   - Facebook comment string ...................87

12   6   - 11/1/22 Facebook post by Galanakis ........91

13   7   - GoFundMe page for Galanakis ...............96

14   8   - William Penn University "Drug Education ...114
         and Testing Program Policy"
15   CERTIFICATE OF REPORTER.........................123
16

17   Reporter's Note:  The original exhibits were
     forwarded to Mr. Miller.
18
     (ph) indicates a phonetic spelling.
19   [sic] indicates the text is as stated.
     Quoted text is as stated by the speaker.
20

21

22

23

24

25

WINTERS APPX 20

1   think this question's harassing in nature.  If we

2   need to get a judge on the phone to determine the

3   validity of the question that's been asked and

4   answered, to which Mr. Galanakis has answered he

5   doesn't know to a speculative question, we can do

6   so.

7       Q.   (Mr. Miller)  Go ahead and give your

8   answer.

9            THE WITNESS:  Let's do that.

10           MR. STEWART:  I think he's answered he

11  doesn't know multiple times.

12      Q.   (Mr. Miller)  Is that your testimony?

13      A.   I don't know.  Yeah.

14      Q.   Is it your testimony that you don't know

15  the answer to my last question?

16      A.   Yes, sir.

17      Q.   Okay.

18      A.   Yes, sir.  Sorry for interrupting you.

19      Q.   I'll take this exhibit back.  Thanks.

20           MR. STEWART:  Counsel, can I see that,

21  since I don't have a courtesy copy.

22           MR. MILLER:  Sure.

23      Q.   (Mr. Miller)  Okay.  After August 28th,

24  2022, what, if any, public statements did you make

25  about Officer Winters?

WINTERS APPX 21

1        A.   Public statements?  Social media?  Is that

2   what you're saying?

3        Q.   Anything to the public.

4        A.   I couldn't tell you anything off the top

5   of my head, but I did a few posts.

6        Q.   Like what?

7        A.   Facebook, YouTube.

8        Q.   What'd you say?

9        A.   I would have to go back and look at it to

10  tell you everything I said.

11       Q.   You don't remember a single thing you

12  said?

13       A.   I was wrongfully arrested.

14       Q.   Did you say anything about Officer

15  Winters?

16       A.   Yes.

17       Q.   What?

18       A.   I couldn't tell you the full thing.  I

19  would have to look at it, like I said.  I mean, if

20  you have any pictures or videos, I could read it off

21  for you.

22       Q.   After August 28th, 2022, what, if any,

23  public statements did you make about Officer

24  Christopher Wing?

25       A.   About Wing?  I don't remember what I said

WINTERS APPX 22

1    about Wing.

2         Q.   Have you ever stated that Officer Nathan

3    Winters has been convicted of a crime?

4         A.   Yes.

5         Q.   When?

6         A.   I don't know when, but I know I said it.

7         Q.   In what manner?

8         A.   YouTube and Facebook and I think TikTok.

9         Q.   YouTube, Facebook, TikTok.  Anything else?

10        A.   Not that I can remember.

11        Q.   Did you verbalize it to anybody outside of

12   YouTube, Facebook, and TikTok?

13        A.   I don't remember.

14        Q.   Have you ever stated that Officer Chris

15   Wing has been convicted of a crime?

16        A.   I don't know if I ever said he -- was he

17   convicted of a crime.

18        Q.   Why can't you remember that?

19        A.   Because this mess was a year ago, I

20   believe -- more than a year ago.  So it's touching

21   my memory a little bit less often now.

22        Q.   It's a pretty important statement to make

23   about somebody.

24        A.   Yeah.  I remember making it about Winters.

25        Q.   Do you have a YouTube.com account?

 1        A.    Yeah.

 2        Q.    What's your user name under which you post

 3   YouTube content?

 4        A.    Tayvin Galanakis.

 5        Q.    Have you posted any videos or other

 6   content to YouTube regarding your interactions with

 7   Newton police officers, including Officers Winters

 8   and Wing on August 28th, 2022?

 9        A.    Just YouTube?

10        Q.    Just YouTube.

11        A.    I don't know.  Right now I have one video

12   up.

13        Q.    Have you posted any other videos?

14        A.    On YouTube?

15        Q.    Yep.

16        A.    Yeah.  But not about the case or what

17   happened.

18        Q.    Mr. Galanakis, on my computer I'm showing

19   you a thumbnail of the very beginning of a video,

20   which is identified by Bates number City ID 00627

21   and which is Galanakis Deposition Exhibit 3.

22              You have the ability to press play so you

23   can -- can you press play on this video, and watch

24   as much of it as you need to to confirm that you've

25   seen it before.

1      A.    Yeah.

2      Q.    What's your user name under which you post

3   YouTube content?

4      A.    Tayvin Galanakis.

5      Q.    Have you posted any videos or other

6   content to YouTube regarding your interactions with

7   Newton police officers, including Officers Winters

8   and Wing on August 28th, 2022?

9      A.    Just YouTube?

10     Q.    Just YouTube.

11     A.    I don't know.  Right now I have one video

12  up.

13     Q.    Have you posted any other videos?

14     A.    On YouTube?

15     Q.    Yep.

16     A.    Yeah.  But not about the case or what

17  happened.

18     Q.    Mr. Galanakis, on my computer I'm showing

19  you a thumbnail of the very beginning of a video,

20  which is identified by Bates number City ID 00627

21  and which is Galanakis Deposition Exhibit 3.

22            You have the ability to press play so you

23  can -- can you press play on this video, and watch

24  as much of it as you need to to confirm that you've

25  seen it before.

1        A.    Yeah, I can do --

2        Q.    Okay.

3        A.    -- I can do that for you.

4        Q.    I'm handing you my computer so you can do

5    that.  Press play.  And when you're satisfied that

6    you've seen that video before, you can just pause

7    it, and we'll continue.

8        A.    So you just want me to say if I've seen

9    the video before?

10       Q.    Yes.

11             (Mr. Winters left the deposition.)

12       A.    Yeah, I saw that.

13             MR. MILLER:  All right.  I'm taking my

14   computer back from Mr. Galanakis.

15       Q.    (Mr. Miller)  Who created that video?

16       A.    I did.

17       Q.    Did you post this video, which is

18   Galanakis Deposition Exhibit 3, to YouTube.com under

19   the title "Police wrongfully arrest 19-year-old

20   during traffic stop"?

21       A.    I believe so.

22       Q.    The public could view that posting;

23   correct?

24       A.    Yes.

25       Q.    All right.  I'm going to show you a paused

Case 4:23-cv-00044-SHL-SBJ    Document 45-3    Filed 12/13/23    Page 30 of 43

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 67

1    portion of Galanakis Deposition Exhibit 3 at

2    38 minutes, 27 seconds.

3              It's 38 minutes, 28 seconds.

4              Okay.  I'm handing you my computer,

5    Mr. Galanakis, with that paused portion.  Do you see

6    that?

7        A.    Yes.

8        Q.    Do you see the yellow writing?

9        A.    Yes.

10       Q.    Is that your writing?

11       A.    That -- that is my writing, yes.

12       Q.    What does it say?

13       A.    Says "Nathan Winters of the Newton Police

14   Department convicted of domestic abuse after beating

15   up his ex-girlfriend."

16             MR. MILLER:  Okay.  I'm taking my computer

17   back.

18       Q.    (Mr. Miller)  Did you write that?

19       A.    I did write that.

20       Q.    Why?

21       A.    Well, I wrote that because he had some

22   history of abuse.

23       Q.    How do you know that?

24       A.    I talked to his ex-girlfriend.

25       Q.    Who's his ex-girlfriend?

1    A.   I can't remember her name.  It was back
2  then.
3    Q.   You don't know who his ex-girlfriend is?
4    A.   Never met her.  Just talked to her about
5  the situation.
6    Q.   If you've never met her, then how did you
7  talk to her?
8    A.   Well, that video went viral, and she found
9  my accounts and messaged me, and we talked.
10   Q.   Okay.  What'd she tell you?
11   A.   I can't remember what she -- exactly what
12  she told me.  So I'm not going to state it.
13   Q.   At the time you posted Galanakis
14  Deposition Exhibit 3 to YouTube.com, did you know
15  whether Officer Winters had been convicted of a
16  crime?
17   A.   Well, there was this thing on Iowa Courts,
18  and it said "relief of abuse," I think it said, and
19  when I made that statement of him being convicted,
20  that's what I thought it was.  I thought it was a
21  conviction of abuse, but it was really just a relief
22  of a restraining order.
23   Q.   So at the time you posted Galanakis
24  Deposition Exhibit 3 to YouTube.com, did you or did
25  you not know whether Officer Winters was convicted

WINTERS APPX 28

1    of a crime?

2          A.    At the time I was -- I fully was aware

3    that I -- that he was convicted of domestic abuse,

4    but that turned out to not be the case, and it was

5    something way more simpler than a conviction.

6          Q.    You said you did some research on Iowa

7    Courts Online?

8          A.    (Nods head.)

9                MR. STEWART:  Is that a yes?

10               THE WITNESS:  Yes.  Sorry.  I apologize,

11   guys.

12               MR. MILLER:  That's okay.  I forget

13   sometimes too.  So I appreciate it.

14         Q.    (Mr. Miller)  What did you find on Iowa

15   Courts Online that led you to believe Officer

16   Winters was convicted of a crime?

17         A.    Well, when you search his name up on

18   there, what made me believe that he was -- he did

19   some sort of abuse was the relief.  It said -- I

20   don't know exactly what it said, but it said "relief

21   of abuse" and some lines like that.

22         Q.    Did you read the whole thing?

23         A.    I can't remember if I did, but you have to

24   pay for extra information.  So the full thing wasn't

25   accessible unless you pay for it.

WINTERS APPX 29

1      Q.   So you didn't read the entire document

2   that you were basing your statement to the public,

3   "Officer Winters was convicted of domestic abuse";

4   is that right?

5      A.   No.  Because I was basing it off my

6   assumptions off the ex-girlfriend that came and told

7   me what happened.

8      Q.   Did she say he was convicted of a crime?

9      A.   She did not say that.

10      Q.   Why did you say that?

11      A.   Well, I thought if you were to beat up

12   your ex-girlfriend, that would be considered

13   domestic abuse.  And, like I said, it was much

14   simpler than conviction, and I was wrong about

15   conviction, but there is a history of abuse there.

16      Q.   How do you know?

17      A.   The ex-girlfriend.

18      Q.   You're just -- it was purely based on her

19   statements to you?

20      A.   Well, and that Iowa Courts Online, that

21   thing that said "relief of abuse."

22      Q.   Well, the document that you reviewed on

23   Iowa Courts Online, you said you didn't review the

24   whole thing; right?

25      A.   Just connected the dots.

WINTERS APPX 30

1        Q.   Did you review the whole thing or not?

2        A.   I didn't pay for the whole thing.

3        Q.   So you didn't review the whole thing?

4        A.   No.

5        Q.   So when -- in Galanakis Deposition

6   Exhibit 3, which you posted to YouTube.com, when you

7   said Officer Winters was convicted of domestic

8   abuse, you were basing that on what someone, who you

9   don't know, told you online and based on an

10  incomplete document that you found on Iowa Courts

11  Online.  Am I understanding that correctly?

12       A.   Yes.

13       Q.   I'm going to show you another paused

14  portion of Galanakis Deposition Exhibit 3, which is

15  that video you posted to YouTube.com.  It's at

16  38 minutes and 31 seconds.

17            All right, Mr. Galanakis.  I'm handing you

18  my computer so you can review that paused portion of

19  Galanakis Deposition Exhibit 3.  Is there yellow

20  writing on that?

21       A.   Yes.

22       Q.   Is that your writing?

23       A.   Yes, that's my writing.

24       Q.   What's it say?

25       A.   It said, "Even after Nathan beat" -- you

WINTERS APPX 31

1    this merchandise outside -- like, not through that

2    website?

3        A.   My family would ask about it, and I would

4    tell them, yeah, I'll get them a shirt made, but I

5    never made that happen.

6        Q.   Okay.  We're done with that.  You can keep

7    looking at it if you want, but we're --

8        A.   That's all right.

9        Q.   Okay.

10       A.   I want to look at this one, actually.

11       Q.   Sure.

12       A.   Okay.  Yeah, we're good.

13       Q.   What is GoFundMe?

14       A.   GoFundMe is the donation service I used.

15       Q.   How have you ever used GoFundMe, if at

16   all?

17       A.   So I used GoFundMe when this all first

18   went down when I uploaded the video, and a big

19   YouTuber is the one who advertised it for me.  His

20   name was Lackluster.  And that's how it all started.

21           MR. MILLER:  All right.  I'm showing your

22   counsel what's been marked as Galanakis Deposition

23   Exhibit 7.

24           THE WITNESS:  Thank you.

25       Q.   (Mr. Miller)  All right.  Your counsel's

WINTERS APPX 32

 1    just handed you Galanakis Deposition Exhibit 7.  Do

 2    you know what that is?

 3         A.   This is the home page of the GoFundMe, I'm

 4    pretty sure.

 5         Q.   The GoFundMe that you were just telling me

 6    about?

 7         A.   Yes.  That is correct.

 8         Q.   I think you testified just a minute ago

 9    that you created a GoFundMe fundraiser on

10    GoFundMe.com; is that right?

11         A.   Yes.

12         Q.   Is Galanakis Deposition Exhibit 7, which

13    you're looking at right now, a copy of the home

14    page of your GoFundMe fundraiser?

15         A.   Yes.

16         Q.   Why'd you create that GoFundMe fundraiser?

17         A.   I created it before I had any attorneys

18    signed.  And I've never been in a lawsuit before.

19    So I assumed I was going to owe some money, and

20    that's why I created that, the GoFundMe, to raise

21    funds for attorney fees.

22         Q.   When you say you didn't have an attorney

23    signed, what do you mean by that?

24         A.   I wasn't represented by anybody at the

25    time.

1       Q.    You weren't represented by a lawyer?

2       A.    Eventually I was.

3       Q.    But at the time you weren't?

4       A.    I believe so.

5       Q.    So the purpose of the GoFundMe fundraiser

6    was to raise money so that you could pay for

7    attorney fees?

8       A.    Yes, sir.

9       Q.    As of today how much have you raised?

10      A.    I'm not sure.  I shut down the GoFundMe.

11   It was months ago.  I don't know what it closed at.

12   This is --

13      Q.    Yeah, let's see.  On the first page there,

14   it says two thousand dollar -- $2,768 raised.  Is

15   that --

16      A.    Is this the most recent one you got?

17      Q.    Well, that's what's reflected on page 1 of

18   Galanakis Deposition Exhibit 7.  Is that true?  Did

19   you raise that amount?

20      A.    Yes.

21      Q.    Did you raise more than that amount?

22      A.    I don't know.  I have to go check the

23   GoFundMe and see if I did or not.

24      Q.    Where's the money that you raised held?

25      A.    It was held in the GoFundMe till I

WINTERS APPX 34

Case 4:23-cv-00044-SHL-SBJ    Document 45-3    Filed 12/13/23    Page 38 of 43

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                                    Page 99

1    transferred it to my bank account.

2         Q.   So is all the money that was raised

3    through your GoFundMe fundraiser in your personal

4    bank account now?

5         A.   No.

6         Q.   Where is it?

7         A.   Well, when I was in college, I had

8    previous lawyers before I was with my current ones,

9    and they emailed me that they were going to need

10   $1,500 to do -- I don't know what they were going to

11   do with, but they said I couldn't use my GoFundMe.

12             So from there on, then, it just stayed in

13   the GoFundMe account until I became with new

14   lawyers.  Got new lawyers, and there's no fees at

15   all.

16             So while I was in college, I spent that

17   fundraising money on basic necessities while I was

18   going to school.

19        Q.   Did you spend all of it?

20        A.   No.

21        Q.   How much is left?

22        A.   A thousand.

23        Q.   And that's in your personal bank account?

24        A.   Yes.

25        Q.   Did you ever let any of the donors or

Case 4:23-cv-00044-SHL-SBJ    Document 45-3    Filed 12/13/23    Page 39 of 43

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Page 100

1    contributors to your GoFundMe fundraiser know that

2    you didn't use the money for what it was intended?

3         A.    No.

4         Q.    Why not?

5         A.    Well, I never thought to until the outcome

6    of this case.

7         Q.    Do you think you should let them know?

8         A.    Yes, I should let them know, and I should

9    pay everybody back.  I'm going to.

10        Q.    I think you said you didn't know exactly,

11   but do you know roughly how much was ultimately

12   raised through your GoFundMe fundraiser?

13        A.    I couldn't tell you, because I don't know

14   if this screenshot is recent or not.  So I couldn't

15   tell you the full amount I raised.

16        Q.    If you look down in the bottom left-hand

17   corner of Galanakis Deposition Exhibit 7.

18        A.    Number 7?

19        Q.    I think it will have a date stamp on

20   there.

21        A.    February 2023.  So this is pretty old.

22   I'm not sure exactly when I closed the account, but

23   closing an account means that no one can donate

24   money anymore.  And I did that when I knew that I

25   wasn't going to need any additional money for

1    attorney fees.

2         Q.   I think -- correct me if I'm wrong, but

3    did you say you closed the GoFundMe fundraiser

4    account a few months ago?

5         A.   It might have been longer than that.

6         Q.   Might have been longer --

7         A.   I couldn't tell you the exact date.

8         Q.   Was it this year, in 2023, that you closed

9    it?

10        A.   Just let me take a look at this paper, and

11   I can let you know that.

12             Well, this was in February, and there's

13   still a "donate now" button; so it had to be in 2023

14   where I closed it.

15        Q.   Is it possible that there's -- that you

16   raised more money than what's reflected on page 1 of

17   the exhibit that you're holding right now?

18        A.   Yeah.

19        Q.   Based on your recollection, would you say

20   you raised more than that amount?

21        A.   Yes.

22        Q.   A lot more?

23        A.   On my YouTube, yes.

24        Q.   So how much money -- hang on.  So just

25   through the GoFundMe fundraiser --

1        A.   Oh, just the --

2        Q.   -- fundraiser account.

3        A.   Sorry.

4        Q.   Yeah.  So how much -- I think it's roughly

5   $2,700, which is reflected there, through the

6   GoFundMe exclusively.  Did you raise much more than

7   that 2,700?

8        A.   I don't know if I did or not.

9        Q.   Do you think you raised 5,000 through

10  GoFundMe?

11       A.   5,000, no.

12       Q.   No, it wasn't quite that much?

13       A.   No.

14       Q.   Do you think it was 3,000?  If you

15  remember.

16       A.   I don't remember.

17       Q.   Okay.  Now, you did mention that you also

18  raised some money through YouTube.  Did I hear that

19  right?

20       A.   Yes, yes.

21       Q.   Explain that.

22       A.   YouTube is not donations.  It is ad

23  revenue from watch time.

24       Q.   And you received ad revenue?

25       A.   Yes.

WINTERS APPX 38

1          Q.    Explain how that works.

2          A.    So when you hit a certain amount on

3    YouTube, like of views, they give you monetization,

4    and then you can advertise your video, and you get

5    paid for the video.

6          Q.    How much?

7          A.    I don't know exactly how much I got paid.

8          Q.    Why not?

9          A.    It's a number I'll have to check to give

10   you an honest statement.

11         Q.    Was it hundreds of dollars?

12         A.    It was more than hundreds of dollars.

13         Q.    Was it thousands of dollars?

14         A.    I would say it was a couple thousand.

15         Q.    A couple -- so would it be more or less

16   than $2,000, do you think?

17         A.    I couldn't give you the exact answer.

18   Otherwise I would tell you.

19         Q.    But it's more than a thousand?

20         A.    Yeah.

21         Q.    You said it was a couple thousand?

22         A.    Yes.  Yes, sir.

23         Q.    And that's just ad revenue given the

24   number of views of the videos that you posted on

25   YouTube.com?

WINTERS APPX 39

1        A.   Yes.

2        Q.   Where does the check for the ad revenues

3   come from?

4        A.   Google.

5        Q.   It's written by Google?

6        A.   Yes.

7        Q.   Outside of YouTube.com ad revenues, did

8   you raise or receive any other money?

9        A.   I don't know.  Family.  They would give me

10   money for college, but that wasn't exactly for

11   attorney fees.

12        Q.   I should clarify my question.  Outside of

13   the GoFundMe fundraiser and the YouTube.com ad

14   revenue, did anyone else give you money for the

15   purpose of paying attorney fees?

16        A.   I don't know.

17        Q.   Did any family members give you money for

18   attorney fees?

19        A.   If they did, it was through GoFundMe.

20        Q.   Did any friends give you money for

21   attorney fees?

22        A.   No, not friends.  They're not that nice.

23        Q.   Did strangers give you money for attorney

24   fees?

25        A.   Yes.

WINTERS APPX 40