**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **TAYVIN GALANAKIS,** Plaintiff, <br><br> v. <br><br> **CITY OF NEWTON, IOWA, et al.,** Defendants. | **CASE NO. 4:23-cv-00044** <br><br> **PLAINTIFF/COUNTERCLAIM DEFENDANT'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS** |
| **NATHAN WINTERS AND CHRISTOPHER WING,** Counterclaim Plaintiffs, <br><br> v. <br><br> **TAYVIN GALANAKIS,** Counterclaim Defendant. | **"FILED UNDER SEAL"** |

**COMES NOW** the Plaintiff/Counterclaim Defendant and provides this Appendix in Support of Motion for Summary Judgment on Counterclaims:

**TABLE OF CONTENTS**

1. Petition at Law and Jury Demand ..............................................................3

2. Amended Answer and Counterclaims .........................................................9

3. Answer and Affirmative Defenses to Counterclaims ...........................17

4. Affidavit of Courtney Van Der Hart ........................................................21

5. Excerpts of Internal Investigation 21-003 (Confidential) ...................27

8. Filings in Jasper County Civil No. DACV122471 .................................34

7. Excerpts of Internal Investigation 22-006 ...............................................54

8.    **Excerpts of Newton Police Department Policy Manual**...................... **57**

9.    **Messages Between Courtney Van Der Hart and Tayvin Galanakis** ................................................................................................ **63**

10.   **Screenshot of Galanakis FaceBook Post w/ Comments** ...................... **67**

11.   **Excerpts of Deposition of Tayvin Galanakis** ......................................... **71**

12.   **Excerpts of Deposition of Nathan Winters (Confidential)**.................. **78**

13.   **Excerpts of Deposition of Robert Burdess (Confidential)** .................. **86**

14.   **Excerpts of Nathan Winter's Answer to Second Set of Interrogatories (Confidential)** .................................................... **96**

15.   **YouTube/FaceBook Video, City RFP 613** ............................................ **101**

**GRIBBLE, BOLES, STEWART & WITOSKY LAW**

BY:   */s/ Adam C. Witosky* _____
        Matthew M. Boles              AT0001037
        Adam C. Witosky              AT0010436
        2015 Grand Avenue, Suite 200
        Des Moines, Iowa 50312
        Telephone: (515) 235-0551
        Facsimile:  (515) 243-3696
        Email:       mboles@gbswlaw.com
                        awitosky@gbswlaw.com
        **ATTORNEYS FOR PLAINTIFF**

**PROOF OF SERVICE**

        The undersigned certifies that the foregoing instrument was **electronically filed** on CM/ECF on December 13, 2023.  Subject to the exceptions cited therein, Local Rule 5A provides this electronic filing, once electronically posted to the registered case party's CM/ECF account, constitutes service for purposes of the Federal Rules of Civil Procedure.

        Copies have been provided to all registered parties because once the document is posted, those parties can view and download the presented or filed document.

                        */s/ Adam C. Witosky* _____

## IN THE IOWA DISTRICT COURT FOR JASPER COUNTY

| | |
|---|---|
| TAYVIN GALANAKIS,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br><br>Defendants. | CASE NO. _____<br><br><br><br><br>PETITION AT LAW and JURY DEMAND |

**COMES NOW**, the Plaintiff, and for his Petition at Law and Jury Demand states:

1.     Plaintiff Tayvin Galanakis is a citizen and resident of Newton, Iowa, who engaged with officers at the 100 block of South 3rd Ave West, Newton, Iowa 50208 at all times relevant to the events complained of herein.

2.     Defendant City of Newton, Iowa (hereinafter "City") is a municipal corporation organized and authorized to operate under the laws of Iowa and is located at 101 West 4th Street South, Newton, Jasper County, Iowa 50208. Defendant City is responsible for maintaining and operating the Newton Police Department.

3.     Defendant Chief Rob Burdess is believed to be a citizen and resident of Iowa and was serving as the Chief of Police for the Newton Police Department at all times relevant to the events complained of herein.

4.     Defendant Nathan Winters is believed to be a citizen and resident of Iowa and was serving as a police officer for the City of Newton Police Department at all times relevant to the events complained of herein.

5.     Defendant Christopher Wing is believed to be a citizen and resident of Iowa and was serving as a Lieutenant of the City of Newton Police Department at all times relevant to the events complained of herein.

## JURISDICTION AND VENUE

6.     Jurisdiction of the District Court is proper pursuant to Iowa Code §602.6101.

7.     All events, actions, injury, and damages referenced in this Petition occurred in Jasper County, therefore venue is proper pursuant to Iowa Code §616.18.

## GENERAL FACTUAL ALLEGATIONS

8.     Plaintiff repleads each preceding paragraph as if fully set forth herein.

9.     On August 28, 2022, around 12:15 a.m., Officer Winters and Lt. Wing were driving patrol when they passed a vehicle with its high beams on, not dimmed for oncoming traffic.

10.     Tayvin was operating the vehicle with the high beams on.

11.     Officer Winters and Lt. Wing activated the lights and sirens of their vehicle to initiate a stop of the vehicle Tayvin was operating.

12.     Tayvin complied with these signals and pulled the vehicle over to a stop.

13.     Officer Winters approached the driver's side window and asked for the owner's identification and registration for the vehicle.

14.     In addition to Officer Winters' approach towards Tayvin's vehicle, Lieutenant Wing also got out of the police vehicle and watched this entire encounter.

15.     Further, Lieutenant Wing verbally expressed multiple times that

Officer Winters' actions were appropriate and was well within his duties as a police officer.

16.     Tayvin was 19 years old, born and raised in Newton, and a freshman on the William Penn Football Team in Oskaloosa, Iowa.

17.     Tayvin was home for the weekend and was in the process of going home when he was pulled over.

18.     Tayvin explained to the officers this was his first interaction with law enforcement, he was nervous, and was not sure what he needed to provide the officers, such as the registration.

19.     Officer Winters began asking Tayvin if he had had anything to drink that night.

20.     Tayvin responded that he did not have anything to drink continuously throughout this encounter.

21.     Despite Tayvin's answer, Defendant Winters kept questioning if Tayvin was intoxicated.

22.     Defendant Winters directed Tayvin to join him in his police squad vehicle while he ran his information in the system.

23.     While in the police vehicle, Defendant Winters admonished Tayvin and said he believed Tayvin was lying and that Deputy Winters could "smell the alcohol on him," and his eyes were bloodshot.

24.     After running his information, Defendant Winters despite having no reasonable suspicion, instructed Tayvin out of the police vehicle to administer a

variety of field sobriety tests.

25.     Tayvin complied and got out, awaiting orders from Defendant Winters on which tests he wanted Tayvin to complete.

26.     At or about 12:23 a.m., Officer Winters conducted a Horizontal Gaze Nystagmus Test (HGN).

27.     At or about 12:25 a.m., Officer Winters conducted a walk-and-turn test.

28.     At or about 12:28 a.m., Officer Winters conducted a One Leg Stand/Balancing Test.

29.     At or about 12:30 a.m., Officer Winters conducted another memorization test forcing Tayvin to close his eyes, lean his head back, and count to thirty (30).

30.     At or about 12:33 a.m., Officer Winters conducted a finger-to-nose test.

31.     Following these field sobriety tests, Officer Winters falsely alleged that Tayvin performed poorly on these tests, though video evidence disputes these allegations.

32.     Tayvin continued to plead his innocence and asked continuously for the officers to conduct a breath test.

33.     Finally, at 12:35 a.m., Officer Winters conducted a standard handheld preliminary breathalyzer test with the results showing that Tayvin blew a 0.00.

34.     Despite this result, Officer Winters told Tayvin he had enough cause to arrest Tayvin on suspicion of intoxication.

35.     Officer Winters stated that with Tayvin's slow response and inability to find his registration, his bloodshot eyes, and the field tests, he had probable cause.

36.     Once the breath test established zero alcohol in Tayvin's system, Officer Winters changed his story and began questioning Tayvin about marijuana use.

37.     Despite previously claiming he could smell alcohol on Tayvin, Officer Winters now claimed he believed Tayvin was intoxicated due to his use of marijuana.

38.     Tayvin continuously told the officers that he did not use marijuana and that his placement on the William Penn football team renders him unable to use marijuana because of his weekly drug tests.

39.     At 12:40 a.m., Officer Winters placed handcuffs on Tayvin, read him his Miranda rights, and put him in the back of the police vehicle.

40.     Tayvin and the Defendants arrived at the Newton Police Station at 12:44 a.m. and put Tayvin in a detention room awaiting Officer Winters' report.

41.     Tayvin has asthma and is prescribed an inhaler for his asthmatic attacks.

42.     Although Tayvin pled with Officer Winters about his difficulty breathing due to the stress he was experiencing from the interaction, Officer Winters initially denied him the ability to use his inhaler.

43.     After repeated requests, Officer Winters finally gave Tayvin his inhaler.

44.     Officer Winters asked Tayvin if he would do a drug recognition test and submit to a urine test to which Tayvin agreed.

45.     At or about 12:57 a.m., Officer Shinkle, a drug recognition expert with the Newton Police Department, arrived.

46.     At 1:12 a.m., Officer Shinkle conducted a second round of the same field

sobriety tests that Officer Winters put Tayvin through.

47.     Officer Shinkle also conducted a variety of other tests including but not limited to, a blood pressure test, checked Tayvin's pulse, and did a thorough white and blue light check on his mouth and body.

48.     Following these tests, Officer Shinkle concluded at or around 2:03 a.m., that Tayvin was not intoxicated and he was not showing any signs or had any evidence of drug or alcohol use.

49.     At this time, Officer Shinkle told Tayvin that he was going to be released and that he was going to take Tayvin home.

50.     Before leaving the station, Tayvin requested to speak to Officer Winters and at no point in their final interaction, did Tayvin receive an apology from Officer Winters for falsely accusing him of using alcohol and/or drugs.

51.     Although Tayvin continued to assert his innocence and subsequently proved that he was not intoxicated, Officer Winters remained defiant.

52.     Lt. Wing, as Officer Winters' supervising officer, stood idly by as he observed Officer Winter make claims of Tayvin's intoxication unsupported by any testing or other objective evidence.

53.     Lt. Wing participated in Tayvin's arrest for operating while intoxicated despite there being no basis to believe probable cause existed.

54.     Throughout this entire encounter, Tayvin complied with all orders by Defendants, despite his confusion and frustration at being seized and arrested without cause.



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br><br>    Defendants. | No. 4:23-cv-00044<br><br><br>**AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND JURY DEMAND FOR NATHAN WINTERS AND CHRISTOPHER WING**<br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |
| NATHAN WINTERS and CHRISTOPHER WING,<br><br>    Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br><br><br>    Counterclaim Defendant. | |

**COMES NOW**, Defendants Nathan Winters ("Officer Winters"), and Christopher Wing ("Lt. Wing") (collectively "Defendants"), by and through the undersigned, and for their Amended Answer, Affirmative Defenses, Counterclaims, and Jury Demand hereby state the following:

9. Defendants deny to the allegations alleged in paragraph 9.

10. Defendants admit to the allegations alleged in paragraph 10.

11. Defendants admit that Defendant Officer Winters and Defendant Lt. Wing activated the emergency signal lights on their car and initiated the stop. Defendants lack sufficient information to either admit or deny the remaining allegations contained in paragraph 11.

12. Defendants admit to the allegations alleged in paragraph 12.

13. Defendants admit to the allegations alleged in paragraph 13.

14. Defendants admit to the allegations alleged in paragraph 14.

15. Defendants admit to the allegations alleged in paragraph 15.

16. Defendants lack sufficient information to either admit or deny the allegations contained in paragraph 16.

17. Defendants lack sufficient information to either admit or deny the allegations contained in paragraph 17. Defendants admit that Plaintiff did state such.

18. Defendants deny the allegations alleged in paragraph 18.

19. Defendants admit that when Defendant Officer Winters made findings that supported that assertion that Plaintiff may have been driving while impaired, he asked Plaintiff if he had been drinking. The remaining allegations alleged in paragraph 19 are denied.

20. Defendants admit to the allegations alleged in paragraph 20.

21. Defendants admit to the allegations alleged in paragraph 21.

22. Defendants admit to the allegations alleged in paragraph 22.

23. Defendants admit that Defendant Officer Winters stated that his eyes were bloodshot and asked Plaintiff why his person smelled of alcohol while in the patrol car. Defendants deny the remaining allegations alleged in paragraph 23.

24.     Defendants deny that Defendant Officer Winters lacked reasonable suspicion. Defendants admit to the remaining allegations alleged in paragraph 24.

25.     Defendants admit to the allegations alleged in paragraph 25.

26.     Defendants admit to the allegations alleged in paragraph 26.

27.     Defendants admit to the allegations alleged in paragraph 27.

28.     Defendants admit to the allegations alleged in paragraph 28.

29.     Defendants admit to the allegations alleged in paragraph 29.

30.     Defendants admit to the allegation alleged in paragraph 30.

31.     Defendants deny the allegations alleged in paragraph 31.

32.     Defendants admit to the allegations alleged in paragraph 32.

33.     Defendants admit to the allegations alleged in paragraph 33.

34.     Defendants admit that Defendant Officer Winters had probable cause to arrest Plaintiff. Defendants deny the allegations alleged in paragraph 34.

35.     Defendants admit that the allegations alleged in paragraph 35 describe in part the facts that established Defendant Officer Winters' probable cause needed to make an arrest. Defendants deny the remaining allegations alleged in paragraph 35.

36.     Defendants admit that Defendant Officer Winters questioned Plaintiff about his marijuana use. Defendants deny the remaining allegations alleged in paragraph 36.

37.     Defendants admit that Defendant Officer Winters stated that the field sobriety tests indicated that Plaintiff was under the influence. Defendants deny the remaining allegations alleged in paragraph 37.

38.     Defendants admit that Plaintiff stated that he was subject to weekly drug tests as part of the William Penn football team. Defendants deny the remaining allegations alleged in paragraph 38.

39.     Defendants admit to the allegations alleged in paragraph 39.

40.     Defendants admit to the allegations alleged in paragraph 40.

41.     Defendants admit that Plaintiff had an inhaler in his possession. Defendants lack sufficient information to either admit or deny the allegations contained in paragraph 41.

42.     Defendants admit to the allegations alleged in paragraph 42 to the extent that Defendant Officer Winters did deny Plaintiff the use of his inhaler after one oral request.

43.     Defendants admit that Plaintiff was provided with his inhaler within approximately twenty seconds of his request. Defendants deny the remaining allegations alleged in paragraph 43.

44.     Defendants deny that Plaintiff agreed to do a drug recognition test upon Defendant Officer Winters' first request for him to do one. Defendants admit to the allegations alleged in paragraph 44 to the extent that eventually, Plaintiff agreed to be tested.

45.     Defendants admit to the allegations alleged in paragraph 45.

46.     Defendants admit to the allegations alleged in paragraph 46.

47.     Defendants admit to the allegations alleged in paragraph 47.

48.     Defendants admit to the allegations alleged in paragraph 47.

49.     Defendants admit to the allegations alleged in paragraph 48.

50.     Defendants admit that Defendant Officer Winters did not apologize for his actions, and that Plaintiff did request to speak with him. Defendants deny the remaining allegations alleged in paragraph 50.

10. The individual Defendants have qualified immunity.

11. Plaintiff's fault exceeds that fault of Defendants. Plaintiff is barred recovery pursuant to Iowa Code chapter 668.

12. Plaintiff's fault must be compared with the fault of Defendants, if any is found, a Plaintiff's reward must be diminished by the percentage of fault pursuant to Iowa Code chapter 668.

13. Defendants are immune from any liability as alleged by Plaintiff pursuant to Iowa Code chapter 670.

14. Defendants, in whole or in part, are not subject to punitive damages.

15. Defendants, in whole or in part, were improperly served as to not effectuate personal jurisdiction.

16. Plaintiff did not sustain any actual damages, or any damages were caused by Plaintiff's own intentional conduct, failure to mitigate, or superseding or intervening cause.

17. Defendants reserve the right to supplement affirmative defenses as discovery continues in this case.

## <u>COUNTERCLAIMS</u>

COMES NOW, Counterclaim Plaintiffs Officer Winters and Lt. Wing (collectively "Counterclaim Plaintiffs"), by and through the undersigned, and for their Counterclaims hereby state as follows:

1. Counterclaim Plaintiff Officer Winters is a resident and citizen of the state of Iowa and employed by the Defendant City as a peace officer.

2. Counterclaim Plaintiff Lt. Wing is a resident and citizen of the state of Iowa and employed by Defendant City as a peace officer.

11.     At all material times, Counterclaim Plaintiff Officer Winters was a certified law enforcement officer pursuant to Iowa Code chapter 80F.1.

12.     On the following dates and occurrences, Counterclaim Defendant falsely and knowingly spoke and/or authored the following, but not limited to the following, defamatory statements concerning Counterclaim Plaintiff Officer Winters:

> a.   On September 9, 2022, Counterclaim Defendant posted a publicly viewable video under his account on the public video-sharing website called "YouTube," on which he wrote that "NATHAN WINTER OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX GIRLFRIEND."[1]

> b.   On September 9, 2022, Counterclaim Defendant posted a publicly viewable video under his account on the public video-sharing website called "YouTube," on which he wrote that "EVEN AFTER NATHAN BEAT THE SHIT OUT HIS GIRLFRIEND."[2]

> c.   On August 29, 2022, Counterclaim Defendant posted a publicly viewable posting on the social media website "Facebook" in which he stated that "I got falsely ARRESTED. Nathan Winters of the Newton Police Department, IA decided to assume and guess I was drinking based off of me having a hard time finding my insurance. I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum." Exhibit B.

---

[1] The video can be accessed at https://www.youtube.com/watch?v=so_bFYoIsow. The text is found at 38:24 – 38:37.

[2] The video can be accessed at https://www.youtube.com/watch?v=so_bFYoIsow. The text is found at 38:24 – 38:37

17.     The false and defamatory statements and communications were stated with utter disregard for the truth of such statements.

18.     Counterclaim Defendant, through counsel, informed Counterclaim Defendant, through counsel, that he had no interest in the truth regarding the aforementioned defamatory statements and communications involving Counterclaim Plaintiff Officer Winters.

19.     In fact, Counterclaim Defendant knew at all material times the accusations along with the false and defamatory statements and communications were in fact completely and utterly false.

20.     Counterclaim Defendant demonstrated this by retweeting the following comment through his account on the social media platform "Twitter" that, referring to Counterclaim Plaintiff Officer Winters, "[a]lthough the officer may not have been convicted nor any charges filed, he did consent to have a civil no-contact/protective order placed on him by a former girlfriend … *for* domestic abuse. The order has been modified to allow him to use a gun while at work."

21.     Counterclaim Defendant caused these knowingly false and defamatory written and/or oral statements to be published to third parties through publicly accessible online platforms and other means which exposed the statements to the general public.

22.     One such means of publication was that Counterclaim Defendant took advantage of the publicity generated from these false and defamatory statements by using them to sell merchandise which further defamed Counterclaim Plaintiff Officer Winters when it was publicly advertised throughout Counterclaim Defendant's various social media accounts.

23.     Another such means of publication was that Counterclaim Defendant took advantage of the publicity generated from these false and defamatory statements by using them to earn income.

    b.   Mental anguish;

    c.   Loss of enjoyment of life;

    d.   Loss of community reputation;

    e.   Loss of employability;

    f.   Loss of time and inconvenience bringing this action; and

    g.   Any other category of damages found just and proper.

**WHEREFORE**, Counterclaim Plaintiff Officer Winters respectfully requests this Court grant his claim for defamation against Counterclaim Defendant and order that he be afforded such other relief to which they may be entitled, including but not limited to, ordering the cessation of these defamatory statements and communications, compensatory damages, punitive damages, costs, and attorney's fees.

## COUNT II- DEFAMATION OF COUNTERCLAIM PLAINTIFF LT. WING

33.    Counterclaim Plaintiffs re-allege and incorporate herein paragraphs 1-32.

34.    At all material times, Counterclaim Plaintiff Lt. Wing was a certified law enforcement officer pursuant to Iowa Code chapter 80F.1.

35.    On the following dates and occurrences, Counterclaim Defendant falsely and knowingly spoke and/or authored the following, but not limited to the following, defamatory statements concerning Counterclaim Plaintiff Lt. Wing:

    a.   On or around August 29, 2022, Counterclaim Defendant posted a publicly viewable comment on the social media website "Facebook" on which he stated that in reference to Counterclaim Plaintiff Officer Winters' supervisor, that "his boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a woman." Exhibit D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **TAYVIN GALANAKIS,**<br>        Plaintiff, | **CASE NO. 4:23-cv-00044** |
| **v.** | |
| **CITY OF NEWTON, IOWA, et al.,**<br>        Defendants. | **PLAINTIFF/COUNTERCLAIM DEFENDANT'S ANSWER and AFFIRMATIVE DEFENSES TO NATHAN WINTERS AND CHRISTOPHER WING COUNTERCLAIMS** |
| **NATHAN WINTERS AND CHRISTOPHER WING,**<br>        Counterclaim Plaintiffs, | |
| **v.** | |
| **TAYVIN GALANAKIS,**<br>        Counterclaim Defendant. | |

**COMES NOW**, the Plaintiff/Counterclaim Defendant and for this Answer to Counterclaims and Affirmative Defenses states:

## ANSWER TO COUNTERCLAIMS

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Paragraph 4 is an assertion of law, and not an allegation of fact requiring a response.

5.      Paragraph 5 is an assertion of law, and not an allegation of fact requiring a response.

6.      Admitted.

7.      Denied.

8.      Paragraph 8 is denied to the extent it alleges probable cause existed to detain or arrest Tayvin Galanakis for operating while intoxicated. Paragraph 8 is admitted to the extent Tayvin was released without a criminal charge.

9.      Denied.

## COUNTERCLAIM COUNT I
## DEFAMATION OF COUNTERCLAIM PLAINTIFF OFFICER WINTERS

10.     Plaintiff/Counterclaim Defendant realleges all prior paragraphs as if set forth herein.

11.     Admitted.

12.     Plaintiff/Counterclaim Defendant denies having falsely and knowingly made any defamatory statement concerning Officer Winters:

      a.  Admitted statement was posted;

      b.  Admitted statement was posted;

      c.  Admitted statement was posted;

      d.  Admitted statement was posted;

      r. Admitted statement was posted.

13.     Admitted Officer Winters has not been criminally charged or convicted of domestic abuse, but is subject to a civil protective order for relief from domestic abuse.

14.     Denied.

15.     Denied.

16.    Denied.

17.    Denied.

18.    Denied.

19.    Denied.

20.    Paragraph 20 is admitted to the extent the comment was made, but all other allegations are denied.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied, including all subparts.

**WHEREFORE,** the Plaintiff/Counterclaim Defendant prays this counterclaim be dismissed in its entirety and for any additional relief the Court finds proper.

## COUNTERCLAIM COUNT II
## DEFAMATION OF COUNTERCLAIM PLAINTIFF LT. WING

33.    Plaintiff/Counterclaim Defendant realleges all prior paragraphs as if set

forth herein.

34. Admitted.

35. Plaintiff/Counterclaim Defendant denies having falsely and knowingly made any defamatory statement concerning Officer Winters:

a. Admitted statement was posted;

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

**WHEREFORE,** the Plaintiff/Counterclaim Defendant prays this counterclaim

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>CITY OF NEWTON, IOWA, et al.,<br>Defendants/Counterclaim<br>Plaintiff. | CASE NO. 4:23-cv-00044<br><br>AFFIDAVIT OF COURTNEY VAN<br>DER HART |

**COMES NOW** the Affiant, Courtney Van Der Hart, and after being duly sworn the undersigned deposes and states:

1.     I am an adult and fully competent to make this Affidavit, which I do voluntarily.

2.     I am not a party to this action and do not have an interest in it.

3.     I was in a domestic relationship with Nathan Winters from the end of 2019 until around August 2021.

4.     During this relationship, Nathan Winters physically abused me.

5.     In July 2021, Nathan threatened to kill me if I cheated on him, saying he would need three bullets, one for me, one for the "new" guy, and one for himself.

6.     In July 2021, I was holding and looking at his cell phone, which he allowed me to do. When I started to walk while reading a message, he pushed me onto the bed, held me down, and grabbed and twisted my wrist until I dropped the phone.

7.     In June 2021, Nathan and I argued in my bedroom. When I attempted

to leave, he blocked the door while my kids were on the other side in the living room.

8.     Around this same time, he was giving me a shoulder rub while I lay on the bed. He put his hand on the back of neck, squeezed slightly and said, "You realize if I squeezed right now it would kill you."

9.     In May 2021, we were at a birthday party for a co-worker of mine. I was walking behind another co-worker as we were all leaving for dinner when Nathan grabbed my wrist, pulled me back, and told me I wasn't allowed to be that close to my co-worker.

10.     Throughout the summer of 2020, he would regularly drive past my house and other places I went. He would park down the road from my house, sitting in his car with the lights off.

11.     In April 2020, Nathan was sitting in his patrol car on duty when I leaned in to give him a kiss goodnight. He elbowed me in the chest so hard I was pushed backward into my car. The blow left a bruise on my chest. Following this, we communicated via SnapChat and text message about his pushing me, which he admitted to doing. (Attachment 1.)

12.     In July 2020, while at his mother's house where he lived, he refused to let me leave the bedroom. When I attempted to, he lifted me up, slammed me onto his bed, held me down by the wrists, and told me I could leave when he said I could leave.

Further, the Affiant sayeth naught.

I, Courtney Van Der Hart, on this �age11th⎠day of December 2023, do hereby certify under oath that the contents set forth herein are true and correct.

*Courtney Van Der Hart*

Courtney Van Der Hart

STATE OF IOWA          )
                       ) ss:
COUNTY OF POLK         )

On this ⎣11th⎤ day of December 2023, before me, a Notary Public in and for said County and State, personally appeared Courtney Van Der Hart, known by me to be the person in the above-entitled action.

*Kendra Levine*

Notary Public - State of Iowa

KENDRA LEVINE
Commission Number 839523
My Commission Expires
5/19/25

10:06 💬



# Nathan Winters

  >

ME

It ok

ME

Fyi dont you ever fucking push me like that again. I've kissed you a million fucking times in your patrol car just like that and you've never said no i thought you were kidding around and i was trying to make your fucking night better.

NATHAN WINTERS

Okay I'm sorry I'm just supper irritable I'm over it I'm not mad. I'm sorry

I overreacted cuz I'm sleepy and exhausted and pissy, and upset, and depressed I'm sorry

ME

You are super fucking strong Nathan. It is not ok to to throw your fucking elbow into me like that. I was just trying to cheer you up

NATHAN WINTERS

I didn't know I did I'm sorry

I'm sorry



**Nathan Winters**        

ME

It ok

ME

Fyi dont you ever fucking push me like that again. I've kissed you a million fucking times in your patrol car just like that and you've never said no i thought you were kidding around and i was trying to make your fucking night better.

NATHAN WINTERS

Okay I'm sorry I'm just supper irritable I'm over it I'm not mad. I'm sorry

I overreacted cuz I'm sleepy and exhausted and pissy, and upset, and depressed I'm sorry

ME

You are super fucking strong Nathan. It is not ok to to throw your fucking elbow into me like that. I was just trying to cheer you up

NATHAN WINTERS

I didn't know I did I'm sorry

I'm sorry

YESTERDAY

NATHAN WINTERS

I'm talking to other officers rn, that's why I'm being short

I'm trying to be "social"

ME

You and assuming 

ME

  Send a chat          

3

April 2020



6:11 ◎ ◌◌

Nathan Winters
6412180270

Me too. Maybe I should quit    6:04 PM

6:07 PM    Why?

Cuz I'm about sick    6:08 PM

Ok so you weren't sick you did it.. but you're sick your boss might find out?    6:08 PM

No I was sick I did it

And you know it    6:11 PM

Enter message

# GET TO KNOW *Newton*

# POLICE DEPARTMENT

## AUTHORIZATION OF AN INTERNAL INVESTIGATION

DATE:      August 6, 2021

TO:        Wayne Winchell, Lieutenant

FROM:      Rob Burdess, Chief of Police

RE:        Internal Investigation 21-003

**Allegations: Newton Police Department Policy, Procedures and Rules**
**320.4.1 General Standards**
**320.5.1 Laws, Rules and Orders**
**320.5.2 Ethics**
**320.5.4 Relationships**
**320.5.8 Performance**
**320.5.9 Conduct**

**Complaint Summary**

On August 5, 2021 Chief Burdess was notified by Chief Deputy Rozendaal and Lt. Shutts of the Jasper County Sheriff's Office that one of their dispatchers, Courtney VanDerHart, had disclosed to them that she had been in an on-and-off relationship with Officer Nathan Winters and over the past several months he has displayed harassing, stalking and potentially assaultive behavior towards VanDerHart while on and off duty. It was reported that she intended to resign from her position since he contacts her at work on the dispatch phone and forces her to talk to him.

Lt. Chris Wing made contact with VanDerHart who alleged that in recent months Officer Nathan Winters would show up at her house upset about work, would frequently contact her via text/social media if she would not answer her phone, sit down the street from her house when she had visitors, spotlight her house with police vehicle and threaten to tow her car if she did not come outside of her house to talk to him, show up at her house in Monroe and yell at her from the front yard, elbow her in the chest while she tried to hug him and make comments about not wanting to live while he was on duty.

Officer Winters is the principal party of this investigation based on the above listed allegations.

Officer Winters has been notified in writing that an investigation has been initiated and he serves as a principal of investigation. Issue him a copy of the Garrity waiver prior to the interview. Please refer to and follow NPD Policy #1010 for internal investigation procedures.

Please review the attached documents, interview the involved officers, supervisors and other witnesses and review any other pertinent evidence to include, but not limited to written reports, videos, and any other evidence that may be present.

Upon completion forward your report to me for follow up.

CONFIDENTIAL
CITY RFP 00652

# Newton Police Department
## CITIZEN COMPLAINT/
## INTERNAL INVESTIGATION REPORT

| | | Control No. |
|---|---|---|
| | Complainant's Name Courtney VanDerHart | |

| 3. Complaint Received by: Lt. Chris Wing | 4. Address 505 W Lincoln St. Apt#1, Monroe, IA 50170 | 5. Res. Phone 641-417-9884 |
|---|---|---|

| 6. ☒ Uniform Patrol ☐ Investigation/Identification ☐ Parking Enforcement ☐ Administration | 7. Race-Sex-Age W F 31 | 8. Place of Employment Jasper County Sheriff's Office |
|---|---|---|

| 9. Address of Employment 2300 Law Center Dr. Newton, IA | 10. Bus. Phone 641-792-5912 |
|---|---|

| 11. Date/Time of Incident Oct 19 - Now | 12. Date/Time of Complaint 8/5/21 @ 2028 | 13. Location of Complaint JCSO |
|---|---|---|

| 14. Name of Witness Maissa Cowan | 15. Address | 16. Relationship Friend | 17. Phone No. |
|---|---|---|---|

| 18. Name of Witness Natasha Henry | 19. Address | 20. Relationship Friend | 21. Phone No. 641-840-9613 |
|---|---|---|---|

| 22. Complaint Against Nathan Winters | I.D. No. 639 | 23. Rank Patrol | 24. Unit | 25. Case No. |
|---|---|---|---|---|

| 26. Type of Complaint | ☒ Formal | ☐ Informal | ☒ Notify Chief of Police |
|---|---|---|---|

**27. Allegation**

| ☐ Excessive Use of Force | ☒ Standard of Conduct | ☐ Police Service |
|---|---|---|
| ☐ Missing Property | ☐ Operational Procedures | ☒ Other (explain in narrative) |

**28. Description of Allegations**

- elbowing me out of patrol car
- showing up at my house in uniform upset before work
- making comments about not wanting to live while on duty
- showing up at friends house telling me he is going to tow my car to get me outside while on duty.

CONFIDENTIAL

CITY RFP 00655

# GET TO KNOW *Newton*

# POLICE DEPARTMENT

On Thursday, August 5, 2021 I was asked to speak with Jasper Country Dispatcher Courtney VanDerHart about her relationship with Officer Winters of the Newton Police Department and some concerns that she had brought up to her supervisors. That evening I made contact with Courtney and explained to her why I was calling and asked if she would be willing to meet with me to discuss the allegations. Courtney agreed to meet with me at the Jasper County Sheriffs Officer at 2100hrs. A short time later I received a request to call her back and she asked if she could move up the time of the interview to 1930hrs.

The meeting took place in the conference/training room in the Sheriff's Office. The meeting was recorded on digital audio recording for future review. It should be noted that on the recording in indicated that the date was June 5, which should be August 5.

I asked Courtney to tell me what happened and how this all transpired. She asked if I wanted to know from the beginning and I told her yes. She told me that she didn't even tell Shutts that much. I told her that I really wanted to get a rough timeline and get a better understanding as to what happened and what was happening that brought us to this point. I explained that most likely Lt. Winchell would be assigned the actual investigation and that he would likely do a much more detailed interview with her.

Courtney started out by telling me that that she first met Officer Winters in August of 2018 after he joined the department and she was just a friend. Officer Winters at the time was in a relationship, however she added him on Snapchat. She said that he make 1 sort of inappropriate snap between August and October of 2018 and it was a snap of him saying he was tired and had his arm like it was around someone and said that there was room for her or something to that effect.

In October 2019 Officer Winters then girlfriend broke up with him and while she was on a trip in Michigan Officer Winters sent her a nude picture of himself. She indicated that two week later they started hanging out once in a while and "hooked up" (had casual sex). After that it turned into more of a relationship and they started talking all the time. When asked about the relationship she indicated that it was rocky and off and on.

She mentioned that he had Depression and Mental Health issues that were bad, which may have stemmed from him losing his dad. I asked her to clarify what those issues were and she showed me a text message from March 2021 in which he said he is pacing back and forth with his service pistol in his hand and wish he could just do it so

CONFIDENTIAL
CITY RFP 00656

EX #4



# POLICE DEPARTMENT

he could see his dad and mentioned that his mother and grandma would be alright and that the department would just replace him.

She also spoke about how possessive he was of her and would blow up her phone when she was on trips with her girlfriends, and would park down the street from her house when she lived in Newton while on duty and watch her house to make sure she was at home. She mentioned that she had friends who witnessed this.

She mentioned that he would be very moody when he was having a bad day he would be "very shitty" to her. I asked her to describe that and she told me that he would send her rude snapchats to try and just say shitty things to her.

As she was describing things from her relationship she told me that she would always meet him somewhere in town when she got off work and tell him goodnight and give him a kiss. She became emotional and told me that she only told Natasha Henry about this, and proceeded to tell me that one night she met him in the front parking lot of Cornfed Crossfit to tell him goodnight and give him a kiss and he was having a bad night and she leaned in to give him a kiss and he turned away from him. She told me that she leaned in one more time thinking that he was just playing and he threw his elbow into her chest and sent her flying backward, leaving a bruise which she took a picture of and showed it to Natasha Henry. She indicated that she still has the picture.

She continued with other stories about the troubled relationship which included stories of him showing up at her house in Monroe yelling at her in the front yard. She told him that people were going to see this and someone could easily see that he was a Newton officer and they would probably call him in.

She also told me about an incident last summer when she told Officer Winters that she was going to be helping a friend do a facebook live show for pure romance. This was in Newton and Officer Winters showed up at the house, spotlighted the house and blew up her phone until she answered and told her that she was illegally parked and that he was going to tow her car unless she came out. Eventually she went out and talked to him and had to convince her friend's husband not to call the Chief the next morning to report him.

Recently she noticed people following her on social media that she didn't know but had Officer Winters as a mutual friend. She told me that she finally reached out to them after Officer Winters repeatedly told her that he didn't know them. She later found out

CONFIDENTIAL
CITY RFP 00657

Appx. 30



that he was meeting and hooking up with girls on Tinder and she found that he was sending them nude photos of himself. When she confronted him as to how he would feel if the shoe was on the other foot he said that he would need 3 bullets, one for her, one for the guy, and one for himself. This was all within the past couple of months.

She told me that she knows she needs to get away from him but that he thinks of her as a possession and not a person and said that she will never leave him. This is what led to her wanting to resign her position.

I explained to her that she didn't need to do that. That we as a department would handle these issues and that he would be instructed by me tonight that he is to have absolutely no further contact with her. I then asked her to fill out the citizen complaint form and just put a few bullet points that had happened, which she did. I also sent her a Citizen Invite for her to share the evidence she had on her phone. She did send 16 items, and called me back letting me know she had more. I explained that I would send her another link on Friday afternoon for her to send the rest.

I asked her in the end what she wanted to see happen, and she told me that she cares for him and wants to see him get the help he needs and that she doesn't want him to get in trouble.

After getting this information I contacted Chief Burdess and express my concern regarding being fit for duty and given some of his statement what he might do after I call him tonight and inform him of the internal and that he is to have no further contact with Courtney. I shared that I felt I needed to meet with Officer Winters tonight and make the notification in person and retrieve his duty weapon, which he agreed.

At approximately 2230 hours Sgt. Lavely and I met Officer Winters at his house and I explained why we were there and the concern over comments he had made about self-harm. He told me that those comments were true. I explained that there was going to be an internal investigation and that at this time he was on administrative leave and that Chief Burdess would be in touch with him in the morning. I explained that under the circumstances that I was going to take his duty weapon and belt and badge. I asked Officer Winters to show us to where they were located which he did and Sgt. Lavely and I secured his weapon, belt and badge. I shared with Officer Winters that we cared about him and his health and that there were outlets through the employee assistance program that would help him.

CONFIDENTIAL
CITY RFP 00658



Sgt. Lavely and I returned to the PD where his weapon was placed in the armory and his duty belt and badge with placed in the old dark room/K9 drug room.

I had a case number assigned to this which is 21-24195.  All videos and documents in evidence.com have been restricted.

Lt. Chris Wing

CONFIDENTIAL
CITY RFP 00659

Appx. 32



by the story told to her by Courtney.  No report was made and no investigation conducted at the time of the incident.

In reference to the incident at Corn Fed Crossfit, Officer Winters denied that he swung his elbow in anyway, only blocking an unwanted hug, and in his description that act would not have caused any injury.  In the messages relating to the incident Courtney clearly expresses anger at what Officer Winters did and points out that he was strong, that he pushed her, and that she felt that he wasn't sorry and only sorry that his boss may find out.  Officer Winters stated that Courtney was lying and told a different version.  Natasha stated that Courtney told her what happened and showed her the bruise.  Courtney said that she photographed the bruise but later deleted it when they were getting along again.  In order to look at this incident fairly and unbiased I had to put myself in the shoes of an officer investigating this crime with names removed.  I had to consider the fact that it was reported more than a year after the incident.  Courtney says that the incident happened how she described.  Officer Winters denies that is what happened.  Someone is telling the truth and someone is lying.  Courtney supplied screenshots that had content discussing this incident.  The challenge is that these screenshots don't encompass the entire conversation as Courtney was not saving them for a future investigation, only to document Winters' statements as she said he would deny saying things.  With conflicting stories, no eye witnesses, no photos or ability to compare the bruise to the described assault and age progression of the bruise in comparison to the act, and the only witness was told what happened by Courtney, there would not be probable cause to file charges in this case.

Next is incident in Knoxville in which Courtney says that Winters blocked the doorway, pinned her to the bed, and told her that she can leave when he tells her she can leave.  Winters denied that he did so and claims that he never put his hands on her or blocked her from leaving.  It is her word against Winters' word and there is no supporting evidence such as injury documentation, confessions or statements, or witnesses.  This incident cannot be confirmed.

Next is the situation in which Courtney claims that Officer Winters told her, when discussing if roles were reversed and she had cheated on her, that he would need three bullets, one for the guy, one for Courtney, and one for himself.  Courtney says that he said these things.  Winters said that he doesn't remember saying anything like this to Courtney.  This statement cannot be confirmed, was not witnessed by anyone else, was never reported or investigated.

CONFIDENTIAL
CITY RFP 00683

| Save | Print | Clear Form |
|---|---|---|

*Petition for Relief from Domestic Abuse*

**Read** *Protect Yourself from Domestic Violence* on the Iowa Judicial Branch website before using this form. The booklet explains court procedures and provides information about how to contact an attorney.

You may want to or should see an attorney:

- If you do not know how to use this form, or if you do not understand this form.
- If you think Defendant will hire an attorney.
- If you think Defendant will try to get custody of your children.
- You may involve an attorney in this process at any time, although you are not required to.

**Caution:** You must provide any protected or confidential information in full on a separate Protected Information Disclosure form.

For other general information about domestic abuse, call the confidential **Iowa Domestic Violence Hotline: 1-800-942-0333.**

In the Iowa District Court for __Jasper__ County
*County where the Petition is filed*

__Courtney Viola VanDerHart__
**Plaintiff**
*Full name of person seeking relief from domestic abuse*

vs.

__Nathan Michael Winters__
**Defendant**
*Full name of alleged domestic abuser*

Civil no. __DACV122471__
*Leave blank – Clerk of court will fill in*

**Petition for Relief from Domestic Abuse**
Iowa Code ch. 236

If you need assistance to participate in court due to a disability, contact the disability coordinator (information available at: http://www.iowacourts.gov/Administration/Directories/ADA_Access/). **Disability coordinators cannot provide legal advice.** Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942)

1. I, Plaintiff, understand that this action is being filed under Iowa Code chapter 236.

2. I now live in __Jasper__ County, Iowa.

3. I can receive mail at the following address: *Any of the following addresses may be used: a mailing address, the mailing address of a shelter or other agency, a public or private post office box, or any other mailing address with permission of the resident of that address.*

   __505 W Lincoln St Apt #1__ __Monroe__ __IA__ __50170__ __Jasper__
   *Plaintiff's Mailing address*   *City*   *State*   *ZIP code*   *County*

4. Defendant lives at the following address (if known):

   __1610 E Robinson St Unit 33C__ __Knoxville__ __IA__ __50138__ __Marion__
   *Defendant's home address*   *City*   *State*   *ZIP code*   *County*

5. Defendant's employer and work address (if known): __Newton Police Department__
   *Employer*

   __101 W 4th St S__ __Newton__ __IA__ __50170__ __Jasper__
   *Defendant's work address*   *City*   *State*   *ZIP code*   *County*

6. Defendant is 17 years of age or younger (if known): ☐ Yes ☑ No

   If yes, provide Defendant's year of birth: __1997__
   *yyyy*

**FILED**
AUG 19 2021
TIME __11:04am__
JASPER COUNTY CLERK OF COURT

*Petition for Relief from Domestic Abuse,* continued

7. Identification and age of each child under age 18 whose welfare may be affected by this controversy: *Use a Protected Information Disclosure form to provide full names and birthdates to the court.*

*not his children*

| First, middle, and last initials of each child | Birth year | First, middle, and last initials of each child | Birth year |
|---|---|---|---|
| A. Kooper Gerritt V | 2018 | D. | |
| B. Kole Walter V | 2018 | E. | |
| C. | | F. | |

☐ *Check this box if you have attached sheets with additional information.*

8. Relationship of Plaintiff and Defendant **at the time** of the abuse or threat of abuse:
*Check only one*

A. ☐ Married

B. ☐ Separated

C. ☐ Divorced

D. ☐ Adult relatives living together

E. ☐ Parents of the same minor child or children under age 18

F. ☐ Living together

G. ☐ Lived together within one year of the assault, but not at the time of the assault

H. ☑ Intimate relationship*

I. ☐ Have been in an intimate relationship and have had contact within one year of the assault*

*An "intimate relationship" means a significant romantic involvement that need not include sexual involvement. An intimate relationship does not include a casual social relationship or association in a business or professional capacity.

**Note:** If none of these boxes accurately describes your relationship, do not complete this form. Contact an attorney or call the police about your abuse.

9. Nature of the alleged domestic abuse
*Check all that apply*

A. ☑ Defendant has physically abused me.

B. ☐ Defendant has sexually abused me.

C. ☑ Defendant has threatened me, and I fear for my physical safety.

10. Injuries

A. Describe the **most recent injury**, including threats and any nonconsensual (against your will) sexual experience. Please describe **how** the injury or threat happened, **where** it happened, and **when** you were injured or threatened.

Most recent threats have been within past 3-4 weeks. After telling him I wanted to end relationship he told me I wasn't allowed to end things until he said. Argument over cheating he told me if I was with another man he would need 3 bullets. 1 for me, 1 for the

☑ *Check this box if you have attached sheets with additional information.*

DATE: 08/19/21          PAGE: 1

the "new" guy and one bullet for him to shoot himself. He
allowed me to look at his phone. When I walked away with the
phone and started reading a message he pushed me onto
the bed and grabbed my wrist to make me drop his phone so
he could take it back. This all happened at my apartment
in Monroe. In July.

*Petition for Relief from Domestic Abuse,* continued

B.  Describe any **other injuries** or threats you have received from Defendant. Please include **how** you were injured or threatened, **where** it happened, and **when** you were injured or threatened.

We have a year and a half long history of threats and physical abuse. Last Summer while sitting in his patrol car he elbowed me out of his patrol car while on duty. It sent me back into my car & a bruise was left on my breast/chest area. He has multiple times stood in doorways blocking me so I could not leave

☑ *Check this box if you have attached sheets with additional information.*

**Questions 11-18:** If Plaintiff and Defendant have no children in common (biological or adopted) under age 18, skip questions 11 through 18.

Questions 11-18 relate to the Uniform Child Custody Jurisdiction and Enforcement Act and to the court's duty under Iowa Code section 236.5(1)(*b*)(5) (2013). If you are unsure how to answer these questions, contact a lawyer for advice.

11.  Who should have temporary custody of the minor children you have in common with Defendant? *Check one*

☐ Me (Plaintiff)    ☐ Defendant    ☐ Other *Identify*_____

12.  Explain how your safety and your children's safety will be affected by the court's decision about temporary custody or temporary visitation:

_____
_____
_____

13.  If you want custody, provide suggestions for how Defendant could visit the children without contacting you—for example: through friends, relatives, or baby-sitters. List any concerns you may have about visitation:

_____
_____
_____

14.  Identify the minor children (under age 18) you have in common with Defendant.
*Give each child's initials, address, and birth year. If children are living in a shelter or other safe place, give only the county and state where they are living.*

| Child's initials | Present address (or county/state) | Birth year |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Appx. 37    CITY RFP 00723

JASPER COUNTY CASE # _DACV122471_

The most recent was about a month ago at my apartment in monroe. We were in an argument and he stood in the doorway between my bedroom and living room. My kids were on the other side playing in the living room. He has come to my apartment before work in his police uniform very upset. Stood in the doorway so I couldn't shut the door. My neighbors were above us so I let him all the way in and shut the door. He got more upset and refused to leave. My kids were home sleeping at the time. Last summer at his house (his moms house) in Knoxville we again had an argument I went to leave and was upset crying and would not talk to him so he lifted me up & slammed me on his bed and held my wrists down to try and talk to me. He told me I could leave when he said I could. When I have tried to end the relationship in the past & recently he tells me I am not going to break up with him. Calls me names and tells me I am stupid, crazy, or irrational and it was not going to happen. During break ups he drives constantly past my house alot of times in his patrol car. Shows up to my house unannounced and refuses to leave. He has showed up to my work to force me to see him bringing snacks or sending flowers. He has told me I am not allowed to talk to certain co-workers. ( I work at the Sheriffs office so we all know each other) At a newton PD Officers wedding last fall he threatened my coworker

SIGNATURE_ County Resrut_

DATE_ 08/19/21_

PAGE _1_

CITY RFP 00724

JASPER COUNTY CASE # DACV12247l

for making a comment about my breasts & said he was going to "throw him through a fucking window". He has made numerous threats to harm himself If I left. I have alot Of suicidal messages on my phone. ~~I have~~ ~~let this~~

I have had to get our employers Involved now. He is under on Internal Investigation With Newton PD. ~~I have~~ I am scared he is going to retaliate. In the past he has felt like he had nothing to live for after his dad died and he was talked to at work. He told me he didn't want to live and was intoxicated saying he was going to "go for a drive" talking nonsense. This scared me to where I almost involved his bosses then but he came out of it. Im scared what he will do if he thinks Im the one to cause all this. He has threated to harm himself if he ever got fired saying he would "rather be dead" If the anger is geared towards me I dont know what he would do. Him making threats have scared me into not saying anything. I feel like the arguments are escalating and him blocking me away from my kids scared me. because now its involving them.

SIGNATURE _County Vosik_

DATE _08/19/21_

PAGE _2_

CITY RFP 00725

*Petition for Relief from Domestic Abuse, continued*

### 21. Notice of Protected or Confidential Information

Pursuant to Iowa Code section 236.10, this file is a public record and accessible by anyone.  If you would like all or part of this file to remain confidential to the general public in order to protect the safety or privacy of any person, then you must request the court to seal all or part of this file.*  The person from whom you are seeking relief will have access to the file, even if it is sealed.

*Check all that apply if you want this file sealed:*

☑ I request all portions of this file to be sealed.

☐ I request that my county of residence and mailing address be sealed.

☐ I request that the names and addresses of: my children or wards, or children's or ward's minor children be sealed.

☐ Other request: *Please specify:* _____

_____

*\*Court orders and support payment records cannot be sealed. The court may, upon request, order that address and location information be redacted from those records.*

It is the responsibility of the party filing a document or exhibit with the court to ensure that protected or confidential information is omitted from or abbreviated on the document or exhibit. *See* Iowa Court Rule 16.602. Protected information (for example, children's full names or social security numbers) should be abbreviated on this form and provided in full on a Protected Information Disclosure form.

### 22. Oath and Signature

I, Courtney Viola Van DerHart, have read this Petition, and I certify under penalty of
*Print your full name: first, middle, last*

perjury and pursuant to the laws of the State of Iowa that the information I have provided in this Petition is true and correct.

August _____ 19 _____ .20 21 _____ Curty VonDert _____
*Month*        *Day*        *Year*        *Plaintiff's signature\**

505 W Lincoln St   Apt #9        Monroe        IA        50170
*Mailing address*        *City*        *State*        *ZIP code*

(641) 417-9884   Ckvanderhart@gmail.com
*Phone number*        *Email address*        *Additional email address, if applicable*

*\*Whether filing electronically or in paper, you must handwrite your signature on this form. If you are filing electronically, scan the form after signing it and then file electronically.*

---

For other general information about domestic abuse,
call the confidential

**Iowa Domestic Abuse Hotline:**
**1-800-942-0333**

---

Appx. 40                                    CITY RFP 00729

E-FILED          DACV122471 - 2021 AUG 19 11:33 AM          JASPER
CLERK OF DISTRICT COURT                    Page 1 of 4

## IN THE DISTRICT COURT FOR JASPER COUNTY

| | |
|---|---|
| **ORDER OF PROTECTION**<br><br>This order can be verified during business hours with Jasper County Clerk of Court at (641)792-3255 or with the Jasper County Sheriff at (641)792-5912 or | **05501  DACV122471**<br>Judge: McCall<br>County **JASPER** State  **IOWA**<br><br>**TEMPORARY PROTECTIVE ORDER**<br>**(Section 236.3 Petition)**<br><br>**ISSUE DATE: 08/19/21** |
| PETITIONER/PROTECTED PARTY:<br>**COURTNEY VIOLA VANDERHART**<br>COURTNEY VIOLA VANDERHART<br>VS. | Other Protected Persons: |
| RESPONDENT/DEFENDANT:<br>**NATHAN MICHAEL WINTERS** | RESPONDENT  Date of Birth<br>Address for Respondent (not shared with Protected Party) |

**THE COURT HEREBY FINDS:**

It has jurisdiction over the parties and subject matter.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**

The above named Respondent is restrained from committing further acts of abuse or threats of abuse.  The above named Respondent is restrained from any contact with the Petitioner/Protected Party.  **Additional terms of this order and exceptions to the above provisions are as set forth below.**

This order is effective upon service on Respondent.  It shall remain in effect until modified, terminated or superseded by a later written order, or until the dismissal of the case, but in no event for more than one year.

**WARNINGS TO RESPONDENT:**

**This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, and U. S. Territory, and any tribal jurisdiction.  18 U.S. C 2265.  Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment.  18 U.S.C. 2262.  Only the court can change this order.**

**NOTICE FOR LAW ENFORCEMENT:**

**CAUTION :** ☑    **If checked,<br>FIREARMS WARNING<br>for Law Enforcement**    **The Respondent will be provided with reasonable notice and opportunity to be heard.  See page 2, paragraph 8.**

      The court has considered the petition for Relief from Domestic Abuse and finds that a temporary protective order under Iowa Code section 236.4(2) is necessary to protect the Protected Party named above.

      Therefore, the court ORDERS as follows:

      *  Respondent shall not threaten, assault, stalk, molest, attack, harass, or otherwise abuse the Protected Party.  Respondent shall not use, or attempt to use, or threaten to use physical force against the protected party that would reasonably be expected to cause bodily injury.

\*   Respondent shall stay away from the protected party and shall not be in that party's presence except in a courtroom during court hearings.

\*   Respondent shall not communicate with the protected party in person or through any means including third persons.  This restriction shall not prohibit communication through legal counsel.

\*  The Protected Party shall have exclusive possession of the residence located at **505 W. Lincoln St., Apt. #1, Monroe, IA**.  Respondent shall not go to, enter, occupy or remain in that residence or any other residence in which the Protected Party is staying, under any circumstance.
  Respondent shall turn over to the sheriff all devices that allow access or entry to the residence or outbuildings (for example, keys or garage openers).

Unless modified by order filed in this proceeding or in a juvenile court proceeding affecting the same children, this temporary order shall prevail over any other existing custody order.  The issue of visitation will be addressed at the hearing mentioned below.  Until such time, respondent shall not contact these children and shall not contact the Protected Party about visitation.

\* The parties have no children together.

\*   **A RESPONDENT WHO VIOLATES THIS ORDER FACES IMMEDIATE ARREST.**  Violation may occur even if the Protected Party consents to conduct that is prohibited by this order.  Only the court can relieve respondent from the restrictions contained in this order.

\*   A hearing on **Domestic Abuse is scheduled on 08/31/2021 at 10:30 AM  at the Jasper Co. Courthouse, 101 1st ST N, RM 305 Newton IA 50208.  ,** to decide if a final protective order should be entered.  Failure of the Respondent to appear may result in a final protective order being entered against the Respondent.  Failure of the Protected Party to appear may result in the case being dismissed.  Each party has the right to be represented by an attorney at this hearing.  The parties shall bring copies of any existing child custody orders to the hearing.

\*   The court finds, pursuant to Iowa Code section 236.10, that to protect the safety or privacy of the Protected Party and/or the Protected Party's children, the clerk of court shall until further order of the court:
 seal the entire file from public access, other than court orders and child support payment records.

The indices available at the clerk's office or through Iowa Courts Information System (ICIS) shall remain open.

\*  <u>The Respondent may be required to relinquish all firearms, offensive weapons, and ammunition upon issuance of a permanent protective order.</u>

☑ The Jasper County Sheriff or any other law enforcement agency or any other person authorized to effect personal service shall serve and return service upon the respondent, the petition/motion and this order at least two days before the hearing.

☑ The Clerk of Court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing

E-FILED                    DACV122471 - 2021 AUG 19 11:33 AM          JASPER
                           CLERK OF DISTRICT COURT                    Page 3 of 4

or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

5RDA01

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED          DACV122471 - 2021 AUG 19 11:33 AM          JASPER
CLERK OF DISTRICT COURT          Page 4 of 4



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| Type: | TEMPORARY PROTECTIVE ORDER |

So Ordered

_____

Brad McCall, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-08-19 11:33:32

E-FILED          DACV122471 - 2021 OCT 01 10:17 AM          JASPER
CLERK OF DISTRICT COURT                    Page 1 of 3

| ORDER OF PROTECTION | 05501  DACV122471 |
|---|---|
| This order can be verified during business hours with **Jasper County Clerk of Court at (641)792-3255** or at any time with the **Jasper County Sheriff at (641)792-5912** | Judge: **Richard B Clogg**<br>County **JASPER** State  **IOWA**<br><br>**PROTECTIVE ORDER**<br>**BY CONSENT AGREEMENT**<br>**(Section 236.3 Petition)**<br><br>**ISSUE DATE: 10/01/21** |

| **PETITIONER/PROTECTED PARTY:**<br>COURTNEY VIOLA VANDERHART<br><br>VS. | Other Protected Persons: |
|---|---|
| **RESPONDENT/DEFENDANT:**<br>NATHAN MICHAEL WINTERS<br><br>**CAUTION:** ☐  **If checked, FIREARMS WARNING for Law Enforcement** | RESPONDENT  Date of Birth 1997<br>Address for Respondent (not shared address with Protected Party)<br>Knoxville, Iowa |

**THE COURT HEREBY FINDS:**
It has jurisdiction over the parties and subject matter and the respondent has been provided with reasonable notice and opportunity to be heard.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**
The above named Respondent is restrained from committing further acts of abuse or threats of abuse.  The above named Respondent is restrained from any contact with the Petitioner/Protected Party.  **Additional terms of this order and exceptions to the above provisions are as set forth below.**

This order shall remain in effect until **October 1, 2022** unless it is modified, terminated, extended, or superseded by written order of the court, or until the dismissal of the case.

**WARNINGS TO RESPONDENT:**
**This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, and U. S. Territory, and any tribal jurisdiction.  18 U.S.C. 2265.  Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment.  18 U.S.C. 2262.  Only the court can change this order.**

**Federal and state laws provide penalties for possessing, transporting, shipping, or receiving any firearm or ammunition. (18 U. S. C. 992(g)(8)); Iowa Code Section 724.26(2)(a).**

**Only the court can change this order.**

On 10/01/21, a hearing was held on the Petition for relief from domestic Abuse.  The following persons were present and participated in the hearing: **Courtney Vanderhart and Nathan Michael Winters ad counsel of record for each party..**

E-FILED          DACV122471 - 2021 OCT 01 10:17 AM          JASPER
CLERK OF DISTRICT COURT                    Page 2 of 3

The court FINDS by a preponderance of the evidence:

(1)  Respondent was personally served with a copy of the petition and the temporary protective order containing notice of this hearing.

(2)  The parties appeared and each consented to the entry of this order

Therefore, pursuant to Iowa Code Chapter 236, the court ORDERS as follows:

1.  Respondent shall not threaten, assault, stalk, molest, attack, harass or otherwise abuse the protected party.  Respondent shall not use, or attempt to use, or threaten to use physical force against the protected party that would reasonably be expected to cause bodily injury.

2.  Respondent shall not communicate with the protected party in person or through any means including third persons.  This restriction shall not prohibit communication through legal counsel.

3.  The protected party shall have exclusive possession of the residence located at 505 W Lincoln ST, Apt #1, Monroe, IA 50170.  Respondent shall not go to, enter, occupy or remain in that residence or any other residence in which the protected party is staying, under any circumstance.

4.  Additional Provisions are as follows:
Nothing in this Order prohibits the Repondent from conducting official police business. However, the Respondent shall not enter the dispatch room if the parties are on duty at the same time. Respondent shall have no contact with Protected Party other than emergency radio contact.
 seal the entire file from public access, other than court orders and child support payment records.

 Respondent was personally served with a copy of this order by the court.

The clerk of court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.

5RDA03

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED                    DACV122471 - 2021 OCT 01 10:17 AM          JASPER
                                CLERK OF DISTRICT COURT                        Page 3 of 3



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| **Type:** | PROTECTIVE ORDER |

So Ordered

Richard B. Clogg, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-10-01 10:17:27

E-FILED          DACV122471 - 2021 OCT 13 12:51 PM          JASPER
CLERK OF DISTRICT COURT                    Page 1 of 3

| | |
|---|---|
| **ORDER OF PROTECTION AMENDED**<br><br>This order can be verified during business hours with **Jasper County Clerk of Court at (641)792-3255 or at any time with the Jasper County Sheriff at (641)792-5912** | 05501  DACV122471<br>Judge: Richard B Clogg<br>County **JASPER** State  **IOWA**<br><br>**CANCELLATION, MODIFICATION, OR EXTENSION OF CHAPTER 236 ORDER**<br><br>**ISSUE DATE: 10/13/21** |

| **PETITIONER/PROTECTED PARTY:** COURTNEY VIOLA VANDERHART<br><br>VS. | Other Protected Persons: |
|---|---|
| **RESPONDENT/DEFENDANT:** NATHAN MICHAEL WINTERS | RESPONDENT  Date of Birth 1997 |
| **CAUTION:** ☐  **If checked, FIREARMS WARNING for Law Enforcement** | Address of Respondent (not shared address with Protected Party)<br>**Knoxville, Iowa** |

**THE COURT HEREBY FINDS:**
It has jurisdiction over the parties and subject matter and the respondent has been provided with reasonable notice and opportunity to be heard.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**
    **(see below)**
   This modified order expires on:  <u>October 1, 2022</u>

**Only the court can change this order.**

On 10/13/21, this matter comes before the court regarding the Chapter 236 Consent order entered on **October 1, 2021**.
The following persons were present and participated in the hearing:
Modified by consent of the parties and court.

The Court FINDS that:
**The Protected Order by Consent Agreement should be modified as set forth herein.**

The Court **ORDERS** as follows:
The order is **modified** as follows:
The following is removed from the Order: " **However, the Respondent shall not enter the dispatch room if the parties are on duty at the same time. Respondent shall have no contact with the Protected Party other than emergency radio contact."  The following is added to the Order: "Respondent shall call dispatch only for official police purposes if the Protected Party is on duty. Respondent may only enter the building through the jail when the Protected Party is on duty."**

E-FILED          DACV122471 - 2021 OCT 13 12:51 PM          JASPER
CLERK OF DISTRICT COURT          Page 2 of 3

The modification is effective immediately.

To the extent not inconsistent herewith, the prior protective order shall also remain in force.

The clerk of court shall reflect this change in status on the domestic abuse registry and shall notify law enforcement regarding this order.

☑ The Jasper County Sheriff, or any other law enforcement agency or any other person authorized to effect personal service shall serve and return service upon the respondent.
☐ Respondent was personally served with a copy of this order by the court.
☑ The Clerk of Court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.
Copies to: Dusty Clements and Ryan Ellis

5RDA04

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED          DACV122471 - 2021 OCT 13 12:51 PM          JASPER
CLERK OF DISTRICT COURT                    Page 3 of 3



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| **Type:** | ORDER TO MODIFY PROTECTIVE/NO CONTACT ORDER |

So Ordered

Richard B. Clogg, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-10-13 12:51:39

E-FILED          DACV122471 - 2023 FEB 22 03:35 PM          JASPER
CLERK OF DISTRICT COURT                    Page 1 of 3

Rule 4.200--Form 4.203: *Cancellation, Modification, or Extension of Protective Order--Domestic Abuse (Iowa Code chapter 236)*

| | |
|---|---|
| **Cancellation, Modification, or Extension of Protective Order--Domestic Abuse**<br>Iowa Code chapter 236 | 05501  DACV122471<br>Judge Terry Rickers<br>**County JASPER   State IOWA**<br><br>Issue Date 02/22/23 |

To verify this order during business hours, contact the JASPER County Clerk of Court office at (641) 792-3255, or anytime with the JASPER County Sheriff's Office at (641) 792-5912.

| | |
|---|---|
| **Plaintiff or Protected Person**<br>COURTNEY VIOLA VANDERHART<br>v**.**<br>**Defendant**<br>NATHAN MICHAEL WINTERS<br><br>**CAUTION:** ☐ If checked, **FIREARMS WARNING** for Law Enforcement | **Other Protected Persons** *use initials and birth year for minor children*<br><br>Defendant's date of birth 1997<br><br>Defendant's address ***cannot be same as Plaintiff's or Protected Person's address***<br>Knoxville, Iowa |

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

**The court finds**

The court has jurisdiction over the parties and the subject matter.  Defendant was provided with actual notice of this hearing and an opportunity to participate.  **Additional findings are below.**  This order is in effect upon service on Defendant.

**Notice to Defendant**

1.	This order is enforceable in every state, U.S. Territory, tribal jurisdiction, and the District of Columbia.  Violating this order outside the State of Iowa may result in federal imprisonment. 18 U.S.C. section 2262.

2.	**Federal and Iowa felony criminal penalties for possessing, transporting, shipping, or receiving any firearms, offensive weapons, or ammunition apply as long as a qualifying protective order is in effect.**  18 U.S.C. sections 922(d)(8), (g) (8); Iowa Code section 724.26(2)**.**

**The court orders**

The Protective Order is **extended** to **February 22, 2024**.

**Notice for law enforcement**

Any peace officer with probable cause to believe Defendant has violated this order **must** immediately arrest Defendant.  Iowa Code sections 236.11(1).

The court  enters this order on whether to cancel, modify, or extend the Iowa Code chapter 236 Protective Order issued on OCTOBER 1, 2021.

With hearing.  The court held a hearing regarding the request.  Participating in the hearing were:

Plaintiff or Protected Person

E-FILED          DACV122471 - 2023 FEB 22 03:35 PM          JASPER
                    CLERK OF DISTRICT COURT                 Page 2 of 3

With attorney representation.
Defendant
    With attorney representation.

**Following commencement of the hearing, the parties informed the Court that they were willing to extend the existing protective order by consent. This consent order is entered without any findings regarding the Petitioner's allegations in this case. Nothing in this order prohibits the Respondent/Defendant from conducting official police business. Respondent/Defendant shall call dispatch only for official police purposes if the Protected Party is on duty. Respondent/Defendant may only enter the building through the jail when the Protected Party is on duty. These determinations are hereby incorporated into the additional findings and order set forth below.**

## The court finds

> Defendant was personally served with a copy of the Request to Cancel, Modify, or Extend an Iowa Code chapter 236 Protective Order containing notice of the date and time of this hearing.

## The court orders

The Iowa Code chapter 236 Protective Order as issued on OCTOBER 1, 2021 is **extended** to FEBRUARY 22, 2024.
Court costs are waived.
The clerk of court will reflect this change in status on the IOWA System (the protective and no contact order registry) and notify law enforcement regarding this order.
The clerk of court will provide copies of this order to Plaintiff, Defendant, any counsel of record, the Jasper County Sheriff in the county where Defendant resides, and the 24-hour dispatcher in the county where Defendant resides required by Iowa Code sections 236.5(6) and 664A.4.  If the Jasper County Sheriff determines that Defendant resides in another county, the Jasper County Sheriff will send the order to the County Sheriff where Defendant resides for service of the order.

**Both parties were served with a copy of this order by the Court.**

YDA203

E-FILED          DACV122471 - 2023 FEB 22 03:35 PM          JASPER
CLERK OF DISTRICT COURT          Page 3 of 3



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| **Type:** | Order GRANTING Motion to Extend Protective Order/NCO |

So Ordered

Terry Rickers, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2023-02-22 15:35:09

22-25845

On Saturday, August 28, 2022, at 0013hours, I was riding with Officer Winters after having a meeting with him. We had just left the back lot of the PD traveling eastbound on S 2nd Ave W. As we were approaching W 2nd St, a white Chevy Impala was traveling westbound toward us with its high beams on. The vehicle turned south on W 2nd St and Officer Winters initiated a stop on the vehicle in the 200 blk S 3rd Ave W.


I approached the vehicle on the passenger side, which was occupied by one male later identified as Tayvin Galanakis. Officer Winter was talking with Tayvin and explained the reason for the stop and requested he license registration and insurance. I could not hear any of the responses from Tayvin as the passenger side window was up. Tayvin had some trouble locating the requested documents and made several attempts to locate the documents in the glove box by putting stuff back in the glove box and then going back and looking in the glove box again.


Officer Winters asked Tayvin to step back to the patrol car, and asked him to take his gum out and put it on the dash. This was an indicator to me that he suspected he was under the influence. Tayvin was asked to have a seat in the front passenger seat by Officer Winters. I walked back and opened the door for Tayvin and I took a seat in the back seat cage, and radioed dispatch to rest Officer Winters depravation period due to the fact that Tayvin had gum in his mouth. During their conversation Tayvin explained that he was at a friend's house and that he was on his way home. He also explained that he plays football for William Penn College and that he was home for the weekend because as a freshman they aren't part of the travel team. Officer Winters as Tayvin how much he had to drink tonight and Tayvin said that he nothing to drink. Officer Winters then asked Tayvin why he would have bloodshot and watery eyes. Tayvin said the he would blow right now and Officer Winters advised they would get to that. When asked why he would think that, Office Winters explained that his difficulty retrieving paperwork was a clue as well as the odor of alcohol. At this the only issue I observed was the fumbling for the paperwork.


Tayvin acted shocked and wanted to know if he could record this. Officer Winters told him that he could and that he was also recording. Tayvin then took his phone out and video recorded a statement to the effect that, Officer Winters thinks I've been drinking and that he was going to look dumb when he blew zeros.   Tayvin told Officer Winters that he wanted to blow right know. Officer Winters explained that he would get to that but first offered him sobriety tests, which Tayvin agreed to.


For the sobriety tests Tayvin was asked to step to the parking lot area of the water tower. After asking some questions regarding his eyes he performed the HGN test. During the test Tayvin engaged Officer

CITY RFP 00905

Winters in conversation about football and was upset that he had just got his hair permed and that the rain was going to mess it up. I should be noted that there was a very light rain during the sobriety tests; however nearer the time of arrest it picked up a little and was more steady.

The second test he offered was the walk and turn. This test and the One Leg Stand were the only tests that I could really see the results of. During the W&T he I overserved two clues, incorrect number of steps, and improper turn. This would be a fail. After completing the test Tayvin asked for the breath test stating that he was two for two on the tests. Officer Winter rebuked him and told him that he wasn't and asked why he took more steps than advised. Tayvin then challenges Officer Winters and asks if this was his first year and asked how many false accusations had he had and Officer Winters said zero. To which Tayvin said this will be your first.

They proceeded to the One Leg Stand (OLS) during this test I observed no clues.

Officer Winters then administered three additional eye tests which are designed to detect drug impairment, which I'm not familiar with. After the tests Tayvin asked officer Winters why he assumed he was drunk. Officer Winters told him that he was showing several strong signs of impairment. Tayvin looked at me and caught me off guard and asked about the signs of impairment and I told him that he was a little slow with the paperwork and that he wasn't very smooth and consistent, and those can be tale, tale signs of impairment. Officer Winters then read Tayvin his Miranda Warning, which Tayvin acknowledged before blowing into the PBT which showed no presence of alcohol. Officer Winters then asked Tayvin when the last time he smoked Marijuana. This lead me to believe that there was something with the other tests that lead Officer Winters to believe that Tayvin was impaired. Tayvin couldn't tell Officer Winters when the last time he smoked marijuana was but insisted that it wasn't resent and stated that he is tested weekly for football. Tayvin asked if Officer Winters could go from thinking it was alcohol to drugs and I told him that he could and that in the past he has been very good at it.

In looking back it was at this point that I should have questioned Officer Winters as to what his observations where and how they lead him to believe he was impaired. Officer Winters then made a phone call to Officer Shinkle who was working and was a Drug Recognition Expert. While Officer Winters was on the phone Tayvin asked if he could make a phone call to his mom and I told him that he could. During the course of his conversation with his mom he asked me to talk to her and I told him that I really couldn't because he was an adult. Tayvin asked me why I was allowing this to happen and I pointed out that he was specialized in this area and that if he believed he was under the influence that he could do this. Initially Tayvin indicated that he would do a DRE eval but after Officer Winters was

CITY RFP 00906

done with his phone call he decided that he wasn't going to do one at which time Officer Winters told Tayvin that he was under arrest for OWI. He was handcuffed, searched and placed in the back of patrol car 843. Officer Winters was getting ready to leave and I pointed out that the car was legally parked but we needed to see if he wanted to leave it there and make sure it was secured.

Once at the PD Officer Shinkle agreed to do a DRE evaluation on Tayvin which took roughly an hour. During that time I spoke with his mom, Lindsey Maxwell, 3 different times. I explained what was going and told her that I was a little limited on what I could say due to the fact that he was of age, and told her that I would have him call her when he was done. After the DRE evaluation was complete Officer Shinkle and Winters came into the office and Officer Shinkle told me that he found no signs of impairment. Officer Winters asked if they should charge him she he had been arrested. I told them absolutely not that if a DRE evaluation showed no evidence that we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way. About this time dispatch advised that his mom was in the front lobby to pick him. Prior to leaving he had requested that he speak with a supervisor so I spoke him for a few minutes.

After Tayvin was released I spoke with Officer Shinkle regarding the discrepancy in observations. I was advised that this was the 3rd DRE evaluation that Officer Winters had asked him to do on this shift. Officer Shinkle told me that first too he just looked at and spoke with the subjects and declined to do a DRE. This worries me as Officer Winters does a lot of OWI's and I have had a lot of faith in him. I'm afraid this could happen again, and plan on meeting with Officer Winters to discuss this concern.

After looking back at my BWC footage I wish I had interjected earlier and spoke with Officer Winters to understand what he was seeing and to hopefully have prevented him from being arrested to begin with.

CITY RFP 00907

Newton Police Department
Policy Manual
Policy Manual

*Policy Manual*

### 103.5 ISSUING THE POLICY MANUAL

An electronic version of the Policy Manual will be made available to all members on the department network for viewing and printing. No changes shall be made to the manual without authorization from the Chief of Police or the authorized designee.

Each member shall acknowledge that he/she has been provided access to and has had the opportunity to review the Policy Manual and Departmental Directives. Members shall seek clarification as needed from an appropriate supervisor for any provisions that they do not fully understand.

### 103.6 PERIODIC REVIEW OF THE POLICY MANUAL

The Chief of Police will ensure that the Policy Manual is periodically reviewed and updated as necessary.

### 103.7 REVISIONS TO POLICIES

All revisions to the Policy Manual will be provided to each member on or before the date the policy becomes effective. Each member will be required to acknowledge that he/she has reviewed the revisions and shall seek clarification from an appropriate supervisor as needed.

Members are responsible for keeping abreast of all Policy Manual revisions.

Each Lieutenant will ensure that members under his/her command are aware of any Policy Manual revision.

All department members suggesting revision of the contents of the Policy Manual shall forward their written suggestions to their Lieutenants, who will consider the recommendations and forward them to the command staff as appropriate.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

CITY RFP 01414

# Organizational Structure and Responsibility

**200.1  PURPOSE AND SCOPE**
This policy establishes the organizational structure of the Department and defines general responsibilities of department members.

**200.2  POLICY**
The Newton Police Department will implement and maintain an organizational structure that provides clear and identifiable roles for command, control and guidance of the Department. Each position and assignment should have clearly identified responsibilities and a defined chain of command.

**200.3  DIVISIONS**
The Chief of Police is responsible for administering and managing the Newton Police Department. There are three divisions in the Department:

- Administration Division
- Patrol Division
- Investigation Division

200.3.1  ADMINISTRATION DIVISION
The Administration Division is commanded by the Chief of Police, whose primary responsibility is to provide general management, direction and control for the Administration Division. The Administration Division consists of technical and administrative services.

200.3.2  PATROL DIVISION
The Patrol Division is commanded by an assigned Lieutenant, whose primary responsibility is to provide general management, direction and control for the Patrol Division. The Patrol Division consists of uniformed patrol and special operations, which includes the Patrol Division, Traffic Safety Unit, Motorcycle Unit, K-9 Unit, School Rescource Officer and police aides/assistants.

200.3.3  INVESTIGATION DIVISION
The Investigation Division is commanded by an assigned Lieutenant, whose primary responsibility is to provide general management, direction and control for the Investigation Division. The Investigation Division consists of the Investigation Division, Identification Unit, Narcotics Unit, crime analysis and forensic services.

**200.4  COMMAND PROTOCOL**

200.4.1  SUCCESSION OF COMMAND
The Chief of Police exercises command over all members of the Newton Police Department. During planned absences, the Chief of Police will designate a Lieutenant to serve as the acting Chief of Police.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

Newton Police Department

Policy Manual

Policy Manual

*Organizational Structure and Responsibility*

Except when designated as above, the order of command authority in the absence or unavailability of the Chief of Police is as follows:

    (a)    On-duty Lieutenant

    (b)    On-duty Sergeant

    (c)    On-duty Shift Supervisor

### 200.4.2   UNITY OF COMMAND

The principles of unity of command ensure efficient supervision and control within the Department. Generally, each member shall be accountable to one supervisor at any time for a given assignment or responsibility. Except where specifically delegated authority may exist by policy or special assignment (e.g., Canine, Bicycle Patrol), any supervisor may temporarily direct any subordinate if an operational necessity exists.

## 200.5   AUTHORITY AND RESPONSIBILITIES

Each member will be assigned duties and responsibilities. Each member is delegated the authority necessary to effectively execute those responsibilities. Each member will also be held accountable for the appropriate application of that delegated authority.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

CITY RFP 01417

**Policy**

**206**

# Supervision Staffing Levels

## 206.1   PURPOSE AND SCOPE
The purpose of this policy is to establish guidelines to ensure that proper supervision is available to meet the needs of the Department and members throughout all Divisions.

## 206.2   POLICY
The Newton Police Department will ensure that proper supervision is available to meet the needs of its members and to achieve the goals of the Department. The needs of its members should be balanced with the needs of the Department for flexibility and discretion in assigning members to meet supervisory needs. While balance is desirable, the paramount concern is to meet the needs of the Department.

## 206.3   MINIMUM SUPERVISION STAFFING LEVELS
Minimum staffing levels should be established by the Lieutenants for each Division and work group. The supervision staffing levels should support proper supervision, span of control, compliance with any collective bargaining agreement and activity levels to meet the needs of members and the goals of the Department.

### 206.3.1   TEMPORARY SUPERVISORS
In order to accommodate training and other unforeseen circumstances, a qualified lower-ranking member may be used as a temporary supervisor in place of a regularly assigned supervisor.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

# Media Relations

### 324.1   PURPOSE AND SCOPE
This policy provides guidelines for the release of official department information to the media. It also addresses coordinating media access to scenes of disasters, criminal investigations, emergencies and other law enforcement activities.

### 324.2   POLICY
It is the policy of the Newton Police Department to protect the privacy rights of individuals, while releasing non-confidential information to the media regarding topics of public concern. Information that has the potential to negatively affect investigations will not be released.

### 324.3   RESPONSIBILITIES
The ultimate authority and responsibility for the release of information to the media shall remain with the Chief of Police. In situations not warranting immediate notice to the Chief of Police and in situations where the Chief of Police has given prior approval, Lieutenants, Shift Supervisors and designated Chief of Police or Designees (Chief of Police or Designees) may prepare and release information to the media in accordance with this policy and applicable laws regarding confidentiality.

### 324.4   PROVIDING ADVANCE INFORMATION
To protect the safety and rights of department members and other persons, advance information about planned actions by law enforcement personnel, such as movement of persons in custody or the execution of an arrest or search warrant, should not be disclosed to the media, nor should media representatives be invited to be present at such actions except with the prior approval of the Chief of Police.

Any exceptions to the above should only be considered for the furtherance of legitimate law enforcement purposes. Prior to approving any exception, the Chief of Police will consider, at a minimum, whether the release of information or the presence of the media would unreasonably endanger any individual or prejudice the rights of any person or is otherwise prohibited by law.

### 324.5   MEDIA REQUESTS
Any media request for information or access to a law enforcement incident shall be referred to the Chief of Police or Designee, or if unavailable, to the first available supervisor. Prior to releasing any information to the media, members shall consider the following:

(a)   At no time shall any member of this department make any comment or release any official information to the media without prior approval from a supervisor or the Chief of Police or Designee.

(b)   In situations involving multiple agencies or government departments, every reasonable effort should be made to coordinate media releases with the authorized

# Newton Police Department
## Policy Manual
### Policy Manual

*Personnel Complaints*

---

## 1010.9   CRIMINAL INVESTIGATION

Where a member is accused of potential criminal conduct, a separate supervisor or investigator shall be assigned to investigate the criminal allegations apart from any administrative investigation. Any separate administrative investigation may parallel a criminal investigation.

The Chief of Police shall be notified as soon as practicable when a member is accused of criminal conduct. The Chief of Police may request a criminal investigation by an outside law enforcement agency.

A member accused of criminal conduct shall be provided with all rights afforded to a civilian. The member should not be administratively ordered to provide any information in the criminal investigation.

The Newton Police Department may release information concerning the arrest or detention of any member, including an officer, that has not led to a conviction. No disciplinary action should be taken until an independent administrative investigation is conducted.

If a complainant is determined to be in violation of Iowa Code § 718.6 (false reports), the investigator shall file the necessary paperwork with the county attorney's office for possible charges (Iowa Code § 80F.1).

## 1010.10   POST-ADMINISTRATIVE INVESTIGATION PROCEDURES

Upon completion of a formal investigation, an investigation report should be forwarded to the Chief of Police through the chain of command. The Chief of Police may accept or modify any classification or recommendation for disciplinary action.

### 1010.10.1   CHIEF OF POLICE RESPONSIBILITIES

Upon receipt of any written recommendation for disciplinary action, the Chief of Police shall review the recommendation and all accompanying materials. The Chief of Police may modify any recommendation and/or may return the file to the Lieutenant for further investigation or action.

Once the Chief of Police is satisfied that no further investigation or action is required by staff, the Chief of Police shall determine the amount of discipline, if any, that should be imposed. In the event disciplinary action is proposed, the Chief of Police shall provide the member with a written notice and the following:

    (a)    Access to all of the materials considered by the Chief of Police in recommending the proposed discipline (Iowa Code § 80F.1).

    (b)    An opportunity to respond orally or in writing to the Chief of Police within five days of receiving the notice.

        1.    Upon a showing of good cause by the member, the Chief of Police may grant a reasonable extension of time for the member to respond.

        2.    If the member elects to respond orally, the presentation shall be recorded by the Department. Upon request, the member shall be provided with a copy of the recording.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department



**Courtney Van Der Hart**
Active 4h ago

Yep at the very bottom

Where it says petition for relief of domestic abuse. He has a protective order against him and still works as a cop

Oh I do see that

Thank you so much

Please dont put my name into any of this. Im the protected party and i work at the sheriffs office so its extremely messy but someone sent me your post and it made me so mad. Thats 100% nathan and hes always doing that shit. Violating peoples right. Treating people like shir. Its aggravating. I dealt with that for 2 years and it disgusts me hes able to treat the people he deals with like that also

Its all public information you just looked

Don't worry I won't

Thank you so much

I really appreciate it

Aa




**Courtney Van Der Hart**
Active 4h ago

I really appreciate it



No problem!



Does this means its over now

Is that your name

Damn he abused you ?

I didnt file any charges or anything i petitoned for the no contact order civilly. Yeah after court was done it goes to closed or dismissed or whatever the outcome is. So thats why it shows closed. So he has it for a year from the d- 't was closed. So he still has it
until October 1st

Aa

**Courtney Van Der Hart**
Active 4h ago

I didnt file any charges or anything i petitoned for the no contact order civilly. Yeah after court was done it goes to closed or dismissed or whatever the outcome is. So thats why it shows closed. So he has it for a year from the date it was closed. So he still has it
until October 1st

So basically he goes to domestics and arrests people for doing the same thing he does.

Hes able to have his gun while at work

Wow and the newton police department still allows him to go around

Yep.

It's caused a ton of issues. Our departments work together.

AUG 29, 2022 AT 5:33 PM

Thank you for that information. I wish my post was getting more publicity

AUG 29, 2    T 7:51 PM

Aa


AUG 29, 2022 AT 7:51 PM

Same. Thats why i figured i would message you. He just keeps getting away with acting like that. Im glad you spke out

AUG 29, 2022 AT 8:33 PM

I'm going to sue

Im glad you are apeaking up! I hope cheif is cooperative with you. This is not the first time winters has done this. I've thought for a long time he is violating peoples rights.

I doubt the chief will do anything. This guy has been complained about so many times. Plus he's still an officer after abusing you. They must have a good relationship

Winters hasn't been there long. Half the problem is you cant find police officers so its hard for departments to let them go. Last hiring they had 1 kid pass everything and hes already gone.

I will say and if you have a lawyer maybe ask him b⌄ ↓ ⌄ould not sign anything without ⌄ ↓ ⌄. lawyers ok. I don't trust them

Aa



      



**Tay Galanakis**
August 29, 2022 · 🌐

Got pulled over Saturday night for having my high beams on in town, which is understandable. Shortly after I got falsely ARRESTED. Nathan Winters of the Newton Police Department, IA decided to assume and guess I was drinking and driving based off of me having a hard time finding my insurance.I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum. So let's get started. Nathan Winters doesn't act very human like so it was hard to get my point across. After handing over my registration and all that fun stuff, Nathan decided to have me get out my car and go to his. Before this he already asked me if I've been drinking and I told him no. So I'm in his vehicle trying to have a normal conversation with this guy while he's going through my records and stuff like that and everytime he replied it sounded very scripted. He sounded like a little kid who was roll playing a cop during recess😂 I'm thinking in my head no way this guy pass training. Anyways shortly after I was talking to him he interrupts me and goes so how much have you had to drink tonight and I go "nothing I already told you that." Then he continued to harass me about how sure he was that I was drunk. Then I go you can blow me right now and it will say 0, then he made a sexual joke about what I said knowing I was talking about the breathalyzer. At this point I pull my phone and record a 10 second clip of me saying "officer winter is going to look real dumb for accusing me of being drunk once this is all said and done." So he brings me outside and I'm looking at his supervisor like dude is your boy a rookie at this 😂 you have to do something about his behavior. Officer wing (the supervisor) goes "he's just doing his job, he knows more about the test." Anyways he has me do all the field test even after I told him I have a bad ankle from football. Pass all the test except one because I took 3 extra steps to take the pressure off my right ankle so I could turn around easier. At this point it's pouring outside still. You guys are going to love this part. Nathan Winters told me to lift my head up and to close my eyes once he said to. So I'm looking up staring at the rain and then eventually I close my eyes when he starts the test. Once I open my eyes he goes "why are you eyes watering." I burst out in laughter and look at him and ask him if it's really that stupid. So I get to the point where I'm about to blow, I'm smiling having a grand time, confidence is at an all time high because I know I'm about to prove 2 corrupted cops wrong. As he prepares the breathalyzer I look at officer Wing and go "you ready for this." Then I turn back to Winters and go "how many false accusations you got under you belt" he goes 0. Then I reply with "congratulations this is about to be your first." As you can guess from the ease of my story telling I blow straight 0s. Then guess what this fool reverts to. "When's the last time you smoked marijuana" I go I don't smoke sir" then he goes so you hit a vape pen with weed in it" I'm like dude I just told you no. 🔲At this point he just wanted to find something because it hurt his ego that he was wrong about me being drunk. Being a cop shouldn't be an ego game but obviously that's how Nathan Winters treats his profession. Wait I'm not done yet. Nathan Winters asks me if I would like to do a drug evaluation, I told him no I don't need to, I don't wanna go waste 3 hours at the department for something I already know the truth about. I ask him how are you going to tell me that I'm drunk and that I smell like alcohol to telling me I'm on drugs once you get proven wrong. Shortly after I declined going to the police department he reads off my rights and states "you are under **arrest** for driving while impaired." At this point I'm thinking I'm being pranked, because there's no absolute way I just got arrested based off assumptions. I was respectful during the arrest, I'm looking at the super visor asking him are you serious right now there's no actual way you guys

   

driving at midnight am I right!?? I'm talking to winter's explaining to him you just can't arrest someone based on a guess. Then I ask this geek if I could use my inhaler (I got asthma and the humidity sets it off) he had my inhaler right on his desk because he removed it from my pocket upon arrest. He tells me NO. Yeah you read that right. So then I give him a lesson about the consequences he could receive if he doesn't let me use it, then he finally gives me it. Anyways the drug specialist comes in (very nice guy and understanding) goes through all the same field test with me inside where it's not pouring. Checks my pupils, checks my eye coordination. Takes me to a dark room and blue lights in my mouth under, under my nose, on my hands, on my clothes and concludes his investigation. He stated that I'm perfectly fine and he has 0 reason to think I'm on drugs. Boom 😽 if Nathan winters just acted human instead of acting like a scripted robot cop he'd understand the words coming from my mouth. I made the supervisor on duty come in and talk too. I told him he needs to do better. Wing is honestly speechless at the point and look like he just saw a ghost. I dismiss wing from what now is my office and tell him to bring in Nathan Winters. Nathan is absolutely stunned. Comes inside the room and says hey how is it going buddy like everything is fine 😂😂🙈. So I give this guy a lecture on how to do his job correctly, and make him apologize at the end of our conversation. His last words to me were "I'm sorry I guess" I just left it at that because I honestly feel like he's kinda slow in the head. That concludes my story I was set free after 3 hours wasted of my night. Wing and Winters performed horribly that night and that's just something the chief should not let slide. I'm not asking for winters to get fired, as he seems to be slightly mental and that would be just unfair to fire him based on something he can't help.

 1K

823 comments   535 shares

| Like | Comment | Share |

Most relevant 

 **Jaden Revell**
I had something similar happend but I parked on the curb to give him room to go up to my window asked me 3 times I'm like nope but yah headlight was out soo yah

Like   Reply   1y                     3

 **Andrea Brown-Yowell**
He did the same thing to me and I ended up being charged with an OWI and assault on a peace officer when I did neither, I ended up going to court with my lawyer and all the charges were dropped because when I did not do either and it showed it on the b... See more

Like   Reply   1y                     18

**Tay Galanakis**
Andrea Brown this guy definitely needs to be released

Like   Reply   1y        👍 9

 **Judith Miller Kehrle**
Say what???!!!! Bizarre.

Like   Reply   1y    2


      

Like   Reply   1y

 **Cameron Bookout**
**Jacob Christiansen**

Like   Reply   1y

 **Steve Armstrong**
If he's got domestic charges he's not allowed to carry a gun that's automatic jail time

Like   Reply   1y

>  **Tay Galanakis**
> **Steve Armstrong** his boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a women
>
> Like   Reply   1y

>  **Steve Armstrong**
> Yes his boss should get charges too
>
> Like   Reply   1y

>  View 2 more replies

 **Mic Kelso**
This is such bullshit! Uniformed officers are supposed to serve and protect not harass and accuse!!!

Like   Reply   1y

 **Tammi Regnier Schwickerath**
Newton PD is a joke! A cop who will remain nameless since proceedings are still happening, called my hubby and then asked him to come down to the station to make a formal statement. After getting his haircut, he stopped by. That cop read him his rights... **See more**

Like   Reply   1y

>  **Lonnie Appleby**
> **Tammi Regnier Schwickerath** did that to me too!
>
> Like   Reply   1y

 **Donnie Sutton**
Let me say we'll to the group of people that has been harassed and charged with things the NPD dream up to charge for their ego. But first off now let me warn you to watch out because now they won't leave you alone as others that have proven them wrong... **See more**

Like   Reply   1y

 **Alex Miller**
He also whipped a u turn multiple times in the middle of first Ave just to pull me over for my third brake light being out in the middle of the night.

Like   Reply   1y

        


**Karla Rae**
Lucky to be Alive!!!
Like  Reply  1y


**Matt O'Harra**
Thats cops now a days
Like  Reply  1y


**Tay Galanakis**
Officer Winters is not fit mentally for the job and physically 



Like  Reply  1y


**Tay Galanakis**
This is his face walking in my room finding out he was wrong
Like  Reply  1y


**Cindy Herwehe Rudkin-Anthony**
**Tay Galanakis** P.o.S. with a RECORD of his own & wants to treat Newton Citizens like Shit! He shouldn't even be a Cop with his RECORD on IOWA COURTS!!
Like  Reply  1y

 View 17 more replies


**Tammy Perry**
I know of 3 cases that proves my statement
Like  Reply  1y


**Craig Sherman**
I'm sharing this with everyone I know in Newton and on fb. This is absolutely disgusting. That "officer" is a pile of hot trash.
Like  Reply  1y


**Kelsea Quinn DeCook**
Small town cops have the most inflated, fragile egos 🥴🤪 truly detrimental to society 🙃
Like  Reply  1y

```
 1            UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
 2                 CENTRAL DIVISION

 3
     - - - - - - - - - - - - - - - - -
 4   TAYVIN GALANAKIS,              :
                                    :
 5        Plaintiff,               :
     vs.                           : Case No.
 6                                 : 4:23-cv-000044
                                   :
 7   CITY OF NEWTON, IOWA, ROB     :
     BURDESS, NATHAN WINTERS,      :
 8   CHRISTOPHER WING, individually:
     and in their official         :
 9   capacities with the Newton    :
     Police Department,            :
10                                 :
          Defendants.              :
11   - - - - - - - - - - - - - - - - -
     NATHAN WINTERS and            :
12   CHRISTOPHER WING,             :
                                   :
13        Counterclaim Plaintiffs,:
                                   :
14   vs.                          :
                                   :
15   TAYVIN GALANAKIS,             :
                                   :
16        Counterclaim Defendant. :
     - - - - - - - - - - - - - - - - -

17

18    VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19   taken by the Defendants/Counterclaim Plaintiffs

20   before Jessi C. Lass, Certified Shorthand Reporter

21   of the State of Iowa, at 6701 Westown Parkway, Suite

22   100, Des Moines, Iowa, commencing at 2:14 p.m.,

23   Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

Case 4:23-cv-00044-SHL-SBJ   Document 46-3   Filed 12/14/23   Page 72 of 101

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                                 Pages 2..5

Page 2

```
 1            A P P E A R A N C E S
 2  For the Plaintiff/Counterclaim Defendant:
 3      CHRISTOPHER C. STEWART, ESQ.
        GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
 4      2015 Grand Avenue, Suite 200
        Des Moines, Iowa 50312
 5
 6  For the Defendants/Counterclaim Plaintiffs:
 7      NICHOLAS F. MILLER, ESQ.
        BRICK GENTRY PC
 8      6701 Westown Parkway, Suite 100
        West Des Moines, Iowa 50266
 9
10  Videographer:
        AMY COOPER
11      FIDELITY VIDEO SERVICES, INC.
12  Also present:
        NATHAN WINTERS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        T A B L E   O F   C O N T E N T S
 2  WITNESS: TAYVIN GALANAKIS                      PAGE
 3  Examination By Mr. Miller ........................5
 4  Examination By Mr. Stewart ....................120
 5
 6  EXHIBITS                              PAGE FIRST
                                          REFERENCED
 7  1  - Body cam video (City ID 00630) ...........20
 8  2  - NAIA drug-testing policy manual ..........56
 9  3  - Video (City ID 00627) ....................65
10  4  - 8/29/22 Facebook post by Galanakis .......75
11  5  - Facebook comment string ..................87
12  6  - 11/1/22 Facebook post by Galanakis .......91
13  7  - GoFundMe page for Galanakis ..............96
14  8  - William Penn University "Drug Education ...114
          and Testing Program Policy"
15
    CERTIFICATE OF REPORTER......................123
16
17  Reporter's Note:  The original exhibits were
    forwarded to Mr. Miller.
18
    (ph) indicates a phonetic spelling.
19  [sic] indicates the text is as stated.
    Quoted text is as stated by the speaker.
20
21
22
23
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2       (Exhibit Numbers 1 through 8 were marked
 3  for identification.)
 4       THE VIDEOGRAPHER:  Today's date is
 5  November 10th, 2023, and the approximate time is
 6  2:14 p.m.  This begins the video deposition of
 7  Tayvin Galanakis requested by the defendants and
 8  counterclaim plaintiffs regarding Case
 9  Number 423-cv-00044 in the United States District
10  Court for the Southern District of Iowa, Central
11  Division.  This deposition is being held in the
12  offices of Brick Gentry, located at 6701 Westown
13  Parkway, Suite 100, in West Des Moines, Iowa.
14       My name is Amy Cooper, certified legal
15  videographer of Fidelity Video Services,
16  Incorporated, West Des Moines, Iowa.
17       Counsel will please identify themselves
18  for the record.
19       MR. STEWART:  Chris Stewart for the
20  plaintiff/counterclaim defendant.
21       MR. MILLER:  Nicholas Miller for the
22  defendants and the counterclaim plaintiffs.
23       THE VIDEOGRAPHER:  The oath will now be
24  administered by Jessi Lass, certified shorthand
25  reporter of Susan Frye Court Reporting, Des Moines,
```

Page 5

```
 1  Iowa.
 2            TAYVIN GALANAKIS,
 3  the Plaintiff, being first duly sworn by the
 4  certified shorthand reporter, testified under oath
 5  as follows:
 6                 EXAMINATION
 7  BY MR. MILLER:
 8    Q.   State your name.
 9    A.   My name is Tayvin Galanakis.
10    Q.   Can you spell your first and last name.
11    A.   First name, T-a-y-v-i-n, last name,
12  G-a-l-a-n-a-k-i-s.
13       MR. MILLER:  Thank you.
14    Q.   (Mr. Miller)  Where do you reside?
15    A.   I live in Newton, Iowa.
16    Q.   Are you employed?
17    A.   Yep.
18    Q.   Where?
19    A.   Self-employed, Amazon.
20    Q.   Are you employed by Amazon?  Or explain
21  that.
22    A.   I run a business for Amazon.
23    Q.   Explain that a little bit more.
24    A.   So I do wholesale.  It's my own business.
25  I don't have an LLC, but Dawn dish soap, wholesale
```

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023
Pages 66..69

Page 66

1    A.   Yeah, I can do --
2    Q.   Okay.
3    A.   -- I can do that for you.
4    Q.   I'm handing you my computer so you can do
5    that.  Press play.  And when you're satisfied that
6    you've seen that video before, you can just pause
7    it, and we'll continue.
8    A.   So you just want me to say if I've seen
9    the video before?
10   Q.   Yes.
11        (Mr. Winters left the deposition.)
12   A.   Yeah, I saw that.
13        MR. MILLER:  All right.  I'm taking my
14   computer back from Mr. Galanakis.
15   Q.   (Mr. Miller)  Who created that video?
16   A.   I did.
17   Q.   Did you post this video, which is
18   Galanakis Deposition Exhibit 3, to YouTube.com under
19   the title "Police wrongfully arrest 19-year-old
20   during traffic stop"?
21   A.   I believe so.
22   Q.   The public could view that posting;
23   correct?
24   A.   Yes.
25   Q.   All right.  I'm going to show you a paused

Page 67

1    portion of Galanakis Deposition Exhibit 3 at
2    38 minutes, 27 seconds.
3         It's 38 minutes, 28 seconds.
4         Okay.  I'm handing you my computer,
5    Mr. Galanakis, with that paused portion.  Do you see
6    that?
7    A.   Yes.
8    Q.   Do you see the yellow writing?
9    A.   Yes.
10   Q.   Is that your writing?
11   A.   That -- that is my writing, yes.
12   Q.   What does it say?
13   A.   Says "Nathan Winters of the Newton Police
14   Department convicted of domestic abuse after beating
15   up his ex-girlfriend."
16        MR. MILLER:  Okay.  I'm taking my computer
17   back.
18   Q.   (Mr. Miller)  Did you write that?
19   A.   I did write that.
20   Q.   Why?
21   A.   Well, I wrote that because he had some
22   history of abuse.
23   Q.   How do you know that?
24   A.   I talked to his ex-girlfriend.
25   Q.   Who's his ex-girlfriend?

Page 68

1    A.   I can't remember her name.  It was back
2    then.
3    Q.   You don't know who his ex-girlfriend is?
4    A.   Never met her.  Just talked to her about
5    the situation.
6    Q.   If you've never met her, then how did you
7    talk to her?
8    A.   Well, that video went viral, and she found
9    my accounts and messaged me, and we talked.
10   Q.   Okay.  What'd she tell you?
11   A.   I can't remember what she -- exactly what
12   she told me.  So I'm not going to state it.
13   Q.   At the time you posted Galanakis
14   Deposition Exhibit 3 to YouTube.com, did you know
15   whether Officer Winters had been convicted of a
16   crime?
17   A.   Well, there was this thing on Iowa Courts,
18   and it said "relief of abuse," I think it said, and
19   when I made that statement of him being convicted,
20   that's what I thought it was.  I thought it was a
21   conviction of abuse, but it was really just a relief
22   of a restraining order.
23   Q.   So at the time you posted Galanakis
24   Deposition Exhibit 3 to YouTube.com, did you or did
25   you not know whether Officer Winters was convicted

Page 69

1    of a crime?
2    A.   At the time I was -- I fully was aware
3    that I -- that he was convicted of domestic abuse,
4    but that turned out to not be the case, and it was
5    something way more simpler than a conviction.
6    Q.   You said you did some research on Iowa
7    Courts Online?
8    A.   (Nods head.)
9         MR. STEWART:  Is that a yes?
10        THE WITNESS:  Yes.  Sorry.  I apologize,
11   guys.
12        MR. MILLER:  That's okay.  I forget
13   sometimes too.  So I appreciate it.
14   Q.   (Mr. Miller)  What did you find on Iowa
15   Courts Online that led you to believe Officer
16   Winters was convicted of a crime?
17   A.   Well, when you search his name up on
18   there, what made me believe that he was -- he did
19   some sort of abuse was the relief.  It said -- I
20   don't know exactly what it said, but it said "relief
21   of abuse" and some lines like that.
22   Q.   Did you read the whole thing?
23   A.   I can't remember if I did, but you have to
24   pay for extra information.  So the full thing wasn't
25   accessible unless you pay for it.

Case 4:23-cv-00044-SHL-SBJ   Document 46-3   Filed 12/14/23   Page 74 of 101

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                   Pages 70..73

Page 70

1      Q.   So you didn't read the entire document
2  that you were basing your statement to the public,
3  "Officer Winters was convicted of domestic abuse";
4  is that right?
5      A.   No.  Because I was basing it off my
6  assumptions off the ex-girlfriend that came and told
7  me what happened.
8      Q.   Did she say he was convicted of a crime?
9      A.   She did not say that.
10     Q.   Why did you say that?
11     A.   Well, I thought if you were to beat up
12 your ex-girlfriend, that would be considered
13 domestic abuse.  And, like I said, it was much
14 simpler than conviction, and I was wrong about
15 conviction, but there is a history of abuse there.
16     Q.   How do you know?
17     A.   The ex-girlfriend.
18     Q.   You're just -- it was purely based on her
19 statements to you?
20     A.   Well, and that Iowa Courts Online, that
21 thing that said "relief of abuse."
22     Q.   Well, the document that you reviewed on
23 Iowa Courts Online, you said you didn't review the
24 whole thing; right?
25     A.   Just connected the dots.

Page 71

1      Q.   Did you review the whole thing or not?
2      A.   I didn't pay for the whole thing.
3      Q.   So you didn't review the whole thing?
4      A.   No.
5      Q.   So when -- in Galanakis Deposition
6  Exhibit 4, which you posted to YouTube.com, when you
7  said Officer Winters was convicted of domestic
8  abuse, you were basing that on what someone, who you
9  don't know, told you online and based on an
10 incomplete document that you found on Iowa Courts
11 Online.  Am I understanding that correctly?
12     A.   Yes.
13     Q.   I'm going to show you another paused
14 portion of Galanakis Deposition Exhibit 3, which is
15 that video you posted to YouTube.com.  It's at
16 38 minutes and 31 seconds.
17          All right, Mr. Galanakis.  I'm handing you
18 my computer so you can review that paused portion of
19 Galanakis Deposition Exhibit 3.  Is there yellow
20 writing on that?
21     A.   Yes.
22     Q.   Is that your writing?
23     A.   Yes, that's my writing.
24     Q.   What's it say?
25     A.   It said, "Even after Nathan beat" -- you

Page 72

1  want me to read all of it on the screen?
2      Q.   Yes.
3      A.   -- "the chief of police allowed Nathan
4  Winters to stay on the force even after Nathan beat
5  the shit out of his" -- can I see the rest real
6  quick?
7      Q.   Yep.
8      A.   -- "girlfriend."
9          MR. MILLER:  Taking my computer back from
10 Mr. Galanakis.
11     Q.   (Mr. Miller)  Why'd you write that?
12     A.   I wrote that because of what the
13 ex-girlfriend told me.
14     Q.   Did you know whether the statement that
15 "Nathan beat the shit out his ex -- out his
16 girlfriend" was in any way true?
17     A.   Yes.
18     Q.   How?
19     A.   Just by connecting the online court case
20 that says something about abuse and what the girl
21 told me, I feel like there's some connection there.
22     Q.   Is it based on anything else?
23     A.   No.  I wouldn't just write that to make it
24 up.  That'd be nonsense.
25     Q.   So you wrote that statement based on what

Page 73

1  some person, who you can't remember their name, told
2  you?
3      A.   And the online court case.
4      Q.   By the online court case, are you -- what
5  are you referring to?
6      A.   I don't know the exact website address.  I
7  would have to pull it up on my phone.
8      Q.   Well, what was the document?
9      A.   The document?  It was a PD -- I think it
10 was a PDF or something like that.
11     Q.   Was there a title on the document?
12     A.   I can't remember the title.
13     Q.   What'd it say that led you to believe your
14 statement was true?
15     A.   I believed it said "relief of abuse."
16     Q.   Did you read anything in there about there
17 being no finding of wrongdoing or no finding of
18 fault by Officer Winters?
19     A.   No, I never saw that.
20     Q.   Okay.  But, again, you didn't review the
21 whole document; right?
22     A.   No.
23     Q.   Did you think it was a good idea to make
24 those statements when you hadn't reviewed all the
25 information?

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023
Pages 74..77

Page 74

1     A.   I don't know.  Because the truth is out
2  there, and we'll find the truth out, and time will
3  tell if it's -- if it was accurate of me to do that
4  or not.
5     Q.   "Time will tell."  So at the time you made
6  the statements, you weren't 100 percent certain
7  whether they were true or not, were you?
8     A.   Well, based on how the interaction between
9  us and the ex-girlfriend and the Iowa Courts Online,
10  I just -- it had to be -- it had to be true,
11  honestly.
12     Q.   Well, if it had to be true --
13     A.   Not the conviction.  Sorry.
14     Q.   But it wasn't true.
15     A.   Sorry.  The conviction part wasn't true,
16  but there is abuse in there.
17     Q.   When you made these statements, you didn't
18  know whether Officer Winters was convicted of a
19  crime, did you?
20     A.   I assumed that the "relief abuse" meant
21  conviction.
22     Q.   Why would you assume that?
23     A.   I don't have a really good understanding
24  of law.  So that's why I assumed that.
25     Q.   Wouldn't you want to have a good

Page 75

1  understanding of the law before you accuse somebody
2  of committing a crime -- or having been convicted of
3  a crime?
4     A.   Yeah, yeah.
5     Q.   Do you have a Facebook account?
6     A.   Yep.
7     Q.   What's the user name under which you post
8  content to Facebook?
9     A.   Tay G. -- Tay Galanakis.  Yeah, Tay
10  Galanakis.
11     Q.   Spell that.
12     A.   T-a-y and then G-a-l-a-n-a-k-i-s.
13     Q.   Have you posted content on Facebook about
14  your interactions with Newton police on August 28th,
15  2022?
16     A.   Yep.
17          MR. MILLER:  Can we re-mark this as
18  Exhibit 4.
19          I'm showing what's been marked as
20  Galanakis Deposition Exhibit 4 to counsel for
21  Mr. Galanakis.
22     Q.   (Mr. Miller)  All right, Mr. Galanakis.
23  Your counsel has just handed you what's been marked
24  as Galanakis Deposition Exhibit 4.  Do you know what
25  that is?

Page 76

1     A.   This is the initial post I posted about
2  the case.
3     Q.   How do you know that's what it is?
4     A.   I first came to Facebook to talk about it
5  before I had the footage.
6     Q.   On the fourth line down in --
7     A.   This is going to be hard.
8     Q.   -- Galanakis Deposition Exhibit 4, which
9  is your Facebook post that we're talking about, it
10  says, quote, "I don't even like to refer to him as
11  Officer Winters.  This guy is on the slow side of
12  the spectrum."  End quote.  Did I read that right?
13     A.   Yep.
14     Q.   Why'd you post that?
15     A.   I just feel like he's kind of -- he's
16  slow.  I feel like he's slow.
17     Q.   Was this a public post?
18     A.   Yes.
19     Q.   What do you mean by "This guy is on the
20  slow side of the spectrum"?
21     A.   He's just not all there.  And there's
22  nothing against people that are not all there.  They
23  just shouldn't be in that profession, holding a gun.
24     Q.   What do you mean, "he's not all there"?
25     A.   I mean, if you just interact with him when

Page 77

1  he's doing his job, like I did, you can kind of just
2  tell.
3     Q.   What can you tell?
4     A.   Well, there's many reasons.  I mean, I
5  could go on and on, but I could start with this one
6  right here.
7     Q.   Go ahead.
8     A.   Well, he asked me why I was shaking so
9  much, and I said, "Hey, man, I'm nervous."
10          And then he told me that there's no reason
11  to be nervous.  He didn't exactly say that, but he
12  told me he wears shorts when it's 30 below and that
13  he could handle the cold.  And that's the way he
14  said it.  So hearing that from a police officer is
15  just breathtaking to me --
16     Q.   So that comment from Officer Winters leads
17  you to believe that he's, in your words, slow and
18  not all there?
19     A.   Along with what -- a lot of other things
20  he said.  I can tell you another one.
21     Q.   What?
22     A.   He said he got a lot of concussions from
23  playing football.  And usually what happens when you
24  get a lot of concussions, it can -- it triggers
25  polyps in your brain.

Page 82

1    reporter.)
2        A.    How do I measure?  I don't know.
3        Q.    (Mr. Miller)  How do you know whether
4    Officer Winters is, quote, "on the slow side of the
5    spectrum"?
6        A.    I mean, it's just a figure of speech.  It
7    wasn't really that deep.  It wasn't like I had --
8    wasn't giving a blood test or anything.
9        Q.    Were you trying to insult him?
10       A.    Yes.  That was an insult, yes.
11       Q.    On August 29th, 2022, you also made a
12   public post on Facebook that, quote, "Officer
13   Winters is not fit mentally for the job and
14   physically," end quote; correct?
15       A.    Correct.
16       Q.    Why'd you make that statement?
17       A.    Viewing his body was for the physical
18   aspect.  And then just off what he was saying to me
19   for the mental aspect.
20       Q.    Are you familiar with any of Officer
21   Winters' physical testing for the Newton Police
22   Department?
23       A.    No.
24       Q.    Then why would you criticize his physical
25   fitness?

Page 83

1        A.    Just a figure of speech.
2        Q.    So you actually don't know whether he's
3    physically fit for being a Newton Police Department
4    officer?
5        A.    Not as his boss would know.
6        Q.    Do you?
7        A.    I would say no.
8        Q.    Then why would you say that?
9        A.    Why would I say no?
10       Q.    Why would you say that he's not physically
11   fit for his job if you don't know?
12       A.    I mean, his body -- he's absolutely
13   like -- I mean, his buttons were gasping for air.
14   You see how these are relaxed right here?  His were,
15   like, looking like they were about to break.
16            So when I'm looking at that, I'm like,
17   this guy is definitely not physically fit to be a
18   police officer, because what if someone was taking
19   off on foot?
20       Q.    So you looked at Officer Winters' side,
21   judged it, and made the conclusion that he's not
22   physically fit for his job?
23       A.    100 percent.
24       Q.    Why'd you make the statement that Winters
25   is not fit mentally for the job?

Page 84

1        A.    I'm a very observant person.  So after
2    everything he said, I was kind of taking it all in,
3    and I came to conclusion that if I was his boss, I
4    would say he's not mentally fit for this job.
5        Q.    Why?
6        A.    Well, first and foremost, if I had an
7    employee who asked somebody why are they shaking so
8    much and to argue back and say, "Well, I wear shorts
9    when it's 30 below," I would right then and there
10   not hire the guy, because he just said a statement
11   like that.
12       Q.    Is there any other reason why you think
13   he's not mentally fit?
14       A.    The concussions could play a part.  It
15   depends whether he was being truthful or not about
16   how much concussions he had.  He didn't tell me an
17   exact number, but he said many concussions.  And
18   that would definitely -- that could play a part in
19   someone's mental health, concussions, really.
20       Q.    But do you know whether it did or not for
21   him?
22       A.    No.
23       Q.    So what else is your statement that he's
24   not mentally fit for the job based on?
25       A.    I think he's not mentally fit at all.

Page 85

1        Q.    Why?
2        A.    He seems like -- like, if someone wanted
3    to be a cop their whole life and they couldn't get
4    the job and the police department felt like -- they
5    felt bad and just hired him instead of actually
6    hiring based off how good is he, how good is he in
7    the field, is this guy -- is he trustworthy, is he
8    going to be fair to our citizens.
9        Q.    Is there anything else that your statement
10   that Officer Winters is not mentally fit for the job
11   based on?
12       A.    There's many things I could say, but I
13   don't remember --
14       Q.    Go ahead.
15       A.    -- them all.  We'd have to watch some of
16   that video back together, and I could point out a
17   lot of moments where I don't think he's mentally fit
18   for the job.
19       Q.    Like what?
20       A.    We'll have to watch the video.
21       Q.    You don't remember?
22       A.    No.
23       Q.    Do you know if Officer Winters did any
24   mental health evaluations or any cognitive testing
25   to get his job?

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Pages 122..123

Page 122

1    A.   Yes.

2         Q.   (Mr. Stewart)  Were you upset with the

3    defendants' actions in their transportation of you

4    and the interactions you had at the police station?

5              MR. MILLER:  Object to the form of the

6    question.

7    A.   Yes.

8         Q.   (Mr. Stewart)  Did you believe the conduct

9    of the defendants at both the scene and at the

10   station were improper or unlawful?

11             MR. MILLER:  Object to the form of the

12   question.

13   A.   Yes.

14             MR. MILLER:  These are all leading

15   questions.

16             Go ahead.

17   A.   Yes.

18             MR. STEWART:  Nothing further from me.

19             MR. MILLER:  I have nothing.

20             THE VIDEOGRAPHER:  Off the record, ending

21   the deposition at 5:17 p.m.

22

23

24

25

Page 123

1              C E R T I F I C A T E

2         I, the undersigned, a Certified Shorthand

3    Reporter of the State of Iowa, do hereby certify

4    that there came before me at the time, date, and

5    place hereinbefore indicated, the witness named on

6    the caption sheet hereof, who was by me duly sworn

7    to testify to the truth of said witness's knowledge,

8    that the witness was thereupon examined under oath,

9    the examination taken down by me in shorthand and

10   later reduced to a transcript through the use of a

11   computer-aided transcript device under my

12   supervision and direction, and that the deposition

13   is a true record of the testimony given and of all

14   objections interposed.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by any of

17   the parties to the action in which this deposition

18   is taken, and further that I am not a relative or

19   employee of any attorney or counsel employed by the

20   parties hereto or financially interested in the

21   action.

22        Dated this 19th day of November 2023.

23

24   _____

25        CERTIFIED SHORTHAND REPORTER

     Jessi C. Lass, Iowa CSR #1336

**1**

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF IOWA
 2                       CENTRAL DIVISION

 3   TAYVIN GALANAKIS,        )CASE NO.: 4:23-cv-00044

 4     Plaintiff/Counterclaim )
       Defendant,             )DEPOSITION OF
 5                            )NATHAN WINTERS
     vs.                      )(CONFIDENTIAL)
 6                            )
     CITY OF NEWTON, IOWA,    )
 7   et al.,                  )
                              )
 8     Defendants/Counterclaim)
       Plaintiffs.            )
 9   _____)

10        THE DEPOSITION OF NATHAN WINTERS, taken

11   before Emma L. Rosky, Certified Shorthand

12   Reporter and Registered Professional Reporter for

13   the State of Iowa, commencing at 1:17 p.m.,

14   October 27, 2023, at 2015 Grand Avenue,

15   Suite 200, Des Moines, Iowa.

16

17

18

19

20

21

22

23

24

25
```

**2**

CONFIDENTIAL

```
 1                  A P P E A R A N C E S

 2   Plaintiff/Counterclaim
     Defendants by:    MATTHEW BOLES
 3                     Attorney at Law
                       Gribble, Boles, Stewart &
 4                     Witosky Law
                       2015 Grand Avenue
 5                     Suite 200
                       Des Moines, IA 50312

 6

 7   Defendants/Counterclaim
     Plaintiffs by:    NICHOLAS F. MILLER
 8                     Attorney at Law
                       Brick Gentry, P.C.
 9                     6701 Westown Parkway
                       Suite 100
10                     West Des Moines, IA 50266

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**3**

CONFIDENTIAL

```
 1                  INDEX OF EXAMINATION

 2   Examination by          Page

 3   Mr. Boles               4

 4   Mr. Miller              39

 5

 6               PREVIOUSLY MARKED
                     EXHIBITS
 7   Exhibit
     Name       Description                   Page
 8   Exhibit 1  Internal Investigation        16

 9   Exhibit 4  Petition for Relief from
10              Domestic Abuse                25

11

12

13

14

15

16          INDEX OF ATTORNEY REQUESTS

17   Request by          Page     Line

18   Mr. Boles           32       8

19

20

21

22

23

24

25
```

**4**

CONFIDENTIAL

```
 1                  NATHAN WINTERS,

 2   called as a witness, having been first duly

 3   sworn, testified as follows:

 4                  DIRECT EXAMINATION

 5   BY MR. BOLES:

 6        Q.   Can you state your name for the record,

 7   please.

 8        A.   Officer Nathan Winters, W-i-n-t-e-r-s.

 9        Q.   Okay.  And how are you employed?

10        A.   Police officer with the City of Newton.

11        Q.   And how long have you been employed in that

12   capacity?

13        A.   Just under five years.

14        Q.   Okay.  And where were you employed before

15   that?

16        A.   Hy-Vee Corporate as a officer.

17        Q.   Okay.  And did you have some prior law

18   enforcement experience?

19        A.   No.

20        Q.   Okay.  Were you ever involved with the

21   Urbandale Police Department?

22        A.   No.

23        Q.   Okay.  What's your education background?

24        A.   I have an associate's degree in criminal

25   justice from Indian Hills.
```

1  that you are conscious of when a minority is

2  being stopped that they're not in fear that

3  they're going to get shot?

4  MR. MILLER: Objection, form and

5  foundation.

6  Q. Do you have any training on that?

7  A. No.

8  Q. Okay. So what other signs was Mr. Galanakis

9  demonstrating that were signs of intoxication

10  besides his slow movement?

11  A. I also -- when I was speaking with him, I

12  noticed that he spoke with slurred speech as

13  well.

14  Q. Okay. What part do you think was slurred

15  when you were making that observation?

16  A. When he was speaking, some of his S's were

17  slurred. He was having a hard time saying words.

18  Some of his wording was mumbled.

19  Q. Okay. So you think that it's his S's that

20  were slurred?

21  A. Yes.

22  Q. Okay. What else?

23  A. He would -- like I said, some of his wording

24  was mumbled as well. Thick tongue.

25  Q. Okay. And based upon that -- or is there

1  other things that you observed?

2  A. And before the traffic stop, having his high

3  beams in town -- failing to dim his headlights

4  while he was approaching me.

5  Q. He explained to you why he did it, because

6  one of his lights was out; correct?

7  A. Yes.

8  Q. And you told him it was illegal for him to

9  have his high beams on?

10  A. I advised him that it was illegal for him to

11  not dim his headlights.

12  Q. Okay. What part of the Iowa Code are you

13  referring to on that?

14  A. Iowa Code Section 321.415.

15  Q. And based upon that, you believe that was a

16  basis for field testing for alcohol?

17  A. Yes.

18  Q. What tests were performed?

19  A. I started with the horizontal gaze and

20  nystagmus test, and then I performed that test,

21  and then I performed the walk-and-turn test, then

22  I performed the one-leg stand test, then I

23  offered the preliminary breath test, and then I

24  offered three advanced roadside impaired driving

25  enforcement tests.

1  Q. Okay. Did Mr. Galanakis tell you that he

2  had a bad ankle?

3  A. Yes.

4  Q. Did he also inform you that he had not drank

5  anything?

6  A. Yes.

7  Q. You told him to take his gum out and leave

8  it on the dash; is that correct?

9  A. Yes.

10  Q. He was following all of your commands?

11  A. Yes.

12  Q. You didn't make any observation that he had

13  bloodshot eyes or glassy eyes, did you?

14  A. I stated that he had watery and bloodshot

15  eyes, yes.

16  Q. Okay. Did you believe that you were having

17  a coherent conversation with him?

18  A. Was Mr. Galanakis coherent?

19  Q. Yeah.

20  A. Yes.

21  Q. And would you agree that when you offered

22  the PBT, he blew zeros?

23  A. Yes.

24  Q. Okay. And you performed this test in the

25  rain, didn't you?

1  A. It was sprinkling that night I believe, yes.

2  Q. On the video -- the entire length of the

3  video, it's raining in it. Would you agree with

4  that?

5  A. It was wet out, yes. I don't remember

6  exactly if it was raining.

7  Q. Do you believe that the interfering

8  condition of rain has an impact on the subject's

9  performance?

10  MR. MILLER: Objection, form and

11  foundation.

12  A. Small. Minor.

13  Q. Okay. Tell me about it.

14  A. It can be slick. It can be -- on gravel it

15  can be all sorts of stuff if it's wet. A person

16  can obviously slip on their footing.

17  Q. Okay. What about when the rain is hitting

18  someone's eyes?

19  A. Yeah, it can get in -- the water can get in

20  their eyes, yes.

21  Q. And people, when they're standing and

22  listening to you and it's hitting them, they're

23  reacting to it; right? We all react to rain.

24  A. Yeah.

25  Q. Okay. After you ran him through all of

17

CONFIDENTIAL

1    A.   Yes.

2    Q.  What are the signs and use of marijuana?

3    A.   Slow and lethargic response, watery and

4    bloodshot eyes, slurred speech, impaired balance,

5    impaired physio -- other items.

6    Q.  Other items, you said?

7    A.   Yes.

8    Q.  Like what?

9    A.   Like cognitive -- like, being able to do

10    more than one thing at one time, getting the

11    proper paperwork, all that other -- all the stuff

12    that I had requested many times.

13    Q.  Is it your testimony that Mr. Galanakis was

14    having cognitive function impairment at some

15    point?

16    A.  I would believe during my interaction with

17    him after having to ask him for his insurance

18    three to four times and him not being able to

19    provide it and fumbling through his registration,

20    that that was something going on.

21    Q.  Okay.  So after that for the 14 minutes that

22    the traffic stop lasted, are you telling me that

23    it's your belief that he had cognitive function

24    impairment?

25    A.  After that incident, no.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

18

CONFIDENTIAL

1    Q.  Okay.  Marijuana that's raw, does it smell

2    different than burnt marijuana?

3    A.  Marijuana, to me, smells like marijuana.  I

4    don't know what burned marijuana or raw marijuana

5    is -- the differences between them.

6    Q.  You've graduated from the Iowa Law

7    Enforcement Academy; correct?

8    A.  Yes.

9    Q.  As part of their training, don't they burn

10    marijuana so you can smell the difference between

11    marijuana as a product and then as a consumer

12    good of smoke and what it smells like?

13    A.  No.

14    Q.  You never did that?

15    A.  No.

16    Q.  Marijuana; does it smell like alcohol?

17    A.  No.

18    Q.  Okay.  Does a clean PBT provide cause to

19    accuse somebody of using marijuana?

20    A.  A PBT estimates if and how much alcohol is

21    on a person's breath.  It is not co-admissible.

22    Q.  I understand.  My question is:  If they blow

23    .000, does that somehow provide you cause to then

24    accuse that person of using marijuana?

25    A.  Off of the standardized field sobriety tests

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

19

CONFIDENTIAL

1    that I had, I believe that I had probable cause,

2    yes.

3    Q.  Okay.  So what about the field sobriety

4    tests made you believe that he was under the

5    influence of marijuana?

6    A.  His walk-and-turn, his one-leg stand, and

7    his other indicators during the ARIDE tests.

8    Q.  Okay.  You received a written counseling

9    report for discipline out of the Galanakis

10    interaction.  I believe that was August 28th of

11    2022; correct?

12    A.  I believe that's when the traffic stop

13    happened was the 28th.

14    Q.  Correct.  It did.

15    A.  I received the letter a week or so later.

16    Q.  Okay.  Did you receive anything regarding

17    your field testing or OWI detection and the

18    manner in which you conducted it that night?

19    A.  Not the testing, no.  Just with speaking to

20    people more -- being more nice to people.

21    Q.  You also had a situation on August 3rd of

22    2022.  You had a one-day suspension due to a

23    motor vehicle accident; correct?

24    A.  Yes.

25    Q.  And then you had a discipline letter for

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

20

CONFIDENTIAL

1    failure to secure a vehicle where $600 was

2    missing, and that was April 6th of 2022?

3    A.  Yes.

4    Q.  Do you have any supervisory relationship

5    over Officer Shinkle?

6    A.  I am -- if there's -- if it's he and I

7    working and there's no supervisor, I'm considered

8    the officer in charge.

9    Q.  Right.  And I got some explanation as the

10    officer in charge as being the highest ranking

11    officer that's on duty at the time.  Is that your

12    understanding?

13    A.  Yes.

14    Q.  What authority do you have in that role when

15    you're the officer in charge?

16    A.  Just making sure that policy's being

17    followed appropriately, and if, like, dispatch

18    has a question, they would contact me, or if

19    somebody wants to speak to a supervisor, I would

20    take that complaint and then speak -- and then

21    send that information into the sergeants and

22    lieutenants.

23    Q.  Okay.  How often are you the officer in

24    charge?

25    A.  Frequently.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

1    Q.   Frequently.  Once a week?

2    A.   Yeah, usually.

3    Q.   You've been involved in prior litigation;

4    correct?

5    A.   Have I?  No.

6    Q.   Okay.  Answer to Interrogatory No. 13 says

7    you agree that the Iowa Courts Online system is

8    accurate.

9    A.   Yes.

10   Q.   Okay.  You have a protective order for

11   domestic abuse --

12   A.   Yes.

13   Q.   -- from the summer of 2021; is that correct?

14   A.   Yes.

15   Q.   You were involved in a relationship with

16   Courtney VanDerHart between October 2019 and

17   August 5th of 2021?

18   A.   Yes.

19   Q.   Did you elbow Courtney VanDerHart in the

20   chest hard enough to bruise her while she was in

21   your patrol car?

22        MR. MILLER:  Object to the form and

23   foundation, and I'm also going to object based on

24   his Fifth Amendment privilege.

25   Q.   Did you tackle Courtney VanDerHart from

1    behind at one point during that relationship?

2        MR. MILLER:  I'm going to object to the

3    form and foundation and ask to invoke the

4    witness' Fifth Amendment privilege -- Fifth

5    Amendment to the United States Constitution.

6    Q.   You're currently not being prosecuted for a

7    criminal act, are you?

8    A.   No.

9    Q.   And no charge has been filed?

10   A.   No.

11   Q.   And what's the statute of limitations on a

12   simple domestic assault?

13        MR. MILLER:  Object to the form and

14   foundation.

15   A.   I believe it's two years.

16   Q.   So for the record, what is your liberty

17   interest that you're protecting by asserting your

18   fifth amendment right?

19        MR. MILLER:  Object to the form and

20   foundation.

21   Q.   You can answer.

22   A.   I don't understand your question.

23   Q.   In order to assert your Fifth Amendment

24   right, you have to be facing a liberty interest.

25   That's what you're protecting.  You're saying:

1    I'm not answering and pleading the Fifth because

2    I have potential criminal exposure.  Based upon

3    my review, you have no criminal exposure, so I do

4    not believe that the Fifth Amendment assertion is

5    available to you because you face no criminal

6    jeopardy.

7        Now I'm asking you:  What is it that you

8    believe is still out there that would cause you

9    to be able to assert your Fifth Amendment?

10        MR. MILLER:  Objection, form and

11   foundation.  That is not a proper question.

12   That's a legal argument.

13        Do you understand the question?

14        THE WITNESS:  I don't understand what

15   he's asking me, no.

16   Q.   You're not currently being charged with a

17   domestic and no one has pursued a criminal charge

18   of domestic assault against you.  I believe the

19   statute has run, so it's time-barred.  So my

20   statement is:  Where is your Fifth Amendment

21   privilege?

22        MR. MILLER:  Again, same objection;

23   form, foundation.  He's making a legal argument.

24   Q.   Did you grab Courtney VanDerHart by the

25   wrist in a violent manner during the course of

1    that relationship?

2        MR. MILLER:  Objection, form,

3    foundation, and Fifth Amendment privilege.

4        MR. BOLES:  You actually have to assert

5    your Fifth Amendment right.  Your lawyer doesn't

6    get to do it.

7        THE WITNESS:  Then I would assert my

8    Fifth Amendment right.

9        MR. MILLER:  Can we go off the record?

10        (An off-the-record discussion was

11   held.)

12   BY MR. BOLES:

13   Q.   We've had some conversation off the record

14   regarding your assertion of your Fifth Amendment

15   right.  I've asked you a series of what I believe

16   is four questions now regarding the allegations

17   of domestic abuse, and I just want to make sure

18   the record is clear that you are asserting your

19   Fifth Amendment right as it relates to all four

20   of the allegations that I've just asked; is that

21   correct?

22   A.   Yes.

23   Q.   Did you show up at the home of a friend of

24   Courtney VanDerHart's and threaten to tow her

25   car?

25

CONFIDENTIAL

1    A.  It was illegally parked so I advised her
2    that she needed to move her car or it could
3    potentially be towed.
4    Q.  Okay.  Would you park your police vehicle
5    and watch her house while you were on duty?
6    A.  She requested me to do so when they were
7    traveling -- to patrol her sister's house as they
8    did not live in a very good area.
9    Q.  Okay.  Would you show up to her house in
10   uniform and yell at her in her front yard?
11   A.  No.
12   Q.  Did you ever threaten to shoot her if she
13   cheated on you?
14   A.  No.
15   Q.  Did you ever pin her down on your bed by her
16   wrists and tell her she would leave -- she could
17   leave when you told her she could leave?
18       MR. MILLER:  Object to the form and
19   foundation, and I would also advise the witness
20   to assert his Fifth Amendment privilege.
21   A.  I'd invoke my Fifth Amendment privilege.
22   Q.  All right.  You stipulated to a no-contact
23   order; correct?
24   A.  Yes.
25   Q.  I'm going to hand you what's marked as

26

CONFIDENTIAL

1    Plaintiff's Exhibit 4.  You've seen that before.
2    That was served upon you; correct?
3    A.  Yes.
4    Q.  And you've read through that?
5    A.  Yes.
6    Q.  And were you represented by legal counsel
7    when you were engaged in this no-contact order?
8    A.  Yes.
9    Q.  Who was your legal counsel?
10   A.  My attorney was Ryan Ellis out of Indianola.
11   Q.  Okay.  And if -- you can go ahead and thumb
12   through that so you can see what's all in that
13   attachment.
14   A.  Okay.
15   Q.  That material that I've provided you in
16   Exhibit 4 was the same packet of material that
17   you were given prior to court and then also was
18   discussed at court with -- relating to the
19   no-contact order; correct?
20       MR. MILLER:  Object to the form and
21   foundation.
22   A.  Yes.
23   Q.  All right.  And you stipulated to the
24   no-contact order?
25   A.  Yes.

27

CONFIDENTIAL

1    Q.  And you have extended that twice now?
2    A.  I have not, no.
3    Q.  Well, you've stipulated to it that it's been
4    extended?
5    A.  I've agreed to it, yes.
6    Q.  Okay.  Can you hand me back Exhibit 4?  She
7    provided a written statement in here as to what
8    it is that she is alleging occurred.  She was
9    alleging that you went to her apartment while you
10   were in uniform and stood in her doorway and said
11   that she could leave when you said it was time to
12   leave or that you would allow her to leave;
13   right?
14       MR. MILLER:  Object to the form and
15   foundation, and I would also advise the witness
16   to assert his Fifth Amendment privilege.
17   A.  I'll invoke my Fifth Amendment.
18   Q.  Okay.  Page 723, City Request for
19   Production, page 3 of 7 of the petition for
20   relief from domestic abuse, top of the page,
21   paragraph B, "Describe any other injuries or
22   threats you have received from Defendant.  Please
23   include how you were injured or threatened and
24   where it happened and when you were injured or
25   threatened."  Her written response is, "We have a

28

CONFIDENTIAL

1    year and a half long history of threats and
2    physical abuse.  Last summer while sitting in his
3    patrol car, he elbowed me out of his patrol car
4    while on duty.  It sent me back into my car and a
5    bruise was left on my breast/chest area.  He has
6    multiple times stood in doorways blocking me so I
7    could not leave."  You read that as well;
8    correct?
9        MR. MILLER:  I'm going to object to the
10   form and foundation of the question and advise
11   the witness not to comment under the Fifth
12   Amendment privilege.
13   A.  I'll invoke my Fifth Amendment.
14   Q.  City Request for Production 725, page --
15   what would be, essentially, page 5, I believe, of
16   the petition for relief from domestic abuse, top
17   of that page, "He said he was going to, quote,
18   throw him through a fucking window, end of quote.
19   He has made numerous threats to harm himself if I
20   left.  I have a lot of suicidal messages on my
21   phone."  You read that before the hearing;
22   correct?
23       MR. MILLER:  I'm going to object to the
24   form and foundation and advise the witness to
25   assert his Fifth Amendment privilege.

1     A.   I'll invoke my Fifth Amendment.

2     Q.   Okay.  Second paragraph, "He told me he

3  didn't want to live and was intoxicated saying he

4  was going to, quote, go for a drive, end of

5  quote, talking nonsense."  You read that;

6  correct?

7          MR. MILLER:  Object to the form and

8  foundation of the question and advise the witness

9  to assert his Fifth Amendment privilege.

10    A.   I'll invoke my Fifth Amendment.

11    Q.   You also in paragraph 2 of that page said --

12  she said, "I'm scared what he will do if he

13  thinks I'm the one to cause all of this.  He has

14  threatened to harm himself if he ever got fired

15  saying he would, quote, rather be dead, end of

16  quote."  You read all of that on that date;

17  correct?

18          MR. MILLER:  Object to the form and

19  foundation and advise the witness to assert his

20  Fifth Amendment privilege.

21    A.   I'll invoke my Fifth Amendment.

22    Q.   Further in that paragraph, "I don't know

23  what he would do.  Him making threats have scared

24  me into not saying anything.  I feel like the

25  arguments are escalating and him blocked me away

1  from my kids scared me because now it's involving

2  them."  You read that as well?

3          MR. MILLER:  Objection, form and

4  foundation, and advise the witness to assert his

5  Fifth Amendment privilege.

6     A.   I'll invoke my Fifth Amendment.

7     Q.   All right.  Why did you stipulate to this?

8          MR. MILLER:  Objection to the form and

9  foundation -- asking the witness -- I would also

10  advise the witness to assert the attorney-client

11  privilege and his Fifth Amendment privilege.

12    Q.   You may answer.

13          MR. MILLER:  I'm advising you to assert

14  both your attorney-client privilege and your

15  Fifth Amendment privilege.

16    A.   I'll invoke my attorney privilege and Fifth

17  Amendment.

18    Q.   Okay.  I don't want to know what your

19  attorney said.  I want to know why you did this.

20          MR. MILLER:  Same advice.

21    A.   I'll invoke my attorney privilege and Fifth

22  Amendment.

23    Q.   You chose not to fight these allegations;

24  correct?

25          MR. MILLER:  Object to the form and

1  foundation.

2     A.   I'll invoke my attorney privilege and Fifth

3  Amendment.

4     Q.   You had an internal investigation and you

5  were placed on administrative leave; correct?

6     A.   Yes.

7     Q.   You had an evaluation for your fitness for

8  duty with Dr. Ashlyn (phonetic)?

9     A.   Mental health, yes.

10    Q.   Okay.  When did you have that?

11    A.   I believe it was September of 2020, maybe.

12    Q.   Okay.  And Dr. Ashlyn (phonetic) provided a

13  written report that was --

14    A.   I believe so, yes.

15    Q.   -- was presented back to the Newton Police

16  Department?

17    A.   I believe so.

18    Q.   And what was the result of that?

19    A.   That -- I believe it was just that I'd gone

20  through a traumatic family experience and that my

21  emotions at the time were normal.

22    Q.   Did you say something about contemplating

23  suicide?

24    A.   At the time, yes.

25    Q.   Had you previously threatened self-harm?

1     A.   After the loss of my father, yes.

2     Q.   Had you previously attempted suicide?

3     A.   No.

4     Q.   Did you tell people that you would want to

5  die because then you could be with your dad

6  again?

7     A.   Yes.

8          MR. BOLES:  Okay.  I don't believe we

9  have a copy of Dr. Ashlyn's (phonetic) report and

10  so we need a copy of that.

11    Q.   You're making a counterclaim for defamation.

12  What do you believe you've been defamed?  How

13  have you been defamed?

14    A.   Mr. Galanakis many times on social media

15  and through interviews has said that I'm not

16  physically fit or mentally fit to do the job and

17  that I am below the IQ level of mental ability.

18    Q.   Okay.  I just deposed your chief of police

19  and I asked him a series of questions about

20  whether or not the public can comment on

21  officers, and he said they can and it is their

22  right to criticize the performance of officers

23  and the department itself.  Would you agree with

24  that?

25          MR. MILLER:  Object to the form and

33

CONFIDENTIAL

1    foundation.

2    A.   I would agree.

3    Q.   What?

4    A.   I would agree.

5    Q.   Okay.  And I'll just read you, kind of, the

6    same questions.  I'd asked him:  Does the public

7    have the right to criticize police officers?  Do

8    you think they do?

9    A.   Yes.

10   Q.   Does the public have the right to criticize

11   the police department?

12           MR. MILLER:  Objection, form,

13   foundation.

14   A.   Yes.

15   Q.   Does the public have the right to contact

16   the department to criticize an officer or the

17   department?

18           MR. MILLER:  Objection, form and

19   foundation.

20   A.   Within certain terms.

21   Q.   Okay.  What certain terms do you think it

22   is?

23   A.   They shouldn't be able to cross the line of

24   threatening and harassing and leaving messages on

25   my voicemail that they know where I sleep, they

34

CONFIDENTIAL

1    know what I drive, and they're going to get me.

2    Q.   Who left those messages?

3    A.   Unknown people of unknown places.

4    Q.   Okay.  Doesn't involve Mr. Galanakis;

5    correct?

6    A.   Not that I'm aware of.

7    Q.   Okay.  If an officer does a bad job, is the

8    general public allowed to point it out?

9           MR. MILLER:  Objection, form and

10   foundation.

11          THE WITNESS:  Yeah.

12   Q.   If the department appears to be ignoring

13   that its officers are doing a bad job, are they

14   also allowed to point out that shortcoming or

15   failure on the department?

16          MR. MILLER:  Objection, form,

17   foundation.

18   A.   Yes.

19   Q.   Do you believe it's a crime to tell a cop

20   he's doing a bad job?

21          MR. MILLER:  Objection, form and

22   foundation.

23   A.   No.

24   Q.   Do you think it's a crime to be rude or

25   profane to an officer?

35

CONFIDENTIAL

1           MR. MILLER:  Objection, form and

2    foundation.

3    A.   No.

4    Q.   You've stipulated to the allegations that

5    are in the petition for relief from domestic

6    abuse, and there's allegations that you

7    physically assaulted her on multiple occasions,

8    and there's allegations that you have threatened

9    her or intimidated not only her, but her

10   children.

11          So what is it you believe Mr. Galanakis has

12   said that's inconsistent with what you've

13   stipulated to?

14          MR. MILLER:  Object to the form,

15   foundation, and just advise the witness to not

16   say anything that you are privileged against

17   saying under the Fifth Amendment.

18   A.   I'll invoke my Fifth Amendment.

19   Q.   You don't have a Fifth Amendment privilege

20   on this particular issue.

21          MR. MILLER:  Can you --

22   Q.   You can avoid talking about something that

23   you think is invoking it, but my question is:

24   What has Mr. Galanakis, a non-state actor, said

25   that you haven't stipulated to?  This is for your

36

CONFIDENTIAL

1    defamation claim.  What is it that he did to

2    defame you?

3           MR. MILLER:  You can answer that

4    question.

5    A.   Just without going too much into detail,

6    those accusations are not true, and he's

7    continued to say that I've been physically

8    charged and convicted of domestic abuse, which is

9    not true.

10   Q.   You stipulated to the -- that you

11   domestically abused her.

12          MR. MILLER:  Object to the form,

13   foundation, and advise the witness not to answer

14   that question, invoking your Fifth Amendment

15   right.

16   A.   I'll invoke my Fifth Amendment.

17   Q.   That's a misuse and improper use of the

18   Fifth Amendment.  I'm asking for your damage

19   claim.  In order for you to establish your

20   damages, you've got to tell me what it is that

21   Mr. Galanakis did to defame you.  You stipulated

22   to the statements that the complaining witness

23   made against you.  That's the only way you get a

24   stipulated agreement; is you concede what she's

25   saying --

1        C E R T I F I C A T E

2

3            I, Emma L. Rosky, a Certified Shorthand
         Reporter of the State of Iowa and Registered
4        Professional Reporter, do hereby certify that
         there came before me at the time, date, and place
5        hereinbefore indicated, the witness named on the
         caption sheet hereof, who was by me duly sworn to
6        testify to the truth of said witness's knowledge,
         touching and concerning the matters in
7        controversy in this cause; that the witness was
         thereupon examined under oath, the examination
8        taken down by me in shorthand, and later reduced
         to printed form under my supervision and
9        direction, and that the deposition is a true
         record of the testimony given and of all
10       objections interposed.

11           I further certify that I am neither attorney
         or counsel for, or related to or employed by any
12       of the parties to the action in which this
         deposition is taken, and further that I am not a
13       relative or employee of any attorney or counsel
         employed by the parties hereto or financially
14       interested in the action.

15

16           Dated at Des Moines, Iowa, this 11th day of

17       December, 2023.

18

19

20

21               /s/ Emma L. Rosky

22               CERTIFIED SHORTHAND REPORTER,
                 and REGISTERED PROFESSIONAL
23               REPORTER

24

25

         SWEENEY COURT REPORTING (515) 244-6373
      320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 1**

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF IOWA
 2                       CENTRAL DIVISION

 3    TAYVIN GALANAKIS,          )CASE NO.: 4:23-cv-00044
                                 )
 4      Plaintiff/Counterclaim   )
        Defendant,               )DEPOSITION OF
 5                               )CHIEF ROBERT BURDESS
      vs.                        )(CONFIDENTIAL)
 6                               )
      CITY OF NEWTON, IOWA,      )
 7    et al.,                    )
                                 )
 8      Defendants/Counterclaim  )
        Plaintiffs.              )
 9    _____)

10           THE DEPOSITION OF CHIEF ROBERT BURDESS,

11    taken before Emma L. Rosky, Certified Shorthand

12    Reporter and Registered Professional Reporter for

13    the State of Iowa, commencing at 12:31 p.m.,

14    October 27, 2023, at 2015 Grand Avenue,

15    Suite 200, Des Moines, Iowa.
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 2**

CONFIDENTIAL

```
 1                   A P P E A R A N C E S

 2    Plaintiff/Counterclaim
      Defendants by:     MATTHEW BOLES
 3                       Attorney at Law
                         Gribble, Boles, Stewart &
 4                       Witosky Law
                         2015 Grand Avenue
 5                       Suite 200
                         Des Moines, IA 50312
 6

 7    Defendants/Counterclaim
      Plaintiffs by:     NICHOLAS F. MILLER
 8                       Attorney at Law
                         Brick Gentry, P.C.
 9                       6701 Westown Parkway
                         Suite 100
10                       West Des Moines, IA 50266
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 3**

CONFIDENTIAL

```
 1                  INDEX OF EXAMINATION

 2    Examination by        Page

 3    Mr. Boles              4
```

```
 8                    E X H I B I T S

 9    Exhibit
      Name       Description                 Page
10
      Exhibit 1  Internal Investigation       40
11
      Exhibit 2  Notice of Final Disposition  40
12               April 6, 2022

13    Exhibit 3  Notice of Final Disposition  40
                 August 3, 2022
14
      Exhibit 4  Petition for Relief from     40
15               Domestic Abuse
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 4**

CONFIDENTIAL

```
 1              CHIEF ROBERT BURDESS,

 2    called as a witness, having been first duly

 3    sworn, testified as follows:

 4                  DIRECT EXAMINATION

 5    BY MR. BOLES:

 6    Q.   Would you state your name for the record and

 7    spell it.

 8    A.   Robert Burdess.  R-o-b-e-r-t  B-u-r-d-e-s-s.

 9    Q.   And how are you employed?

10    A.   I'm the Police Chief with the Newton Police

11    Department.

12    Q.   And how long have you been employed in that

13    capacity?

14    A.   I've been the Police Chief for eight years

15    and I've been a law enforcement officer for just

16    over 26.

17    Q.   Okay.  Can you take me through your law

18    enforcement career; where'd you start and so on?

19    A.   Sure.  I was hired in August of 1997 by the

20    University of Iowa Police Department in

21    Iowa City.  Immediately upon hire I attended the

22    Iowa Law Enforcement Academy and graduated in

23    November of '97.

24         In 1999, July of '99, I came to Newton and

25    I've worked there ever since.  I've served in the
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

CONFIDENTIAL

5

1     capacity of patrol officer, K9 officer,
2     detective, lieutenant, and chief of police.
3        Q.   How long were you a K9 officer?
4        A.   Oh, 17 years.
5        Q.   What's your formal education background?
6        A.   I've got an associate's degree from
7     Des Moines Area Community College in criminal
8     justice, I have a bachelor's degree from Upper
9     Iowa University in public administration, and a
10    master's degree from Walden University.
11         I have a leadership or management
12    certificate from Northwestern University in
13    Illinois.  It's the University School of Police
14    Staff and Command.  And I recently graduated from
15    FBI's National Command College, and that would
16    have been last year.
17       Q.   Okay.  What other training or certifications
18    do you have as a police chief?
19       A.   I attend lots of trainings.  I guess I don't
20    know specific --
21       Q.   Well, have you ever taken any leadership
22    courses specifically related to being police
23    chief or taken any management/personnel classes?
24       A.   Yeah, the Northwestern Command School.  That
25    was 21 weeks.

6

CONFIDENTIAL

1        Q.   What was that focused on or what was the
2     emphasis when you got your degree there?
3        A.   It was anywhere from project management, HR,
4     internal investigations, recruiting, retention --
5     just a gamut of things -- budgeting.
6        Q.   Okay.
7        A.   And then the FBI Command College was last
8     May, and that was more of crisis leadership,
9     wellness, again, recruiting, retention, things of
10    that matter.  I did receive a certification in
11    internal investigations -- would have been within
12    the past two years.
13         80 hours of -- roughly 80 hours of training
14    and conducting and overseeing internal
15    investigations or internal affairs.
16       Q.   Okay.  I have the training records that were
17    produced.  Those are your training records over
18    the course of your time at the Newton Police
19    Department, would you agree?
20       A.   Yes, sir.
21       Q.   Okay.  About how often do you -- not only
22    yourself as an individual, but the other
23    officers -- engage in some form of training?
24       A.   They have a minimum of 40 hours a year.
25       Q.   Okay.  And on these sheets, most of these

7

CONFIDENTIAL

1     seem to be anywhere from one to four hours.  Is
2     that accurate for the majority of them?
3        A.   Yes.
4        Q.   I see that there's an Iowa Police Chief
5     Conference that's worth 10.5 hours.
6        A.   Yes.
7        Q.   Okay.  And that's similar to the training
8     sheets for Officer Wing and Officer Winters as
9     well; that those are kept and logged?
10       A.   Correct.
11       Q.   All right.  What did you do to prepare for
12    the deposition today?
13       A.   I reviewed the incident report and the
14    internal investigation files.
15       Q.   Okay.  Anything else?
16       A.   No, sir.
17       Q.   Okay.  Tell me about the organizational
18    structure of the Newton Police Department.  How
19    does that break down?
20       A.   Sure.  Currently, it's one chief of police,
21    four lieutenants, two sergeants --
22       Q.   Two sergeants?
23       A.   Yes, sir.
24       Q.   Okay.
25       A.   And then the rest would be a mixture of

8

CONFIDENTIAL

1     patrol officers, school resource officers, and
2     detectives.  There's 27 total sworn, authorized
3     personnel within the department when we're
4     full-staffed, and then we have six civilian staff
5     members.
6        Q.   Okay.  So, essentially, 33 employees?
7        A.   Yes, sir.
8        Q.   All right.  How many of those officers are
9     DRE officers?
10       A.   One.
11       Q.   And by name, who is that?
12       A.   Officer Shinkle.
13       Q.   Okay.  How long has he been employed?
14       A.   I believe since 2019.  That's a rough
15    estimate.
16       Q.   And is it -- do you only need one?
17       A.   Typically, departments have one staffed.
18    The position is funded by -- the training is
19    funded by the Governor's Traffic Safety Bureau,
20    so they'll fund so many per county.
21       Q.   That was my next question, if it's funded
22    through the program at the state level.
23         Is Officer Shinkle a good officer?
24       A.   Yes, sir.
25       Q.   Seem competent in his job?

9

1   A.   No.

2   Q.   Has he ever had any problem or complaint

3   about the way or manner in which he conducts his

4   job?

5   A.   No, sir.

6   Q.   Do you have supreme confidence in his

7   ability to make determinations and assessments

8   with regard to his DRE responsibilities?

9   A.   Yes, sir.

10   Q.   Where do they fit in in the structure?

11   Where does he fit in in that structure?

12   A.   He was a patrol officer at the time of this

13   incident.  Right now -- he was recently given a

14   position as a criminal investigator, so he's been

15   in that position for two weeks now.

16   Q.   Okay.  Tell me:  What's an officer in

17   charge?

18   A.   What is an officer in charge?

19   Q.   Yes, sir.

20   A.   In the absence of a supervisor such as a

21   sergeant, lieutenant, or, I guess, myself, the

22   most senior officer on the shift would be the

23   officer in charge.

24   Q.   Okay.  Kind of like military officer, the

25   officer of the day?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

10

1   A.   Yes.

2   Q.   Okay.  When that officer in charge is

3   assigned as the senior person on duty, would it

4   be fair to say that that officer in charge, then,

5   is responsible for the DRE officer?

6   A.   I guess, what would be your definition of

7   "responsible"?

8   Q.   Well, let's just take, like, a grocery

9   store.  You have swing managers that are the

10   people that are there at night, and if

11   something -- there's a problem, they're

12   responsible for everything that happens in the

13   store overnight.

14   A.   Okay.

15   Q.   A regular store manager, you know, by the

16   time they've risen to that level, they're working

17   a day shift, and then there are shift managers

18   that are for the early hours, the midday, and

19   then the evening hours, and then they've got

20   this -- what they call a swing manager.

21   A.   Okay.  Yeah, so --

22        MR. MILLER:  I will just object to the

23   form of the question, but you can answer.

24   A.   Yeah.  I guess to that extent, yes.  He

25   would be responsible for anybody working that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

11

1   shift.

2   Q.   All right.  And are there times when

3   Officer Winters is the officer in charge?

4   A.   I would assume so.

5   Q.   Okay.  What are the training requirements to

6   be an officer in the Newton Police Department?

7   A.   They must attend the Iowa Law Enforcement

8   Academy and then complete our 16-week field

9   training program.

10   Q.   Okay.  And then they have to keep up with

11   their 40 hours of continuing education a year?

12   A.   The state requires 12.  We provide, of

13   course, above and beyond that, so a minimum of

14   40.

15   Q.   Okay.  Who's responsible for arranging the

16   training?

17   A.   It had been Lieutenant Cook, but he recently

18   retired so that duty is now being shifted.

19   Q.   And then who -- I'm assuming you would have

20   somebody that's in charge of being responsible

21   and make sure the compliance is being done with

22   regard to the training; is that correct?

23   A.   Yes.

24   Q.   And who is that?

25   A.   That would have been Lieutenant Cook also.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

12

1   Q.   Okay.  And what specifically did they do to

2   ensure that the individual officers were

3   complying with training?

4   A.   So the state requires a certain number of

5   hours per year and certain disciplines, so he

6   would ensure that was done by each officer each

7   year.  During our annual in-service training, we

8   provide additional training on certain elements

9   to our on-staff folks.

10   Q.   With regard to your responsibilities as the

11   chief, how do you oversee that compliance and

12   training?  What role do you have in that?

13   A.   Just reports from Lieutenant Cook at the

14   time advising me that we've met the training

15   standards for the year.

16   Q.   Okay.  Have you ever had an officer that may

17   not be in conformity with the requirements and

18   that there needs to be something done to ensure

19   that they're in compliance?

20   A.   Not with the basic requirements, no.

21   Q.   Okay.  What about internally; your own

22   standard of 40 hours?

23   A.   There may be times when an officer may go on

24   vacation or be on injury leave during our annual

25   in-service training so they may miss a portion of

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

1    it.  But again, some of those hours aren't
2    mandatory and so we may make them up or we may
3    not depending on what type of class it is.
4    Q.   Okay.  And I handed you, which was the
5    city's request for production, 02627 through
6    02637 which was your training records.
7        Would it be fair to say that every officer
8    has a similar document that can be produced about
9    their training since they've been employed by the
10    Newton Police Department?
11    A.   Yes, sir.
12    Q.   Okay.  Tell me:  In your role as a chief,
13    what do you do or what is your role in compliance
14    as a whole?  Not just with the rules but with
15    compliance with the rules and regulations of the
16    Newton Police Department.  How you get involved
17    in that?
18    A.   I guess to ask a clarifying question --
19    Q.   Sure.
20    A.   So how do I prove that we are in compliance
21    with our policies and procedures?
22    Q.   No.  What's your role in making sure that
23    those internal rules and regulations of the
24    Newton Police Department are actually being
25    complied with by individual officers?

1    A.   Okay.  Well, some of that job, of course, is
2    my supervisors, you know, I read police reports
3    and I see performance evaluations, those type of
4    things.  Then if a complaint arises due to an
5    allegation that a possible policy or procedure is
6    not being followed, then I will assign that to
7    the professional standards individuals, which are
8    the lieutenants, to follow-up and investigate.
9    Q.   Okay.  And what role do you as the chief
10    play in determining discipline or sanction?
11    A.   So once a lieutenant has completed the
12    entire internal investigation, they will provide
13    a report with their findings and then they will
14    turn it over to me to determine if and what level
15    of discipline is necessary.
16    Q.   Okay.  I looked at Interrogatory No. 8 and
17    the question was whether or not there was -- what
18    the system was for tracking complaints, and your
19    answer in Interrogatory No. 8 said:  There's no
20    system to track complaints.  Is that correct?
21    A.   That's correct.
22    Q.   How do you ensure, then, that officers are
23    performing as required if there's no tracking?
24    A.   So any complaint that comes in is handled by
25    a supervisor, and they're ensuring that they are

1    adhering to the policies and procedures.  They
2    could do anything from a -- a verbal conversation
3    with the officer if there's not compliance, all
4    the way up to referring it to me for an internal
5    investigation.
6    Q.   Okay.  What are the -- I'm speaking
7    specifically about your OWI detection -- what are
8    the requirements for your street officers or your
9    patrol officers with regard to their training for
10    OWI detection?
11    A.   Minimum training is the Iowa Law Enforcement
12    Academy's training on detecting and enforcing
13    drug or intoxicated drivers, and then, of course,
14    our field training program has a section where
15    there's field training in that specific
16    discipline.
17    Q.   Okay.  What do you do in terms of internally
18    to track whether or not all of the proper testing
19    is being performed in a traffic stop involving an
20    OWI?
21    A.   That would be the job of the supervisors or
22    the lieutenants and sergeants would review
23    reports.
24    Q.   So Wing would be responsible for that, for
25    example?

1    A.   He would be one, yes.
2    Q.   Okay.  And what is your understanding what
3    they do to ensure compliance?
4    A.   Read the reports, read the charges, they'll
5    sometimes do an audit, and watch the full video.
6    Q.   How often is that done?
7    A.   I don't know.
8    Q.   Okay.  Do you have any way of tracking
9    whether or not X percentage of traffic stops
10    involving OWI are audited?  Do you know what your
11    number is?
12    A.   In terms of a full audit watching the video
13    and everything?
14    Q.   Yes.
15    A.   No, I don't.
16    Q.   Okay.  Have you done a full audit on this
17    traffic stop involving an OWI?
18        MR. MILLER:  Object to the form of the
19    question.
20    A.   An internal investigation was conducted on
21    this incident.
22    Q.   Okay.  Do you keep track of the number of
23    times when you do an audit that the officer did
24    not meet the standard for a traffic stop
25    involving OWI?

17

1    A.   Not a formal tracking system.  If there was
2    some form of correction needed, it would be in
3    the form of a -- likely a counseling letter or
4    training document.
5    Q.   Okay.  Based upon your representations
6    there, have you had occasion to provide training
7    letters to Officer Winters?
8    A.   Not as it relates to OWIs.
9    Q.   Okay.  What other training letters have you
10   provided to Officer Winters regarding his
11   performance as a Newton Police Department
12   officer?
13   A.   I have not provided any.
14   Q.   Well, as the chief, are you aware that he
15   has been provided those letters?
16   A.   No, sir.
17   Q.   You would agree that he's been disciplined;
18   correct?
19   A.   Yes, sir.
20   Q.   Okay.  And what is your understanding of the
21   nature of the discipline actions against him and
22   the conduct that was being disciplined?
23   A.   To my recollection he's been disciplined for
24   a vehicle accident and then he's also been
25   disciplined regarding an allegation of a theft

18

1    that ended up being a -- which he was cleared of,
2    but he did not follow proper procedures in
3    inventorying the vehicle.
4    Q.   Failure to secure the vehicle?
5    A.   Yes.
6    Q.   And that happened in April of 2022 on the
7    failure to secure the vehicle?
8    A.   That sounds accurate.
9    Q.   And he received a one-day suspension for the
10   motor vehicle accident that was in August of
11   2022?
12   A.   That's correct.
13   Q.   And did he also receive a written counseling
14   regarding the communication during the traffic
15   stop involving Mr. Galanakis in August of 2022?
16   A.   Correct.  That wouldn't have been considered
17   formal discipline, though.
18   Q.   What's the role of a DRE officer in relation
19   to an OWI stop or detection?
20   A.   They're typically looking for impairment
21   outside of just alcohol.
22   Q.   And how is a DRE or your sole DRE officer
23   engaged after a patrol officer makes an OWI stop
24   and once you have further investigation as to
25   whether or not the person is under the influence

19

1    of drugs?
2    A.   That's a request by the patrol officer doing
3    the OWI investigation to the DRE for assistance.
4    Q.   Okay.  How often is a DRE officer engaged on
5    a percentage basis for your OWI stops in Newton?
6    A.   I don't know that.
7    Q.   Do you keep any statistics on that?
8    A.   Officer Shinkle would have some form of
9    activity report.
10   Q.   Okay.  Are you aware that Officer Winters
11   tends to engage the DRE officer quite frequently?
12   A.   Yes.
13   Q.   Okay.  As a matter of fact, on the shift
14   that he was on in this particular case when he
15   stopped Mr. Galanakis, he, earlier in his shift,
16   inquired and requested that Shinkle examine two
17   other people that he'd stopped.  Would you agree
18   with that?
19   A.   I'm aware he contacted him earlier that
20   night, yes.
21   Q.   Okay.  Were you also aware that Shinkle,
22   after talking with those people, simply talking
23   to them, made a determination they didn't need to
24   be tested because they weren't under the
25   influence?

20

1    A.   I don't know the results of those
2    conversations.
3    Q.   Okay.  Did you read your internal
4    investigation report?
5    A.   Yes.
6    Q.   Did you read where Wing says that?  Found
7    out from Shinkle that that's what Winters had
8    been doing?
9    A.   I didn't memorize the entire internal
10   investigation, sir.
11   Q.   Well, it's a critical paragraph where Wing
12   says that when -- he thought Winters knew what he
13   was doing but now he has serious questions about
14   his ability on OWI stops.  Do you remember that?
15            MR. MILLER:  Object to the form of the
16   question.
17   Q.   You can answer.
18   A.   No, sir.
19   Q.   Okay.  We'll get to that.  Are there any
20   limitations or restrictions on when an OWI
21   traffic stop officer can engage the DRE officer?
22   A.   No, sir.
23   Q.   If a lieutenant's on the scene and has
24   concerns about a stop and how it's being
25   conducted, what should the officer -- the

1   concerns about a series of tests or the way and
2   manner that a stop is conducted?
3   A.   Same as if an officer was not following
4   policies and procedures.  We'd do an internal
5   investigation and determine what happened.
6   Q.   Okay.  So in this particular case involving
7   Mr. Galanakis, an internal investigation was
8   conducted and Lieutenant Wing determined that he
9   had great concerns about the way that the testing
10  was being conducted.  What was the protocol or
11  the method by which you, as the chief, addressed
12  those concerns?
13  A.   The concerns against Officer Winters?
14  Q.   Yes.
15  A.   We conducted an internal investigation.
16  Q.   I understand.  The investigation's done.
17  The report is written.  But the question is:
18  What did you do about the fact that this officer,
19  Officer Wing, says on page 907 of that report,
20  "After Tayvin was released I spoke with
21  Officer Shinkle regarding the discrepancy in
22  observations.  I was advised that this was the
23  third DRE evaluation Officer Winters had asked
24  him to do on this shift.  Officer Shinkle told me
25  the first two he just looked at and spoke with

1   the subjects and declined to do a DRE.  This
2   worries me as Officer Winters does a lot of OWIs
3   and I have had a lot of faith in him.  I'm afraid
4   this could happen again and plan on meeting with
5   Officer Winters to discuss this concern -- "
6           MR. MILLER:  Object to the form and
7   foundation.
8           MR. BOLES:  I'm reading to have a
9   foundation.  There's no question before the
10  witness.
11  Q.   Now, based upon that, what was done by you
12  as the chief of police?
13          MR. MILLER:  Objection, form and
14  foundation.
15  A.   Sounds like Officer Wing -- Lieutenant Wing
16  had a discussion with Officer Winters.
17  Q.   He said he plans on meeting with him.
18  You're the chief.  What happened?  What was the
19  follow-up on this?
20  A.   I don't know if he did or not.
21  Q.   Well, what did you do as the chief?
22  A.   I assigned an internal investigation to
23  Lieutenant Winchell who conducted it and had a
24  discussion with Officer Winters at the end of
25  that.

1   Q.   Okay.  Page 906.  Wing says, "In looking
2   back it was at this point I should have
3   questioned Officer Winters as to what his
4   observations were and how that led him to believe
5   that he was impaired."  The "he" being
6   Mr. Galanakis.
7           Did you have a conversation as the chief of
8   police with Lieutenant Wing about what his
9   feeling was as to regarding the competency of
10  Officer Winters to make an OWI stop?
11          MR. MILLER:  Objection, form and
12  foundation.
13  A.   No, sir.  I didn't have a conversation with
14  him about that.
15  Q.   Okay.  Does the public have the right to
16  criticize a police officer?
17          MR. MILLER:  Objection, form and
18  foundation.
19  A.   Yes, sir.
20  Q.   Okay.  Does the public have a right to
21  criticize the Newton Police Department?
22          MR. MILLER:  Objection, form and
23  foundation.
24  A.   Yes, sir.
25  Q.   Does the public have the right to contact

1   the department to criticize an officer or the
2   department itself?
3           MR. MILLER:  Objection, form and
4   foundation.
5   A.   Yes, sir.
6   Q.   If an officer is doing a bad job, does an
7   individual citizen have the right or allowed to
8   point it out?
9           MR. MILLER:  Objection, form and
10  foundation.
11  A.   Yes, sir.
12  Q.   If the department appears to be ignoring
13  that it has an officer that is doing a bad job,
14  are they allowed to point that out as well?
15          MR. MILLER:  Objection, form and
16  foundation.
17  A.   Yes, sir.
18  Q.   Does an individual have the right to say, "I
19  think the public should contact the department
20  for protecting an officer doing a bad job"?
21          MR. MILLER:  Objection, form and
22  foundation.
23  A.   Yeah.  I can't control what people say.
24  Q.   Is it a crime to tell a cop he's doing a bad
25  job?

29

1   MR. MILLER:  Objection, form and
2   foundation.
3   A.   No, sir.
4   Q.   Is it a crime to be rude or profane to an
5   officer?
6        MR. MILLER:  Objection, form and
7   foundation.
8   A.   Depends.
9   Q.   Okay.  Explain or qualify that answer.
10       MR. MILLER:  Objection, form and
11  foundation.
12  A.   I guess you'd have to define what rude and
13  profane would mean.
14  Q.   Well, you said it depends, so tell me what
15  the qualification is on whether or not that is a
16  crime.
17       MR. MILLER:  Objection, form and
18  foundation.
19  A.   There could be circumstances of disorderly
20  conduct or harassment of a public official.
21  Q.   Okay.  When did you learn that
22  Officer Winters was in a domestic relationship
23  with the dispatcher?
24  A.   It would have been summer of '22.  I don't
25  know the exact date.

30

1   Q.   Okay.  What's the policy regarding members
2   of the department having an interpersonal
3   relationship?
4        MR. MILLER:  Objection, form and
5   foundation.
6   A.   That's a relationship with somebody from
7   another agency.  There's no policy.
8   Q.   So the dispatcher is not in the Newton
9   Police Department?
10  A.   No, sir.
11  Q.   Okay.  What department is she in?
12  A.   Jasper County Sheriff's Office.
13  Q.   Okay.  Would it be fair to say that
14  Officer Winters had training on February 21st,
15  2021, on workplace violence conducted by Target
16  Solutions?
17  A.   If it's on his training log then that would
18  be accurate, yes, sir.
19  Q.   What training was given in that particular
20  workplace violence seminar or CLE?
21       MR. MILLER:  Objection, form and
22  foundation.
23  A.   I don't have the curriculum to give you.
24  Q.   Okay.  What training does the department
25  give officers regarding interpersonal

31

1   relationships?
2   A.   None.
3   Q.   None?  When did you learn that the
4   dispatcher was accusing Officer Winters of
5   domestic abuse?
6        MR. MILLER:  Objection, form and
7   foundation.
8   A.   Again, that would have been summer of 2022.
9   Q.   Okay.  And how did you learn it?
10  A.   I was notified by two members of the Jasper
11  County Sheriff's Office.
12  Q.   Okay.  What did they tell you regarding the
13  alleged domestic abuse?
14  A.   They just advised that they'd had a
15  conversation with -- I believe her name is
16  Courtney, and she had revealed some information
17  that they had concerns about and wanted to pass
18  on to me.
19  Q.   What information did they reveal to you
20  about Courtney VanDerHart and what she had said?
21  A.   Just in generalities, not a good
22  relationship between the two.  Some potential
23  harassment-type activity.
24  Q.   Okay.  Was Mayor Hansen correct when he
25  publicly said that an officer that commits

32

1   domestic abuse would be terminated?
2        MR. MILLER:  Objection, form and
3   foundation.
4   A.   I don't know if he said that or not.
5   Q.   Well, he did, but was he correct in saying
6   that if a member of the Newton Police Department
7   is involved in domestic abuse, they would be
8   terminated?
9        MR. MILLER:  Objection, form and
10  foundation.
11  A.   If an officer's convicted of a domestic
12  abuse, yes.
13  Q.   So if you have somebody stealing stuff
14  within the department but they never get
15  convicted, you're okay with that?
16       MR. MILLER:  Objection, form and
17  foundation.
18  A.   There's a lot of what-ifs here.
19  Q.   Well, you're the one that says the
20  conviction is the key for you to make an action;
21  right?
22  A.   That's a piece of the puzzle.
23  Q.   Okay.  What did you do in regard to
24  Mayor Hansen?  Did you tell him that?  Did you
25  tell him at some point that if an officer is

1    involved in domestic abuse they'll be terminated?
2    A.   No, sir.
3    Q.   You never said that to him?
4    A.   No, sir.
5    Q.   All right.  Did you conduct an internal
6    affairs investigation as to the allegations
7    against one of your officer?
8    A.   Yes, sir.
9    Q.   What did you determine as to the nature of
10   the domestic abuse that Courtney VanDerHart was
11   alleging between October 2019 and August 5, 2021
12   which was the term of her relationship with
13   Mr. Winters?
14        MR. MILLER:  Object to the form of the
15   question.
16   A.   Lieutenant Winchell conducted the internal
17   investigation and provided me with the findings.
18   Q.   Okay.  What were the findings?
19   A.   He was either exonerated or some of the
20   findings were not sustained.
21   Q.   What was he exonerated of?  What acts?
22   A.   I don't recall the specifics.
23   Q.   Okay.  What acts did you find that there was
24   merit to and substance to?
25   A.   None of -- none of the findings were

1    sustained or founded.
2    Q.   What about Courtney VanDerHart saying that
3    she was elbowed in the chest to create a bruise
4    while she was inside of Officer Winters' patrol
5    car?  That was unfounded?
6         MR. MILLER:  Objection, form and
7    foundation.
8    A.   Correct.
9    Q.   And what was the determination that that was
10   unfounded?
11        MR. MILLER:  Objection, form and
12   foundation.
13   A.   Lack of evidence.
14   Q.   Okay.  What about when she alleged that
15   Officer Winters had violently grabbed her by the
16   wrist?
17        MR. MILLER:  Objection, form and
18   foundation.
19   A.   Again, lack of evidence.
20   Q.   Okay.  What about when he showed up at
21   Courtney VanDerHart's friend's house and
22   threatened to tow her car?
23        MR. MILLER:  Objection, form and
24   foundation.
25   A.   Again, lack of evidence.

1    Q.   Okay.  So you talked to those witnesses who
2    were there when he said that to her?
3    A.   Lieutenant Winchell conducted an internal
4    investigation regarding that.
5    Q.   Okay.  What about when he would sit in his
6    patrol car and watch her house while he was on
7    duty?
8         MR. MILLER:  Objection, form and
9    foundation.
10   A.   Again, determining what was actually going
11   on in those circumstances were not able to be
12   identified.
13   Q.   Okay.  What about when he'd show up in
14   uniform and stand on her front step and yell at
15   her while he was in uniform?
16        MR. MILLER:  Objection, form and
17   foundation.
18   A.   Again, no evidence to support that that
19   occurred.
20   Q.   What about when he threatened to shoot her
21   if she cheated on him?
22        MR. MILLER:  Objection, form and
23   foundation.
24   A.   Again, no evidence to support that that
25   occurred.

1    Q.   So when you brought him in and he was
2    talking about contemplating suicide, that wasn't
3    enough evidence to say -- or that he was going to
4    do harm to people?
5         MR. MILLER:  Objection, form and
6    foundation.
7    A.   That's two different conversations, sir.
8    Q.   So you think someone who's contemplating
9    suicide who is an officer with a service revolver
10   or sidearm, that's a different conversation when
11   he's threatening not only harm to himself but
12   harm that he'd shoot her if she cheats on him?
13        MR. MILLER:  Objection, form and
14   foundation.
15   A.   Again, two separate conversations.
16   Q.   No.  My question is: You don't think that
17   that's the same conversation; an officer that's
18   having enough of a break from reality or state
19   that he's going to do violence either to himself
20   or others and he has a service sidearm?
21        MR. MILLER:  Objection, form and
22   foundation.
23   A.   That would just be an opinion.
24   Q.   What's that?
25   A.   It would just be an opinion if I gave you an

37

CONFIDENTIAL

1   answer.
2       Q.   Well, that's what I want.  That's why I'm
3   deposing you.
4       A.   And again, I don't know.  I'm not him.
5       Q.   Did he ever go and get evaluated by
6   Dr. Asher (phonetic)?
7       A.   Yes, he did.
8       Q.   And based upon that did you take his service
9   sidearm?
10      A.   Yes, sir.
11      Q.   Okay.  And what was the determination of
12  Ashlyn's (phonetic) exam?
13           MR. MILLER:  Objection, form and
14  foundation.
15      A.   He was cleared to come back to duty.
16      Q.   What about when Officer Winters was pinning
17  her down on her bed by her wrists and telling her
18  she can leave when he said she could leave?
19           MR. MILLER:  Objection, form and
20  foundation.
21      A.   Again, sir, no evidence to support that that
22  occurred.
23      Q.   Okay.  And what about when he tackled
24  Courtney VanDerHart from behind?
25           MR. MILLER:  Objection, form and

38

CONFIDENTIAL

1   foundation.
2       A.   No evidence to support that.
3       Q.   Did you have any role in the public
4   statement that was made regarding
5   Officer Winters' domestic?
6            MR. MILLER:  Object to the form of the
7   question.
8       A.   Yes.
9       Q.   Okay.  What did you do or what did you
10  contribute?
11      A.   I don't recall specifically -- yeah.  I
12  don't recall specifically without having it in
13  front of me.
14      Q.   Okay.  If an officer's found in a civil
15  proceeding to have committed domestic abuse,
16  would that be grounds for termination?
17      A.   I don't know.  That would be speculating.
18      Q.   Well, no.  It's a standard.  If you are
19  found to have committed it in a civil proceeding,
20  is the requirement or your position as the chief
21  that you'd be terminated from your role as an
22  officer in the Newton Police Department?
23           MR. MILLER:  Object to the form and
24  foundation of the question.
25      A.   It's possible.

39

CONFIDENTIAL

1       Q.   Okay.  Do you find it troubling that
2   Officer Winters stipulated and consented to the
3   no-contact order?
4            MR. MILLER:  Object to the form and
5   foundation.
6       A.   Yeah, that would be just an opinion.
7       Q.   I want your opinion.
8       A.   Yeah.
9       Q.   Do you find that troubling?
10      A.   I don't really have an opinion either way.
11      Q.   Okay.  And then what about when he goes back
12  in and agrees to extend it?
13           MR. MILLER:  Object to the form --
14      Q.   Do you have an opinion on that?
15           MR. MILLER:  Objection.
16      A.   No, sir.
17      Q.   Do you think somebody that didn't do any of
18  that would fight it and not stipulate to have a
19  no-contact order?
20           MR. MILLER:  Object to the form and
21  foundation.
22      A.   I don't know, sir.
23           MR. BOLES:  I don't have anything
24  further.  Thank you.  Appreciate your time.
25           MR. MILLER:  I don't have any questions

40

CONFIDENTIAL

1   for Rob Burdess.
2            (The deposition concluded at
3            1:16 p.m.)
4            (The following record was made
5            after the conclusion of the
6            deposition at 2:01 p.m. on October
7            27, 2023.)
8            MR. MILLER:  I'll just note on the
9   record that both deposition transcripts should be
10  designated as confidential under the protective
11  order.
12           (Deposition Exhibits 1, 2, 3, and
13           4 were marked for identification
14           by the reporter.)
15
16
17
18
19
20
21
22
23
24
25

41

CONFIDENTIAL

1              I, ROBERT BURDESS, the deponent in the

2      foregoing deposition, do hereby certify that I

3      have read the foregoing -- pages of typewritten

4      material and that the same is, with the

5      corrections noted on the attached page, if any, a

6      true and correct transcript of my deposition upon

7      oral examination given at the time and place

8      herein stated.

9

10              _____

11              ROBERT BURDESS

12

13

14        Subscribed and sworn to before me

15      this _____ day of _____, 20__.

16

17

18              _____

19              Notary Public

20

21

22

23

24

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

42

CONFIDENTIAL

1              C O R R E C T I O N S

2      ___  ___  _____

3      ___  ___  _____

4      ___  ___  _____

5      ___  ___  _____

6      ___  ___  _____

7      ___  ___  _____

8      ___  ___  _____

9      ___  ___  _____

10     ___  ___  _____

11     ___  ___  _____

12     ___  ___  _____

13     ___  ___  _____

14     ___  ___  _____

15     ___  ___  _____

16     ___  ___  _____

17     ___  ___  _____

18     ___  ___  _____

19     ___  ___  _____

20     ___  ___  _____

21     ___  ___  _____

22     ___  ___  _____

23     ___  ___  _____

24     ___  ___  _____

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

43

CONFIDENTIAL

C E R T I F I C A T E

1

2

3         I, Emma L. Rosky, a Certified Shorthand
       Reporter of the State of Iowa and Registered
4      Professional Reporter, do hereby certify that
       there came before me at the time, date, and place
5      hereinbefore indicated, the witness named on the
       caption sheet hereof, who was by me duly sworn to
6      testify to the truth of said witness's knowledge,
       touching and concerning the matters in
7      controversy in this cause; that the witness was
       thereupon examined under oath, the examination
8      taken down by me in shorthand, and later reduced
       to printed form under my supervision and
9      direction, and that the deposition is a true
       record of the testimony given and of all
10     objections interposed.

11        I further certify that I am neither attorney
       or counsel for, or related to or employed by any
12     of the parties to the action in which this
       deposition is taken, and further that I am not a
13     relative or employee of any attorney or counsel
       employed by the parties hereto or financially
14     interested in the action.

15

16        Dated at Des Moines, Iowa, this 11th day of

17     December, 2023.

18

19

20

21              /s/ Emma L. Rosky
              _____

22              CERTIFIED SHORTHAND REPORTER,
              and REGISTERED PROFESSIONAL
23              REPORTER

24

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

# IN THE UNITED STATES DISTRICT
# COURT FOR THE SOUTHERN DISTRICT
# OF IOWA CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS, | Case No. 4:23-cv-00044-SHL-SBJ |
| Plaintiff, | |
| v. | |
| CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department, | **DEFENDANT NATHAN WINTERS'S OBJECTIONS AND ANSWERS TO PLAINTIFF TAYVIN GALANAKIS'S SECOND SET OF INTERROGATORIES** |
| Defendants. | |
| NATHAN WINTERS and CHRISTOPHER WING, | |
| Defendants/Counterclaim Plaintiffs, | |
| v. | |
| TAYVIN GALANAKIS, | |
| Plaintiff/Counterclaim Defendant. | Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

**COMES NOW**, Defendant Nathan Winters ("Winters"), by and through his undersigned counsel, and under Rule 33 of the Federal Rules of Civil Procedure provides the following objections and answers to Plaintiff Tayvin Galanakis's ("Galanakis") Second Set of Interrogatories.

## I.    General Statement

By responding to these Interrogatories, Winters does not waive any objections that may be appropriate (a) to the use, for any purpose, by Winters of any of the information or documents

**INTERROGATORY NO. 21:**  State why You consented to the entry of an Iowa Code Ch. 236 Protective Order and the extension of same against You in Jasper County Case No. DACV122471, and whether You would face professional discipline should there have been a factual finding you committed domestic abuse.

**ANSWER:**
***BEGIN CONFIDENTIAL DESIGNATION***

**Winters incorporates the general objections as if restated here.  Winters also objects to Interrogatory No. 21 on several other grounds.  First, Winters objects to Interrogatory No. 21 because it seeks information protected by the attorney-client privilege.  Specifically, stating the reasons why Winters consented to a Protective Order requires disclosing information protected from disclosure by the attorney-client privilege.**

**Next, Winters objects to Interrogatory No. 21 because the Fifth Amendment to the United State Constitution privileges Winters to refuse to answer.**

***END CONFIDENTIAL DESIGNATION***

**Next, Winters also objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence because the reasons why Winters consented to a Protective Order do not tend to make any fact at issue in this action more or less likely.  In fact, the reasons why Winters consented to a Protective Order have no bearing whatever on any fact at issue in this action.**

**Finally, Winters objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence because it seeks nonexistent, hypothetical information about a nonexistent, hypothetical situation.  Winters also objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably**

calculated to lead to the discovery of admissible evidence because it seeks information that has no tendency to make a fact at issue in the case more or less likely.  Specifically, the effect that a hypothetical finding of abuse would have had on Nathan Winters's employment will have no bearing on a fact at issue in this case.  Nor can Winters appropriately speculate about future employment actions based on a hypothetical situation.

For these reasons, Winters objects to Interrogatory No. 21 and will not provide an answer to Interrogatory No. 21.

**INTERROGATORY NO. 22:**  Identify and describe all alleged events Concerning the allegations of domestic abuse against Courtney Vanderhart and the Protective Order against You, including:

- a. Dates and times of all alleged events;

- b. Persons present in all alleged events;

- c. Involvement of law enforcement in all alleged events;

- d. All Communications between You and any law enforcement personal Concerning the allegations of domestic abuse against You;

- e. Describe all occurrences and Communications with Courtney Vanderhart leading up to, during, and following all alleged events;

- f. Identify all, if any, injuries You inflicted on Courtney Vanderhart;

- g. Identify all, if any, injuries You suffered by any persons involved in all alleged events; and,

- h. Identify all Communications between You and all other persons regarding the alleged events.

**ANSWER:**

**\*\*\*BEGIN CONFIDENTIAL DESIGNATION\*\*\***

Winters incorporates the general objections as if restated here.  Winters objects to Interrogatory No. 22 as vague and ambiguous with respect to the confusing request to identify and describe "all *alleged* events Concerning the *allegations* of domestic abuse against

Courtney Vanderhart."   **This phrase and the interrogatory as a whole are too vague, ambiguous, and confusing for Winters to provide an answer.**

**Winters also objects to Interrogatory No. 22 because the Fifth Amendment to the United State Constitution privileges Winters to refuse to answer.**

**\*\*\*<u>END CONFIDENTIAL DESIGNATION</u>\*\*\***

**INTERROGATORY NO. 23:**   Summarize Your factual contentions for Counterclaim Counts I and V, Identifying any documents relied on, including how You "have suffered and will continue to suffer":

    a.   Pain and suffering;

    b.   Mental anguish;

    c.   Loss of enjoyment of life;

    d.   Loss of community reputation;

    e.   Loss of employability;

    f.   Embarrassment;

    g.   Humiliation;

    h.   Loss of time and inconvenience bringing this action; and,

    i.   "Any other category of damages" You expect to seek.

**ANSWER:**

**Winters incorporates the general objections as if restated here.   Winters further objects to Interrogatory No. 23 as vague and ambiguous with respect to the term "summarize."   The term "summarize" as used in Interrogatory No. 23 has a subjective meaning, and Winters cannot reasonably anticipate the level of detail sought by Interrogatory No. 23.   To the extent that Interrogatory No. 23 seeks a comprehensive written**

## **VERIFICATION**

The undersigned hereby states that I have read the foregoing Answers to Interrogatories and know the contents thereof, and under penalty of perjury hereby state that the information contained therein is true and accurate to the best of my knowledge and belief.

Dated this _19_ day of _October_____, 2023.

_Nathan Winters_
Nathan Winters

**YouTube / FaceBook Video**

**City RFP 613**

**(Submitted to Court on Flash Drive)**