## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **TAYVIN GALANAKIS,**<br>        Plaintiff,<br><br>v.<br><br>**CITY OF NEWTON, IOWA, et al.,**<br>        Defendants. | **CASE NO. 4:23-cv-00044**<br><br><br><br>**PLAINTIFF/COUNTERCLAIM DEFENDANT'S APPENDIX RESISTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>***FILED UNDER SEAL*** |
| **NATHAN WINTERS AND CHRISTOPHER WING,**<br>        Counterclaim Plaintiffs,<br><br>v.<br><br>**TAYVIN GALANAKIS,**<br>        Counterclaim Defendant. | |

**COMES NOW** the Plaintiff/Counterclaim Defendant and for this Appendix

Defendants' Motion for Summary Judgment provides:

### TABLE OF CONTENTS

**Excerpts from Petition at Law and Jury Demand, R.Doc. 1-1** ......................3

**Excerpts from Answer and Affirmative Defenses for City of Newton and Rob Burdess, R.Doc. 2** ..................................................................................7

**Excerpts from Amended Answer, Affirmative Defenses, Counterclaims, and Jury Demand for Nathan Winters and Christopher Wing, R.Doc. 23** .................................................................................................... 10

**Excerpts from the Deposition of Tayvin Galanakis** ..................................... 13

**Excerpts from the Deposition of Nathan Winters (Confidential)** .............. 19

**Excerpts from the Deposition of Robert Burdess (Confidential)**............... 24

**Excerpts from Robert Burdess Deposition Ex. 1**............................................. 33

**Excerpts from Deposition of Lance Platt** ......................................................... 46

**Lance Platt Deposition Ex. 1** ............................................................................. 53

**Excerpts from Newton Police Department Policy Manual**.......................... 71

**Excerpts from DWI Detection and Standardized Field Sobriety Testing, Section 6, Feb. 2018** ............................................................................. 76

**Body Camera Video of Lieutenant Cristopher Wing (Notice of Mailing)** ................................................................................................................................. 78

**GRIBBLE, BOLES, STEWART & WITOSKY LAW**

BY:  /s/ Adam C. Witosky

Matthew M. Boles          AT0001037
Adam C. Witosky          AT0010436
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
Telephone: (515) 235-0551
Facsimile:  (515) 243-3696
Email:     mboles@gbswlaw.com
           awitosky@gbswlaw.com
**ATTORNEYS FOR PLAINTIFF**

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was **electronically filed** on CM/ECF on January 10, 2024.  Subject to the exceptions cited therein, Local Rule 5A provides this electronic filing, once electronically posted to the registered case party's CM/ECF account, constitutes service for purposes of the Federal Rules of Civil Procedure.

Copies have been provided to all registered parties because once the document is posted, those parties can view and download the presented or filed document.

/s/ Tami Fairchild

## IN THE IOWA DISTRICT COURT FOR JASPER COUNTY

| | |
|---|---|
| TAYVIN GALANAKIS,<br>             **Plaintiff,**<br><br>**vs.**<br><br>**CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,**<br><br>             **Defendants.** | CASE NO. _____<br><br><br><br>PETITION AT LAW and JURY DEMAND |

**COMES NOW**, the Plaintiff, and for his Petition at Law and Jury Demand states:

1.     Plaintiff Tayvin Galanakis is a citizen and resident of Newton, Iowa, who engaged with officers at the 100 block of South 3rd Ave West, Newton, Iowa 50208 at all times relevant to the events complained of herein.

2.     Defendant City of Newton, Iowa (hereinafter "City") is a municipal corporation organized and authorized to operate under the laws of Iowa and is located at 101 West 4th Street South, Newton, Jasper County, Iowa 50208. Defendant City is responsible for maintaining and operating the Newton Police Department.

3.     Defendant Chief Rob Burdess is believed to be a citizen and resident of Iowa and was serving as the Chief of Police for the Newton Police Department at all times relevant to the events complained of herein.

4.     Defendant Nathan Winters is believed to be a citizen and resident of Iowa and was serving as a police officer for the City of Newton Police Department at all times relevant to the events complained of herein.

36.     Once the breath test established zero alcohol in Tayvin's system, Officer Winters changed his story and began questioning Tayvin about marijuana use.

37.     Despite previously claiming he could smell alcohol on Tayvin, Officer Winters now claimed he believed Tayvin was intoxicated due to his use of marijuana.

38.     Tayvin continuously told the officers that he did not use marijuana and that his placement on the William Penn football team renders him unable to use marijuana because of his weekly drug tests.

39.     At 12:40 a.m., Officer Winters placed handcuffs on Tayvin, read him his Miranda rights, and put him in the back of the police vehicle.

40.     Tayvin and the Defendants arrived at the Newton Police Station at 12:44 a.m. and put Tayvin in a detention room awaiting Officer Winters' report.

41.     Tayvin has asthma and is prescribed an inhaler for his asthmatic attacks.

42.     Although Tayvin pled with Officer Winters about his difficulty breathing due to the stress he was experiencing from the interaction, Officer Winters initially denied him the ability to use his inhaler.

43.     After repeated requests, Officer Winters finally gave Tayvin his inhaler.

44.     Officer Winters asked Tayvin if he would do a drug recognition test and submit to a urine test to which Tayvin agreed.

45.     At or about 12:57 a.m., Officer Shinkle, a drug recognition expert with the Newton Police Department, arrived.

46.     At 1:12 a.m., Officer Shinkle conducted a second round of the same field

sobriety tests that Officer Winters put Tayvin through.

47.     Officer Shinkle also conducted a variety of other tests including but not limited to, a blood pressure test, checked Tayvin's pulse, and did a thorough white and blue light check on his mouth and body.

48.     Following these tests, Officer Shinkle concluded at or around 2:03 a.m., that Tayvin was not intoxicated and he was not showing any signs or had any evidence of drug or alcohol use.

49.     At this time, Officer Shinkle told Tayvin that he was going to be released and that he was going to take Tayvin home.

50.     Before leaving the station, Tayvin requested to speak to Officer Winters and at no point in their final interaction, did Tayvin receive an apology from Officer Winters for falsely accusing him of using alcohol and/or drugs.

51.     Although Tayvin continued to assert his innocence and subsequently proved that he was not intoxicated, Officer Winters remained defiant.

52.     Lt. Wing, as Officer Winters' supervising officer, stood idly by as he observed Officer Winter make claims of Tayvin's intoxication unsupported by any testing or other objective evidence.

53.     Lt. Wing participated in Tayvin's arrest for operating while intoxicated despite there being no basis to believe probable cause existed.

54.     Throughout this entire encounter, Tayvin complied with all orders by Defendants, despite his confusion and frustration at being seized and arrested without cause.

E-FILED  2023 JAN 05 9:28 AM JASPER - CLERK OF DISTRICT COURT

damages, for interest and costs as allowed by law, and such other relief as may be just under the circumstances.

### JURY DEMAND

Plaintiff hereby demands a trial by jury in this matter on all counts to which Plaintiff is entitled to a jury.

**GRIBBLE, BOLES, STEWART & WITOSKY LAW**

BY:  */s/ Matthew M. Boles*
_____

Matthew M. Boles            AT0001037

BY:  */s/ Adam C. Witosky*
_____

Adam C. Witosky            AT0010436

2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
Telephone: (515) 235-0551
Facsimile: (515) 243-3696
Email:      mboles@gbswlaw.com
                awitosky@gbswlaw.com

**ATTORNEYS FOR PLAINTIFF**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br><br>           Plaintiff,<br><br>v.<br><br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br><br><br>           Defendants. | No. 4:23-cv-00044<br><br>**ANSWER AND AFFIRMATIVE DEFENSES FOR CITY OF NEWTON AND ROB BURDESS**<br><br><br><br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

**COMES NOW**, Defendants City of Newton, Iowa ("City"), and Rob Burdess ("Chief Burdess") (collectively "Defendants"), by and through the undersigned, and for their Answer and Affirmative Defenses hereby state the following:

## ANSWER

### PARTIES

1.      Defendants lack sufficient information to either admit or deny the allegations contained in paragraph 1. Defendants admit that Plaintiff did engage with officers employed by Defendant City at or around 100 block of South 3rd Ave. West, Newton, Iowa 50208 at relevant times. The remaining allegations alleged in paragraph 1 are denied.

2.      Defendants admit that Defendant City maintains and operates the Newton Police Department. Defendant City is a municipal government entity under Iowa Constitution Article III,

43.     Defendants admit that Plaintiff was provided with his inhaler within approximately twenty seconds of his request. Defendants deny the remaining allegations alleged in paragraph 43.

44.     Defendants deny that Plaintiff agreed to do a drug recognition test upon Defendant Officer Winters' first request for him to do one. Defendants admit to the allegations alleged in paragraph 44 to the extent that eventually, Plaintiff agreed to be tested.

45.     Defendants admit to the allegations alleged in paragraph 45.

46.     Defendants admit to the allegations alleged in paragraph 46.

47.     Defendants admit to the allegations alleged in paragraph 47.

48.     Defendants admit to the allegations alleged in paragraph 47.

49.     Defendants admit to the allegations alleged in paragraph 48.

50.     Defendants admit that Defendant Officer Winters did not apologize for his actions, and that Plaintiff did request to speak with him. Defendants deny the remaining allegations alleged in paragraph 50.

51.     Defendants admit that Plaintiff did assert his innocence. Defendants deny the allegations alleged in paragraph 51.

52.     Defendants deny the allegations alleged in paragraph 52.

53.     Defendants deny the allegations alleged in paragraph 53.

54.     Defendants deny the allegations alleged in paragraph 54.

## CAUSES OF ACTION
## COUNT I CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983
## VIOLATION OF FOURTH AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### *Right to be free from Arrest without Probable Cause*
**(*Against Nathan Winters and Christopher Wing, individually*)**

55.     Defendants incorporate by reference the responses contained in all the paragraphs set forth above and below as though fully set forth herein.

17.     Defendants reserve the right to supplement affirmative defenses as discovery continues in this case.

Respectfully submitted,

By:     */s/ Matthew S. Brick*
Matthew S. Brick, AT0001081
Erin M. Clanton, AT0002592
**BRICK GENTRY, P.C.**
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
T: (515) 274-1450
F: (515) 274-1488
matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com

Counsel for Defendants
CITY OF NEWTON, ROB BURDESS,
NATHAN WINTERS and CHRISTOPHER
WING

Counsel for Counterclaim Plaintiffs
NATHAN WINTERS and CHRISTOPHER
WING



EXHIBIT

A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| TAYVIN GALANAKIS,<br><br>     Plaintiff,<br><br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,<br><br>     Defendants. | No. 4:23-cv-00044<br><br><br><br>**AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND JURY DEMAND FOR NATHAN WINTERS AND CHRISTOPHER WING**<br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |
| NATHAN WINTERS and CHRISTOPHER WING,<br><br>     Counterclaim Plaintiffs,<br><br><br>v.<br><br><br>TAYVIN GALANAKIS,<br><br><br>     Counterclaim Defendant. |  |

**COMES NOW**, Defendants Nathan Winters ("Officer Winters"), and Christopher Wing ("Lt. Wing") (collectively "Defendants"), by and through the undersigned, and for their Amended Answer, Affirmative Defenses, Counterclaims, and Jury Demand hereby state the following:

38.     Defendants admit that Plaintiff stated that he was subject to weekly drug tests as part of the William Penn football team. Defendants deny the remaining allegations alleged in paragraph 38.

39.     Defendants admit to the allegations alleged in paragraph 39.

40.     Defendants admit to the allegations alleged in paragraph 40.

41.     Defendants admit that Plaintiff had an inhaler in his possession. Defendants lack sufficient information to either admit or deny the allegations contained in paragraph 41.

42.     Defendants admit to the allegations alleged in paragraph 42 to the extent that Defendant Officer Winters did deny Plaintiff the use of his inhaler after one oral request.

43.     Defendants admit that Plaintiff was provided with his inhaler within approximately twenty seconds of his request. Defendants deny the remaining allegations alleged in paragraph 43.

44.     Defendants deny that Plaintiff agreed to do a drug recognition test upon Defendant Officer Winters' first request for him to do one. Defendants admit to the allegations alleged in paragraph 44 to the extent that eventually, Plaintiff agreed to be tested.

45.     Defendants admit to the allegations alleged in paragraph 45.

46.     Defendants admit to the allegations alleged in paragraph 46.

47.     Defendants admit to the allegations alleged in paragraph 47.

48.     Defendants admit to the allegations alleged in paragraph 47.

49.     Defendants admit to the allegations alleged in paragraph 48.

50.     Defendants admit that Defendant Officer Winters did not apologize for his actions, and that Plaintiff did request to speak with him. Defendants deny the remaining allegations alleged in paragraph 50.

    c.   Humiliation;

    d.   Pain and suffering;

    e.   Inconvenience; and

    f.   Any other category of damages found just and proper.

**WHEREFORE**, Counterclaim Plaintiff Lt. Wing respectfully requests this Court grant his claim for recovery due to Counterclaim Defendant's invasion of his privacy and order that he be afforded such other relief to which they may be entitled including, but not limited to, compensatory damages, punitive damages, costs, and attorney's fees.

## JURY DEMAND

**COMES NOW**, the Defendants/Counterclaim Plaintiffs and respectfully request a trial by jury on all issues raised herein.

Respectfully submitted,

By:   */s/ Matthew S. Brick*
     Matthew S. Brick, AT0001081
     Erin M. Clanton, AT0002592
     Doug A. Fulton, AT0002672
     **BRICK GENTRY, P.C.**
     6701 Westown Parkway, Suite 100
     West Des Moines, IA 50266
     T: (515) 274-1450
     F: (515) 274-1488
     matt.brick@brickgentrylaw.com
     erin.clanton@brickgentrylaw.com
     doug.fulton@brickgentrylaw.com

     Counsel for Defendants
     CITY OF NEWTON, ROB BURDESS,
     NATHAN WINTERS and CHRISTOPHER
     WING

     Counsel for Counterclaim Plaintiffs
     NATHAN WINTERS and CHRISTOPHER
     WING

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION


 3
    - - - - - - - - - - - - - - - - -
 4  TAYVIN GALANAKIS,             :
                                  :
 5       Plaintiff,               :
    vs.                           :  Case No.
 6                                :  4:23-cv-000044
                                  :
 7  CITY OF NEWTON, IOWA, ROB     :
    BURDESS, NATHAN WINTERS,      :
 8  CHRISTOPHER WING, individually:
    and in their official         :
 9  capacities with the Newton    :
    Police Department,            :
10                                :
         Defendants.              :
11  - - - - - - - - - - - - - - - - -
    NATHAN WINTERS and            :
12  CHRISTOPHER WING,             :
                                  :
13       Counterclaim Plaintiffs,:
                                  :
14  vs.                           :
                                  :
15  TAYVIN GALANAKIS,             :
                                  :
16       Counterclaim Defendant. :
    - - - - - - - - - - - - - - - - -

17

18    VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19  taken by the Defendants/Counterclaim Plaintiffs

20  before Jessi C. Lass, Certified Shorthand Reporter

21  of the State of Iowa, at 6701 Westown Parkway, Suite

22  100, Des Moines, Iowa, commencing at 2:14 p.m.,

23  Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

COPY

Case 4:23-cv-00044-SHL-SBJ   Document 53-3   Filed 01/10/24   Page 14 of 78

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023
Pages 2..5

Page 2

**A P P E A R A N C E S**

1
2  For the Plaintiff/Counterclaim Defendant:
3      CHRISTOPHER C. STEWART, ESQ.
        GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
4      2015 Grand Avenue, Suite 200
        Des Moines, Iowa 50312
5
6  For the Defendants/Counterclaim Plaintiffs:
7      NICHOLAS F. MILLER, ESQ.
        BRICK GENTRY PC
8      6701 Westown Parkway, Suite 100
        West Des Moines, Iowa 50266
9
10  Videographer:
        AMY COOPER
11      FIDELITY VIDEO SERVICES, INC.
12  Also present:
        NATHAN WINTERS
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

**T A B L E   O F   C O N T E N T S**

1
2  WITNESS: TAYVIN GALANAKIS                          PAGE
3  Examination By Mr. Miller .........................5
4  Examination By Mr. Stewart .....................120
5
6  EXHIBITS                                    PAGE FIRST
                                                REFERENCED
7  1  - Body cam video (City ID 00630) .............20
8  2  - NAIA drug-testing policy manual ............56
9  3  - Video (City ID 00627) ......................65
10  4  - 8/29/22 Facebook post by Galanakis .........75
11  5  - Facebook comment string ....................87
12  6  - 11/1/22 Facebook post by Galanakis .........91
13  7  - GoFundMe page for Galanakis ................96
14  8  - William Penn University "Drug Education ...114
            and Testing Program Policy"
15
    CERTIFICATE OF REPORTER.........................123
16
17  Reporter's Note:  The original exhibits were
    forwarded to Mr. Miller.
18
    (ph) indicates a phonetic spelling.
19  [sic] indicates the text is as stated.
    Quoted text is as stated by the speaker.
20
21
22
23
24
25

Page 4

P R O C E E D I N G S

1
2      (Exhibit Numbers 1 through 8 were marked
3  for identification.)
4      THE VIDEOGRAPHER:  Today's date is
5  November 10th, 2023, and the approximate time is
6  2:14 p.m.  This begins the video deposition of
7  Tayvin Galanakis requested by the defendants and
8  counterclaim plaintiffs regarding Case
9  Number 423-cv-00044 in the United States District
10  Court for the Southern District of Iowa, Central
11  Division.  This deposition is being held in the
12  offices of Brick Gentry, located at 6701 Westown
13  Parkway, Suite 100, in West Des Moines, Iowa.
14      My name is Amy Cooper, certified legal
15  videographer of Fidelity Video Services,
16  Incorporated, West Des Moines, Iowa.
17      Counsel will please identify themselves
18  for the record.
19      MR. STEWART:  Chris Stewart for the
20  plaintiff/counterclaim defendant.
21      MR. MILLER:  Nicholas Miller for the
22  defendants and the counterclaim plaintiffs.
23      THE VIDEOGRAPHER:  The oath will now be
24  administered by Jessi Lass, certified shorthand
25  reporter of Susan Frye Court Reporting, Des Moines,

Page 5

1  Iowa.
2          TAYVIN GALANAKIS,
3  the Plaintiff, being first duly sworn by the
4  certified shorthand reporter, testified under oath
5  as follows:
6                  EXAMINATION
7  BY MR. MILLER:
8      Q.  State your name.
9      A.  My name is Tayvin Galanakis.
10      Q.  Can you spell your first and last name.
11      A.  First name, T-a-y-v-i-n, last name,
12  G-a-l-a-n-a-k-i-s.
13      MR. MILLER:  Thank you.
14      Q.  (Mr. Miller)  Where do you reside?
15      A.  I live in Newton, Iowa.
16      Q.  Are you employed?
17      A.  Yep.
18      Q.  Where?
19      A.  Self-employed, Amazon.
20      Q.  Are you employed by Amazon?  Or explain
21  that.
22      A.  I run a business for Amazon.
23      Q.  Explain that a little bit more.
24      A.  So I do wholesale.  It's my own business.
25  I don't have an LLC, but Dawn dish soap, wholesale

Page 22

1  up.
2       Q.   Did you watch it in the car?
3       A.   Yes.
4       Q.   Were you driving?
5       A.   No.
6       Q.   Okay.  I may show you certain portions of
7  Officer Winters' body cam video, which is --
8  sometimes I'll refer to it as Galanakis Deposition
9  Exhibit 1 in connection with my questions today.  If
10 at any point you think it would be helpful to see a
11 certain part, you just stop me and you let me know.
12 Okay?
13      A.   Perfect.
14      Q.   All right.  Let's talk about when Officer
15 Winters first pulled you over.  How long did it take
16 you to produce copies of your registration and proof
17 of insurance?
18      A.   I believe for the registration it was
19 probably around 45 seconds.  And for the insurance,
20 I found out it was on my phone, and as soon as I got
21 on my phone it was probably 10 seconds, once I found
22 out it was on my phone.
23      Q.   Do you at all know, from the time Officer
24 Winters first asked you for proof of insurance to
25 when you finally produced it on your phone, how long

Page 23

1  that took?
2       A.   I believe around 45 seconds.
3       Q.   45 seconds.  I'm going to show you an
4  approximately three-minute-and-one- or two-second
5  portion of Officer Winters' body cam video, which is
6  Galanakis Deposition Exhibit 1, beginning at
7  14 minutes, 24 seconds and ending at 17 minutes,
8  25 second, based on the timer in the upper
9  right-hand corner of the video.
10           All right, Mr. Galanakis.  I'm handing you
11 my computer so you can watch that portion of the
12 video.
13      A.   Is there a certain point you want me to
14 stop it at?
15      Q.   17:25.
16      A.   17:25.
17      Q.   Top right corner.
18           MR. MILLER:  Thank you.  Taking my
19 computer back now that Mr. Galanakis has reviewed
20 that portion of the video.
21      Q.   (Mr. Miller)  So based on that portion of
22 the video, Mr. Galanakis, would you agree it took
23 about three minutes for you to produce proof of
24 insurance?
25      A.   Yes.

Page 24

1       Q.   Why'd it take you three minutes?
2       A.   It was one of my first times getting
3  pulled over.  I didn't know where everything was.
4       Q.   You didn't know where your proof of
5  insurance was?
6       A.   Yeah.
7       Q.   Do you remember how many times Officer
8  Winters asked you for proof of insurance before you
9  produced it?
10      A.   No.
11      Q.   Was it more than once?
12      A.   I don't know.
13      Q.   You don't know?
14      A.   Huh-uh -- no.  Sorry.  Can't be doing
15 that.  Can't be doing huh-uh.  Got to say no, man.
16 Got to say no.
17      Q.   When Officer Winters stopped you on
18 August 28th, 2022, did you know whether you had
19 proof of insurance?
20      A.   Yes.  Because you're supposed to drive
21 with insurance.
22      Q.   So you knew you had it; you just didn't
23 know where it was?
24      A.   Correct.
25      Q.   Did you know what proof of insurance

Page 25

1  looked like?
2       A.   Yes.
3       Q.   Why, after Officer Winters asked you for
4  proof of insurance a second time, did you ask him,
5  quote, "Would it be that white card?" end quote?
6       A.   It was my old insurance.  So I was asking
7  him if this is the insurance right here, and he told
8  me that that was the expired version of the
9  insurance.
10      Q.   You didn't know that it was expired?
11      A.   Nope.
12      Q.   Why not?
13      A.   I don't know why not.  That's a good
14 question.
15      Q.   Well, why'd you show Officer Winters an
16 expired proof of insurance?
17      A.   Because, before I get into my car, I don't
18 examine my insurance before every drive.  So I had
19 no idea it was expired.
20      Q.   I think you mentioned you eventually
21 provided Officer Winters proof of insurance by
22 showing him an email that was on your phone; is that
23 right?
24      A.   Text message.
25      Q.   It was a text message?

Case 4:23-cv-00044-SHL-SBJ   Document 53-3   Filed 01/10/24   Page 16 of 78

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023

Pages 26..29

Page 26

1    A.    (Nods head.)
2    Q.    But in any case, you had something on your
3  phone that you thought was proof of your auto
4  insurance?
5    A.    Yes.
6    Q.    So if you had proof of insurance on your
7  phone the whole time, why didn't you provide that to
8  Officer Winters when he first asked you for proof of
9  insurance?
10    A.    I knew there was an email version and
11  there was a physical version.  I just happened to
12  have the physical version as the expired insurance.
13    Q.    Is it possible that it just took you some
14  time to remember that you had an email on your phone
15  showing proof of insurance?
16    A.    No.
17    Q.    You knew you had it the whole time?
18    A.    Can you explain on that?
19    Q.    Well, you knew from the time Officer
20  Winters first asked you for proof of insurance that
21  you had an email version on your phone?
22    A.    I did not -- I did not know that.
23    Q.    You didn't know when he first asked you
24  for proof of insurance?
25    A.    I didn't know that I wouldn't have the

Page 27

1  physical version.  I knew I had an email version,
2  but I thought I would also have the physical
3  version.
4    Q.    And then -- so then it was once you
5  realized you didn't have the physical copy that you
6  resorted to the email version?
7    A.    Correct.
8    Q.    So why not just provide him the email
9  version from the beginning?
10    A.    I didn't want to make any sudden movements
11  towards my phone.  I just wanted --
12    (Reporter clarification.)
13    A.    -- any sudden movements toward my phone,
14  because I believe it was in my lap, and instead I
15  did what he told me, which was getting my
16  registration and insurance.  And, generally, that's
17  in the glove compartment, and that's what I did.
18    Q.    (Mr. Miller)  So the reason you didn't
19  initially provide him the email version of your
20  proof of insurance was because you didn't want to
21  make a sudden movement toward your phone?
22    A.    Can you repeat that question?
23    MR. MILLER:  Can you read that back.
24    (The pending question was read by the
25  reporter.)

Page 28

1    A.    That's not the initial reason.
2    Q.    (Mr. Miller)  What was the reason?
3    A.    The initial reason why I didn't go to the
4  email version was because I thought I had the
5  physical version.
6    Q.    Why were your eyes red and watery when
7  Officer Winters pulled you over?
8    A.    To me they weren't red and watery.  That's
9  just opinion-based.
10    Q.    How do you know?
11    A.    How do I know they weren't red and watery?
12    Q.    Yes.
13    A.    There's a mirror, and it's like right --
14  it's connected to the glass of your screen.  It's
15  your rearview mirror.  And once he said that, I
16  mean, I could've easily just looked into that mirror
17  and seen that my eyes weren't red.
18    Q.    So if you at the time believe your eyes
19  weren't red and watery, why didn't you say that?
20    A.    I mean, I already knew.  I had nothing to
21  prove.
22    Q.    But why didn't you tell Officer Winters
23  that your eyes -- that you didn't believe your eyes
24  were red and watery after he had asked you why they
25  were?

Page 29

1    A.    I don't remember exactly what I told him
2  after he said my eyes were red and watery, but I'm
3  pretty sure that triggered a response in me to be
4  conflicted and say, "Wow, is this guy really -- does
5  he really think I'm drunk right now, or is
6  he really -- does he think I'm high?  Because I know
7  for a fact that I'm not either of that.  So why
8  would my eyes be red and watery?"  That's how I
9  would internally know or easily look into that
10  mirror and just see that my eyes are not red.  I
11  mean, the video shows my eyes are not red and
12  watery.
13    Q.    Well, you never told Officer Winters that
14  you didn't believe your eyes were red and watery
15  that night, did you?
16    A.    I don't remember.
17    Q.    You don't remember whether you told him
18  whether you believed your eyes were red or watery?
19    A.    No.
20    Q.    Do you remember what you did tell him?
21    A.    At the end of the night, towards the end
22  of the altercation, before I got arrested, I did
23  tell him it was -- the reason they could possibly be
24  watery is because I just got done looking up in the
25  sky while it was pouring out.  So when you're doing

Case 4:23-cv-00044-SHL-SBJ   Document 53-3   Filed 01/10/24   Page 17 of 78

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                                    Pages 30..33

Page 30

1  this and it's raining out, that could be a reason
2  why your eyes appear to look watery.
3      Q.   Why would they appear to look red?
4      A.   If you're looking up into the sky and it's
5  raining and a rain drop directly hits your eye, that
6  could make your eye red.  But even then I don't
7  think my eyes was red.
8      Q.   But you never told that to Officer
9  Winters, did you?
10     A.   I don't know.
11     Q.   Any other reason why your eyes would have
12 been red and watery other than the rain?
13     A.   The only possible reason I could think of
14 other than the rain is my contacts I took out, but
15 that's the only other reason I could think of.
16     Q.   Were you wearing contacts when Officer
17 Winters pulled you over?
18     A.   No.
19     Q.   So how could they make your eyes red and
20 watery?
21     A.   When you take them out, you're having
22 contact with your hand and your eye.  So when you
23 take them out, it can make your eyes red and watery.
24 But even then my eyes weren't red and watery.  So
25 that wouldn't have done it.

Page 31

1      Q.   Well, when was the last time you wore them
2  before Officer Winters pulled you over?
3      A.   Two hours before that.
4      Q.   So it's your testimony that taking your
5  contacts out two hours before Officer Winters pulled
6  you over caused your eyes to be red and watery by
7  the time he did pull you over?
8      A.   No.  Because my eyes weren't red and
9  watery.
10     Q.   Why didn't you tell him that?
11     A.   I don't remember if I did or not.
12     Q.   Are you allergic to dogs?
13     A.   Some breeds.
14     Q.   Which ones?
15     A.   The breeds that are not hyperangelic -- or
16 how do you say that word?  Hype -- it's the certain
17 breed that doesn't shed.  So that's -- whatever
18 breed that is, that's the breed I'm not allergic to.
19 So anything other than those dogs, I'm allergic to.
20     Q.   Are you allergic to anything else?
21     A.   Am I allergic to anything else?  I don't
22 know.
23     Q.   You don't know?
24     A.   (Shakes head.)
25     Q.   Are you allergic to other pets or animals

Page 32

1  other than dogs?
2      A.   Cats.
3      Q.   Cats.  Were you around a dog on
4  August 28th, 2022?
5      A.   I don't remember.
6      Q.   Do you remember what you told Officer
7  Winters about your allergies?
8      A.   What I told Winters about my allergies?  I
9  don't remember.  I would have to go back in that
10 video and look.
11     Q.   Let's talk about the walk-and-turn test.
12 Did you have any injuries on August 28th, 2022?
13     A.   I had a tweak in my ankle.
14     Q.   What's a tweak?
15     A.   It's something that is bearable, but still
16 caused some issues.
17     Q.   Anything else?
18     A.   Nothing that I can remember.
19     Q.   Did your ankle tweak affect your ability
20 to perform the walk-and-turn test on August 28th,
21 2022?
22     A.   I don't remember.
23     Q.   You don't remember.  I'm going to show you
24 an approximately two-minute-and-30-second portion of
25 Officer Winters' body cam video, which again is

Page 33

1  Galanakis Deposition Exhibit 1, beginning at
2  25 minutes, 3 seconds and ending at 27 minutes,
3  30 seconds, based on the timer in the upper
4  right-hand corner of the video.
5      All right, Mr. Galanakis.  I'm handing you
6  my computer so you can view that portion of the
7  video.  You can go ahead and stop it at 27 minutes,
8  30 seconds.  Press play --
9      A.   Thank you, sir.  27 minutes and 30
10 seconds?
11     Q.   Correct.
12     You can stop it at 27:30.
13     A.   Oh, I'm sorry.  I went eight seconds over.
14 My bad.
15     Q.   That's okay.  I'm taking my computer back,
16 because you completed viewing that portion of the
17 video.
18     Before you started the walk-and-turn test,
19 Mr. Galanakis, you said, quote, "I'll be able to do
20 this," end quote.  And during the walk-and-turn
21 test, you said, quote, "Come on, man.  It's too
22 easy," end quote.
23     If you had an ankle injury that affected
24 your ability to perform the walk-and-turn test,
25 why'd you say these things?

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                    Pages 122..123

Page 122

1   **A.  Yes.**
2       Q.  (Mr. Stewart)  Were you upset with the
3   defendants' actions in their transportation of you
4   and the interactions you had at the police station?
5           MR. MILLER:  Object to the form of the
6   question.
7   **A.  Yes.**
8       Q.  (Mr. Stewart)  Did you believe the conduct
9   of the defendants at both the scene and at the
10  station were improper or unlawful?
11          MR. MILLER:  Object to the form of the
12  question.
13  **A.  Yes.**
14          MR. MILLER:  These are all leading
15  questions.
16          Go ahead.
17  **A.  Yes.**
18          MR. STEWART:  Nothing further from me.
19          MR. MILLER:  I have nothing.
20          THE VIDEOGRAPHER:  Off the record, ending
21  the deposition at 5:17 p.m.
22
23
24
25

Page 123

1           C E R T I F I C A T E
2       I, the undersigned, a Certified Shorthand
3   Reporter of the State of Iowa, do hereby certify
4   that there came before me at the time, date, and
5   place hereinbefore indicated, the witness named on
6   the caption sheet hereof, who was by me duly sworn
7   to testify to the truth of said witness's knowledge,
8   that the witness was thereupon examined under oath,
9   the examination taken down by me in shorthand and
10  later reduced to a transcript through the use of a
11  computer-aided transcript device under my
12  supervision and direction, and that the deposition
13  is a true record of the testimony given and of all
14  objections interposed.
15      I further certify that I am neither attorney or
16  counsel for, nor related to or employed by any of
17  the parties to the action in which this deposition
18  is taken, and further that I am not a relative or
19  employee of any attorney or counsel employed by the
20  parties hereto or financially interested in the
21  action.
22      Dated this 19th day of November 2023.
23
24  _____
        CERTIFIED SHORTHAND REPORTER
25      Jessi C. Lass, Iowa CSR #1336

---

**Page 1**

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

TAYVIN GALANAKIS,              )CASE NO.: 4:23-cv-00044
                              )
     Plaintiff/Counterclaim   )
     Defendant,               )DEPOSITION OF
                              )NATHAN WINTERS
vs.                           )(CONFIDENTIAL)
                              )
CITY OF NEWTON, IOWA,         )
et al.,                       )
                              )
     Defendants/Counterclaim  )
     Plaintiffs.              )
_____)

10     THE DEPOSITION OF NATHAN WINTERS, taken

11 before Emma L. Rosky, Certified Shorthand

12 Reporter and Registered Professional Reporter for

13 the State of Iowa, commencing at 1:17 p.m.,

14 October 27, 2023, at 2015 Grand Avenue,

15 Suite 200, Des Moines, Iowa.

---

**Page 2**

CONFIDENTIAL

1                  A P P E A R A N C E S

2

3  Plaintiff/Counterclaim
   Defendants by:      MATTHEW BOLES
                       Attorney at Law
4                      Gribble, Boles, Stewart &
                       Witosky Law
5                      2015 Grand Avenue
                       Suite 200
6                      Des Moines, IA 50312

7  Defendants/Counterclaim
   Plaintiffs by:      NICHOLAS F. MILLER
8                      Attorney at Law
                       Brick Gentry, P.C.
9                      6701 Westown Parkway
                       Suite 100
10                     West Des Moines, IA 50266

---

**Page 3**

CONFIDENTIAL

1                 INDEX OF EXAMINATION

2  Examination by          Page

3  Mr. Boles               4

4  Mr. Miller              39

5

6              PREVIOUSLY MARKED
                   EXHIBITS
7  Exhibit
   Name       Description              Page

8  Exhibit 1  Internal Investigation   16

9  Exhibit 4  Petition for Relief from
10            Domestic Abuse           25

16             INDEX OF ATTORNEY REQUESTS

17  Request by        Page      Line

18  Mr. Boles         32        8

---

**Page 4**

CONFIDENTIAL

1                  NATHAN WINTERS,

2  called as a witness, having been first duly

3  sworn, testified as follows:

4                 DIRECT EXAMINATION

5  BY MR. BOLES:

6  Q.   Can you state your name for the record,

7  please.

8  A.   Officer Nathan Winters, W-i-n-t-e-r-s.

9  Q.   Okay.  And how are you employed?

10  A.   Police officer with the City of Newton.

11  Q.   And how long have you been employed in that

12  capacity?

13  A.   Just under five years.

14  Q.   Okay.  And where were you employed before

15  that?

16  A.   Hy-Vee Corporate as a officer.

17  Q.   Okay.  And did you have some prior law

18  enforcement experience?

19  A.   No.

20  Q.   Okay.  Were you ever involved with the

21  Urbandale Police Department?

22  A.   No.

23  Q.   Okay.  What's your education background?

24  A.   I have an associate's degree in criminal

25  justice from Indian Hills.

9

1  that you are conscious of when a minority is
2  being stopped that they're not in fear that
3  they're going to get shot?
4          MR. MILLER:  Objection, form and
5  foundation.
6  Q.  Do you have any training on that?
7  A.  No.
8  Q.  Okay.  So what other signs was Mr. Galanakis
9  demonstrating that were signs of intoxication
10  besides his slow movement?
11  A.  I also -- when I was speaking with him, I
12  noticed that he spoke with slurred speech as
13  well.
14  Q.  Okay.  What part do you think was slurred
15  when you were making that observation?
16  A.  When he was speaking, some of his S's were
17  slurred.  He was having a hard time saying words.
18  Some of his wording was mumbled.
19  Q.  Okay.  So you think that it's his S's that
20  were slurred?
21  A.  Yes.
22  Q.  Okay.  What else?
23  A.  He would -- like I said, some of his wording
24  was mumbled as well.  Thick tongue.
25  Q.  Okay.  And based upon that -- or is there

10

1  other things that you observed?
2  A.  And before the traffic stop, having his high
3  beams in town -- failing to dim his headlights
4  while he was approaching me.
5  Q.  He explained to you why he did it, because
6  one of his lights was out; correct?
7  A.  Yes.
8  Q.  And you told him it was illegal for him to
9  have his high beams on?
10  A.  I advised him that it was illegal for him to
11  not dim his headlights.
12  Q.  Okay.  What part of the Iowa Code are you
13  referring to on that?
14  A.  Iowa Code Section 321.415.
15  Q.  And based upon that, you believe that was a
16  basis for field testing for alcohol?
17  A.  Yes.
18  Q.  What tests were performed?
19  A.  I started with the horizontal gaze and
20  nystagmus test, and then I performed that test,
21  and then I performed the walk-and-turn test, then
22  I performed the one-leg stand test, then I
23  offered the preliminary breath test, and then I
24  offered three advanced roadside impaired driving
25  enforcement tests.

11

1  Q.  Okay.  Did Mr. Galanakis tell you that he
2  had a bad ankle?
3  A.  Yes.
4  Q.  Did he also inform you that he had not drank
5  anything?
6  A.  Yes.
7  Q.  You told him to take his gum out and leave
8  it on the dash; is that correct?
9  A.  Yes.
10  Q.  He was following all of your commands?
11  A.  Yes.
12  Q.  You didn't make any observation that he had
13  bloodshot eyes or glassy eyes, did you?
14  A.  I stated that he had watery and bloodshot
15  eyes, yes.
16  Q.  Okay.  Did you believe that you were having
17  a coherent conversation with him?
18  A.  Was Mr. Galanakis coherent?
19  Q.  Yeah.
20  A.  Yes.
21  Q.  And would you agree that when you offered
22  the PBT, he blew zeros?
23  A.  Yes.
24  Q.  Okay.  And you performed this test in the
25  rain, didn't you?

12

1  A.  It was sprinkling that night I believe, yes.
2  Q.  On the video -- the entire length of the
3  video, it's raining in it.  Would you agree with
4  that?
5  A.  It was wet out, yes.  I don't remember
6  exactly if it was raining.
7  Q.  Do you believe that the interfering
8  condition of rain has an impact on the subject's
9  performance?
10          MR. MILLER:  Objection, form and
11  foundation.
12  A.  Small.  Minor.
13  Q.  Okay.  Tell me about it.
14  A.  It can be slick.  It can be -- on gravel it
15  can be all sorts of stuff if it's wet.  A person
16  can obviously slip on their footing.
17  Q.  Okay.  What about when the rain is hitting
18  someone's eyes?
19  A.  Yeah, it can get in -- the water can get in
20  their eyes, yeah.
21  Q.  And people, when they're standing and
22  listening to you and it's hitting them, they're
23  reacting to it; right?  We all react to rain.
24  A.  Yeah.
25  Q.  Okay.  After you ran him through all of

13

CONFIDENTIAL

1  these tests and the three advanced roadside
2  impairments, there was no indication that he was
3  under the influence of alcohol, was there?
4        MR. MILLER:  Objection, form and
5  foundation.
6  A.  Correct.
7  Q.  All right.  And Officer Wing was standing
8  there the whole time?
9  A.  Yes.  Lieutenant Wing was, yes.
10  Q.  Was he riding with you that night?
11  A.  Yes.
12  Q.  Okay.  Was he riding with you the whole
13  shift?
14  A.  I believe I had just picked him up.
15  Q.  So he was not in your vehicle when you had
16  made two previous traffic stops on that
17  particular shift?
18  A.  That's correct.
19  Q.  And on those two previous traffic stops you
20  asked the DRE Officer Shinkle to do drug
21  recognition exams on those two drivers; correct?
22  A.  I don't recall that.
23  Q.  Okay.  Well, if he says in the internal
24  affairs investigation that now you should have
25  do that, would you have reason to say that he has

14

CONFIDENTIAL

1  misremembered or you disagree with that?
2        MR. MILLER:  Objection, form and
3  foundation.
4  A.  No.
5  Q.  Okay.  And if he said that all he simply did
6  was talk to those two individuals and determined
7  he doesn't even need to run through any battery
8  of tests and released them, said they're not
9  under the influence of narcotics, would you have
10  reason to object to that?
11        MR. MILLER:  Objection, form and
12  foundation.
13  A.  For those two specific stops, no.
14  Q.  Okay.  So at that point after he is cleared,
15  "he" being Mr. Galanakis is cleared with all of
16  the roadside testing, you still have a belief
17  that he's under the influence of drugs; correct?
18  A.  Yes.
19  Q.  What were the indicators that you believe he
20  exhibited that showed he was under the influence
21  of the drugs?
22  A.  He showed five clues of impairment in the
23  walk-and-turn test, he showed two clues of
24  impairment in the one-leg stand test, and also
25  had indicators of impairment in the advanced

15

CONFIDENTIAL

1  roadside impaired driving tests.
2  Q.  Okay.  What do those specifically correlate
3  with the determination that there is a need for a
4  DRE exam?
5  A.  Can you rephrase your question?
6  Q.  What about those indicators causes you, as
7  an officer, to believe that now you should go
8  ahead and have a DRE officer run him through
9  testing?
10  A.  Through those -- through my training and
11  experience with those tests, individuals that
12  demonstrate indicators of impairment indicate
13  drug impairment within their person.  I am not a
14  certified drug recognition expert, therefore I
15  was reaching out to our DRE.
16  Q.  Okay.  And in this specific instance with
17  Mr. Galanakis, your experience and training was
18  wrong, wasn't it?
19        MR. MILLER:  Objection, form and
20  foundation.
21  A.  At the end of the investigation, yes.
22  Q.  And even in spite of Shinkle telling Wing
23  "he's good" meaning Mr. Galanakis is good, he
24  doesn't exhibit any signs of being under the
25  influence of drugs, you still wanted to charge

16

CONFIDENTIAL

1  him, didn't you?
2  A.  No.
3  Q.  You didn't?  Did you have a chance to read
4  the internal affairs report?
5  A.  The only parts I've reviewed were the parts
6  of me being notified of the internal and the
7  findings of the internal investigation.
8  Q.  Okay.  I've got a copy on here.  I've got to
9  find mine that -- I can just give it to you.
10        Back page.  We've marked it as Exhibit 1;
11  City Request for Production number nine -- page
12  907.  That second to last paragraph, if you would
13  read that.
14  A.  Okay.
15  Q.  Okay.  Does that refresh your recollection
16  of the two previous people that you referred for
17  a DRE?
18  A.  I had questions about them, yes, I believe.
19  Q.  Okay.  You would agree that you placed
20  Mr. Galanakis under arrest for OWI?
21  A.  Yes.
22  Q.  And you handcuffed him?
23  A.  Yes.
24  Q.  And you searched and then placed him in the
25  back of patrol car 843?

1   A.   Yes.

2   Q.   What are the signs and use of marijuana?

3   A.   Slow and lethargic response, watery and

4   bloodshot eyes, slurred speech, impaired balance,

5   impaired physio -- other items.

6   Q.   Other items, you said?

7   A.   Yes.

8   Q.   Like what?

9   A.   Like cognitive -- like, being able to do

10   more than one thing at one time, getting the

11   proper paperwork, all that other -- all the stuff

12   that I had requested many times.

13   Q.   Is it your testimony that Mr. Galanakis was

14   having cognitive function impairment at some

15   point?

16   A.   I would believe during my interaction with

17   him after having to ask him for his insurance

18   three to four times and him not being able to

19   provide it and fumbling through his registration,

20   that that was something going on.

21   Q.   Okay.  So after that for the 14 minutes that

22   the traffic stop lasted, are you telling me that

23   it's your belief that he had cognitive function

24   impairment?

25   A.   After that incident, no.

1   Q.   Okay.  Marijuana that's raw, does it smell

2   different than burnt marijuana?

3   A.   Marijuana, to me, smells like marijuana.  I

4   don't know what burned marijuana or raw marijuana

5   is -- the differences between them.

6   Q.   You've graduated from the Iowa Law

7   Enforcement Academy; correct?

8   A.   Yes.

9   Q.   As part of their training, don't they burn

10   marijuana so you can smell the difference between

11   marijuana as a product and then as a consumer

12   good of smoke and what it smells like?

13   A.   No.

14   Q.   You never did that?

15   A.   No.

16   Q.   Marijuana; does it smell like alcohol?

17   A.   No.

18   Q.   Okay.  Does a clean PBT provide cause to

19   accuse somebody of using marijuana?

20   A.   A PBT estimates if and how much alcohol is

21   on a person's breath.  It is not co-admissible.

22   Q.   I understand.  My question is:  If they blow

23   .000, does that somehow provide you cause to then

24   accuse that person of using marijuana?

25   A.   Off of the standardized field sobriety tests

1   that I had, I believe that I had probable cause,

2   yes.

3   Q.   Okay.  So what about the field sobriety

4   tests made you believe that he was under the

5   influence of marijuana?

6   A.   His walk-and-turn, his one-leg stand, and

7   his other indicators during the ARIDE tests.

8   Q.   Okay.  You received a written counseling

9   report for discipline out of the Galanakis

10   interaction.  I believe that was August 28th of

11   2022; correct?

12   A.   I believe that's when the traffic stop

13   happened was the 28th.

14   Q.   Correct.  It did.

15   A.   I received the letter a week or so later.

16   Q.   Okay.  Did you receive anything regarding

17   your field testing or OWI detection and the

18   manner in which you conducted it that night?

19   A.   Not the testing, no.  Just with speaking to

20   people more -- being more nice to people.

21   Q.   You also had a situation on August 3rd of

22   2022.  You had a one-day suspension due to a

23   motor vehicle accident; correct?

24   A.   Yes.

25   Q.   And then you had a discipline letter for

1   failure to secure a vehicle where $600 was

2   missing, and that was April 6th of 2022?

3   A.   Yes.

4   Q.   Do you have any supervisory relationship

5   over Officer Shinkle?

6   A.   I am -- if there's -- if it's he and I

7   working and there's no supervisor, I'm considered

8   the officer in charge.

9   Q.   Right.  And I got some explanation as the

10   officer in charge as being the highest ranking

11   officer that's on duty at the time.  Is that your

12   understanding?

13   A.   Yes.

14   Q.   What authority do you have in that role when

15   you're the officer in charge?

16   A.   Just making sure that policy's being

17   followed appropriately, and if, like, dispatch

18   has a question, they would contact me, or if

19   somebody wants to speak to a supervisor, I would

20   take that complaint and then speak -- and then

21   send that information into the sergeants and

22   lieutenants.

23   Q.   Okay.  How often are you the officer in

24   charge?

25   A.   Frequently.



```
 1              C E R T I F I C A T E

 2

 3        I, Emma L. Rosky, a Certified Shorthand
          Reporter of the State of Iowa and Registered
 4        Professional Reporter, do hereby certify that
          there came before me at the time, date, and place
 5        hereinbefore indicated, the witness named on the
          caption sheet hereof, who was by me duly sworn to
 6        testify to the truth of said witness's knowledge,
          touching and concerning the matters in
 7        controversy in this cause; that the witness was
          thereupon examined under oath, the examination
 8        taken down by me in shorthand, and later reduced
          to printed form under my supervision and
 9        direction, and that the deposition is a true
          record of the testimony given and of all
10        objections interposed.

11        I further certify that I am neither attorney
          or counsel for, or related to or employed by any
12        of the parties to the action in which this
          deposition is taken, and further that I am not a
13        relative or employee of any attorney or counsel
          employed by the parties hereto or financially
14        interested in the action.

15

16        Dated at Des Moines, Iowa, this 11th day of

17        December, 2023.

18

19

20

21              /s/ Emma L. Rosky

22              CERTIFIED SHORTHAND REPORTER,
                and REGISTERED PROFESSIONAL
23              REPORTER

24

25

          SWEENEY COURT REPORTING (515) 244-6373
      320 Insurance Exchange Bldg., Des Moines, IA 50309
```

1

2

CONFIDENTIAL

CONFIDENTIAL

1     IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
2               CENTRAL DIVISION

3   TAYVIN GALANAKIS,        )CASE NO.: 4:23-cv-00044
                             )
4      Plaintiff/Counterclaim)
        Defendant,           )DEPOSITION OF
5                            )CHIEF ROBERT BURDESS
     vs.                     )(CONFIDENTIAL)
6                            )
     CITY OF NEWTON, IOWA,   )
7    et al.,                 )
                             )
8     Defendants/Counterclaim)
       Plaintiffs.           )
9    _____)

10          THE DEPOSITION OF CHIEF ROBERT BURDESS,

11    taken before Emma L. Rosky, Certified Shorthand

12    Reporter and Registered Professional Reporter for

13    the State of Iowa, commencing at 12:31 p.m.,

14    October 27, 2023, at 2015 Grand Avenue,

15    Suite 200, Des Moines, Iowa.

1            A P P E A R A N C E S

2   Plaintiff/Counterclaim
    Defendants by:      MATTHEW BOLES
3                       Attorney at Law
                        Gribble, Boles, Stewart &
4                       Witosky Law
                        2015 Grand Avenue
5                       Suite 200
                        Des Moines, IA 50312
6

7   Defendants/Counterclaim
    Plaintiffs by:      NICHOLAS F. MILLER
8                       Attorney at Law
                        Brick Gentry, P.C.
9                       6701 Westown Parkway
                        Suite 100
10                      West Des Moines, IA 50266

3

4

CONFIDENTIAL

CONFIDENTIAL

1            INDEX OF EXAMINATION

2   Examination by       Page

3   Mr. Boles              4

8            E X H I B I T S

9   Exhibit
    Name        Description              Page
10
    Exhibit 1   Internal Investigation    40
11
    Exhibit 2   Notice of Final Disposition  40
12              April 6, 2022
13  Exhibit 3   Notice of Final Disposition  40
                August 3, 2022
14
    Exhibit 4   Petition for Relief from   40
15              Domestic Abuse

1            CHIEF ROBERT BURDESS,

2    called as a witness, having been first duly

3    sworn, testified as follows:

4            DIRECT EXAMINATION

5   BY MR. BOLES:

6   Q.   Would you state your name for the record and

7   spell it.

8   A.   Robert Burdess.  R-o-b-e-r-t B-u-r-d-e-s-s.

9   Q.   And how are you employed?

10  A.   I'm the Police Chief with the Newton Police

11  Department.

12  Q.   And how long have you been employed in that

13  capacity?

14  A.   I've been the Police Chief for eight years

15  and I've been a law enforcement officer for just

16  over 26.

17  Q.   Okay.  Can you take me through your law

18  enforcement career; where'd you start and so on?

19  A.   Sure.  I was hired in August of 1997 by the

20  University of Iowa Police Department in

21  Iowa City.  Immediately upon hire I attended the

22  Iowa Law Enforcement Academy and graduated in

23  November of '97.

24          In 1999, July of '99, I came to Newton and

25  I've worked there ever since.  I've served in the

5

1    capacity of patrol officer, K9 officer,
2    detective, lieutenant, and chief of police.
3        Q.   How long were you a K9 officer?
4        A.   Oh, 17 years.
5        Q.   What's your formal education background?
6        A.   I've got an associate's degree from
7    Des Moines Area Community College in criminal
8    justice, I have a bachelor's degree from Upper
9    Iowa University in public administration, and a
10   master's degree from Walden University.
11       I have a leadership or management
12   certificate from Northwestern University in
13   Illinois.  It's the University School of Police
14   Staff and Command.  And I recently graduated from
15   FBI's National Command College, and that would
16   have been last year.
17       Q.   Okay.  What other training or certifications
18   do you have as a police chief?
19       A.   I attend lots of trainings.  I guess I don't
20   know specific --
21       Q.   Well, have you ever taken any leadership
22   courses specifically related to being police
23   chief or taken any management/personnel classes?
24       A.   Yeah, the Northwestern Command School.  That
25   was 21 weeks.

6

1        Q.   What was that focused on or what was the
2    emphasis when you got your degree there?
3        A.   It was anywhere from project management, HR,
4    internal investigations, recruiting, retention --
5    just a gamut of things -- budgeting.
6        Q.   Okay.
7        A.   And then the FBI Command College was last
8    May, and that was more of crisis leadership,
9    wellness, again, recruiting, retention, things of
10   that matter.  I did receive a certification in
11   internal investigations -- would have been within
12   the past two years.
13       80 hours of -- roughly 80 hours of training
14   and conducting and overseeing internal
15   investigations or internal affairs.
16       Q.   Okay.  I have the training records that were
17   produced.  Those are your training records over
18   the course of your time at the Newton Police
19   Department, would you agree?
20       A.   Yes, sir.
21       Q.   Okay.  About how often do you -- not only
22   yourself as an individual, but the other
23   officers -- engage in some form of training?
24       A.   They have a minimum of 40 hours a year.
25       Q.   Okay.  And on these sheets, most of these

7

CONFIDENTIAL

1    seem to be anywhere from one to four hours.  Is
2    that accurate for the majority of them?
3        A.   Yes.
4        Q.   I see that there's an Iowa Police Chief
5    Conference that's worth 10.5 hours.
6        A.   Yes.
7        Q.   Okay.  And that's similar to the training
8    sheets for Officer Wing and Officer Winters as
9    well; that those are kept and logged?
10       A.   Correct.
11       Q.   All right.  What did you do to prepare for
12   the deposition today?
13       A.   I reviewed the incident report and the
14   internal investigation files.
15       Q.   Okay.  Anything else?
16       A.   No, sir.
17       Q.   Okay.  Tell me about the organizational
18   structure of the Newton Police Department.  How
19   does that break down?
20       A.   Sure.  Currently, it's one chief of police,
21   four lieutenants, two sergeants --
22       Q.   Two sergeants?
23       A.   Yes, sir.
24       Q.   Okay.
25       A.   And then the rest would be a mixture of

8

CONFIDENTIAL

1    patrol officers, school resource officers, and
2    detectives.  There's 27 total sworn, authorized
3    personnel within the department when we're
4    full-staffed, and then we have six civilian staff
5    members.
6        Q.   Okay.  So, essentially, 33 employees?
7        A.   Yes, sir.
8        Q.   All right.  How many of those officers are
9    DRE officers?
10       A.   One.
11       Q.   And by name, who is that?
12       A.   Officer Shinkle.
13       Q.   Okay.  How long has he been employed?
14       A.   I believe since 2019.  That's a rough
15   estimate.
16       Q.   And is it -- do you only need one?
17       A.   Typically, departments have one staffed.
18   The position is funded by -- the training is
19   funded by the Governor's Traffic Safety Bureau,
20   so they'll only fund so many per county.
21       Q.   That was my next question, if it's funded
22   through the program at the state level.
23       Is Officer Shinkle a good officer?
24       A.   Yes, sir.
25       Q.   Seem competent in his job?

CONFIDENTIAL

1    A.   No.

2    Q.   Has he ever had any problem or complaint

3    about the way or manner in which he conducts his

4    job?

5    A.   No, sir.

6    Q.   Do you have supreme confidence in his

7    ability to make determinations and assessments

8    with regard to his DRE responsibilities?

9    A.   Yes, sir.

10   Q.   Where do they fit in in the structure?

11   Where does he fit in in that structure?

12   A.   He was a patrol officer at the time of this

13   incident.  Right now -- he was recently given a

14   position as a criminal investigator, so he's been

15   in that position for two weeks now.

16   Q.   Okay.  Tell me:  What's an officer in

17   charge?

18   A.   What is an officer in charge?

19   Q.   Yes, sir.

20   A.   In the absence of a supervisor such as a

21   sergeant, lieutenant, or, I guess, myself, the

22   most senior officer on the shift would be the

23   officer in charge.

24   Q.   Okay.  Kind of like military officer, the

25   officer of the day?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

CONFIDENTIAL

1    A.   Yes.

2    Q.   Okay.  When that officer in charge is

3    assigned as the senior person on duty, would it

4    be fair to say that that officer in charge, then,

5    is responsible for the DRE officer?

6    A.   I guess, what would be your definition of

7    "responsible"?

8    Q.   Well, let's just take, like, a grocery

9    store.  You have swing managers that are the

10   people that are there at night, and if

11   something -- there's a problem, they're

12   responsible for everything that happens in the

13   store overnight.

14   A.   Okay.

15   Q.   A regular store manager, you know, by the

16   time they've risen to that level, they're working

17   a day shift, and then there are shift managers

18   that are for the early hours, the midday, and

19   then the evening hours, and then they've got

20   this -- what they call a swing manager.

21   A.   Okay.  Yeah, so --

22        MR. MILLER:  I will just object to the

23   form of the question, but you can answer.

24   A.   Yeah.  I guess to that extent, yes.  He

25   would be responsible for anybody working that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

11

CONFIDENTIAL

1    shift.

2    Q.   All right.  And are there times when

3    Officer Winters is the officer in charge?

4    A.   I would assume so.

5    Q.   Okay.  What are the training requirements to

6    be an officer in the Newton Police Department?

7    A.   They must attend the Iowa Law Enforcement

8    Academy and then complete our 16-week field

9    training program.

10   Q.   Okay.  And then they have to keep up with

11   their 40 hours of continuing education a year?

12   A.   The state requires 12.  We provide, of

13   course, above and beyond that, so a minimum of

14   40.

15   Q.   Okay.  Who's responsible for arranging the

16   training?

17   A.   It had been Lieutenant Cook, but he recently

18   retired so that duty is now being shifted.

19   Q.   And then who -- I'm assuming you would have

20   somebody that's in charge of being responsible

21   and make sure the compliance is being done with

22   regard to the training; is that correct?

23   A.   Yes.

24   Q.   And who is that?

25   A.   That would have been Lieutenant Cook also.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

12

CONFIDENTIAL

1    Q.   Okay.  And what specifically did they do to

2    ensure that the individual officers were

3    complying with training?

4    A.   So the state requires a certain number of

5    hours per year and certain disciplines, so he

6    would ensure that was done by each officer each

7    year.  During our annual in-service training, we

8    provide additional training on certain elements

9    to our on-staff folks.

10   Q.   With regard to your responsibilities as the

11   chief, how do you oversee that compliance and

12   training?  What role do you have in that?

13   A.   Just reports from Lieutenant Cook at the

14   time advising me that we've met the training

15   standards for the year.

16   Q.   Okay.  Have you ever had an officer that may

17   not be in conformity with the requirements and

18   that there needs to be something done to ensure

19   that they're in compliance?

20   A.   Not with the basic state requirements, no.

21   Q.   Okay.  What about internally; your own

22   standard of 40 hours?

23   A.   There may be times when an officer may go on

24   vacation or be on injury leave during our annual

25   in-service training so they may miss a portion of

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

13

CONFIDENTIAL

1   it. But again, some of those hours aren't
2   mandatory and so we may make them up or we may
3   not depending on what type of class it is.
4   Q.  Okay. And I handed you, which was the
5   city's request for production, 02627 through
6   02637 which was your training records.
7   Would it be fair to say that every officer
8   has a similar document that can be produced about
9   their training since they've been employed by the
10  Newton Police Department?
11  A.  Yes, sir.
12  Q.  Okay. Tell me: In your role as a chief,
13  what do you do or what is your role in compliance
14  as a whole? Not just with the rules but with
15  compliance with the rules and regulations of the
16  Newton Police Department. How you get involved
17  in that?
18  A.  I guess to ask a clarifying question --
19  Q.  Sure.
20  A.  So how do I prove that we are in compliance
21  with our policies and procedures?
22  Q.  No. What's your role in making sure that
23  those internal rules and regulations of the
24  Newton Police Department are actually being
25  complied with by individual officers?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

14

CONFIDENTIAL

1   Okay. Well, some of that job, of course, is
2   my supervisors, you know, I read police reports
3   and I see performance evaluations, those type of
4   things. Then if a complaint arises due to an
5   allegation that a possible policy or procedure is
6   not being followed, then I will assign that to
7   the professional standards individuals, which are
8   the lieutenants, to follow-up and investigate.
9   Q.  Okay. And what role do you as the chief
10  play in determining discipline or sanction?
11  A.  So once a lieutenant has completed the
12  entire internal investigation, they will provide
13  a report with their findings and then they will
14  turn it over to me to determine if and what level
15  of discipline is necessary.
16  Q.  Okay. I looked at Interrogatory No. 8 and
17  the question was whether or not there was -- what
18  the system was for tracking complaints, and your
19  answer in Interrogatory No. 8 said: There's no
20  system to track complaints. Is that correct?
21  A.  That's correct.
22  Q.  How do you ensure, then, that officers are
23  performing as required if there's no tracking?
24  A.  So any complaint that comes in is handled by
25  a supervisor, and they're ensuring that they are

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

15

CONFIDENTIAL

1   adhering to the policies and procedures. They
2   could do anything from a -- a verbal conversation
3   with the officer if there's not compliance, all
4   the way up to referring it to me for an internal
5   investigation.
6   Q.  Okay. What are the -- I'm speaking
7   specifically about your OWI detection -- what are
8   the requirements for your street officers or your
9   patrol officers with regard to their training for
10  OWI detection?
11  A.  Minimum training is the Iowa Law Enforcement
12  Academy's training on detecting and enforcing
13  drug or intoxicated drivers, and then, of course,
14  our field training program has a section where
15  there's field training in that specific
16  discipline.
17  Q.  Okay. What do you do in terms of internally
18  to track whether or not all of the proper testing
19  is being performed in a traffic stop involving an
20  OWI?
21  A.  That would be the job of the supervisors or
22  the lieutenants and sergeants would review
23  reports.
24  Q.  So Wing would be responsible for that, for
25  example?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

16

CONFIDENTIAL

1   A.  He would be one, yes.
2   Q.  Okay. And what is your understanding what
3   they do to ensure compliance?
4   A.  Read the reports, read the charges, they'll
5   sometimes do an audit, and watch the full video.
6   Q.  How often is that done?
7   A.  I don't know.
8   Q.  Okay. Do you have any way of tracking
9   whether or not X percentage of traffic stops
10  involving OWI are audited? Do you know what your
11  number is?
12  A.  In terms of a full audit watching the video
13  and everything?
14  Q.  Yes.
15  A.  No, I don't.
16  Q.  Okay. Have you done a full audit on this
17  traffic stop involving an OWI?
18         MR. MILLER: Object to the form of the
19  question.
20  A.  An internal investigation was conducted on
21  this incident.
22  Q.  Okay. Do you keep track of the number of
23  times when you do an audit that the officer did
24  not meet the standard for a traffic stop
25  involving OWI?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

17

CONFIDENTIAL

1     Not a formal tracking system.  If there was
2 some form of correction needed, it would be in
3 the form of a -- likely a counseling letter or
4 training document.
5    Q.  Okay.  Based upon your representations
6 there, have you had occasion to provide training
7 letters to Officer Winters?
8    A.  Not as it relates to OWIs.
9    Q.  Okay.  What other training letters have you
10 provided to Officer Winters regarding his
11 performance as a Newton Police Department
12 officer?
13    A.  I have not provided any.
14    Q.  Well, as the chief, are you aware that he
15 has been provided those letters?
16    A.  No, sir.
17    Q.  You would agree that he's been disciplined;
18 correct?
19    A.  Yes, sir.
20    Q.  Okay.  And what is your understanding of the
21 nature of the discipline actions against him and
22 the conduct that was being disciplined?
23    A.  To my recollection he's been disciplined for
24 a vehicle accident and then he's also been
25 disciplined regarding an allegation of a theft

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

18

CONFIDENTIAL

1 that ended up being a -- which he was cleared of,
2 but he did not follow proper procedures in
3 inventorying the vehicle.
4    Q.  Failure to secure the vehicle?
5    A.  Yes.
6    Q.  And that happened in April of 2022 on the
7 failure to secure the vehicle?
8    A.  That sounds accurate.
9    Q.  And he received a one-day suspension for the
10 motor vehicle accident that was in August of
11 2022?
12    A.  That's correct.
13    Q.  And did he also receive a written counseling
14 regarding the communication during the traffic
15 stop involving Mr. Galanakis in August of 2022?
16    A.  Correct.  That wouldn't have been considered
17 formal discipline, though.
18    Q.  What's the role of a DRE officer in relation
19 to an OWI stop or detection?
20    A.  They're typically looking for impairment
21 outside of just alcohol.
22    Q.  And how is a DRE or your sole DRE officer
23 engaged after a patrol officer makes an OWI stop
24 and once you have further investigation as to
25 whether or not the person is under the influence

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

19

CONFIDENTIAL

1 of drugs?
2    A.  That's a request by the patrol officer doing
3 the OWI investigation to the DRE for assistance.
4    Q.  Okay.  How often is a DRE officer engaged on
5 a percentage basis for your OWI stops in Newton?
6    A.  I don't know that.
7    Q.  Do you keep any statistics on that?
8    A.  Officer Shinkle would have some form of
9 activity report.
10    Q.  Okay.  Are you aware that Officer Winters
11 tends to engage the DRE officer quite frequently?
12    A.  Yes.
13    Q.  Okay.  As a matter of fact, on the shift
14 that he was on in this particular case when he
15 stopped Mr. Galanakis, he, earlier in his shift,
16 inquired and requested that Shinkle examine two
17 other people that he'd stopped.  Would you agree
18 with that?
19    A.  I'm aware he contacted him earlier that
20 night, yes.
21    Q.  Okay.  Were you also aware that Shinkle,
22 after talking with those people, simply talking
23 to them, made a determination they didn't need to
24 be tested because they weren't under the
25 influence?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

20

CONFIDENTIAL

1    A.  I don't know the results of those
2 conversations.
3    Q.  Okay.  Did you read your internal
4 investigation report?
5    A.  Yes.
6    Q.  Did you read where Wing says that?  Found
7 out from Shinkle that that's what Winters had
8 been doing?
9    A.  I didn't memorize the entire internal
10 investigation, sir.
11    Q.  Well, it's a critical paragraph where Wing
12 says that when -- he thought Winters knew what he
13 was doing but now he has serious questions about
14 his ability on OWI stops.  Do you remember that?
15       MR. MILLER:  Object to the form of the
16 question.
17    Q.  You can answer.
18    A.  No, sir.
19    Q.  Okay.  We'll get to that.  Are there any
20 limitations or restrictions on when an OWI
21 traffic stop officer can engage the DRE officer?
22    A.  No, sir.
23    Q.  If a lieutenant's on the scene and has
24 concerns about a stop and how it's being
25 conducted, what should the officer -- the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

21

CONFIDENTIAL

1   supervising officer do at that point?

2   A.   They have the ability to stop the

3   investigation or intervene in some way.

4   Q.   Okay.  What about when an officer is

5   conducting the OWI field sobriety testing in the

6   rain?  Does the supervising officer have a

7   responsibility to say, "That's not how we test

8   people; in the rain"?

9   A.   I don't know any guidelines that says you

10   can't test somebody in the rain.

11   Q.   You really don't?

12   A.   Correct.

13   Q.   Okay.  What about in the snow?

14   A.   I've seen tests done in all weather

15   conditions, sir.

16   Q.   Okay.  Allowed to conduct tests on ice?

17   A.   If the surface is not conducive to somebody

18   having good footing then -- for example, a

19   walk-and-turn would not be done on the ice.

20   Q.   What about when someone's there and it's

21   raining and you're trying to do a horizontal gaze

22   test and the rain is hitting them in the face?

23   Do you think that gives you an accurate test?

24   A.   I don't know, sir.  I wasn't there and I

25   can't --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

22

CONFIDENTIAL

1   Q.   Well, I'm asking:  Based upon your

2   experience of 26 years, do you think that

3   influences some of the validity of the test?

4   MR. MILLER:  Object to the form and

5   foundation of the question.

6   A.   I can't judge how strong the rain was and

7   how it would have affected the test, sir.  I

8   wasn't there.

9   Q.   Well, let's talk about your 26 years as an

10   officer.  Have you made OWI stops?

11   A.   Yes, sir.

12   Q.   Okay.  Based upon your experience and

13   training, do you believe that weather conditions

14   influence a validity of tests?

15   A.   Can they?

16   Q.   Yes.

17   A.   Yes.

18   Q.   Okay.  Now, when someone is saying that,

19   "Well, their eyes were fluttering," indicating

20   that that must be drugs, do you think the rain

21   drops might have an impact on someone's eyelids

22   and their eyes when they're standing there and

23   trying to perform a test?

24   MR. MILLER:  Object to the form and

25   foundation of the question.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

23

CONFIDENTIAL

1   MR. BOLES:  The foundation is that he's

2   got 26 years.  He's said he's made the stop, so.

3   MR. MILLER:  He can answer.

4   MR. BOLES:  I understand, but it's an

5   improper objection.  He's got the foundation.

6   MR. MILLER:  I'm allowed to make my

7   objections for the record.

8   MR. BOLES:  Make good ones.

9   BY MR. BOLES:

10   Q.   Go ahead.

11   A.   I wasn't there, sir.

12   Q.   My question is:  Based upon your experience

13   and training, would you agree that when the rain

14   is hitting somebody, your eyes are going to blink

15   when the rain hits them?

16   MR. MILLER:  Object to the form and

17   foundation of the question.

18   A.   It's possible.

19   Q.   Okay.  What happens if a lieutenant is on

20   the site and is worried an officer isn't

21   performing a test or conducting the stop

22   appropriately?  What should the supervising

23   officer do at that point?

24   A.   They have the ability to intervene.

25   Q.   Okay.  And how do they intervene?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

24

CONFIDENTIAL

1   MR. MILLER:  Object to the form and

2   foundation of the question.

3   A.   A lot of different options.

4   Q.   Okay.  Take me through the options that they

5   have when they think that is happening.

6   A.   They can stop the testing.  They can take

7   over the testing themselves.  They can call

8   another officer to do the testing.  Those are

9   just a handful of options based on a "what if".

10   Q.   Okay.  And at that point does the officer on

11   duty or the supervisor have the right to say that

12   he does not believe that the individual that

13   they're testing is under the influence?

14   A.   I don't know that they would say that unless

15   they did the testing themselves or were able to

16   view all of the results of said testing.

17   Q.   Okay.  Well, if you're standing there and

18   you're watching these tests being performed and

19   they're not being performed properly, do you have

20   a protocol as a supervisor to intervene?

21   A.   If he deemed the tests were being done

22   improperly, then yes, he would have an obligation

23   to step in.

24   Q.   Okay.  As the chief, what is your course of

25   action if you learned a lieutenant has those

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 25**

1   concerns about a series of tests or the way and
2   manner that a stop is conducted?
3   A.   Same as if an officer was not following
4   policies and procedures.  We'd do an internal
5   investigation and determine what happened.
6   Q.   Okay.  So in this particular case involving
7   Mr. Galanakis, an internal investigation was
8   conducted and Lieutenant Wing determined that he
9   had great concerns about the way that the testing
10  was being conducted.  What was the protocol or
11  the method by which you, as the chief, addressed
12  those concerns?
13  A.   The concerns against Officer Winters?
14  Q.   Yes.
15  A.   We conducted an internal investigation.
16  Q.   I understand.  The investigation's done.
17  The report is written.  But the question is:
18  What did you do about the fact that this officer,
19  Officer Wing, says on page 907 of that report,
20  "After Tayvin was released I spoke with
21  Officer Shinkle regarding the discrepancy in
22  observations.  I was advised that this was the
23  third DRE evaluation Officer Winters had asked
24  him to do on this shift.  Officer Shinkle told me
25  the first two he just looked at and spoke with

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 26**

1   the subjects and declined to do a DRE.  This
2   worries me as Officer Winters does a lot of OWIs
3   and I have had a lot of faith in him.  I'm afraid
4   this could happen again and plan on meeting with
5   Officer Winters to discuss this concern -- "
6       MR. MILLER:  Object to the form and
7   foundation.
8       MR. BOLES:  I'm reading to have a
9   foundation.  There's no question before the
10  witness.
11  Q.   Now, based upon that, what was done by you
12  as the chief of police?
13      MR. MILLER:  Objection, form and
14  foundation.
15  A.   Sounds like Officer Wing -- Lieutenant Wing
16  had a discussion with Officer Winters.
17  Q.   He said he plans on meeting with him.
18  You're the chief.  What happened?  What was the
19  follow-up on this?
20  A.   I don't know if he did or not.
21  Q.   Well, what did you do as the chief?
22  A.   I assigned an internal investigation to
23  Lieutenant Winchell who conducted it and had a
24  discussion with Officer Winters at the end of
25  that.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 27**

1   Q.   Okay.  Page 906.  Wing says, "In looking
2   back it was at this point I should have
3   questioned Officer Winters as to what his
4   observations were and how that led him to believe
5   that he was impaired."  The "he" being
6   Mr. Galanakis.
7     Did you have a conversation as the chief of
8   police with Lieutenant Wing about what his
9   feeling was as to regarding the competency of
10  Officer Winters to make an OWI stop?
11      MR. MILLER:  Objection, form and
12  foundation.
13  A.   No, sir.  I didn't have a conversation with
14  him about that.
15  Q.   Okay.  Does the public have the right to
16  criticize a police officer?
17      MR. MILLER:  Objection, form and
18  foundation.
19  A.   Yes, sir.
20  Q.   Okay.  Does the public have a right to
21  criticize the Newton Police Department?
22      MR. MILLER:  Objection, form and
23  foundation.
24  A.   Yes, sir.
25  Q.   Does the public have the right to contact

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 28**

1   the department to criticize an officer or the
2   department itself?
3      MR. MILLER:  Objection, form and
4   foundation.
5   A.   Yes, sir.
6   Q.   If an officer is doing a bad job, does an
7   individual citizen have the right or allowed to
8   point it out?
9      MR. MILLER:  Objection, form and
10  foundation.
11  A.   Yes, sir.
12  Q.   If the department appears to be ignoring
13  that it has an officer that is doing a bad job,
14  are they allowed to point that out as well?
15      MR. MILLER:  Objection, form and
16  foundation.
17  A.   Yes, sir.
18  Q.   Does an individual have the right to say, "I
19  think the public should contact the department
20  for protecting an officer doing a bad job"?
21      MR. MILLER:  Objection, form and
22  foundation.
23  A.   Yeah.  I can't control what people say.
24  Q.   Is it a crime to tell a cop he's doing a bad
25  job?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

37

CONFIDENTIAL

1    answer.

2         Q.   Well, that's what I want.  That's why I'm

3    deposing you.

4         A.   And again, I don't know.  I'm not him.

5         Q.   Did he ever go and get evaluated by

6    Dr. Asher (phonetic)?

7         A.   Yes, he did.

8         Q.   And based upon that did you take his service

9    sidearm?

10        A.   Yes, sir.

11        Q.   Okay.  And what was the determination of

12   Ashlyn's (phonetic) exam?

13             MR. MILLER:  Objection, form and

14   foundation.

15        A.   He was cleared to come back to duty.

16        Q.   What about when Officer Winters was pinning

17   her down on her bed by her wrists and telling her

18   she can leave when he said she could leave?

19             MR. MILLER:  Objection, form and

20   foundation.

21        A.   Again, sir, no evidence to support that that

22   occurred.

23        Q.   Okay.  And what about when he tackled

24   Courtney VanDerHart from behind?

25             MR. MILLER:  Objection, form and

38

CONFIDENTIAL

1    foundation.

2         A.   No evidence to support.

3         Q.   Did you have any role in the public

4    statement that was made regarding

5    Officer Winters' domestic?

6             MR. MILLER:  Object to the form of the

7    question.

8         A.   Yes.

9         Q.   Okay.  What did you do or what did you

10   contribute?

11        A.   I don't recall specifically -- yeah.  I

12   don't recall specifically without having it in

13   front of me.

14        Q.   Okay.  If an officer's found in a civil

15   proceeding to have committed domestic abuse,

16   would that be grounds for termination?

17        A.   I don't know.  That would be speculating.

18        Q.   Well, no.  It's a standard.  If you are

19   found to have committed it in a civil proceeding,

20   is the requirement or your position as the chief

21   that you'd be terminated from your role as an

22   officer in the Newton Police Department?

23             MR. MILLER:  Object to the form and

24   foundation of the question.

25        A.   It's possible.

39

CONFIDENTIAL

1         Q.   Okay.  Do you find it troubling that

2    Officer Winters stipulated and consented to the

3    no-contact order?

4             MR. MILLER:  Object to the form and

5    foundation.

6         A.   Yeah, that would be just an opinion.

7         Q.   I want your opinion.

8         A.   Yeah.

9         Q.   Do you find that troubling?

10        A.   I don't really have an opinion either way.

11        Q.   Okay.  And then what about when he goes back

12   in and agrees to extend it?

13             MR. MILLER:  Object to the form --

14        Q.   Do you have an opinion on that?

15             MR. MILLER:  Objection.

16        A.   No, sir.

17        Q.   Do you think somebody that didn't do any of

18   that would fight it and not stipulate to have a

19   no-contact order?

20             MR. MILLER:  Object to the form and

21   foundation.

22        A.   I don't know, sir.

23             MR. BOLES:  I don't have anything

24   further.  Thank you.  Appreciate your time.

25             MR. MILLER:  I don't have any questions

40

CONFIDENTIAL

1    for Rob Burdess.

2             (The deposition concluded at

3             1:16 p.m.)

4             (The following record was made

5             after the conclusion of the

6             deposition at 2:01 p.m. on October

7             27, 2023.)

8             MR. MILLER:  I'll just note on the

9    record that both deposition transcripts should be

10   designated as confidential under the protective

11   order.

12             (Deposition Exhibits 1, 2, 3, and

13             4 were marked for identification

14             by the reporter.)

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL                                41

```
 1            I, ROBERT BURDESS, the deponent in the
 2       foregoing deposition, do hereby certify that I
 3       have read the foregoing -- pages of typewritten
 4       material and that the same is, with the
 5       corrections noted on the attached page, if any, a
 6       true and correct transcript of my deposition upon
 7       oral examination given at the time and place
 8       herein stated.
 9
10            _____
11                 ROBERT BURDESS
12
13
14            Subscribed and sworn to before me
15       this _____ day of _____, 20__.
16
17
18            _____
19                 Notary Public
20
21
22
23
24
25
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

CONFIDENTIAL                                42

```
 1                 C O R R E C T I O N S
 2       ___  ___  _____
 3       ___  ___  _____
 4       ___  ___  _____
 5       ___  ___  _____
 6       ___  ___  _____
 7       ___  ___  _____
 8       ___  ___  _____
 9       ___  ___  _____
10       ___  ___  _____
11       ___  ___  _____
12       ___  ___  _____
13       ___  ___  _____
14       ___  ___  _____
15       ___  ___  _____
16       ___  ___  _____
17       ___  ___  _____
18       ___  ___  _____
19       ___  ___  _____
20       ___  ___  _____
21       ___  ___  _____
22       ___  ___  _____
23       ___  ___  _____
24       ___  ___  _____
25
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

CONFIDENTIAL                                43

```
                 C E R T I F I C A T E
 1
 2
 3            I, Emma L. Rosky, a Certified Shorthand
         Reporter of the State of Iowa and Registered
 4       Professional Reporter, do hereby certify that
         there came before me at the time, date, and place
 5       hereinbefore indicated, the witness named on the
         caption sheet hereof, who was by me duly sworn to
 6       testify to the truth of said witness's knowledge,
         touching and concerning the matters in
 7       controversy in this cause; that the witness was
         thereupon examined under oath, the examination
 8       taken down by me in shorthand, and later reduced
         to printed form under my supervision and
 9       direction, and that the deposition is a true
         record of the testimony given and of all
10       objections interposed.
11            I further certify that I am neither attorney
         or counsel for, or related to or employed by any
12       of the parties to the action in which this
         deposition is taken, and further that I am not a
13       relative or employee of any attorney or counsel
         employed by the parties hereto or financially
14       interested in the action.
15
16            Dated at Des Moines, Iowa, this 11th day of
17       December, 2023.
18
19
20
21            _____
                    /s/ Emma L. Rosky
22            CERTIFIED SHORTHAND REPORTER,
              and REGISTERED PROFESSIONAL
23            REPORTER
24
25
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309



# GET TO KNOW Newton POLICE DEPARTMENT

## Notice of Final Disposition

**Date:** October 3, 2022

**To:** Nathan Winters, Police Officer

**From:** Rob Burdess, Chief of Police

**RE:** Internal Investigation Final Disposition 22-006

---

| Allegations: NPD Policy, Procedures and Rules | | Findings |
|---|---|---|
| 600 | Investigation and Prosecution | **Unfounded** |
| 320.5.7 | Efficiency | **Unfounded** |
| Reference | Non-conformance to established training and procedural standards | **Unfounded** |

### Finding Synopsis
A thorough investigation of the complaint received on August 29, 2022 was conducted and the findings indicate no clear violation of NPD policy. The investigation did find that Officer Winters' communication with the driver and his demeanor towards the uncooperative subject could improve. This was not part of the initial formal complaint and a follow up counseling session will occur to address this issue.

### Notice of Follow Up
Lieutenant Winchell will conduct a counseling session with Officer Winters to discuss improving communication during investigations and maintaining a professional demeanor.



EXHIBIT
Burdess
1
10-27-23

**City of Newton Police Department** 101 W 4ᵗʰ St S, Newton, IA 50208   | (641) 791-0850  | www.NewtonGov.org  | www.GetToKnowNewton.com



# GET TO KNOW *Newton*
## POLICE DEPARTMENT

(DRE Examination) and when that showed that he was not impaired, he was released without charges.

The only area that I feel needs addressed with Officer Winters is in reference to his verbal exchange with a very mouthy teenager. It was apparent that Officer Winters was irritated by Galanakis' behavior and this caused him to chip back at Galanakis unnecessarily. During sobriety Galanakis asked where he played football and he told him Knoxville. Galanakis then pointed out that Newton just beat Knoxville last night. Winters responded something along the lines of, "Not when I played them." Later when Galanakis requested his inhaler Officer Winters could have explained how this may affect the deprivation period. Instead he said "no" and when Galanakis argued it Winters tossed it towards him. Lastly, when Galanakis was lecturing him on how he thought Winters screwed up after being told he was going to be released, Winters was looking at his computer most of the time. When Galanakis then demanded an apology and Winters said, "I'm sorry I guess." Officer Winters needs to maintain a professional demeanor even when a mouthy person is trying to push his buttons. While this was not extreme and did not violate policy, it did nothing to de-escalate Galanakis and certainly did not present Winters in a good light when Galanakis shared his videos on social media and now has been showed on TV news. Better verbal tactics would have benefited Officer Winters in this case and should be a priority for him in future cases. For this reason I have added a policy 320.5.9 Conduct to the allegations. (see below)

320.5.9  CONDUCT                    **-Founded**
  a. Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution or discipline under this policy.
  b. Unreasonable and unwarranted force to a person encountered or a person under arrest.
  c. Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.
  d. Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another.
  e. Engaging in horseplay that reasonably could result in injury or property damage.
  f. Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

**City of Newton Police Department** 101 W 4th St S, Newton, IA 50208  | (641) 791-0850 | www.NewtonGov.org  |  www.GetToKnowNewton.com

CITY RFP 00883

Pltf.App. 34



# POLICE DEPARTMENT

g. Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

h. Criminal, dishonest or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

i. Unauthorized possession of, loss of, or damage to department property or the property of others, or endangering it through carelessness or maliciousness.

j. Attempted or actual theft of department property; misappropriation or misuse of public funds, property, personnel or the services or property of others; unauthorized removal or possession of department property or the property of another person.

k. Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any collective bargaining agreement or contract, including fraud in securing the appointment or hire.

l. Initiating any civil action for recovery of any damages or injuries incurred in the course and scope of employment or appointment without first notifying the Chief of Police of such action.

m. Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.


**End of Report – Lt. Wayne Winchell**

## Exhibits

Exhibit #1 Authorization of internal investigation – Officer Winters principal
Exhibit #2 Notice of internal investigation from Chief Burdess to Officer Stombaugh
Exhibit #3 Incident Report and Supplemental reports written by Officer Winters and Officer Shinkle for case 22-25845
Exhibit #4 Audio recording of 08/30/2022 Officer Winters Interview
Exhibit #5 Garrity Warning signed by Officer Winters
Exhibit #6 Audio recording of 09/01/2022 Officer Shinkle Interview
Exhibit #7 Audio recording of 09/02/2022 Tayvin Galanakis Interview
Exhibit #8 Facebook Post by Tayvin Galanakis
Exhibit #9 Audio recording of 09/03/2022 Lt. Wing Interview
Exhibit #10 Written statement written by Lt. Wing.
Exhibit #11 Digital copy of Internal Investigation 22-00

**City of Newton Police Department** 101 W 4th St S, Newton, IA 50208   | (641) 791-0850 | www.NewtonGov.org | www.GetToKnowNewton.com

CITY RFP 00884

Pltf.App. 35



Grid_____
Arrest #_____
Car #_____
Video #_____

rlc030102

# IOWA INCIDENT REPORT SUPPLEMENTAL
## NEWTON POLICE DEPARTMENT
101 W 4TH ST S
NEWTON, IA 50208
(641) 792-1547

| C A S E | Case Number | Date of This Report | County in which Incident Occurred | |
|---|---|---|---|---|
| | 22-25845 | 08/28/2022 | JASPER - 50 | |
| | ORI Number | | | |
| | NEWTON POLICE DEPARTMENT - IA0500100 | | | |
| I N F O | Date of Original Occurrence | | Type of Offense | |
| | 08/28/2022 | | OWI/DRE. | |
| | Name - Last | First | Middle | Suffix |
| | WINTERS | NATHAN | | |
| | Clearance Classification | | Investigative Status | |
| | ☑ Unfounded   ☐ Exceptionally Cleared   ☐ Cleared by Arrest | | ☐ Open   ☑ Closed   ☐ Suspended | |

## Narrative

1. Location: The entirety of this evaluation was conducted at the Newton Police Department. The area used was in doors, well lit, and had flat hard surfaced floors.

2. Witnesses: None

3. Breath Test: Officer Winters collected a preliminary breath test of .000 BrAC.

4. Notification and Interview of Arresting Officer: Officer Winters informed me he traffic stopped Tayvin Galanakis for operating his vehicle with his high beams activated. Officer Winters stated Tayvin had fumbled through his papers when attempting to retrieve his vehicle registration. His movements were described as slow. Officer Winters completed field sobriety tests with Tayvin and believed him to be impaired. Officer Winters collected a preliminary breath test of .000 and believed him to be impaired on drugs.

5. Initial Observation of the Suspect: Tayvin has an adult male with brown curly hair and hazel iris'. He was dark completed. His eyes were bloodshot. He appeared upset and flustered. He wore a grey t shirt and white shorts with tennis shoes. His speech was quick but clear.

6. Medical Problems and Treatment: Tayvin said he was a college football player and recently hurt his right ankle at a practice. He said he is also sees a school therapist and was prescribed Welburtin for anxiety. He said he takes a pill daily and took it at about 1-2 pm earlier that day. He said he had no physical defects. Tayvin said he normally wears corrective contact lenses but did not have them in currently.

7. Psychophysical Tests:
A) Modified Romberg Balance: I explained and demonstrated the test. He said he understood. Tayvin estimated 30 seconds in 29 actual seconds. He had a slight 1" side to side and front to back sway.

B) Walk and turn: I explained and demonstrated the test to Tayvin. I placed him in the starting position and instructed him to hold that position. He said he understood. I explained the remainder of the test. During this time, Tayvin relaxed to a normal standing position. I corrected Tayvin back to the starting position. Tayvin understood the entire test. He completed the rest of the test without issue.

C) One leg Stand (left leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

D) One leg Stand (right leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

E) Finger to Nose: I explained and demonstrated the test. Tayvin said he understood. I observed the following:
    1L: touched upper lip
    2R: touched upper lip
    3L: touched right nostril
    4R: touched right nostril
    5R: touched tip of nose
    6L: touched right nostril

8. Clinical Indicators:
HGN: Not present
Vertical Nystagmus: Not Present
Lack of Convergence: Present, left eye would move outward during test
Blood Pressure: 110/80 mmHg (DRE Average range 120-140/70-80)
Pulse (DRE Average Pulse Range 60-90 BMP)
o 74 bpm @ 0114
o 76 bpm @ 0134
o72 bpm @ 0146

Pupil Size:
§ 4.5mm - DRE Average Range Room Light (2.5MM-5.0MM)
§ 6.5mm - DRE Average Range Near Darkness (5.0MM-8.5MM)
§ 3mm - DRE Average Range Direct Light (2.0MM-4.5MM)
Reaction to Light: Normal
Rebound Dilation: None
Pupillary Unrest: None

9. Signs of Ingestion:
Nasal: Clear

CITY RFP 00893

Pltf.App. 36

Oral: Clear
Injection sites: None
UV Light: None

10. Suspect's Statements: Tayvin said he only takes his prescribed Welbutrin. He said the only supplements he takes is Creatine for working out. He said he takes no other substances of any kind as he is urine tested often for college football.

11. DRE's Opinion:
It is my opinion Tayvin Galanakis is not under the influence of a drug. This case is unfounded and Tayvin was released.

12. Toxicological Sample: No sample was taken.

| O F F I C E R | Complainant/Reporting Party (Signature) | | | |
|---|---|---|---|---|
| | Reporting Officer's Name - Last **SHINKLE** | First **ANDREW** | Middle | Suffix |
| | Title **PATROL OFFICER** | Badge Number **611** | UserID **611** | |
| | Assisting Officer / Admin Reviewer's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Supervisor's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Incident Assigned to: | | | |

Pltf.App. 37

CITY RFP 00894

# DRUG INFLUENCE EVALUATION

| | |
|---|---|
| EVALUATOR: | Officer Andrew Shinkle, Newton PD |
| IACP#: 032597 | LOG#: 22-23-62 |
| DEPT CASE 22-25845 | |
| EVALUATION: Enforcement | SCRIBE: N/A |
| | WITNESS: N/A |

| ARRESTEE'S NAME (Last, First, Middle) Galanakis, Tavin John | Date of Birth 8/16/2003 | Age 19 | Sex M | Race UN | Arresting Officer (Name, ID#) Winters, Nathan 639 |
|---|---|---|---|---|---|

| Date Examined / Time /Location 8/28/22 0052 Newton Police Dept | Breath Results: .000 | Test Refused ☐ | | Chemical Test: Urine ☐ Blood ☒ Test or tests refused |
|---|---|---|---|---|

| Miranda Warning Given ☐Yes Given By: 611 | Hours 0103 | What have you eaten today? When? Hot Cakes, (BF) Burgers (Lch) | What have you been drinking? Coca Cola, Milk | How much — | Time of last drink? 2 hrs ago |
|---|---|---|---|---|---|

| Time now/ Actual 0050/0105 | When did you last sleep? How long Last night 7-8 hrs | Are you sick or injured? ☒ Yes ☐ No R. Ankle | Are you diabetic or epileptic? ☐ Yes ☒ No |
|---|---|---|---|

| Do you take insulin? ☐ Yes ☒ No | Do you have any physical defects? ☐ Yes ☒ No | Are you under the care of a doctor or dentist? ☒ Yes ☐ No   Therapist |
|---|---|---|

| Are you taking any medication or drugs? ☒ Yes ☐ No   Wellbutrin | Attitude: Upset | Coordination: Normal |
|---|---|---|

| Speech: Fast | Breath Odor: Normal | Face: Normal |
|---|---|---|

| Corrective Lenses: ☒ None ☐ Glasses ☐ Contacts, if so ☐ Hard ☐ Soft | Eyes:☐ Reddened Conjunctiva ☒ Normal ☐ Bloodshot ☒ Watery | Blindness: ☒ None ☐ Left ☐ Right | Tracking: ☒ Equal ☐ Unequal |
|---|---|---|---|

| Pupil Size: ☒ Equal ☐ Unequal (explain) | ☐ Refused Hgn/Vgn Vertical Nystagmus ☐ Yes ☒ No | Able to follow stimulus ☒ Yes ☐ No | Eyelids ☒ Normal ☐ Droopy |
|---|---|---|---|

| Pulse and time | HGN | Right Eye | Left Eye | Convergence | ONE LEG STAND |
|---|---|---|---|---|---|
| 1. 74 / 0114 | Lack of Smooth Pursuit | NP | NP | | |
| 2. 78 / 0134 | Maximum Deviation | NP | NP | | L R |
| 3. 72 / 0148 | Angle of Onset | NP | NP | Right eye  Left eye | |

Convergence — Right eye / Left eye

ONE LEG STAND

| L R | |
|---|---|
| ☐ ☐ | Sways while balancing |
| ☐ ☐ | Uses arms to balance |
| ☐ ☐ | Hopping |
| ☐ ☐ | Puts foot down |
| ☐ | Body Tremors |
| ☐ | Stopped Test |
| ☐ | Refused Test |

**Romberg Balance**

**Walk and turn test**

| | 1st Nine | 2nd Nine |
|---|---|---|
| Cannot keep balance X | | |
| Starts too soon | | |
| Stops walking | | |
| Misses heel-toe | | |
| Steps off line | | |
| Raises arms | | |
| Actual steps taken | | |

☐ Refused Test

☒ Eyelid Tremors
☐ Refused Test

Carotid pulse

| Internal clock 29 estimated as 30 sec. | Describe Turn: As directed | Cannot do test (explain) | Type of Footwear: Tennis shoes |
|---|---|---|---|

**Draw lines to spots touched**

| | Room light | Darkness | Direct |
|---|---|---|---|
| Left Eye | 4.5 | 6.5 | 3 |
| Right Eye | 4.5 | 6.5 | 3 |

| Nasal area: Clear |
|---|
| Oral cavity: Clear |

| NOTES: | REBOUND DILATION ☐ Refused ☐ Yes ☐ No | REACTION TO LIGHT: Normal |
|---|---|---|

RIGHT ARM     LEFT ARM

☐ Unremarkable     ☐ Refused

| Blood Pressure 110/80 | Temperature -0F |
|---|---|

Muscle tone: ☐ Normal ☐ Flaccid ☒ Rigid ☐ Refused
Comments:

| What drugs or medications have you been using? Wellbutrin (1 pill)  Creatine (5 mg) | How much? — | Time of use? This morning | Where were the drugs used? (Location) Dorm |
|---|---|---|---|

| Date / Time of arrest: 8/28/22 0040 | Time DRE was notified: 0030 | Evaluation start time: 0052 | Evaluation completion time: 0052 | Precinct/Station: |
|---|---|---|---|---|

| Opinion of Evaluator: ☒ Poly Drug | ☐ Depressant ☐ Stimulant | ☐ Hallucinogen ☐ Dissociative Anesthetic | ☐ Narcotic Analgesic ☐ Inhalant | ☐ Cannabis ☐ Alcohol | ☐ Medical Rule Out ☒ No Opinion |
|---|---|---|---|---|---|

IP-147D Rev 6/90

CITY RFP 00896

# DRUG INFLUENCE NARRATIVE

| | | | |
|---|---|---|---|
| **Date:** | 8/28/22 | **Case Number:** | 22-25845 |
| **Officer's Name:** | A. Shinkle | **Rolling Log#:** | 22-23-62 |
| **Officer's Badge Number:** | #611 | **Suspect Name:** | Tayvin Galanakis |
| **D.R.E. Number:** | 032597 | **Date of Birth:** | 8/19/03 |

**1.  Location:** The entirety of this evaluation was conducted at the Newton Police Department. The area used was in doors, well lit, and had flat hard surfaced floors.

**2.  Witnesses:** None

**3.  Breath Test:** Officer Winters collected a preliminary breath test of .000 BrAC.

**4.  Notification and Interview of Arresting Officer:** Officer Winters informed me he traffic stopped Tayvin Galanakis for operating his vehicle with his high beams activated. Officer Winters stated Tayvin had fumbled through his papers when attempting to retrieve his vehicle registration. His movements were described as slow. Officer Winters completed field sobriety tests with Tayvin and believed him to be impaired. Officer Winters collected a preliminary breath test of .000 and believed him to be impaired on drugs.

**5.  Initial Observation of the Suspect:** Tayvin has an adult male with brown curly hair and hazel iris'. He was dark completed. His eyes were bloodshot. He appeared upset and flustered. He wore a grey t shirt and white shorts with tennis shoes. His speech was quick but clear.

**6.  Medical Problems and Treatment:** Tayvin said he was a college football player and recently hurt his right ankle at a practice. He said he is also sees a school therapist and was prescribed Welburtin for anxiety. He said he takes a pill daily and took it at about 1-2 pm earlier that day. He said he had no physical defects. Tayvin said he normally wears corrective contact lenses but did not have them in currently.

**7.  Psychophysical Tests:**

A)  Modified Romberg Balance: I explained and demonstrated the test. He said he understood. Tayvin estimated 30 seconds in 29 actual seconds. He had a slight 1" side to side and front to back sway.

B)  Walk and turn: I explained and demonstrated the test to Tayvin. I placed him in the starting position and instructed him to hold that position. He said he understood. I explained the remainder of the test. During this time, Tayvin relaxed to a normal standing position. I corrected Tayvin back to the starting position. Tayvin said he understood the entire test. He completed the rest of the test without issue.

C)  One leg Stand (left leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

D)  One leg Stand (right leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

CITY RFP 00897

E)    Finger to Nose: I explained and demonstrated the test. Tayvin said he understood. I observed the following:

1L: touched upper lip

2R: touched upper lip

3L: touched right nostril

4R: touched right nostril

5R: touched tip of nose

6L: touched right nostril

## 8. Clinical Indicators:

- HGN: Not present

- Vertical Nystagmus: Not Present

- Lack of Convergence: Present, left eye would move outward during test

- Blood Pressure: 110/80 mmHg  (DRE Average range 120-140/70-90 )

- Pulse (DRE Average Pulse Range 60-90 BMP)
  - o   74 bpm @ 0114
  - o   78 bpm @ 0134
  - o   72 bpm @ 0148
- Pupil Size:

  - 4.5mm - DRE Average Range Room Light (2.5MM-5.0MM)

  - 6.5mm - DRE Average Range Near Darkness (5.0MM-8.5MM)

  - 3mm - DRE Average Range Direct Light (2.0MM-4.5MM)

- Reaction to Light: Normal

- Rebound Dilation: None

- Pupillary Unrest: None

## 9. Signs of Ingestion:

Nasal:  Clear

Oral:  Clear

Injection sites: None

UV Light: None

## 10. Suspect's Statements: Tayvin said he only takes his prescribed Welbutrin. He said the only supplements he takes is Creatine for working out. He said he takes no other substances of any kind as he is urine tested often for college football.

CITY RFP 00898

## 11. DRE's Opinion:

It is my opinion Tayvin Galanakis is not under the influence of a drug.

## 12. Toxicological Sample: No sample was taken.

## 13. Miscellaneous:

Officer Andrew Shinkle
DRE # 32597

## Drug Influence Evaluation Checklist

AKS    1. Breath Alcohol Test

AKS    2. Interview of Arresting Officer
    (NOTE: Gloves must be worn from this point on)

AKS    3. Preliminary Examination (and first pulse)
    (first pulse, initial estimation of angle of onset, and initial estimation of pupil size)

AKS    4. Eye Examinations

AKS    5. Divided Attention Tests:

    *AKS    Romberg Balance*

    *AKS    Walk and Turn*

    *AKS    One Leg Stand*

    *AKS    Finger to Nose*

AKS    6. Vital signs (and second pulse)

AKS    7. Dark Room Examination (for pupil size and ingestion signs)

AKS    8. Examination of Muscle Tone

AKS    9. Examination for Injection Sites (and third pulse)

AKS    10. Subject Statements and Other Observations

AKS    11. Opinion of Evaluator

AKS    12. Toxicological Examination

CITY RFP 00900

22-25845

On Saturday, August 28, 2022, at 0013hours, I was riding with Officer Winters after having a meeting with him. We had just left the back lot of the PD traveling eastbound on S 2nd Ave W. As we were approaching W 2nd St, a white Chevy Impala was traveling westbound toward us with its high beams on. The vehicle turned south on W 2nd St and Officer Winters initiated a stop on the vehicle in the 200 blk S 3rd Ave W.

I approached the vehicle on the passenger side, which was occupied by one male later identified as Tayvin Galanakis. Officer Winter was talking with Tayvin and explained the reason for the stop and requested he license registration and insurance. I could not hear any of the responses from Tayvin as the passenger side window was up. Tayvin had some trouble locating the requested documents and made several attempts to locate the documents in the glove box by putting stuff back in the glove box and then going back and looking in the glove box again.

Officer Winters asked Tayvin to step back to the patrol car, and asked him to take his gum out and put it on the dash. This was an indicator to me that he suspected he was under the influence. Tayvin was asked to have a seat in the front passenger seat by Officer Winters. I walked back and opened the door for Tayvin and I took a seat in the back seat cage, and radioed dispatch to rest Officer Winters depravation period due to the fact that Tayvin had gum in his mouth. During their conversation Tayvin explained that he was at a friend's house and that he was on his way home. He also explained that he plays football for William Penn College and that he was home for the weekend because as a freshman they aren't part of the travel team. Officer Winters as Tayvin how much he had to drink tonight and Tayvin said that he nothing to drink. Officer Winters then asked Tayvin why he would have bloodshot and watery eyes. Tayvin said the he would blow right now and Officer Winters advised they would get to that. When asked why he would think that, Office Winters explained that his difficulty retrieving paperwork was a clue as well as the odor of alcohol. At this the only issue I observed was the fumbling for the paperwork.

Tayvin acted shocked and wanted to know if he could record this. Officer Winters told him that he could and that he was also recording. Tayvin then took his phone out and video recorded a statement to the effect that, Officer Winters thinks I've been drinking and that he was going to look dumb when he blew zeros. Tayvin told Officer Winters that he wanted to blow right know. Officer Winters explained that he would get to that but first offered him sobriety tests, which Tayvin agreed to.

For the sobriety tests Tayvin was asked to step to the parking lot area of the water tower. After asking some questions regarding his eyes he performed the HGN test. During the test Tayvin engaged Officer

CITY RFP 00905

Winters in conversation about football and was upset that he had just got his hair permed and that the rain was going to mess it up. I should be noted that there was a very light rain during the sobriety tests; however nearer the time of arrest it picked up a little and was more steady.

The second test he offered was the walk and turn. This test and the One Leg Stand were the only tests that I could really see the results of. During the W&T he I overserved two clues, incorrect number of steps, and improper turn. This would be a fail. After completing the test Tayvin asked for the breath test stating that he was two for two on the tests. Officer Winter rebuked him and told him that he wasn't and asked why he took more steps than advised. Tayvin then challenges Officer Winters and asks if this was his first year and asked how many false accusations had he had and Officer Winters said zero. To which Tayvin said this will be your first.

They proceeded to the One Leg Stand (OLS) during this test I observed no clues.

Officer Winters then administered three additional eye tests which are designed to detect drug impairment, which I'm not familiar with. After the tests Tayvin asked officer Winters why he assumed he was drunk. Officer Winters told him that he was showing several strong signs of impairment. Tayvin looked at me and caught me off guard and asked about the signs of impairment and I told him that he was a little slow with the paperwork and that he wasn't very smooth and consistent, and those can be tale, tale signs of impairment. Officer Winters then read Tayvin his Miranda Warning, which Tayvin acknowledged before blowing into the PBT which showed no presence of alcohol. Officer Winters then asked Tayvin when the last time he smoked Marijuana. This lead me to believe that there was something with the other tests that lead Officer Winters to believe that Tayvin was impaired. Tayvin couldn't tell Officer Winters when the last time he smoked marijuana was but insisted that it wasn't resent and stated that he is tested weekly for football. Tayvin asked if Officer Winters could go from thinking it was alcohol to drugs and I told him that he could and that in the past he has been very good at it.

In looking back it was at this point that I should have questioned Officer Winters as to what his observations where and how they lead him to believe he was impaired. Officer Winters then made a phone call to Officer Shinkle who was working and was a Drug Recognition Expert. While Officer Winters was on the phone Tayvin asked if he could make a phone call to his mom and I told him that he could. During the course of his conversation with is mom he asked me to talk to her and I told him that I really couldn't because he was an adult. Tayvin asked me why I was allowing this to happen and I pointed out that he was specialized in this area and that if he believed he was under the influence that he could do this. Initially Tayvin indicated that he would do a DRE eval but after Officer Winters was

CITY RFP 00906

done with his phone call he decided that he wasn't going to do one at which time Officer Winters told Tayvin that he was under arrest for OWI.  He was handcuffed, searched and placed in the back of patrol car 843.  Officer Winters was getting ready to leave and I pointed out that the car was legally parked but we needed to see if he wanted to leave it there and make sure it was secured.

Once at the PD Officer Shinkle agreed to do a DRE evaluation on Tayvin which took roughly an hour. During that time I spoke with his mom, Lindsey Maxwell, 3 different times.  I explained what was going and told her that I was a little limited on what I could say due to the fact that he was of age, and told her that I would have him call her when he was done.  After the DRE evaluation was complete Officer Shinkle and Winters came into the office and Officer Shinkle told me that he found no signs of impairment.  Officer Winters asked if they should charge him she he had been arrested.  I told them absolutely not that if a DRE evaluation showed no evidence that we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way.  About this time dispatch advised that his mom was in the front lobby to pick him.  Prior to leaving he had requested that he speak with a supervisor so I spoke him for a few minutes.

After Tayvin was released I spoke with Officer Shinkle regarding the discrepancy in observations.  I was advised that this was the 3rd DRE evaluation that Officer Winters had asked him to do on this shift. Officer Shinkle told me that first too he just looked at and spoke with the subjects and declined to do a DRE.  This worries me as Officer Winters does a lot of OWI's and I have had a lot of faith in him.  I'm afraid this could happen again, and plan on meeting with Officer Winters to discuss this concern.

After looking back at my BWC footage I wish I had interjected earlier and spoke with Officer Winters to understand what he was seeing and to hopefully have prevented him from being arrested to begin with.

CITY RFP 00907

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF IOWA
                       CENTRAL DIVISION

TAYVIN GALANAKIS,                      §
      Plaintiff,                       §
                                       §
V.                                     §  CASE NO. 4:23-cv-00044
                                       §
CITY OF NEWTON, IOWA, ROB BURDESS,§
NATHAN WINTERS, CHRISTOPHER WING, §
INDIVIDUALLY AND IN THEIR              §
OFFICIAL CAPACITIES WITH THE           §
NEWTON POLICE DEPARTMENT,              §
      Defendants.                      §
                                       §
    ------------------------------     §
                                       §
NATHAN WINTERS AND CHRISTOPHER         §
WING,                                  §
      Defendants/Counterclaim          §
      Plaintiffs,                      §
                                       §
V.                                     §
                                       §  Removed from the
TAYVIN GALANAKIS,                      §  District Court for
      Plaintiff/Counterclaim           §  Jasper County, Iowa
      Defendant.                       §  No. LACV123038
    _____

              ORAL AND VIDEOTAPED DEPOSITION OF
                         LANCE PLATT
                      NOVEMBER 3, 2023
                      VOLUME 1 of 1
    _____
```

    ORAL AND VIDEOTAPED DEPOSITION OF LANCE PLATT,
produced as a witness at the instance of the Defendants
City of Newton and Rob Burdess and Defendants/Counterclaim
Plaintiffs Nathan Winters and Christopher Wing and duly
sworn, was taken in the above-styled and numbered cause on
the 3rd day of November, 2023, from 9:07 a.m. to 11:56
a.m., before Laurin Rainer, Certified Shorthand Reporter
in and for the State of Texas, reported by computerized
stenotype machine, at the offices of Associated Court
Reporters, 1716 Briarcrest Drive, Suite 300, Bryan, Texas
77802, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

Page 2

```
 1                    APPEARANCES
 2 FOR THE DEFENDANTS CITY OF NEWTON AND ROB BURDESS AND
   DEFENDANTS/COUNTERCLAIM PLAINTIFFS NATHAN WINTERS AND
 3 CHRISTOPHER WING:
 4    Mr. Nicholas F. Miller
      Brick Gentry, P.C.
 5    6701 Westown Parkway
      Suite 100
 6    West Des Moines, Iowa 50266
      Telephone: (515)274-1450 - Fax: (515)274-1488
 7    Email: nick.miller@brickgentrylaw.com
 8 FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT TAYVIN GALANAKIS:
 9    Mr. Matthew M. Boles
      Matthew M. Boles
10    Gribble, Boles, Stewart & Witosky Law
      2015 Grand Avenue
11    Suite 200
      Des Moines, Iowa 50312
12    Telephone:  (515)644-6852
      Email: mboles@gbswlaw.com
13
14 ALSO PRESENT:
15    Ms. Myra Thetford, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX
 2                                              PAGE
 3 Appearances ........................................    2
 4 LANCE PLATT
 5    Examination by Mr. Nicholas F. Miller ..........    4
 6 Reporter's Certificate .............................  102
 7
 8                    EXHIBITS
 9 NO.  DESCRIPTION                                PAGE
10  1   Platt and Associates Technical Report ..........  13
11  2   Body cam video .................................  20
12  3   William Penn University Sports Medicine Department
          Drug Education and Testing Program Policy ......  90
13
    4   National Association of Intercollegiate Athletics
14      National Administrative Council Drug Testing
          Policy Manual .................................  93
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Today is Friday,
 3 November 3rd, 2023.  We're on the record at 9:07 a.m.
 4            THE REPORTER:  Pursuant to Federal Rules of
 5 Civil Procedure 30(b)(5)(A)(i), this is the deposition of
 6 Lance Platt.  Today's date is November 3, 2023, and the
 7 time is 9:07.
 8            My name is Laurin Rainer, Registered
 9 Professional Reporter, Certified Shorthand Reporter in the
10 state of Texas, CSR No. 8307.  My business address is
11 Associated Court Reporters, 1225 North Loop West, Suite
12 327, Houston, Texas 77008.
13            This deposition is being conducted at the
14 offices of Associated Court Reporters, 1716 Briarcrest
15 Drive, Suite 300, Bryan, Texas 77802.
16            Those present at this deposition include
17 the following persons:  Mr. Nicholas Miller, Mr. Matthew
18 Boles, Dr. Lance Platt, and Ms. Myra Thetford.
19            I will now administer the oath.  Will you
20 raise your right hand for me?  Do you solemnly swear or
21 affirm that the testimony you are about to give in this
22 matter will be the truth, the whole truth, and nothing but
23 the truth, so help you God?
24            THE WITNESS:  Yes, ma'am.
25                        *
```

Page 5

```
 1                    LANCE PLATT,
 2 having been first duly sworn, testified as follows:
 3                    EXAMINATION
 4 BY MR. MILLER:
 5    Q.   State your name.
 6    A.   Lance Platt, P-l-a-t-t.
 7    Q.   Are you employed?
 8    A.   I am.
 9    Q.   Where?
10    A.   I am a self-employed consultant.  The name of my
11 company is Platt and Associates.
12    Q.   What would you consider your profession?
13    A.   I evaluate cases, criminal and civil cases,
14 mainly impaired driving, also police practices and
15 procedures, including use of force.
16    Q.   Is the curriculum vitae that you provided with
17 your expert report in this case current and up-to-date?
18    A.   Yes, sir.
19    Q.   How did you get into drug recognition or the
20 field that you're in now?
21    A.   I was a police officer in College Station,
22 Texas, which is right next to where we are, and left there
23 in 1999.  I went to work for the Texas Engineering
24 Extension Service, which is part of Texas A&M University.
25 While I was there, I served several capacities.  I was a
```

**LANCE PLATT - November 03, 2023**

Page 10

1    Q.    Now I'm asking about a ten-year.

2    A.    Okay.  Ten -- within the ten years, I would say

3  I probably have given five to ten depositions.  I don't

4  know the exact amount.  I do -- I did submit some -- the

5  cases that I've testified in, but I don't know the exact

6  number of depositions.  But I've testified as an expert

7  and been qualified well over 300 times.

8    Q.    Over the course of how many years?

9    A.    Since 2002.

10   Q.    In any of those cases, have you opined or

11  concluded that the person subject to the field sobriety

12  testing was impaired or intoxicated?

13   A.    That happens a lot when I do evaluations of

14  cases.  Now, I do -- I do up front evaluations of -- of a

15  case.  Many times -- and I say many times -- the case is

16  no good for me.  I mean, I -- I -- they hire me to look at

17  it, and I look at it, and I make a decision.  And if I

18  feel like I can help, I help.  If I can't, I can't.  But

19  I'm very forward with them, like, this is what this is,

20  this is what I see.  That's the only way that you can be

21  because there is no other way.

22         So I do an evaluation, you know, an up

23  front evaluation of the case.  The testimony and the

24  deposition is me.  I mean, I will not do it unless I want

25  to.  So it -- it's -- it's up to me, and the attorneys

Page 11

1  know that up front when I talk to them.

2    Q.    So for the cases in which you are deposed or the

3  cases in which you testify in court, how many of those --

4  in how many of those have you concluded that the person

5  subject to the field sobriety testing was impaired or

6  intoxicated?

7    A.    In court, it would be all of them.

8    Q.    You concluded that the person subject to the

9  testing was impaired or intoxicated?

10   A.    No, was -- was not impaired.

11   Q.    Was not.  Explain your process when you're

12  retained as an expert witness for evaluating the field

13  sobriety testing.

14   A.    Usually, it's a contact, you know, through the

15  phone or through the -- through the internet, and I'll

16  contact the attorney and tell them what I do.  It usually

17  takes some explanation because there's not a ton of people

18  out there that -- that do exactly what -- what I do.  And

19  we'll talk about the case, and I'll tell them up front I

20  do an up front evaluation, and there is no way around

21  that.  I mean, I do an evaluation up front, and this is

22  what it costs.  If you don't want to do it, then we can go

23  ahead and hang up.

24         I do that for two reasons.  Number one is

25  to protect the client.  Number two is to protect me.

Page 12

1  Because there may be times, like you said, when I see that

2  they're impaired, I'm like, "Here, here's my report, but I

3  I'm not going to testify."

4         I'll get the discovery in that they want me

5  to look at.  When I say "they," I'm talking about the

6  attorneys.  And I'll look at the discovery, and then I'll

7  compile a report, send the report back to the attorney,

8  and then we go from there.

9    Q.    When you say you look at the discovery, what

10  types of things are you talking about?

11   A.    I get case reports, video.  Mainly, my stuff

12  that I look at is what happened on the street.  You know,

13  it -- it's the arrest report, any supplemental arrest

14  reports to what happened on the street, if there were

15  field sobriety that was done out on the street, if there

16  was a drug recognition expert exam that was done away from

17  the street.  So my stuff is really contained to -- to the

18  actual enforcement -- the law enforcement out on the

19  street.  That -- that's my -- my scope.

20   Q.    So you -- you said arrest reports.  You would

21  review --

22   A.    Yes, sir.

23   Q.    -- those documents?  What other documents would

24  you review?

25   A.    Arrest reports, I look at toxicology reports

Page 13

1  sometimes, any supplemental reports that the officers turn

2  in, anything to do with booking.  Booking.  Anything like

3  that that has law enforcement related to it, I look at it.

4    Q.    Do you ever review videos?

5    A.    I do.

6    Q.    What kind?

7    A.    Arrest videos, in car, I've reviewed videos from

8  jails, but usually it's the in car video that I look at

9  because in -- with a OWI, you have the three phases.  You

10  know, and you have the video, and a lot of it starts when

11  the person is driving.  So I do look at the video from

12  start to finish.  Now, some cases don't have video.  You

13  know, those are difficult because there's really

14  nothing -- nothing to look at.  But the ones that have

15  video, I do.  I -- I look at the video from start to

16  finish, and that's what my report is based on.

17   Q.    What about officer body cam videos?  Do you

18  normally review those?

19   A.    Yes, any -- any -- any video.

20         (Exhibit 1 marked)

21   Q.    (BY MR. MILLER) Dr. Platt, I'm going to hand you

22  what's been marked as Defense Deposition -- I'm sorry --

23  Platt Deposition 1, Exhibit 1.  What is that?

24   A.    That is what I refer to as a Technical Report

25  for Mr. Matthew Boles for Tayvin Galanakis.

Page 14

1    Q.    Did you create Platt Deposition Exhibit 1?
2    A.    Yes, I did.
3    Q.    Is Platt Deposition Exhibit 1 a true and
4    accurate copy of the report that you authored in this
5    case?
6    A.    Yes, sir.
7    Q.    In connection with your report in this case,
8    what resources did you review?
9    A.    I looked at the video of the scene, I believe,
10   and then I looked at the -- the arrest report that they
11   had out on the street.  Let's see.  The case report and
12   the video.  That's -- that's -- that's what I looked at.
13   I try to keep my scope tight.  I mean, that's -- that's --
14   that's what -- what I looked at.  That's what I --
15   Q.    Were there any pieces of literature or other
16   resources that you rely on when you're authoring your
17   report?
18   A.    I look at the -- the NHTSA, the National Highway
19   Traffic Safety Administration, or NHTSA, manuals, the --
20   the manuals that the officers use in their training.  I --
21   I reference from those and look at those, also, because
22   that's what the officers are trained out of.
23   Q.    You're referring to the NHTSA FSST manual [sic]?
24   A.    SFST.
25   Q.    What does SFST stand for?

Page 15

1    A.    Standardized field sobriety testing.
2    Q.    What version of the NHTSA SFST manual did you
3    rely on in authoring your report?
4    A.    I looked at the 2018 manual, as when the arrest
5    was made in 2022, the 2023 manual hadn't been released
6    yet, but there is a 2023 manual out there, but I
7    referenced the -- I usually reference the manual -- or
8    always reference the manual that the officers used at the
9    time that they were trained in and at the time that the
10   arrest was made.  So NHTSA spreads those manuals out.
11   Every four or five years, they a release a new one.  So at
12   the time this arrest was made, it was the 2018.
13   Q.    That would have been the most --
14   A.    The most recent.
15   Q.    -- current version?
16   A.    Yes, sir.
17   Q.    Are you familiar -- when did the 2023 version
18   get published?
19   A.    They had a -- they had a release of that to the
20   trainers, I think, in 02 of '23, but it wasn't released
21   out to the officers, gosh, until I think the -- the June
22   or July, maybe August of '23, even later than that.
23   that.  I know -- I think there were some problems with
24   some of the editing and stuff like that, so.
25   Q.    Since its publication, have you reviewed the

Page 16

1    2023 version of the NHTSA SFST manual?
2    A.    I have.  I actually taught a class, a 2023
3    class.
4    Q.    Are there meaningful differences between the
5    2023 version and the 2018 version?
6    A.    No, not really.  I mean, if you look at field
7    sobriety testing as -- as a whole, they really can't
8    change anything because if you did, you would have to
9    revalidate, and NHTSA is not going to do that, in my
10   opinion.  So other than there being some -- they changed
11   some definitions of some words, some of the stuff is
12   changed, and I'm -- the statistics are changed.  In 2018,
13   they were really heavy on cannabis.  They like to -- they
14   -- they're -- they're moving towards a drugged driving.
15       So there were a few minor changes that were
16   made; but as far as the tests go and the validity of the
17   tests, that's been the same since 1977.  That hasn't
18   changed at all, and they're still alcohol tests.
19   Q.    What other resources or pieces of literature did
20   you review in preparing your report in this case?
21   A.    I looked at the NHTSA manuals, mainly.  That's
22   about all that I used.  After the report was done and
23   turned in, another -- a -- a peer reviewed and published
24   study came out from the Journal of the American Medical
25   Association, and I did look at that, and I believe I told

Page 17

1    Mr. Boles about that, that study.
2    Q.    To prepare your report and your opinions in this
3    case, did you review or consult any Advanced Roadside
4    Impaired Driving Enforcement manuals?
5    A.    I may have looked at the ARIDE manual kind of,
6    but it was mainly SFST because that's what happened out on
7    the street.
8    Q.    When you say "ARIDE," that's the Advanced
9    Roadside --
10   A.    Yeah.  I'm sorry.
11   Q.    -- Impaired Driving Enforcement?
12   A.    Yes, sir.  I'm sorry.  That's what that stands
13   for, A-R-I-D-E.
14   Q.    No worries.  Just making a record.  Okay.  And
15   remind me:  Why did you not consult that piece of
16   literature?
17   A.    I looked -- I looked at it.  I know that some of
18   the tests that he did were from the ARIDE protocol, but I
19   was familiar with that anyway.  I knew the protocol.  The
20   main tests that he did -- the horizontal gaze, walk and
21   turn, and one leg stand -- are alcohol specific tests.
22   Standardized field sobriety tests.  So that -- that's why
23   I looked at the SFSTs mainly.
24   Q.    Did you review or consult any manuals other than
25   drug recognition expert manuals, particularly ones from

Page 18

1 the IACP?

2    A.    No, sir, I -- I kept it in -- all within the
3 NHTSA -- NHTSA realm.

4    Q.    What is the IACP?

5    A.    Internal Association of Chiefs of Police.

6    Q.    Did you review Matt Bruner's expert report that
7 was authored in this case?

8    A.    I did.  I did look at that, yes.

9    Q.    Based on all the information, literature, and
10 materials you reviewed in connection with this case, did
11 you reach any opinions?

12    A.    I did.

13    Q.    Specifically, what are your opinions?

14    A.    My opinion specifically is that on this night,
15 Mr. Galanakis was not under the influence of cannabis.

16    Q.    Did you reach any other opinions?

17    A.    As far as being under the influence?  No.  I
18 don't believe he -- he shouldn't have been arrested.  He
19 was not under the influence and -- which was proven later
20 by the drug recognition person, but that was my -- that
21 was my end result, was that he shouldn't have been
22 arrested.  I didn't see a loss of mental or physical
23 faculty that I believe rose to the level of a drug.  I
24 didn't believe he was under the influence of cannabis,
25 which I have seen people under the influence of

Page 19

1 cannabis -- cannabis before.  I believe they got into an
2 argument, and this was the end result of the argument.  So
3 that's -- that was my opinion.

4    Q.    Any other opinions?

5    A.    No, sir.

6    Q.    Do you plan on forming any additional opinions?

7    A.    I don't plan on it, no.

8    Q.    To prepare your expert report, which has been
9 previously marked as Platt Deposition Exhibit 1, did you
10 review any videos?

11    A.    Yes.  There was a video of the scene, the stop
12 video.

13    Q.    What kind of video was that?

14    A.    That was the video where they had stopped him
15 and -- and got him out and were -- were conversing and
16 talking with him, where you actually saw all three of
17 the -- the people on video.

18    Q.    Was it a body camera?

19    A.    I believe it was a body cam.  There was also a
20 dashcam, but the body cam was the one that got the most
21 interaction between the two.

22    Q.    There were two officers on the scene --

23    A.    Right.

24    Q.    -- is that right?

25    A.    Right.

Page 20

1    Q.    Do you remember which officer's body cam video
2 you reviewed?

3    A.    I believe it was the -- I don't think it was the
4 lieutenant.  I believe it was the -- the -- the arresting
5 officer that I looked at.

6    Q.    Would that be Officer Nathan Winters?

7    A.    Winters is his last name, yeah.  And I think
8 Wing was the lieutenant.  Lieutenant Wing.

9    Q.    Do you recall if the body cam video from Officer
10 Winters' body was identified by a Bates number?

11    A.    I don't know.

12         (Exhibit 2 marked)

13    Q.    (BY MR. MILLER) Dr. Platt, I'm going to show you
14 a thumbnail of Officer Winters' -- the beginning
15 of Officer --

16    A.    Uh-huh.

17    Q.    -- Winters' body cam video.  Does that, to you,
18 look like an accurate thumbnail of the very beginning of
19 the video that you reviewed?

20    A.    Based on my recollection, yeah, it looks -- it
21 looks familiar.  But, yes, his body cam activated inside
22 of the vehicle.  It looks -- it looks familiar, yes.

23    Q.    In the bottom left-hand corner of the video
24 screen there, do you see a Bates number?

25    A.    When you say "Bates," what are you talking

Page 21

1 about?

2    Q.    Do you see a reference down there, City I.D. --

3    A.    Yeah, City I.D. 00630.

4    Q.    Was the video that you reviewed to prepare your
5 report similarly marked with that identifier?

6    A.    You know what?  I don't remember.

7    Q.    Okay.  I'm handing you back Platt Deposition
8 Exhibit No. 1 [sic], which is the body camera video from
9 Officer Winters.  Can you go ahead and play through that
10 and let me know if that's a copy of the video that you
11 reviewed to prepare your report in this case?

12    A.    Yeah, I --

13    Q.    Go ahead.

14    A.    Just here?

15    Q.    It's touch, or you can use -- I'm sorry.
16 It's -- what I'm showing you is Platt Deposition Exhibit
17 2, not Deposition Exhibit 1.

18    A.    Okay.

19    Q.    Which I'll just note for the record.  So go
20 ahead and play through that until you can confirm that's a
21 copy of the video that you reviewed in connection with
22 this case.

23    A.    It's not playing.  Do you need a Mac?  Sorry.  I
24 have a Mac, Mac Book.

25    Q.    And you can skip to different portions of that

## LANCE PLATT - November 03, 2023

Page 66

1 looking for -- the officer is.  Swaying -- I'm sorry.

2 Puts foot down, uses arms for balance more than 6 inches,

3 swaying, and hops.

4       The swaying, it's very subjective.  I mean,

5 who knows.  It just says "sway."  I have -- I have

6 researched this before and looked at this.  When you take

7 50 percent of your balance ability away, there's going to

8 be some sway.  Your brain is going to recognize that one

9 foot is off the ground, and it's going to try to find its

10 center of balance.  The officers are not taught in the

11 class what sway is, and I -- I -- I really think they

12 should.  I mean, it just says "sway."  There are reasons

13 why the body sways.

14       So swaying, to me, I mean, I can understand

15 if the person was -- was back and forth and back and

16 forth, but just moving a little bit, I didn't score him

17 the clue.  I did score him the uses arms for balance more

18 than 6 inches.  I think the officer kept his right arm

19 away from his body for balance.  So I got him for the one

20 clue.

21   Q.   When you -- you said there's four clues.  So

22 looking for those four clues, is that basically how the

23 one leg stand test is evaluated?

24   A.   Yes, sir.

25   Q.   The presence or absence of those clues?

Page 67

1   A.   Yes.  It's for alcohol, yes.

2   Q.   You mentioned this, but did you identify

3 indicators or clues of impairment in Mr. Galanakis'

4 performance of the one leg test?

5   A.   I believe that he used his arms for balance more

6 than 6 inches.  So that's I identified.  That's one of the

7 clues.

8   Q.   So is that an indicator or a clue of impairment

9 by a substance other than alcohol?

10   A.   It could be.  It's a possibility.  But, again, I

11 don't know of any study that links that, really, with

12 anything other than alcohol, as far as -- as -- as this --

13 as these clues go, no other drugs that I'm familiar with.

14   Q.   In your report, which is Platt Deposition

15 Exhibit 1, you stated that Officer Winters interfered with

16 Galanakis' one leg stand test.  Can you tell me what you

17 meant by that?

18   A.   I believe he talked to him while he was doing

19 the test, which you're not supposed to do, just, you know,

20 get back and leave -- leave him alone and let him do the

21 test.

22   Q.   Was that just one interference, or were there

23 multiple?

24   A.   I believe it was one.

25   Q.   Just once?

Page 68

1   A.   Yes.

2   Q.   Okay.  Doctor, I'm going to show you a portion

3 of Officer Winters' body cam video, which is Platt

4 Deposition Exhibit 2, beginning at 27 minutes, 30 seconds

5 and ending at 29 minutes, 50 seconds, based on the timer

6 in the upper right-hand corner of the video.  And, Doctor,

7 I'm handing you my computer, which has that portion of the

8 video.  And I'm going to press play, and I'll stop when we

9 complete that portion.

10       (Video plays)

11   A.   Right there is where he interfered.

12       (Video continues to play)

13   Q.   (BY MR. MILLER) Okay, Doctor.  I'm stopping the

14 video because we've completed that portion.  While we were

15 watching this portion of the video, you specifically

16 identified what you previously testified to about what, in

17 your opinion, was Officer Winters interfering --

18   A.   Yes.

19   Q.   -- with the one leg stand test.

20   A.   Yes.

21   Q.   What exactly did Officer Winters do?

22   A.   He said -- he asked him if -- if he remembered

23 how he told him to count.

24   Q.   And it's that comment, in your opinion, that was

25 the interference --

Page 69

1   A.   Yes.

2   Q.   -- with the one leg stand test?

3   A.   Yes.  When someone is taking a test, you don't

4 all -- all of a sudden start asking them questions.  At

5 that point, he told him he understood him, Officer Winters

6 needed to back up, let him do the test, and record it.

7   Q.   Did Mr. Galanakis follow Officer Winters'

8 instructions on how to perform the one leg stand test?

9   A.   Not to a hundred percent, no.

10   Q.   How?

11   A.   He didn't count out loud.

12   Q.   In your opinion, Officer Winters should not have

13 reminded him to count out loud?

14   A.   Correct.  According to the curriculum, yes.

15 Don't interfere with people while they're testing and then

16 note it in your report.

17   Q.   But in any case, Mr. Galanakis had failed to

18 count out loud consistent with the instructions before

19 Officer Winters, in your opinion, interfered with the one

20 leg stand test, correct?

21   A.   Correct.

22   Q.   After Mr. Galanakis asked Officer Winters to

23 repeat the directions for the one leg stand test, did

24 Mr. Galanakis correctly recall the instructions?

25   A.   He didn't count at any time.  He might have been

Page 102

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
2                     CENTRAL DIVISION
3 TAYVIN GALANAKIS,              §
        Plaintiff,               §
4                                §
  V.                             § CASE NO. 4:23-cv-00044
5                                §
  CITY OF NEWTON, IOWA, ROB BURDESS,§
6 NATHAN WINTERS, CHRISTOPHER WING, §
  INDIVIDUALLY AND IN THEIR       §
7 OFFICIAL CAPACITIES WITH THE     §
  NEWTON POLICE DEPARTMENT,        §
8       Defendants.               §
                                  §
9 ------------------------------   §
                                  §
10 NATHAN WINTERS AND CHRISTOPHER  §
  WING,                           §
11      Defendants/Counterclaim    §
        Plaintiffs,               §
12                               §
  V.                             §
13                               § Removed from the
  TAYVIN GALANAKIS,              § District Court for
14      Plaintiff/Counterclaim    § Jasper County, Iowa
        Defendant.               § No. LACV123038
15
16      _____
             REPORTER'S CERTIFICATION
17      ORAL AND VIDEOTAPED DEPOSITION OF
                  LANCE PLATT
18               NOVEMBER 3, 2023

19
20      I, LAURIN RAINER, Certified Shorthand Reporter in and
21 for the State of Texas, hereby certify to the following:
22      That the witness, Lance Platt, was duly sworn by the
23 officer and that the transcript of the oral deposition is
24 a true record of the testimony given by the witness;
25
```

Page 103

```
1      That the original deposition transcript was delivered
2 to Mr. Nicholas F. Miller;
3      That a copy of this certificate was served on all
4 parties and/or the witness shown herein on
5 November 17, 2023.
6      I further certify that pursuant to FRCP No. 30(e)(2)
7 that the signature of the deponent:
8      _____ was requested by the deponent or a party before
9 the completion of the deposition and that the signature is
10 to be returned within 30 days from the date of receipt of
11 the transcript.  If returned, the attached Correction Page
12 contains any changes and the reasons therefor;
13      __X__ was not requested by the deponent or a party
14 before the completion of the deposition.
15      I further certify that I am neither counsel for,
16 related to, nor employed by any of the parties in the
17 action in which this proceeding was taken, and further
18 that I am not financially or otherwise interested in the
19 outcome of the action.
20      Certified to by me this 17th day of November, 2023.
21            /s/ Laurin Rainer, CSR

          _____
22            Laurin Rainer, CSR, RPR
              Texas CSR No. 8307, expires 05/31/2024
23            Associated Court Reporters
              Firm Register No. 29
24            Waco, Texas 76701
              Telephone: (254)753-3330
25
```

# PLATT and ASSOCIATES

**IMPAIRED DRIVING CONSULTING**
4343 Carter Creek Parkway, Suite 120
Bryan, TX 77802

979 846-3950 - office
979 412-2346 - cell

web: www.impaireddrivingexpert.com
email: lance@impaireddrivingexpert.com

**July 1, 2023**

**Mr. Matthew Boles**
**Attorney at Law**

| Re: | Re: | **Tayvin Galanakis** |
|---|---|---|
| | Agency/Case Number | **Newton Police Department/22-25845** |
| | Court | |
| | County | **Jasper** |
| | Offense | **Operating While Intoxicated (OWI drugs)** |
| | Date of Offense | **August 28, 2022** |

Dear Mr. Boles:

At your request, I have reviewed the OWI case report and video; I have analyzed Mr. Galanakis' performance on the three phases of OWI detection including the standardized field sobriety tests that were given to him in the field by the officer. I have, also, evaluated the officer's performance, regarding the administrative requirements that are required by the National Highway Traffic Safety Administration (NHTSA) and the International Association of Chiefs of Police (IACP) in order for the tests to be considered standardized in accordance with the test battery protocol.

Attached to this letter, you will find a detailed technical report based upon the information that was provided in the officer's case report and video submitted on the night of the arrest. The technical report will outline the activities of the officer and the defendant as the events unfold. My comments will follow.

If you need clarification of any point, please feel free to contact me.

If there is anything further that Platt and Associates can do for you in the future, please feel free to contact us at your convenience. It was a pleasure to assist you; and we look forward to a continued relationship with you and your legal practice.

Sincerely,

**Lance A. Platt, Ph.D.**

Lance A. Platt, Ph.D.
Platt and Associates



EXHIBIT
Platt Depo
1

# Operating While Intoxicated / Case Report/Video Review

| | |
|---|---|
| Date | **August 28, 2022** |
| Weather | **Raining** |
| Defendant's vehicle | **Chevrolet Impala** |
| Roadway conditions, type and design | **Multi lane/divided/wet** |
| Ambient light conditions | **Emergency vehicle lights/officer's flashlight** |
| Traffic conditions | **Unknown** |
| Direction of travel | **Westbound on S 2nd Avenue W** |
| Traffic infraction | **Drove with bright lights on** |
| Location of arrest | **200 block S 3rd Avenue W** |
| Start time of initial investigation | **00:13:00 hours (on case report)** |
| Arrest time | **00:40:48 hours (on video)** |
| Time reference | **27 minutes and 48 seconds** |
| Start time of in custody videotape (jail) | **N/A** |
| End time of in custody videotape (jail) | **N/A** |
| Time reference | **N/A** |

# On Scene Case Report/Video

**DWI Detection Definition** – Session 4-P. 4 of 36 NHTSA SFST Student Manual, HS 178 02/2018:

"DWI detection is defined as: THE ENTIRE PROCESS OF IDENTIFYING AND GATHERING EVIDENCE TO DETERMINE IF A SUBJECT SHOULD BE ARRESTED FOR A DWI VIOLATION."

## 1.00   Vehicle in Motion Phase:

**1.01**   **Elements of the Driving Task** – Session 5-P. 18 of 66 NHTSA SFST Student Manual, HS 178, 02/2018:

Relationship of Visual Cues to Impaired Driving Attention Capability Driving is a complex task, composed of many parts: Steering, controlling accelerator, signaling, controlling brake pedal, operating clutch, operating gearshift, observing other traffic, observing signal lights, stop signs, other traffic control devices, making decisions whether to stop, turn, speed up, slow down, etc., many other things.

**1.02**   **The Stop Command and Impairment** – Session 5-P. 25 of 66 NHTSA SFST Student Manual, HS 178, 02/2018:

"After the command to stop is given, the alcohol impaired driver may exhibit additional important evidence of DWI.  Some of these cues are exhibited because the stop command places additional demands on the driver's ability to divide attention.  The signal to stop creates a new situation with which the driver must devote some attention, i.e., emergency flashing lights, siren, etc., demand and divert the subject's attention. Signal to stop requires the driver to turn the steering wheel, operate the brake pedal, activate the signal light, etc.  As soon as the officer gives the stop command, the subject's driving task becomes more complex.  If subject is under the influence, the subject may not be able to handle this more complex driving very well."

**1.03**   **Stopping Inappropriately In Response To Officer** – Session 5-P. 5 of 66 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"Whenever there is a valid reason to stop a vehicle, the officer should be alert to the possibility that the driver may be impaired by alcohol and/or other drugs. Once the stop command has been communicated to the suspect driver, the officer must closely observe driver's actions and vehicle maneuvers during the stopping sequence. Sometimes, significant evidence of alcohol influence comes to light during the stopping sequence.  In some cases, the stopping sequence might produce the first suspicion of DWI.  Drivers impaired by alcohol and/or other drugs may respond in unexpected and dangerous ways to the stop command."

**Observations of Examiner:** The video begins with the officer conducting a traffic stop on a vehicle that was allegedly traveling with its bright lights on, there were no other driving facts mentioned by the officer.   The vehicle does react to the stop

command in what I believe to be a safe and normal manner.  Mr. Galanakis does state, in what I believe to be in a clear and logical tone of speech that he knows the headlight is out, but it would be safer driving with two lit headlights at night instead of one.

## 2.00   Personal Contact Phase:

**2.01**   **Questioning Techniques** – Session 6-P. 15 of 28 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"The questions you ask and the way in which you ask them can constitute simple divided attention tasks.  Three techniques are particularly pertinent:  asking for two things simultaneously; asking interrupting or distracting questions; asking unusual questions.  An example of the first technique, asking two things simultaneously, is requesting that a driver produce both drivers license and the vehicle registration. Possible evidence of impairment may come to light as the driver responds to this dual request."

**Observations of Examiner:**  The officer does identify Mr. Galanakis as the driver and sole occupant of the vehicle.

**2.02**   **Medical Questions** – Session 6-P. 19 of 28 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"Officers should be alert for potential medical conditions that may mimic drug or alcohol impairment.   Some questions may include Do you have any physical disabilities; Are you sick or injured; Are you under the care of a doctor or dentist; Are you diabetic or epileptic; If diabetic ask if they take insulin; Are you on any medications.

**2.03**   **Exiting the Vehicle** – Session 6-P. 19 of 28 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"How the driver steps and walks from the vehicle and actions or behavior during the exit sequence may provide important evidence of impairment."

**2.04**   **Multiple Persons in the Car (ETOH Odor):** If multiple persons are inside a vehicle, in a closed environment, each having been drinking, then, the combined odor of alcohol coming from their respirations would be greater than if just one had been drinking.  It is possible that the odor of alcohol detected was due to the accumulation of odors within the interior of the vehicle as opposed to coming from the defendant's breath, alone.

**Observations of Examiner:**  The officer does state in his case report as he spoke to and contacted Mr. Galanakis, that he noticed the **small** odor of an alcoholic beverage that was coming from his person. While this may have been the officer's opinion there is no way that the officer can correlate the odor of alcohol to a level of intoxication.

Regarding an odor of intoxicant, in 1998, the Southern California Research Institute (SCRI) in cooperation with the Insurance Institute for Highway Safety conducted a study entitled "Police Officers detection of breath odors from alcohol ingestion"

authored by Herbert Moskowitz, Marceline Burns, and Susan Ferguson. The end results of this research indicated, "it was demonstrated that officers were able to derive only limited information from alcohol odor. These findings are consistent with the Widmark (1932) police station study and the Compton (1985) open-air roadside studies. Both previous studies found small likelihood of detecting breath alcohol odors for BAC's below 0.08 and 0.10% and detection failures even below 0.10%".

As with the Widmark and the Compton studies on breath alcohol odor, the SCRI study also indicated that the officers were unable to consistently classify odor of alcohol to intoxication levels. This was especially evident at 0.08% BAC's and lower. Mr. Galanakis does not admit to consuming alcohol (he is asked twice) or taking any type of drugs on this date. Mr. Galanakis later gives a PBT of 0.000.

**2.05   Glassy, Bloodshot Eyes**: There are several things that could cause a person's eyes to be glassy and bloodshot.

(a)   Bloodshot eyes:

(1)   Pollens and molds, causing an allergic reaction.
(2)   Smoke, paint, chemicals, or other irritants.
(3)   Lack of sleep.
(4)   Dry contact lenses.
(5)   "Dry eye" condition.

(b)   Glassy eyes:

(1)   Normal appearance.
(2)   Eyes blink with a clear sheen of moisture to keep the eye from drying out.
(3)   Serious eye disorder, if not glassy; blindness, glaucoma, cataracts, etc.
(4)   Often exaggerated by lights shining in a person's eyes, moisture acts as a mirror and light, reflecting off the surface of the eye.

NHTSA agrees with this opinion based upon the 1997 study titled "The Detection of DWI at BACs Below 0.10" Final Report by Jack Stuster. The final report states on page 14. "Finally, some clues were eliminated because they might be indicators more of social class than of alcohol impairment. For example, the interview and archival research indicated that a flushed or red face might be an indication of alcohol impairment in some people. However, a flushed or red face and bloodshot eyes are open to subjective interpretation and could be due to allergies or caused by outdoor work. A disheveled appearance similarly is open to subjective interpretation. We attempted to limit the recommendations to clear and objective post-stop behaviors."

**Observations of Examiner:** In my opinion and NHTSA, bloodshot and glassy or glossy eyes are not always indicative of alcohol consumption or intoxication.

**3.00   Pre-Arrest Screening Phase:**

(a)   **"Simplicity"** – Session 7-P. 15 of 39 NHTSA SFST Student Manual, HS 178, revised 02/2018:

Simplicity is the key to divided attention field sobriety testing. It is not enough to select a test that just divides the subject's attention. The test also must be one that is reasonably simple for the average person to complete as instructed when sober. Tests that are difficult for a sober subject to perform have little or no evidentiary value."

**3.01**   **Horizontal Gaze Nystagmus (HGN) Test**: The NHTSA HGN test was researched and validated as a test for determining alcohol levels above or below .08, based upon the NHTSA SFST validation studies.

**(a)**   **Procedures to Assess Possible Medical Impairment** – Session 8-P. 28-29 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"Prior to administration of HGN, the eyes are checked for equal tracking (can they follow an object together). If the eyes do not track together, or if the pupils are noticeably unequal in size, the chance of medical disorders or injuries causing the nystagmus may be present."

"By passing a stimulus across both eyes, you can check to see if both eyes are tracking equally. If they don't (i.e., if one eye tracks the stimulus, but the other fails to move, or lags behind the stimulus) there is the possibility of a neurological disorder. If a person has sight in both eyes, but the eyes fail to track together, there is a possibility that the person is suffering from an injury or illness affecting the brain."

**(b)**   **Stimulus Positioning** – Session 8-P. 31 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"HGN and VGN can be observed directly and does not require special equipment. You will need a contrasting stimulus for the subject to follow with their eyes. This can be a penlight or pen. The stimulus used should be held slightly above eye level, so that the eyes are wide open when they look directly at it. It should be held approximately 12-15 inches in front of the nose. Remain aware of your position in relation to the subject at all times."

**Observations of Examiner:** There are three (3) clues associated with the HGN test:

(1)   lack of smooth pursuit;

(2)   distinct and sustained nystagmus at maximum deviation and

(3)   onset of nystagmus prior to 45 degrees.

These are the only clues for the HGN test; and, they have to be looked for in that order. Each eye is checked two (2) times in the HGN test. There is a total of two (2) complete passes for each eye for a total of six (6) passes, plus one (1) pass to check for equal tracking. As a result, there is a total of seven (7) passes. If a test for vertical gaze nystagmus is performed, it requires two (2) passes; if the HGN and VGN tests are combined; there will be a total of nine (9) tests.

**Observations of Examiner:** The minimum number of full HGN passes required to satisfy the NHTSA HGN standardized protocol as stated above is 7-9.

**(c)**    **Alcohol Influence -** Session 8-P. 38 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"When we administer the HGN test, we look for three specific clues as evidence of alcohol influence.

**(d)**    **Clues -** Session 8-P. 36 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"It is possible that all three clues definitely will be found in one eye, while only two (or sometimes only one) will show up in the other eye. It is always necessary to check both eyes, and to check them independently. Notwithstanding, it is unlikely that the eyes of someone under the influence of alcohol will behave totally different. Thus, if one eye shows all three clues distinctly while the other eye gives no evidence of nystagmus, the person may be suffering from one of the pathological disorders covered previously."

**(e)**    **Optokinetic Effect –** Session 8-P. 21 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"Examples of optokinetic nystagmus include watching strobe lights, rotating lights, or rapidly moving traffic in close proximity. The Horizontal Gaze Nystagmus test will not be influence by optokinetic nystagmus when administered properly. During the Horizontal Gaze Nystagmus test, the suspect is required to fixate the eyes on a penlight, pencil or similar object that moves in accordance with the HGN testing procedures, thus optokinetic nystagmus will not occur. The movement of the stimulus and the fixation on the stimulus by the subject precludes this form of nystagmus from being observed by the officer."

**(f)**    **Interfering Conditions –** Session 8-P. 83 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

"Examples of conditions that may interfere with subjects' performance while checking for nystagmus: Wind, dust, etc. (irritating the subject's eyes). Note: Try to face the subject away from flashing or strobe lights that could cause visual or other distractions that could impede the test. Visual or other distractions impeding the test."

**(g)**    **Lack of Smooth Pursuit (LOSP) –** Session 8-P. 41 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018: The protocol for the LOSP test is as follows:

"It is necessary to move the object smoothly in order to check the eye's ability to pursue smoothly. The stimulus should be moved from center position, all the way out to the right side (checking subject's left eye) where the eye can go

no further, and then all the way back across subject's face all the way out to the left side where the eye can go no further (checking subject's right eye) and then back to the center. The object must be moved steadily, at a speed that takes approximately 2 seconds to bring the eye from center to side. In checking for this clue, make at least two complete passes in front of the eyes. If you are still not able to determine whether or not the eye is jerking as it moves, additional passes may be made in front of the eyes."

(h)     **Distinct and Sustained Nystagmus at Maximum Deviation (DNMD)** – Session 8-P. 40-46 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018: The protocol for the DNMD test is as follows:

"Once you have completed the check for lack of smooth pursuit, you will check the eyes for distinct and sustained nystagmus when the eye is held at maximum deviation, beginning with the subject's left eye. Once again, position the stimulus approximately 12-15 inches (30-38 cm) in front of subject's nose and slightly above eye level. Move the stimulus off to the right side (checking subject's left eye) until the eye has gone as far as possible. Hold the stimulus steady at that position for a minimum of four (4) seconds, and carefully watch the eye. Then, move the stimulus back across the subject's face all the way out to the left side (subject's right eye). Four seconds will not cause fatigue nystagmus. This type of nystagmus may begin if a subject's eye is held at maximum deviation for more than 30 seconds. Hold the stimulus steady and carefully watch the eye. If the person is impaired, the eye is likely to exhibit definite, distinct, and sustained jerking when held at maximum deviation for a minimum of 4 seconds. In order to "count" this clue as evidence of impairment, the nystagmus must be distinct and sustained for a minimum of 4 seconds. If you think you see only slight nystagmus at this stage of the test, or if you have to convince yourself that nystagmus is present, then it really isn't there."

(i)     **Onset of Nystagmus Prior to 45 Degrees (ONPD)** – Session 8-P. 49-51 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018: The protocol for the ONPD test is as follows:

"Once again, position the stimulus approximately 12-15 inches (30-38 cm) in front of subject's nose and slightly above eye level. The angle of onset of nystagmus is simply the point at which the eye is first seen jerking. Examples: With someone at a very high BAC (0.20+), the jerking might begin almost immediately after the eye starts to move toward the side. For someone at 0.08 BAC, the jerking might not start until the eye has moved nearly to the 45-degree angle. Generally speaking, the higher the BAC, the sooner the jerking will start as the eye moves toward the side. If the jerking begins prior to 45 degrees, that person's BAC could be 0.08 or above. It is not difficult to determine when the eye has reached the 45-degree point, but it does require some practice. If you start with the stimulus approximately 12-15 inches (30-38 cm) directly in front of the nose, you will reach 45 degrees when you have moved the stimulus an equal distance to the side. Two other important indicators can be used to determine if the eye is within 45 degrees. At 45 degrees, some white usually will still be visible in the corner of the eye (for most people). (Although rare, there may be times when a person's eye may be

at a 45-degree angle and no white in the corner of the eye is visible). The stimulus is positioned approximately 12-15 inches from (30-38 cm), subject's nose and slightly above eye level. It is necessary to move the stimulus slowly to identify the point at which the eye begins to jerk. Start moving the stimulus towards the right side (left eye) at the speed that would take approximately 4 seconds for the stimulus to reach a 45-degree angle. As you are slowly moving the stimulus, watch the eye carefully for any sign of jerking. When you see the jerking begin, immediately stop moving the stimulus and hold it steady at that position. With the stimulus held steady, look at the eye and verify that the jerking is continuing. If the jerking is not evident with the stimulus held steady, you have not located the point of onset. Therefore, resume moving the stimulus slowly toward the side until you notice the jerking again. When you locate the point of onset of nystagmus, you must determine whether it is prior to 45 degrees. Verify some white is still showing in the corner of the eye."

**(j)**    **Vertical Gaze Nystagmus (VGN)** – Session VIII-P. 34 NHTSA SFST Instructor Manual, HS 178, R5/2013:

"Point out that Vertical Gaze Nystagmus was **not** examined in the original research that led to the validation of the Standardized Field Sobriety Test battery (Horizontal Gaze Nystagmus, Walk and Turn and One Leg Stand)."

**(k)**    **Medical Impairment** – Session 8-P. 27 of 95 NHTSA SFST Student Manuel, HS 178, revised 02/2018:

"The examinations that you conduct to assess possible medical impairment include Equal pupil size, Resting nystagmus, Equal tracking. Pupil size will be affected by some medical conditions or injuries. If the two pupils are distinctly different in size, it is possible that the subject: Has a prosthetic eye, is suffering from a head injury, has a neurological disorder. Resting nystagmus is referred to as jerking as the eyes look straight ahead. This condition is not frequently seen. Its presence usually indicates pathology or high doses of a drug such as a Dissociative Anesthetic like PCP. Resting nystagmus may also be a medical problem. Tracking ability will be affected by certain medical conditions or injuries involving the brain. This observation is a medical assessment. If the two eyes do not track together, the possibility of a serious medical condition or injury is present."

**(l)**    **Stimulus too High** – P. 32, Final Report Validation of the SFST Battery at BACs Below 0.10 Percent, NHTSA 1998:

"Horizontal gaze nystagmus is an involuntary jerking of the eye which occurs naturally as the eyes gaze to the side. Under normal circumstances, nystagmus occurs when the eyes are rotated at high peripheral angles."

**(m)**   **Stimulus Movement Mistakes** – Session VIII-P. 43 of 95 NHTSA SFST Instructor Manual, HS 178, 02/2018:

"Holding object too close to (or too far from) subject's eyes;" Moving object too slowly (or too quickly) toward the side; "Failing to move object far

enough to the side to bring eye to maximum deviation; "Curving downward and curving around."

**(n)**   **Validation/Compliance to Standards** – Session 8-P. 17 of 95 NHTSA SFST Student Manuel, HS 178, revised 02/2018:

"**IT IS NECESSARY TO EMPHASIZE THIS VALIDATION APPLIES ONLY WHEN:    THE TESTS ARE ADMINISTERED IN THE PRESCRIBED, STANDARDIZED MANNER, THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECT'S PERFORMANCE, THE STANDARDIZED CRITERIA ARE EMPLOYED TO INTERPRET THAT PERFORMANCE.  IF ANY ONE OF THE SFST ELEMENTS IS CHANGED THE VALIDITY MAY BE COMPROMISED.**" (Removed from NHTSA 2013 SFST Manual added in 2015)

**Observations of Examiner:** The officer does state in his case report that he did not observe any HGN test clues.  Based upon NHTSA impaired driving training a lack of observed HGN could eliminate a CNS Depressant an Inhalant or PCP as the alleged impairing substance.

**3.02**   **Walk and Turn (W&T) Test**: The NHTSA W&T test was researched and validated as a test for determining **alcohol** levels above or below .08, based upon the NHTSA SFST validation studies.

**(a)**   **Walk and Turn Test Conditions:** Session 8-P. 62 of 95 NHTSA SFST Student Manual, HS 178 revised 02/2018:

"Whenever possible, the Walk and Turn test should be conducted on a reasonably dry, hard, level, non-slippery surface. There should be sufficient room for suspects to complete nine heel to toe steps. Recent field validation studies have indicated that varying environmental conditions have not affected a suspect's ability to perform this test."

**(b)**   **Walk and Turn Stages:** Session 8-P. 54 of 82 NHTSA SFST Student Manual, HS 178 revised 10/2015:

"Like all divided attention tests, Walk and Turn has two stages.  They are Instruction Stage and Walking Stage.  Both stages are important, because they can affect the subject's overall performance on the test."

**(c)**   **Instructions Stage:  Initial Positioning and Verbal Instructions** – Session 8-P. 64 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

For standardization in the performance of this test, have the subject assume the heel-to-toe stance by giving the following verbal instructions, accompanied by demonstrations:

(1)   "Place your left foot on the line (real or imaginary).
(2)   "Place your right foot on the line ahead of the left foot, with the heel of the right foot against the toe of the left foot."

(3)     "Place your arms down at your sides."

(4)     "Maintain this position until I have completed the instructions.  <u>Do not start</u> to walk until told to do so."

(5)     "Do you understand the instructions so far?" (Make sure the suspect indicates understanding.)

**(d)**     **Demonstrations and Instructions for the Walking Stage** – Session 8-P. 65-69 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018: Explain the test requirements, using the following verbal instructions, accompanied by demonstrations:

(1)     "When I tell you to start, take nine heel-to-toe steps on the line, turn, and take nine heel-to-toe steps down the line."

(2)     "When you turn, keep the front (lead) foot on the line, and turn by taking a series of small steps with the other foot, like this."

(3)     "While you are walking, keep your arms at your sides, watch your feet at all times, and count your steps out loud."

(4)     "Once you start walking, don't stop until you have completed the test."

(5)     "Do you understand the instructions?" (Make sure suspect understands)

(6)     "Instruct the person to begin the test."

**Observations of Examiner:** The officer stated in his case report that he observed Mr. Galanakis to exhibit 5 out of a possible 8 W&T test clues:

- Stepped offline
- Took 13 steps
- Stopped walking
- Improper turn
- Missed heel to toe

**Observations of Examiner:** I observed Mr. Galanakis to exhibit 3 out of a possible 8 W&T test clues:

- Took the wrong number of steps
- Stopped while walking
- Conducted an improper turn

**(e)**     **Test Interpretation** -- Session VIII-P. 66 of 95 NHTSA SFST Student Manual, HS 178, 02/2018:

You may observe a number of different behaviors when a subject performs this test. Original research demonstrated that the behaviors listed below are likely to be observed in someone with a BAC above 0.08.  Look for the following clues each time this test is given:

A.     Cannot keep balance while listening to the instructions. Two tasks are required at the beginning of this test. The subject must balance heel-to-toe on the line, and at the same time, listen carefully to the instructions. Typically, the person who is impaired can do only one

of these things. The subject may listen to the instructions, but not keep balance. Record this clue if the subject does not maintain the heel-to-toe position throughout the instructions. (Feet must actually break apart or step off the line.) Do not record this clue if the suspect sways or uses the arms to balance but maintains the heel-to-toe position.

B. Starts too soon. The impaired person may also keep balance, but not listen to the instructions. Since you specifically instructed the subject not to start walking "until I tell you to begin," record this clue if the subject does not wait.

C. Stops while walking. The subject stops while walking. Do not record this clue if the suspect is merely walking slowly.

D. Does not touch heel to toe. The subject leaves a space of more than one-half inch between the heel and toe on any step.

E. Steps off the line. The subject steps so that one foot is entirely off the line.

F. Uses arms to balance. The subject raises one or both arms more than 6 inches from the sides in order to maintain balance.

G. Improper turn. The subject removes the front foot from the line while turning. Also record this clue if the suspect has not followed directions as demonstrated, i.e., spins or pivots around or loses balance while turning.

H. Incorrect number of steps. Record this clue if the subject takes more or fewer than nine steps in either direction.

Note: If subject can't do the test, record observed clues and document the reason for not completing the test, e.g., subject's safety.

If the subject has difficulty with the test (for example, steps off the line), continue from that point, not from the beginning. This test may lose its sensitivity if it is repeated several times.

**(f)**   **Walk and Turn Limitations** – Session 8 – P. 62 of 95 NHTSA SFST Student Manual, HS 178 revised 02/2018:

"The original SCRI studies suggested individuals over 65 years of age or people with back, leg or inner ear problems had difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. Also, the SCRI studies suggest that Individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes. Officers should consider all factors when conducting SFSTs."

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his W&T test results, he does mention an ankle injury however the officer does not expand upon it.

**(g)**   **Interfering Conditions** – Session 8 – P. 86 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

Examples of conditions that may interfere with a suspect's performance of the WAT test are:

(1)   Wind/weather conditions'
(2)   Suspect's age
(3)   Suspect's footwear.

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his W&T test results, he does mention an ankle injury however the officer does not expand upon it.

**(h)**   **Issues of Balance** – Vestibular Disorders Association website: The ability to maintain balance depends not only on vision and the vestibular system, but, also, on information that the brain receives from the muscles and joints which provide clues, such as the direction of the head turn and the texture and slope of the walking surface.

The human balance system depends on the inner ear, the eyes, and the muscles and joints to transmit reliable information about the body's movement and orientation in space.  If the inner ear or other elements of the balance system are damages, the result may be vertigo, dizziness, poor balance, and other symptoms.

Balance, is, also, dependent on good muscle strength and joint mobility.  A sedentary lifestyle, arthritis and/or other diseases of the bones or muscles can compromise strength and/or mobility.  Even healthy people over 65 (or younger) appear to have more trouble than younger people maintaining their balance on soft or uneven surfaces when visual cues are not available (e.g., in the dark or failure to identify a balance focal point).

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his W&T test results, he does mention an ankle injury however the officer does not expand upon it.

**(i)**   **Validation/Compliance to Standards** – Session 8-P. 17 of 95 NHTSA SFST Student Manuel, HS 178, revised 02/2018:

**"IT IS NECESSARY TO EMPHASIZE THIS VALIDATION APPLIES ONLY WHEN:   THE TESTS ARE ADMINISTERED IN THE PRESCRIBED, STANDARDIZED MANNER, THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECT'S PERFORMANCE, THE STANDARDIZED CRITERIA ARE EMPLOYED TO INTERPRET THAT PERFORMANCE.  IF ANY ONE OF THE SFST ELEMENTS IS CHANGED THE VALIDITY MAY BE COMPROMISED."** (Removed from NHTSA 2013 SFST Manual added in 2015)

**Observations of Examiner:** Based upon my observation of the submitted video, it is my opinion Mr. Galanakis performs well physically however he does not follow the instructions given to him by the officer.

**3.03**   **One Leg Stand (OLS) Test**: The NHTSA OLS test was researched and validated as a test for determining **alcohol** levels above or below .08, based upon the NHTSA SFST validation studies.

**(a)**     There are two stages of the one leg stand test. The first stage is the "instructional stage," where the tested individual is to place both feet together and keep their arms down at their sides. The tested individual is told not to begin the test until told to do so and asked if they understand. There are no clues scored during this stage of the one leg stand test.

**(b)**     **Instructions Stage:  Initial Positioning and Verbal Instructions** – Session 8-P. 75 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

Initiate the test by giving the following instructions, accompanied by demonstrations.

- o   "Please stand with your feet together and your arms down at the sides, like this."
- o   "Do no start to perform the test until I tell you to do so."
- o   "Do you understand the instructions so far?"

**(c)**     **Demonstrations and Instructions for the Balance and Counting Stage** – Session 8-P. 76 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

Explain the test requirements, using the following verbal instructions, accompanied by demonstrations:

- o   "When I tell you to start, raise either leg with the foot approximately six inches off the ground, keeping your foot parallel to the ground."
- o   "Keep both legs straight and your arms at your side."
- o   "While holding that position, count out loud in the following manner: one thousand and one, one thousand and two, one thousand and three, and so on until told to stop."
- o   "Keep your arms at your sides at all times and keep watching the raised foot."
- o   "Do you understand?"
- o   "Go ahead and perform the test." (Officer should always time the thirty seconds.  Test should be discontinued after 30 seconds.)
- o   Observe the subject from a safe distance.

**(d)**     **One Leg Stand Test Clues**

**Sways:** The suspect sways while balancing: This refers to side to side or back and forth motion of the body, or a swaying motion of the foot, while the subject maintains the OLS position. (NHTSA 2018 Student Manual, Session 8 page 77 of 95).

**Swaying:** "Slight tremors of the foot or body should not be interpreted as swaying"
(NHTSA 2018 Student Manual, Session 8 page 77 of 95).

**Uses arms to balance:** Subject moves arms 6 or more inches from the side of the body in order to keep balance. (NHTSA 2018 Student Manual, Session 8 page 77 of 95).

**Hopping:** Subject is able to keep one foot off the ground, but resorts to hopping in order to maintain balance. (NHTSA 2018 Student Manual, Session 8 page 77 of 95).

**Puts foot down:** The subject is not able to maintain the OLS position, putting the foot down one or more times during the 30 second count. If the subject puts the foot down, give instructions to pick the foot up again and continue counting from the point at which the foot touched. (NHTSA 2018 Student Manual, Session 8 page 77 of 95).

Note: If subject can't do the test, record observed clues and document the reason for not completing the test, e.g., subject's safety. (NHTSA 2018 Student Manual, Session 8 page 78 of 95).

**Observations of Examiner:** The officer stated in his case report that he observed Mr. Galanakis to exhibit 2 out of a possible 4 OLS test clues:

- Swaying
- Kept his right arm away from his body for balance

**Observations of Examiner:** I observed Mr. Galanakis to exhibit 1 out of a possible 4 OLS test clues, the officer also interfered with Mr. Galanakis as he performed the OLS test:

- Used arms for balance (> 6 inches)

**(e)**   **Test Conditions** – Session 8-P. 73 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018:

One leg stand requires a dry, hard, level, and non-slippery surface. Suspect's safety should be considered at all times. Standardizing this test for every type of road condition is unrealistic. The original research study recommended that this test be performed on a dry, hard, level, non-slippery surface, and relatively safe conditions. If not, the research recommends: subject be asked to perform the test elsewhere, or only HGN be administered. However, recent field validation studies have indicated that varying environmental conditions have not affected a subject's ability to perform this test."

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his OLS test results, he does mention an ankle injury however the officer does not expand upon it.

**(f)**   **Issues of Balance** – Vestibular Disorders Association website: The ability to maintain balance depends not only on vision and the vestibular system, but, also, on information that the brain receives from the muscles and joints which provide clues, such as the direction of the head turn and the texture and slope of the walking surface.

The human balance system depends on the inner ear, the eyes, and the muscles and joints to transmit reliable information about the body's movement and orientation in space. If the inner ear or other elements of the balance system

are damages, the result may be vertigo, dizziness, poor balance, and other symptoms.

Balance, is, also, dependent on good muscle strength and joint mobility. A sedentary lifestyle, arthritis and/or other diseases of the bones or muscles can compromise strength and/or mobility. Even healthy people over 65 (or younger) appear to have more trouble than younger people maintaining their balance on soft or uneven surfaces when visual cues are not available (e.g., in the dark or failure to identify a balance focal point).

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his OLS test results, he does mention an ankle injury however the officer does not expand upon it.

(g)   **One Leg Stand: Weight and Age Limits** – Session 8-P. 73 of 95, NHTSA SFST Student Manual, HS 178 revised 02/2018:

"The original SCRI studies suggested that certain individuals over 65 years of age, people with back, leg or middle ear problems, or people who are overweight by 50 or more pounds may have difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. There was no data containing the weight of the test subjects included in the final report. Also, the SCRI studies suggest that individuals wearing heels of more than 2 inches high should be given the opportunity to remove their shoes."

**Observations of Examiner:** It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his OLS test results, he does mention an ankle injury however the officer does not expand upon it.

(h)   **Validation/Compliance to Standards** – Session 8-P. 17 of 95 NHTSA SFST Student Manual, HS 178, revised 02/2018: The manual states:

**"IT IS NECESSARY TO EMPHASIZE THIS VALIDATION APPLIES ONLY WHEN:   THE TESTS ARE ADMINISTERED IN THE PRESCRIBED STANDARDIZED MANNER, THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECT'S PERFORMANCE, THE STANDARDIZED CRITERIA ARE EMPLOYED TO INTERPRET THAT PERFORMANCE.   IF ANY ONE OF THE STANDARDIZED FIELD SOBRIETY TEST ELEMENTS IS CHANGED THE VALIDITY MAY BE COMPROMISED."** (Removed from NHTSA 2013 SFST Manual added 2015)

**Observations of Examiner:** Based upon my observation of the submitted video, it is my opinion that Mr. Galanakis performed the OLS test well physically and mentally.

**3.04   Lack of Convergence (LOC) Test:** The Lack of Convergence test is not a part of the NHTSA SFST battery.

**Observations of Examiner:** Officer Winters indicated that Mr. Galanakis did display a lack of convergence. The lack of convergence is consistent with Depressant, Dissociative Anesthetic, Inhalants and Cannabis according to the DRE curriculum. The NHTSA DRE curriculum does state, "The test for LOC is also very simple. This test may not be as reliable as the other eye tests because some people have an inability to cross their eyes normally." (Session 5 page 15 of 42 Revised 02/2018). A person under the influence of a CNS Depressant and Cannabis drug categories should exhibit a LOC according to the NHTSA DRE curriculum. Mr. Galanakis also wears glasses, he may not be able to cross his eyes.

**3.05** **Modified Romberg (MR) Test:** The Modified Romberg test is not a part of the NHTSA SFST battery.

**Observations of Examiner:** Officer Winters indicated that Mr. Galanakis estimated the passing of 30 seconds as 34 seconds which is within the acceptable range of time, the officer tells another officer (whom I believe to be the DRE) on the phone that the Romberg was 38 (he later corrects himself at the jail stating 37 or 38), which would not be acceptable according to NHTSA. Which one was it?

**3.06** **Finger to Nose (FTN) Test:** The Finger to Nose test is not a part of the NHTSA SFST battery. The scoring or assessment for this test is unknown.

**Observations of Examiner:** Officer Winters indicated that Mr. Galanakis did not touch the tip of his nose with the tip of his finger. Mr. Galanakis also had his eyes closed and his head tilted back which can cause visual disruption including eye lid tremors. The officer does tell Mr. Galanakis, "The trick is you are going to have your eyes closed and your head tilted back." The officer is correct, the **trick** to causing eye lid tremors and making it very difficult to touch the tip of your nose with the tip of your finger I to make the person close their eyes and tilt their head back.

**3.07** **Preliminary (PBT) Test:** The PBT is not a part of the NHTSA SFST battery.

**Observations of Examiner:** Officer Winters administered the PBT to Mr. Galanakis and the test result was .000%, the **small** odor of alcohol apparently was not a factor.

**4.00** **Arrest Decision:**

**(a)** Upon completion of the PBT test, the officer immediately mentions Miranda and asks Mr. Galanakis if he has "smoked weed" Mr. Galanakis tells the officer he is tested on Friday per his school and most likely NCAA standards since Mr. Galanakis is a college athlete (William Penn). The officer remarks, "But it's Saturday" to which Mr. Galanakis responded (correctly) "It stays in your system for 30 days if I smoked and did the test next Friday I am off the team." In my opinion a trained officer should have known that. Mr. Galanakis was arrested by the officer for OWI at 00:40:48 hours, he was transported to the jail and had a DRE evaluation conducted on him where it was determined that he was not under the influence, he was released.

**Observations of Examiner:** Based upon my observation of the submitted video and case report, it is my opinion that Mr. Galanakis does not exhibit physical and/or mental difficulty while being contacted by the officer that I would associate with any type of drugs or alcohol including Cannabis.

Lieutenant Wing whom I believe to have been on scene with officer Winters wrote in his supplemental report that after the DRE evaluation he was told by officer's Shinkle and Winters (who has just arrested him right in front of Lieutenant Wing) that officer Shinkle found no signs of impairment, officer Winters asked Lieutenant Wing if he should charge him, he had been arrested. Lieutenant Wing allegedly told officer Winters absolutely not, that if a DRE evaluation showed no evidence, then we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way." This is the same police officer (supervisor) who witnessed the entire event at the scene including the arrest of Mr. Galanakis for OWI, some of the same "tests" (Romberg, FTN, LOC, HGN) were administered to Mr. Galanakis in the field which were observed by Lieutenant Wing, the same tests were administered on the DRE evaluation by officer Shinkle. Lieutenant Wing stated in his supplemental report that Mr. Galanakis was released to his mom with no charges.

*All opinions stated herein are stated to a reasonable degree of professional certainty within the fields of my expertise of law enforcement training and procedures including the NHTSA standardized field sobriety testing, drug evaluation and classification and advanced roadside impaired driving enforcement programs administration, scoring and training protocols required in the successful completion of the student and instructor courses, including both standardized and non-standardized tests, the conduct and training of impaired driving investigations, and the NHTSA standardized protocols involving both alcohol and/or drugs other than alcohol.*

Sincerely,

**Lance A. Platt, Ph.D.**

Lance A. Platt, Ph.D.
Platt and Associates

*Policy Manual*

---

### 103.5   ISSUING THE POLICY MANUAL

An electronic version of the Policy Manual will be made available to all members on the department network for viewing and printing. No changes shall be made to the manual without authorization from the Chief of Police or the authorized designee.

Each member shall acknowledge that he/she has been provided access to and has had the opportunity to review the Policy Manual and Departmental Directives. Members shall seek clarification as needed from an appropriate supervisor for any provisions that they do not fully understand.

### 103.6   PERIODIC REVIEW OF THE POLICY MANUAL

The Chief of Police will ensure that the Policy Manual is periodically reviewed and updated as necessary.

### 103.7   REVISIONS TO POLICIES

All revisions to the Policy Manual will be provided to each member on or before the date the policy becomes effective. Each member will be required to acknowledge that he/she has reviewed the revisions and shall seek clarification from an appropriate supervisor as needed.

Members are responsible for keeping abreast of all Policy Manual revisions.

Each Lieutenant will ensure that members under his/her command are aware of any Policy Manual revision.

All department members suggesting revision of the contents of the Policy Manual shall forward their written suggestions to their Lieutenants, who will consider the recommendations and forward them to the command staff as appropriate.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

# Organizational Structure and Responsibility

## 200.1   PURPOSE AND SCOPE
This policy establishes the organizational structure of the Department and defines general responsibilities of department members.

## 200.2   POLICY
The Newton Police Department will implement and maintain an organizational structure that provides clear and identifiable roles for command, control and guidance of the Department. Each position and assignment should have clearly identified responsibilities and a defined chain of command.

## 200.3   DIVISIONS
The Chief of Police is responsible for administering and managing the Newton Police Department. There are three divisions in the Department:

- Administration Division
- Patrol Division
- Investigation Division

### 200.3.1   ADMINISTRATION DIVISION
The Administration Division is commanded by the Chief of Police, whose primary responsibility is to provide general management, direction and control for the Administration Division. The Administration Division consists of technical and administrative services.

### 200.3.2   PATROL DIVISION
The Patrol Division is commanded by an assigned Lieutenant, whose primary responsibility is to provide general management, direction and control for the Patrol Division. The Patrol Division consists of uniformed patrol and special operations, which includes the Patrol Division, Traffic Safety Unit, Motorcycle Unit, K-9 Unit, School Rescource Officer and police aides/assistants.

### 200.3.3   INVESTIGATION DIVISION
The Investigation Division is commanded by an assigned Lieutenant, whose primary responsibility is to provide general management, direction and control for the Investigation Division. The Investigation Division consists of the Investigation Division, Identification Unit, Narcotics Unit, crime analysis and forensic services.

## 200.4   COMMAND PROTOCOL

### 200.4.1   SUCCESSION OF COMMAND
The Chief of Police exercises command over all members of the Newton Police Department. During planned absences, the Chief of Police will designate a Lieutenant to serve as the acting Chief of Police.

# Newton Police Department

### Policy Manual

Policy Manual

## *Organizational Structure and Responsibility*

Except when designated as above, the order of command authority in the absence or unavailability of the Chief of Police is as follows:

    (a)    On-duty Lieutenant

    (b)    On-duty Sergeant

    (c)    On-duty Shift Supervisor

### 200.4.2   UNITY OF COMMAND
The principles of unity of command ensure efficient supervision and control within the Department. Generally, each member shall be accountable to one supervisor at any time for a given assignment or responsibility. Except where specifically delegated authority may exist by policy or special assignment (e.g., Canine, Bicycle Patrol), any supervisor may temporarily direct any subordinate if an operational necessity exists.

## 200.5   AUTHORITY AND RESPONSIBILITIES
Each member will be assigned duties and responsibilities. Each member is delegated the authority necessary to effectively execute those responsibilities. Each member will also be held accountable for the appropriate application of that delegated authority.

Copyright Lexipol, LLC 2023/04/28, All Rights Reserved.
Published with permission by Newton Police Department

CITY RFP 01417

**Policy**
**206**

# Supervision Staffing Levels

## 206.1  PURPOSE AND SCOPE
The purpose of this policy is to establish guidelines to ensure that proper supervision is available to meet the needs of the Department and members throughout all Divisions.

## 206.2  POLICY
The Newton Police Department will ensure that proper supervision is available to meet the needs of its members and to achieve the goals of the Department. The needs of its members should be balanced with the needs of the Department for flexibility and discretion in assigning members to meet supervisory needs. While balance is desirable, the paramount concern is to meet the needs of the Department.

## 206.3  MINIMUM SUPERVISION STAFFING LEVELS
Minimum staffing levels should be established by the Lieutenants for each Division and work group. The supervision staffing levels should support proper supervision, span of control, compliance with any collective bargaining agreement and activity levels to meet the needs of members and the goals of the Department.

### 206.3.1  TEMPORARY SUPERVISORS
In order to accommodate training and other unforeseen circumstances, a qualified lower-ranking member may be used as a temporary supervisor in place of a regularly assigned supervisor.

*Personnel Complaints*

---

**1010.9   CRIMINAL INVESTIGATION**

Where a member is accused of potential criminal conduct, a separate supervisor or investigator shall be assigned to investigate the criminal allegations apart from any administrative investigation. Any separate administrative investigation may parallel a criminal investigation.

The Chief of Police shall be notified as soon as practicable when a member is accused of criminal conduct. The Chief of Police may request a criminal investigation by an outside law enforcement agency.

A member accused of criminal conduct shall be provided with all rights afforded to a civilian. The member should not be administratively ordered to provide any information in the criminal investigation.

The Newton Police Department may release information concerning the arrest or detention of any member, including an officer, that has not led to a conviction. No disciplinary action should be taken until an independent administrative investigation is conducted.

If a complainant is determined to be in violation of Iowa Code § 718.6 (false reports), the investigator shall file the necessary paperwork with the county attorney's office for possible charges (Iowa Code § 80F.1).

**1010.10   POST-ADMINISTRATIVE INVESTIGATION PROCEDURES**

Upon completion of a formal investigation, an investigation report should be forwarded to the Chief of Police through the chain of command. The Chief of Police may accept or modify any classification or recommendation for disciplinary action.

**1010.10.1   CHIEF OF POLICE RESPONSIBILITIES**

Upon receipt of any written recommendation for disciplinary action, the Chief of Police shall review the recommendation and all accompanying materials. The Chief of Police may modify any recommendation and/or may return the file to the Lieutenant for further investigation or action.

Once the Chief of Police is satisfied that no further investigation or action is required by staff, the Chief of Police shall determine the amount of discipline, if any, that should be imposed. In the event disciplinary action is proposed, the Chief of Police shall provide the member with a written notice and the following:

    (a)    Access to all of the materials considered by the Chief of Police in recommending the proposed discipline (Iowa Code § 80F.1).

    (b)    An opportunity to respond orally or in writing to the Chief of Police within five days of receiving the notice.

        1.    Upon a showing of good cause by the member, the Chief of Police may grant a reasonable extension of time for the member to respond.

        2.    If the member elects to respond orally, the presentation shall be recorded by the Department. Upon request, the member shall be provided with a copy of the recording.



DWI Detection
and
Standardized
Field Sobriety
Testing

Session 6 – Phase Two:
Personal Contact

February 2018

Revised:
02/2018

DWI Detection and Standardized Field Sobriety Testing
Phase Two: Personal Contact

Session 6
Page 1 of 28

Pl.'s App. 76

CITY RFP 02215



There are two common factors that tend to produce <u>high</u> results on a PBT.

Residual Mouth Alcohol – After a person takes a drink, some of the alcohol will remain in the mouth. If the person exhales soon after drinking, the breath sample will pick up some of this leftover mouth alcohol. In this case, the breath sample will contain an additional amount of alcohol and the test result will be higher than the true BAC.

It takes approximately 15 minutes for the residual alcohol to be eliminated from the mouth.

The only sure way to eliminate this factor is to make sure the subject does not consume any alcohol for at least 15 to 20 minutes before conducting a breath test. Remember, too, most mouthwashes, breath sprays, cough syrups, etc., contain alcohol and may produce residual mouth alcohol. Therefore, do not permit the subject to put <u>anything</u> in their mouth for at least 15 to 20 minutes prior to testing.

Breath Contaminants – Some types of PBTs might react to certain substances other than alcohol. For example, substances such as ether, chloroform, acetone, acetaldehyde, and cigarette smoke may produce a positive reaction on certain devices. If so, the test would be contaminated and its result would be higher than the true BAC. Normal characteristics of breath samples, such as halitosis (bad breath), food odors, etc., do not affect accuracy.

_____

_____

_____

_____

_____

Revised:
02/2018

DWI Detection and Standardized Field Sobriety Testing
Phase Three: Pre-Arrest Screening
Pet. App. 77

Session 7
Page 31 of 39

CITY RFP 02273

# Lieutenant Christopher Wing's Body Camera Video

(Produced as: CITY ID 00629-Wing - Axon_Body_3_Video_2022-08-
28_0013_X60A24506_BrickGentry_Oct-03-104416-2022_Conflict)

## SUBMITTED ON THUMB DRIVE
## VIA U.S. MAIL TO:

Clerk of Court
U.S. District Court
Southern District of Iowa
123 East Walnut Street
Suite 300
Des Moines, IA 50309