## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, et al.,<br>        Defendants. | CASE NO. 4:23-cv-00044<br><br><br><br>PLAINTIFF/COUNTERCLAIM DEFENDANT'S APPENDIX RESISTING COUNTERCLAIM PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>*REDACTED* |
| NATHAN WINTERS AND CHRISTOPHER WING,<br>        Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>        Counterclaim Defendant. | |

**COMES NOW** the Plaintiff/Counterclaim-Defendant and for this Appendix

Resisting Counterclaim Plaintiff's Motion for Partial Summary Judgment provides:

### TABLE OF CONTENTS

Amended Answer, Affirmative Defenses, Counterclaims, and Jury Demand for Nathan Winters and Christopher Wing, R.Doc.23 ........................ 3

Plaintiff/Counterclaim Defendant's Answer and Affirmative Defenses to Counterclaims, R.Doc.32 ...................................................................... 7

Affidavit of Courtney Van Der Hart ...................................................... 10

Second Affidavit of Courtney Van Der Hart ........................................ 16

Filings in Jasper County Civil No. DACV122471 ................................ 22

Excerpts from Deposition of Tayvin Galanakis .................................. 42

**Excerpt from Tayvin Galanakis Deposition Ex. 7** ............................................... 49

**Excerpts from Deposition of Nathan Winters (Confidential)** ......................... 50

**Excerpts from Nathan Winters' Answers to Second Set of Interrogatories (Confidential)** ............................................................. 59

**Excerpts from Deposition of Chief Robert Burdess (Confidential)** .............. 64

**Excerpts from Chief Robert Burdess Deposition Ex. 1** .................................... 70

**Excerpts from Deposition of Lance Platt** ............................................................ 83

**Lance Platt Deposition Ex. 1** ................................................................................ 89

**Web Capture of Tayvin Galanakis' YouTube Page** ............................................ 91

**YouTube Partner Program overview & eligibility Page** ................................. 92

### GRIBBLE, BOLES, STEWART & WITOSKY LAW

BY:     */s/ Adam C. Witosky*

Matthew Boles          AT0001037
Adam C. Witosky         AT0010436
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
Telephone: (515) 235-0551
Fax: (515) 243-3696
Email: mboles@gbswlaw.com
       awitosky@gbswlaw.com

### ATTORNEYS FOR PLAINTIFF

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was **electronically filed** on CM/ECF on January 19, 2024.  Subject to the exceptions cited therein, Local Rule 5A provides this electronic filing, once electronically posted to the registered case party's CM/ECF account, constitutes service for purposes of the Federal Rules of Civil Procedure.

Copies have been provided to all registered parties because once the document is posted, those parties can view and download the presented or filed document.

*/s/ Adam C. Witosky*



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS, | No. <u>4:23-cv-00044</u> |
| Plaintiff, | |
| v. | |
| CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department, | **AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND JURY DEMAND FOR NATHAN WINTERS AND CHRISTOPHER WING** |
| Defendants. | Removed from the District Court for Jasper County, Iowa, No. LACV123038 |
| NATHAN WINTERS and CHRISTOPHER WING, | |
| Counterclaim Plaintiffs, | |
| v. | |
| TAYVIN GALANAKIS, | |
| Counterclaim Defendant. | |

**COMES NOW**, Defendants Nathan Winters ("Officer Winters"), and Christopher Wing ("Lt. Wing") (collectively "Defendants"), by and through the undersigned, and for their Amended Answer, Affirmative Defenses, Counterclaims, and Jury Demand hereby state the following:

11.     At all material times, Counterclaim Plaintiff Officer Winters was a certified law enforcement officer pursuant to Iowa Code chapter 80F.1.

12.     On the following dates and occurrences, Counterclaim Defendant falsely and knowingly spoke and/or authored the following, but not limited to the following, defamatory statements concerning Counterclaim Plaintiff Officer Winters:

   a.   On September 9, 2022, Counterclaim Defendant posted a publicly viewable video under his account on the public video-sharing website called "YouTube," on which he wrote that "NATHAN WINTER OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX GIRLFRIEND."[1]

   b.   On September 9, 2022, Counterclaim Defendant posted a publicly viewable video under his account on the public video-sharing website called "YouTube," on which he wrote that "EVEN AFTER NATHAN BEAT THE SHIT OUT HIS GIRLFRIEND."[2]

   c.   On August 29, 2022, Counterclaim Defendant posted a publicly viewable posting on the social media website "Facebook" in which he stated that "I got falsely ARRESTED. Nathan Winters of the Newton Police Department, IA decided to assume and guess I was drinking based off of me having a hard time finding my insurance. I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum." Exhibit B.

---

[1] The video can be accessed at https://www.youtube.com/watch?v=so_bFYoIsow. The text is found at 38:24 – 38:37.

[2] The video can be accessed at https://www.youtube.com/watch?v=so_bFYoIsow. The text is found at 38:24 – 38:37

    d.   On August 29, 2022, Counterclaim Defendant posted a publicly viewable comment on the social media website "Facebook" on which he stated that "Officer Winters is not fit mentally for the job and physically." (emojis/symbols omitted). Exhibit C.

    e.   On September 9, 2022, Counterclaim Defendant posted a publicly viewable video under his account on the public video-sharing website called "YouTube," on which he wrote that "NATHAN WINTERS OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING OF HIS EX GIRLFRIEND THE CHIEF OF POLICE ALLOWED NATHAN WINTERS TO STAY ON THE FORCE EVEN AFTER NATHAN BEAT THE SHIT OUT HIS GIRLFRIEND."[3]

13.    Counterclaim Plaintiff Officer Winters has never been charged, let alone convicted, of domestic abuse.

14.    At no time did Counterclaim Plaintiff Officer Winters violate any of the City's standard operating procedures during the traffic stop and subsequent arrest.

15.    The aforesaid allegations are defamatory per se in that they falsely accuse Counterclaim Plaintiff Officer Winters of crimes of moral turpitude, of incompetence, and of lacking skill in the professional occupation in which he earns a living, and those communications tend to injure his ability to conduct a trade or business.

16.    The false and defamatory statements and communications were written and stated with actual malice.

---

[3] The video can be accessed at https://www.youtube.com/watch?v=so_bFYoIsow. The text is found at 38:24 – 38:37.

**CCDef.App. 5**

17.     The false and defamatory statements and communications were stated with utter disregard for the truth of such statements.

18.     Counterclaim Defendant, through counsel, informed Counterclaim Defendant, through counsel, that he had no interest in the truth regarding the aforementioned defamatory statements and communications involving Counterclaim Plaintiff Officer Winters.

19.     In fact, Counterclaim Defendant knew at all material times the accusations along with the false and defamatory statements and communications were in fact completely and utterly false.

20.     Counterclaim Defendant demonstrated this by retweeting the following comment through his account on the social media platform "Twitter" that, referring to Counterclaim Plaintiff Officer Winters, "[a]lthough the officer may not have been convicted nor any charges filed, he did consent to have a civil no-contact/protective order placed on him by a former girlfriend … *for* domestic abuse. The order has been modified to allow him to use a gun while at work."

21.     Counterclaim Defendant caused these knowingly false and defamatory written and/or oral statements to be published to third parties through publicly accessible online platforms and other means which exposed the statements to the general public.

22.     One such means of publication was that Counterclaim Defendant took advantage of the publicity generated from these false and defamatory statements by using them to sell merchandise which further defamed Counterclaim Plaintiff Officer Winters when it was publicly advertised throughout Counterclaim Defendant's various social media accounts.

23.     Another such means of publication was that Counterclaim Defendant took advantage of the publicity generated from these false and defamatory statements by using them to earn income.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| **TAYVIN GALANAKIS,**<br>　　Plaintiff,<br><br>**v.**<br><br>**CITY OF NEWTON, IOWA, et al.,**<br>　　Defendants. | **CASE NO. 4:23-cv-00044** |
| **NATHAN WINTERS AND CHRISTOPHER WING,**<br>　　Counterclaim Plaintiffs,<br><br>**v.**<br><br>**TAYVIN GALANAKIS,**<br>　　Counterclaim Defendant. | **PLAINTIFF/COUNTERCLAIM DEFENDANT'S ANSWER and AFFIRMATIVE DEFENSES TO NATHAN WINTERS AND CHRISTOPHER WING COUNTERCLAIMS** |

**COMES NOW**, the Plaintiff/Counterclaim Defendant and for this Answer to Counterclaims and Affirmative Defenses states:

## ANSWER TO COUNTERCLAIMS

1.　　Admitted.

2.　　Admitted.

3.　　Admitted.

4.　　Paragraph 4 is an assertion of law, and not an allegation of fact requiring a response.

5.　　Paragraph 5 is an assertion of law, and not an allegation of fact requiring a response.

6.    Admitted.

7.    Denied.

8.    Paragraph 8 is denied to the extent it alleges probable cause existed to detain or arrest Tayvin Galanakis for operating while intoxicated. Paragraph 8 is admitted to the extent Tayvin was released without a criminal charge.

9.    Denied.

## COUNTERCLAIM COUNT I
## DEFAMATION OF COUNTERCLAIM PLAINTIFF OFFICER WINTERS

10.    Plaintiff/Counterclaim Defendant realleges all prior paragraphs as if set forth herein.

11.    Admitted.

12.    Plaintiff/Counterclaim Defendant denies having falsely and knowingly made any defamatory statement concerning Officer Winters:

   a.  Admitted statement was posted;

   b.  Admitted statement was posted;

   c.  Admitted statement was posted;

   d.  Admitted statement was posted;

   r. Admitted statement was posted.

13.    Admitted Officer Winters has not been criminally charged or convicted of domestic abuse, but is subject to a civil protective order for relief from domestic abuse.

14.    Denied.

15.    Denied.

16.    Denied.

17.    Denied.

18.    Denied.

19.    Denied.

20.    Paragraph 20 is admitted to the extent the comment was made, but all other allegations are denied.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied, including all subparts.

**WHEREFORE,** the Plaintiff/Counterclaim Defendant prays this counterclaim be dismissed in its entirety and for any additional relief the Court finds proper.

## COUNTERCLAIM COUNT II
## DEFAMATION OF COUNTERCLAIM PLAINTIFF LT. WING

33.    Plaintiff/Counterclaim Defendant realleges all prior paragraphs as if set

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF IOWA
#### CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>Plaintiff/Counterclaim Defendant, | CASE NO. 4:23-cv-00044 |
| vs. | |
| CITY OF NEWTON, IOWA, et al.,<br>Defendants/Counterclaim<br>Plaintiff. | AFFIDAVIT OF COURTNEY VAN DER HART |

**COMES NOW** the Affiant, Courtney Van Der Hart, and after being duly sworn the undersigned deposes and states:

1.    I am an adult and fully competent to make this Affidavit, which I do voluntarily.

2.    I am not a party to this action and do not have an interest in it.

3.    I was in a domestic relationship with Nathan Winters from the end of 2019 until around August 2021.

4.    During this relationship, Nathan Winters physically abused me.

5.    In July 2021, Nathan threatened to kill me if I cheated on him, saying he would need three bullets, one for me, one for the "new" guy, and one for himself.

6.    In July 2021, I was holding and looking at his cell phone, which he allowed me to do. When I started to walk while reading a message, he pushed me onto the bed, held me down, and grabbed and twisted my wrist until I dropped the phone.

7.    In June 2021, Nathan and I argued in my bedroom. When I attempted

to leave, he blocked the door while my kids were on the other side in the living room.

8.  Around this same time, he was giving me a shoulder rub while I lay on the bed. He put his hand on the back of neck, squeezed slightly and said, "You realize if I squeezed right now it would kill you."

9.  In May 2021, we were at a birthday party for a co-worker of mine. I was walking behind another co-worker as we were all leaving for dinner when Nathan grabbed my wrist, pulled me back, and told me I wasn't allowed to be that close to my co-worker.

10.  Throughout the summer of 2020, he would regularly drive past my house and other places I went. He would park down the road from my house, sitting in his car with the lights off.

11.  In April 2020, Nathan was sitting in his patrol car on duty when I leaned in to give him a kiss goodnight. He elbowed me in the chest so hard I was pushed backward into my car. The blow left a bruise on my chest. Following this, we communicated via SnapChat and text message about his pushing me, which he admitted to doing. (Attachment 1.)

12.  In July 2020, while at his mother's house where he lived, he refused to let me leave the bedroom. When I attempted to, he lifted me up, slammed me onto his bed, held me down by the wrists, and told me I could leave when he said I could leave.

Further, the Affiant sayeth naught.

I, Courtney Van Der Hart, on this ⊔⊔th day of December 2023, do hereby certify under oath that the contents set forth herein are true and correct.

_Courtney Van Der Hart_
Courtney Van Der Hart

STATE OF IOWA          )
                       )  ss:
COUNTY OF POLK         )

On this ⊔⊔th day of December 2023, before me, a Notary Public in and for said County and State, personally appeared Courtney Van Der Hart, known by me to be the person in the above-entitled action.

_Kendra Levine_
Notary Public - State of Iowa

KENDRA LEVINE
Commission Number 839523
My Commission Expires
5/19/25





CCDef.App. 13



 Send a chat  



+ Enter message

1 2 3 4 5 6 7 8 9 0

Q W E R T Y U I O P

A S D F G H J K L

Z X C V B N M

!#1 , English (US) .

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

TAYVIN GALANAKIS,
Plaintiff/Counterclaim Defendant,

vs.

CITY OF NEWTON, IOWA, et al.,
Defendants/Counterclaim
Plaintiff.

CASE NO. 4:23-cv-00044

SECOND AFFIDAVIT OF
COURTNEY VAN DER HART

**COMES NOW** the Affiant, Courtney Van Der Hart, and after being duly sworn the undersigned deposes and states:

1.    I am an adult and fully competent to make this Affidavit, which I do voluntarily.

2.    I am not a party to this action and do not have an interest in it.

3.    On August 29, 2022, I saw a post by Tayvin Galanakis on Facebook about his having been falsely arrested by Officer Nathan Winters of the Newton Police Department.

4.    After seeing the post, I contacted Mr. Galanakis via Facebook Messenger and told him about my having gotten a protective order for relief from domestic abuse against Officer Winters.

5.    I directed Mr. Galanakis to the Iowa Courts Online docket for my civil case.

6.    The screenshots attached to this Affidavit are true and accurate copies of messages I exchanged with Mr. Galanakis.

Further, the Affiant sayeth naught.

I, Courtney Van Der Hart, on this ___17th___ day of January 2024, do hereby certify under oath that the contents set forth herein are true and correct.

_Courtney VanDerHart_
Courtney Van Der Hart

STATE OF IOWA        )
                         ) ss:
COUNTY OF POLK    )

On this ___17th___ day of January 2024, before me, a Notary Public in and for said County and State, personally appeared Courtney Van Der Hart, known by me to be the person in the above-entitled action.

_Michael Alto_
Notary Public - State of Iowa

> MICHAEL EMANUEL ALTO
> Commission Number 831181
> My Commission Expires
> 4/5/24



Yep at the very bottom

Where it says petition for relief of domestic abuse. He has a protective order against him and still works as a cop

Oh I do see that

Thank you so much

Please dont put my name into any of this. Im the protected party and i work at the sheriffs office so its extremely messy but someone sent me your post and it made me so mad. Thats 100% nathan and hes always doing that shit. Violating peoples right. Treating people like shir. Its aggravating. I dealt with that for 2 years and it disgusts me hes able to treat the people he deals with like that also

Its all public information you just looked

Don't worry I won't

Thank you so much

I really appreciate it

 No problem!



Does this means its over now

Is that your name

Damn he abused you ?

I didnt file any charges or anything i petitoned for the no contact order civilly. Yeah after court was done it goes to closed or dismissed or whatever the outcome is. So thats why it shows closed. So he has it for a year from the d__ it was closed. So he still has it

I didnt file any charges or anything I petitoned for the no contact order civilly. Yeah after court was done it goes to closed or dismissed or whatever the outcome is. So thats why it shows closed. So he has it for a year from the date it was closed. So he still has it
until October 1st

So basically he goes to domestics and arrests people for doing the same thing he does.

Hes able to have his gun while at work

Wow and the newton police department still allows him to go around

Yep.

It's caused a ton of issues. Our departments work together.

AUG 29, 2022 AT 5:33 PM

Thank you for that information. I wish my post was getting more publicity

AUG 29, T 7:51 PM

 Same. Thats why i figured i would message you. He just keeps getting away with acting like that. Im glad you spke out

AUG 29, 2022 AT 8:33 PM

I'm going to sue

 Im glad you are apeaking up! I hope cheif is cooperative with you. This is not the first time winters has done this. I've thought for a long time he is violating peoples rights.

I doubt the chief will do anything. This guy has been complained about so many times. Plus he's still an officer after abusing you. They must have a good relationship

Winters hasn't been there long. Half the problem is you cant find police officers so its hard for departments to let them go. Last hiring they had 1 kid pass everything and hes already gone.

I will say and if you have a lawyer maybe ask him b⸱ ⸱⸱ ⸱ould not sign anything without ⸱ ⸱ ⸱ lawyers ok. I

| Save | Print | Clear Form |

*Petition for Relief from Domestic Abuse*

**Read** *Protect Yourself from Domestic Violence* on the Iowa Judicial Branch website before using this form. The booklet explains court procedures and provides information about how to contact an attorney.

You may want to or should see an attorney:

- If you do not know how to use this form, or if you do not understand this form.
- If you think Defendant will hire an attorney.
- If you think Defendant will try to get custody of your children.
- You may involve an attorney in this process at any time, although you are not required to.

**Caution:** You must provide any protected or confidential information in full on a separate Protected Information Disclosure form.

For other general information about domestic abuse, call the confidential **Iowa Domestic Violence Hotline: 1-800-942-0333.**

In the Iowa District Court for __Jasper__ County
*County where the Petition is filed*

**Courtney Viola VanDerHart**
**Plaintiff**
*Full name of person seeking relief from domestic abuse*

vs.

**Nathan Michael Winters**
**Defendant**
*Full name of alleged domestic abuser*

Civil no. __DACV122471__
*Leave blank – Clerk of court will fill in*

**Petition for Relief from Domestic Abuse**
Iowa Code ch. 236

If you need assistance to participate in court due to a disability, contact the disability coordinator (information available at: http://www.iowacourts.gov/Administration/Directories/ADA_Access/). Disability coordinators cannot provide legal advice. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942)

1. I, Plaintiff, understand that this action is being filed under Iowa Code chapter 236.

2. I now live in __Jasper__ County, Iowa.

3. I can receive mail at the following address: *Any of the following addresses may be used: a mailing address, the mailing address of a shelter or other agency, a public or private post office box, or any other mailing address with permission of the resident of that address.*

   __505 W Lincoln St Apt#1__  __Monroe__  __IA__  __50170__  __Jasper__
   *Plaintiff's Mailing address*        *City*        *State*  *ZIP code*  *County*

4. Defendant lives at the following address (if known):

   __1610 E Robinson St Unit 33C__  __Knoxville__  __IA__  __50138__  __Marion__
   *Defendant's home address*        *City*        *State*  *ZIP code*  *County*

5. Defendant's employer and work address (if known): __Newton Police Department__
                                                        *Employer*

   __101 W 4th St S__  __Newton__  __IA__  __50170__  __Jasper__
   *Defendant's work address*   *City*    *State*  *ZIP code*  *County*

6. Defendant is 17 years of age or younger (if known):  ☐ Yes  ☑ No

   If yes, provide Defendant's year of birth: __1997__
                                               *yyyy*

**FILED**
AUG 1 9 2021
TIME __11:04am__
JASPER COUNTY CLERK OF COURT

---

**CCDef.App. 22**          CITY RFP 00720

*Petition for Relief from Domestic Abuse*, continued

7. Identification and age of each child under age 18 whose welfare may be affected by this controversy: *Use a Protected Information Disclosure form to provide full names and birthdates to the court.*

not his children {

| First, middle, and last initials of each child | Birth year | First, middle, and last initials of each child | Birth year |
|---|---|---|---|
| A. KooPer Gerritt V | 2018 | D. | |
| B. Kole Walter V | 2018 | E. | |
| C. | | F. | |

☐ *Check this box if you have attached sheets with additional information.*

8. Relationship of Plaintiff and Defendant **at the time** of the abuse or threat of abuse: *Check only one*

A. ☐ Married

B. ☐ Separated

C. ☐ Divorced

D. ☐ Adult relatives living together

E. ☐ Parents of the same minor child or children under age 18

F. ☐ Living together

G. ☐ Lived together within one year of the assault, but not at the time of the assault

H. ☑ Intimate relationship*

I. ☐ Have been in an intimate relationship and have had contact within one year of the assault*

*An "intimate relationship" means a significant romantic involvement that need not include sexual involvement. An intimate relationship does not include a casual social relationship or association in a business or professional capacity.

**Note:** If none of these boxes accurately describes your relationship, do not complete this form. Contact an attorney or call the police about your abuse.

9. Nature of the alleged domestic abuse *Check all that apply*

A. ☑ Defendant has physically abused me.

B. ☐ Defendant has sexually abused me.

C. ☑ Defendant has threatened me, and I fear for my physical safety.

10. Injuries

A. Describe the **most recent injury**, including threats and any nonconsensual (against your will) sexual experience. Please describe **how** the injury or threat happened, **where** it happened, and **when** you were injured or threatened.

Most recent threats have been within past 3-4 weeks. After telling him I wanted to end relationship he told me I wasn't allowed to end things until he said. Argument over cheating he told me if I was with another man he would need 3 bullets. 1 for me, 1 for the

☑ *Check this box if you have attached sheets with additional information.*

DATE: 08/19/21                    PAGE: 1

the "new" guy and one bullet for him to shoot himself. He
allowed me to look at his phone. When I walked away with the
phone and started reading a message he pushed me onto
the bed and grabbed my wrist to make me drop his phone so
he could take it back. This all happened at my apartment
in Monroe. In July.

*Petition for Relief from Domestic Abuse*, continued

B. Describe any **other injuries** or threats you have received from Defendant. Please include **how** you were injured or threatened, **where** it happened, and **when** you were injured or threatened.

We have a year and a half long history of threats and physical abuse. Last summer while sitting in his patrol car he elbowed me out of his patrol car while on duty. It sent me back into my car & a bruise was left on my breast/chest area. He has multiple times stood in doorways blocking me so I could not leave

☑ *Check this box if you have attached sheets with additional information.*

**Questions 11-18:** If Plaintiff and Defendant have no children in common (biological or adopted) under age 18, skip questions 11 through 18.

Questions 11-18 relate to the Uniform Child Custody Jurisdiction and Enforcement Act and to the court's duty under Iowa Code section 236.5(1)(*b*)(5) (2013). If you are unsure how to answer these questions, contact a lawyer for advice.

11. Who should have temporary custody of the minor children you have in common with Defendant? *Check one*

☐ Me (Plaintiff)    ☐ Defendant    ☐ Other *Identify*_____

12. Explain how your safety and your children's safety will be affected by the court's decision about temporary custody or temporary visitation:

_____
_____
_____

13. If you want custody, provide suggestions for how Defendant could visit the children without contacting you—for example: through friends, relatives, or baby-sitters. List any concerns you may have about visitation:

_____
_____
_____

14. Identify the minor children (under age 18) you have in common with Defendant.
*Give each child's initials, address, and birth year. If children are living in a shelter or other safe place, give only the county and state where they are living.*

| Child's initials | Present address (or county/state) | Birth year |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**CCDef.App. 25**                    CITY RFP 00723

JASPER COUNTY CASE # _DACV122471_

The most recent was about a month ago. at my apartment
in monroe. We were in an argument and he stood in
the doorway between my bedroom and living room. my
kids were on the other side playing in the living room.
He has came to my apartment before work in his police
uniform very upset. stood in the doorway so I couldn't
shut the door. my neighbors were above us so I let him
all the way in and shut the door. He got more upset and
refused to leave. My kids were home sleeping at the time.
Last summer at his house (his moms house) in Knoxville
we again had an argument I went to leave and was
upset crying and would not talk to him so he lifted
me up & slammed me on his bed and held my wrists
down to try and talk to me. He told me I could leave
when he said I could. When I have tried to end
the relationship in the past & recently he tells me I
am not going to break up with him. calls me names and
tells me I am stupid, crazy, or irrational and it was not
going to happen. During break ups he drives constantly
past my house alot of times in his patrol car. Shows up
to my house unannounced and refuses to leave. He has
showed up to my work to force me to see him bringing
snacks or sending flowers. He has told me I am not
allowed to talk to certain co-workers. (I work at the
Sheriff's office so we all know each other) At a newton
PD officers wedding last fall he threatened my coworker

SIGNATURE _County Vesnt_

DATE _08/19/21_

PAGE _1_

JASPER COUNTY CASE # DACV122471

for making a comment about my breasts & said he was going to "throw him through a fucking window" He has made numerous threats to harm himself If I left. I have alot of suicidal messages on my phone. I have in this

I have had to get our employers Involved now. He is under on Internal Investigation with Newton PD I am scared he is going to retaliate. In the past he has felt like he had nothing to live for after his dad died and he was talked to at work. He told me he didn't want to live and was intoxicated saying he was going to "go for a drive" talking nonsense. This scared me to where I almost involved his bosses then but he came out of it. Im scared what he will do if he thinks Im the one to cause all this. He has threated to harm himself if he ever got fired saying he would "rather be dead" If the anger is geared towards me I dont know what he would do. Him making threats have scared me into not saying anything. I feel like the arguments are escalating and him blocking me away from my kids scared me. because now its involving them.

SIGNATURE Courtney Vosika

DATE 08/19/21

PAGE 2

    CITY RFP 00725

*Petition for Relief from Domestic Abuse*, continued

## 21. Notice of Protected or Confidential Information

Pursuant to Iowa Code section 236.10, this file is a public record and accessible by anyone.  If you would like all or part of this file to remain confidential to the general public in order to protect the safety or privacy of any person, then you must request the court to seal all or part of this file.*  The person from whom you are seeking relief will have access to the file, even if it is sealed.

*Check all that apply if you want this file sealed:*

☑ I request all portions of this file to be sealed.

☐ I request that my county of residence and mailing address be sealed.

☐ I request that the names and addresses of: my children or wards, or children's or ward's minor children be sealed.

☐ Other request: *Please specify:* _____
_____

*\*Court orders and support payment records cannot be sealed. The court may, upon request, order that address and location information be redacted from those records.*

It is the responsibility of the party filing a document or exhibit with the court to ensure that protected or confidential information is omitted from or abbreviated on the document or exhibit.  *See* Iowa Court Rule 16.602.  Protected information (for example, children's full names or social security numbers) should be abbreviated on this form and provided in full on a Protected Information Disclosure form.

## 22. Oath and Signature

I, *Courtney Viola Van Der Hart*, have read this Petition, and I certify under penalty of
*Print your full name: first, middle, last*
perjury and pursuant to the laws of the State of Iowa that the information I have provided in this Petition is true and correct.

August 19 . 2021  *Curty VonDrut*
*Month    Day    Year    Plaintiff's signature\**

505 W Lincoln St  Apt #9    Monroe    IA    50170
*Mailing address*    *City*    *State*    *ZIP code*

(641) 417-9884  CKVanderhart@gmail.com
*Phone number*    *Email address*    *Additional email address, if applicable*

*\*Whether filing electronically or in paper, you must handwrite your signature on this form. If you are filing electronically, scan the form after signing it and then file electronically.*

> For other general information about domestic abuse, call the confidential
>
> **Iowa Domestic Abuse Hotline:**
> **1-800-942-0333**

**CCDef.App. 28**    **CITY RFP 00729**

E-FILED          DACV122471 - 2021 AUG 19 11:33 AM          JASPER
CLERK OF DISTRICT COURT                    Page 1 of 4

IN THE DISTRICT COURT FOR JASPER COUNTY

| | |
|---|---|
| **ORDER OF PROTECTION**<br><br>This order can be verified during business hours with Jasper County Clerk of Court at (641)792-3255 or with the Jasper County Sheriff at (641)792-5912 or | **05501  DACV122471**<br>Judge: McCall<br>County **JASPER** State  **IOWA**<br><br>**TEMPORARY PROTECTIVE ORDER**<br>**(Section 236.3 Petition)**<br><br>**ISSUE DATE: 08/19/21** |
| PETITIONER/PROTECTED PARTY:<br>**COURTNEY VIOLA VANDERHART**<br>COURTNEY VIOLA VANDERHART<br>VS. | Other Protected Persons: |
| RESPONDENT/DEFENDANT:<br>**NATHAN MICHAEL WINTERS** | RESPONDENT  Date of Birth<br>Address for Respondent (not shared with Protected Party) |

**THE COURT HEREBY FINDS:**

It has jurisdiction over the parties and subject matter.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**

The above named Respondent is restrained from committing further acts of abuse or threats of abuse.  The above named Respondent is restrained from any contact with the Petitioner/Protected Party.  **Additional terms of this order and exceptions to the above provisions are as set forth below.**

This order is effective upon service on Respondent.  It shall remain in effect until modified, terminated or superseded by a later written order, or until the dismissal of the case, but in no event for more than one year.

**WARNINGS TO RESPONDENT:**

**This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, and U. S. Territory, and any tribal jurisdiction.  18 U.S. C 2265.  Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment.  18 U.S.C. 2262.  Only the court can change this order.**

**NOTICE FOR LAW ENFORCEMENT:**

**CAUTION :** ☑          **If checked,<br>FIREARMS WARNING<br>for Law Enforcement**          The Respondent will be provided with reasonable notice and opportunity to be heard.  See page 2, paragraph 8.

The court has considered the petition for Relief from Domestic Abuse and finds that a temporary protective order under Iowa Code section 236.4(2) is necessary to protect the Protected Party named above.

Therefore, the court ORDERS as follows:

\* Respondent shall not threaten, assault, stalk, molest, attack, harass, or otherwise abuse the Protected Party.  Respondent shall not use, or attempt to use, or threaten to use physical force against the protected party that would reasonably be expected to cause bodily injury.

E-FILED          DACV122471 - 2021 AUG 19 11:33 AM          JASPER
CLERK OF DISTRICT COURT          Page 2 of 4

    \*  Respondent shall stay away from the protected party and shall not be in that party's presence except in a courtroom during court hearings.

    \*  Respondent shall not communicate with the protected party in person or through any means including third persons.  This restriction shall not prohibit communication through legal counsel.

    \*  The Protected Party shall have exclusive possession of the residence located at **505 W. Lincoln St., Apt. #1, Monroe, IA**.  Respondent shall not go to, enter, occupy or remain in that residence or any other residence in which the Protected Party is staying, under any circumstance.
  Respondent shall turn over to the sheriff all devices that allow access or entry to the residence or outbuildings (for example, keys or garage openers).

Unless modified by order filed in this proceeding or in a juvenile court proceeding affecting the same children, this temporary order shall prevail over any other existing custody order.  The issue of visitation will be addressed at the hearing mentioned below.  Until such time, respondent shall not contact these children and shall not contact the Protected Party about visitation.

\* The parties have no children together.

    \*  **A RESPONDENT WHO VIOLATES THIS ORDER FACES IMMEDIATE ARREST.**  Violation may occur even if the Protected Party consents to conduct that is prohibited by this order.  Only the court can relieve respondent from the restrictions contained in this order.

    \*  A hearing on **Domestic Abuse is scheduled on 08/31/2021 at 10:30 AM  at the Jasper Co. Courthouse, 101 1st ST N, RM 305 Newton IA 50208.  ,** to decide if a final protective order should be entered.  Failure of the Respondent to appear may result in a final protective order being entered against the Respondent.  Failure of the Protected Party to appear may result in the case being dismissed.  Each party has the right to be represented by an attorney at this hearing.  The parties shall bring copies of any existing child custody orders to the hearing.

    \*   The court finds, pursuant to Iowa Code section 236.10, that to protect the safety or privacy of the Protected Party and/or the Protected Party's children, the clerk of court shall until further order of the court:
 seal the entire file from public access, other than court orders and child support payment records.

    The indices available at the clerk's office or through Iowa Courts Information System (ICIS) shall remain open.

    \*  <u>The Respondent may be required to relinquish all firearms, offensive weapons, and ammunition upon issuance of a permanent protective order.</u>

☑ The Jasper County Sheriff or any other law enforcement agency or any other person authorized to effect personal service shall serve and return service upon the respondent, the petition/motion and this order at least two days before the hearing.

☑ The Clerk of Court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing

E-FILED                DACV122471 - 2021 AUG 19 11:33 AM        JASPER
                       CLERK OF DISTRICT COURT                  Page 3 of 4

or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

5RDA01

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED          DACV122471 - 2021 AUG 19 11:33 AM          JASPER
CLERK OF DISTRICT COURT                Page 4 of 4



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| Type: | TEMPORARY PROTECTIVE ORDER |

So Ordered

Brad McCall, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-08-19 11:33:32

E-FILED          DACV122471 - 2021 OCT 01 10:17 AM          JASPER
                 CLERK OF DISTRICT COURT                    Page 1 of 3

| | |
|---|---|
| **ORDER OF PROTECTION**<br><br>This order can be verified during business hours with **Jasper County Clerk of Court at (641)792-3255 or at any time with the Jasper County Sheriff at (641)792-5912** | **05501  DACV122471**<br>Judge: **Richard B Clogg**<br>County **JASPER** State  **IOWA**<br><br>**PROTECTIVE ORDER BY CONSENT AGREEMENT (Section 236.3 Petition)**<br><br>**ISSUE DATE: 10/01/21** |
| **PETITIONER/PROTECTED PARTY:**<br>COURTNEY VIOLA VANDERHART<br><br>VS. | Other Protected Persons: |
| **RESPONDENT/DEFENDANT:**<br>NATHAN MICHAEL WINTERS<br><br>**CAUTION:** ☐  **If checked, FIREARMS WARNING for Law Enforcement** | RESPONDENT  Date of Birth 1997<br>Address for Respondent (not shared address with Protected Party)<br>Knoxville, Iowa |

**THE COURT HEREBY FINDS:**

It has jurisdiction over the parties and subject matter and the respondent has been provided with reasonable notice and opportunity to be heard.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**

The above named Respondent is restrained from committing further acts of abuse or threats of abuse.  The above named Respondent is restrained from any contact with the Petitioner/Protected Party.  **Additional terms of this order and exceptions to the above provisions are as set forth below.**

This order shall remain in effect until **October 1, 2022** unless it is modified, terminated, extended, or superseded by written order of the court, or until the dismissal of the case.

**WARNINGS TO RESPONDENT:**

**This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, and U. S. Territory, and any tribal jurisdiction.  18 U.S.C. 2265.  Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment.  18 U.S.C. 2262.  Only the court can change this order.**

**Federal and state laws provide penalties for possessing, transporting, shipping, or receiving any firearm or ammunition. (18 U. S. C. 992(g)(8)); Iowa Code Section 724.26(2)(a).**

**Only the court can change this order.**

On 10/01/21, a hearing was held on the Petition for relief from domestic Abuse.  The following persons were present and participated in the hearing: **Courtney Vanderhart and Nathan Michael Winters ad counsel of record for each party.**.

**CCDef.App. 33**

E-FILED          DACV122471 - 2021 OCT 01 10:17 AM          JASPER
CLERK OF DISTRICT COURT                                Page 2 of 3

The court FINDS by a preponderance of the evidence:

(1)  Respondent was personally served with a copy of the petition and the temporary protective order containing notice of this hearing.

(2)  The parties appeared and each consented to the entry of this order

Therefore, pursuant to Iowa Code Chapter 236, the court ORDERS as follows:

1.  Respondent shall not threaten, assault, stalk, molest, attack, harass or otherwise abuse the protected party.  Respondent shall not use, or attempt to use, or threaten to use physical force against the protected party that would reasonably be expected to cause bodily injury.

2.  Respondent shall not communicate with the protected party in person or through any means including third persons.  This restriction shall not prohibit communication through legal counsel.

3.  The protected party shall have exclusive possession of the residence located at 505 W Lincoln ST, Apt #1, Monroe, IA 50170.  Respondent shall not go to, enter, occupy or remain in that residence or any other residence in which the protected party is staying, under any circumstance.

4.  Additional Provisions are as follows:
Nothing in this Order prohibits the Repondent from conducting official police business. However, the Respondent shall not enter the dispatch room if the parties are on duty at the same time. Respondent shall have no contact with Protected Party other than emergency radio contact.
 seal the entire file from public access, other than court orders and child support payment records.

 Respondent was personally served with a copy of this order by the court.

The clerk of court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.

5RDA03

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED          DACV122471 - 2021 OCT 01 10:17 AM          JASPER
                 CLERK OF DISTRICT COURT                       Page 3 of 3



State of Iowa Courts

**Case Number**          **Case Title**
DACV122471               COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL
                         WINTERS
**Type:**                PROTECTIVE ORDER

So Ordered

Richard B. Clogg, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-10-01 10:17:27

E-FILED       DACV122471 - 2021 OCT 13 12:51 PM       JASPER
CLERK OF DISTRICT COURT                Page 1 of 3

| **ORDER OF PROTECTION AMENDED**<br><br>This order can be verified during business hours with **Jasper County Clerk of Court at (641)792-3255 or at any time with the Jasper County Sheriff at (641)792-5912** | 05501  DACV122471<br>Judge: Richard B Clogg<br>County **JASPER** State  **IOWA**<br><br>**CANCELLATION, MODIFICATION, OR EXTENSION OF CHAPTER 236 ORDER**<br><br>**ISSUE DATE: 10/13/21** |
|---|---|
| **PETITIONER/PROTECTED PARTY:**<br>COURTNEY VIOLA VANDERHART<br><br>VS. | Other Protected Persons: |
| **RESPONDENT/DEFENDANT:**<br>NATHAN MICHAEL WINTERS | RESPONDENT  Date of Birth 1997 |
| **CAUTION:** ☐  **If checked, FIREARMS WARNING for Law Enforcement** | Address of Respondent (not shared address with Protected Party)<br>**Knoxville, Iowa** |

**THE COURT HEREBY FINDS:**
It has jurisdiction over the parties and subject matter and the respondent has been provided with reasonable notice and opportunity to be heard.  **Additional findings are set forth below.**

**THE COURT HEREBY ORDERS:**
        **(see below)**
     This modified order expires on:  <u>October 1, 2022</u>

**Only the court can change this order.**

On 10/13/21, this matter comes before the court regarding the Chapter 236 Consent order entered on **October 1, 2021**.
The following persons were present and participated in the hearing:
Modified by consent of the parties and court.

The Court FINDS that:
**The Protected Order by Consent Agreement should be modified as set forth herein.**

The Court **ORDERS** as follows:
The order is **modified** as follows:
The following is removed from the Order: " **However, the Respondent shall not enter the dispatch room if the parties are on duty at the same time. Respondent shall have no contact with the Protected Party other than emergency radio contact." The following is added to the Order: "Respondent shall call dispatch only for official police purposes if the Protected Party is on duty. Respondent may only enter the building through the jail when the Protected Party is on duty."**

**CCDef.App. 36**

E-FILED               DACV122471 - 2021 OCT 13 12:51 PM          JASPER
                      CLERK OF DISTRICT COURT                   Page 2 of 3

The modification is effective immediately.

To the extent not inconsistent herewith, the prior protective order shall also remain in force.

The clerk of court shall reflect this change in status on the domestic abuse registry and shall notify law enforcement regarding this order.

☑ The Jasper County Sheriff, or any other law enforcement agency or any other person authorized to effect personal service shall serve and return service upon the respondent.
☐ Respondent was personally served with a copy of this order by the court.
☑ The Clerk of Court shall provide copies of this order to the parties and law enforcement agencies, pursuant to Iowa Code sections 236.5(5) and 664A.4.
Copies to: Dusty Clements and Ryan Ellis


5RDA04


If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

E-FILED          DACV122471 - 2021 OCT 13 12:51 PM          JASPER
CLERK OF DISTRICT COURT                              Page 3 of 3



State of Iowa Courts

| **Case Number** | **Case Title** |
|---|---|
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| **Type:** | ORDER TO MODIFY PROTECTIVE/NO CONTACT ORDER |

So Ordered

Richard B. Clogg, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2021-10-13 12:51:39

E-FILED          DACV122471 - 2023 FEB 22 03:35 PM          JASPER
CLERK OF DISTRICT COURT          Page 1 of 3

Rule 4.200--Form 4.203: *Cancellation, Modification, or Extension of Protective Order--Domestic Abuse (Iowa Code chapter 236)*

| | |
|---|---|
| **Cancellation, Modification, or Extension of Protective Order--Domestic Abuse**<br>Iowa Code chapter 236 | 05501  DACV122471<br>Judge Terry Rickers<br>**County JASPER   State IOWA**<br><br>Issue Date 02/22/23 |

To verify this order during business hours, contact the JASPER County Clerk of Court office at (641) 792-3255, or anytime with the JASPER County Sheriff's Office at (641) 792-5912.

| | |
|---|---|
| **Plaintiff or Protected Person**<br>COURTNEY VIOLA VANDERHART<br>v.<br><br>**Defendant**<br>NATHAN MICHAEL WINTERS<br><br>**CAUTION:** ☐ If checked, **FIREARMS WARNING** for Law Enforcement | **Other Protected Persons** *use initials and birth year for minor children*<br><br>Defendant's date of birth 1997<br><br>Defendant's address **cannot be same as Plaintiff's or Protected Person's address**<br>Knoxville, Iowa |

If you need assistance to participate in court due to a disability, call the disability coordinator at (515) 286-3394 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**

**The court finds**

The court has jurisdiction over the parties and the subject matter.  Defendant was provided with actual notice of this hearing and an opportunity to participate. **Additional findings are below.**  This order is in effect upon service on Defendant.

**Notice to Defendant**

1. This order is enforceable in every state, U.S. Territory, tribal jurisdiction, and the District of Columbia.  Violating this order outside the State of Iowa may result in federal imprisonment. 18 U.S.C. section 2262.

2. **Federal and Iowa felony criminal penalties for possessing, transporting, shipping, or receiving any firearms, offensive weapons, or ammunition apply as long as a qualifying protective order is in effect.**  18 U.S.C. sections 922(d)(8), (g)(8); Iowa Code section 724.26(2)**.**

**The court orders**

The Protective Order is **extended** to **February 22, 2024**.

**Notice for law enforcement**

Any peace officer with probable cause to believe Defendant has violated this order **must** immediately arrest Defendant.  Iowa Code sections 236.11(1).

The court  enters this order on whether to cancel, modify, or extend the Iowa Code chapter 236 Protective Order issued on OCTOBER 1, 2021.

With hearing.  The court held a hearing regarding the request.  Participating in the hearing were:

Plaintiff or Protected Person

E-FILED          DACV122471 - 2023 FEB 22 03:35 PM          JASPER
CLERK OF DISTRICT COURT          Page 2 of 3

With attorney representation.
Defendant
    With attorney representation.

**Following commencement of the hearing, the parties informed the Court that they were willing to extend the existing protective order by consent. This consent order is entered without any findings regarding the Petitioner's allegations in this case. Nothing in this order prohibits the Respondent/Defendant from conducting official police business. Respondent/Defendant shall call dispatch only for official police purposes if the Protected Party is on duty. Respondent/Defendant may only enter the building through the jail when the Protected Party is on duty. These determinations are hereby incorporated into the additional findings and order set forth below.**

## The court finds

   >  Defendant was personally served with a copy of the Request to Cancel, Modify, or Extend an Iowa Code chapter 236 Protective Order containing notice of the date and time of this hearing.

## The court orders

The Iowa Code chapter 236 Protective Order as issued on OCTOBER 1, 2021 is **extended** to FEBRUARY 22, 2024.
Court costs are waived.
The clerk of court will reflect this change in status on the IOWA System (the protective and no contact order registry) and notify law enforcement regarding this order.
The clerk of court will provide copies of this order to Plaintiff, Defendant, any counsel of record, the Jasper County Sheriff in the county where Defendant resides, and the 24-hour dispatcher in the county where Defendant resides required by Iowa Code sections 236.5(6) and 664A.4.  If the Jasper County Sheriff determines that Defendant resides in another county, the Jasper County Sheriff will send the order to the County Sheriff where Defendant resides for service of the order.

**Both parties were served with a copy of this order by the Court.**

YDA203

E-FILED         DACV122471 - 2023 FEB 22 03:35 PM         JASPER
CLERK OF DISTRICT COURT                Page 3 of 3



State of Iowa Courts

| | |
|---|---|
| **Case Number** | **Case Title** |
| DACV122471 | COURTNEY VIOLA VANDERHART VS' NATHAN MICHAEL WINTERS |
| **Type:** | Order GRANTING Motion to Extend Protective Order/NCO |

So Ordered

Terry Rickers, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2023-02-22 15:35:09

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3
     - - - - - - - - - - - - - - - - -
 4   TAYVIN GALANAKIS,              :
                                    :
 5          Plaintiff,              :
     vs.                            :  Case No.
 6                                  :  4:23-cv-000044
                                    :
 7   CITY OF NEWTON, IOWA, ROB      :
     BURDESS, NATHAN WINTERS,       :
 8   CHRISTOPHER WING, individually:
     and in their official          :
 9   capacities with the Newton    :
     Police Department,             :
10                                  :
            Defendants.             :
11   - - - - - - - - - - - - - - - - -
     NATHAN WINTERS and            :
12   CHRISTOPHER WING,             :
                                    :
13          Counterclaim Plaintiffs,:
                                    :
14   vs.                            :
                                    :
15   TAYVIN GALANAKIS,             :
                                    :
16          Counterclaim Defendant. :
     - - - - - - - - - - - - - - - - -
17

18     VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19   taken by the Defendants/Counterclaim Plaintiffs

20   before Jessi C. Lass, Certified Shorthand Reporter

21   of the State of Iowa, at 6701 Westown Parkway, Suite

22   100, Des Moines, Iowa, commencing at 2:14 p.m.,

23   Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

**COPY**

Case 4:23-cv-00044-SHL-SBJ    Document 66-4    Filed 01/19/24    Page 43 of 95

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                              Pages 2..5

Page 2

```
 1              A P P E A R A N C E S
 2  For the Plaintiff/Counterclaim Defendant:
 3       CHRISTOPHER C. STEWART, ESQ.
         GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
 4       2015 Grand Avenue, Suite 200
         Des Moines, Iowa 50312
 5
 6  For the Defendants/Counterclaim Plaintiffs:
 7       NICHOLAS F. MILLER, ESQ.
         BRICK GENTRY PC
 8       6701 Westown Parkway, Suite 100
         West Des Moines, Iowa 50266
 9
10  Videographer:
         AMY COOPER
11       FIDELITY VIDEO SERVICES, INC.
12  Also present:
         NATHAN WINTERS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        T A B L E   O F   C O N T E N T S
 2  WITNESS: TAYVIN GALANAKIS                      PAGE
 3  Examination By Mr. Miller .........................5
 4  Examination By Mr. Stewart .....................120
 5
 6  EXHIBITS                              PAGE FIRST
                                          REFERENCED
 7  1  - Body cam video (City ID 00630) .............20
 8  2  - NAIA drug-testing policy manual ............56
 9  3  - Video (City ID 00627) ......................65
10  4  - 8/29/22 Facebook post by Galanakis .........75
11  5  - Facebook comment string ....................87
12  6  - 11/1/22 Facebook post by Galanakis .........91
13  7  - GoFundMe page for Galanakis ................96
14  8  - William Penn University "Drug Education ...114
         and Testing Program Policy"
15
    CERTIFICATE OF REPORTER.........................123
16
```
```
17  Reporter's Note:  The original exhibits were
    forwarded to Mr. Miller.
18
    (ph) indicates a phonetic spelling.
19  [sic] indicates the text is as stated.
    Quoted text is as stated by the speaker.
20
21
22
23
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2       (Exhibit Numbers 1 through 8 were marked
 3  for identification.)
 4       THE VIDEOGRAPHER:  Today's date is
 5  November 10th, 2023, and the approximate time is
 6  2:14 p.m.  This begins the video deposition of
 7  Tayvin Galanakis requested by the defendants and
 8  counterclaim plaintiffs regarding Case
 9  Number 423-cv-00044 in the United States District
10  Court for the Southern District of Iowa, Central
11  Division.  This deposition is being held in the
12  offices of Brick Gentry, located at 6701 Westown
13  Parkway, Suite 100, in West Des Moines, Iowa.
14       My name is Amy Cooper, certified legal
15  videographer of Fidelity Video Services,
16  Incorporated, West Des Moines, Iowa.
17       Counsel will please identify themselves
18  for the record.
19       MR. STEWART:  Chris Stewart for the
20  plaintiff/counterclaim defendant.
21       MR. MILLER:  Nicholas Miller for the
22  defendants and the counterclaim plaintiffs.
23       THE VIDEOGRAPHER:  The oath will now be
24  administered by Jessi Lass, certified shorthand
25  reporter of Susan Frye Court Reporting, Des Moines,
```

Page 5

```
 1  Iowa.
 2            TAYVIN GALANAKIS,
 3  the Plaintiff, being first duly sworn by the
 4  certified shorthand reporter, testified under oath
 5  as follows:
 6                 EXAMINATION
 7  BY MR. MILLER:
 8    Q.  State your name.
 9    A.  My name is Tayvin Galanakis.
10    Q.  Can you spell your first and last name.
11    A.  First name, T-a-y-v-i-n, last name,
12  G-a-l-a-n-a-k-i-s.
13       MR. MILLER:  Thank you.
14    Q.  (Mr. Miller)  Where do you reside?
15    A.  I live in Newton, Iowa.
16    Q.  Are you employed?
17    A.  Yep.
18    Q.  Where?
19    A.  Self-employed, Amazon.
20    Q.  Are you employed by Amazon?  Or explain
21  that.
22    A.  I run a business for Amazon.
23    Q.  Explain that a little bit more.
24    A.  So I do wholesale.  It's my own business.
25  I don't have an LLC, but Dawn dish soap, wholesale
```

Page 26

1    A.    (Nods head.)

2    Q.    But in any case, you had something on your
3  phone that you thought was proof of your auto
4  insurance?

5    A.    Yes.

6    Q.    So if you had proof of insurance on your
7  phone the whole time, why didn't you provide that to
8  Officer Winters when he first asked you for proof of
9  insurance?

10   A.    I knew there was an email version and
11 there was a physical version.  I just happened to
12 have the physical version as the expired insurance.

13   Q.    Is it possible that it just took you some
14 time to remember that you had an email on your phone
15 showing proof of insurance?

16   A.    No.

17   Q.    You knew you had it the whole time?

18   A.    Can you explain on that?

19   Q.    Well, you knew from the time Officer
20 Winters first asked you for proof of insurance that
21 you had an email version on your phone?

22   A.    I did not -- I did not know that.

23   Q.    You didn't know when he first asked you
24 for proof of insurance?

25   A.    I didn't know that I wouldn't have the

Page 27

1  physical version.  I knew I had an email version,
2  but I thought I would also have the physical
3  version.

4    Q.    And then -- so then it was once you
5  realized you didn't have the physical copy that you
6  resorted to the email version?

7    A.    Correct.

8    Q.    So why not just provide him the email
9  version from the beginning?

10   A.    I didn't want to make any sudden movements
11 towards my phone.  I just wanted --

12         (Reporter clarification.)

13   A.    -- any sudden movements toward my phone,
14 because I believe it was in my lap, and instead I
15 did what he told me, which was getting my
16 registration and insurance.  And, generally, that's
17 in the glove compartment, and that's what I did.

18   Q.    (Mr. Miller)  So the reason you didn't
19 initially provide him the email version of your
20 proof of insurance was because you didn't want to
21 make a sudden movement toward your phone?

22   A.    Can you repeat that question?

23         MR. MILLER:  Can you read that back.

24         (The pending question was read by the
25 reporter.)

Page 28

1    A.    That's not the initial reason.

2    Q.    (Mr. Miller)  What was the reason?

3    A.    The initial reason why I didn't go to the
4  email version was because I thought I had the
5  physical version.

6    Q.    Why were your eyes red and watery when
7  Officer Winters pulled you over?

8    A.    To me they weren't red and watery.  That's
9  just opinion-based.

10   Q.    How do you know?

11   A.    How do I know they weren't red and watery?

12   Q.    Yes.

13   A.    There's a mirror, and it's like right --
14 it's connected to the glass of your screen.  It's
15 your rearview mirror.  And once he said that, I
16 mean, I could've easily just looked into that mirror
17 and seen that my eyes weren't red.

18   Q.    So if you at the time believe your eyes
19 weren't red and watery, why didn't you say that?

20   A.    I mean, I already knew.  I had nothing to
21 prove.

22   Q.    But why didn't you tell Officer Winters
23 that your eyes -- that you didn't believe your eyes
24 were red and watery after he had asked you why they
25 were?

Page 29

1    A.    I don't remember exactly what I told him
2  after he said my eyes were red and watery, but I'm
3  pretty sure that triggered a response in me to be
4  conflicted and say, "Wow, is this guy really -- does
5  he really think I'm drunk right now, or is
6  he really -- does he think I'm high?  Because I know
7  for a fact that I'm not either of that.  So why
8  would my eyes be red and watery?"  That's how I
9  would internally know or easily look into that
10 mirror and just see that my eyes are not red.  I
11 mean, the video shows my eyes are not red and
12 watery.

13   Q.    Well, you never told Officer Winters that
14 you didn't believe your eyes were red and watery
15 that night, did you?

16   A.    I don't remember.

17   Q.    You don't remember whether you told him
18 whether you believed your eyes were red or watery?

19   A.    No.

20   Q.    Do you remember what you did tell him?

21   A.    At the end of the night, towards the end
22 of the altercation, before I got arrested, I did
23 tell him it was -- the reason they could possibly be
24 watery is because I just got done looking up in the
25 sky while it was pouring out.  So when you're doing

Case 4:23-cv-00044-SHL-SBJ    Document 66-4    Filed 01/19/24    Page 45 of 95

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                           Pages 66..69

Page 66

1    A.    Yeah, I can do --
2    Q.    Okay.
3    A.    -- I can do that for you.
4    Q.    I'm handing you my computer so you can do
5    that.  Press play.  And when you're satisfied that
6    you've seen that video before, you can just pause
7    it, and we'll continue.
8    A.    So you just want me to say if I've seen
9    the video before?
10    Q.    Yes.
11        (Mr. Winters left the deposition.)
12    A.    Yeah, I saw that.
13        MR. MILLER:  All right.  I'm taking my
14    computer back from Mr. Galanakis.
15    Q.    (Mr. Miller)  Who created that video?
16    A.    I did.
17    Q.    Did you post this video, which is
18    Galanakis Deposition Exhibit 3, to YouTube.com under
19    the title "Police wrongfully arrest 19-year-old
20    during traffic stop"?
21    A.    I believe so.
22    Q.    The public could view that posting;
23    correct?
24    A.    Yes.
25    Q.    All right.  I'm going to show you a paused

Page 67

1    portion of Galanakis Deposition Exhibit 3 at
2    38 minutes, 27 seconds.
3        It's 38 minutes, 28 seconds.
4        Okay.  I'm handing you my computer,
5    Mr. Galanakis, with that paused portion.  Do you see
6    that?
7    A.    Yes.
8    Q.    Do you see the yellow writing?
9    A.    Yes.
10    Q.    Is that your writing?
11    A.    That -- that is my writing, yes.
12    Q.    What does it say?
13    A.    Says "Nathan Winters of the Newton Police
14    Department convicted of domestic abuse after beating
15    up his ex-girlfriend."
16        MR. MILLER:  Okay.  I'm taking my computer
17    back.
18    Q.    (Mr. Miller)  Did you write that?
19    A.    I did write that.
20    Q.    Why?
21    A.    Well, I wrote that because he had some
22    history of abuse.
23    Q.    How do you know that?
24    A.    I talked to his ex-girlfriend.
25    Q.    Who's his ex-girlfriend?

Page 68

1    A.    I can't remember her name.  It was back
2    then.
3    Q.    You don't know who his ex-girlfriend is?
4    A.    Never met her.  Just talked to her about
5    the situation.
6    Q.    If you've never met her, then how did you
7    talk to her?
8    A.    Well, that video went viral, and she found
9    my accounts and messaged me, and we talked.
10    Q.    Okay.  What'd she tell you?
11    A.    I can't remember what she -- exactly what
12    she told me.  So I'm not going to state it.
13    Q.    At the time you posted Galanakis
14    Deposition Exhibit 3 to YouTube.com, did you know
15    whether Officer Winters had been convicted of a
16    crime?
17    A.    Well, there was this thing on Iowa Courts,
18    and it said "relief of abuse," I think it said, and
19    when I made that statement of him being convicted,
20    that's what I thought it was.  I thought it was a
21    conviction of abuse, but it was really just a relief
22    of a restraining order.
23    Q.    So at the time you posted Galanakis
24    Deposition Exhibit 3 to YouTube.com, did you or did
25    you not know whether Officer Winters was convicted

Page 69

1    of a crime?
2    A.    At the time I was -- I fully was aware
3    that I -- that he was convicted of domestic abuse,
4    but that turned out to not be the case, and it was
5    something way more simpler than a conviction.
6    Q.    You said you did some research on Iowa
7    Courts Online?
8    A.    (Nods head.)
9        MR. STEWART:  Is that a yes?
10        THE WITNESS:  Yes.  Sorry.  I apologize,
11    guys.
12        MR. MILLER:  That's okay.  I forget
13    sometimes too.  So I appreciate it.
14    Q.    (Mr. Miller)  What did you find on Iowa
15    Courts Online that led you to believe Officer
16    Winters was convicted of a crime?
17    A.    Well, when you search his name up on
18    there, what made me believe that he was -- he did
19    some sort of abuse was the relief.  It said -- I
20    don't know exactly what it said, but it said "relief
21    of abuse" and some lines like that.
22    Q.    Did you read the whole thing?
23    A.    I can't remember if I did, but you have to
24    pay for extra information.  So the full thing wasn't
25    accessible unless you pay for it.

Page 70

1     Q.   So you didn't read the entire document
2  that you were basing your statement to the public,
3  "Officer Winters was convicted of domestic abuse";
4  is that right?
5     A.   No.  Because I was basing it off my
6  assumptions off the ex-girlfriend that came and told
7  me what happened.
8     Q.   Did she say he was convicted of a crime?
9     A.   She did not say that.
10    Q.   Why did you say that?
11    A.   Well, I thought if you were to beat up
12 your ex-girlfriend, that would be considered
13 domestic abuse.  And, like I said, it was much
14 simpler than conviction, and I was wrong about
15 conviction, but there is a history of abuse there.
16    Q.   How do you know?
17    A.   The ex-girlfriend.
18    Q.   You're just -- it was purely based on her
19 statements to you?
20    A.   Well, and that Iowa Courts Online, that
21 thing that said "relief of abuse."
22    Q.   Well, the document that you reviewed on
23 Iowa Courts Online, you said you didn't review the
24 whole thing; right?
25    A.   Just connected the dots.

Page 71

1     Q.   Did you review the whole thing or not?
2     A.   I didn't pay for the whole thing.
3     Q.   So you didn't review the whole thing?
4     A.   No.
5     Q.   So when -- in Galanakis Deposition
6  Exhibit 3, which you posted to YouTube.com, when you
7  said Officer Winters was convicted of domestic
8  abuse, you were basing that on what someone, who you
9  don't know, told you online and based on an
10 incomplete document that you found on Iowa Courts
11 Online.  Am I understanding that correctly?
12    A.   Yes.
13    Q.   I'm going to show you another paused
14 portion of Galanakis Deposition Exhibit 3, which is
15 that video you posted to YouTube.com.  It's at
16 38 minutes and 31 seconds.
17         All right, Mr. Galanakis.  I'm handing you
18 my computer so you can review that paused portion of
19 Galanakis Deposition Exhibit 3.  Is there yellow
20 writing on that?
21    A.   Yes.
22    Q.   Is that your writing?
23    A.   Yes, that's my writing.
24    Q.   What's it say?
25    A.   It said, "Even after Nathan beat" -- you

Page 72

1  want me to read all of it on the screen?
2     Q.   Yes.
3     A.   -- "the chief of police allowed Nathan
4  Winters to stay on the force even after Nathan beat
5  the shit out of his" -- can I see the rest real
6  quick?
7     Q.   Yep.
8     A.   -- "girlfriend."
9         MR. MILLER:  Taking my computer back from
10 Mr. Galanakis.
11    Q.   (Mr. Miller)  Why'd you write that?
12    A.   I wrote that because of what the
13 ex-girlfriend told me.
14    Q.   Did you know whether the statement that
15 "Nathan beat the shit out his ex -- out his
16 girlfriend" was in any way true?
17    A.   Yes.
18    Q.   How?
19    A.   Just by connecting the online court case
20 that says something about abuse and what the girl
21 told me, I feel like there's some connection there.
22    Q.   Is it based on anything else?
23    A.   No.  I wouldn't just write that to make it
24 up.  That'd be nonsense.
25    Q.   So you wrote that statement based on what

Page 73

1  some person, who you can't remember their name, told
2  you?
3     A.   And the online court case.
4     Q.   By the online court case, are you -- what
5  are you referring to?
6     A.   I don't know the exact website address.  I
7  would have to pull it up on my phone.
8     Q.   Well, what was the document?
9     A.   The document?  It was a PD -- I think it
10 was a PDF or something like that.
11    Q.   Was there a title on the document?
12    A.   I can't remember the title.
13    Q.   What'd it say that led you to believe your
14 statement was true?
15    A.   I believed it said "relief of abuse."
16    Q.   Did you read anything in there about there
17 being no finding of wrongdoing or no finding of
18 fault by Officer Winters?
19    A.   No, I never saw that.
20    Q.   Okay.  But, again, you didn't review the
21 whole document; right?
22    A.   No.
23    Q.   Did you think it was a good idea to make
24 those statements when you hadn't reviewed all the
25 information?

Case 4:23-cv-00044-SHL-SBJ   Document 66-4   Filed 01/19/24   Page 47 of 95

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                          Pages 74..77

Page 74

1        A.   I don't know.  Because the truth is out
2   there, and we'll find the truth out, and time will
3   tell if it's -- if it was accurate of me to do that
4   or not.
5        Q.   "Time will tell."  So at the time you made
6   the statements, you weren't 100 percent certain
7   whether they were true or not, were you?
8        A.   Well, based on how the interaction between
9   us and the ex-girlfriend and the Iowa Courts Online,
10  I just -- it had to be -- it had to be true,
11  honestly.
12       Q.   Well, if it had to be true --
13       A.   Not the conviction.  Sorry.
14       Q.   But it wasn't true.
15       A.   Sorry.  The conviction part wasn't true,
16  but there is abuse in there.
17       Q.   When you made these statements, you didn't
18  know whether Officer Winters was convicted of a
19  crime, did you?
20       A.   I assumed that the "relief abuse" meant
21  conviction.
22       Q.   Why would you assume that?
23       A.   I don't have a really good understanding
24  of law.  So that's why I assumed that.
25       Q.   Wouldn't you want to have a good

Page 75

1   understanding of the law before you accuse somebody
2   of committing a crime -- or having been convicted of
3   a crime?
4        A.   Yeah, yeah.
5        Q.   Do you have a Facebook account?
6        A.   Yep.
7        Q.   What's the user name under which you post
8   content to Facebook?
9        A.   Tay G. -- Tay Galanakis.  Yeah, Tay
10  Galanakis.
11       Q.   Spell that.
12       A.   T-a-y and then G-a-l-a-n-a-k-i-s.
13       Q.   Have you posted content on Facebook about
14  your interactions with Newton police on August 28th,
15  2022?
16       A.   Yep.
17            MR. MILLER:  Can we re-mark this as
18  Exhibit 4.
19            I'm showing what's been marked as
20  Galanakis Deposition Exhibit 4 to counsel for
21  Mr. Galanakis.
22       Q.   (Mr. Miller)  All right, Mr. Galanakis.
23  Your counsel has just handed you what's been marked
24  as Galanakis Deposition Exhibit 4.  Do you know what
25  that is?

Page 76

1        A.   This is the initial post I posted about
2   the case.
3        Q.   How do you know that's what it is?
4        A.   I first came to Facebook to talk about it
5   before I had the footage.
6        Q.   On the fourth line down in --
7        A.   This is going to be hard.
8        Q.   -- Galanakis Deposition Exhibit 4, which
9   is your Facebook post that we're talking about, it
10  says, quote, "I don't even like to refer to him as
11  Officer Winters.  This guy is on the slow side of
12  the spectrum."  End quote.  Did I read that right?
13       A.   Yep.
14       Q.   Why'd you post that?
15       A.   I just feel like he's kind of -- he's
16  slow.  I feel like he's slow.
17       Q.   Was this a public post?
18       A.   Yes.
19       Q.   What do you mean by "This guy is on the
20  slow side of the spectrum"?
21       A.   He's just not all there.  And there's
22  nothing against people that are not all there.  They
23  just shouldn't be in that profession, holding a gun.
24       Q.   What do you mean, "he's not all there"?
25       A.   I mean, if you just interact with him when

Page 77

1   he's doing his job, like I did, you can kind of just
2   tell.
3        Q.   What can you tell?
4        A.   Well, there's many reasons.  I mean, I
5   could go on and on, but I could start with this one
6   right here.
7        Q.   Go ahead.
8        A.   Well, he asked me why I was shaking so
9   much, and I said, "Hey, man, I'm nervous."
10            And then he told me that there's no reason
11  to be nervous.  He didn't exactly say that, but he
12  told me he wears shorts when it's 30 below and that
13  he could handle the cold.  And that's the way he
14  said it.  So hearing that from a police officer is
15  just breathtaking to me --
16       Q.   So that comment from Officer Winters leads
17  you to believe that he's, in your words, slow and
18  not all there?
19       A.   Along with what -- a lot of other things
20  he said.  I can tell you another one.
21       Q.   What?
22       A.   He said he got a lot of concussions from
23  playing football.  And usually what happens when you
24  get a lot of concussions, it can -- it triggers
25  polyps in your brain.

TAYVIN GALANAKIS vs CITY OF NEWTON, et al.
TAYVIN GALANAKIS  11/10/2023                                         Pages 122..123

Page 122

1   A.   Yes.

2       Q.   (Mr. Stewart)  Were you upset with the

3   defendants' actions in their transportation of you

4   and the interactions you had at the police station?

5           MR. MILLER:  Object to the form of the

6   question.

7   A.   Yes.

8       Q.   (Mr. Stewart)  Did you believe the conduct

9   of the defendants at both the scene and at the

10  station were improper or unlawful?

11          MR. MILLER:  Object to the form of the

12  question.

13  A.   Yes.

14          MR. MILLER:  These are all leading

15  questions.

16          Go ahead.

17  A.   Yes.

18          MR. STEWART:  Nothing further from me.

19          MR. MILLER:  I have nothing.

20          THE VIDEOGRAPHER:  Off the record, ending

21  the deposition at 5:17 p.m.

22

23

24

25

Page 123

1           C E R T I F I C A T E

2       I, the undersigned, a Certified Shorthand

3   Reporter of the State of Iowa, do hereby certify

4   that there came before me at the time, date, and

5   place hereinbefore indicated, the witness named on

6   the caption sheet hereof, who was by me duly sworn

7   to testify to the truth of said witness's knowledge,

8   that the witness was thereupon examined under oath,

9   the examination taken down by me in shorthand and

10  later reduced to a transcript through the use of a

11  computer-aided transcript device under my

12  supervision and direction, and that the deposition

13  is a true record of the testimony given and of all

14  objections interposed.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by any of

17  the parties to the action in which this deposition

18  is taken, and further that I am not a relative or

19  employee of any attorney or counsel employed by the

20  parties hereto or financially interested in the

21  action.

22      Dated this 19th day of November 2023.

23

24          _Jessi Lass_

            CERTIFIED SHORTHAND REPORTER

25          Jessi C. Lass, Iowa CSR #1336



| Search | How it works ⌄ | Start a GoFundMe | gofundme | Sign in | Share | Donate |

# Donate to help support attorney fees



Driver Blows 0.00% - Officers Still Lock Him Up

CONGRATULATIONS 100% SOBER ARRESTED LAWSUIT INCOMING

Watch on ▶ YouTube



**$2,768** raised of $2,500 goal

92 donations

Share

Donate now

Anonymous
$50 • 3 d

Carol Temperley
$20 • 12 d

Dante DeCicco
$20 • 13 d

Anonymous
$100 • 23 d

Anonymous
$18 • 23 d

See all | ☆ See top donations

---

Tayvin Galanakis is organizing this fundraiser.

Hi, my name is Tayvin Galanakis. I was recently falsely arrested by the newton police department and I'm looking to proceed in legal action.

---

## Updates (2)

**January 7, 2023** by Tayvin Galanakis, Organizer

Lawsuit went through today. We will get a court date as soon as possible. It's showtime!

See older updates

---

Donate | Share

---

## Organizer

Tayvin Galanakis
Organizer
Newton, IA

Contact

---

## Words of support (14)

Please donate to share words of support.



EXHIBIT
7
11-10-23

CITY ID 00297

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
 2                    CENTRAL DIVISION

 3     TAYVIN GALANAKIS,      )CASE NO.: 4:23-cv-00044
                             )
 4       Plaintiff/Counterclaim )
         Defendant,          )DEPOSITION OF
 5                           )NATHAN WINTERS
       vs.                   )(CONFIDENTIAL)
 6                           )
       CITY OF NEWTON, IOWA, )
 7     et al.,               )
                             )
 8       Defendants/Counterclaim)
         Plaintiffs.         )
 9     _____)

10          THE DEPOSITION OF NATHAN WINTERS, taken

11     before Emma L. Rosky, Certified Shorthand

12     Reporter and Registered Professional Reporter for

13     the State of Iowa, commencing at 1:17 p.m.,

14     October 27, 2023, at 2015 Grand Avenue,

15     Suite 200, Des Moines, Iowa.
```

A P P E A R A N C E S

```
Plaintiff/Counterclaim
Defendants by:     MATTHEW BOLES
                   Attorney at Law
                   Gribble, Boles, Stewart &
                   Witosky Law
                   2015 Grand Avenue
                   Suite 200
                   Des Moines, IA 50312

Defendants/Counterclaim
Plaintiffs by:     NICHOLAS F. MILLER
                   Attorney at Law
                   Brick Gentry, P.C.
                   6701 Westown Parkway
                   Suite 100
                   West Des Moines, IA 50266
```

3

CONFIDENTIAL

INDEX OF EXAMINATION

```
Examination by      Page
Mr. Boles            4
Mr. Miller          39

        PREVIOUSLY MARKED
             EXHIBITS
Exhibit
Name      Description               Page
Exhibit 1  Internal Investigation    16
Exhibit 4  Petition for Relief from
           Domestic Abuse            25

    INDEX OF ATTORNEY REQUESTS

Request by    Page    Line
Mr. Boles      32       8
```

4

CONFIDENTIAL

NATHAN WINTERS,
called as a witness, having been first duly
sworn, testified as follows:
DIRECT EXAMINATION
BY MR. BOLES:

[Q & A content redacted]

CCDef.App. 50







CONFIDENTIAL

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309









45

1               C E R T I F I C A T E

2

3          I, Emma L. Rosky, a Certified Shorthand
           Reporter of the State of Iowa and Registered
4          Professional Reporter, do hereby certify that
           there came before me at the time, date, and place
5          hereinbefore indicated, the witness named on the
           caption sheet hereof, who was by me duly sworn to
6          testify to the truth of said witness's knowledge,
           touching and concerning the matters in
7          controversy in this cause; that the witness was
           thereupon examined under oath, the examination
8          taken down by me in shorthand, and later reduced
           to printed form under my supervision and
9          direction, and that the deposition is a true
           record of the testimony given and of all
10         objections interposed.

11         I further certify that I am neither attorney
           or counsel for, or related to or employed by any
12         of the parties to the action in which this
           deposition is taken, and further that I am not a
13         relative or employee of any attorney or counsel
           employed by the parties hereto or financially
14         interested in the action.

15

16         Dated at Des Moines, Iowa, this 11th day of

17         December, 2023.

18

19

20

21              /s/ Emma L. Rosky

22              CERTIFIED SHORTHAND REPORTER,
                and REGISTERED PROFESSIONAL
23              REPORTER

24

25

           SWEENEY COURT REPORTING (515) 244-6373
      320 Insurance Exchange Bldg., Des Moines, IA 50309

CCDef.App. 58

**IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF IOWA CENTRAL DIVISION**

| | |
|---|---|
| TAYVIN GALANAKIS, | Case No. 4:23-cv-00044-SHL-SBJ |
| Plaintiff, | |
| v. | |
| CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department, | **DEFENDANT NATHAN WINTERS'S OBJECTIONS AND ANSWERS TO PLAINTIFF TAYVIN GALANAKIS'S SECOND SET OF INTERROGATORIES** |
| Defendants. | |
| NATHAN WINTERS and CHRISTOPHER WING, | |
| Defendants/Counterclaim Plaintiffs, | |
| v. | |
| TAYVIN GALANAKIS, | |
| Plaintiff/Counterclaim Defendant. | Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

COMES NOW, Defendant Nathan Winters ("Winters"), by and through his undersigned counsel, and under Rule 33 of the Federal Rules of Civil Procedure provides the following objections and answers to Plaintiff Tayvin Galanakis's ("Galanakis") Second Set of Interrogatories.

## I.     General Statement

By responding to these Interrogatories, Winters does not waive any objections that may be appropriate (a) to the use, for any purpose, by Winters of any of the information or documents

**INTERROGATORY NO. 21:** State why You consented to the entry of an Iowa Code Ch. 236 Protective Order and the extension of same against You in Jasper County Case No. DACV122471, and whether You would face professional discipline should there have been a factual finding you committed domestic abuse.

**ANSWER:**
***BEGIN CONFIDENTIAL DESIGNATION***



***END CONFIDENTIAL DESIGNATION***

Next, Winters also objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence because the reasons why Winters consented to a Protective Order do not tend to make any fact at issue in this action more or less likely. In fact, the reasons why Winters consented to a Protective Order have no bearing whatever on any fact at issue in this action.

Finally, Winters objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence because it seeks nonexistent, hypothetical information about a nonexistent, hypothetical situation. Winters also objects to Interrogatory No. 21 as overbroad, unduly burdensome, not proportional to the needs of the case, and not reasonably

calculated to lead to the discovery of admissible evidence because it seeks information that has no tendency to make a fact at issue in the case more or less likely.  Specifically, the effect that a hypothetical finding of abuse would have had on Nathan Winters's employment will have no bearing on a fact at issue in this case.  Nor can Winters appropriately speculate about future employment actions based on a hypothetical situation.

For these reasons, Winters objects to Interrogatory No. 21 and will not provide an answer to Interrogatory No. 21.

**INTERROGATORY NO. 22:**  Identify and describe all alleged events Concerning the allegations of domestic abuse against Courtney Vanderhart and the Protective Order against You, including:

    a.  Dates and times of all alleged events;

    b.  Persons present in all alleged events;

    c.  Involvement of law enforcement in all alleged events;

    d.  All Communications between You and any law enforcement personal Concerning the allegations of domestic abuse against You;

    e.  Describe all occurrences and Communications with Courtney Vanderhart leading up to, during, and following all alleged events;

    f.  Identify all, if any, injuries You inflicted on Courtney Vanderhart;

    g.  Identify all, if any, injuries You suffered by any persons involved in all alleged events; and,

    h.  Identify all Communications between You and all other persons regarding the alleged events.

**ANSWER:**

## ***BEGIN CONFIDENTIAL DESIGNATION***

███████████████████████

███████████████████

████████████████████████

███████████████████

**\*\*\*END CONFIDENTIAL DESIGNATION\*\*\***

**INTERROGATORY NO. 23:**  Summarize Your factual contentions for Counterclaim Counts I and V, Identifying any documents relied on, including how You "have suffered and will continue to suffer":

    a.  Pain and suffering;

    b.  Mental anguish;

    c.  Loss of enjoyment of life;

    d.  Loss of community reputation;

    e.  Loss of employability;

    f.  Embarrassment;

    g.  Humiliation;

    h.  Loss of time and inconvenience bringing this action; and,

    i.  "Any other category of damages" You expect to seek.

**ANSWER:**

**Winters incorporates the general objections as if restated here.  Winters further objects to Interrogatory No. 23 as vague and ambiguous with respect to the term "summarize."  The term "summarize" as used in Interrogatory No. 23 has a subjective meaning, and Winters cannot reasonably anticipate the level of detail sought by Interrogatory No. 23.  To the extent that Interrogatory No. 23 seeks a comprehensive written**

## **VERIFICATION**

The undersigned hereby states that I have read the foregoing Answers to Interrogatories and know the contents thereof, and under penalty of perjury hereby state that the information contained therein is true and accurate to the best of my knowledge and belief.

Dated this _19_ day of _October_____, 2023.

_____
Nathan Winters



**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF IOWA,
 2                  CENTRAL DIVISION

 3     TAYVIN GALANAKIS,        )CASE NO.: 4:23-cv-00044
                                )
 4       Plaintiff/Counterclaim )
         Defendant,             )DEPOSITION OF
 5                              )CHIEF ROBERT BURDESS
       vs.                      )(CONFIDENTIAL)
 6                              )
       CITY OF NEWTON, IOWA,    )
 7     et al.,                  )
                                )
 8       Defendants/Counterclaim)
         Plaintiffs.            )
 9     _____)

10         THE DEPOSITION OF CHIEF ROBERT BURDESS,

11     taken before Emma L. Rosky, Certified Shorthand

12     Reporter and Registered Professional Reporter for

13     the State of Iowa, commencing at 12:31 p.m.,

14     October 27, 2023, at 2015 Grand Avenue,

15     Suite 200, Des Moines, Iowa.
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 2**

```
 1               A P P E A R A N C E S

 2     Plaintiff/Counterclaim
       Defendants by:    MATTHEW BOLES
 3                        Attorney at Law
                          Gribble, Boles, Stewart &
 4                        Witosky Law
                          2015 Grand Avenue
 5                        Suite 200
                          Des Moines, IA 50312

 6

 7     Defendants/Counterclaim
       Plaintiffs by:    NICHOLAS F. MILLER
 8                        Attorney at Law
                          Brick Gentry, P.C.
 9                        6701 Westown Parkway
                          Suite 100
10                        West Des Moines, IA 50266
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 3**

CONFIDENTIAL

INDEX OF EXAMINATION

| Examination by | Page |
|---|---|
| Mr. Boles | 4 |

E X H I B I T S

| Exhibit Name | Description | Page |
|---|---|---|
| Exhibit 1 | Internal Investigation | 40 |
| Exhibit 2 | Notice of Final Disposition April 6, 2022 | 40 |
| Exhibit 3 | Notice of Final Disposition August 3, 2022 | 40 |
| Exhibit 4 | Petition for Relief from Domestic Abuse | 40 |

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 4**

CONFIDENTIAL

CHIEF ROBERT BURDESS,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BOLES:

```
 6   Q.   [redacted]
 7        [redacted]
 8   A.   [redacted]
 9   Q.   [redacted]
10   A.   [redacted]
11        [redacted]
12   Q.   [redacted]
13        [redacted]
14   A.   [redacted]
15        [redacted]
16
17   Q.   [redacted]
18        [redacted]
19   A.   [redacted]
20        [redacted]
21        [redacted]
22        [redacted]
23        [redacted]
24        [redacted]
25        [redacted]
```

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309



CCDef.App. 65







A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]

A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
MR. MILLER: [redacted]
A. [redacted]

[redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]

Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]

41

CONFIDENTIAL

1    I, ROBERT BURDESS, the deponent in the

2    foregoing deposition, do hereby certify that I

3    have read the foregoing -- pages of typewritten

4    material and that the same is, with the

5    corrections noted on the attached page, if any, a

6    true and correct transcript of my deposition upon

7    oral examination given at the time and place

8    herein stated.

9

10    _____

11    ROBERT BURDESS

12

13

14    Subscribed and sworn to before me

15    this _____ day of _____, 20__.

16

17

18    _____

19    Notary Public

20

21

22

23

24

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

42

CONFIDENTIAL

C O R R E C T I O N S

1    ___  ___  _____

2    ___  ___  _____

3    ___  ___  _____

4    ___  ___  _____

5    ___  ___  _____

6    ___  ___  _____

7    ___  ___  _____

8    ___  ___  _____

9    ___  ___  _____

10    ___  ___  _____

11    ___  ___  _____

12    ___  ___  _____

13    ___  ___  _____

14    ___  ___  _____

15    ___  ___  _____

16    ___  ___  _____

17    ___  ___  _____

18    ___  ___  _____

19    ___  ___  _____

20    ___  ___  _____

21    ___  ___  _____

22    ___  ___  _____

23    ___  ___  _____

24    ___  ___  _____

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

43

CONFIDENTIAL

C E R T I F I C A T E

1

2

3    I, Emma L. Rosky, a Certified Shorthand
Reporter of the State of Iowa and Registered
4    Professional Reporter, do hereby certify that
there came before me at the time, date, and place
5    hereinbefore indicated, the witness named on the
caption sheet hereof, who was by me duly sworn to
6    testify to the truth of said witness's knowledge,
touching and concerning the matters in
7    controversy in this cause; that the witness was
thereupon examined under oath, the examination
8    taken down by me in shorthand, and later reduced
to printed form under my supervision and
9    direction, and that the deposition is a true
record of the testimony given and of all
10    objections interposed.

11    I further certify that I am neither attorney
or counsel for, or related to or employed by any
12    of the parties to the action in which this
deposition is taken, and further that I am not a
13    relative or employee of any attorney or counsel
employed by the parties hereto or financially
14    interested in the action.

15

16    Dated at Des Moines, Iowa, this 11th day of

17    December, 2023.

18

19

20

21    /s/ Emma L. Rosky

22    CERTIFIED SHORTHAND REPORTER,
and REGISTERED PROFESSIONAL
23    REPORTER

24

25

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309



## Notice of Final Disposition

**Date:** October 3, 2022

**To:** Nathan Winters, Police Officer

**From:** Rob Burdess, Chief of Police

**RE:** Internal Investigation Final Disposition 22-006

---

| Allegations: NPD Policy, Procedures and Rules | | Findings |
|---|---|---|
| 600 | Investigation and Prosecution | **Unfounded** |
| 320.5.7 | Efficiency | **Unfounded** |
| Reference | Non-conformance to established training and procedural standards | **Unfounded** |

### Finding Synopsis
A thorough investigation of the complaint received on August 29, 2022 was conducted and the findings indicate no clear violation of NPD policy. The investigation did find that Officer Winters' communication with the driver and his demeanor towards the uncooperative subject could improve. This was not part of the initial formal complaint and a follow up counseling session will occur to address this issue.

### Notice of Follow Up
Lieutenant Winchell will conduct a counseling session with Officer Winters to discuss improving communication during investigations and maintaining a professional demeanor.



EXHIBIT
Burdess
1
ER tabbies
ID-21-23

CITY RFP 00864

**CCDef.App. 70**



# POLICE DEPARTMENT

(DRE Examination) and when that showed that he was not impaired, he was released without charges.

The only area that I feel needs addressed with Officer Winters is in reference to his verbal exchange with a very mouthy teenager. It was apparent that Officer Winters was irritated by Galanakis' behavior and this caused him to chip back at Galanakis unnecessarily. During sobriety Galanakis asked where he played football and he told him Knoxville. Galanakis then pointed out that Newton just beat Knoxville last night. Winters responded something along the lines of, "Not when I played them." Later when Galanakis requested his inhaler Officer Winters could have explained how this may affect the deprivation period. Instead he said "no" and when Galanakis argued it Winters tossed it towards him. Lastly, when Galanakis was lecturing him on how he thought Winters screwed up after being told he was going to be released, Winters was looking at his computer most of the time. When Galanakis then demanded an apology and Winters said, "I'm sorry I guess." Officer Winters needs to maintain a professional demeanor even when a mouthy person is trying to push his buttons. While this was not extreme and did not violate policy, it did nothing to de-escalate Galanakis and certainly did not present Winters in a good light when Galanakis shared his videos on social media and now has been showed on TV news. Better verbal tactics would have benefited Officer Winters in this case and should be a priority for him in future cases. For this reason I have added a policy 320.5.9 Conduct to the allegations. (see below)

320.5.9  CONDUCT             -Founded
    a. Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution or discipline under this policy.
    b. Unreasonable and unwarranted force to a person encountered or a person under arrest.
    c. Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.
    d. Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another.
    e. Engaging in horseplay that reasonably could result in injury or property damage.
    f. Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

CITY RFP 00883

**CCDef.App. 71**



g. Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

h. Criminal, dishonest or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

i. Unauthorized possession of, loss of, or damage to department property or the property of others, or endangering it through carelessness or maliciousness.

j. Attempted or actual theft of department property; misappropriation or misuse of public funds, property, personnel or the services or property of others; unauthorized removal or possession of department property or the property of another person.

k. Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any collective bargaining agreement or contract, including fraud in securing the appointment or hire.

l. Initiating any civil action for recovery of any damages or injuries incurred in the course and scope of employment or appointment without first notifying the Chief of Police of such action.

m. Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.


**End of Report – Lt. Wayne Winchell**

## Exhibits

Exhibit #1 Authorization of internal investigation – Officer Winters principal
Exhibit #2 Notice of internal investigation from Chief Burdess to Officer Stombaugh
Exhibit #3 Incident Report and Supplemental reports written by Officer Winters and Officer Shinkle for case 22-25845
Exhibit #4 Audio recording of 08/30/2022 Officer Winters Interview
Exhibit #5 Garrity Warning signed by Officer Winters
Exhibit #6 Audio recording of 09/01/2022 Officer Shinkle Interview
Exhibit #7 Audio recording of 09/02/2022 Tayvin Galanakis Interview
Exhibit #8 Facebook Post by Tayvin Galanakis
Exhibit #9 Audio recording of 09/03/2022 Lt. Wing Interview
Exhibit #10 Written statement written by Lt. Wing.
Exhibit #11 Digital copy of Internal Investigation 22-00

CITY RFP 00884

CCDef.App. 72



# IOWA INCIDENT REPORT SUPPLEMENTAL
## NEWTON POLICE DEPARTMENT
101 W 4TH ST S
NEWTON, IA 50208
(641) 792-1547

Grid _____
Arrest # _____
Car # _____
Video # _____

rlc030102

| **C A S E   I N F O** | | | |
|---|---|---|---|
| Case Number **22-25545** | Date of This Report **08/28/2022** | County in which Incident Occurred **JASPER - 50** | |
| ORI Number **NEWTON POLICE DEPARTMENT - IA0500100** | | | |
| Date of Original Occurrence **08/28/2022** | | Type of Offense **OWI/DRE.** | |
| Name - Last **WINTERS** | First **NATHAN** | Middle | Suffix |
| Clearance Classification [✓] Unfounded  [ ] Exceptionally Cleared  [ ] Cleared by Arrest | | Investigative Status [ ] Open  [✓] Closed  [ ] Suspended | |

## Narrative

1. Location: The entirety of this evaluation was conducted at the Newton Police Department. The area used was in doors, well lit, and had flat hard surfaced floors.

2. Witnesses: None

3. Breath Test: Officer Winters collected a preliminary breath test of .000 BrAC.

4. Notification and Interview of Arresting Officer: Officer Winters informed me he traffic stopped Tayvin Galanakis for operating his vehicle with his high beams activated. Officer Winters stated Tayvin had fumbled through his papers when attempting to retrieve his vehicle registration. His movements were described as slow. Officer Winters completed field sobriety tests with Tayvin and believed him to be impaired. Officer Winters collected a preliminary breath test of .000 and believed him to be impaired on drugs.

5. Initial Observation of the Suspect: Tayvin has an adult male with brown curly hair and hazel iris'. He was dark completed. His eyes were bloodshot. He appeared upset and flustered. He wore a grey t shirt and white shorts with tennis shoes. His speech was quick but clear.

6. Medical Problems and Treatment: Tayvin said he was a college football player and recently hurt his right ankle at a practice. He said he is also sees a school therapist and was prescribed Welburtin for anxiety. He said he takes a pill daily and took it at about 1-2 pm earlier that day. He said he had no physical defects. Tayvin said he normally wears corrective contact lenses but did not have them in currently.

7. Psychophysical Tests:
A) Modified Romberg Balance: I explained and demonstrated the test. He said he understood. Tayvin estimated 30 seconds in 29 actual seconds. He had a slight 1" side to side and front to back sway.

B) Walk and turn: I explained and demonstrated the test to Tayvin. I placed him in the starting position and instructed him to hold that position. He said he understood. I explained the remainder of the test. During this time, Tayvin relaxed to a normal standing position. I corrected Tayvin back to the starting position. Tayvin said he understood the entire test. He completed the rest of the test without issue.

C) One leg Stand (left leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

D) One leg Stand (right leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

E) Finger to Nose: I explained and demonstrated the test. Tayvin said he understood. I observed the following:
      1L: touched upper lip
      2R: touched upper lip
      3L: touched right nostril
      4R: touched right nostril
      5R: touched tip of nose
      6L: touched right nostril

8. Clinical Indicators:
HGN: Not present
Vertical Nystagmus: Not Present
Lack of Convergence: Present, left eye would move outward during test
Blood Pressure: 110/80 mmHg (DRE Average range 120-140/70-80)
Pulse (DRE Average Pulse Range 60-90 BMP)
o 74 bpm @ 0114
o 76 bpm @ 0134
o72 bpm @ 0148

Pupil Size:
§ 4.5mm - DRE Average Range Room Light (2.5MM-5.0MM)
§ 5.5mm - DRE Average Range Near Darkness (5.0MM-8.5MM)
§ 3mm - DRE Average Range Direct Light (2.0MM-4.5MM)
Reaction to Light: Normal
Rebound Dilation: None
Pupillary Unrest: None

9. Signs of Ingestion:
Nasal: Clear

CITY RFP 00893

CCDef.App. 73

Oral: Clear
Injection sites: None
UV Light: None

10. Suspect's Statements: Tayvin said he only takes his prescribed Welbutrin. He said the only supplements he takes is Creatine for working out. He said he takes no other substances of any kind as he is urine tested often for college football.

11. DRE's Opinion:
It is my opinion Tayvin Galanakis is not under the influence of a drug. This case is unfounded and Tayvin was released.

12. Toxicological Sample: No sample was taken.

| O F F I C E R | Complainant/Reporting Party (Signature) | | | |
|---|---|---|---|---|
| | Reporting Officer's Name - Last **SHINKLE** | First **ANDREW** | Middle | Suffix |
| | Title **PATROL OFFICER** | Badge Number **611** | UserID **611** | |
| | Assisting Officer / Admin Reviewer's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Supervisor's Name - Last | First | Middle | Suffix |
| | Title | Badge Number | UserID | |
| | Incident Assigned to: | | | |

CCDef.App. 74

CITY RFP 00894

# DRUG INFLUENCE EVALUATION

| EVALUATOR: | Officer Andrew Shinkle, Newton PD | |
|---|---|---|
| IACP#: 032597 | LOG#: 22-23-62 | |

| DEPT CASE | 22-25845 | SCRIBE: N/A |
|---|---|---|
| EVALUATION: | Enforcement | WITNESS: N/A |

| ARRESTEE'S NAME (Last, First, Middle) Galanakis, Tavin John | Date of Birth 8/16/2003 | Age 19 | Sex M | Race UN | Arresting Officer (Name, ID#) Winters, Nathan 639 |
|---|---|---|---|---|---|

| Date Examined / Time /Location 8/28/22 0052 Newton Police Dept | Breath Results: .000 | Test Refused ☐ | Chemical Test: Urine ☐ Blood ☐ Test or tests refused |
|---|---|---|---|

| Miranda Warning Given ☐ Yes Given By: 611 | Hours 0103 | What have you eaten today? When? Hot Cakes, (BF) Burgers (Lch) | What have you been drinking? Coca Cola, Milk | How much — | Time of last drink? 2 hrs ago |
|---|---|---|---|---|---|

| Time now/ Actual 0050/0105 | When did you last sleep? How long Last night 7-8 hrs | Are you sick or injured? ☒ Yes ☐ No R. Ankle | Are you diabetic or epileptic? ☐ Yes ☒ No |
|---|---|---|---|

| Do you take insulin? ☐ Yes ☒ No | Do you have any physical defects? ☐ Yes ☒ No | Are you under the care of a doctor or dentist? ☒ Yes ☐ No    Therapist |
|---|---|---|

| Are you taking any medication or drugs? ☒ Yes ☐ No  Wellbutrin | Attitude: Upset | Coordination: Normal |
|---|---|---|

| Speech: Fast | Breath Odor: Normal | Face: Normal |
|---|---|---|

| Corrective Lenses: ☒ None ☐ Glasses ☐ Contacts, if so ☐ Hard ☐ Soft | Eyes: ☐ Reddened Conjunctiva ☒ Normal ☐ Bloodshot ☐ Watery | Blindness: ☒ None ☐ Left ☐ Right | Tracking: ☒ Equal ☐ Unequal |
|---|---|---|---|

| Pupil Size: ☒ Equal ☐ Unequal (explain) | ☐ Refused Hgn/Vgn Vertical Nystagmus ☐ Yes ☒ No | Able to follow stimulus ☒ Yes ☐ No | Eyelids ☒ Normal ☐ Droopy |
|---|---|---|---|

| Pulse and time | HGN | Right Eye | Left Eye | Convergence |
|---|---|---|---|---|
| 1. 74 / 0114 | Lack of Smooth Pursuit | NP | NP | |
| 2. 78 / 0134 | Maximum Deviation | NP | NP | Right eye  Left eye |
| 3. 72 / 0148 | Angle of Onset | NP | NP | |

## ONE LEG STAND

L R
- ☐ ☐ Sways while balancing
- ☐ ☐ Uses arms to balance
- ☐ ☐ Hopping
- ☐ ☐ Puts foot down
- ☐ Body Tremors
- ☐ Stopped Test
- ☐ Refused Test

### Romberg Balance

☒ Eyelid Tremors
☐ Refused Test

Carotid pulse

### Walk and turn test

☐ Refused Test

| | Cannot keep balance | X | |
|---|---|---|---|
| | Starts too soon | | |
| | | 1st Nine | 2nd Nine |
| | Stops walking | | |
| | Misses heel-toe | | |
| | Steps off line | | |
| | Raises arms | | |
| | Actual steps taken | | |

| Internal clock 29 estimated as 30 sec. | Describe Turn: As directed | Cannot do test (explain) | Type of Footwear: Tennis shoes |
|---|---|---|---|

### Draw lines to spots touched

| | Room light | Darkness | Direct |
|---|---|---|---|
| Left Eye | 4.5 | 6.5 | 3 |
| Right Eye | 4.5 | 6.5 | 3 |

Nasal area: Clear
Oral cavity: Clear

| NOTES: | REBOUND DILATION ☐ Refused ☐ Yes ☐ No | REACTION TO LIGHT: Normal |
|---|---|---|

RIGHT ARM          LEFT ARM

| Blood Pressure 110/80 | Temperature -0F |
|---|---|

Muscle tone: ☐ Normal ☐ Flaccid ☒ Rigid ☐ Refused
Comments:

☐ Unremarkable      ☐ Refused

| What drugs or medications have you been using? Wellbutrin (1 pill)  Creatine (5 mg) | How much? This morning | Time of use? — | Where were the drugs used? (Location) Dorm |
|---|---|---|---|

| Date / Time of arrest: 8/28/22 0040 | Time DRE was notified: 0030 | Evaluation start time: 0052 | Evaluation completion time: 0052 | Precinct/Station: |
|---|---|---|---|---|

| Opinion of Evaluator: Poly Drug | ☐ Depressant ☐ Stimulant | ☐ Hallucinogen ☐ Dissociative Anesthetic | ☐ Narcotic Analgesic ☐ Inhalant | ☐ Cannabis ☐ Alcohol | ☐ Medical Rule Out ☒ No Opinion |
|---|---|---|---|---|---|

CITY RFP 00896

# DRUG INFLUENCE NARRATIVE

| | | | |
|---|---|---|---|
| **Date:** | 8/28/22 | **Case Number:** | 22-25845 |
| **Officer's Name:** | A. Shinkle | **Rolling Log#:** | 22-23-62 |
| **Officer's Badge Number:** | #611 | **Suspect Name:** | Tayvin Galanakis |
| **D.R.E. Number:** | 032597 | **Date of Birth:** | 8/19/03 |

**1. Location:** The entirety of this evaluation was conducted at the Newton Police Department. The area used was in doors, well lit, and had flat hard surfaced floors.

**2. Witnesses:** None

**3. Breath Test:** Officer Winters collected a preliminary breath test of .000 BrAC.

**4. Notification and Interview of Arresting Officer:** Officer Winters informed me he traffic stopped Tayvin Galanakis for operating his vehicle with his high beams activated. Officer Winters stated Tayvin had fumbled through his papers when attempting to retrieve his vehicle registration. His movements were described as slow. Officer Winters completed field sobriety tests with Tayvin and believed him to be impaired. Officer Winters collected a preliminary breath test of .000 and believed him to be impaired on drugs.

**5. Initial Observation of the Suspect:** Tayvin has an adult male with brown curly hair and hazel iris'. He was dark completed. His eyes were bloodshot. He appeared upset and flustered. He wore a grey t shirt and white shorts with tennis shoes. His speech was quick but clear.

**6. Medical Problems and Treatment:** Tayvin said he was a college football player and recently hurt his right ankle at a practice. He said he is also sees a school therapist and was prescribed Welburtin for anxiety. He said he takes a pill daily and took it at about 1-2 pm earlier that day. He said he had no physical defects. Tayvin said he normally wears corrective contact lenses but did not have them in currently.

**7. Psychophysical Tests:**

A)    Modified Romberg Balance: I explained and demonstrated the test. He said he understood. Tayvin estimated 30 seconds in 29 actual seconds. He had a slight 1" side to side and front to back sway.

B)    Walk and turn: I explained and demonstrated the test to Tayvin. I placed him in the starting position and instructed him to hold that position. He said he understood. I explained the remainder of the test. During this time, Tayvin relaxed to a normal standing position. I corrected Tayvin back to the starting position. Tayvin said he understood the entire test. He completed the rest of the test without issue.

C)    One leg Stand (left leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

D)    One leg Stand (right leg): I explained and demonstrated the test. Tayvin said he understood. I observed no clues of impairment.

CITY RFP 00897

E)    Finger to Nose: I explained and demonstrated the test. Tayvin said he understood. I observed the following:

    1L: touched upper lip

    2R: touched upper lip

    3L: touched right nostril

    4R: touched right nostril

    5R: touched tip of nose

    6L: touched right nostril

## 8. Clinical Indicators:

- HGN: Not present
- Vertical Nystagmus: Not Present
- Lack of Convergence: Present, left eye would move outward during test
- Blood Pressure: 110/80 mmHg  (DRE Average range <u>120-140/70-90</u> )

- Pulse (DRE Average Pulse Range 60-90 BMP)
  - 74 bpm @ 0114
  - 78 bpm @ 0134
  - 72 bpm @ 0148
- Pupil Size:
  - 4.5mm - DRE Average Range Room Light (2.5MM-5.0MM)
  - 6.5mm - DRE Average Range Near Darkness (5.0MM-8.5MM)
  - 3mm - DRE Average Range Direct Light (2.0MM-4.5MM)

- Reaction to Light: Normal
- Rebound Dilation: None
- Pupillary Unrest: None

## 9. Signs of Ingestion:

Nasal: Clear

Oral: Clear

Injection sites: None

UV Light: None

## 10. Suspect's Statements: Tayvin said he only takes his prescribed Welbutrin. He said the only supplements he takes is Creatine for working out. He said he takes no other substances of any kind as he is urine tested often for college football.

CITY RFP 00898

## 11. DRE's Opinion:

It is my opinion Tayvin Galanakis is not under the influence of a drug.

## 12. Toxicological Sample: No sample was taken.

## 13. Miscellaneous:

Officer Andrew Shinkle
DRE # 32597

## Drug Influence Evaluation Checklist

AKS     1. Breath Alcohol Test

AKS     2. Interview of Arresting Officer
        (NOTE: Gloves must be worn from this point on)

AKS     3. Preliminary Examination (and first pulse)
        (first pulse, initial estimation of angle of onset, and initial estimation of pupil size)

AKS     4. Eye Examinations

AKS     5. Divided Attention Tests:

        *AKS     Romberg Balance*

        *AKS     Walk and Turn*

        *AKS     One Leg Stand*

        *AKS     Finger to Nose*

AKS     6. Vital signs (and second pulse)

AKS     7. Dark Room Examination (for pupil size and ingestion signs)

AKS     8. Examination of Muscle Tone

AKS     9. Examination for Injection Sites (and third pulse)

AKS     10. Subject Statements and Other Observations

AKS     11. Opinion of Evaluator

AKS     12. Toxicological Examination

CITY RFP 00900

**CCDef.App. 79**

22-25845

On Saturday, August 28, 2022, at 0013hours, I was riding with Officer Winters after having a meeting with him. We had just left the back lot of the PD traveling eastbound on S 2nd Ave W. As we were approaching W 2nd St, a white Chevy Impala was traveling westbound toward us with its high beams on. The vehicle turned south on W 2nd St and Officer Winters initiated a stop on the vehicle in the 200 blk S 3rd Ave W.

I approached the vehicle on the passenger side, which was occupied by one male later identified as Tayvin Galanakis. Officer Winter was talking with Tayvin and explained the reason for the stop and requested he license registration and insurance. I could not hear any of the responses from Tayvin as the passenger side window was up. Tayvin had some trouble locating the requested documents and made several attempts to locate the documents in the glove box by putting stuff back in the glove box and then going back and looking in the glove box again.

Officer Winters asked Tayvin to step back to the patrol car, and asked him to take his gum out and put it on the dash. This was an indicator to me that he suspected he was under the influence. Tayvin was asked to have a seat in the front passenger seat by Officer Winters. I walked back and opened the door for Tayvin and I took a seat in the back seat cage, and radioed dispatch to rest Officer Winters depravation period due to the fact that Tayvin had gum in his mouth. During their conversation Tayvin explained that he was at a friend's house and that he was on his way home. He also explained that he plays football for William Penn College and that he was home for the weekend because as a freshman they aren't part of the travel team. Officer Winters as Tayvin how much he had to drink tonight and Tayvin said that he nothing to drink. Officer Winters then asked Tayvin why he would have bloodshot and watery eyes. Tayvin said the he would blow right now and Officer Winters advised they would get to that. When asked why he would think that, Office Winters explained that his difficulty retrieving paperwork was a clue as well as the odor of alcohol. At this the only issue I observed was the fumbling for the paperwork.

Tayvin acted shocked and wanted to know if he could record this. Officer Winters told him that he could and that he was also recording. Tayvin then took his phone out and video recorded a statement to the effect that, Officer Winters thinks I've been drinking and that he was going to look dumb when he blew zeros. Tayvin told Officer Winters that he wanted to blow right know. Officer Winters explained that he would get to that but first offered him sobriety tests, which Tayvin agreed to.

For the sobriety tests Tayvin was asked to step to the parking lot area of the water tower. After asking some questions regarding his eyes he performed the HGN test. During the test Tayvin engaged Officer

Winters in conversation about football and was upset that he had just got his hair permed and that the rain was going to mess it up. I should be noted that there was a very light rain during the sobriety tests; however nearer the time of arrest it picked up a little and was more steady.

The second test he offered was the walk and turn. This test and the One Leg Stand were the only tests that I could really see the results of. During the W&T he I overserved two clues, incorrect number of steps, and improper turn. This would be a fail. After completing the test Tayvin asked for the breath test stating that he was two for two on the tests. Officer Winter rebuked him and told him that he wasn't and asked why he took more steps than advised. Tayvin then challenges Officer Winters and asks if this was his first year and asked how many false accusations had he had and Officer Winters said zero. To which Tayvin said this will be your first.

They proceeded to the One Leg Stand (OLS) during this test I observed no clues.

Officer Winters then administered three additional eye tests which are designed to detect drug impairment, which I'm not familiar with. After the tests Tayvin asked officer Winters why he assumed he was drunk. Officer Winters told him that he was showing several strong signs of impairment. Tayvin looked at me and caught me off guard and asked about the signs of impairment and I told him that he was a little slow with the paperwork and that he wasn't very smooth and consistent, and those can be tale, tale signs of impairment. Officer Winters then read Tayvin his Miranda Warning, which Tayvin acknowledged before blowing into the PBT which showed no presence of alcohol. Officer Winters then asked Tayvin when the last time he smoked Marijuana. This lead me to believe that there was something with the other tests that lead Officer Winters to believe that Tayvin was impaired. Tayvin couldn't tell Officer Winters when the last time he smoked marijuana was but insisted that it wasn't resent and stated that he is tested weekly for football. Tayvin asked if Officer Winters could go from thinking it was alcohol to drugs and I told him that he could and that in the past he has been very good at it.

In looking back it was at this point that I should have questioned Officer Winters as to what his observations where and how they lead him to believe he was impaired. Officer Winters then made a phone call to Officer Shinkle who was working and was a Drug Recognition Expert. While Officer Winters was on the phone Tayvin asked if he could make a phone call to his mom and I told him that he could. During the course of his conversation with is mom he asked me to talk to her and I told him that I really couldn't because he was an adult. Tayvin asked me why I was allowing this to happen and I pointed out that he was specialized in this area and that if he believed he was under the influence that he could do this. Initially Tayvin indicated that he would do a DRE eval but after Officer Winters was

CITY RFP 00906

done with his phone call he decided that he wasn't going to do one at which time Officer Winters told Tayvin that he was under arrest for OWI.  He was handcuffed, searched and placed in the back of patrol car 843.  Officer Winters was getting ready to leave and I pointed out that the car was legally parked but we needed to see if he wanted to leave it there and make sure it was secured.

Once at the PD Officer Shinkle agreed to do a DRE evaluation on Tayvin which took roughly an hour. During that time I spoke with his mom, Lindsey Maxwell, 3 different times.  I explained what was going and told her that I was a little limited on what I could say due to the fact that he was of age, and told her that I would have him call her when he was done.  After the DRE evaluation was complete Officer Shinkle and Winters came into the office and Officer Shinkle told me that he found no signs of impairment.  Officer Winters asked if they should charge him she he had been arrested.  I told them absolutely not that if a DRE evaluation showed no evidence that we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way.  About this time dispatch advised that his mom was in the front lobby to pick him.  Prior to leaving he had requested that he speak with a supervisor so I spoke him for a few minutes.

After Tayvin was released I spoke with Officer Shinkle regarding the discrepancy in observations.  I was advised that this was the 3rd DRE evaluation that Officer Winters had asked him to do on this shift. Officer Shinkle told me that first too he just looked at and spoke with the subjects and declined to do a DRE.  This worries me as Officer Winters does a lot of OWI's and I have had a lot of faith in him.  I'm afraid this could happen again, and plan on meeting with Officer Winters to discuss this concern.

After looking back at my BWC footage I wish I had interjected earlier and spoke with Officer Winters to understand what he was seeing and to hopefully have prevented him from being arrested to begin with.

**LANCE PLATT - November 03, 2023**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

TAYVIN GALANAKIS,                     §
    Plaintiff,                     §
                                   §
V.                                    §  CASE NO. 4:23-cv-00044
                                   §
CITY OF NEWTON, IOWA, ROB BURDESS,§
NATHAN WINTERS, CHRISTOPHER WING, §
INDIVIDUALLY AND IN THEIR          §
OFFICIAL CAPACITIES WITH THE       §
NEWTON POLICE DEPARTMENT,           §
    Defendants.                    §
                                   §
    ------------------------------ §
                                   §
NATHAN WINTERS AND CHRISTOPHER      §
WING,                               §
    Defendants/Counterclaim        §
    Plaintiffs,                    §
                                   §
V.                                    §
                                   §  Removed from the
TAYVIN GALANAKIS,                     §  District Court for
    Plaintiff/Counterclaim         §  Jasper County, Iowa
    Defendant.                     §  No. LACV123038

_____

ORAL AND VIDEOTAPED DEPOSITION OF
LANCE PLATT
NOVEMBER 3, 2023
VOLUME 1 of 1

_____

    ORAL AND VIDEOTAPED DEPOSITION OF LANCE PLATT,
produced as a witness at the instance of the Defendants
City of Newton and Rob Burdess and Defendants/Counterclaim
Plaintiffs Nathan Winters and Christopher Wing and duly
sworn, was taken in the above-styled and numbered cause on
the 3rd day of November, 2023, from 9:07 a.m. to 11:56
a.m., before Laurin Rainer, Certified Shorthand Reporter
in and for the State of Texas, reported by computerized
stenotype machine, at the offices of Associated Court
Reporters, 1716 Briarcrest Drive, Suite 300, Bryan, Texas
77802, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

LANCE PLATT - November 03, 2023

Page 2

1                    APPEARANCES
2 FOR THE DEFENDANTS CITY OF NEWTON AND ROB BURDESS AND
  DEFENDANTS/COUNTERCLAIM PLAINTIFFS NATHAN WINTERS AND
3 CHRISTOPHER WING:
4     Mr. Nicholas F. Miller
      Brick Gentry, P.C.
5     6701 Westown Parkway
      Suite 100
6     West Des Moines, Iowa 50266
      Telephone: (515)274-1450 - Fax: (515)274-1488
7     Email: nick.miller@brickgentrylaw.com
8 FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT TAYVIN GALANAKIS:
9     Mr. Matthew M. Boles
      Matthew M. Boles
10    Gribble, Boles, Stewart & Witosky Law
      2015 Grand Avenue
11    Suite 200
      Des Moines, Iowa 50312
12    Telephone:  (515)644-6852
      Email: mboles@gbswlaw.com
13
14 ALSO PRESENT:
15    Ms. Myra Thetford, Videographer
16
17
18
19
20
21
22
23
24
25

Page 3

1                      INDEX
2                                            PAGE
3 Appearances ........................................    2
4 LANCE PLATT
5     Examination by Mr. Nicholas F. Miller .........    4
6 Reporter's Certificate ............................  102
7
8                    EXHIBITS
9 NO.  DESCRIPTION                              PAGE
10 1   Platt and Associates Technical Report ..........  13
11 2   Body cam video .................................  20
12 3   William Penn University Sports Medicine Department
       Drug Education and Testing Program Policy ......  90
13
   4   National Association of Intercollegiate Athletics
14     National Administrative Council Drug Testing
       Policy Manual .................................  93
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                   P R O C E E D I N G S
2            THE VIDEOGRAPHER:  Today is Friday,
3 November 3rd, 2023.  We're on the record at 9:07 a.m.
4            THE REPORTER:  Pursuant to Federal Rules of
5 Civil Procedure 30(b)(5)(A)(i), this is the deposition of
6 Lance Platt.  Today's date is November 3, 2023, and the
7 time is 9:07.
8            My name is Laurin Rainer, Registered
9 Professional Reporter, Certified Shorthand Reporter in the
10 state of Texas, CSR No. 8307.  My business address is
11 Associated Court Reporters, 1225 North Loop West, Suite
12 327, Houston, Texas 77008.
13            This deposition is being conducted at the
14 offices of Associated Court Reporters, 1716 Briarcrest
15 Drive, Suite 300, Bryan, Texas 77802.
16            Those present at this deposition include
17 the following persons:  Mr. Nicholas Miller, Mr. Matthew
18 Boles, Dr. Lance Platt, and Ms. Myra Thetford.
19            I will now administer the oath.  Will you
20 raise your right hand for me?  Do you solemnly swear or
21 affirm that the testimony you are about to give in this
22 matter will be the truth, the whole truth, and nothing but
23 the truth, so help you God?
24            THE WITNESS:  Yes, ma'am.
25                           *

Page 5

1                     LANCE PLATT,
2 having been first duly sworn, testified as follows:
3                     EXAMINATION
4 BY MR. MILLER:
5     Q.   State your name.
6     A.   Lance Platt, P-l-a-t-t.
7     Q.   Are you employed?
8     A.   I am.
9     Q.   Where?
10    A.   I am a self-employed consultant.  The name of my
11 company is Platt and Associates.
12    Q.   What would you consider your profession?
13    A.   I evaluate cases, criminal and civil cases,
14 mainly impaired driving, also police practices and
15 procedures, including use of force.
16    Q.   Is the curriculum vitae that you provided with
17 your expert report in this case current and up-to-date?
18    A.   Yes, sir.
19    Q.   How did you get into drug recognition or the
20 field that you're in now?
21    A.   I was a police officer in College Station,
22 Texas, which is right next to where we are, and left there
23 in 1999.  I went to work for the Texas Engineering
24 Extension Service, which is part of Texas A&M University.
25 While I was there, I served several capacities.  I was a

Page 10

1  Q.    Now I'm asking about a ten-year.
2  A.    Okay.  Ten -- within the ten years, I would say
3  I probably have given five to ten depositions.  I don't
4  know the exact amount.  I do -- I did submit some -- the
5  cases that I've testified in, but I don't know the exact
6  number of depositions.  But I've testified as an expert
7  and been qualified well over 300 times.
8  Q.    Over the course of how many years?
9  A.    Since 2002.
10 Q.    In any of those cases, have you opined or
11 concluded that the person subject to the field sobriety
12 testing was impaired or intoxicated?
13 A.    That happens a lot when I do evaluations of
14 cases.  Now, I do -- I do up front evaluations of -- of a
15 case.  Many times -- and I say many times -- the case is
16 no good for me.  I mean, I -- I -- they hire me to look at
17 it, and I look at it, and I make a decision.  And if I
18 feel like I can help, I help.  If I can't, I can't.  But
19 I'm very forward with them, like, this is what this is,
20 this is what I see.  That's the only way that you can be
21 because there is no other way.
22        So I do an evaluation, you know, an up
23 front evaluation of the case.  The testimony and the
24 deposition is me.  I mean, I will not do it unless I want
25 to.  So it -- it's -- it's up to me, and the attorneys

Page 11

1  know that up front when I talk to them.
2  Q.    So for the cases in which you are deposed or the
3  cases in which you testify in court, how many of those --
4  in how many of those have you concluded that the person
5  subject to the field sobriety testing was impaired or
6  intoxicated?
7  A.    In court, it would be all of them.
8  Q.    You concluded that the person subject to the
9  testing was impaired or intoxicated?
10 A.    No, was -- was not impaired.
11 Q.    Was not.  Explain your process when you're
12 retained as an expert witness for evaluating the field
13 sobriety testing.
14 A.    Usually, it's a contact, you know, through the
15 phone or through the -- through the internet, and I'll
16 contact the attorney and tell them what I do.  It usually
17 takes some explanation because there's not a ton of people
18 out there that -- that do exactly what -- what I do.  And
19 we'll talk about the case, and I'll tell them up front I
20 do an up front evaluation, and there is no way around
21 that.  I mean, I do an evaluation up front, and this is
22 what it costs.  If you don't want to do it, then we can go
23 ahead and hang up.
24        I do that for two reasons.  Number one is
25 to protect the client.  Number two is to protect me.

Page 12

1  Because there may be times, like you said, when I see that
2  they're impaired, I'm like, "Here, here's my report, but I
3  I'm not going to testify."
4        I'll get the discovery in that they want me
5  to look at.  When I say "they," I'm talking about the
6  attorneys.  And I'll look at the discovery, and then I'll
7  compile a report, send the report back to the attorney,
8  and then we go from there.
9  Q.    When you say you look at the discovery, what
10 types of things are you talking about?
11 A.    I get case reports, video.  Mainly, my stuff
12 that I look at is what happened on the street.  You know,
13 it -- it's the arrest report, any supplemental arrest
14 reports to what happened on the street, if there were
15 field sobriety that was done out on the street, if there
16 was a drug recognition expert exam that was done away from
17 the street.  So my stuff is really contained to -- to the
18 actual enforcement -- the law enforcement out on the
19 street.  That -- that's my -- my scope.
20 Q.    So you -- you said arrest reports.  You would
21 review --
22 A.    Yes, sir.
23 Q.    -- those documents?  What other documents would
24 you review?
25 A.    Arrest reports, I look at toxicology reports

Page 13

1  sometimes, any supplemental reports that the officers turn
2  in, anything to do with booking.  Booking.  Anything like
3  that that has law enforcement related to it, I look at it.
4  Q.    Do you ever review videos?
5  A.    I do.
6  Q.    What kind?
7  A.    Arrest videos, in car, I've reviewed videos from
8  jails, but usually it's the in car video that I look at
9  because in -- with a OWI, you have the three phases.  You
10 know, and you have the video, and a lot of it starts when
11 the person is driving.  So I do look at the video from
12 start to finish.  Now, some cases don't have video.  You
13 know, those are difficult because there's really
14 nothing -- nothing to look at.  But the ones that have
15 video, I do.  I -- I look at the video from start to
16 finish, and that's what my report is based on.
17 Q.    What about officer body cam videos?  Do you
18 normally review those?
19 A.    Yes, any -- any -- any video.
20        (Exhibit 1 marked)
21 Q.    (BY MR. MILLER) Dr. Platt, I'm going to hand you
22 what's been marked as Defense Deposition -- I'm sorry --
23 Platt Deposition 1, Exhibit 1.  What is that?
24 A.    That is what I refer to as a Technical Report
25 for Mr. Matthew Boles for Tayvin Galanakis.

Page 14

1  Q.    Did you create Platt Deposition Exhibit 1?
2  A.    Yes, I did.
3  Q.    Is Platt Deposition Exhibit 1 a true and
4 accurate copy of the report that you authored in this
5 case?
6  A.    Yes, sir.
7  Q.    In connection with your report in this case,
8 what resources did you review?
9  A.    I looked at the video of the scene, I believe,
10 and then I looked at the -- the arrest report that they
11 had out on the street.  Let's see.  The case report and
12 the video.  That's -- that's -- that's what I looked at.
13 I try to keep my scope tight.  I mean, that's -- that's --
14 that's what -- what I looked at.  That's what I --
15  Q.    Were there any pieces of literature or other
16 resources that you rely on when you're authoring your
17 report?
18  A.    I look at the -- the NHTSA, the National Highway
19 Traffic Safety Administration, or NHTSA, manuals, the --
20 the manuals that the officers use in their training.  I --
21 I reference from those and look at those, also, because
22 that's what the officers are trained out of.
23  Q.    You're referring to the NHTSA FSST manual [sic]?
24  A.    SFST.
25  Q.    What does SFST stand for?

Page 15

1  A.    Standardized field sobriety testing.
2  Q.    What version of the NHTSA SFST manual did you
3 rely on in authoring your report?
4  A.    I looked at the 2018 manual, as when the arrest
5 was made in 2022, the 2023 manual hadn't been released
6 yet, but there is a 2023 manual out there, but I
7 referenced the -- I usually reference the manual -- or
8 always reference the manual that the officers used at the
9 time that they were trained in and at the time that the
10 arrest was made.  So NHTSA spreads those manuals out.
11 Every four or five years, they a release a new one.  So at
12 the time this arrest was made, it was the 2018.
13  Q.    That would have been the most --
14  A.    The most recent.
15  Q.    -- current version?
16  A.    Yes, sir.
17  Q.    Are you familiar -- when did the 2023 version
18 get published?
19  A.    They had a -- they had a release of that to the
20 trainers, I think, in 02 of '23, but it wasn't released
21 out to the officers, gosh, until I think the -- the June
22 or July, maybe August of '23, or maybe even later than
23 that.  I know -- I think there were some problems with
24 some of the editing and stuff like that, so.
25  Q.    Since its publication, have you reviewed the

Page 16

1 2023 version of the NHTSA SFST manual?
2  A.    I have.  I actually taught a class, a 2023
3 class.
4  Q.    Are there meaningful differences between the
5 2023 version and the 2018 version?
6  A.    No, not really.  I mean, if you look at field
7 sobriety testing as -- as a whole, they really can't
8 change anything because if you did, you would have to
9 revalidate, and NHTSA is not going to do that, in my
10 opinion.  So other than there being some -- they changed
11 some definitions of some words, some of the stuff is
12 changed, and I'm -- the statistics are changed.  In 2018,
13 they were really heavy on cannabis.  They like to -- they
14 -- they're -- they're moving towards a drugged driving.
15      So there were a few minor changes that were
16 made; but as far as the tests go and the validity of the
17 tests, that's been the same since 1977.  That hasn't
18 changed at all, and they're still alcohol tests.
19  Q.    What other resources or pieces of literature did
20 you review in preparing your report in this case?
21  A.    I looked at the NHTSA manuals, mainly.  That's
22 about all that I used.  After the report was done and
23 turned in, another -- a -- a peer reviewed and published
24 study came out from the Journal of the American Medical
25 Association, and I did look at that, and I believe I told

Page 17

1 Mr. Boles about that, that study.
2  Q.    To prepare your report and your opinions in this
3 case, did you review or consult any Advanced Roadside
4 Impaired Driving Enforcement manuals?
5  A.    I may have looked at the ARIDE manual kind of,
6 but it was mainly SFST because that's what happened out on
7 the street.
8  Q.    When you say "ARIDE," that's the Advanced
9 Roadside --
10  A.    Yeah.  I'm sorry.
11  Q.    -- Impaired Driving Enforcement?
12  A.    Yes, sir.  I'm sorry.  That's what that stands
13 for, A-R-I-D-E.
14  Q.    No worries.  Just making a record.  Okay.  And
15 remind me:  Why did you not consult that piece of
16 literature?
17  A.    I looked -- I looked at it.  I know that some of
18 the tests that he did were from the ARIDE protocol, but I
19 was familiar with that anyway.  I knew the protocol.  The
20 main tests that he did -- the horizontal gaze, walk and
21 turn, and one leg stand -- are alcohol specific tests.
22 Standardized field sobriety tests.  So that -- that's why
23 I looked at the SFSTs mainly.
24  Q.    Did you review or consult any manuals other than
25 drug recognition expert manuals, particularly ones from

**LANCE PLATT - November 03, 2023**

Page 18

1 the IACP?

2    A.    No, sir, I -- I kept it in -- all within the

3 NHTSA -- NHTSA realm.

4    Q.    What is the IACP?

5    A.    Internal Association of Chiefs of Police.

6    Q.    Did you review Matt Bruner's expert report that

7 was authored in this case?

8    A.    I did.  I did look at that, yes.

9    Q.    Based on all the information, literature, and

10 materials you reviewed in connection with this case, did

11 you reach any opinions?

12    A.    I did.

13    Q.    Specifically, what are your opinions?

14    A.    My opinion specifically is that on this night,

15 Mr. Galanakis was not under the influence of cannabis.

16    Q.    Did you reach any other opinions?

17    A.    As far as being under the influence?  No.  I

18 don't believe he -- he shouldn't have been arrested.  He

19 was not under the influence and -- which was proven later

20 by the drug recognition person, but that was my -- that

21 was my end result, was that he shouldn't have been

22 arrested.  I didn't see a loss of mental or physical

23 faculty that I believe rose to the level of a drug.  I

24 didn't believe he was under the influence of cannabis,

25 which I have seen people under the influence of

Page 19

1 cannabis -- cannabis before.  I believe they got into an

2 argument, and this was the end result of the argument.  So

3 that's -- that was my opinion.

4    Q.    Any other opinions?

5    A.    No, sir.

6    Q.    Do you plan on forming any additional opinions?

7    A.    I don't plan on it, no.

8    Q.    To prepare your expert report, which has been

9 previously marked as Platt Deposition Exhibit 1, did you

10 review any videos?

11    A.    Yes.  There was a video of the scene, the stop

12 video.

13    Q.    What kind of video was that?

14    A.    That was the video where they had stopped him

15 and -- and got him out and were -- were conversing and

16 talking with him, where you actually saw all three of

17 the -- the people on video.

18    Q.    Was it a body camera?

19    A.    I believe it was a body cam.  There was also a

20 dashcam, but the body cam was the one that got the most

21 interaction between the two.

22    Q.    There were two officers on the scene --

23    A.    Right.

24    Q.    -- is that right?

25    A.    Right.

Page 20

1    Q.    Do you remember which officer's body cam video

2 you reviewed?

3    A.    I believe it was the -- I don't think it was the

4 lieutenant.  I believe it was the -- the -- the arresting

5 officer that I looked at.

6    Q.    Would that be Officer Nathan Winters?

7    A.    Winters is his last name, yeah.  And I think

8 Wing was the lieutenant.  Lieutenant Wing.

9    Q.    Do you recall if the body cam video from Officer

10 Winters' body was identified by a Bates number?

11    A.    I don't know.

12          (Exhibit 2 marked)

13    Q.    (BY MR. MILLER) Dr. Platt, I'm going to show you

14 a thumbnail of Officer Winters' -- the beginning

15 of Officer --

16    A.    Uh-huh.

17    Q.    -- Winters' body cam video.  Does that, to you,

18 look like an accurate thumbnail of the very beginning of

19 the video that you reviewed?

20    A.    Based on my recollection, yeah, it looks -- it

21 looks familiar.  But, yes, his body cam activated inside

22 of the vehicle.  It looks -- it looks familiar, yes.

23    Q.    In the bottom left-hand corner of the video

24 screen there, do you see a Bates number?

25    A.    When you say "Bates," what are you talking

Page 21

1 about?

2    Q.    Do you see a reference down there, City I.D. --

3    A.    Yeah, City I.D. 00630.

4    Q.    Was the video that you reviewed to prepare your

5 report similarly marked with that identifier?

6    A.    You know what?  I don't remember.

7    Q.    Okay.  I'm handing you back Platt Deposition

8 Exhibit No. 1 [sic], which is the body cam video from

9 Officer Winters.  Can you go ahead and play through that

10 and let me know if that's a copy of the video that you

11 reviewed to prepare your report in this case?

12    A.    Yeah, I --

13    Q.    Go ahead.

14    A.    Just here?

15    Q.    It's touch, or you can use -- I'm sorry.

16 It's -- what I'm showing you is Platt Deposition Exhibit

17 2, not Deposition Exhibit 1.

18    A.    Okay.

19    Q.    Which I'll just note for the record.  So go

20 ahead and play through that until you can confirm that's a

21 copy of the video that you reviewed in connection with

22 this case.

23    A.    It's not playing.  Do you need a Mac?  Sorry.  I

24 have a Mac, Mac Book.

25    Q.    And you can skip to different portions of that

Page 102

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION
 3 TAYVIN GALANAKIS,               §
        Plaintiff,                 §
 4                                 §
                                   §
   V.                              § CASE NO. 4:23-cv-00044
 5                                 §
   CITY OF NEWTON, IOWA, ROB BURDESS,§
 6 NATHAN WINTERS, CHRISTOPHER WING, §
   INDIVIDUALLY AND IN THEIR        §
 7 OFFICIAL CAPACITIES WITH THE     §
   NEWTON POLICE DEPARTMENT,        §
 8      Defendants.                §
                                   §
 9 ----------------------------    §
                                   §
10 NATHAN WINTERS AND CHRISTOPHER   §
   WING,                           §
11      Defendants/Counterclaim    §
        Plaintiffs,                §
12                                 §
   V.                              §
13                                 § Removed from the
   TAYVIN GALANAKIS,               § District Court for
14      Plaintiff/Counterclaim     § Jasper County, Iowa
        Defendant.                 § No. LACV123038
15
     _____
16
              REPORTER'S CERTIFICATION
17       ORAL AND VIDEOTAPED DEPOSITION OF
                  LANCE PLATT
18              NOVEMBER 3, 2023

19
20      I, LAURIN RAINER, Certified Shorthand Reporter in and
21 for the State of Texas, hereby certify to the following:
22      That the witness, Lance Platt, was duly sworn by the
23 officer and that the transcript of the oral deposition is
24 a true record of the testimony given by the witness;
25
```

Page 103

```
 1      That the original deposition transcript was delivered
 2 to Mr. Nicholas F. Miller;
 3      That a copy of this certificate was served on all
 4 parties and/or the witness shown herein on
 5 November 17, 2023.
 6      I further certify that pursuant to FRCP No. 30(e)(2)
 7 that the signature of the deponent:
 8      _____ was requested by the deponent or a party before
 9 the completion of the deposition and that the signature is
10 to be returned within 30 days from the date of receipt of
11 the transcript.  If returned, the attached Correction Page
12 contains any changes and the reasons therefor;
13      __X__ was not requested by the deponent or a party
14 before the completion of the deposition.
15      I further certify that I am neither counsel for,
16 related to, nor employed by any of the parties in the
17 action in which this proceeding was taken, and further
18 that I am not financially or otherwise interested in the
19 outcome of the action.
20      Certified to by me this 17th day of November, 2023.
21           /s/ Laurin Rainer, CSR

             _____
22           Laurin Rainer, CSR, RPR
             Texas CSR No. 8307, expires 05/31/2024
23           Associated Court Reporters
             Firm Register No. 29
24           Waco, Texas 76701
             Telephone: (254)753-3330
25
```

# PLATT and ASSOCIATES

**IMPAIRED DRIVING CONSULTING**
4343 Carter Creek Parkway, Suite 120
Bryan, TX 77802

979 846-3950 - office
979 412-2346 - cell

web: www.impaireddrivingexpert.com
email: lance@impaireddrivingexpert.com

**July 1, 2023**

**Mr. Matthew Boles**
**Attorney at Law**

| Re: | Re: | **Tayvin Galanakis** |
|---|---|---|
| | Agency/Case Number | **Newton Police Department/22-25845** |
| | Court | |
| | County | **Jasper** |
| | Offense | **Operating While Intoxicated (OWI drugs)** |
| | Date of Offense | **August 28, 2022** |

Dear Mr. Boles:

At your request, I have reviewed the OWI case report and video; I have analyzed Mr. Galanakis' performance on the three phases of OWI detection including the standardized field sobriety tests that were given to him in the field by the officer. I have, also, evaluated the officer's performance, regarding the administrative requirements that are required by the National Highway Traffic Safety Administration (NHTSA) and the International Association of Chiefs of Police (IACP) in order for the tests to be considered standardized in accordance with the test battery protocol.

Attached to this letter, you will find a detailed technical report based upon the information that was provided in the officer's case report and video submitted on the night of the arrest. The technical report will outline the activities of the officer and the defendant as the events unfold. My comments will follow.

If you need clarification of any point, please feel free to contact me.

If there is anything further that Platt and Associates can do for you in the future, please feel free to contact us at your convenience. It was a pleasure to assist you; and we look forward to a continued relationship with you and your legal practice.

Sincerely,

**Lance A. Platt, Ph.D.**

Lance A. Platt, Ph.D.
Platt and Associates


EXHIBIT
Platt Depo
1

**Observations of Examiner:** Based upon my observation of the submitted video and case report, it is my opinion that Mr. Galanakis does not exhibit physical and/or mental difficulty while being contacted by the officer that I would associate with any type of drugs or alcohol including Cannabis.

Lieutenant Wing whom I believe to have been on scene with officer Winters wrote in his supplemental report that after the DRE evaluation he was told by officer's Shinkle and Winters (who has just arrested him right in front of Lieutenant Wing) that officer Shinkle found no signs of impairment, officer Winters asked Lieutenant Wing if he should charge him, he had been arrested. Lieutenant Wing allegedly told officer Winters absolutely not, that if a DRE evaluation showed no evidence, then we weren't going to charge him and that we should give him his property back and take him to his car so he can be on his way." This is the same police officer (supervisor) who witnessed the entire event at the scene including the arrest of Mr. Galanakis for OWI, some of the same "tests" (Romberg, FTN, LOC, HGN) were administered to Mr. Galanakis in the field which were observed by Lieutenant Wing, the same tests were administered on the DRE evaluation by officer Shinkle. Lieutenant Wing stated in his supplemental report that Mr. Galanakis was released to his mom with no charges.

*All opinions stated herein are stated to a reasonable degree of professional certainty within the fields of my expertise of law enforcement training and procedures including the NHTSA standardized field sobriety testing, drug evaluation and classification and advanced roadside impaired driving enforcement programs administration, scoring and training protocols required in the successful completion of the student and instructor courses, including both standardized and non-standardized tests, the conduct and training of impaired driving investigations, and the NHTSA standardized protocols involving both alcohol and/or drugs other than alcohol.*

Sincerely,

**Lance A. Platt, Ph.D.**

Lance A. Platt, Ph.D.
Platt and Associates



# YouTube Partner Program overview & eligibility



We're expanding the YouTube Partner Program (YPP) to more creators with earlier access to fan funding and Shopping features. The expanded YouTube Partner Program is available to eligible creators in these countries/regions. The expansion is rolling out over the next month to eligible creators in AE, AU, BR, EG, ID, KE, KY, LT, LU, LV, MK, MP, MT, MY, NG, NL, NO, NZ, PF, PG, PH, PT, QA, RO, RS, SE, SG, SI, SK, SN, TC, TH, TR, UG, VI, VN, and ZA. If you're in one of the countries/regions above, check out this article to learn more about the changes to YPP.

If you're not in one of the countries/regions above, there are no changes to the YouTube Partner Program for you.

Check your eligibility for the expanded YouTube Partner Program. If you're not eligible yet, select **Get notified** in the Earn     area of YouTube Studio. We'll send you an email once we've rolled the expanded YPP program to you and you've reached the eligibility thresholds.

The YouTube Partner Program (YPP) gives creators greater access to YouTube resources and monetization features, and access to our Creator Support teams. It also allows revenue sharing from ads being served on your content. Learn more about the features, eligibility criteria, and application details in this article.



Want to apply to YPP, but need help building an audience first? Check out our tips to establish your fanbase, and our tips for the YouTube Partner Program.

## What you need to join

1. Follow the YouTube channel monetization policies.

CCDef.App. 92

   a. These are a collection of policies and guidelines that allow you to monetize on YouTube, and compliance with them is required when you accept a partner agreement with YouTube.

2. Live in a country/region where the YouTube Partner Program is available.
3. Have no active Community Guidelines strikes on your channel.
4. Make sure 2-Step Verification is turned on for your Google Account.
5. Have advanced features access on YouTube.
6. Have one active AdSense account that you'll link to your channel, or be ready to set one up in YouTube Studio if you don't already have one (only create a new AdSense account in YouTube Studio – learn more).

## How you can become eligible

Once you understand what you need to join, your channel can become eligible for YPP with either Shorts or long-form video. If you'd like us to notify you when you're eligible, click **Notify me when I'm eligible** in the Earn area of YouTube Studio. You'll get an email once you've met either of the below eligibility thresholds.

1. Get 1,000 subscribers with 4,000 valid public watch hours in the last 12 months, **or**
2. Get 1,000 subscribers with 10 million valid public Shorts views in the last 90 days.

# YouTube Partner Program Eligibility



Keep in mind that any public watch hours from Shorts views in the Shorts Feed won't count towards the 4,000 public watch hours threshold.

## More on eligibility thresholds

These thresholds help us make a more informed decision about whether your channel meets our policies and guidelines. Once you apply, your channel will go through a standard review process to see whether your channel meets our policies and guidelines. If it meets our policies and guidelines, we'll accept your channel into YPP. Keep in mind we continuously check channels in YPP to make sure they continue to meet our policies and guidelines over time.

## Where to apply

Once you have what you need and your channel is eligible to apply, sign up for YPP from either a desktop computer or a mobile device:

Computer   Android   iPhone & iPad

1. Sign in to **YouTube**
2. In the top right, click your profile picture  ›  **YouTube Studio**
3. In the left menu, click **Earn**
4. Select **Apply** to get started
5. Click **Start** to review and **Accept** Base terms
6. Click **Start** to set up an AdSense account, or link an existing active one

Once done, you'll see **In Progress** in the Get Reviewed step, which means we have your application!

## How we review your application

Once you accept YPP terms and link an active AdSense account, your channel will automatically be put in a review queue. Our automated systems and human reviewers will review your channel as a whole to make sure your channel follows all of our policies and guidelines. Check back in the **Earn** section of YouTube Studio anytime to see the status of your application.

We'll get back to you with a decision once your channel is reviewed (**typically in about 1 month**).

Keep in mind delays are possible due to higher-than-usual application volumes, system issues, or resource limitations. All YPP applications are serviced in the order they're received by us. Sometimes channels require multiple reviews, especially when several reviewers disagree on your channel's suitability for YPP. This may increase the time required for a decision to be made.

If your first application wasn't successful, don't worry - you can appeal the decision within 21 days or keep uploading original content and you'll be able to re-apply after a 30-day period. If this isn't your first application to be rejected, or you've previously re-applied, you can try again after a 90-day period. Our reviewers likely found that a significant portion of your channel doesn't currently follow our policies and guidelines, so be sure to review those against your channel's overall content and adjust your channel before re-applying. Learn more about steps you can take to strengthen your application for next time.

## Choose how to earn and get paid

Once you're in YPP, get started in YouTube Studio with Watch Page Ads, Shorts Feed Ads, Memberships, Supers, Shopping, and more. To turn on monetization features, you'll need to review and accept the relevant module terms. Learn more about the modules and their options here.

After choosing how you want to monetize, you'll be able to manage ad preferences, turn on monetization for your uploads, and more. Here's a list of FAQs that we get from creators who have just joined YPP.

### Getting paid

Visit our Help Center for an easier understanding of your earnings as a YouTube partner, learn all about AdSense (Google's program that lets creators in YPP get paid), and troubleshoot common payment issues.

### Stay active to keep making money

As the YouTube Partner Program continues to grow, it's important to maintain a healthy, active ecosystem of channels. To focus our support for creators who are active and engaged with the community, we may turn off monetization on channels that haven't uploaded a video or posted to the Community tab for **6 months or more**.

## FAQs around applying and more

What if I don't meet the program threshold?

What do "valid public watch hours" and "valid public Shorts views" mean?

If I meet the threshold, do I automatically get into YPP?

What happens if my counts drop below the threshold after I apply?

I'm no longer in YPP (or I was never in the program) and I'm seeing ads on my videos. Am I earning revenue from those ads?