UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>          Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>          Defendants.<br><hr><br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>          Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>          Plaintiff/Counterclaim Defendant. | No. <u>4:23-cv-00044-SHL-SBJ</u><br><br><br><br>**COUNTERCLAIMANTS' APPENDIX IN<br>RESISTANCE TO COUNTERCLAIM<br>DEFENDANT TAYVIN GALANAKIS'S<br>MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>**FILED UNDER SEAL**<br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.b.4.,

Counterclaimants Officer Nathan Winters and Lieutenant Christopher Wing (together,

"Counterclaimants") submit this Appendix in resistance to Plaintiff Tayvin Galanakis's Motion

for Summary Judgment, Doc. 44.

By:   <u>/s/ Nicholas F. Miller</u>
   Matthew S. Brick, AT0001081
   Erin M. Clanton, AT0002592
   Douglas A. Fulton, AT0002672
   Nicholas F. Miller, AT0015361
   **BRICK GENTRY, P.C.**
   6701 Westown Parkway, Suite 100
   West Des Moines, IA 50266

T: (515) 274-1450
F: (515) 274-1488
matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com
doug.fulton@brickgentrylaw.com
nick.miller@brickgentrylaw.com

Counsel for Defendants CITY OF
NEWTON, ROB BURDESS, NATHAN
WINTERS and CHRISTOPHER WING

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2024, a true copy of the COUNTERCLAIMANTS'
APPENDIX IN RESISTANCE TO COUNTERCLAIM DEFENDANT TAYVIN
GALANAKIS'S MOTION FOR SUMMARY JUDGMENT was electronically filed using the
Court's CM/ECF system, which sent notice to counsel of record, as follows:

Matthew M. Boles
Adam C. Witosky
GRIBBLE, BOLES, STEWART &
WITOSKY LAW
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
mboles@gbswlaw.com
awitosky@gbswlaw.com
Counsel for Plaintiff/Counterclaim Defendant


/s/     Nicholas F. Miller
        **Nicholas F. Miller, AT0015361**

# **TABLE OF CONTENTS**

I.      Declaration of Nicholas Miller ……………………..…………..Counterclaimants Appx. 1

      a.      Copy of YouTube Video………………………………...Counterclaimants Appx. 4

      b.      Screenshots of YouTube Video…………………...…Counterclaimants Appx. 5

II.     Declaration of Rob Burdess…………………………………….Counterclaimants Appx. 7

      a.      Officer Winters's Body Camera Recording…..………Counterclaimants Appx. 10

III.    Officer Winters's Iowa Incident Report………..…………...…Counterclaimants Appx. 11

IV.     Declaration of Nathan Winters…………………………….…...Counterclaimants Appx. 15

V.      Excerpts from Plaintiff Tayvin Galanakis's Deposition
      Transcript…………………………………………..…...…..Counterclaimants Appx. 18

      a.      Galanakis Deposition Exhibit 4…………..……....…Counterclaimants Appx. 59

      b.      Galanakis Deposition Exhibit 5…………….………..Counterclaimant Appx. 61

      c.      Galanakis Deposition Exhibit 6…………….…………Counterclaimant Appx. 62

      d.      Galanakis Deposition Exhibit 7………..…………….Counterclaimant Appx. 64

VI.     Excerpts from Dr. Lance Platt's Deposition Transcript………..Counterclaimants Appx. 68

VII.    Declaration of Matt Bruner……………..……………..……… Counterclaimants Appx. 73

VIII.   Plaintiff Tayvin Galanakis's Initial Disclosures………..……..Counterclaimants Appx. 90

IX.     Plaintiff/Counterclaim Defendant's
      Supplemental Initial Disclosures………………..…………Counterclaimants Appx. 94

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>　　　Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>　　　Defendants.<br><hr>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>　　　Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>　　　Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**DECLARATION OF NICHOLAS MILLER**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nicholas F. Miller, under 28 U.S.C. §1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.　　I am counsel of record in this action for Counterclaim Plaintiffs Nathan Winters and Christopher Wing.

2.　　Attached to my Declaration is a true and accurate copy of Galanakis Deposition Exhibit 3, which is the publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022.

3.　　The publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022, can be viewed at https://www.youtube.com/watch?v=so_bFYoIsow.  I last visited this URL address and viewed the

1

Counterclaimants Appx. 1

video on January 18, 2024.

4.      Attached to my Declaration are two true and accurate screenshots of the video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022, at https://www.youtube.com/watch?v=so_bFYoIsow, taken on January 18, 2024.

5.      Attached to my Declaration is a true and accurate copy of the Declaration of Rob Burdess.

6.      Attached to my Declaration is a true and accurate copy of the Declaration of Nathan Winters.

7.      Attached to my Declaration is a true and accurate copy of Officer Nathan Winters's Iowa Incident Report.

8.      Attached to my Declaration are true and accurate copies of excerpts from Plaintiff Tayvin Galanakis's deposition.

9.      Attached to my Declaration are true and accurate copies of Galanakis Deposition Exhibits 4, 5, 6, and 7.

10.     Attached to my Declaration are true and accurate copies of excerpts from Dr. Lance Platt's Deposition Transcript.

11.     Attached to my Declaration is a true and accurate copy of the Declaration of Matt Bruner.

12.     Attached to my Declaration is a true and accurate copy of Plaintiff's Initial Disclosures, served March 30, 2023.

13.     Attached to my Declaration is a true and accurate copy of Plaintiff/Counterclaim Defendant's Supplemental Initial Disclosures, served on October 19, 2023, less than one month

before the close of discovery on November 13, 2023.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2024.

/s/ Nicholas F. Miller

3

# PLACEHOLDER

This page of Counterclaimants' Appendix is a placeholder for the flash drive containing a true and accurate copy Galanakis Deposition Exhibit 3, which is the publicly viewable video that Plaintiff Tayvin Galanakis posted on YouTube under his personal YouTube account on September 9, 2022.

In connection with Counterclaimant Officer Nathan Winters's Motion for Partial Summary Judgment, Doc. 45, the flash drive has previously been mailed to the Court, c/o the Honorable Presiding Judge Locher, via First Class United States Mail.



**Police Wrongfully Arrest 19 Year Old During Traffic Stop**

Tayvin Galanakis
12.6K subscribers

2M views  1 year ago
To help support:
Go Fund Me - https://gofund.me/04c23294
Paypal: https://www.paypal.me/taytothejay?loc...   ...more

18,341 Comments        Sort by



**Police Wrongfully Arrest 19 Year Old During Traffic Stop**

Tayvin Galanakis
12.6K subscribers    Subscribe

👍 63K    👎    Share    Download    Clip    Save    •••

2M views  1 year ago
To help support:
Go Fund Me - https://gofund.me/04c23294
Paypal: https://www.paypal.me/taytothejay?loc  ....more

18,341 Comments    Sort by

Counterclaimants Appx. 6

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>    Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>    Defendants. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**DECLARATION OF ROB BURDESS** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>    Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>    Plaintiff/Counterclaim Defendant. | Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Rob Burdess, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I am the Chief of Police for the Defendant City of Newton, Iowa's Police Department.

2.      As the Chief of Police for the Newton Police Department, I am the lawful custodian of police records, including video recordings from Newton Police Department officers' body cameras.

3.      As the lawful custodian of video recordings from Newton Police Department officers' body cameras, I have personal knowledge of the Newton Police Department's procedures

1

Counterclaimants Appx. 7

for taking custody of and maintaining the video recordings from officer body cameras.

4.      Newton Police Officers are required to preserve any recording that contains evidence relevant to potential criminal, civil or administrative matters for a minimum of 90 days. Recorded evidence is automatically sent to a secure and encrypted cloud server through WiFi, LTE/PEU, and while a camera is docked for charging. The recorded evidence is preserved on the cloud server and is only accessible to select members of the Newton Police Department administration. The recorded evidence is a .mp4 format video file. A .mp4 is a standard file type that can play on most devices. The recorded evidence is saved until the cessation of the court proceedings or per the Newton Police Department's video evidence retention schedule.

5.      Consistent with the Newton Police Department's procedures for taking custody of and maintaining video recordings from officer body cameras, the Newton Police Department collected, kept, and maintained a true and accurate copy of the video recording from Defendant Officer Nathan Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis on August 28, 2022.

6.      A true and accurate redacted copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022, is published and publicly available on the City of Newton's website at https://www.newtongov.org/CivicMedia?CID=Public-Safety-6#allVideos.

7.      Also, included with my Declaration is a flash drive containing a true and accurate copy of the video recording from Officer Winters' body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Mr. Galanakis on August 28, 2022. This copy was produced in discovery by the attorneys representing the City of Newton, Nathan Winters, Christopher Wing, and myself in this action to Mr. Galanakis under the Bates Number CITY ID 00630.

2

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/
Rob Burdess

Counterclaimants Appx. 9

# PLACEHOLDER

This page of Counterclaimants' Appendix is a placeholder for the flash drive containing a true and accurate copy of the video recording from Officer Winters's body camera of Officer Winters's traffic stop, field sobriety testing, and arrest of Plaintiff Tayvin Galanakis.

In Connection with Defendants' Motion for Summary Judgment, Doc. 40, and Counterclaimant Officer Nathan Winters's Motion for Partial Summary Judgment, Doc. 45, the flash drive has already been mailed to the Court, c/o the Honorable Presiding Judge Locher, via First Class United States Mail.

Rev. 07/2019
Grid
Photos Yes No
Car # 842
Video # AXON

**IOWA INCIDENT REPORT**

**NEWTON POLICE DEPARTMENT**
101 W 4TH ST S
NEWTON, IA 50208
6417921547

Case Number
22-25845
Date/Time of Report
08/29/2022          02:13   Hrs
Status
02 - INACTIVE        U N

## SUMMARY

| County<br>JASPER - 50 | | Report Type<br>0 - INITIAL INCIDENT | | | | ORI Number<br>IA0500100 | | |
|---|---|---|---|---|---|---|---|---|

| Is Date and Time of<br>Incident Known?    Yes | Incident Date or<br>Lower Date Range   08/28/2022 | Upper Date<br>Range | | Incident Time or<br>Lower Time Range   00:13   Hrs. | Upper Time<br>Range | Hrs. |
|---|---|---|---|---|---|---|

| Day of Week Incident Occurred<br>SUNDAY | Exceptionally Cleared | Date Cleared Exceptionally |
|---|---|---|

### INCIDENT REPORTED BY

| Was Incident Reported<br>by a Victim?    NO | Reporting Victim's<br>Sequence No. | Name - Last<br>WINTERS | First<br>NATHAN | Middle | Suffix |
|---|---|---|---|---|---|

| Business Name (if Incident was Reported by a Business) | | Address<br>101 W 4TH ST S | |
|---|---|---|---|

| City<br>NEWTON | State<br>IA | Zip Code<br>50208 | Home Phone<br>(641) 791-0850 | Work Phone |
|---|---|---|---|---|

## OFFENSE 001

| Seq. No.<br>001 | Ordinance<br>GENERIC | Code Section<br>1 | UCR Offense Code<br>ALL OTHER OFFENSES - 90Z | 2100 |
|---|---|---|---|---|

| Charges/Offense<br>INFORMATION | Attempted/Completed<br>C - COMPLETED |
|---|---|

Type of Criminal Activity (up to 3)

| Type of Weapon/Force Involved (up to 3)<br>99 - NONE | Gang Information (up to 2)<br>N |
|---|---|

| No. of Premises Entered | Method of Entry<br>N - NO FORCE | Offender Suspected of Using (up to 3)<br>N - NOT APPLICABLE |
|---|---|---|

### LOCATION OF OFFENSE

| Location Type<br>13 - HIGHWAY/ROAD/ALLEY/STREET/SIDEWALK | X Coordinate<br>495512.125 | Y Coordinate<br>4616312 |
|---|---|---|

| Literal Description<br>SOUTH 2ND AVE WEST | | | |
|---|---|---|---|

| Address<br>200 BLK S 2ND AVE W | Address 2 | City<br>NEWTON | State<br>IA | Zip<br>50208 |
|---|---|---|---|---|

## VICTIM 001

| Type of Victim<br>S - SOCIETY/PUBLIC | Sequence No.<br>001 | Business/Organization/State/County/Municipality Name<br>CITY OF NEWTON | | | |
|---|---|---|---|---|---|

| Address<br>101 W 4TH ST S | City<br>NEWTON | State<br>IA | Zip Code<br>50208 | Phone<br>(641) 791-0850 |
|---|---|---|---|---|

### VICTIM CONNECTED TO UCR OFFENSE CODES

| UCR Offense Code 1<br>ALL OTHER OFFENSES - 90Z | UCR Offense Code 2 |
|---|---|
| UCR Offense Code 3 | UCR Offense Code 4 |
| UCR Offense Code 5 | UCR Offense Code 6 |
| UCR Offense Code 7 | UCR Offense Code 8 |
| UCR Offense Code 9 | UCR Offense Code 10 |

### ADDITIONAL OFFENSE CIRCUMSTANCE INFO

Aggravated Assault/Homicide Circumstances (up to 2)

Additional Justifiable Homicide Circumstances

## END OFFENSE 001

## OFFENDER 001

| Type of Offender | Sequence No. | NIBRS Offense Sequence Numbers | Lesser Offense Sequence Numbers |
|---|---|---|---|
| 02 - Suspect | 001 | 001 | |

| Name - Last | First | Middle | Suffix |
|---|---|---|---|
| GALANAKIS | TAYVIN | JOHN | |

| Alias(es) |
|---|
| |

| Address | City | State | Zip Code | Home Phone |
|---|---|---|---|---|
| 715 S 3RD AVAE W | NEWTON | IA | 50208 | |

| DOB Known? | DOB | Age or Lower Age Range | Upper Age Range | SSN | Resident Status |
|---|---|---|---|---|---|
| YES | 08/16/2003 | 19 | | 482336773 | R - RESIDENT |

| Driver's License - Number | State | Gender | Height | Weight | Eye Color | Hair Color |
|---|---|---|---|---|---|---|
| 216AN9626 | IA | MALE | 6' 00" | 120 LBS | BROWN - BRO | BROWN - BRO |

| Skin Tone | Race | Ethnicity |
|---|---|---|
| FAIR - FAR | W - WHITE | NOT OF HISPANIC ORIGIN - N |

| Scars/Marks/Tattoos | Offender Present When Officer Arrived? |
|---|---|
| NONE | YES |

| Type of Injury (up to 5) |
|---|
| N - NONE |

### EMPLOYMENT OR SCHOOL INFO

| Employer or School | Occupation |
|---|---|
| | |

| Address | City | State | Zip Code | Work Phone |
|---|---|---|---|---|
| | | | | |

### ARREST INFO

| Offender Arrested? | Arrest Trans. Booking No. | Type of Arrest | Arrest Date | Arrest Time |
|---|---|---|---|---|
| NO | | | | Hrs. |

| Associated Offense Sequence No. | Miranda By | Miranda Date | Miranda Time |
|---|---|---|---|
| | | | Hrs. |

| Arrestee Condition | Arrestee Armed With (up to 2) |
|---|---|
| | |

| Place of Birth | Multiple Arrestee Indicator | Additional Incidents Cleared |
|---|---|---|
| | | |

### JUVENILE INFO

| Parent/Guardian Contacted? | Name - Last | First | Middle | Suffix |
|---|---|---|---|---|
| | | | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Juvenile Arrestee Disposition |
|---|---|---|
| | | |

## END OFFENDER 001

## VEHICLE 001

| Vehicle Year | Make | Model | Style |
|---|---|---|---|
| 2015 | CHEVROLET - CHEV | IMPALA | 4D |

| License Plate # | State | Year | Type |
|---|---|---|---|
| BZB943 | IA | 2023 | |

| VIN | Color(s) |
|---|---|
| 2G1WB5E39F1104187 | WHITE - WHI |

| Associated Offense Sequence No. | Vehicle Impounded? | Impound Location | Impound Tag Number |
|---|---|---|---|
| 001 | NO | | |

### NARRATIVE

On 08/28/2022 at approximately 0013 hours, I, Officer Nathan Winters was on active patrol in my fully marked patrol car(843) when I was traveling east bound on S 2nd AVE W in Newton. I was traveling in approximately the 300 BLK when I noticed a white vehicle traveling west bound on S 2nd AVE W in Newton IA. I noticed that this vehicle had its bright lights on and did not dim their headlights while they were driving towards me. The driver of this vehicle turned south on W 2nd ST S in Newton IA.

I also turned south onto W 2nd ST S. I initiated my emergency lights on my patrol car to initiate a traffic stop on the vehicle. The traffic stop was conducted in approximately the 200 BLK of S 3rd AVE W in Newton IA. I radioed my location to Jasper County dispatchers. I exited my patrol car where I approached the driver on the driver side door where I made contact with a male who was identified as Tayvin Galanakis(08/16/2003) of Newton IA.

I advised Tayvin the reason for the stop. When I did so, he stated "yeah, I turn my brights on because I have a head light out". I advised him that he was not allowed to have his bright lights on in town and that he had to dim his head lights to oncoming traffic at approximately 500 feet (see IA code 321.415). While I was speaking with Tayvin, I noticed that he had watery and blood shot eyes. I noticed that there was a small odor of an alcoholic beverage that was coming from his person. I asked Tayvin where he was headed and he stated "I am headed home". I asked him Tayvin for his license, registration and proof of insurance. I asked tayvin where he was coming from and he stated "from a friends house". I asked him if he had anything to drink. I could not hear his answer so I asked him again and he did not answer this question.

Tayvin reached over to the glove box where he retrieved some paper work. While he did so, I noticed that he moved slowly. I also noticed that while I was speaking with him, I noticed that he was speaking with a slowed slurred speech. While Tayvin was trying to find his registration, he was moving slowly, he had the correct registration in his left hand and he continued to move slowly. Tayvin then gave me two registrations for the vehicle. Tayvin then sat in the driver seat without giving me the insurance. I then asked him again for his insurance.

While I was waiting for his insurance, Tayvin grabbed a debit card out of his billfold. He then placed this back and then gave me his license. Tayvin then grabbed the registration again and then looked at it and then placed it back into the glove box. At this point I had still not received the insurance card. Tayvin continued to sit in the drivers seat with no insurance. I had to remind him again for his insurance.

As I was waiting for Tayvin to give me his insurance card, I noticed that he continued to move slowly. Tayvin then provided me an insurance card that was

Counterclaimants Appx. 12    CITY ID.00002

expired from 2021. He then stated I have the email version. As Tayvin started to look in his phone for his insurance, he continued to move slowly thumbing through items on his phone where he finally was able to find the insurance. I advised Tayvin that I wanted him to exit his vehicle. I told him to take his gum out of his mouth and place it on his dash. He did so without incident.

I advised Tayvin that I wanted him to have a seat in my front passenger seat of my patrol car. Tayvin did so. I sat in the drivers seat. While tayvin and I sat in my patrol car, I asked him where he was coming from and he stated "uh, back there at Creightons". While he and I were speaking in my patrol car, I noticed a small scent of alcohol that was coming from his person. Tayvin then stated "I am home from college". I continued to speak with Tayvin and while I did so, I continued to notice that he was speaking with a slurred speech.

I asked Tayvin how much he had to drink tonight and he stated "none". I asked him why his eyes were watery and blood shot tayvin then stated "you wanna blow me really quick". I stated no. Tayvin then stated "I got contacts but we can do the little thing". Tayvin stated "that is funny, I have had nothing to drink".

I advised him that his movements in the car with him fumbling over the registrations, him moving slowly are concerns. Tayvin then stated "yep". He then stated "so what happens when nothing pops up, do you get in trouble". I advised him that I am doing my duties and that I would probably not get in trouble for doing my job. I advised Tayvin that I wanted to make sure that he was safe to drive. I advised him that I wanted him to exit my patrol car and go onto the sidewalk that was near by.

Tayvin and I then spoke on the sidewalk that was near us. I asked him if he had any contacts or glasses in and he stated "i took them out at a friends house". I asked him if he had any head injuries and he stated "no". I advised him that I wanted him to stand with his heels and his toes together and his arms down to his side. I demonstrated this position for him. I advised him that I was going to check his eyes. I told Tayvin that I wanted him to follow my finger with his eyes and his eyes only and to not move his head. I asked him if he had any questions and he stated "no". I asked him what color his eyes were and he stated hazel. I asked him if they ever changed colors and he stated "no". I began the test. I asked him if he could see my finger clearly and he stated "yessir". Tayvin had equal tracking and equal pupil size in both of his eyes in two(2) passes of his eyes.

During this test, tayvin did not have lack of smooth pursuit, he did not have distinct and sustained nystagmus at maximum deviation, and he did not have onset prior to 45 degrees. Tayvin did not show any clues of impairment in this test.

The next test was the walk and turn test. I asked Tayvin if he was comfortable in walking in the shoes that he had on and he stated "yes". I asked tayvin if he could see the crack that was in the parking lot that we were standing in. Tayvin stated "yes". I told him that I wanted him to take his left foot and place it on the crack, and take his right foot and place it in front of his left foot with the heel of his right foot touching the toe of his left foot. I demonstrated this position for him. I asked him if he had any questions about this test so far and he stated "no". I told him to stay in this position until I told him to begin the test.

I advised him that from the position that he was in, I wanted him to take nine(9) heel to toe steps, along the crack in the parking lot. I told him that each step would be heel to toe and to keep his arms down to his side during this test. I again asked him if he had any questions and he stated "no". I demonstrated three(3) steps for him. I advised him that when he gets to his ninth step to leave his front foot on the line and turn by taking a series of small step and then take nine(9) heel to toe steps back down that line. I demonstrated the turn and three(3) more steps for him.

I advised Tayvin that during this test to leave his arms down to his side, watch his steps, count his steps out loud, and once he has started walking do not stop until he has completed the test. I asked tayvin if he had any issues with his ankles, knees, hips of his back and he stated "just my right ankle". I asked him if this was going to prevent him from walking and he stated "sometimes, but I will be able to do this". I asked him if his ankle is hurting now and he again stated "no". I advised him that if he did not have any questions that he could begin the test.

During his first nine(9) steps, Tayvin stepped off line for one(1) clue, he took 13 steps for one(1) clue, and once he got to his 13th step, he stopped walking for one(1) clue. He then made an improper turn by pivoting on both of his feet instead of taking a series of small steps for one(1) clue. IN his second nine(9) steps, he missed heel to toe for one(1) clue, and he took fifteen(15) steps back down the line. During this test, Tayvin stated "Common man, this is to easy, lets do the breath now". I asked Tayvin how many steps I told him to take and he stated "like 8 or 9". tayvin then stated "I thought you were going to tell me when to turn". I advised him that I was not going to do that and that he was to count his steps out loud. During this test, Tayvin showed five(5) clues of impairment in this test. It should be noted that two(2) out of the eight(8) indicate a failing score.

The next test was the one leg stand test. I advised him that I wanted him to stand with his heels and his toes together and his arms down to his side.Tayvin then stated "God, you a rookie bro and asked me if this was my first year". Tayvin then stated "How many false accusations you got"? I advised him that I believed "zero". He then stated "this is about to be your first one".

I advised Tayvin that when I say begin, I wanted him to raise either his left or his right foot and raise is approximately six(6) inches off of the ground and keep it parallel to the ground. I demonstrated this test for him. I advised him that during this test, I wanted him to keep his arms down to his side, watch his raised foot and count out loud in the following manner "1001,10021003,1004" so on and so fourth until I told him to stop. I asked him if he had any questions and he stated repeat the directions. I did so. I then asked him if he had any questions and he stated "no". During this test, he was swaying from side to side for one(1) clue, and he kept his right arm away from his body for balance for one(1) clue. Tayvin did not count out loud like he was told to do so. During this test, Tayvin showed two(2) clues of impairment in this test. It should be noted that two(2) out of the four(40 clues indicate a failing score.

I advised Tayvin that I had three(3) more tests for him. I advised him thatI was again going to check his eyes. I advised him that I was going to make a circle around the outside of his face and I was going to come in towards the bridge of his nose but I was not going to touch his nose. I advised him that I wanted him to watch my finger with his eyes and his eyes only and to not move his head. I asked him if he had any questions and he stated "no". In this test, I am checking for lack of convergence. In two(2) circular passes of his face, Tayvin showed lack of convergence in both of his eyes. Lack of convergence is present in a persons eyes when their cannot converge their eyes towards the middle of his nose. This is an indication of impairment.

The next test was the modified romberg test. I advised Tayvin that I when I was done explaining the test, I wanted him to close his eyes, tilt his head back and estimate the passing of 30 seconds. I advised him that when he is done estimating 30 seconds, to open his eyes, tilt his forward and then say done. I asked him if he had any questions and he stated no. He began the test. During this test, he was swaying, he had eye lid tremors, and in 34 seconds he estimated 30 seconds. The eye lid tremors and the swaying from side to side are all indicators of impairment.

The next test was the finger to nose test. I advised him that I wanted him to stand with his heels and his toes together and make a fist and rotate his palms where they were facing me. I told him to extend both of his index fingers on both of his hands. I advised him that I was going to give him a series of commands. I told him either the command would be either left or right. I told him that whichever hand I say, I wanted him to bring that hand up and touch the tip of his nose with the tip of his finger and then bring his hand immediately back down. I advised him that I did not want him touching his nose with the pad of his finger. I told him that during this test he was going to have his eyes closed and his head titled back. I asked him if he had any questions and he stated no.

The following is the order of the test.

1. Left: He used his left hand and touched his right nostril with his knuckle.
2. Right: Tayvin used his right hand and touched the middle of his cheek.

CITY ID 00003
Counterclaim Appx. 13

4. Right: Tayvin used his right hand and touched under neath of his nose.
5. Right: Tayvin used his right hand and touched his right nostril.
6. Left: Tayvin used his left hand and touched the pad of his finger to the tip of his nose.

During this test, Tayvin was having a hard time keeping his head tilted back. He had eye lid tremors, and he never touched the tip of his nose with the tip of his finger. All of these are indicators of impairment.

I offered Tayvin a Preliminary Breath Test(PBT). I advised him that I was going to estimate if and how much alcohol was on his breath. He submitted to a PBT which indicated his Brac to be .000%. I then read him his MIRANDA warnings where I asked Tayvin when was the last time he smoked weed, he started to look around, there was a very long pause, then he stated "I do not remember". Through my training and experience, I know persons who look away and around to be "looking" for an answer. I then asked him if he smoked tonight and he stated "no".

I advised Tayvin that I believed that he was under the influence of something. I asked him if he wanted to talk to another officer and he stated "hell yeah, get him over here'. I asked him if he wanted to do drug influence evaluation. Tayvin asked what that was and I explained it to him briefly and he then stated "yeah lets do it'.

I called Officer Shinkle who was on duty at this time. I advised him of this and he stated he would be available. See his report.

I returned to speak with Tayvin where I advised him that we would have to go to the PD to do this evaluation. He then stated "right now"? I advised him yes. He then stated "I dont want to do that right now". I asked him why and he stated "because you have me out in this damn rain". I then advised him that we would go to the PD where it was dry and Tayvin stated "well, I do not want to do that right now". He then stated "No, I want to go home, you waisted my time". I advised him to turn around and place his hands behind his back. I advised him that he was being placed under arrest for OWI. Tayvin was placed in a set of hinged handcuffs behind his back where they were double locked. I searched his person for any contraband and none was found. Tayvin was placed in the back seat of my patrol car where he was placed in the prisoner compartment. I placed the seat belt on his person. I locked and secured his car. I had my BWC on during this.

Tayvin was transported to the Newton PD where he spoke with Officer Shinkle. See his report. At 0048 hours, I read him the implied consent advisory where I requested a sample of his urine for chemical testing. I advised him that he did not have to answer this right away. I then read him his 8094.20 advisory where I advised him that he could call anyone for any reason.

Tayvin was not charged, and it was determined that he was not under the influence.

He was released without a charge.

At this time, this ends my involvement in this case and this report is for informational use only.

# OFFICER

Complainant/Reporting Party Signature

| Reporting Officer | Badge Number | Supervisor | | | Badge Number |
|---|---|---|---|---|---|
| WINTERS, NATHAN | 639 | | | | |

| Video Taken? (Check All That Apply) | | Evidence Seized? | Photos Taken? |
|---|---|---|---|
| 01 - IN CAR, 02 - OFFICE, 03 - BOTH IN CAR AND OFFICE, 04 - BODY CAMERA, 05 - BOTH IN CAR AND BODY CAMERA | | NO | NO |

| Incident Assigned To |
|---|
| PATROL |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff, | No. 4:23-cv-00044-SHL-SBJ |
| v. | |
| CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>        Defendants. | **DECLARATION OF OFFICER NATHAN<br>WINTERS** |
| NATHAN WINTERS and CHRISTOPHER<br>WING,<br>        Defendants/Counterclaim Plaintiffs, | |
| v. | |
| TAYVIN GALANAKIS,<br>        Plaintiff/Counterclaim Defendant. | Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Nathan Winters, under 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.    I am a police officer with the City of Newton, Iowa's Police Department.

2.    On August 28, 2022, while I was on duty in my capacity as a Newton Police Department officer, I stopped Plaintiff Tayvin Galanakis's vehicle because he was illegally operating the vehicle with its bright lights on.

3.    After stopping Mr. Galanakis, I field sobriety tested him and arrested him for operating his vehicle while under the influence of a drug.

1

Counterclaimants Appx. 15

3.     Mr. Galanakis was ultimately not charged with any offense, including operating his vehicle while under the influence of a drug.

4.     After August 28, 2022, Mr. Galanakis publicly made several false and defamatory statements about me, one of which is that I was convicted of domestic abuse. In fact, a video in which Galanakis makes this false and defamatory statement is still published on YouTube at https://www.youtube.com/watch?v=so_bFYoIsow.

5.     I have never been charged or convicted of domestic abuse.

6.     I have never physically abused any person with whom I've had a romantic relationship, including the person that was my girlfriend between April 2020 and July 2021.



Counterclaimants Appx. 16



Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:    January 17, 2024

/s/
Nathan Winters

3

Counterclaimants Appx. 17

```
 1               UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF IOWA
 2                     CENTRAL DIVISION

 3
     - - - - - - - - - - - - - - - - -
 4   TAYVIN GALANAKIS,                 :
                                       :    ORIGINAL
 5        Plaintiff,                    :
     vs.                               : Case No.
 6                                     : 4:23-cv-000044
                                       :
 7   CITY OF NEWTON, IOWA, ROB         :
     BURDESS, NATHAN WINTERS,          :
 8   CHRISTOPHER WING, individually:
     and in their official            :
 9   capacities with the Newton       :
     Police Department,                :
10                                     :
          Defendants.                  :
11   - - - - - - - - - - - - - - - - -
     NATHAN WINTERS and               :
12   CHRISTOPHER WING,                 :
                                       :
13        Counterclaim Plaintiffs,:
                                       :
14   vs.                               :
                                       :
15   TAYVIN GALANAKIS,                 :
                                       :
16        Counterclaim Defendant. :
     - - - - - - - - - - - - - - - - -
17

18     VIDEO-RECORDED DEPOSITION OF TAYVIN GALANAKIS,

19   taken by the Defendants/Counterclaim Plaintiffs

20   before Jessi C. Lass, Certified Shorthand Reporter

21   of the State of Iowa, at 6701 Westown Parkway, Suite

22   100, Des Moines, Iowa, commencing at 2:14 p.m.,

23   Friday, November 10, 2023.

24

25       JESSI C. LASS - CERTIFIED SHORTHAND REPORTER
```

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff/Counterclaim Defendant:

 3         CHRISTOPHER C. STEWART, ESQ.
           GRIBBLE, BOLES, STEWART & WITOSKY LAW FIRM
 4         2015 Grand Avenue, Suite 200
           Des Moines, Iowa 50312
 5

 6    For the Defendants/Counterclaim Plaintiffs:

 7         NICHOLAS F. MILLER, ESQ.
           BRICK GENTRY PC
 8         6701 Westown Parkway, Suite 100
           West Des Moines, Iowa 50266
 9

10    Videographer:
           AMY COOPER
11         FIDELITY VIDEO SERVICES, INC.

12    Also present:
           NATHAN WINTERS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Counterclaimants Appx. 19

1          T A B L E   O F   C O N T E N T S

2  WITNESS:  TAYVIN GALANAKIS                              PAGE

3  Examination By Mr. Miller .........................5

4  Examination By Mr. Stewart ......................120

5

6  EXHIBITS                                    PAGE FIRST
                                               REFERENCED
7  1   - Body cam video (City ID 00630) ..............20

8  2   - NAIA drug-testing policy manual ............56

9  3   - Video (City ID 00627) ......................65

10 4   - 8/29/22 Facebook post by Galanakis .........75

11 5   - Facebook comment string ....................87

12 6   - 11/1/22 Facebook post by Galanakis .........91

13 7   - GoFundMe page for Galanakis ................96

14 8   - William Penn University "Drug Education ...114
       and Testing Program Policy"
15
   CERTIFICATE OF REPORTER...........................123
16

17  Reporter's Note:  The original exhibits were
    forwarded to Mr. Miller.
18
    (ph) indicates a phonetic spelling.
19  [sic] indicates the text is as stated.
    Quoted text is as stated by the speaker.
20

21

22

23

24

25

Counterclaimants Appx. 20

1    about Wing.

2         Q.    Have you ever stated that Officer Nathan

3    Winters has been convicted of a crime?

4         A.    Yes.

5         Q.    When?

6         A.    I don't know when, but I know I said it.

7         Q.    In what manner?

8         A.    YouTube and Facebook and I think TikTok.

9         Q.    YouTube, Facebook, TikTok.  Anything else?

10        A.    Not that I can remember.

11        Q.    Did you verbalize it to anybody outside of

12   YouTube, Facebook, and TikTok?

13        A.    I don't remember.

14        Q.    Have you ever stated that Officer Chris

15   Wing has been convicted of a crime?

16        A.    I don't know if I ever said he -- was he

17   convicted of a crime.

18        Q.    Why can't you remember that?

19        A.    Because this mess was a year ago, I

20   believe -- more than a year ago.  So it's touching

21   my memory a little bit less often now.

22        Q.    It's a pretty important statement to make

23   about somebody.

24        A.    Yeah.  I remember making it about Winters.

25        Q.    Do you have a YouTube.com account?

```
 1        A.    Yeah.
 2        Q.    What's your user name under which you post
 3   YouTube content?
 4        A.    Tayvin Galanakis.
 5        Q.    Have you posted any videos or other
 6   content to YouTube regarding your interactions with
 7   Newton police officers, including Officers Winters
 8   and Wing on August 28th, 2022?
 9        A.    Just YouTube?
10        Q.    Just YouTube.
11        A.    I don't know.  Right now I have one video
12   up.
13        Q.    Have you posted any other videos?
14        A.    On YouTube?
15        Q.    Yep.
16        A.    Yeah.  But not about the case or what
17   happened.
18        Q.    Mr. Galanakis, on my computer I'm showing
19   you a thumbnail of the very beginning of a video,
20   which is identified by Bates number City ID 00627
21   and which is Galanakis Deposition Exhibit 3.
22              You have the ability to press play so you
23   can -- can you press play on this video, and watch
24   as much of it as you need to to confirm that you've
25   seen it before.
```

```
1          A.    Yeah, I can do --

2          Q.    Okay.

3          A.    -- I can do that for you.

4          Q.    I'm handing you my computer so you can do

5     that.  Press play.  And when you're satisfied that

6     you've seen that video before, you can just pause

7     it, and we'll continue.

8          A.    So you just want me to say if I've seen

9     the video before?

10         Q.    Yes.

11               (Mr. Winters left the deposition.)

12         A.    Yeah, I saw that.

13               MR. MILLER:  All right.  I'm taking my

14    computer back from Mr. Galanakis.

15         Q.    (Mr. Miller)  Who created that video?

16         A.    I did.

17         Q.    Did you post this video, which is

18    Galanakis Deposition Exhibit 3, to YouTube.com under

19    the title "Police wrongfully arrest 19-year-old

20    during traffic stop"?

21         A.    I believe so.

22         Q.    The public could view that posting;

23    correct?

24         A.    Yes.

25         Q.    All right.  I'm going to show you a paused
```

```
 1    portion of Galanakis Deposition Exhibit 3 at

 2    38 minutes, 27 seconds.

 3              It's 38 minutes, 28 seconds.

 4              Okay.  I'm handing you my computer,

 5    Mr. Galanakis, with that paused portion.  Do you see

 6    that?

 7         A.   Yes.

 8         Q.   Do you see the yellow writing?

 9         A.   Yes.

10         Q.   Is that your writing?

11         A.   That -- that is my writing, yes.

12         Q.   What does it say?

13         A.   Says "Nathan Winters of the Newton Police

14    Department convicted of domestic abuse after beating

15    up his ex-girlfriend."

16              MR. MILLER:  Okay.  I'm taking my computer

17    back.

18         Q.   (Mr. Miller)  Did you write that?

19         A.   I did write that.

20         Q.   Why?

21         A.   Well, I wrote that because he had some

22    history of abuse.

23         Q.   How do you know that?

24         A.   I talked to his ex-girlfriend.

25         Q.   Who's his ex-girlfriend?
```

```
 1          A.   I can't remember her name.  It was back
 2     then.
 3          Q.   You don't know who his ex-girlfriend is?
 4          A.   Never met her.  Just talked to her about
 5     the situation.
 6          Q.   If you've never met her, then how did you
 7     talk to her?
 8          A.   Well, that video went viral, and she found
 9     my accounts and messaged me, and we talked.
10          Q.   Okay.  What'd she tell you?
11          A.   I can't remember what she -- exactly what
12     she told me.  So I'm not going to state it.
13          Q.   At the time you posted Galanakis
14     Deposition Exhibit 3 to YouTube.com, did you know
15     whether Officer Winters had been convicted of a
16     crime?
17          A.   Well, there was this thing on Iowa Courts,
18     and it said "relief of abuse," I think it said, and
19     when I made that statement of him being convicted,
20     that's what I thought it was.  I thought it was a
21     conviction of abuse, but it was really just a relief
22     of a restraining order.
23          Q.   So at the time you posted Galanakis
24     Deposition Exhibit 3 to YouTube.com, did you or did
25     you not know whether Officer Winters was convicted
```

1   of a crime?

2        A.   At the time I was -- I fully was aware

3   that I -- that he was convicted of domestic abuse,

4   but that turned out to not be the case, and it was

5   something way more simpler than a conviction.

6        Q.   You said you did some research on Iowa

7   Courts Online?

8        A.   (Nods head.)

9             MR. STEWART:  Is that a yes?

10            THE WITNESS:  Yes.  Sorry.  I apologize,

11   guys.

12            MR. MILLER:  That's okay.  I forget

13   sometimes too.  So I appreciate it.

14        Q.   (Mr. Miller)  What did you find on Iowa

15   Courts Online that led you to believe Officer

16   Winters was convicted of a crime?

17        A.   Well, when you search his name up on

18   there, what made me believe that he was -- he did

19   some sort of abuse was the relief.  It said -- I

20   don't know exactly what it said, but it said "relief

21   of abuse" and some lines like that.

22        Q.   Did you read the whole thing?

23        A.   I can't remember if I did, but you have to

24   pay for extra information.  So the full thing wasn't

25   accessible unless you pay for it.

Counterclaimants Appx. 26

```
 1        Q.   So you didn't read the entire document
 2   that you were basing your statement to the public,
 3   "Officer Winters was convicted of domestic abuse";
 4   is that right?
 5        A.   No.  Because I was basing it off my
 6   assumptions off the ex-girlfriend that came and told
 7   me what happened.
 8        Q.   Did she say he was convicted of a crime?
 9        A.   She did not say that.
10        Q.   Why did you say that?
11        A.   Well, I thought if you were to beat up
12   your ex-girlfriend, that would be considered
13   domestic abuse.  And, like I said, it was much
14   simpler than conviction, and I was wrong about
15   conviction, but there is a history of abuse there.
16        Q.   How do you know?
17        A.   The ex-girlfriend.
18        Q.   You're just -- it was purely based on her
19   statements to you?
20        A.   Well, and that Iowa Courts Online, that
21   thing that said "relief of abuse."
22        Q.   Well, the document that you reviewed on
23   Iowa Courts Online, you said you didn't review the
24   whole thing; right?
25        A.   Just connected the dots.
```

1        Q.   Did you review the whole thing or not?

2        A.   I didn't pay for the whole thing.

3        Q.   So you didn't review the whole thing?

4        A.   No.

5        Q.   So when -- in Galanakis Deposition

6    Exhibit 3, which you posted to YouTube.com, when you

7    said Officer Winters was convicted of domestic

8    abuse, you were basing that on what someone, who you

9    don't know, told you online and based on an

10   incomplete document that you found on Iowa Courts

11   Online.  Am I understanding that correctly?

12       A.   Yes.

13       Q.   I'm going to show you another paused

14   portion of Galanakis Deposition Exhibit 3, which is

15   that video you posted to YouTube.com.  It's at

16   38 minutes and 31 seconds.

17            All right, Mr. Galanakis.  I'm handing you

18   my computer so you can review that paused portion of

19   Galanakis Deposition Exhibit 3.  Is there yellow

20   writing on that?

21       A.   Yes.

22       Q.   Is that your writing?

23       A.   Yes, that's my writing.

24       Q.   What's it say?

25       A.   It said, "Even after Nathan beat" -- you

1    understanding of the law before you accuse somebody

2    of committing a crime -- or having been convicted of

3    a crime?

4        A.    Yeah, yeah.

5        Q.    Do you have a Facebook account?

6        A.    Yep.

7        Q.    What's the user name under which you post

8    content to Facebook?

9        A.    Tay G. -- Tay Galanakis.  Yeah, Tay

10   Galanakis.

11       Q.    Spell that.

12       A.    T-a-y and then G-a-l-a-n-a-k-i-s.

13       Q.    Have you posted content on Facebook about

14   your interactions with Newton police on August 28th,

15   2022?

16       A.    Yep.

17            MR. MILLER:  Can we re-mark this as

18   Exhibit 4.

19            I'm showing what's been marked as

20   Galanakis Deposition Exhibit 4 to counsel for

21   Mr. Galanakis.

22       Q.    (Mr. Miller)  All right, Mr. Galanakis.

23   Your counsel has just handed you what's been marked

24   as Galanakis Deposition Exhibit 4.  Do you know what

25   that is?

```
1          A.   This is the initial post I posted about
2     the case.
3          Q.   How do you know that's what it is?
4          A.   I first came to Facebook to talk about it
5     before I had the footage.
6          Q.   On the fourth line down in --
7          A.   This is going to be hard.
8          Q.   -- Galanakis Deposition Exhibit 4, which
9     is your Facebook post that we're talking about, it
10    says, quote, "I don't even like to refer to him as
11    Officer Winters.  This guy is on the slow side of
12    the spectrum."  End quote.  Did I read that right?
13         A.   Yep.
14         Q.   Why'd you post that?
15         A.   I just feel like he's kind of -- he's
16    slow.  I feel like he's slow.
17         Q.   Was this a public post?
18         A.   Yes.
19         Q.   What do you mean by "This guy is on the
20    slow side of the spectrum"?
21         A.   He's just not all there.  And there's
22    nothing against people that are not all there.  They
23    just shouldn't be in that profession, holding a gun.
24         Q.   What do you mean, "he's not all there"?
25         A.   I mean, if you just interact with him when
```

```
 1   he's doing his job, like I did, you can kind of just
 2   tell.
 3        Q.   What can you tell?
 4        A.   Well, there's many reasons.  I mean, I
 5   could go on and on, but I could start with this one
 6   right here.
 7        Q.   Go ahead.
 8        A.   Well, he asked me why I was shaking so
 9   much, and I said, "Hey, man, I'm nervous."
10             And then he told me that there's no reason
11   to be nervous.  He didn't exactly say that, but he
12   told me he wears shorts when it's 30 below and that
13   he could handle the cold.  And that's the way he
14   said it.  So hearing that from a police officer is
15   just breathtaking to me --
16        Q.   So that comment from Officer Winters leads
17   you to believe that he's, in your words, slow and
18   not all there?
19        A.   Along with what -- a lot of other things
20   he said.  I can tell you another one.
21        Q.   What?
22        A.   He said he got a lot of concussions from
23   playing football.  And usually what happens when you
24   get a lot of concussions, it can -- it triggers
25   polyps in your brain.
```

```
 1        Q.   How do you know that?
 2        A.   You see people with CTE and they're not
 3   themselves anymore or -- even with a concussion --
 4   I've had one, and I didn't feel like I could perform
 5   the same when I was under the concussion.
 6        Q.   You're not a doctor, are you?
 7        A.   No.
 8        Q.   You've had one year of college?
 9        A.   Yep.
10        Q.   What's CTE?
11        A.   CTE is when you get hit in the head too
12   many times.
13        Q.   What's it stand for?
14        A.   CTE -- I don't remember.
15        Q.   Well, you just told me that he could have
16   CTE, but you don't know what it is?
17        A.   I know what it does to you.
18        Q.   What's it do?
19        A.   It can do -- it can do a lot of nasty
20   things to your health.
21        Q.   Like what?
22        A.   I mean, you see people who start talking
23   to themselves.  And we just saw a guy -- for
24   example, I would say Antonio Brown is a guy who
25   definitely has CTE.  You can just tell he has CTE.
```

1        Q.    I'm sorry.  Who's Antonio Brown?

2        A.    Antonio Brown, he used to play for the

3    Pittsburgh Steelers.

4        Q.    What's the Pittsburgh Steelers?

5        A.    They play football under the organization

6    of the NFL.

7        Q.    So if I understand your testimony

8    correctly, Officer Winters mentioned to you during

9    your interaction with him that he'd had a concussion

10   before?

11       A.    Multiple.

12       Q.    And according to you, that was the basis

13   for -- in your words, to post online that he's slow?

14       A.    It was one of the many bases.

15       Q.    What else?

16       A.    I couldn't tell you off the top of my

17   head, but go back and watch that 40-minute video, I

18   could tell you a lot of things of what made me

19   assume that.

20       Q.    When you made that post that Officer

21   Winters is, quote, "on the slow side of the

22   spectrum," what's the "spectrum"?

23       A.    The spectrum?  It's more of a phrase than

24   me explaining what the spectrum is.  I don't have a

25   general knowledge of what the spectrum is.

```
1        Q.   Then why would you say it?

2        A.   I feel like I got my point across by

3   saying he was slow.

4        Q.   Well, what point were you trying to make

5   using a word that you don't understand?

6        A.   He's slow.

7        Q.   What did you mean by "spectrum"?

8        A.   There's certain ends of the spectrum.

9        Q.   What's the spectrum?

10       A.   The spectrum?  The spectrum is -- it's

11  really hard for me to explain.

12       Q.   Do you know what it is?

13       A.   Yeah.  I have a general --

14       Q.   What is it?

15       A.   -- understanding of what it is, but I

16  just -- I don't know the full understanding.  So I

17  couldn't tell you the whole thing without being

18  slightly incorrect about it.  So I would need to see

19  the definition of it.

20       Q.   So you don't know what the spectrum is?

21       A.   I wouldn't say I don't know.

22       Q.   Well, then tell me what it is.

23       A.   The spectrum?  I'll tell you exactly what

24  it is.  So you got one side of the spectrum where --

25  I don't want to offend anybody by explaining it this
```

1   way, but this is what I mean.  So you got people who

2   can fully function on one side of the spectrum, and

3   on the other side of the spectrum, you got people a

4   little off and slow, which is okay, which is okay.

5       Q.   Thanks.

6       A.   I wasn't meaning to offend anybody that's

7   on the slow side of the spectrum.  I was just saying

8   that for somebody to be on the slow side of the

9   spectrum and have a gun in their pocket and not do

10  their job right, that's not okay.  So that's why I

11  said he's on the slow side of the spectrum.

12      Q.   But how do you measure that?

13           MR. STEWART:  I think this has been asked

14  and answered four or five times.  He just gave you

15  four or five examples of how he measured it and what

16  he said his rationale was for Officer Winters being

17  slower on the spectrum or slow on the spectrum or

18  low on the spectrum.  Whatever it is, I think it's

19  been asked and answered.

20           MR. MILLER:  Is that your objection?

21           MR. STEWART:  That's my objection, yes.

22      Q.   (Mr. Miller)  Okay.  You can answer.

23      A.   Can you ask me another question?

24           MR. MILLER:  Can you repeat the question.

25           (The pending question was read by the

Counterclaimants Appx. 35

```
 1   reporter.)
 2        A.   How do I measure?  I don't know.
 3        Q.   (Mr. Miller)  How do you know whether
 4   Officer Winters is, quote, "on the slow side of the
 5   spectrum"?
 6        A.   I mean, it's just a figure of speech.  It
 7   wasn't really that deep.  It wasn't like I had --
 8   wasn't giving a blood test or anything.
 9        Q.   Were you trying to insult him?
10        A.   Yes.  That was an insult, yes.
11        Q.   On August 29th, 2022, you also made a
12   public post on Facebook that, quote, "Officer
13   Winters is not fit mentally for the job and
14   physically," end quote; correct?
15        A.   Correct.
16        Q.   Why'd you make that statement?
17        A.   Viewing his body was for the physical
18   aspect.  And then just off what he was saying to me
19   for the mental aspect.
20        Q.   Are you familiar with any of Officer
21   Winters' physical testing for the Newton Police
22   Department?
23        A.   No.
24        Q.   Then why would you criticize his physical
25   fitness?
```

1          A.    Just a figure of speech.

2          Q.    So you actually don't know whether he's

3    physically fit for being a Newton Police Department

4    officer?

5          A.    Not as his boss would know.

6          Q.    Do you?

7          A.    I would say no.

8          Q.    Then why would you say that?

9          A.    Why would I say no?

10         Q.    Why would you say that he's not physically

11   fit for his job if you don't know?

12         A.    I mean, his body -- he's absolutely

13   like -- I mean, his buttons were gasping for air.

14   You see how these are relaxed right here?  His were,

15   like, looking like they were about to break.

16               So when I'm looking at that, I'm like,

17   this guy is definitely not physically fit to be a

18   police officer, because what if someone was taking

19   off on foot?

20         Q.    So you looked at Officer Winters' side,

21   judged it, and made the conclusion that he's not

22   physically fit for his job?

23         A.    100 percent.

24         Q.    Why'd you make the statement that Winters

25   is not fit mentally for the job?

1      A.   I'm a very observant person.  So after

2  everything he said, I was kind of taking it all in,

3  and I came to conclusion that if I was his boss, I

4  would say he's not mentally fit for this job.

5      Q.   Why?

6      A.   Well, first and foremost, if I had an

7  employee who asked somebody why are they shaking so

8  much and to argue back and say, "Well, I wear shorts

9  when it's 30 below," I would right then and there

10  not hire the guy, because he just said a statement

11  like that.

12      Q.   Is there any other reason why you think

13  he's not mentally fit?

14      A.   The concussions could play a part.  It

15  depends whether he was being truthful or not about

16  how much concussions he had.  He didn't tell me an

17  exact number, but he said many concussions.  And

18  that would definitely -- that could play a part in

19  someone's mental health, concussions, really.

20      Q.   But do you know whether it did or not for

21  him?

22      A.   No.

23      Q.   So what else is your statement that he's

24  not mentally fit for the job based on?

25      A.   I think he's not mentally fit at all.

1      Q.    Why?

2      A.    He seems like -- like, if someone wanted

3   to be a cop their whole life and they couldn't get

4   the job and the police department felt like -- they

5   felt bad and just hired him instead of actually

6   hiring based off how good is he, how good is he in

7   the field, is this guy -- is he trustworthy, is he

8   going to be fair to our citizens.

9      Q.    Is there anything else that your statement

10  that Officer Winters is not mentally fit for the job

11  based on?

12     A.    There's many things I could say, but I

13  don't remember --

14     Q.    Go ahead.

15     A.    -- them all.  We'd have to watch some of

16  that video back together, and I could point out a

17  lot of moments where I don't think he's mentally fit

18  for the job.

19     Q.    Like what?

20     A.    We'll have to watch the video.

21     Q.    You don't remember?

22     A.    No.

23     Q.    Do you know if Officer Winters did any

24  mental health evaluations or any cognitive testing

25  to get his job?

Counterclaimants Appx. 39

```
 1        A.    I assume so.

 2        Q.    Do you know?

 3        A.    I never asked him.

 4        Q.    Do you know?

 5        A.    I don't know.

 6        Q.    Did you know at the time you said he was

 7   not mentally fit for his job?

 8        A.    I didn't know.

 9        Q.    So if he had done some mental health

10   testing or some cognitive testing and passed it all,

11   how would that impact your statement?

12        A.    I would -- I would still feel like he's

13   not mentally fit.

14        Q.    You know better than the test?

15        A.    The test is a lot different from real

16   life.

17        Q.    Okay.

18        A.    As soon as you put that badge on, you have

19   a different set of ego, other than when you're in a

20   room with superiors who are testing you.

21              MR. MILLER:  Could we re-mark this as

22   Exhibit 5?

23              I'm going to take this back from you,

24   Tayvin.

25              Okay.  I'm handing what's just been marked
```

1    as Galanakis Deposition Exhibit 5 to Mr. Galanakis'

2    counsel.

3         Q.    (Mr. Miller)  And your counsel's just

4    handed you Galanakis Deposition Exhibit 5.  Do you

5    know what that is?

6         A.    Yeah.

7         Q.    What is it?

8         A.    Facebook thread, I believe.  Yeah, it's a

9    Facebook thread.

10        Q.    How do you know what -- how do you know

11   that's what it is?

12        A.    There's an F in the top left corner.

13        Q.    Is that the Facebook logo?

14        A.    Yep.  Yes.

15        Q.    Galanakis Deposition Exhibit 5 shows a

16   Facebook post under the user name Tay, T-a-y,

17   Galanakis.  Is that your user name?

18        A.    Yes, sir.

19        Q.    The post says, quote, "His boss needs to

20   make a statement.  He's the one allowing this guy to

21   walk around with a gun after beating up a woman,"

22   end quote.  Did I read that right?

23        A.    Yes.

24        Q.    Did you make that post?

25        A.    Yes.

```
 1        Q.    Was the post public?

 2        A.    Yes.

 3        Q.    Why'd you make that post?

 4        A.    Because Winters beat his girlfriend --

 5        Q.    How do you know that?

 6        A.    -- ex-girlfriend.

 7              The ex-girlfriend came to me.

 8        Q.    She came to you, or did she --

 9        A.    And -- sorry, sorry.  I can't keep doing

10    that.  My bad.

11        Q.    She came to you, or did she message you

12    online?

13        A.    She messaged me online.

14        Q.    And that's what your Facebook post

15    statement here in Galanakis Deposition Exhibit 5 is

16    based on?

17        A.    And again, the relief, the Iowa Courts

18    Online.

19        Q.    The document that you --

20        A.    Yeah.

21        Q.    -- didn't completely review?

22        A.    Yes.

23        Q.    So it was based on those two things?

24        A.    Yes.

25              THE WITNESS:  Sorry.  Got to burp.  Excuse
```

1  me.

2      Q.   (Mr. Miller)  Did you know whether the

3  statements in that post were truthful?

4      A.   Yeah, he beat up his girlfriend.

5      Q.   How do you know that?

6      A.   His ex-girlfriend told me.

7      Q.   That's the only thing it's based on?

8      A.   And the Iowa Courts Online.

9      Q.   Okay.  When you say, "He's the one

10  allowing this guy to walk around with a gun," who's

11  "he"?

12      A.   The top part's cut off; so I can't see who

13  I was talking about.

14      Q.   Let me ask you this:  The post says "his

15  boss."

16      A.   Okay.

17      Q.   Who's his boss?

18      A.   I was either talking about Wing, a

19  lieutenant, or the chief.

20      Q.   You don't know who you were talking about?

21      A.   No.

22      Q.   Well, if you don't know who you're talking

23  about --

24      A.   I don't remember.

25      Q.   Is your testimony that you don't know who

1    you were talking about or you don't remember who you

2    were talking about?

3        A.   I don't remember.  Because in this

4    Exhibit 5, the top part of the message is cut off.

5        Q.   Okay.  But you did make the statement,

6    "His boss needs to make a statement.  He's the one

7    allowing this guy to walk around with a gun after

8    beating up a woman"; right?

9        A.   Yes.

10       Q.   To make a statement like that, wouldn't

11   you want to know who you're talking about?

12       A.   At the time I knew who I was talking

13   about.

14       Q.   Who was it?

15       A.   I can't remember who, though.

16       Q.   Okay.

17       A.   Because he has multiple bosses.

18       Q.   How do you know that?

19       A.   There's ranks.

20       Q.   How do you know that?

21       A.   How do I know there's ranks?  I watch -- I

22   watch a lot of "Cops."  Lieutenant and then there's

23   chief.  There's probably more ranks than that.  I'm

24   not -- I can't remember.

25            MR. MILLER:  Let's take another 10-minute

1    break.

2            THE VIDEOGRAPHER:  Off the record at

3    4:25 p.m.

4            (A brief recess was taken.)

5            THE VIDEOGRAPHER:  On the record at

6    4:34 p.m.

7            MR. MILLER:  Okay.  I'm showing counsel

8    for Mr. Galanakis what's been marked as Galanakis

9    Deposition Exhibit 6.

10           Mr. Galanakis' counsel has just handed

11   Galanakis Deposition Exhibit 6 to Mr. Galanakis.

12       Q.   (Mr. Miller)  Mr. Galanakis, do you know

13   what that is?

14       A.   This is the shirt shop I created.

15       Q.   Is that a Facebook post?  Or explain --

16       A.   Yeah.

17       Q.   -- what it is.

18       A.   The post is on Facebook, linking the shop

19   I created.

20       Q.   What's the shop you created?

21       A.   T-shirt and hoodie shop with a couple of

22   my quotes and Winters' quotes.

23       Q.   So basically what you're telling me, then,

24   is Galanakis Deposition Exhibit 6 is a Facebook post

25   containing a link to that online shop where you're

1    offering merchandise?

2        A.   Yes.

3        Q.   Did you in fact create any merchandise

4    after your August 28th, 2022, interaction with

5    Newton police?

6        A.   I had one made for myself.  That was it.

7        Q.   What pieces of merchandise did you create?

8        A.   I created two shirts -- it wasn't from

9    this shop; it was from a local shop in Newton --

10   that said, "Arrest me I'm sober" and "I wear shorts

11   below -- I wear shorts when it's 30 below.

12   Congratulations."  Those are the two shirts I made.

13       Q.   You designed those hoodies and T-shirts?

14       A.   Yep.

15       Q.   And had some vendor actually create them?

16       A.   Yes.

17       Q.   Any other pieces of merchandise that you

18   had created other than those two kinds of hoodies

19   and T-shirts?

20       A.   Not that I can remember.

21       Q.   Why'd you create these pieces of

22   merchandise?

23       A.   At first I created them because I thought

24   it was a good idea.  And then they never sold.  So

25   it was a bad idea.

1      Q.    Why'd you think it was a good idea?

2      A.    There was funny parts in the video I

3  quoted, and I thought people would love it.  And I

4  didn't -- I didn't meet the threshold for this for

5  them to sell.  So never sold any.

6      Q.    Explain to me what you mean by you never

7  met the threshold.

8      A.    So I had a deal with this vendor.  I

9  forgot what the numbers exactly were, but I'll give

10 you an example.  If I sell 50 shirts in a month, he

11 would continue having these up, and if I didn't meet

12 that threshold, he wouldn't sell them anymore.  And

13 I never reached that threshold he put for me.  So I

14 never got to sell any of these shirts, except my

15 custom-made ones I made for myself.

16     Q.    So you have those pieces of merchandise

17 that you can wear?

18     A.    Yeah, two shirts.

19     Q.    Does anyone else?

20     A.    No.  Unless they made one for themselves.

21     Q.    So if I understand right, you designed

22 these hoodies and T-shirts, and the vendor that

23 you're talking about would offer them on their

24 platform, but would take them down if sufficient

25 sales weren't happening; right?

Counterclaimants Appx. 47

```
 1        A.    Yes.

 2        Q.    Did any sales happen?

 3        A.    No, not that I remember.

 4        Q.    How do you know whether any sales

 5   happened?  Would the vendor let you know?

 6        A.    He was supposed to, but then we never got

 7   in contact afterwards.

 8        Q.    If somebody wanted to purchase any pieces

 9   of that merchandise, could they do it?

10        A.    As of right now?

11        Q.    Yes.

12        A.    I don't know.  I don't know if the

13   website's still up.

14        Q.    What website?

15        A.    ShopTTTJ.com.

16        Q.    Did anyone at ShopTTTJ.com let you know

17   that they weren't going to sell the merchandise you

18   designed anymore?

19        A.    They never let me know at all.

20        Q.    So when you say they took them down, what

21   do you mean by that?

22        A.    I'm assuming this website's no longer up,

23   because I never reached my threshold of sales.

24   That's why.

25        Q.    Outside of the website you just mentioned,
```

*SUSAN FRYE COURT REPORTING | 515-284-1972*
*300 Walnut Street, #36, Des Moines, IA 50309-2224*.

Counterclaimants Appx. 48

1  did you attempt to sell these pieces of merchandise

2  through any other channels?

3      A.   I don't know if I did or not.

4      Q.   Did you attempt to sell them by word of

5  mouth to your friends/family?

6      A.   No.

7      Q.   Did you market this merchandise on social

8  media, like Facebook, TikTok, Twitter, anything like

9  that?

10     A.   Yes.  I know Facebook and TikTok, I did.

11 I'm not sure about Twitter.

12     Q.   So you marketed the merchandise, but still

13 no one bought any?

14     A.   I don't know if anybody bought any.  I

15 would have to check the store, but I think the store

16 is down.

17     Q.   But it's possible that people bought

18 pieces of this merchandise; right?

19     A.   It is possible, correct.

20     Q.   Did you receive any income from any

21 purchases that you know of?

22     A.   No.  And that's why I'm saying I don't

23 know if this website's still up, because I received

24 nothing.

25     Q.   Did you ever attempt to independently sell

1    this merchandise outside -- like, not through that

2    website?

3         A.   My family would ask about it, and I would

4    tell them, yeah, I'll get them a shirt made, but I

5    never made that happen.

6         Q.   Okay.  We're done with that.  You can keep

7    looking at it if you want, but we're --

8         A.   That's all right.

9         Q.   Okay.

10        A.   I want to look at this one, actually.

11        Q.   Sure.

12        A.   Okay.  Yeah, we're good.

13        Q.   What is GoFundMe?

14        A.   GoFundMe is the donation service I used.

15        Q.   How have you ever used GoFundMe, if at

16   all?

17        A.   So I used GoFundMe when this all first

18   went down when I uploaded the video, and a big

19   YouTuber is the one who advertised it for me.  His

20   name was Lackluster.  And that's how it all started.

21             MR. MILLER:  All right.  I'm showing your

22   counsel what's been marked as Galanakis Deposition

23   Exhibit 7.

24             THE WITNESS:  Thank you.

25        Q.   (Mr. Miller)  All right.  Your counsel's

1    just handed you Galanakis Deposition Exhibit 7.  Do

2    you know what that is?

3        A.   This is the home page of the GoFundMe, I'm

4    pretty sure.

5        Q.   The GoFundMe that you were just telling me

6    about?

7        A.   Yes.  That is correct.

8        Q.   I think you testified just a minute ago

9    that you created a GoFundMe fundraiser on

10   GoFundMe.com; is that right?

11       A.   Yes.

12       Q.   Is Galanakis Deposition Exhibit 7, which

13   you're looking at right now, a copy of the home

14   page of your GoFundMe fundraiser?

15       A.   Yes.

16       Q.   Why'd you create that GoFundMe fundraiser?

17       A.   I created it before I had any attorneys

18   signed.  And I've never been in a lawsuit before.

19   So I assumed I was going to owe some money, and

20   that's why I created that, the GoFundMe, to raise

21   funds for attorney fees.

22       Q.   When you say you didn't have an attorney

23   signed, what do you mean by that?

24       A.   I wasn't represented by anybody at the

25   time.

1        Q.    You weren't represented by a lawyer?

2        A.    Eventually I was.

3        Q.    But at the time you weren't?

4        A.    I believe so.

5        Q.    So the purpose of the GoFundMe fundraiser

6    was to raise money so that you could pay for

7    attorney fees?

8        A.    Yes, sir.

9        Q.    As of today how much have you raised?

10       A.    I'm not sure.  I shut down the GoFundMe.

11   It was months ago.  I don't know what it closed at.

12   This is --

13       Q.    Yeah, let's see.  On the first page there,

14   it says two thousand dollar -- $2,768 raised.  Is

15   that --

16       A.    Is this the most recent one you got?

17       Q.    Well, that's what's reflected on page 1 of

18   Galanakis Deposition Exhibit 7.  Is that true?  Did

19   you raise that amount?

20       A.    Yes.

21       Q.    Did you raise more than that amount?

22       A.    I don't know.  I have to go check the

23   GoFundMe and see if I did or not.

24       Q.    Where's the money that you raised held?

25       A.    It was held in the GoFundMe till I

1    transferred it to my bank account.

2         Q.   So is all the money that was raised

3    through your GoFundMe fundraiser in your personal

4    bank account now?

5         A.   No.

6         Q.   Where is it?

7         A.   Well, when I was in college, I had

8    previous lawyers before I was with my current ones,

9    and they emailed me that they were going to need

10   $1,500 to do -- I don't know what they were going to

11   do with, but they said I couldn't use my GoFundMe.

12             So from there on, then, it just stayed in

13   the GoFundMe account until I became with new

14   lawyers.  Got new lawyers, and there's no fees at

15   all.

16             So while I was in college, I spent that

17   fundraising money on basic necessities while I was

18   going to school.

19        Q.   Did you spend all of it?

20        A.   No.

21        Q.   How much is left?

22        A.   A thousand.

23        Q.   And that's in your personal bank account?

24        A.   Yes.

25        Q.   Did you ever let any of the donors or

1  contributors to your GoFundMe fundraiser know that

2  you didn't use the money for what it was intended?

3      A.    No.

4      Q.    Why not?

5      A.    Well, I never thought to until the outcome

6  of this case.

7      Q.    Do you think you should let them know?

8      A.    Yes, I should let them know, and I should

9  pay everybody back.  I'm going to.

10     Q.    I think you said you didn't know exactly,

11 but do you know roughly how much was ultimately

12 raised through your GoFundMe fundraiser?

13     A.    I couldn't tell you, because I don't know

14 if this screenshot is recent or not.  So I couldn't

15 tell you the full amount I raised.

16     Q.    If you look down in the bottom left-hand

17 corner of Galanakis Deposition Exhibit 7.

18     A.    Number 7?

19     Q.    I think it will have a date stamp on

20 there.

21     A.    February 2023.  So this is pretty old.

22 I'm not sure exactly when I closed the account, but

23 closing an account means that no one can donate

24 money anymore.  And I did that when I knew that I

25 wasn't going to need any additional money for

1    attorney fees.

2        Q.   I think -- correct me if I'm wrong, but

3    did you say you closed the GoFundMe fundraiser

4    account a few months ago?

5        A.   It might have been longer than that.

6        Q.   Might have been longer --

7        A.   I couldn't tell you the exact date.

8        Q.   Was it this year, in 2023, that you closed

9    it?

10       A.   Just let me take a look at this paper, and

11   I can let you know that.

12            Well, this was in February, and there's

13   still a "donate now" button; so it had to be in 2023

14   where I closed it.

15       Q.   Is it possible that there's -- that you

16   raised more money than what's reflected on page 1 of

17   the exhibit that you're holding right now?

18       A.   Yeah.

19       Q.   Based on your recollection, would you say

20   you raised more than that amount?

21       A.   Yes.

22       Q.   A lot more?

23       A.   On my YouTube, yes.

24       Q.   So how much money -- hang on.  So just

25   through the GoFundMe fundraiser --

```
 1         A.    Oh, just the --

 2         Q.    -- fundraiser account.

 3         A.    Sorry.

 4         Q.    Yeah.  So how much -- I think it's roughly

 5    $2,700, which is reflected there, through the

 6    GoFundMe exclusively.  Did you raise much more than

 7    that 2,700?

 8         A.    I don't know if I did or not.

 9         Q.    Do you think you raised 5,000 through

10    GoFundMe?

11         A.    5,000, no.

12         Q.    No, it wasn't quite that much?

13         A.    No.

14         Q.    Do you think it was 3,000?  If you

15    remember.

16         A.    I don't remember.

17         Q.    Okay.  Now, you did mention that you also

18    raised some money through YouTube.  Did I hear that

19    right?

20         A.    Yes, yes.

21         Q.    Explain that.

22         A.    YouTube is not donations.  It is ad

23    revenue from watch time.

24         Q.    And you received ad revenue?

25         A.    Yes.
```

```
 1        Q.   Explain how that works.

 2        A.   So when you hit a certain amount on

 3   YouTube, like of views, they give you monetization,

 4   and then you can advertise your video, and you get

 5   paid for the video.

 6        Q.   How much?

 7        A.   I don't know exactly how much I got paid.

 8        Q.   Why not?

 9        A.   It's a number I'll have to check to give

10   you an honest statement.

11        Q.   Was it hundreds of dollars?

12        A.   It was more than hundreds of dollars.

13        Q.   Was it thousands of dollars?

14        A.   I would say it was a couple thousand.

15        Q.   A couple -- so would it be more or less

16   than $2,000, do you think?

17        A.   I couldn't give you the exact answer.

18   Otherwise I would tell you.

19        Q.   But it's more than a thousand?

20        A.   Yeah.

21        Q.   You said it was a couple thousand?

22        A.   Yes.  Yes, sir.

23        Q.   And that's just ad revenue given the

24   number of views of the videos that you posted on

25   YouTube.com?
```

```
 1        A.    Yes.
 2        Q.    Where does the check for the ad revenues
 3   come from?
 4        A.    Google.
 5        Q.    It's written by Google?
 6        A.    Yes.
 7        Q.    Outside of YouTube.com ad revenues, did
 8   you raise or receive any other money?
 9        A.    I don't know.  Family.  They would give me
10   money for college, but that wasn't exactly for
11   attorney fees.
12        Q.    I should clarify my question.  Outside of
13   the GoFundMe fundraiser and the YouTube.com ad
14   revenue, did anyone else give you money for the
15   purpose of paying attorney fees?
16        A.    I don't know.
17        Q.    Did any family members give you money for
18   attorney fees?
19        A.    If they did, it was through GoFundMe.
20        Q.    Did any friends give you money for
21   attorney fees?
22        A.    No, not friends.  They're not that nice.
23        Q.    Did strangers give you money for attorney
24   fees?
25        A.    Yes.
```



**Tay Galanakis**
August 29, 2022 · 🌐

Got pulled over Saturday night for having my high beams on in town, which is understandable. Shortly after I got falsely ARRESTED. Nathan Winters of the Newton Police Department, IA decided to assume and guess I was drinking and driving based off of me having a hard time finding my insurance.I don't even want to refer to him as officer winters, this guy is on the slow side of the spectrum. So let's get started. Nathan Winters doesn't act very human like so it was hard to get my point across. After handing over my registration and all that fun stuff, Nathan decided to have me get out my car and go to his. Before this he already asked me if I've been drinking and I told him no. So I'm in his vehicle trying to have a normal conversation with this guy while he's going through my records and stuff like that and everytime he replied it sounded very scripted. He sounded like a little kid who was roll playing a cop during recess😅 I'm thinking in my head no way this guy pass training. Anyways shortly after I was talking to him he interrupts me and goes so how much have you had to drink tonight and I go "nothing I already told you that." Then he continued to harass me about how sure he was that I was drunk. Then I go you can blow me right now and it will say 0, then he made a sexual joke about what I said knowing I was talking about the breathalyzer. At this point I pull my phone and record a 10 second clip of me saying "officer winter is going to look real dumb for accusing me of being drunk once this is all said and done." So he brings me outside and I'm looking at his supervisor like dude is your boy a rookie at this 😅 you have to do something about his behavior. Officer wing (the supervisor) goes "he's just doing his job, he knows more than me." Anyways he has me do all the field test even after I told him I have a bad ankle from football. Pass all the test except one because I took 3 extra steps to take the pressure off my right ankle so I could turn around easier. At this point it's pouring outside still. You guys are going to love this part. Nathan Winters told me to lift my head up and to close my eyes once he said to. So I'm looking up staring at the rain and then eventually I close my eyes when he starts the test. Once I open my eyes he goes "why are you eyes watering." I burst out in laughter and look at him and ask him if he's really that stupid. So I get to the point where I'm about to blow, I'm smiling having a grand time, confidence is at an all time high because I know I'm about to prove 2 corrupted cops wrong. As he prepares the breathalyzer I look at officer Wing and go "you ready for this." Then I turn back to Winters and go "how many false accusations you got under you belt" he goes 0. Then I reply with "congratulations this is about to be your first." As you can guess from the ease of my story telling I blow straight 0s. Then guess what this fool reverts to. "When's the last time you smoked marijuana" I go I don't smoke sir" then he goes so you hit a vape pen with weed in it" I'm like dude I just told you no. At this point he just wanted to find something because it hurt his ego that he was wrong about me being drunk. Being a cop shouldn't be an ego game but obviously that's how Nathan Winters treats his profession. Wait I'm not done yet. Nathan Winters asks me if I would like to do a drug evaluation, I told him no I don't need to, I don't wanna go waste 3 hours at the department for something I already know the truth about. I ask him how are you going to tell me that I'm drunk and that I smell like alcohol to telling me I'm on drugs once you get proven wrong. Shortly after I declined going to the police department he reads off my rights and states "you are under arrest for driving while impaired." At this point I'm thinking I'm being pranked, because there's no absolute way I just got arrested based off assumptions. I was respectful during the arrest, I'm looking at the super visor asking him are you serious right now there's no actual way you guys are aloud to do this. I turn back Winters and ask him, are you ready to go 0-2. No reply from winters. We get to the police department, winters takes the cuffs off me and we are sitting in this tiny room. Winters is fully confident I'm impaired because what else could a 19 year old be doing driving at midnight am I right!?? I'm talking to winter's explaining to him you just can't arrest someone based on a guess. Then I ask this geek if I could use my inhaler (I got asthma and the humidity sets it off) he had my inhaler right on his desk because he removed it from my pocket upon arrest. He tells me NO. Yeah you read that right. So then I give him a lesson about the consequences he could receive if he doesn't let me use it, then he finally gives it me. Anyways the drug specialist comes in (very nice guy and understanding) goes through all the same field test with me inside where it's not pouring. Checks my pupils, checks my eye coordination. Takes me to a dark room and blue lights in my mouth under, under my nose, on my hands, on my clothes and concludes his investigation. He stated that I'm perfectly fine and he has 0 reason to think I'm on drugs 😠 if Nathan winters just acted human instead of acting like a scripted robot cop he'd understand the words coming from my mouth. I made the supervisor on duty come in and talk too. I told him he needs to do better. Wing is honestly speechless at the point and look like he just saw a ghost. I dismiss wing from what now is my office and tell him to bring in Nathan Winters. Nathan is absolutely stunned. Comes inside the room and says hey how is it going buddy like everything is fine 😅😅



EXHIBIT
4
11-10-23    JCC

CITY ID 00587

Counterclaimants Appx. 59



wing from what now is my office and tell him to bring in Nathan Winters. Nathan is absolutely stunned. Comes inside the room and says hey how is it going buddy like everything is fine 😂😂 🙈. So I give this guy a lecture on how to do his job correctly, and make him apologize at the end of our conversation. His last words to me were "I'm sorry I guess" I just left it at that because I honestly feel like he's kinda slow in the head. That concludes my story I was set free after 3 hours wasted of my night. Wing and Winters performed horribly that night and that's just something the chief should not let slide. I'm not asking for winters to get fired, as he seems to be slightly mental and that would be just unfair to fire him based on something he can't help.

👍❤️😮 874                                                                730 comments  544 shares

        👍 Like                    💬 Comment                    ↗ Share

View previous comments                                              All comments ▼

**Quandale Dingle**
here he is

Like   Reply   22w                                                    👍❤️ 3

**Cory Stapes**
"I dismiss Wing from what is now my office" 😈😈😈
Like   Reply   22w                        😆❤️ 7

**Lisa Marie Dickerson**
**Chris Clausen**
Like   Reply   22w

**Danielle Johnson**
The same thing happened to my man in june by the same cops anything I can do to help get them fired let me know
Like   Reply   22w

**Jennifer Bruns**
THIS WAS SO AWESOME TO READ!! I no longer live in Newton(thk god). I'm A old grannie but I've
hated fact z was born & raised & raised my kids in Newton. I go there only if I need to. Watch that town go 2 H.E.L.L..
Like   Reply   22w

**Jennifer Lynne Hubbs**
**RJ Miller For Iowa House**
Like   Reply   22w

**RJ Miller For Des Moines Public School Board** · Follow
Pigs
Like   Reply   22w

**Nicole Lynn**

CITY ID 00588

Counterclaimants Appx. 60

    

EXHIBIT

D

Like   Reply   21w

 **Tay Galanakis**
**Steve Armstrong** his boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a women

Like   Reply   21w

 **Steve Armstrong**
Yes his boss should get charges too

Like   Reply   21w

 View 2 more replies

 **Mic Kelso**
This is such bullshit! Uniformed officers are supposed to serve and protect not harass and accuse!!!

Like   Reply   21w

 **Tammi Regnier Schwickerath**
Newton PD is a joke! A cop who will remain nameless since proceedings are still happening, called my hubby and then asked him to come down to the station to make a formal statement. After getting his haircut, he stopped by. That cop read him his rights... **See more**

Like   Reply   21w

 **Lonnie Appleby**
**Tammi Regnier Schwickerath** did that to me too!

Like   Reply   20w

 **Donnie Sutton**
Let me say we'll to the group of people that has been harassed and charged with things the NPD dream up to charge for their ego. But first off now let me warn you to watch out because now they won't leave you alone as others that have proven them wrong... **See more**

Like   Reply   21w

 **Alex Miller**
He also whipped a u turn multiple times in the middle of first Ave just to pull me over for my third brake light being out in the middle of the night.

Like   Reply   21w

 **Tay Galanakis**
**Alex Miller** what a rookie

Like   Reply   21w



EXHIBIT

5

11-10-23  Jce



Document title: Facebook

Capture URL: https://www.facebook.com/story.php?story_fbid=pfbid0aaRXYaY5Bm97RWqzedx8kmhnMRiSRsmJGzyckLqNWQoujX6b6OBmxLBi1aIVFaESI&amp;id=1...

Capture timestamp (UTC): Fri, 10 Feb 2023 03:52:18 GMT

CITY ID 00518

Counterclaimants Appx. 62

Page 1 of 2



👍 Like          💬 Comment          ➦ Share

All comments ▾

**Brandie Lynn Stanton**
I'm gonna need one of these 🤣
Like   Reply   14w

**Eric Askme**
Hell yeah bro I want one
Like   Reply   14w

**Alainah Galanakis**
yes i'm def buying one
Like   Reply   14w

**Amit Patel**
Lol this is money!!!! 😂
Like   Reply   12w

**Dalton Folder**
This 👏 👏 👏 when he said that dumb ass shit 😂
Like   Reply   12w

**Jack Barfell**
Hahaaa!! CONGRATULATIONS. Nathan Winters is 100% the dude who wears shorts and sandals in the winter.
Like   Reply   12w

**Rick Sanchez**
I love it
Like   Reply   12w

**Brown Leroy**
Where's bumper stickers for the whole town !! This is gold !! 😂
Like   Reply   12w

**Bobby Knite**
WELL PLAYED YOUNG MAN👏👏👏👏😀😀😀😀
Like   Reply   10w

Write a comment…          😀 😊 📷 📹 🎁
Press Enter to post.

Document title: Facebook
Capture URL: https://www.facebook.com/story.php?story_fbid=pfbid0aaRXYaY5Bm97RWqzedx8kmhnMRiSRsmJGzvckLqNWQoujX6b6QBmxLPi1atVFaESl&amp;id=1…
Capture timestamp (UTC): Fri, 10 Feb 2023 03:52:18 GMT

CITY ID 00519

Counterclaimants AppX. 63
Page 2 of 2



Search     How it works ⌄     Start a GoFundMe          gofundme          Sign in     Share     Donate

# Donate to help support attorney fees



Driver Blows 0.00% - Officers Still Lock Him Up

Watch on ▶ YouTube



**$2,768** raised of $2,500 goal

92 donations

**Share**

**Donate now**

Anonymous
$50 • 3 d

Carol Temperley
$20 • 12 d

Dante DeCicco
$20 • 13 d

Anonymous
$100 • 23 d

Anonymous
$18 • 23 d

See all          ☆ See top donations

Tayvin Galanakis is organizing this fundraiser.

Hi, my name is Tayvin Galanakis. I was recently falsely arrested by the newton police department and I'm looking to proceed in legal action.

## Updates (2)

**January 7, 2023**  by Tayvin Galanakis, Organizer

Lawsuit went through today. We will get a court date as soon as possible. It's showtime!

See older updates



Donate          Share

## Organizer

Tayvin Galanakis
Organizer
Newton, IA

Contact

## Words of support (14)

Please donate to share words of support.



EXHIBIT
7
11-10-23          JCC
PENGAD 800-631-6989

CITY ID 00297

Counterclaimants Appx. 64

Contact

## Words of support (14)

Please donate to share words of support.



$2,768 raised of $2,500 goal

92 donations

**Share**

**Donate now**

 **jason cardenas**
$10 • 26 d

The police should be held accountable for breaking the law by unlawfully
arresting people.

**David Toth**
$10 • 1 mo

All these tyrants need to hang.

**Richard Podnar**
$10 • 1 mo

the officer's remark on the radio, "he's kind of a smartass" infuriates me. It takes
one to know one, Officer. We'll see who's a smartass once justice is meted out.

**ELMER SANDOVAL**
$50 • 2 mos

to show support to innocent people, and expose corrupted cops. and stop them
from violating our constitutional rights.

**Jacob Miyazaki**
$50 • 2 mos

this BS needs to stop. so sorry this happened to you homie

**Kristian N Olsen**
$10 • 2 mos

There are considerably more than 'just a few bad apples' within law enforcement
in America. If gone unchecked, we all lose our civil rights and keeps the country
from becoming a police state.

**Go get Him**
$19 • 2 mos

Accountability is everything. Kudos for standing up for yourself!!

**Scott I Pileckas**
$5 • 3 mos

Praying for you buddy!

**Samuel Pope**
$10 • 3 mos

Legend

Anonymous
$50 • 3 d

Carol Temperley
$20 • 12 d

Dante DeCicco
$20 • 13 d

Anonymous
$100 • 23 d

Anonymous
$18 • 23 d

**See all**    ⭐ **See top donations**

Document title: Fundraiser by Tayvin Galanakis : Donate to help support attorney fees
Capture URL: https://www.gofundme.com/f/donate-to-support-attorney-fees?member=21961501&amp;sharetype=teams&amp;utm_campaign=p_na+share-...
Capture timestamp (UTC): Fri, 10 Feb 2023 15:14:13 GMT

CITY ID 00298

Counterclaimants Appx. 65

Praying for you buddy!

**Samuel Pope**
$10 • 3 mos

Legend

**Tilden Smith**
$25 • 3 mos

Neanderthal, women beating, lying people should not be allowed to be in law enforcement to be a menace to society.

**RYAN MCDONNELL**
$20 • 3 mos

Absolutely disgusting that cops no longer protect and serve. Now they just fill up quotas and flex whatever tiny iota of authority they have in their life, fucking pathetic.

**Michael Sullivan**
$5 • 4 mos

This kid gets hassled by city cops while crime is out of control and bleeding out of the cities into the suburbs. Best of luck to you

**Mitchell Sadler**
$10 • 4 mos

BACON FOR DINNER (●◡●)

**Jeff Crouse**
$20 • 5 mos

Burn this pig down

Created September 10, 2022 • 🏷 Other

🚩 Report fundraiser



$2,768 raised of $2,500 goal

92 donations

[ Share ]

[ Donate now ]

Anonymous
$50 • 3 d

Carol Temperley
$20 • 12 d

Dante DeCicco
$20 • 13 d

Anonymous
$100 • 23 d

Anonymous
$18 • 23 d

[ See all ]    [ ♡ See top donations ]

---

### Your easy, powerful, and trusted home for help

 **Easy**
Donate quickly and easily.

 **Powerful**
Send help right to the people and causes you care about.

 **Trusted**
Your donation is protected by the GoFundMe Giving Guarantee.

CITY ID 00299

Document title: Fundraiser by Tayvin Galanakis : Donate to help support attorney fees
Capture URL: https://www.gofundme.com/f/donate-to-support-attorney-fees?member=21961501&amp;sharetype=teams&amp;utm_campaign=p_na+share-...
Capture timestamp (UTC): Fri, 10 Feb 2023 15:14:13 GMT

Counterclaimants Appx. 66

Page 3 of 4



92 donations

**Share**

**Donate now**

Anonymous
$50 • 3 d

Carol Temperley
$20 • 12 d

Dante DeCicco
$20 • 13 d

Anonymous
$100 • 23 d

Anonymous
$18 • 23 d

See all    ⭐ See top donations

Mitchell Sadler
$10 • 4 mos
BACON FOR DINNER (●‿●)

Jeff Crouse
$20 • 5 mos
Burn this pig down

Created September 10, 2022  •  🏷 Other

🚩 Report fundraiser

## Your easy, powerful, and trusted home for help

 **Easy**
Donate quickly and easily.

 **Powerful**
Send help right to the people and causes you care about.

 **Trusted**
Your donation is protected by the GoFundMe Giving Guarantee.

gofundme

**Fundraise for**
Medical
Emergency
Memorial
Education
Nonprofit
Support COVID-19 fundraisers
Crisis Relief

**Learn more**
How GoFundMe Works
Why GoFundMe
Common questions
Success stories
Supported countries
Charity fundraising
Pricing

**Resources**
Help center
Blog
GoFundMe Stories
Press center
Careers
About
More resources ⌄

🌐 United States · English

f ▶ 🐦 📷 •• 🎙

© 2010-2023 GoFundMe    Terms    Privacy    Do Not Sell My Personal Information    Legal    Accessibility Statement

 

Document title: Fundraiser by Tayvin Galanakis : Donate to help support attorney fees
Capture URL: https://www.gofundme.com/f/donate-to-support-attorney-fees?member=21961501&amp;sharetype=teams&amp;utm_campaign=p_na+share-...
Capture timestamp (UTC): Fri, 10 Feb 2023 15:14:13 GMT

CITY ID 00300

Counterclaimants Appx. 67

Page 4 of 4

**LANCE PLATT - November 03, 2023**

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
                        CENTRAL DIVISION

TAYVIN GALANAKIS,                     §
      Plaintiff,                      §
                                      §
V.                                    §  CASE NO. 4:23-cv-00044
                                      §
CITY OF NEWTON, IOWA, ROB BURDESS,    §
NATHAN WINTERS, CHRISTOPHER WING,     §
INDIVIDUALLY AND IN THEIR             §
OFFICIAL CAPACITIES WITH THE          §
NEWTON POLICE DEPARTMENT,             §
      Defendants.                     §
                                      §
  ------------------------------      §
                                      §
NATHAN WINTERS AND CHRISTOPHER        §
WING,                                 §
      Defendants/Counterclaim         §
      Plaintiffs,                     §
                                      §
V.                                    §
                                      §  Removed from the
TAYVIN GALANAKIS,                     §  District Court for
      Plaintiff/Counterclaim          §  Jasper County, Iowa
      Defendant.                      §  No. LACV123038
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
LANCE PLATT
NOVEMBER 3, 2023
VOLUME 1 of 1

---

ORAL AND VIDEOTAPED DEPOSITION OF LANCE PLATT, produced as a witness at the instance of the Defendants City of Newton and Rob Burdess and Defendants/Counterclaim Plaintiffs Nathan Winters and Christopher Wing and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of November, 2023, from 9:07 a.m. to 11:56 a.m., before Laurin Rainer, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, at the offices of Associated Court Reporters, 1716 Briarcrest Drive, Suite 300, Bryan, Texas 77802, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Counterclaimants Appx. 68

**LANCE PLATT - November 03, 2023**

```
1                        APPEARANCES

2   FOR THE DEFENDANTS CITY OF NEWTON AND ROB BURDESS AND
    DEFENDANTS/COUNTERCLAIM PLAINTIFFS NATHAN WINTERS AND
3   CHRISTOPHER WING:

4        Mr. Nicholas F. Miller
         Brick Gentry, P.C.
5        6701 Westown Parkway
         Suite 100
6        West Des Moines, Iowa 50266
         Telephone: (515)274-1450 - Fax: (515)274-1488
7        Email: nick.miller@brickgentrylaw.com

8   FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT TAYVIN GALANAKIS:

9        Mr. Matthew M. Boles
         Matthew M. Boles
10       Gribble, Boles, Stewart & Witosky Law
         2015 Grand Avenue
11       Suite 200
         Des Moines, Iowa 50312
12       Telephone:  (515)644-6852
         Email: mboles@gbswlaw.com

13

14  ALSO PRESENT:

15       Ms. Myra Thetford, Videographer

16

17

18

19

20

21

22

23

24

25
```

Counterclaimants Appx. 69

**LANCE PLATT - November 03, 2023**

```
 1                        INDEX

 2                                          PAGE

 3  Appearances ......................................    2

 4  LANCE PLATT

 5      Examination by Mr. Nicholas F. Miller ..........    4

 6  Reporter's Certificate ............................  102

 7

 8                       EXHIBITS

 9  NO.  DESCRIPTION                                 PAGE

10  1    Platt and Associates Technical Report ..........   13

11  2    Body cam video ................................   20

12  3    William Penn University Sports Medicine Department
         Drug Education and Testing Program Policy ......   90
13
    4    National Association of Intercollegiate Athletics
14       National Administrative Council Drug Testing
         Policy Manual .................................   93
15

16

17

18

19

20

21

22

23

24

25
```

Counterclaimants Appx. 70

**LANCE PLATT - November 03, 2023**

```
 1                    THE VIDEOGRAPHER:  Off the record --
 2                    MR. BOLES:  You've picked a great spot to
 3   go to lunch at, right?
 4                    THE VIDEOGRAPHER:  Off the record at
 5   11:39 a.m.
 6              (Recess)
 7                    THE VIDEOGRAPHER:  Back on the record at
 8   11:51 a.m.
 9       Q.   (BY MR. MILLER) Okay, Doctor, is -- in your
10   opinion -- I guess I should say did you reach an opinion
11   as to whether Officer Winters administered his field
12   sobriety testing correctly?
13       A.   Based on my observation of the testing, I
14   believe that they were administered correctly, as far as
15   the walk and turn and the one leg stand goes.  He did
16   follow the -- the -- the recommendations on the other ones
17   he did, the lack of convergence, modified Romberg, and the
18   other -- the finger to nose.  So as far as administering
19   the tests, yes.  I mean, there were some things I was
20   concerned with, the environment, you know, because it was
21   wet and things like that.  These tests were not validated
22   in a wet environment.  So that could have -- could have
23   been a factor.  But as far as the instructions, yes, I --
24   I will -- I will agree with him on -- on those.
25       Q.   With respect to the wet environment, I think you
```

Counterclaimants Appx. 71

**LANCE PLATT - November 03, 2023**

1  testified earlier that you didn't conclude that that

2  impacted Mr. Galanakis' ability to perform the field

3  sobriety tests, right?

4      A.    It wouldn't have been for me as -- as an

5  officer, but it did look -- the more I looked, it did --

6  it did look pretty wet, and it was pretty raining the

7  whole time.  Maybe or maybe not.  I mean, it -- it could

8  be -- could have been considered.  It -- it could be

9  considered.  Weather is a factor.

10     Q.    But it wasn't significant in forming your

11 opinions in this case?

12     A.    I don't think it was, not with Mr. Galanakis,

13 no.

14     Q.    When an officer is trying to make a

15 determination as to whether there's sufficient clues or

16 indicators of impairment or intoxication by drugs or

17 alcohol to justify an arrest or, you know, sending them

18 down to the police station --

19     A.    Right.

20     Q.    -- for a DRE expert's analysis, is that process

21 difficult?

22     A.    As far as -- as the arrest process goes?  It's

23 not difficult; but there is a process, you know, that --

24 that you -- that you have to go through.  Understanding

25 that, just because someone doesn't perform adequately on

Counterclaimants Appx. 72

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>        Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, ROB<br>BURDESS, NATHAN WINTERS,<br>CHRISTOPHER WING, individually and in<br>their official capacities with the Newton Police<br>Department,<br>        Defendants.<br>─────────────────────<br><br>NATHAN WINTERS and CHRISTOPHER<br>WING,<br>        Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>TAYVIN GALANAKIS,<br>        Plaintiff/Counterclaim Defendant. | No. 4:23-cv-00044-SHL-SBJ<br><br><br><br>**DECLARATION OF MATT BRUNER**<br><br><br><br><br><br><br><br><br><br><br><br>Removed from the District Court for<br>Jasper County, Iowa, No. LACV123038 |

I, Matt Bruner, under 28 U.S.C. § 1746, declare under penalty of perjury that the following

is true and correct:

1.      I was retained by the City of Newton, Iowa, Rob Burdess, Nathan Winters, and

Christopher Wing to provide expert testimony in this case.

2.      A true and correct copy of the expert witness report I authored is attached to this

Declaration, and the report includes all my opinions and the facts and data I relied on to form my

opinions.

3.      A true and correct copy of my curriculum vitae is also attached following my expert

witness report.

1

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:   December 1, 2023

/s/ _Matt Bruner_

Matt Bruner

Counterclaimants Appx. 74

**Green Line Consulting, LLC**

Matt Bruner

Huxley, IA 50124

Email:  matt.bruner@gmail.com   Cell: 515-598-6894

September 8, 2023

Mr. Nicholas F. Miller

Brick Gentry Law Firm

Re:  Review of technical report submitted by Dr. Lance A. Platt, Ph.D., of Platt and Associates,
     pertaining to case report, video, field sobriety testing, arrest, and post-arrest processing of Mr.
     Tayvin Galanakis on August 28, 2022, in Newton, IA.

Mr. Miller:

At your request I have reviewed Dr. Platt's technical report submitted on July 1, 2023, along with body camera videos of the traffic stop, testing, and processing of Mr. Galanakis from the early morning hours of August 28, 2022.  I conducted a thorough review of the 37 pages of Dr. Platt's technical analysis of the incident included in his 55 page report.

My attached response is formatted into several logical sections to assist in understanding where my experience in impaired driving enforcement and instruction agrees with much of Dr. Platt's technical analysis report.  The second section is an analysis of specific statements and sections of Dr. Platt's technical report that I disagree with as being substantially incorrect, omitting pertinent information, or to which I've come to a different conclusion than Dr. Platt.

Thirdly, I provide my expert analysis of the video and reports provided to me from the night of the stop.  This is followed by my conclusion and opinion on whether there was sufficient impairment displayed by Mr. Galanakis in the early morning hours of August 28, 2022 to warrant an arrest for OWI and the performance of a drug influence evaluation by a certified Drug Recognition Expert.  Lastly, specific and general references that I used to form my conclusion and opinion are cited for your convenience.

Sincerely,

Matt Bruner

Counterclaimants Appx. 75

1. **Agreements with Dr. Platt's Technical Report**

   a. The vast majority of Dr. Platt's report are accurate citations and references directly from the "NHTSA SFST Student Manual," (albeit an outdated "HS 178 02/2018" version from just over five years ago).  To clarify, the manual he is referencing is developed and published by the National Highway Traffic Safety Administration (NHTSA), the International Association of Chiefs of Police (IACP) and the Department of Transportation (DOT)'s Traffic Safety Institute (TSI).  It is titled, "DWI Detection and Standardized Field Sobriety Testing (SFST) Participant Manual."  This manual is the cornerstone for basic impaired driving training and enforcement across the United States (and internationally), having been since at least 1987.

      The SFST manual, along with similarly published Advanced Roadside Impaired Driving Enforcement (ARIDE) and Drug Recognition Expert (DRE) manuals are regularly reviewed and revised by IACP's Technical Advisory Panel.  Periodic reviews are performed to stay current with improved scientific techniques and changing drug/alcohol trends with input from the scientific, medical, and law enforcement communities.

      Dr.  Platt appropriately references the "SFST Student Manual" heavily in his technical analysis, giving much credit to its accuracy, importance, and legitimacy in alcohol-impaired driving investigations.  Any peace officer, instructor, or expert worth their salt should rely on this manual and others published by the reputable sources of NHTSA, IACP, and TSI, such as the current ARIDE Manual and DRE (Pre-School & 7-Day School) manuals.  These manuals "bridge the gap" and focus on impaired driving investigations of alcohol AND drug-impaired drivers.  Since the ARIDE manual builds upon the foundation of the SFST Manual, and the DRE Manual builds upon the foundations of both of those manuals, many references in my report will cite the 2023 ARIDE and Drug Recognition Expert Manuals, which are the most up to date and all-encompassing resource for drug (including alcohol) impaired driving.

   b. The format Dr. Platt uses in his analysis is appropriate and follows the standardized and accepted three-phase process used by officers across the country in impaired driving investigations:
      - Phase 1 - Vehicle in Motion
      - Phase 2 - Personal Contact
      - Phase 3 - Pre-Arrest Screening

      This approach chronologically walks the officer and report-reader though the impaired driving investigation process. It is important to note that impairment may be observed in EACH of these phases and the stepped approach is used by officers in the field to logically determine if there is sufficient probable cause to arrest the driver for impaired operation, or to request further chemical or drug-influence testing.  As Dr. Platt correctly references, "*DWI detection is defined as: THE ENTIRE PROCESS OF IDENTIFYING AND GATHERING EVIDENCE TO DETERMINE IF A SUBJECT SHOULD BE ARRESTED FOR A DWI VIOLATION.*"

   c. When looking specifically at Dr. Platt's "Observations of Examiner" notes throughout the report, although I disagree with many conclusions, I do agree with the discrepancy discovered under section 3.05 (P. 34) relating to timing on the Modified Romberg Balance Test.  Dr. Platt

points out that the officer articulates several different lengths of time that Mr. Galanakis took to complete the test: 34, 38, and 37 seconds. Dr. Platt does not, himself, articulate what he observed as the correct amount of time observed on the video. After careful review of video of the issue, I observed Mr. Galanakis began the test at the 18:35 mark of the video and completed the test by opening his eyes and saying "30" at the 19:05 mark, showing the test took the subject an appropriate 30 second period of time to complete. Other reliable indicators of impairment were ALSO observable during that 30 second portion of the video, but will be addressed later in my analysis of the indicators of impairment observed.

d. Importantly, in Section 3.00 (a) "Simplicity," Dr. Platt cites the SFST manual reading, "*Simplicity is the key to divided attention field sobriety testing. It is not enough to select a test that just divides the subject's attention. The test must also be one that is reasonably simple for the average person to complete as instructed when sober. Tests that are difficult for a sober subject to perform have little or no evidentiary value.*" An emphasis should be placed on this fundamental and key statement. The divided attention field sobriety tests, including the Horizontal Gaze Nystagmus (HGN), Walk & Turn, One-Leg Stand, Lack of Convergence, Modified Romberg Balance, and Finger to Nose tests are all standardized and designed in a manner that a sober/non-impaired subject would perform well. SFST, ARIDE and DRE students perform these tests during their training on many non-impaired subjects (instructors, other officers, etc.) and do not regularly see indicators of impairment.

While I agree with the vast majority of the material cited in Dr. Platt's technical report, I fundamentally disagree with many of his individual analyses under the "Observations of Examiner" sections of the report and conclusions derived from the video, reports, and manuals. Of those, I will focus on his review of the traffic stop, field sobriety testing, and Mr. Galanakis' initial processing at the Newton Police Department as it is of most significance to the case.

## 2. Disagreements and Omissions from Dr. Platt's Technical Report

a. <u>Omission in 2.04</u> "Observations of Examiner" – In reference to the "<u>small</u>" odor of an alcoholic beverage the officer detected, Dr. Platt states, "*While this may have been the officer's opinion, there is no way that the officer can correlate the odor of alcohol to a level of intoxication.*" In my review of the officer's report & video, at no time does he reference a specific level of intoxication correlated with the smell of alcohol. He instead appropriately uses it as a <u>describable cue or evidence of an intoxicant</u> onboard Mr. Galanakis.[1]

b. <u>Disagreement with 2.04</u> "Observations of Examiner" – Dr. Platt states, "*Mr. Galanakis does not admit to consuming alcohol (he is asked twice) or taking any type of drugs on this date.*" As recorded in DRE Andrew Shinkle's report, Mr. Galanakis stated he took "Welburtin" (Wellbutrin), a central nervous system depressant drug 11-12 hours earlier.

---

[1] *DWI Detection and Standardized Field Sobriety Testing Participant Manual.* February 2023 Edition. Session 6- P. 7.

c. <u>Disagreement with 2.05</u> "Observations of Examiner" – Dr. Platt states, *"In my opinion and NHTSA, bloodshot and glassy or glossy eyes are not always indicative of alcohol consumption or intoxication."* While this specific, narrow statement is true, bloodshot and watery eyes ARE consistent with drug (including alcohol) impairment and a reliable indicator for officers when taken in context and with the totality of the circumstances.[2,3] The fact that there may be an alternative explanation for an indicator or clue observed by the officer does not necessarily negate its importance. "Officers are not required to rule out the possibility of innocent behavior as long as reasonable suspicion of criminal activity exists.[4] "

d. <u>Disagreement with 3.01 (B)</u> "Observations of Examiner" – Dr. Platt states, "*These are the only clues for the HGN test"* in reference to lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and onset of nystagmus prior to 45 degrees. More accurately, these are the only scientifically-validated clues in the standardized HGN test of a subject under the influence of a central nervous system depressant, inhalant, or dissociative anesthetic. Many other clues of impairment are observable during the divided-attention HGN test such as: droopy eyelids, head movements, inattentive eye movements, inability to follow instructions, being "on the nod," etc.[5] An officer cannot ignore displayed indicators of impairment to rely strictly on clues related to just 3 of the 7 drug categories.

e. <u>Omission in 3.01 (N)</u> "Observations of Examiner" – Dr. Platt states, "*The officer does state in his case report that he did not observe any HGN test clues. Based upon NHTSA impaired driving training a lack of observed HGN could eliminate a CNS Depressant an Inhalant or PCP as the alleged impairing substance."* PCP (as a category) is no longer specifically referenced in the IACP/NHTSA/TSI curriculum, rather, the drug category of Dissociative Anesthetics are used (which included PCP). This category also includes many drugs other than PCP that are abused. Another issue with Dr. Platt's statement is that it is also ignoring the fact that a negative HGN test IS CONSISTENT with a subject under the influence of the other 4 (of the 7) drug categories: CNS Stimulants, Hallucinogens, Narcotic Analgesics & Cannabis.[6] The lack of HGN on an impaired individual is helpful evidence in assisting an ARIDE-trained officer or DRE in determining potentially which drug category or categories of which the subject may be under the influence.[7]

f. <u>Omission in 3.02</u> "Walk and Turn Test" – Dr. Platt states, "*The NHTSA W&T test was researched and validated as a test for determining **alcohol** (bolded & underlined) levels above or below .08, based upon the NHTSA SFST validation studies.* What Dr. Platt fails to state is that the divided-attention Walk and Turn Test is a useful test in determining divided attention impairment.

---

[2] *DWI Detection and Standardized Field Sobriety Testing Participant Manual*. February 2023 Edition. Session 6- P. 5.

[3] *Drug Recognition Expert Course 7-Day School Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P. 17.

[4] State v. Brian Sean Moran, No. 15-2164 (Iowa Court of Appeals, filed October 26, 2016).

[5] DRE Drug Category Matrix, *Drug Evaluation and Classification Training: the Drug Recognition Expert School.* U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

[6] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 4.

[7] DRE Drug Category Matrix, op. cit.

"*Because Cannabis impairs attention, the Standardized Field Sobriety Tests (SFSTs) like Walk and Turn (WAT) and the One Leg Stand (OLS), as well as the Finger to Nose (FTN) are excellent tools for recognizing people under the influence of Cannabis.*[8]"

g.  Disagreement/Omission 3.02(d) & (i) "Observations of Examiner" – Dr. Platt states he observed 3 out of a possible 8 clues on the Walk & Turn test:
> 1) Took wrong number of steps
> 2) Stopped while walking
> 3) Conducted an improper turn

Officer Winters' report states that he observed 5 out of a possible 8 clues on the Walk & Turn test:
> 1) Stepped off line
> 2) Took 13 steps (improper number of steps)
> 3) Stopped walking
> 4) Improper turn
> 5) Missed heel to toe

Taking either of the above interpretations into account, including Dr. Platt's own observation of 3 validated clues of impairment (the evaluation criteria of which is 2 clues out of 8 to indicate a BAC above .08 and thus impairment and intoxication[9]), Dr. Platt infers that Mr. Galanakis is displaying a level of impairment above the evaluation criteria on the test.  Later, on page 30, under "Observation of Examiner" ("I"), Dr. Platt opines that "…*it is my opinion Mr. Galanakis performs well physical however he does not follow the instructions given to him by the officer.*"  What Dr. Platt fails to state is that three scientifically validated clues of impairment are displayed by Mr. Galanakis, who was unable to divide his attention and perform the psychophysical test appropriately, indicating impairment.

h.  Disagreement with 3.02(f) "Observations of Examiner" – Dr. Platt states, *"It is unknown if Mr. Galanakis has any type of physical injury or disability which could bias his W&T results, he does mention an ankle injury however the officer does not expand upon it."*  This is not true.  On the body camera video at the 13:25 mark, Officer Winters appropriately asks, *"Any problems with your ankles, knees, hips or back?"* prior to conducting the Walk & Turn test. The following exchange then occurs:

> *Mr. Galanakis:*        "Just my right ankle."
> *Officer Winters:*        "What's wrong with your right ankle?"
> *Mr. Galanakis:*        "Messed it up during football."
> *Officer Winters:*        "Ok, does it prevent you from walking?"
> *Mr. Galanakis:*        "Just a little bit but I'll be able to do this."
> *Officer Winters:*        "OK, does it hurt right now?"
> *Mr. Galanakis:*        "Nope, I have all my weight on my left foot right now."

---

[8] *Drug Recognition Expert Course 7-Day School Instructor Guide*. February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P. 9-10.

[9] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*.  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 29.

Mr. Galanakis then attempts to perform the test.  In contrast to Dr. Platt's incorrect statement earlier, Officer Winters not only asked about the ankle injury (or any others), but asked three follow-up questions to which Mr. Galanakis negates the issue, and even states that he'll be able to do the test.  To an even greater extent, Dr. Platt recklessly reiterates this false statement **five** additional times in his technical report:

P. 30, 3.02(g) "Observations of Examiner"
P. 30, 3.02(h) "Observations of Examiner"
P. 32, 3.03(e) "Observations of Examiner"
P. 33, 3.03(f) "Observations of Examiner"
P. 33, 3.03(g) "Observations of Examiner"

i) <u>Disagreement with 3.03 (d)</u> "Observations of Examiner" – Dr. Platt states, *"I observed Mr. Galanakis to exhibit 1 out of a possible 4 OLS test clues, the officer also interfered with Mr. Galanakis as he performed the test."*  Although Dr. Platt does not expound upon how the officer interfered with the test, I will assume he is referencing Officer Winters' reminder during the test to Mr. Galanakis to keep his raised leg straight, and count in the correct manner.  These are not considered interference with the test, rather an attempt to remind Mr. Galanakis how to perform the test properly and is essential for evaluating divided attention.[10]

j) <u>Disagreement with 3.03 (h)</u> "Observations of Examiner" - Dr. Platt states, *"Based upon my observation of the submitted video, it is my opinion that Mr. Galanakis performed the OLS test well physically and mentally."*  I disagree with this opinion as Mr. Galanakis displayed at least one validated clue of impairment (raised arms for balance), but also displayed numerous other indicators of impairment during the test (described in greater detail later in my report):

- Interrupting the officer's instructions
- Inability to comprehend simple instructions during instruction phase (the length of test)
- Failure to keep both legs straight during test
- Failure to count out loud or in the instructed manner
- Short term memory impairment

k) <u>Omission in 3.04</u> - Lack of Convergence (LOC) Test - Dr. Platt states, *"The Lack of Convergence test is not part of the NHTSA SFST battery."*  While the fact that the Lack of Convergence test is not included in the original three standardized field sobriety tests developed in the late 1970's, it <u>is</u> now part of NHTSA's, IACP's, and TSI's ARIDE & DRE curriculum and validation studies.  While approximately 8-12% of the general population cannot naturally cross their eyes as a stimulus is moved toward their face, a recent study[11] showed that 77% of subjects under the influence of cannabis displayed a lack of convergence.  When used in conjunction with the HGN, Walk & Turn, and One Leg Stand tests (among others), it provides a reliable indicator and display of impairment by a person under the influence of alcohol and/or drugs.

---

[10] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P.27.

[11] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). *Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment*. Accident Analysis and Prevention, 92, 219-229.

Counterclaimants Appx. 80

l) <u>Disagreement with 3.04</u> - "Observations of Examiner" – Dr. Platt states, *"Mr. Galanakis also wears glasses, he may not be able to cross his eyes."* As observed in the body camera video, Mr. Galanakis states that he normally wears contact lenses, but took them out earlier. He does not mention the wearing of glasses, nor does DRE Shinkle's DRE "facesheet" indicate he wears corrective lenses.

m) <u>Omission & Disagreement with 3.06</u> - "Finger to Nose (FTN) Test": Dr. Platt states, *"The Finger to Nose test is not a part of the NHTSA SFST battery. The scoring or assessment for this test is unknown."* While the Finger to Nose Test is not included in the original three standardized field sobriety tests developed in the late 1970's, it <u>is</u> now part of NHTSA's, IACP's, and TSI's ARIDE & DRE curriculum and validation studies. It is also standardized & scientifically validated[12] with standardized clues and has been in use for the last decade. A recent study also showed that cannabis-impaired subjects displayed 3 or more misses on the Finger to Nose test in 87% of studied DRE evaluations[13]. When used in conjunction with the HGN, Walk & Turn, and One Leg Stand tests (among others), it provides a reliable indicator and display of impairment by a person under the influence of alcohol and/or drugs.

In the "Observations of Examiner" portion of this section, Dr. Platt also states, *"… the trick to causing eye lid tremors and making it very difficult to touch the tip of your nose with the tip of your finger I(s) to make the person close their eyes and tilt their head back."* Based on my training and experience as a certified Seated-Battery SFST Instructor and certified DRE Instructor, this statement is not true. I have conducted the standardized and scientifically validated Finger to Nose Test for over ten years in enforcement contacts in the field and in classroom settings. I have observed that a non-impaired person is able to follow the instructions and perform the divided-attention test with little to no difficulty and touch the tip of their nose with the tip of their finger correctly. Conversely, I have regularly observed that drug (including alcohol) impaired individuals DO regularly have a difficult time with the simple test.

n) <u>Disagreement with 4.00</u> "Arrest Decision" – Dr. Platt states, *"…it is my opinion that Mr. Galanakis does not exhibit physical and/or mental difficulty while being contacted by the officer that I would associate with any type of drugs or alcohol including Cannabis."* Due to the clear mental and physical impairment observed of Mr. Galanakis during all three phases of this OWI investigation, it is my opinion that there is sufficient probable cause to justify Officer Winters' arrest of Mr. Galanakis for OWI. Those indicators of impairment and evidence of probable cause are described in detail in the next section of this report.

---

[12] Fiorentino, Dary D. (2011) *Validation of sobriety tests for the marine environment*. Accident Analysis and Prevention 43, 870–877.

[13] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). *Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment*. Accident Analysis and Prevention, 92, 219-229.

**3) Expert Analysis & Opinion**

My thorough review of Officer Winters' body camera video reveals numerous cues, clues, and indicators of impairment displayed by Mr. Galanakis during Phase 1 (vehicle in motion), Phase 2 (personal contact), and Phase 3 (pre-arrest screening) of his OWI investigation.  Officer Winters' report also documents indicators of impairment he observed firsthand in the field during the stop.  The totality of the circumstances and evidence collected during all three phases is important to be considered when formulating an arrest/no-arrest decision by peace officers in the field.  It is my opinion and conclusion that there are sufficient indicators of impairment to justify Officer Winters' arrest of Mr. Galanakis for operating a motor vehicle while intoxicated and also to support Officer Winters' request for a certified Drug Recognition Expert to perform a drug influence evaluation of Mr. Galanakis.  My conclusion is supported by the totality of the following cues, clues, and indicators observed in the video and in Officer Winters' report.

Phase 1 - Vehicle in Motion

a)  Mr. Galanakis failed to dim his high beams when meeting the police officer's vehicle.  While Mr. Galanakis states this is due to having a headlight out, the failure to dim his high-beam headlights when approaching oncoming traffic is consistent with divided-attention impairment.[14]  It takes the ability to manage numerous simultaneous tasks to safely operate a motor vehicle, such as controlling the steering wheel, gas & brake pedals, maintaining a heading within the painted lanes, maintaining an appropriate speed, monitoring oncoming and crossing traffic, reacting to traffic signs/signals, etc.  When drugs (including alcohol) are impairing a person, this ability to divide attention is diminished.  The effects of the decreased ability to divide attention are commonly displayed in unsafe driving behaviors such as Mr. Galanakis' failure to dim his high-beams.

Phase 2 - Personal Contact

b)  Numerous air fresheners can be seen hanging from the rearview mirror of Mr. Galanakis' vehicle.  He is also observed chewing gum during the beginning encounter.  Officers are trained to observe possible cover-up odors that may be used to mask the smell of intoxicants.[15]

c) Mr. Galanakis provides inconsistent statements about who the vehicle belongs to.  He initially states that it is his car, then claims that it is actually his grandfather's.  Later Mr. Galanakis claims it is his father's after being questioned about it being registered in his father's name.  Inconsistent responses are a cue officers are trained to detect during phase 2 of their investigation.

d) When Officer Winters requests Mr. Galanakis' driver's license, registration, and insurance, he appears to move slowly and display mental impairment.[17]  Mr. Galanakis is unable to divide his attention as he retrieves his registration, looks at it, then holds onto it without giving it to Officer Winters.  He then pulls out his driver's license and holds it in his hand while looking back into his glove box.  Mr. Galanakis then looks back at the same registration he earlier pulled out, laying in his lap.

---

[14] *DWI Detection and Standardized Field Sobriety Testing Participant Manual*. February 2023 Edition. Session 5- P. 10.
[15] ibid., Session 6- P. 7.
[16] ibid., Session 6- P. 6.
[17] ibid., Session 6- P. 11-12.

Counterclaimants Appx. 82

e)  Mr. Galanakis begins displaying visibly excited emotions once inside the police car, quickly going on the "offensive" during his encounter with the officers.  He begins filming a video from the passenger seat, changing his emotions from cooperative to argumentative with the officer.  These mood changes are consistent with drug impairment.[19]

Phase 3 - Pre-Arrest Screening

f) During the Horizontal Gaze Nystagmus test, Mr. Galanakis appears worried about his hair perm versus the focusing on the field sobriety testing being conducted by Officer Winters.  While the officer is attempting to conduct the test, Mr. Galanakis oddly comments, "You have some big fingers." Unusual statements are an indicator of impairment officers are trained to detect.[20]

g) During the Walk and Turn Test instruction stage, Mr. Galanakis interrupts Officer Winters' simple instructions of the turn and return 9 steps stating, "What, you want me to turn back around?"  He is then explained the turn and steps again.  This is a display of a lack of concentration, consistent with drug impairment. [21]

h) During the Walk and Turn Test walking stage, Mr. Galanakis appears to miss the line on the ground with the back half of his foot (at an angle).  While this would not be a validated clue of impairment if not completely off the line, it is noteworthy.[22]

i) Does not count out loud as instructed during the Walk and Turn Test.[23]

j) On step seven of the first nine-steps, Mr. Galanakis exclaims, "Say when I get to nine."  This is unusual and not performing the test as he was instructed.  This is also a display of a lack of concentration and short term memory, consistent with drug impairment.[24]

k) Mr. Galanakis performs thirteen steps instead of the nine he was instructed to perform in the first half of the test.  This is a validated clue of impairment.[25]

---

[19] DRE Drug Category Matrix, *Drug Evaluation and Classification Training: the Drug Recognition Expert School.* U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

[20] *DWI Detection and Standardized Field Sobriety Testing Participant Manual.* February 2023 Edition. Session 6- P. 6.

[21] *Drug Recognition Expert Course 7-Day School Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P.11.

[22] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*.  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 31.

[23] ibid., Session 2- P. 31.

[24] *DRE 7-Day School Instructor Guide.* Session 21- P.11.

[25] *ARIDE Instructor Guide*. Session 2- P. 28.

l)  Instead of turning properly and as instructed, Mr. Galanakis states, "Am I good? So, how do I turn?" Here Mr. Galanakis displays short term memory and divided attention impairment.  He is reminded by Officer Winters to turn, "Uh, take a series of small steps."  Mr. Galanakis again does not follow instructions or the earlier demonstration and turns in place, resetting his feet several times, not taking a series of small steps.  This is a validated clue of impairment.[26]

m)  On the return 9-steps, Mr. Galanakis actually took 16 steps.  This is a validated clue of impairment.[27]

n) On steps 4 and 8 of the return nine-steps, Mr. Galanakis appears to miss a heel-to-toe step by greater than 1/2".  This is a validated clue of impairment.[28]

o) During the return 9 steps, Mr. Galanakis exclaims, "Come on man, this is too easy." This is another display of Mr. Galanakis having divided attention impairment, and also impaired perception of what exactly is taking place.

p) After the Walk and Turn test and exclaiming he was "2 for 2," Mr. Galanakis was asked "How many steps did I say to take?"  He responded "Like 8 or 9."  This display of divided-attention impairment and short-term memory impairment was displayed approximately 1 minute and 20 seconds after being told numerous times to take 9 steps.

q) During the One Leg Stand Test instruction stage, Mr. Galanakis interrupts Officer Winters' instructions stating, "God, you're a rookie bruh," "This your first year?," and "How many false accusations you got?"

r) Also during the One Leg Stand Test instruction stage, Mr. Galanakis interrupts Officer Winters' demonstration and abruptly states, "Repeat the directions."  When asked from where to where, Mr. Galanakis states, "So you said 6 seconds hold it up."  This is contrary to the simple instructions to hold his foot 6 inches off the ground as the officer demonstrates.  Mr. Galanakis again asks the officer to demonstrate it again, indicative of divided attention impairment and short-term memory impairment.

s) During the balance and counting stage of the One Leg Stand Test, Mr. Galanakis has to be reminded to keep his leg straight, a display of divided attention and short-term memory impairment.

t) Mr. Galanakis did not count out loud as instructed and when asked if he remembered how he was told to count, stated, "1-Mississippi, 2-Mississippi, 3-Mississippi…I honestly forgot how you told me…"  Mr. Galanakis also states, "Just tell me when to switch."  Mr. Galanakis was not instructed to switch anything during the instruction phase of the test.  This is a display of divided attention and short-term memory impairment.

---

[26] *Advanced Roadside Impaired Driving Enforcement Instructor Guide*.  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 28.

[27, 28] …

<span style="color:red">Counterclaimants Appx. 84</span>

u) Mr. Galanakis raises his arms for balance greater than 6 inches from his sides.  This is a validated clue of impairment.[29]  Mr. Galanakis also appears to possibly sway from side to side, but I am unable to verify that clue due to the officer's body camera moving as well.

v) Officer Winters' report states that he observed a lack of convergence in both of Mr. Galanakis' eyes.  While this is difficult to see in the body camera video due to wording in the upper left of the screen covering Mr. Galanakis' eyes, the presence of a Lack of Convergence is indicative of individuals under the influence of central nervous system depressants, inhalants, dissociative anesthetics and/or cannabis.[30]  Taking into account that Mr. Galanakis DID NOT display any Horizontal Gaze Nystagmus (indicative of individuals under the influence of central nervous system depressants, inhalants, and/or dissociative anesthetics), the presence of Lack of Convergence without HGN would be consistent with cannabis impairment.[31]

w)  During the Modified Romberg Balance Test, Mr. Galanakis starts the test too soon, while Officer Winters is still giving the instructions.  This is an indicator and display of divided attention impairment.

x) Officer Winters' report indicates he observes eyelid tremors displayed by Mr. Galanakis.  In the body camera video, Officer Winters moves his body camera and attempts to document the eyelid tremors on video.  Due to moisture on the lens/fogging and movement of the camera it is difficult to definitively identify the eyelid tremors, but movement of Mr. Galanakis' eyelids can be seen.  Eyelid tremors are commonly displayed by individuals under the influence of cannabis and other drugs.[32]  A recent study documented 86% of lab-confirmed cannabis-impaired drivers displayed eyelid tremors.[33]

y) During the Modified Romberg Balance Test, Officer Winters' hand signals appear to identify side-to-side sway, which he documents in his report.  Due to the movement of the camera, it is difficult to confirm this sway via video alone.  Sway during the Modified Romberg Balance Test is an indicator officers are instructed to look for as an indicator of impairment.[34]

---

[29]*Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 2- P. 35.

[30] ibid. Session 5- P. 9.

[31] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[32]*Drug Recognition Expert Course 7-Day School Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 21- P.21.

[33] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[34] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.*  February 2023 Edition. International Association of Chiefs of Police.  National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 15.

Counterclaimants Appx. 85

z) During the Finger to Nose Test, Mr. Galanakis has to be told how to position his hands twice during the instructions. The video of the test is slightly blurry from moisture on the camera lens and movement of the camera. Officer Winters reports observing the following clues of impairment during the test: missing tip of nose (5 times), use of pad instead of fingertips, and eyelid tremors. I also observed that Mr. Galanakis moved his head forward towards his finger instead of keeping his head tilted back. All of these are indicators of impairment, especially of those individuals under the influence of cannabis.[35,36,37,38]

aa) Mr. Galanakis submits a sample of his breath into officers' PBT registering a 0.00 Breath Alcohol Level. This breath alcohol level is not consistent with the level of impairment observed. This is indicative of impairment by something other than alcohol.

bb) After being read the Miranda Warning, Mr. Galanakis is asked when the last time he used Marijuana. Contrary to his talkative behavior for the majority of the field sobriety testing, Mr. Galanakis is quiet for approximately eight seconds and then states, "I do not remember that." When asked if it was that night, Mr. Galanakis states he had not used weed that night.

cc) After arrest and at the police station, in reference to the field sobriety tests, Mr. Galanakis states, "I felt like I was doing good on those." This is a display of impaired perception and proprioception.


In addition to scientifically validated and other indicators of impairment, officers are trained to take into account what the definition of being "under the influence" is when determining whether to arrest a suspect of OWI or to release them. This definition can be found in Iowa's Criminal Jury Instructions:

> *2500.5 OWI – Definition – Under The Influence. A person is "under the influence" when, by drinking liquor and/or beer, one or more of the following is true:*
> *1. Her reason or mental ability has been affected.*
> *2. Her judgment is impaired.*
> *3. Her emotions are visibly excited.*
> *4. She has, to any extent, lost control of bodily actions or motions*

---

[35] *Advanced Roadside Impaired Driving Enforcement Instructor Guide.* February 2023 Edition. International Association of Chiefs of Police. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation. Session 5- P. 20.

[36] Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229.

[37] Fiorentino, Dary D. (2011) Validation of sobriety tests for the marine environment. Accident Analysis and Prevention 43 (2011) 870–877.

[38] Logan, B.; Kacinko, S.L.; and Beirness, D.J. (2016). An Evaluation of Data from Drivers Arrested for Driving Under the Influence in Relation to Per se Limits for Cannabis. *AAA Foundation for Traffic Safety.*

Counterclaimants Appx. 86

Mr. Galanakis' actions and comments meet each of the previous four considerations:

1. "*Reason or mental ability…affected*" - Mr. Galanakis displays a lack of ability to divide attention and short-term memory impairment throughout his encounter with officers.
2. "*Judgement is impaired*" - Mr. Galanakis chose to drive with his bright headlights on and failed to dim them when encountering traffic.  He also chose to be argumentative and verbally aggressive towards officers during the encounter.
3. "*Emotions are visibly excited*" - Mr. Galanakis' emotions range from cooperative to argumentative to verbally aggressive.
4. *"To any extent, lost control of bodily actions or motions"* – Mr. Galanakis displayed a loss of control of bodily actions numerous times during the field sobriety tests (swaying, using arms for balance, eyelid tremoring, inability to touch tip of nose, etc.)

When sufficient indicators of impairment are observed during the three phases of an officer's OWI investigation, officers are trained to then conduct a preliminary breath test to help determine if the impairment is due to alcohol.  Mr. Galanakis' 0.00 breath alcohol reading showed that the impairment he was displaying was not from alcohol in his system.  Officers trained in SFST and A.R.I.D.E. are taught that if impairment other than alcohol is observed, they should attempt to contact a Drug Recognition Expert to conduct a drug influence evaluation to determine whether the impairment is medical or drug-related.  If a DRE isn't available, officers are trained to proceed with the arrest based on probable cause, followed by the implied consent procedure or chemical specimen search warrant process.

Based on my training as a NHTSA SFST practitioner for 17 years, a NHTSA-certified SFST Instructor for 13 years, a NHTSA-certified SFST Train-the-Trainer for 10 years, National Association of State Boating Law Administrators' Certified Seated SFST Instructor for 11 years, Drug Recognition Expert for 9 years and DRE Instructor for 7 years, I am exceedingly familiar with the content within the SFST, ARIDE, and DRE curriculum.  My knowledge and experience includes the practices, procedures, and studies behind the protocols formulated for officers to detect, test, and arrest impaired drivers.

Based on this training and experience, it is my opinion and conclusion that Mr. Galanakis displayed sufficient indicators of impairment (and thus probable cause) to justify an arrest for operating a motor vehicle while intoxicated.  These indicators also rise to the level necessary to request a Drug Recognition Expert investigate the non-alcohol impairment observed in the field further through a drug influence evaluation. Officer Winters, Lieutenant Wing, and DRE Officer Shinkle followed standard practices and procedures consistent with their NHTSA and IACP training in the traffic stop, field sobriety testing, arrest, and drug influence evaluation of Mr. Galanakis.  The ultimate post-arrest release of Mr. Galanakis to his mother without criminal charges demonstrated that the officers acted in a fair and objective manner in the best interest of justice and of Mr. Galanakis himself.

Statement of Compensation:
I am compensated as follows, not to exceed $10,000:
    i. Travel Time: Consultant will be reimbursed according to the relevant standard mileage rate as published by the United States Internal Revenue Service.
    ii. Testimony (whether in court or virtual): $250.00 an hour.
    iii. Trial Preparation (non-report): $150.00 an hour.
    iv. Report Preparation: $100.00 an hour.
    v. Deposition Attendance: $400.00 per deposition.

Materials Reviewed in Preparation of Report

- Dr. Lance Platt's expert witness report addressed to Mr. Boyles on July 1, 2023.

- Body camera video from Newton Police Officer Nathan Winters from the early morning hours of August 28, 2022.

- Dash camera video from squad car Operated by Newton Police Officer Nathan Winters from the early morning hours of August 28, 2022.

- Police officer reports submitted from Newton Officers Nathan Winters, Lt. Chris Wing, and DRE Officer Andrew Shinkle.

References Cited Within Report

Adler, Eugene V. and Burns, Marcelline (1994). Drug Recognition Expert (DRE) Validation Study. Final Report to Governor's Office of Highway Safety, State of Arizona. June 4, 1994.

Bigelow, G. E., Bickel, W. E., Roache, J. D., Liebson, I. A., & Nowowieski, P. (1985). Identifying Types of Drug Intoxication: Laboratory Evaluation of a Subject-Examination Procedure. Washington DC: National Highway Traffic Safety Administration. DOT HS 806753.

Couper, F., Huestis, M., Fulford, J., Perkinson, N., Miller, S., Katz, A., Symoun, J., Raymond, P., & Smither, D.D. (2014). Drugs and Human Performance Fact Sheets [Unpublished manuscript]. National Highway Traffic Safety Administration.

DRE Drug Category Matrix, Drug Evaluation and Classification Training: the Drug Recognition Expert School. U.S. Dept. of Transportation, National Highway Traffic Safety Administration, February 2023.

Fiorentino, Dary D. (2011) Validation of sobriety tests for the marine environment. Accident Analysis and Prevention 43 (2011) 870–877.

Hartman, R. L., Richman, J. E., Hayes, C. E., & Huestis, M. A. (2016). Drug Recognition Expert (DRE) Examination Characteristics of Cannabis Impairment. Accident Analysis and Prevention, 92, 219-229. Retrieved from https://doi.org/10.1016/j.aap.2016.04.012.

International Association of Chiefs of Police, 2023. Advanced Roadside Impaired Driving Enforcement Instructor Guide. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–233.

International Association of Chiefs of Police, 2023. Drug Evaluation and Classification (Preliminary School) Instructor Guide. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–245.

International Association of Chiefs of Police, 2023. Drug Recognition Expert Course 7-Day School Participant Manual. February 2023 Edition. National Highway Traffic Safety Administration, Transportation Safety Institute, US Department of Transportation, pp. 1–765.

International Association of Chiefs of Police, 2023. DWI Detection and Standardized Field Sobriety Testing Participant Guide. February 2023 Edition.

Logan, B.; Kacinko, S.L.; and Beirness, D.J. (2016). An Evaluation of Data from Drivers Arrested for Driving Under the Influence in Relation to Per se Limits for Cannabis. AAA Foundation for Traffic Safety.

National Traffic Law Center (2020).  Investigation and Prosecution of Cannabis-Impaired Driving Cases Monograph.  National District Attorney's Association.

Shrivastava, A., Johnston, M., & Tsuang, M. (2011). Cannabis use and cognitive dysfunction. Indian Journal of Psychiatry, 53(3), 187–191.

State v. Brian Sean Moran, No. 15-2164 (Iowa Court of Appeals, filed October 26, 2016).

Respectfully Submitted,

_____
 Matt Bruner   9/8/23

Counterclaimants Appx. 89

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **TAYVIN GALANAKIS,** | CASE NO.: 4:23-cv-00044 |
| **Plaintiff,** | |
| **v.** | |
| **CITY OF NEWTON, IOWA, ROB BURDESS, NATHAN WINTERS, CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department,** | **PLAINTIFF'S INITIAL DISCLOSURES** |
| **Defendants.** | |

**COMES NOW,** the Plaintiff, pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), and hereby provides these initial disclosures to the Defendants. This information is being provided prior to and without the benefit of discovery, and thus may need additions, clarifications, corrections, and modifications as additional information is obtained.

**POTENTIAL WITNESSES (Rule 26(a)(1)(A)(i))**

1.  Tayvin Galanakis
    c/o Matthew Boles
    Gribble, Boles, Stewart & Witosky
    2015 Grand Avenue, Suite 200
    Des Moines, Iowa 50312

    Telephone: 515-235-0551

    Plaintiff was present and has direct knowledge to the factual basis of the claims against Defendants.

Counterclaimants Appx. 90

2.  Rob Burdess
    Newton Police Department
    101 W. 4th Street South
    Newton IA 50208

    Defendant herein and possesses information and knowledge regarding the
    allegations asserted against him and his fellow defendants.

3.  Nathan Winters
    Newton Police Department
    101 W. 4th Street South
    Newton IA 50208

    Defendant herein and possesses information and knowledge regarding the
    allegations asserted against him and his fellow defendants.

4.  Christopher Wing
    Newton Police Department
    101 W. 4th Street South
    Newton IA 50208

    Defendant herein and possesses information and knowledge regarding the
    allegations asserted against him and his fellow defendants.

5.  Lindsy Maxwell

## A.  DOCUMENTS (Rule 26(a)(1)(a)(ii))

The following lists documents in Plaintiff's possession which Plaintiff may use
to support his claims. These documents are provided without the benefit of
discovery, and are subject to supplementation pursuant to Fed. R. Civ. P.
26(e)(1):

- Petition and Jury Demand (ID 1-18)
- July 18, 2016 Knoxville City Council letter (ID 19)
- September 10, 2022 email from Rob Burdess to Plaintiff and Ms. Maxwell (ID 20)
- Link to Youtube video regarding the stop (ID 21)
- Video re stop and Officer Nathan Winters (ID 22)

## B.  DAMAGES (Rule 26(a)(1)(a)(iii))

The damages in this case are subject to calculation and discovery. The

Counterclaimants Appx. 91

undersigned is not in possession of all necessary documents to quantify damage amounts. This section shall be supplemented through discovery after receiving the appropriate documents.

Furthermore, the nature of the damages in this case are not easily quantifiable. Plaintiff is relying on counsel to advise him on the individual items of damage being claimed in this case. Plaintiff understands the ultimate decision on damages is dependent on the admissibility of evidence at trial, the instructions given to the jury, and the claims allowed by the court after appropriate motions. This answer is a good faith attempt to meet with disclosure requirements, give the Defendants an opportunity to assess the value of this case for settlement purposes, and avoid unnecessary surprises at trial. The amounts set out below are based on counsel's knowledge, experience, and research as to damages in similar cases, and are subject to modification as discovery proceeds:

1. **Past Mental, Emotional and Physical Pain & Suffering:** For this category of damages, Plaintiff anticipates seeking damages in the amount of $150,000.

2. **Future Mental, Emotional and Physical Pain and Suffering – Future:** For this category of damages, Plaintiff anticipates seeking damages in the amount of $50,000.

3. **Punitive Damages:** Plaintiff estimates punitive damages in the amount of $250,000 as a result of the willful nature of Defendants' actions.

4. **Attorney Fees:** Plaintiff will be entitled to reasonable attorney fees as provided by 42 U.S.C. § 1983 and/or as available at common law. Plaintiff recognizes should he prevail and obtain even a nominal award at trial, the defendants will be responsible for payment of reasonable attorney fees incurred for prosecuting this action. It is premature to quantify or speculate on the amount of attorney fees and costs in this matter given the point in litigation.

## C.    INSURANCE AGREEMENT (Rule 26(a)(1)(a)(iv)

Plaintiff has no insurance agreement to satisfy, indemnify, or reimburse any part of the judgement which may be entered in this action.

Counterclaimants Appx. 92

**GRIBBLE BOLES STEWART & WITOSKY LAW**

BY:      */s/ Matthew M. Boles*

Matthew M. Boles          AT0001037
Adam C. Witosky          AT0010436
2015 Grand Avenue, Ste. 200
Des Moines, Iowa 50312
Telephone:      (515) 235-0551
Facsimile:      (515) 243-3696
Email:      mboles@gbswlaw.com
          awitosky@gbswlaw.com
**ATTORNEYS FOR PLAINTIFF**

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by:

| | | | |
|---|---|---|---|
| ( ) | personal service | ( ) | first class mail |
| ( ) | certified mail, return receipt requested | ( ) | facsimile |
| ( ) | Airborne Express (overnight) | ( ) | electronic filing |
| | | (x) | e-mail |

on March 30, 2023.

I declare that the statements above are true to the best of my information, knowledge, and belief.

          */s/ Tami Fairchild*

**Original to:**

Matthew S. Brick
Erin M. Clanton
Doug Fulton
Brick Gentry, PC
6701 Westown Parkway, Suite 100
West Des Moines IA 50266

4

Counterclaimants Appx. 93

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **TAYVIN GALANAKIS,**<br>        Plaintiff,<br><br>**v.**<br><br>**CITY OF NEWTON, IOWA, et al.,**<br>        Defendants. | **CASE NO. 4:23-cv-00044**<br><br><br>**PLAINTIFF/COUNTERCLAIM DEFENDANT'S ANSWER and AFFIRMATIVE DEFENSES TO NATHAN WINTERS AND CHRISTOPHER WING COUNTERCLAIMS** |
| **NATHAN WINTERS AND CHRISTOPHER WING,**<br>        Counterclaim Plaintiffs,<br><br>**v.**<br><br>**TAYVIN GALANAKIS,**<br>        Counterclaim Defendant. | |

**COMES NOW,** the Plaintiff and hereby provides these supplemental initial disclosures to the Defendants.

## A.    POTENTIAL WITNESSES (Rule 26(a)(1)(A)(i))

1.    Tayvin Galanakis
       c/o Matthew Boles
       Gribble, Boles, Stewart & Witosky
       2015 Grand Avenue, Suite 200
       Des Moines, Iowa 50312

       Telephone: 515-235-0551

       Plaintiff was present and has direct knowledge to the factual basis of the claims against Defendants.

2.    Rob Burdess
       Newton Police Department
       101 W. 4th Street South

Newton IA 50208

Defendant herein and possesses information and knowledge regarding the allegations asserted against him and his fellow defendants.

3. Nathan Winters
   Newton Police Department
   101 W. 4th Street South
   Newton IA 50208

   Defendant herein and possesses information and knowledge regarding the allegations asserted against him and his fellow defendants.

4. Christopher Wing
   Newton Police Department
   101 W. 4th Street South
   Newton IA 50208

   Defendant herein and possesses information and knowledge regarding the allegations asserted against him and his fellow defendants.

5. Lindsy Maxwell

**SUPPLEMENTAL DISCLOSURE:**

6. Courtney Van Der Hart
   Knoxville, IA

   Individual with knowledge of domestic abuse against her by Nathan Winters and information known to the Newton Police Department about such abuse.

## B.    DOCUMENTS (Rule 26(a)(1)(a)(ii))

The following lists documents in Plaintiff's possession which Plaintiff may use to support his claims. These documents are provided without the benefit of discovery, and are subject to supplementation pursuant to Fed. R. Civ. P. 26(e)(1):

- Petition and Jury Demand (ID 1-18)
- July 18, 2016 Knoxville City Council letter (ID 19)
- September 10, 2022 email from Rob Burdess to Plaintiff and Ms. Maxwell (ID 20)
- Link to Youtube video regarding the stop (ID 21)

- Video re stop and Officer Nathan Winters (ID 22)

**SUPPLEMENTAL DISCLOSURE:**

- Filings concerning protective order issued in Jasper County No. DACV122471 (ID 23-35)
- Screenshots of Text Messages Between Tayvin Galanakis and Courtney Van Der Hart  (ID 36-81)

**GRIBBLE, BOLES, STEWART & WITOSKY LAW**

BY:  */s/ Adam C. Witosky*

Matthew M. Boles              AT0001037
Adam C. Witosky              AT0010436
2015 Grand Avenue, Suite 200
Des Moines, Iowa 50312
Telephone: (515) 235-0551
Facsimile:  (515) 243-3696
Email:        mboles@gbswlaw.com
                  awitosky@gbswlaw.com
**ATTORNEYS FOR PLAINTIFF**

<u>**PROOF OF SERVICE**</u>

The undersigned certifies that the foregoing instrument was **electronically filed** on CM/ECF on October 19, 2023.  Subject to the exceptions cited therein, Local Rule 5A provides this electronic filing, once electronically posted to the registered case party's CM/ECF account, constitutes service for purposes of the Federal Rules of Civil Procedure.

Copies have been provided to all registered parties because once the document is posted, those parties are able to view and download the presented or filed document.

*/s/ Tami Fairchild*

Counterclaimants Appx. 96