IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS, <br><br>          Plaintiff, <br><br>     vs. <br><br> CITY OF NEWTON, IOWA; and ROB BURDESS, NATHAN WINTERS, and CHRISTOPHER WING, individually and in their official capacities with the Newton Police Department, <br><br>          Defendants. <br><br> _____ <br><br> NATHAN WINTERS and CHRISTOPHER WING, <br><br>          Counterclaim Plaintiffs, <br><br>     vs. <br><br> TAYVIN GALANAKIS, <br><br>          Counterclaim Defendant. | 4:23-cv-00044-SHL-SBJ <br><br><br> **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION.

When the facts are viewed in the light most favorable to him, the record shows that Plaintiff Tayvin Galanakis was arrested by Defendant Nathan Winters, a police officer for the City of Newton, despite showing no material signs of intoxication and blowing 0.00 on a breathalyzer. A reasonable juror therefore could conclude that Winters violated Galanakis's clearly established constitutional rights. It follows that Galanakis is entitled to a jury trial against Winters and co-Defendant Christopher Wing on federal law claims under 42 U.S.C. § 1983 and state law claims for false arrest. Galanakis is similarly entitled to a jury trial against the City of Newton for *respondeat superior* liability on the false arrest claims. Galanakis's remaining claims, however, are not viable, and thus summary judgment will be granted in Defendants' favor on those claims.

Conversely, Galanakis is entitled to summary judgment on most of Winters's and Wing's counterclaims for defamation and invasion of privacy. These claims arise out of statements made

by Galanakis on social media after his arrest, most of which are either substantially true or non-actionable statements of opinion. The only exception is Galanakis's statement that Winters was "convicted of domestic abuse," which a reasonable juror could find to be defamatory and the basis for a false light invasion of privacy claim given that Winters was never even charged with domestic abuse, much less convicted.

For these reasons, and others set forth more fully below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (ECF 40), GRANTS IN PART and DENIES IN PART Galanakis's Motion for Summary Judgment on Counterclaims (ECF 44; ECF 46) and DENIES Winters's Motion for Partial Summary Judgment on Liability (ECF 45). The following claims will go to trial: (i) Galanakis's section 1983 claims against Winters and Wing (Count I); (ii) Galanakis's false arrest claims against Winters and Wing (Count IV); (iii) Galanakis's *respondeat superior* claim against the City of Newton (Count VI); (iv) part of Winters's defamation claim against Galanakis (Counterclaim Count I); and (v) part of Winters's false light invasion of privacy claim against Galanakis (Counterclaim Count V). All other claims are dismissed.

## II.    FACTUAL BACKGROUND.

### A.    Resolving Disputed Issues of Fact.

"When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019). The recitation of facts in this section is designed to be consistent with this standard.

### B.    Galanakis's Detention and Arrest.

Shortly after midnight on August 28, 2022, Officer Winters was on active-duty patrol in his Newton Police Department vehicle, accompanied by Lieutenant Wing. Galanakis was driving with his bright lights on, in arguable violation of Iowa Code 321.415, prompting Officer Winters to initiate a stop. After pulling him over, Winters approached the driver's window of the vehicle

to speak with Galanakis, while Wing approached the passenger side of the vehicle. (Wing BWC,[1] 13:59–18:00.) Winters asserts that Galanakis had "watery and blood shot eyes,"—although this is not apparent in Winters's body worn camera footage—and that there was "a small odor of an alcoholic beverage that was coming from his person." (ECF 40-3, p. 14[2].) Multiple air fresheners were hanging from the rearview mirror of the car and Galanakis was chewing gum. (Winters BWC,[3] 14:00–14:10.)

Winters informed Galanakis of the basis for the stop, and Galanakis explained that he was using his brights because one of his headlights was out. Winters asked: "you've got your license, registration, and insurance with you?" to which Galanakis replied: "yeah I've got you." (Id., 14:23–14:28.) Galanakis then looked for registration and insurance documents in his glove compartment while answering a series of questions from Winters about ownership of the car, where Galanakis had been that evening, and whether he had been drinking. (Id., 14:30–15:24.) Galanakis retrieved two documents and began handing them to Winters while asking: "Is it one of these right here?" Winters responded, "that's the registration" and Galanakis noted, "I just got a new one so I don't know which one's the old one. . . I'll just give you both of them." (Id., 15:23–15:43.) Winters took the current registration, leaving Galanakis with the other document; after reviewing the one Winters did not take, Galanakis acknowledged it was the old registration. (Id., 16:03–16:10.) Galanakis then provided his license, and Winters requested proof of insurance.[4] Galanakis searched his glove compartment, producing a document that Winters noted was expired. (Id., 16:30–16:57.) Galanakis then pulled up the current proof of insurance on his phone. (Id., 16:58–17:25.) Winters alleges that Galanakis "moved slowly" and "was speaking with a slowed slurred speech" (ECF 40-3, p. 14), although the body worn camera footage does not appear to support this allegation—or, at least, a reasonable juror could conclude that it does not. (*See* Winters BWC, 13:58–17:25.) For his part, Wing's assessment was that Galanakis "had some trouble locating the requested documents." (ECF 40-3, p. 17.)

---

[1] "Wing BWC" refers to Wing's body-worn camera footage, found in the record at ECF 57-4, p. 78. Pin citations to the video recording from Wing's body camera are to the time stamp in the upper right-hand corner of the video.
[2] All page citations are to the auto-populated page number inserted by CM/ECF on the upper righthand corner of each page. These numbers often do not match the page numbers on the bottom of the page inserted by the parties.
[3] "Winters BWC" refers to Winters's body-worn camera footage, found in the record at ECF 40-3, p. 9. Pin citations to the video recording from Winters's body camera are to the time stamp in the upper right-hand corner of the video.
[4] Although Defendants characterize this as a second request (ECF 40-2, ¶ 9), the first interaction was not explicitly a demand for documents. Winters asked whether Galanakis had the relevant documents, and Galanakis answered in the affirmative. (Winters BWC, 14:23–14:28.)

Winters instructed Galanakis to remove his chewing gum, exit his vehicle, and accompany Winters to the patrol car. Galanakis did so. (Winters BWC, 17:24–18:12.) While Winters looked up Galanakis's information on the computer in his squad car, Galanakis told Winters he was a freshman on the William Penn University football team. (Id., 18:50–19:15.) Galanakis asked if he could record their interaction, and Winters consented. (Id., 20:36–20:40.) They also discussed ownership and title of the vehicle. (Id., 21:30–21:44.) Winters again asked how much Galanakis had to drink that night, with Galanakis saying, "none." Galanakis consistently denied drinking throughout their interaction and repeatedly asked to "blow," in reference to a preliminary breath test (PBT), often known as a "breathalyzer." (Id., 19:27–34:12.) Winters asked Galanakis why his eyes were watery and bloodshot, and Galanakis explained that he had contacts, later noting that he was not wearing them at the time. (Id., 19:34–19:45, 21:57–21:59.) As with the earlier portion of the video, a reasonable juror could conclude that the body worn camera footage does not show Galanakis with bloodshot eyes. Winters also told Galanakis that he had an "odor of alcohol coming from [his] person." (Id., 20:10–20:14.) Winters then had Galanakis exit the vehicle to perform field sobriety tests. (Id., 21:51–21:55.) It was raining at the time. (Id.)

Winters began by checking Galanakis's eyes. (Id., 22:33–25:00.) Winters instructed Galanakis to track his finger with his eyes and not move his head. (Id.) While completing this portion of the test, Galanakis complained that the rain would mess up his hair and commented on the size of Winters's finger, prompting him to ask whether Winters played football. (Id., 24:00–24:16.) In his report, Winters wrote that Galanakis "did not show any clues of impairment in this test." (ECF 40-3, p. 15.)

Next, Winters had Galanakis complete a walk-and-turn field sobriety test. (Winters BWC, 25:02–27:30.) At Galanakis's request, they selected an area with a straight path for Galanakis to perform the test, although Winters noted that "it's not very flat." (Id., 25:05–25:15.) Winters gave Galanakis instructions on how to complete the test, explaining that he needed to take nine steps heel-to-toe, keeping his arms down at his sides. (Id., 25:20–25:43.) Winters then demonstrated how to take the steps. (Id., 25:43–25:50.) Winters explained that, upon reaching the ninth step, Galanakis needed to take a series of small steps to turn around and take nine heel-to-toe steps back. (Id. 25:50–25:58.) Galanakis began talking over him, asking clarifying questions. (Id., 25:55–26:06.) Winters also instructed Galanakis to count his steps out loud and not stop before completing the test. (Id., 26:07–26:13.) Before Galanakis started, Winters asked whether he had

4

injuries that would interfere with the performance of the test; Galanakis mentioned an ankle injury but assured Winters that he would be able to complete the test. (Id., 26:12–26:25.)

Galanakis performed the walk-and-turn test. (*See* id., 26:26–27:30.) Winters asserts that Galanakis failed the test and showed the following clues of impairment: (1) stepped off the line; (2) improper number of steps; (3) stopped while walking; (4) improper turn; (5) missed heel to toe. (ECF 40-3, p. 15.) In a later report, Wing said he observed two clues: (1) improper number of steps and (2) improper turn. (ECF 57-4, p. 44.) Galanakis's expert acknowledged three clues: (1) improper number of steps; (2) stopped while walking; (3) improper turn. (Id., p. 63). Galanakis also did not count his steps out loud as instructed. After the test, Galanakis again requested a breath test, announcing that he was "two for two" on the sobriety tests. (Winters BWC, 27:14–27:20.) Winters expressed his disagreement with that assessment and asked Galanakis why he took fourteen and fifteen steps during the tests, instead of nine as instructed. Galanakis said, "I thought you were going to tell me when to turn" and "oh, my fault. (Id., 27:20–27:30.)

Next, Winters had Galanakis complete a one-leg stand field sobriety test. (Id., 27:30–29:50.) As Winters began his instructions, Galanakis told him: "you a rookie bro" and asked: "is this your first year?" and "how many false accusations you got?" before commenting, "this about to be your first." (Id., 27:36–27:52.) Winters continued giving instructions and demonstrated how to complete the test. (Id., 27:58–28:15.) Winters told Galanakis to "watch the tip of your toe, keep your arms down at your side, and count out loud in the following manner." (Id., 28:10–28:15.) Galanakis interjected, asking Winters to repeat the directions; Winters did. (Id., 28:14–28:28.) Galanakis then asked Winters to demonstrate the test a second time and Winters did. (Id., 28:27–28:33.) Winters reminded Galanakis to "count out loud in the following manner: 1001, 1002, 1003, 1004, so on and so forth until I tell you to stop." (Id., 28:32–28:45.) Before beginning the test, Winters asked Galanakis "why are you shaking so much?" to which Galanakis responded "it's freezing man!", noting that Winters was in pants while he was in shorts and it was raining. Galanakis also explained that the false accusations made him nervous. Winters responded: "I wear shorts when it's 30 below," prompting Galanakis's retort: "congratulations." (Id., 28:46–29:10.)

Galanakis began the one-leg stand test but did not count out loud as instructed. (Id., 29:12–29:50.) Winters reminded Galanakis to keep his leg straight and, when asked by Galanakis, confirmed that Galanakis's foot was six inches off the ground. (Id., 29:14–29:20.) Winters also asked Galanakis how he'd been told to count, and Galanakis acknowledged "one Mississippi, two

Mississippi, three Mississippi" before commenting, "I honestly forgot how you told me but I'm doing this pretty well" and "just tell when to switch . . . it's getting pretty cold; it's ridiculous." (Id., 29:26–29:48.) In his subsequent report, Winters identified two clues of impairment during this test: Galanakis was (1) swaying side to side and (2) kept his right arm away from his body for balance. (ECF 40-3, p. 15). However, this contradicts statements Winters made to Drug Recognition Expert Officer Andrew Shrinkle the night of the arrest, when he said there were no issues with this test. (Winters BWC, 54:58–55:01.) A reasonable juror could conclude, in any event, that the video does not reflect "swaying" or Galanakis keeping his right arm away from his body for balance. For his part, Wing's report states that he observed no signs of impairment during this test. (ECF 57-4, p. 44.)

At this point, Winters told Galanakis "I've got one more test for you" and had Galanakis follow his finger with his eyes again. (Winters BWC, 29:50–30:55.) In his subsequent report, Winters concluded that Galanakis showed "a lack of convergence in both his eyes. . . [which] is an indicator of impairment" (ECF 40-3, p. 15), although this is not evident from the video. Winters then apparently changed his mind about not needing more tests, choosing to administer a modified Romberg test in which Galanakis was to close his eyes, put his head back, and estimate the passage of thirty seconds. (Winters BWC, 30:56–31:53.) Based on the time counter from the body worn camera footage, it appears that Galanakis estimated the passage of thirty seconds after twenty-nine actual seconds. (Id.) Nonetheless, on the night of the arrest, Winters wrote thirty-four seconds on his written report (ECF 40-3, p. 15) and incongruously told Shrinkle that Galanakis took thirty-seven or thirty-eight seconds. (Winters BWC, 38:51–38:55, 55:05–55:10). There is nothing in the record to explain the discrepancy between what the body camera footage shows and what Winters later said and wrote. In any event, Winters also reported that he observed Galanakis to have eye lid tremors and swayed side to side, which he concluded were signs of impairment. (ECF 40-3, p. 15.) A reasonable juror could conclude that the body worn camera footage does not show this.

Next, Winters had Galanakis perform a finger-to-nose sobriety test. (Winters BWC, 32:16–33:45.) Winters instructed Galanakis to close his eyes, tilt his head back, and touch the tip of his nose with the tip of his finger, following Winter's commands. Galanakis performed the test. (Id.) In his report, Winters stated that Galanakis had multiple signs of impairment in that he had "a hard time keeping his head titled back . . . had eye lid tremors, and . . . never touched the tip of his nose with the tip of his finger." (ECF 40-3, pp. 15–16.) A reasonable juror could conclude that the body

worn camera footage does not corroborate Winters's assessment. Throughout these tests, Wing primarily acted as an observer, although Galanakis occasionally directed questions to Wing or asked a question to which Wing responded. (*See, e.g.*, Wing BWC, 30:05–30:10, 32:02–32:16).

Following the field sobriety tests, Winters finally offered Galanakis a PBT, which Galanakis had requested multiple times. (Winters BWC, 35:00–35:11.) The test revealed a blood alcohol content of 0.00. (Id.; ECF 40-3, p. 16.) Nonetheless, Winters advised Galanakis that he was going to read him his *Miranda* rights anyway, asking, "when's the last time you smoked weed?" (Winters BWC, 35:11–35:22.) After eight to ten seconds, Galanakis answered: "I do not remember that." (Id., 35:22–35:32.) Galanakis repeatedly denied smoking that night, noting that he would be kicked off the football team. (Id., 35:32– 36:55.) Winters informed Galanakis that he believed him to be under the influence and said Galanakis could speak with another officer and undergo a drug influence evaluation. (Id., 37:00–37:30.) Galanakis initially agreed but later declined, stating he wanted to go home. (Id., 40:30–40:44.) At that point, Winters instructed Galanakis to put his hands behind his back to be handcuffed and arrested him for operating while intoxicated. (Id., 40:45–40:55; ECF 40-3, p. 16.)

Winters and Wing took Galanakis to the police station, where Winters and Galanakis discussed his performance on the sobriety tests and completed additional paperwork. (Winters BWC, 46:35–53:54.) Galanakis submitted to a drug influence evaluation by Shrinkle, who concluded Galanakis was "not under the influence of a drug." (ECF 57-4, p. 41.) Galanakis was released without charges. (ECF 40-3, p. 16.) Prior to leaving the police station, Galanakis spoke with Winters and admonished him for his actions. (ECF 45-3, p. 6, 37:39–40:06.[5])

    *C.*    *Social Media Activity and Related Events Following Galanakis's Arrest.*

On August 29, 2022, Galanakis posted a statement on Facebook recounting his version of the events surrounding his arrest. (ECF 46-3, pp. 67–70.) The Facebook post received one thousand "likes" and over eight hundred comments. (Id.) After the post, Winters's ex-girlfriend proactively contacted Galanakis. (ECF 66-4, p. 16; ECF 46-3, pp. 63–66.) In their online conversation, the ex-girlfriend (referred to in this Order as "C.V.") said that Winters had "a protective order against him and still works as a cop." (ECF 46-3, p. 63.) She said she had not filed criminal charges but did file a petition for a civil no-contact order. (Id., p. 64.) Galanakis searched

---

[5] For this video—which is an edited compilation of other videos—the cited times are those listed on the video player, as opposed to the time stamp in upper right corner of video.

Winters's name on Iowa Courts Online and came across information relating to a "petition for relief from domestic abuse." He did not pay to access full versions of the documents. (Id., p. 74; ECF 45-2, ¶ 18; ECF 66-2, ¶ 18.) Some of the court documents, including the petition for relief from domestic abuse, are included in the summary judgment record, along with an affidavit from C.V., screenshots from some of her text messages with Winters, and documents from a Newton Police Department internal investigation. (ECF 46-3, pp. 21–56.) These documents include C.V.'s account of having been stalked, harassed, and physically abused by Winters, including him pushing her onto a bed; holding her down and twisting her wrist; squeezing the back of her neck slightly while saying that if he "squeezed right now it would kill you"; grabbing her wrist and pulling her back while walking with a group; elbowing her in the chest so hard that it left a bruise; and slamming her onto his bed, holding her down by the wrists, saying she could not leave until he said so. (Id.) The documents corroborate her statements that there was a civil no-contact order in place against Winters but do not indicate that Winters was ever charged with or convicted of domestic abuse. (Id.)

At his deposition in October 2023, Winters was asked about specific allegations made by C.V., including whether he: elbowed her in the chest while they were in the patrol car; tackled her from behind; grabbed her wrist in a violent manner; and pinned her down on the bed by her wrists and told her she could leave when he told her she could leave. In response, Winters repeatedly invoked his Fifth Amendment privilege. (Id., pp. 81–82.) He likewise invoked the Fifth Amendment when questioned about the contents of the petition for relief from domestic abuse that preceded the no-contact order. (Id., pp. 82–83.) Later, in response to Galanakis's Motion for Summary Judgment, Winters for the first time provided specific responses and denials to C.V.'s allegations in an affidavit dated January 17, 2024. (ECF 67-3, pp. 18–20.)

There were many comments to Galanakis's initial Facebook post in late August 2022 about his interactions with Winters on the night of the arrest. Galanakis publicly replied to some of these comments with statements implicating Winters in domestic abuse and impugning Winters's fitness to perform his job. (ECF 46-3, pp. 68–70.) Galanakis also criticized Winters's "boss" for allowing Winters to carry a gun after committing domestic abuse. (Id., p. 69.)

In September 2022, Galanakis posted a video on YouTube.com under the title "Police Wrongfully Arrest 19 Year Old During Traffic Stop." (ECF 46-3, p. 73.) The video is an edited compilation of police body-worn camera footage and Galanakis's phone recording from the night

of the arrest. Overlaying the video, Galanakis inserted scrolling text which reads: "NATHAN WINTERS OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX GIRLFRIEND. THE CHIEF OF POLICE ALLOWED NATHAN WINTERS TO STAY ON THE FORCE EVEN AFTER NATHAN BEAT THE SHIT OUT OF HIS GIRLFRIEND. ROB BURDESS (THE CHIEF OF POLICE) HAD NO COMMENT ON THIS." (ECF 45-3, p. 6, 38:24–38:38; ECF 46-3, p. 73.) The YouTube video went viral, with over two million views, 63,000 "likes," and more than 18,000 comments. (ECF 45-3, p. 7.)

On the YouTube page, in a text box immediately below the video, Galanakis posted links to his GoFundMe and Paypal accounts under the heading "To help support." (https://www.youtube.com/watch?v=so_bFYoIsow (last accessed February 6, 2024.)) He also included the following additional information:

> Nathan Winters and LT Wing of The Newton Police Department falsely arrest teen in Newton Iowa. Tayvin Galanakis was pulled over for driving with his high beams on, and then was later falsely arrested for driving while intoxicated even after blowing 0's. Officer Nathan Winters has a no contact order involving domestic abuse in 2021 after beating his ex girlfriend. The Chief of police Rob Burdess allowed Nathan Winters to keep his job as an officer even after the news of domestic abuse.

(Id.) On the GoFundMe page, Galanakis said he was soliciting donations to help pay attorney fees. (ECF 67-3, p. 67.) Through this fundraiser, Galanakis received at least $2,768. (Id.; ECF 45-2, ¶ 22; ECF 66-2, ¶ 22.) Galanakis spent some of the funds on discretionary expenses, and the remaining funds are in his personal bank account; none of the donations had been used to pay attorney fees. (ECF 45-2, ¶¶ 23–25; ECF 66-2, ¶¶ 23–25.) Galanakis also received at least $2,000 in ad revenue from YouTube. (ECF 45-2, ¶ 26; ECF 66-2, ¶ 26.) The video remains publicly accessible on YouTube.

*C. Legal Proceedings.*

On January 5, 2023, Galanakis filed a petition in state court alleging that Winters and Wing unlawfully arrested him without reasonable suspicion or probable cause. (ECF 1-1, ¶¶ 9–54.) Galanakis brings claims against Winters and Wing under 42 U.S.C. § 1983; article I, section 8 of the Iowa Constitution; and Iowa common law. (Id., ¶¶ 55–76, 93–102.) He also brings claims against the City of Newton and Chief of Police (collectively, "Defendants"). (Id., ¶¶ 77–92, 103–116.) Defendants removed the case to federal court, where Winters and Wing filed counterclaims against Galanakis for defamation, making false complaints, invasion of privacy, and intentional

9

infliction of emotional distress. (ECF 1; ECF 3.) The Court dismissed some of the counterclaims but left partially intact Winters's and Wing's claims for defamation (Counts I and II) and invasion of privacy (Counts V and VI). *See Galanakis v. City of Newton*, No. 4:23-cv-00044-SHL-SBJ, 2023 WL 3479167 (S.D. Iowa May 8, 2023). Defendants now move for summary judgment on Galanakis's claims, and the parties cross-move for summary judgment on counterclaims asserted by Winters and Wing.

## III.    LEGAL STANDARDS.

### A.    Summary Judgment Standards.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of identifying "the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). Once met, the burden shifts to the nonmoving party to respond with evidentiary materials "showing the presence of a genuine issue for trial," such that "a jury could reasonably find in his favor." *Id*. at 997 (citing *Torgerson*, 643 F.3d at 1042 and *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). Doing so requires the nonmovant to show more than "some metaphysical doubt as to the material facts." *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The Court may consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," in considering if each party met its burden. *Church v. Anderson*, 249 F. Supp. 3d 963, 969 (N.D. Iowa 2017) (citing Fed. R. Civ. P. 56(c)), *aff'd*, 898 F.3d 830 (8th Cir. 2018). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Gray v. FedEx Ground Package Sys., Inc.*, 799 F.3d 995, 999 (8th Cir. 2015) (quoting *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, there is a genuine issue for trial." *Id.* (citing *Torgerson*, 643 F.3d at 1042).

  *B.  Qualified Immunity for Individual Officers Under Federal Law.*

  Galanakis brings claims pursuant to 42 U.S.C. § 1983, which imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Government officials are protected against section 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

  "Qualified immunity 'is an immunity from suit rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (emphasis omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

  Law enforcement officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). Moreover, all disputed facts must be interpreted in the plaintiff's favor when defendants move for summary judgment based on qualified immunity. *Tolan*, 572 U.S. at 657.

  In assessing whether a right is clearly established, "[t]he relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful." *Jackson v. Stair*, 944

F.3d 704, 711 (8th Cir. 2019). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)). This means a plaintiff must "identify controlling authority or 'a robust consensus of cases of persuasive authority' placing the constitutional question beyond debate." *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

C. *Liability for Supervisors and Government Entities under Federal Law.*

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Relatedly, "a supervisor may . . . be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)). "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions. *Id*. (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

D. *Qualified Immunity under Iowa Law.*

Iowa Code § 670.4A grants qualified immunity to law enforcement officers and others if "[t]he right, privilege, or immunity secured by the law was not clearly established at the time of the alleged deprivation, or ... the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law." "In enacting § 670.4A, it appears the Iowa Legislature was adopting a state law version of qualified immunity that tracks the qualified immunity doctrine as it exists under federal law." *Stark v. Hamelton*, No. 3:18-CV-00069-RGE-SHL, 2021 WL 4056716, at *4 (S.D. Iowa Sept. 2, 2021). State law qualified immunity is only relevant, however, if the plaintiff has stated a viable claim under Iowa law in the first place. In *Burnett v. Smith*, the Iowa Supreme Court held that "we no longer recognize a standalone cause of action for money damages under the Iowa Constitution

unless authorized by the common law, an Iowa statute, or the express terms of a provision of the Iowa Constitution." 990 N.W.2d 289, 307 (Iowa 2023). The impact of *Burnett* on Galanakis's claims will be discussed below.

## IV.   LEGAL ANALYSIS – GALANAKIS'S CLAIMS.

### A.   *The Court Denies Winters's Motion for Summary Judgment on Galanakis's Section 1983 Claim (Count I).*

Galanakis's section 1983 claim against Winters revolves around the Fourth Amendment right to be free from arrest without probable cause. "To establish a Fourth Amendment violation, 'the claimant must demonstrate a seizure occurred and the seizure was unreasonable.'" *Quraishi v. St. Charles County*, 986 F.3d 831, 839 (8th Cir. 2021) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). "Under the Fourth Amendment, the temporary detention of a motorist during a traffic stop is a 'seizure,' which is 'subject to the constitutional imperative that it not be unreasonable under the circumstances.'" *State v. Brown*, 930 N.W.2d 840, 845 (Iowa 2019) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). "Generally, a traffic stop is reasonable when the police have probable cause or reasonable suspicion to believe that the motorist violated a traffic law." *Id.* "Officers are nonetheless entitled to qualified immunity if there is 'arguable probable cause,' which exists when an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Robbins v. City of Des Moines*, 984 F. 3d 673, 680 (8th Cir. 2021) (cleaned up) (quoting *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013)). An officer who arrests an individual without arguable probable cause violates that individual's clearly established constitutional rights. *Schaffer v. Beringer*, 842 F.3d 585, 592 (8th Cir. 2016).

"Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). "We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.'" *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). "If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials." *Id.* (quoting *Whren*, 517 U.S. at 814). "This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts and it promotes evenhanded, uniform enforcement of the law." *Id.* (citation omitted).

Galanakis concedes—and the Court would, in any event, conclude—that Winters had at least reasonable suspicion for the initial traffic stop based on Galanakis's use of high beams. *See* Iowa Code § 321.415(1)(a) (prohibiting drivers from using high beams when approaching an

oncoming vehicle within 1,000 feet). Further, Winters did not violate Galanakis's constitutional rights by extending the stop to perform field sobriety tests to investigate whether Galanakis might be under the influence of a controlled substance. Winters arguably had reasonable suspicion for this investigation—albeit just barely—based on Galanakis's improper use of the high beams, the time of night, the fact that Galanakis was chewing gum (which might have been designed to mask the smell of alcohol), and the presence of multiple air fresheners in the vehicle. *See State v. Pennington*, No. 15-0657, 2016 WL 541227, at *1–2 (Iowa Ct. App. Feb. 10, 2016) (officer had reasonable suspicion based on smell of alcoholic beverages and perfume, which, in the officer's experience, "is often used to attempt to mask the smell of alcoholic beverages").

Winters did not, however, have arguable probable cause for arrest after Galanakis completed the field sobriety tests and blew 0.00 on the breathalyzer. By that point, Winters had interacted with Galanakis for over twenty minutes, during which time a reasonable juror could conclude that Galanakis's speech and movements were not even remotely consistent with someone under the influence of a controlled substance. There is nothing in the body worn camera video to suggest, for example, that Galanakis was slurring his words, struggling to engage in conversation, or otherwise demonstrating features of impairment in his verbal or physical conduct. To the contrary, Galanakis was moving confidently and directing subtle and not-so-subtle verbal jabs at Winters in a manner that would have been difficult for an impaired person. Moreover, although Galanakis had his high beams on when Winters pulled him over, there is otherwise nothing in the record to indicate that Galanakis was driving erratically. Winters does not suggest, for example, that prior to being pulled over Galanakis was changing speeds, having trouble staying in his lane, or otherwise driving in a manner consistent with impairment. *See State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004) (holding that officer lacked reasonable suspicion of impairment where driver did nothing more than briefly cross the edge line of a divided roadway). Finally, Galanakis insisted almost from the first moment that he wanted to blow into a breathalyzer, which would be a remarkable act of bravado for someone under the influence. *See State v. Haviland*, 532 N.W.2d 767, 769 (Iowa 1995) (suspect's decision to drive *toward* approaching police officer did not contribute to reasonable suspicion). Whatever his original suspicions, Winters did not have enough evidence by the time of arrest to amount to even arguable probable cause that Galanakis was operating under the influence. *See Becker v. Crank*, No. 1:12-CV-111SNLJ, 2014 WL 5849371, at *1–2 (E.D. Mo. Nov. 12, 2014) (refusing to grant judgment as a matter of law for defendant on

qualified immunity grounds where "video showed plaintiff ably navigating pulling over while crossing a busy interstate exchange, removing his weapons and walking to defendant's vehicle, and speaking clearly while, among other things, requesting a breathalyzer").

In urging the Court to conclude otherwise, Winters focuses on alleged indicators of impairment like Galanakis's appearance and isolated problems with Galanakis's performance on the field sobriety test, among other things. A reasonable juror could conclude, however, that many of these alleged indicators were not present at all. Those that remain are not enough to establish arguable probable cause following Galanakis's completion of the field sobriety tests and the 0.00 reading on the breathalyzer.

Take, for example, Winters's assertion that Galanakis had bloodshot eyes, exhibited slurred speech, and smelled of alcohol. The body worn camera footage does not show bloodshot eyes or slurred speech, and thus a reasonable juror could find Winters non-credible as to those alleged indicators of impairment. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that courts should not accept assertions of fact that are inconsistent with video evidence). Similarly, Galanakis blew 0.00 on the breathalyzer, no alcohol was found in his vehicle, and the officer who later drug tested Galanakis at the police station did not smell alcohol. On this record, the Court cannot credit Winters's statement that he smelled alcohol without making a credibility determination, which is "improper at the summary judgment stage." *Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) (reversing entry of summary judgment for defendant on qualified immunity grounds because no video or audio recording supported officer's version of events).

Winters's claim that Galanakis struggled to find his insurance and registration paperwork also does virtually nothing to contribute to the presence of probable cause. Galanakis "struggled" to find his registration and insurance paperwork only in the sense that he had expired versions of each document in his glove compartment, along with the current version of the registration. But Galanakis promptly recognized this and told Winters as much as he was handing him the documents, following which Galanakis was able to quickly pull up current insurance information on his phone. In the meantime, Galanakis gave detailed and coherent answers—without any sign of slurred speech—to Winters's questions about where he lived, whose car he was driving, and whether he had anything to drink, among other topics. To the extent this portion of the encounter is indicative of intoxication at all, it provides only weak support and not enough on its own to constitute reasonable suspicion, much less probable cause. *See Tague*, 676 N.W.2d at 205–06

(declining to find reasonable suspicion of intoxication or fatigue based on facts that would be present as to "a substantial portion of the public . . . each day") (quoting *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993), *overruled on other grounds by Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)); *Haviland*, 532 N.W.2d at 768 (officer lacked reasonable suspicion where he offered nothing more than "inchoate and unparticularized suspicion or hunch" of unlawful activity).

Galanakis's statement about being drug tested "every Friday" also adds little to the probable cause analysis when the facts are viewed in the light most favorable to him. Winters asserts that he knew this statement to be false because Galanakis played football for William Penn University, which is under the auspices of the National Association of Intercollegiate Athletics ("NAIA"). Winters alleges that he is familiar with NAIA drug testing policies and procedures, which only require drug testing before a championship game, not on a weekly basis. (ECF 40-2, ¶¶ 68–71.) Winters's incident report does not mention anything about this, however (ECF 40-3, pp. 14–16), and thus a reasonable juror could conclude it was not something Winters realized or contemplated during the stop. Moreover, and in any event, a single false or misleading statement would not be enough to establish arguable probable cause for arrest given the surrounding evidence of non-impairment.

Turning to the field sobriety tests, the parties dispute whether and to what extent Galanakis showed signs of impairment. Based on the body worn camera footage—and viewing the facts in the light most favorable to Galanakis when the footage is not definitive—the Court concludes that Galanakis had very minor issues with the field sobriety tests in the sense that he failed to follow Winters's instructions on the number of steps he should take, how to turn around, and whether to count out loud. These so-called "clues" of impairment cannot, however, be divorced from the surrounding context. At the time of the field sobriety tests, Galanakis and Winters were bickering and interrupting each other. Galanakis's isolated failures to follow directions therefore were more indicative of the fact that he and Winters were distracting each other than of impairment. *See District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (probable cause is a "fluid concept" that requires courts to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause") (cleaned up) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983) and *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). To that end, although Galanakis acted smugly during this

portion of the encounter, nothing about the way he was moving or communicating was suggestive of intoxication; rather, his words and physical movements were steady and confident. Galanakis's performance during the field sobriety tests was therefore not enough, even when considered in conjunction with the small handful of other "clues" of intoxication for which no genuine dispute of fact exists, to give a reasonable officer in Officer Winters's position arguable probable cause to believe Galanakis was intoxicated.

The arguable probable cause analysis would change, of course, if the breathalyzer showed evidence of alcohol in Galanakis's system. But it didn't. Not even a drop. At that point, interpreting disputed facts in the light most favorable to Galanakis, it was time for Winters to end the encounter and release Galanakis for lack of probable cause. Winters refused to do so, however, instead pivoting and claiming that Galanakis must have been under the influence of *marijuana*, not alcohol. As Winters does not claim to have smelled marijuana up to that point in the encounter— and as the Police Department's drug recognition expert later concluded Galanakis was not under the influence of marijuana (ECF 57-4, p. 41)—a reasonable juror could conclude that Winters was simply manufacturing reasons for arrest by that point, and there was not arguable probable cause for arrest. As Judge Limbaugh aptly explained in *Becker v. Crank*:

> [t]he Court cannot say as a matter of law that defendant's "mistake" of arresting a sober person for driving while intoxicated was objectively reasonable under the circumstances. The defendant did not explain how he could have smelled the strong order of alcohol on plaintiff, and plaintiff and/or the video of the encounter itself refuted defendant's purported reasons for arresting plaintiff.

2014 WL 5849371, at *2.

The only remaining issue is whether it was "clearly established" that Winters could not arrest Galanakis for driving while intoxicated in the circumstances presented here. At first glance, this does not appear to be a close call: of course an officer cannot arrest a person for driving while intoxicated when the person is not slurring speech, has no physical manifestations of impairment like bloodshot eyes or trouble with balance, has not engaged in erratic driving, does not smell like alcohol or marijuana, has not admitted to drinking alcohol or using controlled substances, adamantly insists from the outset on being given a breathalyzer, and ultimately passes the breathalyzer with a 0.00 reading. Upon closer inspection, however, the question is at least modestly more difficult because there is no Iowa Supreme Court case specifically holding that probable cause does not exist to arrest someone for operating while intoxicated in these circumstances. Instead, at most, the Iowa Supreme Court has merely held that there is not reasonable suspicion of

intoxication or fatigue when a driver briefly crosses the lane line but is not otherwise seen to have driven erratically and did not nod his head or show any sign of drowsiness. *Tague*, 676 N.W.2d at 205–06; *see also Haviland*, 532 N.W.2d at 768 (no reasonable suspicion where vehicle was temporarily parked in private business and began to leave as officers approached). Winters argues that the absence of squarely-on-point authority means he is entitled to qualified immunity.

The Court disagrees. Although officers must be on notice that their conduct violates constitutional rights, "officers cannot escape suit merely because no prior case involved exactly the same facts as alleged by the plaintiff." *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010). "Rather, 'the contours of an alleged constitutional right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right."'" *Id.* (quoting *Smook v. Minnehaha County*, 457 F.3d 806, 813 (8th Cir. 2006)). "In other words, the rights as set forth in the holdings of existing cases are clearly established not only as to the facts of the prior cases, but also as applied in contexts that reasonable officers would understand to fall within the scope of those rights." *Id.*

This principle squarely applies here. Iowa Supreme Court and Court of Appeals cases have repeatedly recognized the significance of slurred speech, signs of physical impairment, the odor of alcohol/marijuana, bloodshot eyes, erratic driving, the suspect's admissions, and the results of a breathalyzer exam (or the suspect's refusal to take such an exam) in determining whether reasonable suspicion or probable cause exists for driving while intoxicated. *See, e.g.*, *State v. Warren*, 955 N.W.2d 848, 866–67 (Iowa 2021) (officer had reasonable suspicion to extend stop based on "strong odor" of marijuana and "faint order" of alcohol and the driver's bloodshot eyes, droopy eyelids, and admission that "it does smell like weed"); *State v. Stevens*, 394 N.W.2d 388, 391 (Iowa 1986) (concluding officer had reasonable suspicion to investigate intoxication where: the defendant and another man left a bar around 2:00 a.m.; the defendant was seen "slumped down" and non-responsive a short time later in the front seat of a car while its engine was running; and the defendant's companion admitted they were drinking together); *Saunders v. Comm'r of Pub. Safety*, 226 N.W.2d 19, 22 (Iowa 1975) (officer had "reasonable grounds" to detain plaintiff based on "erratic driving, the smell of alcohol on his breath, his difficulty in producing his driver's license, and his unstable walk"); *State v. Wenzel*, 987 N.W.2d 473, 485 (Iowa Ct. App. 2022) (probable cause existed where suspect failed to yield to emergency vehicle, had bloodshot and glassy eyes, slurred speech, rejected all field sobriety tests, and admitting to drinking one beer). It

18

follows that when a reasonable juror could conclude that none of those factors is present—and especially when a breathalyzer test yields a blood-alcohol level of 0.00—there is not arguable probable cause for arrest. Indeed, holding otherwise would subject a "substantial portion of the public" to arrest for driving while intoxicated. *Tague*, 676 N.W.2d at 205–06 (declining to find reasonable suspicion of intoxication or fatigue based on facts that would apply to many drivers). Probable cause is "not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), but it requires more than Winters had on August 28, 2022. Thus, when the facts are interpreted in the light most favorable to Galanakis, a reasonable juror could conclude that Winters violated Galanakis's clearly established rights under the Fourth Amendment by arresting him for driving while intoxicated. The Court therefore DENIES Winters's motion for summary judgment on Count I.

> B.  *The Court Denies Wing's Motion for Summary Judgment on Galanakis's Section 1983 Claim (Count I).*

Typically, the Court must "conduct an individualized analysis of each officer's alleged conduct to determine whether the factual allegations against each individual officer were sufficient to overcome qualified immunity." *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013). Here, however, Defendants have not moved for summary judgment on Count I on behalf of Wing for any reason other than that there was arguable probable cause to arrest Galanakis for driving while intoxicated, nor have they developed the factual record in any way specific to Wing. Thus, although the Court doubts that Wing is identically situated to Winters for qualified immunity purposes, there is no basis on the existing record to evaluate Wing's liability on an individualized basis. Instead, his entitlement to qualified immunity rises and falls with Winters. Because the Court has concluded that Winters is not entitled to qualified immunity at the summary judgment stage, it must reach the same conclusion as to Wing. The Court therefore DENIES Wing's motion for summary judgment on Count I.

> C.  *The Court Grants Winters's and Wing's Motion for Summary Judgment on Galanakis's State Law Constitutional Claims (Count II).*

When Galanakis originally filed this case, the existing state of Iowa law was that an aggrieved party could bring direct tort claims under the Iowa Constitution for money damages against government officials. *See Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), *overruled by Burnett*, 990 N.W.2d at 289. Galanakis therefore included, as Count II, a state constitutional claim against Winters and Wing for unreasonable seizure under Iowa Constitution article I, section 8. (ECF 1-1, pp. 12–14.) In May 2023, the Iowa Supreme Court overruled *Godfrey* and concluded

19

there is no longer a "standalone cause of action for money damages under the Iowa Constitution unless authorized by the common law, an Iowa statute, or the express terms of a provision of the Iowa Constitution." *Burnett*, 990 N.W.2d at 307. It follows that Galanakis's Count II is no longer viable. *See id.* (affirming dismissal of claims for, *inter alia*, unreasonable seizure under Iowa Constitution article I, section 8).

Galanakis does not seriously argue that Count II remains viable despite *Burnett*. Rather, he argues that Winters and Wing "waived" the right to rely on *Burnett* by failing to raise it as a basis for summary judgment in their opening Brief, which instead focused on arguing that Winters and Wing were entitled to qualified immunity under state law. (ECF 40-1, pp. 15–18.) While it is unclear why Winters and Wing initially chose to focus solely on qualified immunity on Galanakis's state law claims, this does not mean they have waived the ability to raise *Burnett* as a defense to Count II. Pursuant to Fed. R. Civ. P. 12(h)(2), the defense of failure to state a claim upon which relief can be granted "may be raised . . . at trial." As *Burnett* gives Winters and Wing a basis for arguing that Count II fails to state a claim upon which relief can be granted, they can raise *Burnett* "at the latest at trial on the merits" without waiving it. *Brooks v. Monroe Sys. for Bus., Inc.*, 873 F.2d 202, 205 (8th Cir. 1989); *see also E&I Glob. Energy Servs., Inc. v. Liberty Mut. Ins. Co.*, No. 4:20-CV-04033-KES, 2023 WL 3966352, at *6 (D.S.D. June 13, 2023), *reconsideration denied*, No. 4:20-CV-04033-KES, 2023 WL 8809325 (D.S.D. Dec. 20, 2023) (allowing party to raise failure to state a claim defense for the first time at trial).

Both sides also suggest it is an open question under Iowa law whether *Burnett* applies retroactively; as in, maybe constitutional tort claims remain viable if, as here, they were filed after *Godfrey* but before *Burnett*. The Court disagrees. *Burnett* itself involved a constitutional tort claim that was filed after *Godfrey*. If the Iowa Supreme Court intended for *Burnett* not to have retroactive effect, it should have overruled *Godfrey* but also allowed the plaintiff's claim to move forward. It did not do so. Instead, *Burnett* affirmed the district court's dismissal of the constitutional tort claim as a matter of law. *See* 990 N.W.2d at 289. It is therefore self-evident that *Burnett* has retroactive effect. *See also Venckus v. City of Iowa City*, 990 N.W.2d 800, 812 (Iowa 2023) (affirming dismissal of pre-*Burnett* constitutional tort claim). As stated by the Iowa Court of Appeals, "Iowa no longer recognizes *Godfrey* constitutional tort claims, whether on file before *Burnett* or not . . . ." *Dishman v. State*, No. 22-1491, 2023 WL 8068563, at *3 (Iowa Ct. App. Nov. 21, 2023).

Given that Winters and Wing failed to properly raise *Burnett* in their motion for summary judgment, the Court could, in theory, choose not to address *Burnett* now and instead let the parties prepare for trial as if Count II is still viable. However, this would be an enormous waste of everyone's time given that the impact of *Burnett* is obvious: Count II fails as a matter of law. There is no reason to wait until the close of trial to so hold. The Court therefore GRANTS Winters's and Wing's motion for summary judgment on Count II.

> D. *The Court Grants Burdess's and the City of Newton's Motion for Summary Judgment on Galanakis's Section 1983* <u>Monell</u> *Claim (Count III) and Negligent Supervision and Training Claim (Count V).*

"*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, plaintiffs seeking to impose liability on a local government entity must "prove that their constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Edwards v. City of Florissant*, 58 F.4th 372, 376 (8th Cir. 2023) (cleaned up) (quoting *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)). "[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018).

"Policy and custom are not the same thing." *Corwin*, 829 F.3d at 699–700. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* at 700 (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). By contrast, to establish municipal liability through an official "custom," a plaintiff must show:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

In addition, "[i]n limited circumstances, a local government may be liable for its 'decision not to train certain employees about their legal duty to avoid violating citizens' rights.'" *Folkerts v. City of Waverly*, 707 F.3d 975, 982 (8th Cir. 2013) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The failure to train must rise to 'deliberate indifference' to be actionable." *Id.* "A

pattern of similar constitutional violations by untrained employees is ordinarily necessary to show deliberate indifference." *Id.* "It may be, however, that 'evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Id.* (quoting *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

Relatedly, "a supervisor may . . . be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson*, 747 F.3d at 543 (quoting *Tlamka v.*, 244 F.3d at 635). "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)). When pursuing supervisor liability on a failure supervise theory, the plaintiff must show the supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). Likewise, for failure to train, the plaintiff must prove that the supervisor's actions or omissions amounted to deliberate indifference to the likelihood that subordinate officers would violate constitutional rights, and the "alleged failure to train actually caused the constitutional deprivation." *McGuire v. Cooper*, 952 F.3d 918, 923 (8th Cir. 2020) (quotation omitted).

Even when the facts are viewed in the light most favorable to him, Galanakis has not done enough to allow a reasonable juror to conclude that the Burdess or the City of Newton had a policy or custom of arresting people for driving while intoxicated despite the absence of probable cause. Indeed, Galanakis's resistance to Defendants' motion for summary judgment barely mentions Burdess and the City at all (ECF 58, pp. 32–33), much less to the degree that would allow a *Monell* claim to reach the jury. There is simply no evidence of a "municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Edwards*, 58 F.4th at 376 (cleaned up) (quoting *Ware*, 150 F.3d at 880).

Galanakis's section 1983 claims against Burdess and the City also fail to the extent he is arguing failure to train or supervise as a basis for liability. At most, the record shows there were two other possible problems with Winters's handling of traffic stops on the night of Galanakis's arrest. Absent evidence that Burdess and the City were previously on notice of such problems, this is nowhere near enough for Galanakis to establish liability on a failure to train or supervise theory, which, for section 1983 purposes, requires proof of deliberate indifference to the rights of persons with whom Winters interacts. *See Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (affirming summary judgment on failure to train claim where police chief did not have notice of other incidents involving similar conduct); *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) (same). The Court therefore GRANTS Burdess's and the City of Newton's motion for summary judgment on Count III.

To the extent Galanakis is trying to bring *Monell* claims against Wing, the effort fails. He did not originally name Wing as a defendant in Count III, and it is too late for him to try to amend his pleadings now. *See, e.g.*, *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716–17 (8th Cir. 2008) (holding that district court erred in allowing late amendment to pleadings where amending party failed to establish good cause).

Finally, the Court GRANTS Burdess's and the City of Newton's motion for summary judgment on Count V, which asserts a state law claim for negligent supervision and training. As with Count III, Galanakis devotes virtually no attention in his brief to what Burdess and the City of Newton allegedly did wrong beyond the simple fact that the City employed Winters and Burdess was the Chief of Police. This is not enough to allow a negligent training or supervision claim against either the City or Burdess to reach the jury. "It is not enough to show the mistakes or negligent conduct of the employee; rather, to recover against the employer under a negligent-training theory, evidence of a *specific* standard of care for training *and its breach* is required." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 709 (Iowa 2016) (reversing jury verdict and holding as matter of law that negligent training theory was not viable).

E.  *The Court Denies Winters's and Wing's Motion for Summary Judgment on the State Law False Arrest Claim (Count IV).*

To prove a claim for false arrest under Iowa law, Galanakis must show: (1) he was detained or restrained against his will; and (2) the detention or restraint was unlawful. *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002). When an arrest is made without a warrant, "the burden of proof shifts to the defendant to show justification for the arrest." *Children v. Burton*, 331

23

N.W.2d 673, 679 (Iowa 1983). Iowa Code § 804.7 permits warrantless arrests in several scenarios, two of which are relevant here: (1) "Where a public offense has in fact been committed, and the peace officer has reasonable grounds for believing that the person to be arrested has committed it"; and (2) "Where the peace officer has reasonable grounds for believing that an indictable public offense has been committed and has reasonable grounds for believing that the person to be arrested has committed it." Iowa Code §§ 804.7(1)(b), (c).

"Reasonable grounds" as used in section 804.7 is "equivalent to traditional 'probable cause.'" *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). However, "[t]he statutory standard for warrantless arrests under Iowa law is not identical to the federal constitutional standard." *Veatch v. City of Waverly*, 858 N.W.2d 1, 7–8 (Iowa 2015). An arrest that satisfies the Fourth Amendment "will not automatically satisfy the statutory requirements for warrantless arrests under section 804.7." *Id.* at 8. Conversely, Iowa courts apply a "less demanding" probable cause standard to civil false arrest claims than to those raised in connection with a criminal prosecution: "[i]f the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Children*, 331 N.W.2d at 680; *see also Veatch*, 858 N.W.2d at 7 (same). In other words, courts must give an officer greater latitude when the officer is defending civil claims for false arrest than when the officer is part of prosecuting a criminal case against the arrestee.

In support of their motion for summary judgment on Count IV, Winters and Wing rely entirely on qualified immunity and the presence of arguable probable cause for Galanakis's arrest. Because the Court has already concluded for purposes of Galanakis's section 1983 claim that the undisputed facts do not entitle Winters and Wing to qualified immunity as a matter of law, the Court DENIES their motion to dismiss Count IV.

> F. *The Court Denies the City of Newton's Motion for Summary Judgment on the* Respondeat Superior *Claim (Count VI).*

The final claim at issue in Defendants' motion for summary judgment is Galanakis's *respondeat superior* claim against the City of Newton (Count VI). *Respondeat superior* is not a viable theory of recovery on federal section 1983 claims, *see City of Canton*, 489 U.S. at 385, and thus Count VI is relevant only as to Galanakis's state law claim for false arrest (Count IV). As noted above, Winters and Wing sought summary judgment on Count IV on qualified immunity grounds and because, in their view, there was arguable probable cause for arrest. As the Court denied their motion for summary judgment on Count IV on those grounds, and as the City of

Newton has not raised any other basis for summary judgment on Count VI, the Court DENIES the City's motion for summary judgment on Count VI. *See Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994) ("A claim of vicarious liability under the doctrine of *respondeat superior* rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment.").

### G. Summary of Rulings on Defendants' Motion for Summary Judgment.

The record contains sufficient facts, viewed in the light most favorable to Galanakis, to allow his section 1983 claims for unlawful seizure (Count I) and his state law claims for false arrest (Count IV) against Winters and Wing to reach the jury. He is likewise entitled to jury trial on his *respondeat superior* claim against the City of Newton (Count VI) arising out of the state law false arrest claim. Conversely, Winters and Wing are entitled to judgment as a matter of law on Galanakis's state law constitutional claims (Count II), and Burdess and the City of Newton are entitled to judgment as a matter of law on his federal *Monell* claims (Count III) and state law claims for negligent supervision and training (Count V).

## V.   LEGAL ANALYSIS – WINTERS'S AND WING'S COUNTERCLAIMS.

### A. The Court Grants in Part and Denies in Part Galanakis's Motion for Summary Judgment and Denies Winters's Motion for Partial Summary Judgment on Winters's Defamation Counterclaim (Counterclaim Count I).

In Counterclaim Counts I and II, Winters and Wing, respectively, bring claims against Galanakis for defamation based on messages posted on social media about his arrest. In a prior ruling, the Court dismissed many aspects of Winters's and Wing's defamation counterclaims but allowed a few claims to proceed. *See Galanakis v. City of Newton*, No. 4:23-CV-00044-SHL-SBJ, 2023 WL 3479167, at *5–11 (S.D. Iowa May 8, 2023). Specifically, the Court concluded that Winters alleged plausible defamation claims in Counterclaim Count I as to the following social media statements by Galanakis (all emphasis in original): (i) "NATHAN WINTER OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX GIRLFRIEND (ECF 3, Counterclaim ¶ 12.a); (ii) "EVEN AFTER NATHAN BEAT THE SHIT OUT HIS GIRLFRIEND (id., ¶ 12.b); (iii) NATHAN WINTERS OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING OF HIS EX GIRLFRIEND THE CHIEF OF POLICE ALLOWED NATHAN WINTERS TO STAY ON THE FORCE EVEN AFTER NATHAN BEAT THE  SHIT OUT HIS GIRLFRIEND (id., ¶ 12.r); (iv) "I don't even want to refer to him as officer winters, this guy is on

25

the slow side of the spectrum" (id., ¶ 12.d); and (v) "Officer Winters is not fit mentally for the job and physically" (id., ¶ 12.g). The Court concluded that Wing alleged a plausible defamation claim in Counterclaim Count II based on the following social media statement by Galanakis: "[Winters's] boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a woman." (Id., ¶ 35.b.)

> 1. <u>Galanakis Is Entitled to Summary Judgment on Counterclaim Count I as it Relates to Statements About Winters's Fitness for his Job.</u>

Unlike the motion to dismiss ruling—when the Court was required to accept as true the allegations of the counterclaims—the factual record is now developed as to each of the allegedly defamatory statements. With the benefit of additional context, the Court concludes that summary judgment must be granted in Galanakis's favor as to the statements that Winters "is on the slow side of the spectrum" and "is not fit mentally for the job and physically." These statements were made as part of a Facebook post in which Galanakis described, in detail, his entire encounter with Winters and Wing on August 28, 2022. (ECF 46-3, pp. 67–68.) It is obvious, in this context, that Galanakis was merely offering opinions about Winters based on his interactions with him during the traffic stop. It is therefore a "protected expression" that cannot give rise to liability for defamation. *See Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021). The Iowa Supreme Court has repeatedly and consistently held as a matter of law that statements like the ones made by Galanakis about Winters's fitness and job performance are not defamatory. *See Yates v. W. Iowa Racing Ass'n*, 721 N.W.2d 762, 773 (Iowa 2006) (describing a dog kennel as producing "substandard and poor performers"); *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 492 (describing a doctor's standard of care as "incompetent"); *see also Cap. Ideas, LLC v. Springboard Advert. LLC*, No. 20-0296, 2021 WL 4592831, at *6 (Iowa Ct. App. Oct. 6, 2021) (describing a competitor as having "no ethics"). Accordingly, the Court grants summary judgment in Galanakis's favor as to the statements that Winters "is on the slow side of the spectrum" and "is not fit mentally for the job and physically."

> 2. <u>Galanakis Is Entitled to Summary Judgment on Counterclaim Count I as it Relates to Statements About Winters "Beating" His Ex-Girlfriend.</u>

Galanakis is also entitled to summary judgment on Winters's defamation claims arising out of statements that Winters "beat" his ex-girlfriend. Galanakis submitted an affidavit from the ex-girlfriend alleging that Winters indeed physically assaulted her, including elbowing her in the chest so hard it left a mark, pushing her, slamming or pushing her down on a bed twice, holding

her down on a bed twice, twisting her wrist, and squeezing the back of her neck slightly while saying that if he "squeezed right now it would kill you." (ECF 46-3, pp. 21–23.) If true, these facts would be enough to make Galanakis's statements "substantially true" and thus absolve him from liability for defamation. *See Hovey v. Iowa St. Daily Pub. Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985) (holding that substantial truth is a defense to defamation).

Whether these facts are disputed is a complicated question. During his deposition, Winters exercised his Fifth Amendment right against self-incrimination when asked questions about whether he physically assaulted his ex-girlfriend. (ECF 46-3, pp. 81–84.) After Galanakis submitted the ex-girlfriend's affidavit as part of the summary judgment record, however, Winters submitted his own affidavit contesting her allegations. (ECF 67-3, pp. 18–20.) The Court must decide whether Winters can create a genuine dispute of material fact in this manner.

The District of Minnesota dealt with a similar issue in *S.E.C. v. Brown*, in which the defendant offered broad explanations for disputed transactions in his interrogatory responses but then pled the Fifth Amendment in his deposition, thus "prevent[ing] the [opposing party] from exploring and clarifying [the interrogatory] responses in a deposition." 579 F. Supp. 2d 1228, 1235 (D. Minn. 2008), *aff'd*, 658 F.3d 858 (8th Cir. 2011). *Brown* concluded that the defendant could not use the interrogatory responses in opposing summary judgment, as this "would allow him to manipulate the discovery process so that his unquestioned, conclusory assertions are the only version of his testimony in the record." *Id.* A similar problem is present here. Winters refused to answer questions about the situation that led to the protective order in his deposition when opposing counsel could have probed for more details, tested his recollection of events, and otherwise tried to expose possible inaccuracies in his testimony. Now, however, Winters wants to create a factual dispute anyway and have the Court deny summary judgment. The Court agrees with *Brown* that this is improper. By invoking the Fifth Amendment so many times during his deposition, Winters gave up the ability to challenge the facts forth in the affidavits and other materials in Galanakis's filings. *See id.*

Other courts have reached this same conclusion. In *First Bank Bus. Cap., Inc. v. Agriprocessors, Inc.*, the Northern District of Iowa cited cases from the First, Second, and Fourth Circuits where courts "confronted with a subsequent waiver of the Fifth Amendment after its invocation during discovery . . . have deemed it appropriate to strike the party's affidavit or other submissions in resistance to a motion for summary judgment." No. 08-CV-1035-LRR, 2010 WL

300630, *8 (N.D. Iowa Jan. 19, 2010). In *First Bank*, one of the defendants in the civil action was also a defendant in a related criminal proceeding. *Id.* Despite the "potential burden" to defendants in these circumstances, the court recognized that a defendant should not be allowed to invoke the Fifth Amendment and shield himself from questioning during discovery, then later "offer his own, undisturbed accounts of events as a means of creating a factual dispute." *Id.* at *9. The court noted that the defendant's failure to seek the court's protection during discovery—the defendant, in fact, actively opposed a stay—mitigated Fifth Amendment concerns and tipped the scales in favor of striking the affidavit. *Id.*

In reaching this conclusion, it is important to note that Winters's manipulation of the discovery process is, in some respects, worse than what the defendants did in *Brown* and *First Bank*. There, the defendants were sued by someone else and thus involuntarily forced into the position of having to respond to interrogatories, sit for a deposition, and otherwise engage in the discovery process about their potentially criminal conduct. Here, by contrast, Winters *chose* to raise counterclaims for defamation against Galanakis. By doing so, he knew or should have known this would place his underlying conduct at issue, yet he exercised his Fifth Amendment right against self-incrimination during his deposition anyway. A litigant cannot affirmatively bring defamation claims against an opposing party, repeatedly refuse to answer questions about those claims in a deposition on Fifth Amendment grounds, then try to create disputed issues of material fact at summary judgment by submitting an affidavit on the same subjects to which he previously objected on Fifth Amendment grounds. *See Brown*, 579 F. Supp. 2d at 1235; *McKeller v. Rubel*, 2009 WL 913908, *2–3 (E.D. Mo. Mar. 31, 2009) (striking allegations from plaintiff's verified complaint—treated as an affidavit for summary judgment proceedings—where the plaintiff invoked the Fifth Amendment in response to questions related to his claims during his deposition).

In these circumstances, the Court will treat the affidavit of Winters's ex-girlfriend as unrebutted such that there is no genuine dispute of material fact about the accuracy of her statements regarding Winters's physical assault. It follows that Galanakis's statements about Winters "beating" his ex-girlfriend must be treated as substantially true. Galanakis is therefore entitled to summary judgment on Winters's Counterclaim Count I as it relates to those statements.

3.   Neither Side Is Entitled to Summary Judgment on Galanakis's Statements that Winters Was "Convicted" of Domestic Abuse.

The remainder of Counterclaim Count I involves Galanakis's statements that Winters was "convicted" of domestic abuse. The Court carefully evaluated the defamatory impact of these

statements in its prior ruling, ultimately deciding to follow persuasive authority from other jurisdictions holding that a statement that someone has been "convicted" of a crime is capable of defamatory meaning when the person has merely been subject to civil, administrative, or investigative proceedings. *See St. Surin v. Virgin Island Daily News, Inc.*, 21 F.3d 1309, 1317–18 (3d Cir. 1994); *Cate St. Cap. Inc. v. Indus. Intel. Inc.*, No. 1:14-CV-00200-JCN, 2015 WL 12564165, at \*4–6 (D. Me. Oct. 28, 2015); *McGarry v. CBS, Inc.*, CIV. A. No. 91-4638, 1991 WL 280247, at \*1–2 (E.D. Pa. Dec. 23, 1991). The point of these cases is that society views a criminal conviction differently than a civil judgment, and thus a statement that someone has been "convicted" of a crime they have never even been charged with is not "substantially true." *See Galanakis*, 2023 WL 3479167, at \*5–7. Nothing in the summary judgment record changes the Court's prior analysis, and thus Galanakis is not entitled to summary judgment on Counterclaim Count I as it relates to the statements about Winters being "convicted" of domestic abuse.

The Court also denies Winters's motion for partial summary judgment as to the same statements. Winters asserts that the statements about him being "convicted" of domestic abuse are defamation per se, and thus he merely must prove three elements: Galanakis "(1) published a statement that was (2) defamatory (3) of and concerning [Winters]." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996). As the undisputed facts establish elements (1) and (3) and the Court has concluded as a matter of law that the statements are capable of defamatory meaning for purposes of element (2), Winters argues there is nothing left for him to prove. *See Bierman v. Weier*, 826 N.W.2d 436, 463–64 (Iowa 2013) (holding that plaintiff in defamation per se case "need not prove any falsity, fault or reputational injury (damages)"). Galanakis, by contrast, argues this is not a defamation per se case: that his statements about Winters's domestic abuse "involve matters of public concern," and thus Winters must prove falsity, fault, and reputational injury (damages). *See id.* at 448 ("[Defamation] per se is available only when a private figure plaintiff sues a nonmedia defendant for certain kinds of defamatory statements that do not concern a matter of public importance.").

In *Bierman*, the Iowa Supreme Court explained the difference between matters of public and private concern:

> Public concern protection serves the constitutional goal of "assur[ing] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." On the other hand, "purely private disputes such as a lawsuit in

which the impact is limited primarily to the parties involved, even though perhaps
of interest to the public, are insufficient to create a matter of public concern."

*Id.* at 462 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985)
and *Johnson v. Nickerson*, 542 N.W.2d 506, 511 (Iowa 1996)). *Bierman* held that a published
statement that might inspire or affect others is not enough to make the statement a "matter of public
concern." *Id.*

Neither *Bierman* nor any other Iowa Supreme Court case cited by the parties has addressed
whether a police officer's alleged assault against a former domestic partner is a matter of public
concern. Courts in other jurisdictions have held, however, that a public official's fitness for
employment is indeed a matter of public concern. *See Muller v. Fort Pike Volunteer Fire Dep't*,
275 So.3d 927, 937 (La. App. 4 Cir. 2019) (holding that public entity's employment of firefighter
despite prior conviction was matter of public concern). Similarly, courts have held that statements
criticizing a police officer's job performance involve matters of public concern. *See Turner v.
Devlin*, 848 P.2d 286, 290 (Ariz. 1993); *Mariano v. Borough of Dickson City*, CIV. A. No.  3:13-
0097, 2013 WL 6234622, at *8 (M.D. Pa. Dec. 2, 2013). The Court concludes that the Iowa
Supreme Court would find this authority persuasive and require Winters to prove falsity, fault, and
reputational injury to win a defamation claim arising out of Galanakis's statement about Winters
being "convicted" of domestic abuse.

The closest thing to on-point authority from the Iowa Supreme Court supports this
conclusion. In *Johnson v. Nickerson*, the Iowa Supreme Court held that "[c]riminal prosecutions
and judicial proceedings in criminal cases 'are without question events of legitimate concern to
the public'" due to the public's "interest in insuring the laws of the state are properly enforced."
542 N.W.2d at 512 (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975)). *Nickerson*
therefore held that an attorney's allegation that prejudice might have played a part in a jury verdict
against a minority defendant was a matter of public concern. *See id.* Given Winters's role in the
criminal justice system, his own criminal and domestic abuse history (or lack thereof) are matters
of public concern relating to his fitness for office, and thus he must prove falsity, fault, and
reputational injury in a defamation claim involving statements about that history. *See id.*

There is a genuine dispute of material fact about whether Winters suffered reputational
injury from the allegedly defamatory statement. *See, e.g.*, *Nelle v. WHO Television, LLC*, 342 F.
Supp. 3d 879, 899–900 (S.D. Iowa 2018) (denying motion for summary judgment on defamation
claims). A reasonable juror could conclude that if Winters actually physically assaulted his ex-

girlfriend, he did not suffer reputational injury from a false statement of having been "convicted" of such conduct even though the statement is untrue. The Court therefore denies each side's Motion for Summary Judgment on Winters's Counterclaim Count I.

                4.  <u>Summary of Rulings on Counterclaim Count I.</u>

In sum, as to Winters, the Court GRANTS IN PART and DENIES IN PART Galanakis's Motion for Summary Judgment on the defamation claims (Counterclaim Count I) and DENIES Winters's Motion for Partial Summary Judgment on those same claims. The jury will have to decide whether Galanakis defamed Winters by saying he had been "convicted" of domestic abuse. In all other respects, Winters's defamation claims fail as a matter of law.

    *B.  The Court Grants Galanakis's Motion for Summary Judgment on Wing's Defamation Counterclaim (Counterclaim Count II).*

As to Wing (Counterclaim Count II), the Court GRANTS Galanakis's Motion for Summary Judgment. The only allegedly defamatory statement is: "[Winters's] boss needs to make a statement. He's the one allowing this guy to walk around with a gun after beating up a woman." (ECF 23, Counterclaim ¶ 35.a.) As an initial matter, it is questionable whether a reasonable listener would have understood this statement to refer to Wing given that only Chief Burdess has ultimate authority on matters of police officer discipline and the surrounding social media posts in which Galanakis identified Burdess by name as the Police Chief. (ECF 67-1, ¶ 41; ECF 45-3, p. 6, 38:24–38:38). Even setting this aside, however, Galanakis's evidence is sufficient to show that it is "substantially true" that Winters physically assaulted a woman. *See Hovey*, 372 N.W.2d at 256. It is also true that Winters was allowed to continue serving as a police officer; i.e., to continue "walk[ing] around with a gun." It follows that the statement that Winters's boss is "allowing this guy to walk around with a gun after beating up a woman" is substantially true and cannot be defamatory even if a listener could understand the word "boss" to refer to Wing rather than Burdess. *See id.* Moreover, and in any event, Galanakis's prefatory statement that Winters's boss "needs to make a statement" is a clear indicator, in context, that Galanakis was offering his opinion about what whether Winters was fit to serve as a police officer. For this reason, too, the statement is non-defamatory as a matter of law. *See Yates*, 721 N.W.2d at 773 (holding that statement of opinion based on facts is not capable of defamatory meaning).

*C. The Court Grants in Part and Denies in Part Galanakis's Motion for Summary Judgment and Denies Winters's Motion for Partial Summary Judgment on Winters's Invasion of Privacy Claim (Counterclaim Count V).*

Winters's final counterclaim (Counterclaim Count V[6]) asserts invasion of privacy. Under Iowa law, there are four types of "invasion of privacy" claims: (1) "unreasonable intrusion upon the seclusion of another;" (2) "appropriation of the other's name or likeness;" (3) "unreasonable publicity given to the other's private life;" and (4) "publicity that unreasonably places the other in a false light before the public." *Koeppel v. Speirs*, 808 N.W.2d 177, 181 (Iowa 2011) (quoting Restatement (Second) of Torts, § 652A(2), at 376). Winters focuses on the fourth type here.

To state a claim for false-light invasion of privacy, a plaintiff must establish the following:

(1) Defendant[] gave publicity to a matter concerning [Plaintiff] that placed him before the public in a false light; (2) the false light [Plaintiff] was placed in would be highly offensive to a reasonable person; and (3) [Defendant] had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Plaintiff] was placed.

*Mills v. Iowa*, 924 F. Supp. 2d 1016, 1035 (S.D. Iowa 2013). "The essential element of untruthfulness differentiates 'false light' from the other forms of invasion of privacy and many times affords an alternate remedy for defamation even though it is not necessary for a plaintiff to prove that he or she was defamed." *Anderson v. Low Rent Hous. Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa 1981).

Galanakis is entitled to summary judgment on some aspects of Winters's invasion of privacy claims, but not others. Under Iowa law, false light invasion of privacy claims overlap significantly with defamation claims, although the two doctrines are not identical. *See id.* at 248–49. For reasons stated above, Galanakis's statements about Winters not being fit for his job are statements of opinion that cannot give rise to a viable claim for defamation. It follows that they are not "false" for purposes of the invasion of privacy. *See id.* (plaintiff must prove "falsity of the matters asserted"); *see also Crowley v. Fox Broad. Co.*, 851 F. Supp. 700, 704 (D. Md. 1994) ("[A] claim for false light invasion of privacy may not stand unless the claim also meets the standards for defamation.") (applying Maryland law); *Rooks v. Krzewski*, No. 306034, 2014 WL 1351353, at *21 (Mich. Ct. App. Apr. 3, 2014) (statement of subjective opinion is not actionable in claim for false light invasion of privacy). Galanakis's statements about Winters "beating" his ex-

[6] There are no Counterclaim Counts III and IV because the Court dismissed those claims pursuant to Fed. R. Civ. P. 12(b)(6).

girlfriend are also not actionable in a false light invasion of privacy claim because they are deemed substantially true due to Winters's exercise of his Fifth Amendment rights. *See Anderson*, 304 N.W.2d at 248 (untruthfulness is an "essential element" of a false light invasion of privacy claim). Galanakis is therefore entitled to summary judgment on Winters's invasion of privacy claims arising out of those statements.

Galanakis is not entitled to summary judgment on Winters's invasion of privacy claims arising out of the statements about being "convicted" of domestic abuse. A reasonable juror could conclude that these statements invaded Winters's privacy and cast him in a false light in a situation where he was never even charged—much less convicted—of anything. *See Anderson*, 304 N.W.2d at 242 (affirming jury verdict for plaintiff in false light invasion of privacy claim where defendant published false statements about the reasons for plaintiff's termination); *McFarland v. McFarland*, 684 F. Supp. 2d 1073, 1093 (N.D. Iowa 2010) (false statements of physical abuse are actionable under false light invasion of privacy theory). It follows that Galanakis is not entitled to summary judgment on this aspect of Winters's invasion of privacy claim.

Conversely, Winters is not entitled to partial summary judgment on Counterclaim Count V, either. Given the evidence that Winters physically assaulted his ex-girlfriend, a reasonable juror could conclude that (i) Galanakis did not place Winters before the public in a false light that would be highly offensive to a reasonable person, and/or (ii) Winters did not suffer any resulting damages. *See, e.g.*, *Bierman*, 826 N.W.2d at 466 (affirming district court's denial of defendant author's motion for summary judgment on false light invasion of privacy claim); *Newkirk v. GKN Armstrong Wheels, Inc.*, 168 F. Supp. 3d 1174, 1202 (N.D. Iowa 2016) (denying motion for summary judgment on invasion of privacy claim). The Court therefore GRANTS IN PART and DENIES IN PART Galanakis's Motion for Summary Judgment and DENIES Winters's Motion for Partial Summary Judgment on Counterclaim Count V.

> D. *The Court Grants Galanakis's Motion for Summary Judgment on Wing's Invasion of Privacy Claim (Counterclaim Count VI).*

Finally, the Court concludes that Galanakis is entitled to summary judgment on Wing's invasion of privacy claim (Counterclaim Count VI). As explained above, the statement that Winters's "boss" is "allowing this guy to walk around with a gun after being up a woman" is substantially true because Winters indeed has been allowed to continue serving as a police officer despite evidence—which, again, the Court must treat as unrebutted—that he physically assaulted his ex-girlfriend. Wing therefore cannot establish the "essential element of untruthfulness" even if

he could convince a juror that the reference to Winters's "boss" is a reference to him, rather than Burdess. *See Anderson*, 304 N.W.2d at 248. The Court GRANTS Galanakis's Motion for Summary Judgment on Counterclaim Count VI.

## VI.   CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (ECF 40), GRANTS IN PART and DENIES IN PART Galanakis's Motion for Summary Judgment on Counterclaims (ECF 44; ECF 46), and DENIES Winters's Motion for Partial Summary Judgment on Liability (ECF 45).

**IT IS SO ORDERED.**

Dated: February 8, 2024

_____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE