1

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
                       CENTRAL DIVISION

- - - - - - - - - - - - - - - X
TAYVIN GALANAKIS,                :
                                 :
       Plaintiff,                :
                                 :
vs.                              :      Case No. 4:23-cv-44
                                 :
CITY OF NEWTON, IOWA; ROB        :    TRANSCRIPT OF HEARING ON
BURDESS, NATHAN WINTERS,         :   MOTIONS FOR SUMMARY JUDGMENT
and CHRISTOPHER WING,            :
individually and in their        :
Official capacities with         :
the Newton Police Department,    :
                                 :
       Defendants.               :
- - - - - - - - - - - - - - - X
```

                              Courtroom 265, Second Floor
                              U.S. Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa
                              January 22, 2024
                              10:01 a.m.

BEFORE:  THE HONORABLE STEPHEN H. LOCHER, District Judge

APPEARANCES:

For the Plaintiff:        MATTHEW M. BOLES, ESQ.
                          ADAM C. WITOSKY, ESQ.
                          Gribble, Boles, Stewart & Witosky, LLC
                          215 Grand Avenue, Suite 200
                          Des Moines, IA  50312

For the Defendants:       DOUGLAS A. FULTON, ESQ.
                          Brick Gentry, P.C.
                          6701 Westown Parkway, Suite 100
                          West Des Moines, IA  50266


                    By videoconference:
               TONYA R. GERKE, CSR, RDR, CRR
                  United States Courthouse
              123 East Walnut Street, Room 197
                    Des Moines, IA 50309

1    P R O C E E D I N G S

2         THE COURT:  Please be seated.  Good morning.

3         We're convened in Galanakis versus City of Newton,

4    et al.  This is City of Newton 4:23-cv-44.

5         We're convened on multiple motions -- cross-motions

6    really -- for summary judgment.  We've got a court reporter, but

7    she's remote, so whoever is going to do the talking today,

8    you're welcome to stay at your seat.  Wherever you end up going,

9    just please make sure you speak slowly and into the microphone

10   carefully so that she can hear you and transcribe everything.

11   I'll try to do the same.  I usually violate it more than the

12   lawyers do.

13        In any event, because we've got cross-motions, I

14   didn't necessarily have any strong feeling about how we should

15   proceed, and if you've talked about proceeding in a particular

16   manner in terms of who's going to go first, that's fine.

17   Otherwise, what I propose is that I hear from the defense first,

18   then the plaintiff.  Both sides, because there's so much

19   overlap, should just go ahead and talk about all the issues --

20   your motion for summary judgment, your resistance to their

21   motion for summary judgment and so on -- and then I will give

22   each side an opportunity for rebuttal at the end as well.

23        So with that in mind, I'll hear from the defense first

24   unless, again, you talked about some other plan.

25        MR. FULTON:  We did not, Your Honor.

1            MR. WITOSKY:  No, Your Honor, and I'm fine with that

2    procedure.

3            THE COURT:  All right.  Very good.

4            MR. FULTON:  Would you like us to go to the podium

5    stand?

6            THE COURT:  Either place.  Like I said, just as long

7    as you're tucked in to the microphone so the court reporter can

8    hear you.

9            MR. FULTON:  Should we say seated so that she can

10   hear?

11           THE COURT:  Yes, please.

12           MR. FULTON:  Thank you, Your Honor.

13           Douglas Fulton for Defendants City of Newton, Nathan

14   Winters, and Christopher Wing.  I'll speak to our motion for

15   summary judgment.

16           As you know, this is a matter that arose out of a stop

17   instituted by Officer Winters in the City of Newton.  What we've

18   brought our motion for summary judgment on is the fact -- the

19   qualified immunity in general for the officer bringing the

20   arrest.  The -- and we know that qualified immunity is

21   specialized and is not to be given without due analysis, but we

22   would also say that when you're considering a claim of qualified

23   immunity, you can't look backwards, you know, to say was this

24   a -- was the arrest ultimately successful and a conviction and

25   then go backwards and see whether or not the actions were

1    reasonable in light of whether there was a conviction or not.

2           In these kind of cases, the Court's got to take a look

3    at all the circumstances that are presented to the officer, what

4    the officer did, what the officer noticed, and to give the

5    officer a -- the benefit of the doubt as to whether or not his

6    arrest -- the stop was legitimate.

7           In this case we think that qualified immunity --

8    qualified immunity is appropriate because we're trying to

9    determine whether a driver is under the influence of a

10   substance, and that's a judge call -- a judgment call based upon

11   imperfect information.  In cases like this, officers have to be

12   allowed to have space to make reasonable judgment calls even if

13   they end up being wrong.  It's kind of like a medical

14   malpractice case.  Just because there's a bad outcome doesn't

15   mean that there is malpractice or that there's negligence.

16          So in this case we believe that we have set forth a

17   factual basis that shows all of the factors that went into

18   Officer Winters' decision:  the stop for failure to dim brights,

19   the inability of Mr. Galanakis to find, locate his registration

20   and his insurance card, the field sobriety tests given to

21   Mr. Galanakis which he didn't complete effectively and didn't

22   seem to be listening to or understanding the instructions, the

23   fact that --

24          THE COURT:  Let me ask this about the following of

25   instructions point.  When I look at the totality of the

1 circumstances and when I watched the videos of this stop, one of

2 the things that I see is there's this sort of sophomoric battle

3 of verbal jabs back and forth between Galanakis and Winters.

4 They're both, I think, acting sort of obnoxiously toward one

5 another.  I can't remember if it was your brief or the

6 plaintiff's brief that talked about them bickering, and I

7 thought that was an accurate word.

8         When it comes to Mr. Galanakis not following

9 instructions correctly, do I take into account the fact that

10 there was this verbal jousting going back and forth and that

11 part of the reason he wasn't able to follow the instructions is

12 because he and Winters alike were both too eager to engage in

13 this sort of dialogue with each other?  In other words, do I

14 just look at the failure to follow the instructions in

15 isolation, or do I need to consider it in a larger context where

16 they're engaged in this verbal jousting?

17         MR. FULTON:  Well, I think you can look at the larger

18 context, Your Honor, and I'm sure the Court will.

19         What I would say to that, though, is that, yes, there

20 was some verbal back and forth between the two of them, but the

21 instructions were clear, and they were repeated multiple times,

22 and so I think that when you take into account the fact that

23 these two are kind of engaging in back and forth, it still

24 doesn't obviate the fact that on multiple occasions -- maybe if

25 there had been one occasion, but on multiple occasions, there

1   was a problem with Mr. Galanakis following those instructions.

2   There was an inability or an unwillingness to listen to what the

3   officer said.  That's what the officer was presented with, and

4   that's what he utilized to make his determination that he needed

5   to go further in the process and the arrest.

6          So I think you can consider it, but I think when you

7   look at the totality and the number of times that it happened,

8   we've got a suspect here who simply, like I say, refuses or is

9   unable to listen to those instructions.  The wrong counting,

10   saying, I thought you were going to tell me when to turn and not

11   counting the number of steps -- I mean, just -- to me that

12   wasn't the back and forth.  That was simple instructions:  Do

13   this; this is how you do it; do it.

14          And I believe that if you look at those, this is one

15   of those cases where both parties could have acted better.

16   Absolutely.  But I think when you look at just the sheer

17   instructions given and what was being -- what the officer was

18   looking for, I think then you start to see a problem with

19   Mr. Galanakis's actions rather than his words, and so that's

20   what we'd ask the Court to look for because I don't think that

21   the -- you know, the back and forth had anything to do with

22   that.

23          I also think that if the qualified immunity is going

24   to be denied, it must be because that -- there is a legal

25   principle that general -- clearly prohibits the officer's

1  conduct in the particular circumstances before him, and I think

2  that what we've seen from the plaintiff's own expert is Officer

3  Winters did what he did.  He might be -- someone might question

4  why he did what he did, but the fact of the matter is there's no

5  established principle that he engaged in that was clearly a

6  violation of law or clearly a violation of established

7  principle, and so we really believe that -- that the law favors

8  the qualified immunity for Officer Winters notwithstanding all

9  of the other conduct and all of the other discussions that

10  occurred.

11         THE COURT:  So let me ask how the body-worn camera

12  footage plays into this because as I understand it, one of the

13  reasons that Officer Winters gave for believing that he had

14  probable cause was that he thought Mr. Galanakis's eyes were

15  bloodshot at the beginning of their encounter, and when I look

16  at Iowa law on driving while intoxicated, that is a relevant

17  indicator.

18         The problem I have, though, is I think a reasonable

19  juror could look at the video and conclude that Mr. Galanakis

20  did not have bloodshot eyes, and there are other factors as well

21  that the video shows.  For example, in a lot of cases the

22  suspect is slurring speech or is delayed in responding to

23  things, and here Mr. Galanakis was almost comically not delaying

24  in responding to things.  He was too adamant because he was

25  trying so hard to tell Winters that he was wrong or that he was

1    dumb or that Galanakis wasn't impaired.

2          My point is I think a reasonable juror could look at

3    that body-worn camera footage and conclude that some of the

4    things that Winters claimed were supportive of probable cause

5    actually weren't present at all.  So what do I do in a situation

6    like that where the video at minimum doesn't confirm what

7    Officer Winters said and maybe more strongly seems to contradict

8    it?

9          MR. FULTON:  Well, I think you've got to look at the

10   totality.  I mean, if this was a case of one -- of one thing

11   generating that arrest, just the fact that he had bloodshot

12   eyes, I think then you've got -- you've got the ability to say

13   that's subject to some interpretation.

14         You know, Officer Winters was adamant that his eyes

15   were bloodshot, but you're right.  If a fact finder could find

16   that that's not actually the case, they can consider that, but I

17   think then you take into account, you know, this fact that, you

18   know, he couldn't get his registration and insurance card right;

19   he couldn't get the stop and turn right; he couldn't get the

20   nose touch right.

21         Officer Winters knew that when he -- or couldn't tell

22   when the last time he'd smoked weed was and it took an

23   inordinate amount of time to smoke weed and then made this claim

24   that he got tested every week which -- again, I think -- again,

25   that's where you've got to look at what Officer Winters had

1   before him where Winters knew that he wasn't drug tested every

2   week, that, in fact, that was a false statement.

3          I think you've got to look at all of those things, and

4   at some point it becomes overwhelming that there are just so

5   many things that the qualified immunity would attach to this

6   stop.

7          THE COURT:  In Officer Winters' paperwork for this

8   stop, did he say in that original paperwork that he knew

9   Galanakis wasn't really tested every week and that he knew that

10  under NAIA rules testing would only happen in advance of a

11  championship game or something like that?  Did it say that in

12  his paperwork?

13         MR. FULTON:  I don't think it does, Your Honor.  That

14  was something that Officer Winters had in the back of his mind.

15  It wasn't actually in the paperwork so --

16         But, again, it's one of the things you have to

17  consider, and I just think there's an overwhelming number of

18  issues that -- that, you know, say that qualified immunity

19  should be applied in this case for his actions, and we'd ask you

20  to take a look at all of those factors, not just one, because we

21  think when you do that that the qualified immunity applies to a

22  police officer looking to take what he believed to be an

23  impaired driver off the road.

24         And then we've kind of talked about the Article -- the

25  Fourth Amendment claim.  Again, we think that there was

1  reasonable suspicion; there was a reasonable request to take

2  sobriety tests and probable cause to justify the arrest.  Again,

3  you can -- you can criticize the arrest and say he shouldn't

4  have arrested Galanakis, but the fact of the matter is that he

5  had sufficient facts in front of him to make that.

6         As far as the -- Galanakis's Article I, Section 8,

7  claim, I think this Court's closely applied federal law and

8  state law on that claim.  We do realize that the Iowa Supreme

9  Court abrogated Article I, Section 8, claims last spring, so

10  there's a real question of whether it even is applicable

11  anymore.  In an abundance of caution, we're waiting to see if

12  the Iowa Supreme Court finds that it's retroactive as opposed to

13  the Iowa Court of Appeals, but we'd ask the Court to apply the

14  same analysis.

15         As far as Galanakis's *Monell* claims, we think these

16  can't survive summary judgment.  There's no evidence to support

17  them, and for -- *Monell* claims require an attempt to hold a

18  municipality liable for an officer's violation of federal -- of

19  the federal constitution, but the plaintiff has to show the

20  constitutional violation was caused by an official policy, an

21  unofficial custom, or a deliberate indifference to train or

22  supervise.  We've seen nothing that shows that, in fact, the

23  City of Newton or any supervisors were guilty of any of those

24  things.

25         In the response as we understand it, Mr. Galanakis

1  argues that Lieutenant Wing was a policymaker for the City, and

2  his failure to stop Officer Winters from field sobriety testing

3  and arresting Mr. Galanakis proves *Monell* liability.  We don't

4  agree with that at all.

5         The fact is Officer Wing, who is a lieutenant, is a

6  supervisor of a line police officer, but he's certainly --

7  there's no evidence and he's certainly not responsible for

8  setting final policy for the City on OWI arrests, testing,

9  things like that, and so there -- acting in that supervisory

10 capacity, they may stop someone from doing something, but they

11 don't make final policy for the police department or for the

12 City.

13        And same -- by the same token, it doesn't appear

14 there -- there's no evidence -- that Lieutenant Wing was

15 deliberately indifferent to anything.  He was on scene.  He may

16 not -- again, maybe you think he should have done more, but the

17 fact of the matter is he wasn't responsible for that policy.

18        Again, for the claims that there was any type of

19 wrongful supervision, negligent hiring, we don't see any

20 evidence of that.  Again, you can criticize what the officer

21 did, but even plaintiff's expert doesn't say anything that he

22 did was outside the norm or outside of established police

23 procedures just because he wouldn't have -- he might not have

24 done the same thing.

25        THE COURT:  Did -- did plaintiff's expert provide any

1  standard of care that would apply to the City of Newton itself

2  in terms of what they needed to do to ensure non-negligent

3  hiring and supervision?

4          MR. FULTON:  I don't -- I could be corrected, but I

5  don't believe so, Your Honor.

6          THE COURT:  Okay.

7          MR. FULTON:  We were just looking at what Officer --

8  at what the officer himself did.

9          THE COURT:  In other words, to your recollection, the

10  expert opined on the reasonableness of what Officer Winters did

11  and maybe Officer Wing as well but didn't also have a layer of

12  his analysis that looked at what Chief -- the chief of police

13  did or the City of Newton did?

14          MR. FULTON:  I don't believe so, Your Honor.  I --

15  counsel will correct me if I'm wrong, but I don't believe so.

16          And so based on all those factors, Your Honor, we

17  think summary judge -- summary judgment is appropriate.  We

18  think qualified immunity is not only appropriate but important

19  in a case like this to give police officers the freedom to do

20  what they need to do to keep streets safe, and so we believe

21  that summary judgment is important in that regard.

22          I also would just mention that Chief Burdess was also

23  sued.  Again, there's no evidence that Chief Burdess did --

24  participated in any constitutional violations.  There's no

25  evidence that he failed to train the officer.  There's no

1  evidence that the chief received notice of a pattern of

2  unconstitutional acts committed by a subordinate or that he was

3  deliberately indifferent to or authorized -- or whether he

4  authorized those acts.

5       I think this is just a case of -- again, even if you

6  look at it in a light totally favorable to the plaintiff, this

7  is just a case where you have a police officer and a subject of

8  arrest who had an encounter.  That encounter didn't go beyond

9  the bounds of good police work.  That encounter had nothing to

10  do with the training or supervision.  There's no evidence that

11  he didn't have the appropriate training or supervision, and so

12  the claims against the chief as well as the claims against the

13  City should be granted summary judgment as well.

14       The City particularly under 1983 liability doesn't

15  have any responsibility for this because the plaintiffs

16  haven't -- and I don't -- they haven't really shown an official

17  municipal policy or an unofficial municipal policy or a

18  deliberately indifferent failure to train or supervise.

19       As I review the record, I don't see anything that

20  shows that the City had any indifference particularly for OWI

21  arrests, and I don't see anything that shows anything by anyone

22  in the City other than the arresting officer that was done or

23  that should have been done, and I don't think any standard has

24  been set for the City that the City did anything including

25  negligent hiring.  There's just no evidence of it.  This is just

1  an arrest that didn't go well.

2          That's what we have, Your Honor.

3          THE COURT:  Got it.  And I know we're out of order a

4  little bit, but let me hear from you on Mr. Galanakis's motion

5  for summary judgment on your counterclaims as well.

6          MR. FULTON:  Basically, Your Honor, we don't think

7  summary judgment's important -- or appropriate on those claims.

8          Essentially, as I read Mr. Galanakis's claims

9  particularly on the defamation claims, he basically says what he

10 has done is true and well within the bounds of the law.  I would

11 point out, however, that Mr. Galanakis's video is still up.  It

12 still professes that Officer Winters was convicted of domestic

13 violence.  He wasn't.  That's a truth.

14         We think that there is ample evidence -- and I'd refer

15 to the citations to the record and the record showing the

16 video -- that there's absolutely no way summary judgment could

17 be granted on those claims, Your Honor.

18         THE COURT:  Let me ask something about how the record

19 got developed because I saw something here that I -- I don't

20 think I've ever seen before.

21         Some of the allegedly defamatory claims involve

22 accusations that Officer Winters beat a former intimate partner,

23 an ex-girlfriend, something along those lines, and in his

24 summary judgment papers, Mr. Galanakis submitted an affidavit

25 from the ex-girlfriend purporting to substantiate the truth of

1  those allegations.

2         My understanding -- and I want you to tell me if I've

3  got it wrong -- is that in his deposition, Officer Winters

4  asserted his Fifth Amendment right against self-incrimination

5  when asked questions about whether there had ever been a

6  physical assault.  He's got the right to do that obviously, but

7  it does carry civil consequences in terms of inferences that can

8  be drawn against him.

9         So in his deposition he pleads the Fifth, but then as

10  part of the summary judgment briefing, he comes in, and he

11  provides an affidavit after all that basically disagrees with

12  his ex-girlfriend's report about what happens.  In an ordinary

13  situation, if you've got two different competing affidavits,

14  that would become a jury question as to whether the truth

15  is what one side says or the other, but here where there was no

16  opportunity to depose Officer Winters about these issues because

17  of his exercise of his Fifth Amendment rights, does that change

18  the analysis in terms of what I should consider undisputed for

19  summary judgment purposes?

20         MR. FULTON:  I think you've got to look at it, Your

21  Honor, but also look at the context of how the question was

22  asked because the question was very broad.  It didn't pertain

23  just to one incident.  It said have you ever -- I'm

24  paraphrasing.  I don't have it right in front of me.  But have

25  you ever had a situation where you've engaged in violent

1   activities?  And he was instructed by his counsel not to answer

2   in an abundance of caution because that's one of those questions

3   that -- again, we're not making -- saying that Officer Winters

4   has ever done anything like that, but you've -- we didn't want

5   him to take any action or make any statements that would, in

6   fact, relate for time immemorial or even recent history without

7   knowing whether or not that had occurred.

8         So I think you can look at it, Your Honor, but I still

9   think that the facts of this case are -- and, frankly, the

10  defendants have some problem with the girlfriend now appearing.

11  In plaintiff's initial disclosures, she wasn't identified as a

12  witness or a person that was going to come forward.  She was

13  only identified about two weeks before discovery closed, so we

14  have problems with that as it is.

15        But I think you've got to look at the totality of the

16  circumstances, and what Officer Winters was saying was her

17  affidavit was just incorrect, and he wasn't convicted of

18  anything, and so I think that you can look at how it was asked,

19  what's being alleged, and I think there's room to say, well,

20  there still is this issue of Mr. Galanakis continuing to allege

21  that he is guilty and was found guilty which I think goes

22  further than just there was an allegation.  I don't believe

23  Mr. Galanakis has ever said there was just an allegation, and

24  that's where -- that's the rub we have with that, Your Honor.

25        THE COURT:  Right, if there were a conviction.

1          Let me go back to the deposition again and the

2   assertion of the Fifth Amendment rights.  Was it as simple as

3   just one question and Officer Winters asserted his Fifth

4   Amendment rights and then plaintiff's counsel just moved on to

5   other topics, or was it a series of questions where the Fifth

6   Amendment was asserted?

7          MR. FULTON:  There was a discussion.  I don't know --

8   and I wasn't at the deposition, and I haven't actually looked at

9   that, Judge, but there was a discussion with counsel about

10  whether or not that was appropriate, but we continued to assert

11  that Fifth Amendment.

12         THE COURT:  Okay.  Got it.  Got it.

13         If you've got anything else, I'll hear it.  Otherwise,

14  I'll turn to the plaintiff.

15         MR. FULTON:  If I can respond to what they say, that

16  would be great, Your Honor.

17         THE COURT:  All right.  I'll give you that chance.

18         Mr. Witosky, I assume you're doing the argument today?

19         MR. WITOSKY:  Yes, Your Honor.

20         THE COURT:  Please go ahead.

21         MR. WITOSKY:  Your Honor, would you prefer that I

22  start with their motion for summary judgment or with the

23  counterclaim issues?

24         THE COURT:  Let's pick up right where we left off and

25  talk counterclaims.

1          MR. WITOSKY:  Okay.  Your Honor, first off -- excuse

2    me -- the law is clear as set out in our brief that when a party

3    raises a claim and then asserts the Fifth Amendment in relation

4    to the elements of that claim and then after that assertion

5    submits a self-serving affidavit as to the facts of the claim

6    that this Court is empowered to completely disregard and strike

7    that affidavit.  That is what happened here.

8          Based on my quick count of what I have in the appendix

9    here related to Officer Winters' deposition on when he was asked

10   about domestic abuse, I believe the questioning went on for

11   approximately seven pages, give or take, and Ms. Van Der Hart --

12   I believe that at the opening of the questioning, the

13   ex-girlfriend at issue was named by name, and so was the fact

14   that she had a protective order against him, so the context of

15   the questioning was clear, and I would just state that I'd be

16   worried if there was any confusion because that would suggest --

17   if you don't know which incident of domestic abuse is being

18   asked about, that kind of suggests that there was more than one

19   incident if you're getting that confused.

20         But regardless, there was no confusion because she was

21   addressed by -- her allegations were addressed by name at the

22   start of -- at the start of the questioning on that issue, and

23   at each instance and at the end of the deposition, it was -- her

24   petition was walked through, and each allegation of abuse was

25   expressly asked about, and in each and every instance, the Fifth

1   Amendment was asserted, so now to come in with an affidavit

2   after the fact denying everything blanketly is improper, and the

3   Court should strike it and grant summary judgment on that

4   because that makes the issues related to defamation and false

5   light invasion of privacy substantially true because the gist or

6   sting of it isn't the conviction; the gist or sting of it is

7   whether or not he committed domestic abuse.  It is the

8   hurtfulness of the utterance, as one Court stated, that is

9   essential to the substantial truth, and saying that just because

10   you haven't been convicted of domestic abuse makes it untrue --

11   it's not the conviction that's the sting; it's the crime itself.

12          THE COURT:  So let's flesh that out in terms of the

13   elements of the defamation claim.

14          So you've got to have publication.  I don't think

15   anyone disputes that there's publication here.  You've got to

16   have falsity, and then sometimes you need damages.  Why is

17   this -- why does this go to the falsity element as opposed to

18   the damages element in a situation where it is undisputed that

19   he was not ever convicted or even charged for that matter of

20   domestic abuse?  So why shouldn't I grant summary judgment for

21   Officer Winters at least on the element of falsity but then let

22   you argue to the jury that because there is evidence of

23   physically assaultive behavior that there's no damage?  Why

24   shouldn't I handle it that way?

25          MR. WITOSKY:  Well, Your Honor, what I would say is --

1    because it goes back to what is meant by the term substantial

2    truth, and it is not -- and as I said, it is not the conviction

3    of the crime, because otherwise -- because otherwise you're

4    creating a situation where every domestic abuser who has been

5    able to successfully avoid prosecution could then sue -- could

6    then sue their victim for saying he abused me by coming in and

7    saying, Well, I was never convicted, which given the Court's

8    historic problems with these sort of cases, it is not something

9    that I think -- is not a road I think we want to walk further

10   down.

11         That being said, I believe that this issue is

12   something that applies -- can be applied to both elements, both

13   falsity and damages.  But I think this falls back to the

14   question of what is meant by substantial truth and the gist or

15   sting of the statements.

16         And, Your Honor, just by way of analogy, the ongoing

17   Trump case in New York and the O.J. -- and the O.J. Simpson

18   situation historically is -- those were -- Trump was never

19   criminally convicted of sexual assault but has been found -- but

20   a jury found that he lied when he said that his victim lied

21   about it, so I just think that that's a can of worms that this

22   Court does not want to open when the hurtfulness of utterance is

23   that Officer Winters is a domestic abuser, not that he was

24   convicted.

25         And those arguments apply equally to the false light

1   invasion of privacy which I took an issue with the false light

2   invasion of privacy.  The public has an interest in whether or

3   not a domestic abuser is employed by the Newton Police

4   Department, and as a matter -- and as a matter of public

5   concern, it's not -- it is not an -- it is not an invasion of an

6   individual's private life in that sense, and I believe that for

7   purposes of per se or per quod defamation that matters of public

8   concern -- discussion of matters of public concern is excluded

9   from a defamation per se, so to that end they would have to -- I

10  believe they would have to prove damages as an essential element

11  to defamation, and that I believe is set out in our response to

12  their motion for summary judgment on the counterclaims.  So I

13  think that addresses the issues with Officer Winters' claims.

14         Now, this is also -- that is the domestic abuse.  As

15  to the claim for defamation as to Officer Winters' job fitness,

16  during his deposition, Tayvin -- Mr. Galanakis was asked if he

17  was intending to insult Winters with those statements, and the

18  answer is yes.  Those were insults, and rhetorical hyperbole

19  like that is not something -- it is not defamatory.  The case

20  law is clear on that.  So the contentions that Tayvin's -- that

21  Mr. Galanakis's insults were defamatory doesn't hold as a matter

22  of law.

23         And going to Lieutenant Wing's claim for defamation as

24  to him being the boss that should have stopped him -- that

25  should have stopped Officer Winters from carrying a gun, well,

1  first off, the record establishes that Lieutenant Wing was aware

2  of the domestic abuse allegations, but beyond that when somebody

3  is -- when somebody is talking about a police officer's boss and

4  the discipline to be imposed, particularly like with a

5  department like Newton where only the chief has disciplinary

6  authority, it's pretty clear the boss is Chief Burdess, so

7  there's no implication to Lieutenant Wing, and I don't think you

8  can get that when you -- you can find that when you can look at

9  the context of a Facebook post that it arose in.

10       THE COURT:  Well, in some of his social media posts --

11  I don't know if it was Facebook or YouTube or where else, but

12  Mr. Galanakis identified Lieutenant Wing as at least a

13  supervisor of Officer Winters; isn't that right?

14       MR. WITOSKY:  I believe that is correct, Your Honor.

15       THE COURT:  And at some point too I think he refers to

16  him as Lieutenant Wing which a reasonable observer could

17  understand as being a higher rank or a higher position as an

18  officer -- a line officer like Winters, so even though it might

19  be true that only the chief of police could have taken Officer

20  Winters' gun away, couldn't a reader of Mr. Galanakis's social

21  media posts not be aware of that and think that Galanakis was

22  referring to Wing?  And, if so, isn't that enough to make out a

23  viable defamation claim?

24       In other words, even if somebody with full information

25  would realize, oh, actually Lieutenant Wing didn't have the

1   ability to take his gun away, that's not quite the relevant

2   question, is it?  Isn't the question what would a reader think

3   he was trying to communicate?

4   　　　　MR. WITOSKY:  Your Honor, I don't believe so, because

5   I believe in the context where there was reference to Lieutenant

6   Wing as a supervisor and along those lines, that was in the

7   context of a false arrest, and truth be told, there were -- you

8   know, as they make issue of in their briefing, there are

9   thousands of comments, so I don't believe that in that context

10  one could take the statement that Lieutenant Wing should have

11  done something in relation to the stop itself and then, you

12  know, reading every -- and then reading every single other

13  comment and then associating that with the statement that

14  Officer Winters' boss should have -- shouldn't be allowing him

15  to be out with a gun because of the domestic abuse issues.

16  　　　　THE COURT:  Got it.

17  　　　　All right.  I don't have any other questions on the

18  counterclaims, so unless you've got any more points you want to

19  make, let's move on to the defense motions for summary judgment.

20  　　　　MR. WITOSKY:  Yes.  Well, Your Honor, I believe at the

21  start of his statement that he talked about not having to look

22  back -- we don't look backwards from the conclusions to

23  determine the reasonableness of the stop, and I don't disagree

24  with that.  In fact, I think we should start at the very

25  beginning of the stop where the -- as Officer Winters states in

1    his deposition, the only evidence of cognitive impairment was

2    noted.

3            In fact, it is on page 22 of our appendix and

4    resistance to their motion for summary judgment, deposition page

5    17, lines 21 to 25.  It says:  So -- in reference to him having

6    fumbled -- fumbling for his registration and the like, Officer

7    Winters was asked, So after that for the 14 minutes that the

8    traffic stopped lasted, are you telling me that it's your belief

9    that he had cognitive function impairment, to which Officer

10   Winters replied, After that incident, no.

11           The only evidence that he -- that -- the only thing

12   that Officer Winters was relying on to indicate any cognitive

13   impairment for Tayvin Galanakis was the difficulty in providing

14   his paperwork to which I'll point out in the first minute of the

15   stop when he was looking for his registration, Officer Winters

16   peppered him with six questions which he answered in

17   approximately one minute while at the same time looking through

18   his paperwork to find the registration in a dark car at 12:30 at

19   night with the only light being Officer Winters' flashlight from

20   outside the vehicle.  Having difficulty reading small text in

21   the dark from somebody else's flashlight is not reasonable

22   suspicion of intoxication.  Being a 19-year-old kid, asking an

23   officer, Hey, are these the documents that you're -- is one of

24   these the document that you asked me for isn't an indication of

25   impairment; it is an indication of, hey, I'm trying to give you

1   what you're asking for.

2         When it comes to his insurance, he spent time looking

3   for a physical copy of the insurance card, and he found one.  It

4   just happened to be expired.  Once that was -- once that was

5   noticed, in 16 seconds he had pulled up the insurance -- you

6   know, the current insurance card on his phone.  None of that is

7   an indication of intoxication.  It is an effort to comply by a

8   nervous kid in the dark, and I don't think that anyone watching

9   that video could objectively -- based solely off of that

10  objectively think, oh, this kid might be intoxicated.

11        And if you don't have that which is the only thing

12  that he would have to rely on -- because I agree -- because I

13  agree with you that at a bare min -- that -- that an ob -- that

14  a jury could watch the video and see that his eyes were not

15  bloodshot, and in addition to that Tayvin expressly -- in his

16  deposition expressly denies that his eyes were bloodshot

17  creating at a bare minimum a fact question there.  So I would

18  say at that point it is at a bare minimum a question of

19  credibility that a jury would have to determine at trial.  In

20  fact, I believe that several of these issues would at minimum --

21  including the field testing would at a minimum be a question of

22  credibility for the -- for a jury to assess.

23        THE COURT:  So let's talk about the clearly

24  established part of the qualified immunity doctrine.  Is there

25  an Iowa Supreme Court case or an Eighth Circuit Court of Appeals

1  or a U.S. Supreme Court case that you can point me to that had

2  facts and circumstances like the ones we have here and the Court

3  said there is no probable cause for arrest for driving while

4  intoxicated in these circumstances?

5          MR. WITOSKY:  Your Honor, if you're asking if I have a

6  case that is a mirror to this one that has been previously

7  determined, no, I do not have a case where a 19-year-old college

8  student got pulled over at 12:30 at night, had difficulty

9  finding some paperwork, and then got -- and then got into a tit

10  for tat with the officer performing the field testing.  No, I

11  don't have that.

12          But what we do have which I believe I point to in our

13  briefing is cases making clear that unless an officer has an

14  objective basis to reasonably suspect it is necessary to

15  investigate for -- for intoxication, you can't -- you're not

16  entitled to field test -- you're not entitled to prolong the

17  stop to do so or to conduct field testing and that for probable

18  cause -- and that you can't arrest unless you have probable

19  cause which Officer Winters did not because as you point out and

20  as we argue, the difficulties with the testing were directly

21  related to the communication issues between Mr. Galanakis and

22  Officer Winters, and that is the opinion of our expert.

23          Oh, and to answer a previous question, Your Honor, we

24  agree that at no point did our expert offer an opinion as to a

25  standard of care for training and supervision by the Newton

1   Police Department.  They just solely commented on whether or not

2   it could be objectively determined based on whether an officer

3   could objectively think there was indication of intoxication

4   based on what occurred in those circumstances.

5         So without -- so the case law is clear, without those

6   unless an officer -- unless you can look at it objectively and

7   find either reasonable suspicion or probable cause based on what

8   was there, you don't have it, and I believe we cite to the *Tague*

9   case, an Iowa Supreme Court case, a case -- excuse me -- and

10  Iowa Court of Appeals cases interpreting it pointing out that it

11  takes -- that you need more than a single act that would

12  appear -- that could be -- that -- let me put it this way.  You

13  need more than a single act that is something that could have

14  been done by a sober driver to have reasonable suspicion or

15  probable cause.  If it is something that -- if it -- if what

16  you're hanging your hat on is something that a sober driver

17  could have equally done, you need more to have sufficient

18  suspicion or cause to either conduct field testing or an arrest.

19  So I believe that the law is clear.

20        And, Your Honor, I believe that the case law on

21  clearly -- for clearly established -- it is our position that

22  the standard for assessing clearly established law is whether an

23  officer would have been reasonably aware that his actions were

24  unconstitutional, not that another court has -- has definitively

25  stated in these exact duplicate circumstances it's a

1   constitutional violation.

2          Yes, it means -- yes, the case law needs to be clear

3   what an officer is required to do or information an officer --

4   the type of information an officer needs to have to constitute a

5   constitutional violation, but you don't -- but you don't need a

6   case that is -- that is an exact duplicate, and the Court has

7   made that clear in setting their standard.

8          As to the claims under Iowa law, Your Honor, we've set

9   out our position as to the claims under the Iowa Constitution.

10  At the time of their -- at the time of their initial brief, the

11  defendants did not raise *Burnett*, so we felt it was necessary to

12  argue it on the merits as well.  We recognize the Iowa Court of

13  Appeals decision in *Dishman* stating that *Burnett* is retroactive.

14  Interesting enough, I have an appeal to file on a case that is

15  directly on point with that issue, but that's neither here nor

16  there, so at this point we would just say that this -- as to the

17  constitutional issues and the Iowa constitution, we will just

18  stand on our briefing on that.

19         As to the common law claims, the false arrest more or

20  less tracks with the constitutional violations, so to address

21  the --

22         Well, first off, to take a step back, to address

23  *Monell* in our briefing we point to a case that makes clear that

24  somebody with supervisory authority -- a high-ranking person

25  with supervisory authority who explicitly permits an

1 unconstitutional act to occur in front of them or directs an

2 unconstitutional act is enough to establish *Monell* liability,

3 and that's what we believe happened here with Lieutenant Wing

4 whose own statements made clear that he had real issues with

5 whether or not Officer Winters had sufficient -- had sufficient

6 grounds for his actions and then yet permitted the

7 unconstitutional acts to happen anyways, so we think that's

8 enough for *Monell* and for the immediate supervision as well.

9          So unless you have further questions on any of those

10 issues, I don't believe I have any more arguments.

11          THE COURT:  No.  No further questions, and I

12 appreciate the argument.

13          Mr. Fulton, I will give you a chance to respond.

14          MR. FULTON:  Thank you, Your Honor.

15          As far as the -- this whole idea with Officer Winters,

16 the gist -- the problem with the defamatory statements towards

17 Officer Winters is it says there was a conviction.  There was

18 never a conviction.  There was never a charge.  The only thing

19 there was was a consented-to protective order.

20          You can't say there was some substantial truth when

21 there is no substantial truth.  It is false.  It is defamatory,

22 and despite questions about it in this lawsuit for the last

23 eight months, it's still up, so we think that you can't couch it

24 as the trier of fact can determine whether or not he would --

25 Winters would have been convicted for domestic abuse.  That's

1  not what's being said.  He said he was convicted of domestic

2  abuse.  That is so far from the truth that it can't stand, and

3  so we would ask the Court to look at that.

4          The -- as far as with Lieutenant Wing being his boss,

5  I think that the Court's on the right track with that.

6  Lieutenant Wing couldn't take this guy's gun away.  Lieutenant

7  Wing was a line supervisor.  The public doesn't know the inner

8  workings of a police department.  So we're assuming that, oh,

9  the public would know he doesn't have authority to take his gun

10 away.  That's just surmising something that isn't true.

11         Lieutenant Wing didn't have that authority.  He was

12 simply a line supervisor, so the reader of those posts has no

13 context as to whether or not this is true, and they're going to

14 accept it as true, so we think that that -- that that is enough

15 for summary judgment.

16         With regard to *Monell* and Officer -- and Lieutenant

17 Wing, again, you're talking about the cases that are cited show

18 a high-ranking officer with policymaking authority.  Lieutenant

19 Wing is just a line supervisor who may have had questions about

20 whether or not his subordinate was acting appropriately, but

21 there's no -- there's no admission.  There's no context that

22 those acts were unconstitutional, that he felt they were

23 unconstitutional.  He did question whether they were appropriate

24 given the timeframe, but, again, I think that -- to try and put

25 liability on Lieutenant Wing under that high, high standard, the

1 | facts aren't there.

2 | And so that's pretty much all I will say, Your Honor.

3 | I think we've probably beat that dead horse.

4 | THE COURT:  All right.  Well, I appreciate the

5 | briefing and argument from both sides.

6 | MR. WITOSKY:  Your Honor, if I could have a brief

7 | rebuttal solely on the counterclaim issues.

8 | THE COURT:  You may.

9 | MR. WITOSKY:  Your Honor, I just wanted to point out

10 | that, first off, the -- Officer Winters consented to the

11 | protective orders as being in place.  He consented them to be

12 | put in twice which I think is an important factor here is that

13 | he -- once again, up until the point of his recent affidavit, he

14 | has -- he has avoided every opportunity to make a statement --

15 | to make a statement under oath as to his conduct.

16 | Secondly, I think calling Lieutenant Wing a line

17 | supervisor is both a disservice and false as it relates to the

18 | construction of the department.  Lieutenant Wing is after the

19 | chief one of three or four -- one of three or four of the

20 | highest-ranking officers in the department.  It goes chief to

21 | lieutenant, and as we put in there, he has -- he is involved in

22 | policymaking, and he was present and he had issues, and he had

23 | questions as to Officer Winters' competence to even be able to

24 | assess -- to assess whether or not somebody was intoxicated,

25 | especially when it comes to the issues of intoxication due to

1  something other than alcohol, and yet he stood there silent --

2  and yet he stood there and participated -- directly participated

3  in the stop and at least tacitly signed off on what we say are

4  unconstitutional actions.

5          So to that point, Your Honor, I think that's -- that's

6  all I have left to say.

7          THE COURT:  All right.  Thank you, Mr. Witosky.

8          The record on this obviously involves a lot of traffic

9  that I'll need to sort through, but our work is already

10 underway, and we'll get an order out as soon as we can on all of

11 the motions.

12         For now we're adjourned.

13         MR. WITOSKY:  I have a procedural question on

14 something.

15         I believe -- we have yet to submit, I believe, our

16 resistance to their motion for summary judgment on

17 counterclaims.  I believe we submitted physical copies.  With

18 the hearing having been done -- we have over 100 pages of

19 documents.  Under the local rule, we would typically have to

20 submit physical copies.  Do you still want us to do that?

21         THE COURT:  Yes, please, just because we use those

22 physical copies for our work back in chambers even when the

23 hearing has already been held.

24         MR. WITOSKY:  Okay.  I just wanted to clarify that,

25 Your Honor.  We'll get those in the mail today.

1          THE COURT:  Sounds good.  Thanks very much.

2          MR. FULTON:  Thank you, Your Honor.

3          (Proceedings concluded at 10:54 a.m.)

4
                    C E R T I F I C A T E
5          I, Tonya R. Gerke, a Certified Shorthand Reporter of
   the State of Iowa and Federal Official Realtime Court Reporter
6  in and for the United States District Court for the Southern
   District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
7  Section 753, that the foregoing is a true and correct transcript
   of the stenographically reported proceedings held in the
8  above-entitled matter and that the transcript page format is in
   conformance with the regulations of the Judicial Conference of
9  the United States.
          Dated at Des Moines, Iowa, March 4, 2024.
10

11
                         /s/ Tonya R. Gerke
12                       Tonya R. Gerke, CSR, RDR, CRR
                         Federal Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25