# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| TAYVIN GALANAKIS,<br>    Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA, NATHAN WINTERS, CHRISTOPHER WING,<br>individually and in their official capacities with the Newton Police Department,<br>    Defendants. | No. 4:23-cv-00044-SHL-SBJ<br><br><br>**DEFENDANTS' TRIAL BRIEF**<br><br><br>Removed from the District Court for Jasper County, Iowa, No. LACV123038 |

## DEFENDANT CITY OF NEWTON, NATHAN WINTERS, and
## CHRISTOPHER WING'S TRIAL BRIEF

1

**BACKGROUND FACTS**

Shortly after midnight on August 28, 2022, Officer Nathan Winters and Lieutenant Christopher Wing were on patrol in Newton, Iowa, when they observed Tayvin Galanakis operating his vehicle with his high-beam headlights illuminated in violation of Iowa law. Galanakis pulled over without incident, and Officer Winters approached the driver's window. Galanakis promptly acknowledged the violation, explaining that he kept his brights on because one of his headlights was out—admitting to a second, independent traffic infraction.

Officer Winters then asked Galanakis for his driver's license, registration, and proof of insurance. What followed was a three-minute episode that would prove significant. Galanakis searched his glove compartment, retrieved two registration documents, and asked Officer Winters "is it one of these—any one of these right here?" Unable to distinguish between his current and expired registrations, Galanakis examined both for several seconds before giving up: "I don't know which one's the old one. I'll just give you both of them." Officer Winters, by contrast, instantly identified the current registration. Galanakis similarly struggled with his proof of insurance, rummaging through his glove compartment before asking "would it be that white card?"—and producing an expired insurance card from 2021. He ultimately provided proof of insurance by pulling up an email on his phone. Galanakis had been stopped three previous times for driving without a functioning headlight, making this his fourth such encounter with law enforcement.

Officer Winters then asked Galanakis to exit the vehicle. As Galanakis stepped out, Officer Winters observed at least three air fresheners hanging from the rear-view mirror and noted that Galanakis had been chewing gum—both of which officers are trained to recognize as possible efforts to mask the odor of intoxicants. Officer Winters instructed Galanakis to leave the gum behind.

The two sat together in the front seats of the police cruiser. After briefly confirming Galanakis's information, Officer Winters asked how much Galanakis had to drink that night. Galanakis said he had had nothing to drink. When Officer Winters asked why his eyes appeared watery and bloodshot, Galanakis offered that he wore contacts—then, minutes later, admitted he had removed his contact lenses at his friend's house earlier that evening. Galanakis also initially told Officer Winters that the car he was driving was his own. Later, when Officer Winters checked the registration, it emerged that the car was registered to Galanakis's father, a fact Galanakis confirmed.

Officer Winters observed what he believed to be signs of intoxication and asked Galanakis to perform field sobriety tests on the sidewalk. He first administered the horizontal gaze nystagmus test, which Galanakis passed. Officer Winters then administered the walk-and-turn test. The instructions were clear and were accompanied by a physical demonstration: take nine heel-to-toe steps, count out loud, keep your arms at your sides, turn using a series of small steps, and take nine heel-to-toe steps back. Galanakis replied "perfect." He then proceeded to take thirteen steps on the first pass without counting out loud, paused to ask Officer Winters to tell him when to turn, and took approximately fifteen or sixteen steps on the return pass. When Officer Winters noted the discrepancy, Galanakis said he thought Officer Winters would signal the turn—notwithstanding that Officer Winters had explicitly instructed Galanakis to count his own steps.

Galanakis then failed the one-leg stand test in equally plain fashion. Officer Winters gave the instructions twice and demonstrated the proper stance twice, once at Galanakis's request. When Galanakis attempted to recite the instructions back, he immediately misremembered them, saying Officer Winters had told him to hold his foot up for "6 seconds" when the instruction was to raise it 6 inches off the ground. During the test itself, Galanakis did not count out loud as instructed.

3

When Officer Winters asked how he had been told to count, Galanakis incorrectly recalled "1 Mississippi, 2 Mississippi, 3 Mississippi," acknowledged "I honestly forgot how you told me," and asked when he should "switch" feet—though Officer Winters had never said anything about switching. Again, both experts found the test had been properly administered, and neither believed the light rain during the tests materially affected performance.

After the field sobriety tests, Officer Winters administered a preliminary breath test. The result was 0.00. No alcohol was detected—but a preliminary breath test cannot detect marijuana, central nervous system depressants, or the host of other substances that can cause intoxication within the meaning of Iowa law.

Following Miranda warnings, Officer Winters asked Galanakis when he had last smoked marijuana. Galanakis stared off for approximately nine seconds before answering "I do not remember that." At his subsequent deposition, Galanakis testified that he has never smoked marijuana in his life.

Officer Winters then asked whether Galanakis would submit to a drug influence evaluation conducted by another officer at the station. Galanakis initially agreed, then declined, saying he wanted to go home. Officer Winters placed him under arrest for operating while intoxicated in violation of Iowa Code section 321J.2. At the Newton Police Department, Officer Andrew Shinkle performed a drug influence evaluation and determined that Galanakis was not under the influence of an intoxicating substance.

Later, Galanakis brought this action alleging unreasonable arrest under the Fourth Amendment and false arrest under Iowa law. Officer Winters and Lieutenant Wing moved for summary judgment based on qualified immunity under federal law and Iowa Code section 670.4A(1). The Court denied the motions, concluding that under the facts viewed in Galanakis's

favor, the officers lacked probable cause and that their violation of clearly established law precluded immunity. The Defendants filed an interlocutory appeal, and the Eighth Circuit affirmed the denial of qualified immunity. *Galanakis v. City of Newton*, 134 F.4th 998 (8th Cir. 2025). Now, Galanakis's claims are ready to be tried.

## GALANAKIS'S LEGAL CLAIMS

Mr. Galanakis will be trying two legal claims to the jury, one for wrongful arrest without probable cause in violation of the Fourth Amendment and one for false arrest in violation of Iowa common law. Galanakis asserts both claims against Officer Winters and Lieutenant Wing. He asserts only the second claim for false arrest against the City of Newton based on a theory of vicarious liability.

## I.      Wrongful Arrest in Violation of the Fourth Amendment

Galanakis claims Officer Winters and Lieutenant Wing arrested him without probable cause in violation of the Fourth Amendment.

"A warrantless arrest is unreasonable and 'violates the Fourth Amendment unless it is supported by probable cause.'" *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) (citation omitted). "Probable cause exists to make a warrantless arrest 'when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009 (8th Cir. 2017) (citation omitted).

"Probable cause 'is not a high bar.'" *Id*. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014). "It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley*, 571 U.S. at 338 (cleaned up). Ultimately, "[t]here must be a 'fair probability' or a 'substantial chance' that the person seized has committed an offense."

*Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Probable cause does not require "an actual showing of [criminal] activity." *Gates*, 462 U.S. at 243 n.13. That means "innocent behavior frequently will provide the basis for a showing of probable cause." *Id*.

"To determine whether an officer had probable cause for an arrest, [courts] 'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022) (quoting *Wesby*, 583 U.S. at 56–57). "There is 'no place' in this analysis for '[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence.'" *Id*. (quoting *Bell*, 979 F.3d at 603). "[T]his is an objective standard requiring that '[courts] afford officers substantial latitude in interpreting and drawing inferences from factual circumstances.'" *Id*. (quoting *Just v. City of St. Louis*, 7 F.4th 761, 767 (8th Cir. 2021)).

In this case, Galanakis was arrested on suspicion of driving while intoxicated. Under Iowa Code § 321J.2(1),

> A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state in any of the following conditions:
>
> a. While under the influence of an alcoholic beverage or other drug or a combination of such substances.
>
> b. While having an alcohol concentration of .08 or more.
>
> c. While any amount of a controlled substance is present in the person, as measured in the person's blood or urine.

Iowa Code § 321J.2(1).

## II.      False Arrest in Violation of Iowa Common Law

Galanakis's second claim is for false arrest under Iowa common law. Unlike his Fourth Amendment claim—which he asserts against only Officer Winters and Lieutenant Wing—Galanakis asserts his false arrest claim against all the Defendants, including the City of Newton.

"A false arrest is one way of committing the tort of false imprisonment—restraining freedom of movement." *Child. v. Burton*, 331 N.W.2d 673, 678 (Iowa 1983). "The essential elements of the tort of false arrest are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Id.* At 678–79.

Under Iowa law, an officer can make a warrantless arrest "[w]here the peace officer has reasonable grounds for believing that an indictable public offense has been committed and has reasonable grounds for believing that the person to be arrested has committed it." Iowa Code § 804.7 (2026). "The 'reasonable ground' standard is consistent with the federal constitutional standard of probable cause needed to make a valid warrantless arrest." *State v. Mattingly*, 220 N.W.2d 865, 868 (Iowa 1974). "Such reasonable ground exists when the known facts and circumstances would lead a reasonably cautious man to believe a crime is being or has been committed." *Id.* And it "is dependent upon the facts of each case." *Id.* However, "[f]acts that occur or come to light subsequent to the arrest are irrelevant to a determination of whether probable cause existed at the time of arrest." *Child.*, 331 N.W.2d at 680.

With all this, it is also important to understand that "[i]n dealing with civil damage actions for false arrest, courts apply a probable cause standard less demanding than the constitutional probable cause standard in criminal cases." *Id.* "If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Id.*

7

In addition to Officer Winters and Lieutenant Wing, Galanakis asserts his false arrest claim against the City of Newton too based on vicarious liability. "The doctrine of vicarious liability imposes liability against an employer for an employee's tortious conduct committed within the scope of employment." *Martin v. Tovar*, 991 N.W.2d 760, 763 (Iowa 2023). "To come within the scope of employment, an employee's actions 'must be of the same general nature as that authorized or incidental to the conduct authorized.'" *Martin*, 991 N.W.2d at 763 (citation omitted). "[A]n employee's conduct is outside the scope of employment if it substantially diverges from conduct that the employer actually authorizes." *Id.* at 763–64.

Here, there is no dispute that Officer Winters and Lieutenant Wing were acting within the scope of their employment when they arrested Galanakis.

## EXPECTED EVIDENCE AND ISSUES

To prove his claims, the Defendants expect Galanakis to present testimony from himself, Officer Winters, Lieutenant Wing, Officer Shinkle, and his retained expert, Dr. Lance Platt.[1] Galanakis will also present the video recordings from Officer Winters's, Lieutenant Wing's, and Officer Shinkle's body-worn cameras. Otherwise, the Defendants expect Galanakis to offer evidence of post-arrest police reports, internal Newton Police Department investigation reports, and Dr. Platt's expert witness reports. As briefly discussed below, the Defendants intend to object to some of this evidence.

---

[1] Galanakis seeks to present Dr. Platt's deposition testimony because he is subject to a conflicting subpoena in California that prevents him from appearing at trial.

I.      **The Post-Arrest Portions of the Recordings from Officer Body-Worn Cameras is Irrelevant to the Probable Cause Analysis**

Probable cause "is determined at the moment the arrest is made, and 'any later developed facts are irrelevant to the probable cause analysis.'" *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Gilmore v. City of Minneapolis*, 837 F.3d 827, 833 (8th Cir. 2016)). As a result, the post-arrest portions of the recordings from officer body-worn cameras are not relevant to the probable cause analysis and lack probative value. The Court should therefore not admit the post-arrest portions unless Galanakis can demonstrate some other admissible purpose for this evidence that carries probative value.

II.     **The Post-Arrest Police Reports and Investigations are Irrelevant to the Probable Cause Analysis**

On top of the principle that later developed facts are irrelevant to the probable cause analysis, probable cause is also an objective standard, and "courts may not delve into the officers' subjective motivation for their actions." *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017). Together, these principles support excluding from evidence the police reports and other internal investigation reports that Galanakis intends to offer at trial. These documents reflect post-arrest subjective rationale for Galanakis's arrest, as well as investigation results unrelated to probable cause. The Court should therefore not admit them at trial—they are not relevant to the proper objective probable cause analysis, and they are unfairly prejudicial.

III.    **Dr. Lance Platt's Written Expert Witness Reports are Inadmissible Hearsay**

"[A]n expert's  report is hearsay and is not admissible in evidence, unless a party can establish an exception to the hearsay rule." *Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co.*, No. 13-CV-4106-CJW, 2017 WL 752282, at *9 (N.D. Iowa Feb. 27, 2017) (collecting cases). At trial, Galanakis intends to offer the written expert reports of Dr. Lance Platt, his retained expert.

The Court should exclude those reports as inadmissible hearsay unless Galanakis can establish a hearsay exception.

## IV.    The Defendants' Evidence is Admissible

Galanakis challenged some of the evidence that the Defendants intend to offer at trial in a motion in limine. For the reasons discussed in the Defendants' resistance, the evidence that the Defendants intend to offer at trial is admissible. Most of that evidence is relevant and demonstrates Galanakis's lack of damages, lack of credibility, and his decision to widely publicize his arrest. Outside of this challenged evidence, the Defendants, too, intend to offer portions of the officer body-worn camera recordings and expert testimony from their retained expert, Captain Matthew Bruner.

## DURATION OF TRIAL

In keeping with the Court's orders, the Defendants believe trial can be comfortably completed within the time allotted. Counsel for the parties have met and conferred regarding several pre-trial matters and have worked productively to make trial as efficient as they can. Further, before trial the parties intend to confer about how they can achieve efficiencies in light of the overlap in witness they intend to call to testify.

Dated: May 12, 2026

Respectfully submitted,

THE CITY OF NEWTON, IOWA, NATHAN WINTERS, and CHRISTOPHER WING, Defendants

By: ___ */s/ Nicholas F. Miller*___
Matthew S. Brick, AT0001081
Erin M. Clanton, AT0002592
Nicholas F. Miller, AT0015361
**BRICK GENTRY, P.C.**
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
T: (515) 274-1450
F: (515) 274-1488
matt.brick@brickgentrylaw.com
erin.clanton@brickgentrylaw.com
doug.fulton@brickgentrylaw.com
nick.miller@brickgentrylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2026, a true copy of this TRIAL BRIEF was electronically filed using the Court's CM/ECF system, which sent notice to counsel of record.

*/s/        Nicholas F. Miller*_____
        **Nicholas F. Miller, AT0015361**

11